UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
6/13(/

Case No. 00-624-CIV-ZLOCH-Seltzer

JAMES E. RADICAN )
)
    Plaintiff, )
)
vs. )
)
RELIANCE STANDARD LIFE )
INSURANCE COMPANY, a Foreign, )
corporation. )
)
    Defendants. )
_____ )



## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY

COMES NOW Plaintiff, JAMES E. RADICAN, by and through his undersigned

counsel and, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.5,

files this Motion for Summary Judgment on the Issue of Liability and states:

## CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS:

1.     At all times material defendant Tarmac America, Inc. ("Tarmac") established and

maintained an employee welfare benefit plan (the 'plan') governed by the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et. seq. A

benefit of Tarmac's employee welfare benefit plan was Group Long Term Disability

Insurance under a policy issued and administered by RELIANCE STANDARD LIFE

1

INSURANCE COMPANY ("RELIANCE") effective January 1, 1996, policy no. LSC

098842. A copy of the RELIANCE policy is attached hereto as exhibit "A". (See

Complaint, ¶ 3 and defendant's Answer thereto).

2.    From January 1 through December 31, 1996 RADICAN was an employee of Tarmac

and a participant in Tarmac's ERISA governed employee welfare benefit plan

including the RELIANCE group disability policy referenced above. (Exhibit "A").

3.    The "Eligibility Requirements"for benefits under the RELIANCE disability policy are

set forth on page 5.0 (exhibit "A") as follows:

> ELIGIBILITY REQUIREMENTS: A person is eligible for insurance
> under this policy if he/she:
> (1) is a member of an Eligible Class, as shown on the schedule
>     of Benefits page; and
> (2) has completed the Waiting Period, as shown on the Sched-
>     ule of Benefits page:

4.    In 1996 RADICAN met the above-stated "Eligibility Requirements" because he had

completed the Waiting Period and was a "Class B" employee as shown on the

Schedule of Benefits page (a salaried employee earning more than $30,000. per year

but less than $59,000.).

5.    Due to back and related health problems including but not limited to severe pain in

the lower back and legs which surgery was unable to relieve, RADICAN became

disabled and unable to work on or about January 1, 1997.

6.    RADICAN timely filed a claim for long term disability benefits with RELIANCE,

claim number 1997-346-010. (See Complaint, ¶ 8 and defendant's Answer thereto).

2

7.   On April 6. 1998, RELIANCE, in administering its policy, denied in writing
     RADICAN's claim for disability benefits on the basis that during 1996 RADICAN
     had "not satisfied the policy definition of a full-time employee" and was "not eligible
     for Long Term Disability Benefits coverage." More specifically, in its initial denial
     letter RELIANCE stated:

     The group policy defines Total Disability as follows:

          "Actively at work" and Active Work" (sic) mean actually
          performing on a full-time basis the material duties pertaining to
          his/her job in the place where and the manner in which the job
          is normally performed. This includes approved time off such as
          vacation, jury duty and funeral leave, but does not include time
          off as a result of an injury or sickness

          "Full-time" means working for you for a minimum of 40 hours
          during a person's regular work week.

     A copy of RELIANCE's April 6. 1998 initial denial letter is attached hereto as

     exhibit "B." (See Complaint. ¶ 9 and defendant's Answer thereto).

8.   RADICAN timely appealed the initial (and subsequent) denial of his claim for
     benefits. (See Complaint, ¶ 10 and defendant's Answer thereto).

9.   In connection with his appeals RADICAN provided RELIANCE with evidence that
     he was a full-time employee in 1996, including but not limited to:

     A.   a letter from B. Edward Pittman, Vice President Human Resources for Tarmac
          (plaintiff's employer), dated February 26. 1998 which provided in relevant
          part:

3

> You (RELIANCE) have stated that Mr. Radican was working "part-time" when the policy became effective, had not returned to "full time active work" prior to his last day worked and therefore did not satisfy the definition of a full-time employee under the terms of the policy.
>
> Jim Radican was <u>a full-time salaried exempt employee</u> of this company from his date of employment in 1965 until his last day of active work on December 31, 1996. At no time prior to the commencement of his short term disability on January 1, 1997 was he ever on part-time status; he was at all times paid full salary and enjoyed full benefits, including long term disability coverage, for which he paid. The fact that he worked partial days in 1996 following his return to work from surgery should in no way be construed as "part-time" status. Had Mr. Radican been classified a part-time employee, he would have been ineligible for participation in our long term disability benefit at all.

B.    A letter dated June 5, 1998 from attorney Marika McVey Ostendorf further explaining that RADICAN was a full-time employee for Tarmac American, Inc. during 1996.

C.    A letter dated January 26, 1999 from attorney Lawrence D. Bache further explaining that RADICAN was a full-time employee of Tarmac America, Inc. during 1996, with attachments which included:

    (1)    The sworn affidavit of Michael Unger correcting an inadvertent error he made in his letter sent to RELIANCE dated February 4, 1998, an error upon which RELIANCE claimed to have based (in part) its determination to deny benefits.

    (2)    RADICAN's sworn affidavit in which he stated he was actively at work on a full-time basis for not less than 40 weeks during 1996.

4

(3)    The sworn affidavit of RADICAN's co-worker, Thomas Mendez, in which he stated RADICAN had been actively at work on a full-time basis for not less than 40 weeks during 1996.

(4)    The sworn affidavit of RADICAN's co-worker, Craig Leonard, in which he stated RADICAN had been actively at work on a full-time basis for not less than 40 weeks during 1996.

A copy of the documents submitted to RELIANCE and referenced in this paragraph as A. B. and C (1-4) are attached hereto as composite exhibit "C".

10    RADICAN's final appeal from the denial of his claim for long-term disability benefits was   denied by RELIANCE in a letter dated November 1, 1999. A copy of the November 1, 1999 final denial letter is attached hereto as exhibit "D". (See Complaint, ¶ 11 and defendant's Answer thereto).

11.    Benefits under the RELIANCE policy are paid by RELIANCE from its own assets.

12    RADICAN performed for Tarmac America. Inc. the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis. i.e.. a minimum of 40 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above to totals not less than 40 weeks. See sworn affidavit of RADICAN dated April 17, 2000 attached hereto as exhibit "E", sworn affidavit of RADICAN's co-worker Craig Leonard dated April 26, 2000 attached hereto as exhibit "F", and

5

affidavit of RADICAN's co-worker Thomas Mendez dated April 25, 2000 attached hereto as exhibit "G".

13.    RADICAN was employed by Tarmac America, Inc. as a full-time worker throughout 1996 and the entire term of his employment. (See affidavit of B. Edward Pittman, Vice President of Human Resources for Tarmac America, Inc. attached hereto as exhibit "H"; also see exhibits "E", "F", "G", and composite exhibit "C").

14.    RADICAN was paid by Tarmac America, Inc. as full-time worker throughout 1996 and the entire term of his employment. (See exhibits "E","H" and composite exhibit "C").

15.    RADICAN was paid by Tarmac America, Inc. in the same way as other full-time employees of the company throughout 1996 and the entire term of his employment. (See exhibits "E" and "H").

16.    RADICAN was insured as a full-time employee of Tarmac America, Inc. throughout 1996 and during the entire period of his coverage under the plan. (See exhibits "G" and "H").

17.    RADICAN enjoyed all benefits and perquisites of other full-time employees of Tarmac America, Inc. throughout 1996 and the entire period of his employment. (See exhibits "E" and "H").

18.    RADICAN paid premiums for his coverage as a full-time employee of Tarmac America, Inc. throughout 1996 and the entire period of his coverage under the plan. (See exhibits "E" and "H").

6

19.    RELIANCE accepted payment of premiums due for a full time employee for RADICAN and has retained those premiums. (See exhibits "E" and "H").

## ARGUMENT AND MEMORANDUM OF LAW

### Summary Judgment Procedure

The purpose of summary judgment procedure, as set forth in Fed. R. Civ. P. 56, is to promote expeditious disposition of cases in which there is no genuine issue of material fact or in which only a question of law must be decided and in which the moving party is entitled to judgment as a matter of law. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324 (1986), the United State Supreme Court stated that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ...." Conclusory allegations or statements will not suffice to create a genuine issue of fact. *Avirgan v. Hull*, 932 F.2d 1572 (11th Cir. 1991) *Cert. denied*, 112 S.Ct. 913 (1992). Thus, when there are no genuine issues of material fact to be decided in a case, the summary judgment procedure may be used to avoid unnecessary trials. Summary Judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The standard for summary judgment in ERISA litigation is synonymous with the standard employed in other civil actions. *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 583 (1st Cir. 1993).

### Standard of Review

## A DE NOVO STANDARD OF REVIEW IS APPLICABLE IN THIS CASE

The threshold question in any ERISA case is to determine the appropriate standard to be used to review the propriety of the decision by the Plan Administrator to deny the plaintiff's claim for benefits. The standard of review is *de novo* unless the language contained in the Plan grants the administrator discretion to determine eligibility for benefits or construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103, L.Ed.2d 80 (1989).

The **Eleventh Circuit** "has interpreted *Bruch* to mandate *de novo* review unless the plan *expressly* provides the administrator discretionary authority to make eligibility determination or to construe the plan's terms." *Kirwan v. Marriott Corporation*, 10 Fd.3d. 784, 788 (11th Cir. 1994). Also see *Moon v. American Home Assurance Co.*, 888 F.2d 86 (11th Cir. 1989); *Guy v. Southeastern Iron Workers Welfare Fund*, 877 F.2d 37 (11th Cir. 1989); *Baker v. Big Star Division of the Grand Union Co.*, 893 F.2d 288 (11th Cir. 1989); and see *McNutt v. J.A. Jones Const. Co.*, 225 F.Supp. 2d. 1375, 1381 (S.D. Ga. 1998). There is no language in the concerned policy expressly granting the plan administrator discretionary authority to make eligibility determinations or to construe the terms of the plan. Therefore the *de novo* standard of review is appropriate in this case under the governing and well reasoned Eleventh circuit precedent.

The plan (exhibit "A") contains an INSURING CLAUSE on page 7.0 which provides in relevant part: "INSURING CLAUSE: We will pay a Monthly Benefit if an Insured: . . . (4) submits satisfactory proof of Total Disability to us." This language is not an implied

8

grant of discretion to the administrator. This language which is contained in most insurance policies simply informs the claimant as to what he/she must do to perfect their claim. The issue as to whether proof is satisfactory is not a matter of discretion

In *Kearny v. Standard Insurance Co.*, 175 F.3d 1084 (9th Cir. 1999 (en banc)) it was argued that policy language which provided that disability benefits were payable "upon satisfactory written proof that you have become disabled" was sufficient to trigger the arbitrary and capricious standard of review.[1]    The Ninth Circuit Court, in rejecting this argument (clarifying a prior opinion) found the language to be ambiguous and stated "[W]e have never held that so imprecise and ambiguous a provision as contained in *Kearney's* policy vests discretion in the administrator, and we decline to do so now." The Seventh Circuit in *Herzberger v. Standard Ins. Co.* 2000 WL 202653 (7th Cir. Feb. 23, 2000) (following *Kearney*), recently aligned itself with the Ninth Circuit and the majority of circuits stating:

> We hold that the mere fact that a plan requires a determination of eligibility or entitlement by the administrator, or requires proof or satisfactory proof of the applicant's claim, or requires both a determination and proof (satisfactory proof), does not give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary. *Herzberger*, 2000 WL 202653, *4.

---

[1] It must be noted that the administrator bears the burden of proving that the arbitrary and capricious (abuse of discretion) standard should apply and any ambiguities must be construed against the administrator and in favor of the party seeking judicial review. *Sharkey v. Ultramar Energy LTD.*, 70 F.3d 226 (2nd Cir. 1995); *Arthurs v. Metropolitan Life Ins. Co.*, 760 F Supp 1095 (S.D. N.Y. 1991)

9

The court in *MacMillan v. Provident Mutual Life Ins. Co. of Philadelphia*, 32

F.Supp.2d 600, 610-611 (W.D. N.Y. 1992) elaborated on this issue as follows:

> A review of the case law in this area however, reveals that those cases (like *Bollenbacher*, supra) are in a distinct minority. Most of the courts that have addressed the issue have held that absent a clear grant of discretion this sort of proof-of-claim language will not trigger application of a deferential standard of review. For example, in *Brown* 140 F.3d 1198, the Court of Appeals of the Eight Circuit held that a plan statement requiring "due . . . proof of loss" and similar phrases "read like a typical insurance policy' and 'do not trigger the deferential ERISA standard of review." Id. 140 F.3d at 1200 (quoting *Ravenscraft v. Hy-Vee Employee Benefit Plan & Trust*, 85 F.3d 398, 402 n. 2 (8th Cir. 1996)); see also *Bounds v. Bell Atl. Enters. Flexible Long-Term Disability Plan*, 32 F.3d 337, 339 (8ᵗʰ Cir. 1994) (deferential standard under *Buci* not triggered by policy provision that claim would be paid after administrator "receives adequate proof of loss").
>
> The Court of Appeals for the Second Circuit has not yet ruled on the issue, but there is at least a suggestion in *I.V. Services*, 136 F.3d at 122 n. 9, that it would not consider language that merely gives the administrator the authority to decide the question of eligibility enough to require application of the arbitrary-and-capricious standard. The Plan in *I.V. Services* provided that the insurance company would "make the decision as to whether" certain medical services were covered under the plan, and that the insurer would "make[ ] determination on appeal of claim denials." Though finding it unnecessary to decide the issue, the Second Circuit "observed[d] that the Plan provisions . . . 'Bear little resemblance to the typical plan provisions cited in recent post-*Firestone* appellate decisions as the basis for a more deferential review.' " Id. (quoting *Masella* 936 F.2d at 103). The court added that "[t]his grant of authority does not approach the 'typical plan provisions' on the basis of which appellate courts have exercised review under the more deferential arbitrary and capricious standard." Id. (collecting cases).

In conclusion, the policy in this case does not contain an express grant of discretion triggering the arbitrary and capricious (abuse of discretion) standard of review as required under Eleventh Circuit precedent. Further, the requirement that a claimant submit "due written proof of loss" is not language which by implication constitutes a grant of discretion to the administrator to determine eligibility for benefits or to construe the terms of the plan. Accordingly, a de novo standard of judicial review is appropriate in this case.

## I.   IN DENYING THE PLAINTIFF'S CLAIM FOR BENE-FITS, THE ADMINISTRATOR WRONGLY CHARAC-TERIZED PLAINTIFF AS A PART-TIME WORKER

The administrator denied RADICAN's claim for benefits on the basis that he never met the plan (exhibit "A") "Eligibility Requirements" for coverage. This determination was based upon RELIANCE's misinterpretation of the definition of "Full-time" in the policy.

RELIANCE does not dispute that RADICAN met the "Eligibility Requirements" contained on page 5.0 of the Plan which provides as follows:

> ELIGIBILITY REQUIREMENTS: A person is eligible for insurance under this policy if he/she:
> (1) is a member of an Eligible Class, as shown on the schedule of Benefits page; and
> (2) has completed the Waiting Period, as shown on the Sched-ule of Benefits page.

RELIANCE does not dispute that RADICAN was a CLASS B employee as defined on page 1.0 and 1.1 of the "Schedule of Benefits" page as follows:

> ELIGIBILITY CLASS: Each active, Full-time employee except any person employed on a temporary or seasonal basis, according to the following classifications:

11

CLASS A: employee earning $59,000.00 or more per year who:
   (1) is engaged in a non-hazardous occupation; and
   (2) functions primarily if an office environment.

CLASS B: salaried employee earning more than $30,000.00 per
year but less than $59,000.00 (emphasis added)

The determination by RELIANCE to deny plaintiff's claim for benefits was based

upon a misinterpretation and consequent misapplication of the policy definition of "Full-

time" contained on page 2.0 which provides:

"Full-time" means working for you (Tarmac) for a minimum of
40 hours during a person's regular work week.

This is the standard definition of full-time worker in the United States and throughout the

English-speaking Wester world.  Nothing in this definition suggests that the term "full-time"

is being given a restricted meaning, or that it is to be interpreted in any way other than that

in which it is normally and conventionally understood.  In a contract of this nature, any

departure from the natural and ordinary meaning of a conventionalized term must be fully

and carefully spelled out.  Indeed any ambiguity in this regard must necessarily be construed

in the plaintiff's favor.  The administrator misinterpreted the above-cited provision to mean

that a full-time worker is one who must at all times work a minimum of 40 hours per week.

However, it is the contract of employment (written or oral) and not performance of the

contract of employment which determines the classification or status of an employee.

Conventionally, the normal average working hours of a person employed full-time is 40

hours per week, but the status of such a person as a full-time worker does not change to that

12

of a part-time worker because that person fails to work a 40-hour week over any period of

time. Classification is a matter of intention and agreement, not of performance.

On January 1, 1996, the date the policy was issued, and throughout 1996, plaintiff's

status with Tarmac was that of a "Full-time employee." Plaintiff's employer informed the

administrator of this fact in a letter from B. Edward Pittman, Vice President Human

Resources for Tarmac (plaintiff's employer), dated February 26, 1998 (composite exhibit

"C") which provided:

> You (RELIANCE) have stated that Mr. Radican was working
> "part-time" when the policy became effective, had not returned
> to "full time active work" prior to his last day worked and
> therefore did not satisfy the definition of a full-time employee
> under the terms of the policy.
>
> Jim Radican was a full-time salaried exempt employee of this
> company from his date of employment in 1965 until his last day
> of active work on December 31, 1996. At no time prior to the
> commencement of his short term disability on January 1, 1997
> was he ever on part-time status; he was at all times paid full
> salary and enjoyed full benefits, including long term disability
> coverage, for which he paid. The fact that he worked partial
> days in 1996 following his return to work from surgery should
> in no way be construed as "part-time" status. Had Mr. Radican
> been classified a part-time employee, he would have been
> ineligible for participation in our long term disability benefit at
> all.

Plaintiff also provided RELIANCE with his sworn affidavit, and the affidavits of two

of his co-workers, Thomas Mendez and Craig Leonard, in which each affiant stated that

RADICAN was a full-time employee in 1996. (See composite exhibit "C"). Further,

attached hereto as exhibit "E" is the sworn affidavit of plaintiff in which he states in relevant

13

part: (a) he was employed as a "Full-time" employee throughout 1996; (b) he was paid as a "Full-time" employee throughout 1996; (c) he was paid in the same way as other "Full-time" employee of the company throughout 1996; (d) he was insured as a "Full-time" employee throughout 1996; (e) he enjoyed all benefits and perquisites of other "Full-time" employees throughout 1996; (f) he paid premiums for his coverage as a "Full-time" employee throughout 1996; and (g) RELIANCE accepted premiums for coverage for him in an amount due for "Full-time" employees throughout 1996 and RELIANCE has retained those premiums. Also attached hereto as exhibit "H" is the sworn affidavit of B. Edward Pittman, vice president of human resources for Tarmac in which he states:

- a. Tarmac America, Inc. had no part-time or seasonal employees in 1996.

- b JAMES E. RADICAN was employed by Tarmac America, Inc. as a full-time worker throughout 1996.

- c. JAMES E. RADICAN was paid by Tarmac America, Inc. as a full-time worker throughout 1996.

- d. JAMES E. RADICAN was paid by Tarmac America, Inc. in the same way as other full-time employees of the company throughout 1996.

- e. JAMES E. RADICAN was insured as a full-time employee of Tarmac America, Inc. throughout 1996.

- f. JAMES E. RADICAN enjoyed all benefits and perquisites of other full-time employees of Tarmac America, Inc. throughout 1996.

- g. JAMES E. RADICAN paid premiums for his coverage as a full-time employee of Tarmac America, Inc. throughout 1996.

14

> h.    Reliance Standard Life Insurance Company ("RELI-
> ANCE") accepted payment of premiums for JAMES E.
> RADICAN in an amount due for full-time employees
> throughout 1996.

In a second denial letter dated August 3, 1998 on page 2, RELIANCE stated in

relevant part ". . . we are not interested in the employment classification of your client . . ."

(RELIANCE's second denial letter is attached hereto as exhibit "I"). Nevertheless

RELIANCE's denial of the claim is based on its mis-classification of the plaintiff as other

than a full-time employee of Tarmac. Whereas the term "full-time" worker does contemplate

and imply an average work week of 40 hours, a worker's failure to put in 40 hours each week

does not ipso facto alter his classification as a full-time employee.    The administrator

therefore erred and was in contravention of the terms of the policy in refusing to pay benefits

on the contention that the plaintiff did not qualify as a "full-time" employee under the plan

because he did not work a standard 40 hour work week during 1996.

## II.    ASSUMING ARGUENDO THAT IN ORDER TO BE-
COME ELIGIBLE FOR BENEFITS AN EMPLOYEE
WAS REQUIRED TO WORK A MINIMUM OF 40
HOURS DURING ANY WEEK IN 1996, THE PLAINTIFF
MET THIS CRITERION

RELIANCE denied plaintiff's claim for benefits on the contention that plaintiff never

worked 40 hours during **any** week in 1996 and was therefore not a "full-time" worker under

the policy. In determining whether the denial of benefits was proper, the court must consider

that RELIANCE pays benefits from its own assets, and its position as a self-interested

fiduciary must be factored into the court's determination as to whether benefits have properly been denied.

In the administrative process plaintiff provided RELIANCE with his sworn affidavit in which he stated that throughout 1996 he worked his full complement of hours (as a full-time worker) for not less than 40 weeks during 1996 (composite exhibit "C"). Plaintiff also provided RELIANCE with the sworn affidavits of two of his co-workers, Thomas Mendez and Craig Leonard, in which they each stated that the plaintiff was actively at work on a "Full-time" basis for not less than 40 weeks during 1996 (composite exhibit "C").[2]

RADICAN was a salaried employee in 1996 who did not punch a time clock. The only way for him to establish the compliment of his working hours was via his own sworn statement and the sworn statements of his co-workers. Notwithstanding this fact, RELIANCE stated in its final denial letter that "attendance records would appear to be the only documents which could perfect the claim," that plaintiff's employer "... made it clear

---

[2]   The three affidavits plaintiff submitted to the administrator stated that plaintiff worked a minimum of 37.5 hours per week rather than a minimum of 40 hours per week because the only policy plaintiff had received (a copy attached to the complaint), defined "Full-time" as comprehending a standard work-week of a minimum of 37.5 hours. The policy provided by RELIANCE with its November 1, 1999 final denial letter is the same as the policy plaintiff received but changes the standard under the "Full-time" definition from a minimum of 37.5 hours to a minimum of 40 hours. In its final denial letter, in addressing this distinction RELIANCE stated:

> "While we disagree with your assessment (37.5 hours), however, it is irrelevant for purposes of review as the evidence in our claim file does not suggest that your client was working even the lower 37.5 hours per week at any point during calendar year 1996 prior to cessation of work on December 31, 1996.

Attached hereto as exhibits "E", "F", and "G" are the affidavits of RADICAN, Thomas Mendez, and Craig Leonard correcting the 37.5 hours to 40 hours.

16

they did not keep attendance records on your client," and therefore "...there is [not] any documentation which could perfect your client's appeal ..." (See November 1, 1999 final denial letter) (exhibit "D"). In other words, there was no way for plaintiff to establish his eligibility for benefits, because he was a salaried and not an hourly employee.

In addition to concluding that there was no way for plaintiff to establish his eligibility for benefits as stated above, in its final denial letter RELIANCE stated that none of the evidence upon which it based its denial of benefits was conclusive. (See exhibit "D"). An ERISA self-interested fiduciary may not properly deny benefits based upon non-conclusive evidence, particularly when, as in this case, three uncontroverted and uncontested sworn affidavits (referred to above) which established plaintiff's eligibility for benefits were submitted to RELIANCE (the administrator).

Further, RELIANCE was provided with documentation in the administrative process which demonstrated that the "non-conclusive evidence" upon which it based its denial was either misinterpreted or misunderstood. (See composite exhibit "C"). More specifically, in its initial denials of plaintiff's claim for benefits RELIANCE relied upon: (1) oral statements it alleged RADICAN made to one of its employees, and, (2) statements made by Michael Unger, General Manager of Pennsuco Cement and Aggregates, a Tarmac America, Inc. company, in his February 4, 1998 letter.

With respect to #1 above, oral statements alleged to have been made by RADICAN, Richard D. Walsh of RELIANCE stated in his August 3, 1998 second denial letter (exhibit "I" hereto):

17

> In fact, on at least two occasions your client (Mr. Radican) informed us via telephone that he worked part time throughout 1996.

Responding to this statement RADICAN provided RELIANCE with his January 26, 1999

(second) appeal his original sworn affidavit (see composite exhibit "C") explaining:

> The reference to "throughout" can be misleading and perhaps there has been some confusion. What I attempted to convey is the truth, i.e., that **I worked part time in 1996 but only for those weeks (less than 12) when I received physical therapy and/or pain treatment**. (emphasis added)

In addition, in his sworn affidavit submitted herewith (exhibit "E") RADICAN further

explains:

> I never stated to any RELIANCE employee that I only worked part time in 1996. I informed RELIANCE via my prior sworn affidavit that the reference to "throughout" can be misleading and perhaps there has been some confusion. What I attempted to convey is the truth, i.e., that I worked part time in 1996 but only for those weeks (less than 12) when I received physical therapy and/or pain treatment.

With respect to no. 2 above, RELIANCE relied upon the following statement made

by Michael Unger, General Manager of Pennsuco Cement and Aggregates, a Tarmac

America, Inc. company, in his letter to RELIANCE dated February 4, 1998:

> It is my understanding that, after recovering from back surgery, James Radican returned to work on or about November 1, 1995.
>
> At that time, Jim reported to Mr. Fred Boudie, Vice President of Production and Sales for Tarmac's Pennsuco Mill in Medley, Florida. **Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatment**.

> Tarmac's policy requires employees to work only on a full-time
> basis. <u>Jim was incapable of performing his duties on this basis
> and was required to file for short-term disability on January 1,
> 1996</u>. (Emphasis added)

With his appeal dated January 26, 1999 RADICAN provided RELIANCE with a

sworn affidavit of Michael Unger dated January 18, 1999 in which Mr. Unger corrected and

clarified the two <u>underlined statements</u> contained in his February 4, 1998 letter as follows:

> My letter dated February 4, 1998 contains the statement:
>
> > Mr. Goudie allowed Jim to work on a part-time basis, and
> > continued to work on a part-time basis for over one year while
> > receiving physical therapy and pain treatments.
>
> The above statement does not state, nor did I mean to infer that JAMES
> RADICAN worked only part-time in 1996. I was attempting to convey
> that JAMES E. RADICAN worked part-time during the weeks when he
> received physical therapy and/or pain treatment.
>
> My letter dated February 4, 1998 contains the statement:
>
> > Jim was incapable of performing his duties on this (a full-time) basis
> > and was required to file for short term disability on January 1, 1996.
>
> The reference to January 1, 1996 was an inadvertent error. The date should
> have been January 1, 1997.

A copy of Unger's affidavit submitted to RELIANCE is attached hereto in composite exhibit

"C".

With respect to other evidence upon which RELIANCE claims to have relied in

making its final determination to deny benefits, RELIANCE failed to disclose to RADICAN

until it issued its final denial letter and closed the case (exhibit "D"), that it relied upon three

other (non-conclusive) factors in making its determination to deny benefits. The failure to

19

disclose this evidence is contrary to 29 C.F.R. § 2560-503-1-(F) which requires that in a

written denial of benefits the administrator must provide in writing:

> (1) the specific reason or reasons for the denial:
>
> (3) A description of any additional material or information
> necessary for the claimant to perfect the claim and an explana-
> tion of why such material or information is necessary.

Because of the failure of RELIANCE to comply with 29 C.F.R. § 2560-503-1-(F),

RADICAN was not given the opportunity in the administrative process to explain to

RELIANCE, the self-interested fiduciary, why the three undisclosed factors did not provide

a basis for concluding that he failed to work the hours of a "Full-time" employee during

1996. Those three factors and the reasons why they do not support RELIANCE's

determination to deny benefits are discussed separately below.

    A.     RELIANCE relied on statements made by plaintiff in his application for

benefits, stating in its final denial letter (exhibit "D"):

> On the Employee's Statement dated November 3, 1997 Mr. Radican
> was asked:
>> Before you stopped working, did your condition require you to
>> change your job or the way you did your job?
> His answer:
>> Yes
>> Date you were first unable to work on a full-time basis
> His answer:
>> 1/1/97
> Next he was asked:
>> Last day you worked before the disability:
> His answer:
>> 12/31/96
> Finally, he was asked:
>> Did you work a full day.

His answer:
No - Part time - recovering from surgery

In the above-cited exchange plaintiff did not state that he only worked part-time throughout

1996. He stated that he was first unable to work on a "full-time basis" on January 1, 1997.

Further, his reference to working part-time recovering from surgery is in response to a

question directed toward whether he worked a full day on December 31, 1996. Accordingly,

any conclusion that he failed to work the hours of a "Full-time" employee during any week

in 1996 was obviously wrong and was necessarily based upon speculation.

B.    RELIANCE claims to have relied upon a January 28, 1998 letter RADICAN

has not seen from Hope B. Fisher, Benefits Administrator for Tarmac, in which she states:

> (o)ur files on Mr. Radican indicate that he had back surgery in October
> of 1995 and was out of work from that time until sometime after mid-
> year 1996 at the recommendation of his doctor. Manuel Porth.
> Sometime during the latter part of 1996, he reported to work, but we
> have no documentation in the file to substantiate the dates worked.

(See Final Denial letter, exhibit "D").

Ms. Fisher's does not state that plaintiff failed to work "Full-time" as defined in the

policy during any week in 1996, and any conclusion in this regard would also have been

reached through speculation. Further, attached hereto is the sworn affidavit of RADICAN

(exhibit "E") in which he states Ms. Fisher worked out of Norfolk, Virginia while he worked

in South Florida, that her statement was made from incomplete information in his

employment file, that he never spoke with Ms. Fisher in 1996, and that if he would have

known that RELIANCE was considering the January 28, 1998 letter from Hope B. Fisher he

21

would have directed them to also contact Joan Black and/or Myra Perez, human resource

employee benefits' personnel who worked with the Tarmac South Florida employees and

who would have had first hand knowledge of RADICAN's employment status in South

Florida and thereafter to relay information obtained in a more detailed inquiry with Ms.

Fisher. Had RELIANCE contacted either of these employees they would have discovered

the truth, i.e., that he worked 40 hours per week for all weeks in 1996 except for those few

weeks when he received physical therapy or pain treatment which total not more than 12

weeks.

C.    RELIANCE relied upon medical reports of Dr. Porth stating in its final denial

letter (exhibit "D"):

> First , a "To Whom it May Concern" letter from Dr. Manuel Porth
> dated January 1, 1996 suggests that your client was not capable of
> working at all during the first half of 1996. Dr. Porth wrote:
>
>> A program of rehabilitation is mandatory and the patient has
>> been advised to remain out of work for the next six months for
>> medical reasons. It is my opinion that with a strenuous program
>> of therapy and rehabilitation, we can maximize the benefits of
>> the surgical procedure and hopefully return this patient to work
>> status by June of 1996. ...
>
> ...Dr. Porth's medical records also suggest that your client was not
> capable or working full-time during calendar year 1996. On March 22,
> 1996 Dr. Porth noted:
>
>> It is now 6 months following his laminectomy, and the quality
>> of life has not significantly improved. He is still unable to
>> return to his job and is aware of his back on a continual basis

Attached hereto as exhibit "E" is the affidavit of RADICAN explaining in relevant part:

22

Notwithstanding having back pain and associated problems throughout 1996 and having been advised by Dr. Manuel Porth that I should refrain from working for the first 6 months in 1996 I did not follow his advice and the only weeks I did not work a minimum of 40 hours per week in 1996 were those weeks in which I received physical therapy and/or pain treatment and which total not more than 12 weeks.

## CONCLUSION

The de novo standard of review is applicable. In denying plaintiff's claims for disability benefits RELIANCE wrongfully characterized plaintiff as a part-time worker. The undisputed facts demonstrate that plaintiff's status with his employer was that of a full-time employee and it is the contract of employment (written or oral) and not the performance of the contract of employment which determines the classification or status of an employee. In addition, assuming arguendo that in order to become eligible for benefits an employee was required to work a minimum of 40 hours during any week in 1996, the undisputed facts demonstrate that RADICAN met this criterion.

**WHEREFORE**, Plaintiff, respectfully request this Honorable Court grant plaintiff JAMES E. RADICAN's Motion for Summary Judgment on the issue of liability finding RADICAN is entitled to long term disability benefits.

Respectfully submitted this 25 day of May, 2000.

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via U.S. mail this 25th day of May, 2000 GENE D. LIPSCHER, Alley, Maass, Rogers, &

23

Lindsay, P.A., Attorney for Defendant, 321 Royal Poinciana Plaza South , P.O. Box 431

Palm Beach, FL 33480-0431.


By: _____
       ROY L. TAYLOR
       Florida Bar No. 403225

Law Office of Roy Taylor
14 NE 1st AVE., No. 601
Miami, FL 33132
(305) 358-8813

By: _____
       LAWRENCE D. BACHE
       Florida Bar No. 0557935

Law Office of Lawrence D. Bache
9000 West Sheridan Street, Suite 174
Pembroke Pines, Florida 33024
(954) 436-7376;  Fax (954) 436-2926


C:\MyFiles\Radican\MSJ 01A Radican.wpd

24

# Reliance Standard Life Insurance Company

Home Office: Chicago, Illinois • Administrative Office: Philadelphia, Pennsylvania

**POLICYHOLDER:** Tarmac America, Inc.                    **POLICY NUMBER:** LSC 098842

**EFFECTIVE DATE:** January 1, 1996

**ANNIVERSARY DATES:** January 1, 1997 and each January 1 thereafter

**PREMIUM DUE DATES:** The first Premium is due on the Effective Date. Further Premiums are due monthly, in advance, on the first day of each month.

This Policy is delivered in Virginia and is governed by its laws.

Reliance Standard Life Insurance Company is referred to as "we", "our" or "us" in this Policy.

The Policyholder and any subsidiaries, divisions or affiliates are referred to as "you", "your" or "yours" in this Policy.

We agree to provide insurance to you in exchange for the payment of Premium and a signed Application. This Policy provides income replacement benefits for Total Disability from Sickness or Injury. It insures those Eligible Persons for the Monthly Benefit shown on the Schedule of Benefits. The insurance is subject to the terms and conditions of this Policy.

The Effective Date of this Policy is shown above. This Policy stays in effect as long as Premium is paid when due. The "TERMINATION OF THIS POLICY" section of the GENERAL PROVISIONS explains when the insurance terminates.

This Policy is signed by our President and Secretary.

SECRETARY                                                PRESIDENT

Countersigned _____

Licensed Resident Agent

**GROUP LONG TERM DISABILITY INSURANCE**
**NON-PARTICIPATING**

LRS-6564 Ed. 2/83                    **Exhibit "A"**

**RELIANCE STANDARD LIFE INSURANCE COMPANY**
Home Office: Chicago, Illinois
Administrative Office: Philadelphia, Pennsylvania

**GROUP POLICY NUMBER:** LSC 098842          **POLICY EFFECTIVE DATE:** January 1, 1996

**POLICY DELIVERED IN:** Virginia          **ANNIVERSARY DATE:** January 1 in each year

Application is made to us by: Tarmac America, Inc.

This Application is completed in duplicate, one copy to be attached to your Policy and the other returned to us.

It is agreed that this Application takes the place of any previous application for your Policy.

Signed at _____ this _____ day of _____.

Policyholder: _____     Agent: _____

By: _____          _____
        (Signature)                                              (Licensed Resident Agent)

_____
        (Title)

LRS-6564-1 Ed. 2/83

**TABLE OF CONTENTS**

Page

SCHEDULE OF BENEFITS .................................................................... 1.0

DEFINITIONS ............................................................................... 2.0

GENERAL PROVISIONS ..................................................................... 3.0
Entire Contract
Changes
Time Limit On Certain Defenses
Records Maintained
Clerical Error
Misstatement Of Age
Not In Lieu Of Worker's Compensation
Conformity With State Laws
Certificate Of Insurance
Termination Of This Policy

CLAIMS PROVISIONS ....................................................................... 4.0
Notice Of Claim
Claim Forms
Written Proof Of Total Disability
Payment of Claims
Arbitration of Claims
Physical Examination And Autopsy
Legal Actions

INDIVIDUAL ELIGIBILITY, EFFECTIVE DATE AND TERMINATION ................................. 5.0
General Group
Eligibility Requirements
Waiting Period
Effective Date Of Individual Insurance
Termination Of Individual Insurance
Individual Reinstatement

PREMIUMS ................................................................................. 6.0

BENEFIT PROVISIONS ...................................................................... 7.0

EXCLUSIONS .............................................................................. 8.0

LIMITATIONS .............................................................................. 9.0

CONTINUITY OF INSURANCE COVERAGE PROVISION .......................................... 10.0

SPECIFIC INDEMNITY BENEFIT ............................................................. 11.0

WORK INCENTIVE AND CHILD CARE BENEFITS ............................................... 12.0

LIVING BENEFIT ........................................................................... 13.0

REHABILITATION BENEFIT .................................................................. 14.0

LRS-6564-2 Ed. 2-83

### SCHEDULE OF BENEFITS

NAME OF SUBSIDIARIES, DIVISIONS OR AFFILIATES TO BE COVERED: None

ELIGIBLE CLASSES: Each active, Full-time employee except any person employed on a temporary or seasonal basis, according to the following classifications:

CLASS A: employee earning $59,000.00 or more per year who:

    (1)   is engaged in a non-hazardous occupation; and
    (2)   functions primarily in an office environment.

CLASS B: salaried employee earning more than $30,000.00 per year but less than $59,000.00

WAITING PERIOD:  Present Employees: none
                      Future Employees: 90 days

INDIVIDUAL EFFECTIVE DATE. The first of the Policy month coinciding with or next following completion of the Waiting Period, if applicable.

INDIVIDUAL REINSTATEMENT: 6 months

MINIMUM PARTICIPATION REQUIREMENTS: Percentage: 100% Number of Insureds: 10

LONG TERM DISABILITY BENEFIT

ELIMINATION PERIOD: 270 consecutive days of Total Disability

MONTHLY BENEFIT: The Monthly Benefit is an amount equal to:

CLASS A: 67% of Covered Monthly Earnings, payable in accordance with the section entitled Benefit Amount.

CLASS B: 60% of Covered Monthly Earnings, payable in accordance with the section entitled Benefit Amount.

MINIMUM MONTHLY BENEFIT: In no event will the Monthly Benefit payable to an Insured be less than $100.00

MAXIMUM MONTHLY BENEFIT:

CLASS A: $15,000.00 (this is equal to a maximum Covered Monthly Earnings of $22,388.00), however, Monthly Benefits in excess of $10,500.00 are subject to our approval of a person's proof of health.

CLASS B: $10,000.00 (this is equal to a maximum Covered Monthly Earnings of $16,667.00).

MAXIMUM DURATION OF BENEFITS:  Benefits will not accrue beyond the longer of: the Duration of Benefits; or Normal Retirement Age; specified below:

| Age at Disablement | Duration of Benefits (in years) |
|---|---|
| 61 or less | To Age 65 |
| 62 | 3-1/2 |
| 63 | 3 |
| 64 | 2-1/2 |
| 65 | 2 |
| 66 | 1-3/4 |
| 67 | 1-1/2 |
| 68 | 1-1/4 |
| 69 or more | 1 |

OR

Normal Retirement Age as defined by the 1983 Amendments to the United States Social Security Act and determined by the Insured's year of birth, as follows:

| Year of Birth | Normal Retirement Age |
|---|---|
| 1937 or before | 65 years |
| 1938 | 65 years and 2 months |
| 1939 | 65 years and 4 months |
| 1940 | 65 years and 6 months |
| 1941 | 65 years and 8 months |
| 1942 | 65 years and 10 months |
| 1943 thru 1954 | 66 years |
| 1955 | 66 years and 2 months |
| 1956 | 66 years and 4 months |
| 1957 | 66 years and 6 months |
| 1958 | 66 years and 8 months |
| 1959 | 66 years and 10 months |
| 1960 and after | 67 years |

CHANGES IN MONTHLY BENEFIT:  Increases in the Monthly Benefit are effective on the date of the change, provided the Insured is Actively at Work on the effective date of the change. If the Insured is not Actively at Work on that date, the effective date of the change will be deferred until the date the Insured returns to Active Work

Decreases in the Monthly Benefit are effective on the date the change occurs.

CONTRIBUTIONS:  Insured: 0%

## DEFINITIONS

"Actively at Work" and "Active Work" mean actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an Injury or Sickness.

"Claimant" means an Insured who makes a claim for benefits under this Policy for a loss covered by this Policy as a result of an Injury to or a Sickness of the Insured.

"Covered Monthly Earnings" means the Insured's monthly salary received from you on the day just before the date of Total Disability. Covered Monthly Earnings do not include commissions, overtime pay, bonuses or any other special compensation not received as Covered Monthly Earnings.

If hourly paid employees are insured, the number of hours worked during a regular work week, not to exceed forty (40) hours per week, times 4.333, will be used to determine Covered Monthly Earnings. If an employee is paid on an annual basis, then the Covered Monthly Earnings will be determined by dividing the basic annual salary by 12.

"Eligible Person" means a person who meets the Eligibility Requirements of this Policy.

"Elimination Period" means a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable. It begins on the first day of Total Disability.

Interruption Period: If, during the Elimination Period, an Insured returns to Active Work for less than 30 days, then the same or related Total Disability will be treated as continuous. Days that the Insured is Actively at Work during this interruption period will not count towards the Elimination Period. This interruption of the Elimination Period will not apply to an Insured who becomes eligible under any other group long term disability insurance plan.

"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.

"Hospital" or "Institution" means a facility licensed to provide care and treatment for the condition causing the Insured's Total Disability.

"Injury" means bodily injury resulting directly from an accident, independent of all other causes. The Injury must cause Total Disability which begins while insurance coverage is in effect for the Insured.

"Insured" means a person who meets the Eligibility Requirements of this Policy and is enrolled for this insurance.

"Physician" means a duly licensed practitioner who is recognized by the law of the state in which treatment is received as qualified to treat the type of Injury or Sickness for which claim is made. The Physician may not be the Insured or a member of his/her immediate family.

"Pre-existing Condition" means any Sickness or Injury for which the Insured received medical treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines, during the 3 months immediately prior to the Insured's effective date of insurance.

"Premium" means the amount of money needed to keep this Policy in force.

"Rehabilitative Employment" means work in any gainful occupation for which the Insured's training, education or experience will reasonably allow. The work must be supervised by a Physician or a licensed rehabilitation specialist approved by us. Rehabilitative Employment includes work performed while Partially Disabled, but does not include performing all the material duties of his/her regular occupation on a Full-time basis.

"Retirement Benefits" mean money which the Insured is entitled to receive upon early or normal retirement or disability retirement under:
    (1) any plan of a state, county or municipal retirement system, if such pension benefits include any credit for employment with you;
    (2) Retirement Benefits under the United States Social Security Act of 1935, as amended, or under any similar plan or act; or
    (3) an employer's retirement plan where payments are made in a lump sum or periodically and do not represent contributions made by an Insured.

Retirement Benefits do not include:

    (1)  a federal government employee pension benefit:

    (2)  a thrift plan;

    (3)  a deferred compensation plan;

    (4)  an individual retirement account (IRA);

    (5)  a tax sheltered annuity (TSA);

    (6)  a stock ownership plan; or

    (7)  a profit sharing plan.

"Sickness" means illness or disease causing Total Disability which begins while insurance coverage is in effect for the insured. Sickness includes pregnancy, childbirth, miscarriage or abortion, or any complications therefrom.

"Totally Disabled" and "Total Disability" mean, with respect to Class A, that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her regular occupation:

    (1)  "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and

    (2)  "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability.

"Totally Disabled" and "Total Disability" mean, with respect to Class B, that as a result of an Injury or Sickness:

    (1)  during the Elimination Period and for the first 60 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;

        (a)  "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;

        (b)  "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and

    (2)  after a Monthly Benefit has been paid for 60 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

If an Insured is employed by you and requires a license for such occupation, the loss of such license for any reason does not in and of itself constitute "Total Disability".

However, if an Insured is employed by you as a licensed pilot or as a crew member, "Total Disability" means that, due to an Injury or Sickness, he/she cannot perform the material duties of any gainful occupation for which his/her education, training or experience will reasonably allow. The loss of a pilot's authorization to fly for any reason does not in and of itself constitute "Total Disability".

## GENERAL PROVISIONS

**ENTIRE CONTRACT:** The entire contract between you and us is this Policy, your Application (a copy of which is attached at issue) and any attached amendments.

**CHANGES:** No agent has authority to change or waive any part of this Policy. To be valid, any change or waiver must be in writing, signed by either our President, a Vice President, or a Secretary. The change or waiver must also be attached to this Policy.

**TIME LIMIT ON CERTAIN DEFENSES:** After this Policy has been in force for two (2) years from its Effective Date, no statement made by you shall be used to void this Policy; and no statement by any Insured on a written application for insurance shall be used to reduce or deny a claim after the Insured's insurance coverage, with respect to which claim has been made, has been in effect for two (2) years.

**RECORDS MAINTAINED:** You must maintain records of all Insureds. Such records must show the essential data of the insurance, including new persons, terminations, changes, etc. This information must be reported to us regularly. We reserve the right to examine the insurance records maintained at the place where they are kept. This review will only take place during normal business hours.

**CLERICAL ERROR:** Clerical errors in connection with this Policy or delays in keeping records for this Policy, whether by you, us, or the Plan Administrator:

    (1)  will not terminate insurance that would otherwise have been effective; and
    (2)  will not continue insurance that would otherwise have ceased or should not have been in effect.

If appropriate, a fair adjustment of premium will be made to correct a clerical error.

**MISSTATEMENT OF AGE:** If an Insured's age is misstated, the Premium will be adjusted. If the Insured's benefit is affected by the misstated age, it will also be adjusted. The benefit will be changed to the amount the Insured is entitled to at his/her correct age.

**NOT IN LIEU OF WORKER'S COMPENSATION:** This Policy is not a Worker's Compensation Policy. It does not provide Worker's Compensation benefits.

**CONFORMITY WITH STATE LAWS:** Any section of this Policy, which on its Effective Date, conflicts with the laws of the state in which this Policy is issued, is amended by this provision. This Policy is amended to meet the minimum requirements of those laws.

**CERTIFICATE OF INSURANCE:** We will send to you an individual certificate for each Insured. The certificate will outline the insurance coverage, state this Policy's provisions that affect the Insured, and explain to whom benefits are payable.

**TERMINATION OF THIS POLICY:** You may cancel this Policy at any time by giving us written notice. This Policy will be cancelled on the date we receive your notice or, if later, the date requested in your notice.

This Policy will terminate at the end of the Grace Period if Premium has not been paid by that date.

We may cancel this Policy within thirty-one (31) days of written notice prior to the date of cancellation, only:
    (1)  if the number of Insureds is less than the Minimum Participation Number shown on the Schedule of Benefits; or
    (2)  if the percentage of Eligible Persons insured is less than the Minimum Participation Percentage shown on the Schedule of Benefits.

You will still owe us any Premium that is not paid up to the date this Policy is cancelled. We will return, pro-rata, any part of the Premium paid beyond the date this Policy is cancelled.

Termination of this Policy will not affect any claim which was covered prior to termination, subject to the terms and conditions of this Policy.

## CLAIMS PROVISIONS

**NOTICE OF CLAIM:** Written notice must be given to us within thirty-one (31) days after a Total Disability covered by this Policy occurs, or as soon as reasonably possible. The notice should be sent to us at our Administrative Office or to our authorized agent. The notice should include your name, the Policy Number and the Insured's name.

**CLAIM FORMS:** When we receive the notice of claim, we will send the Claimant the claim forms to file with us. We will send them within fifteen (15) days after we receive notice. If we do not, then proof of Total Disability will be met by giving us a written statement of the type and extent of the Total Disability. The statement must be sent within ninety (90) days after the loss began

**WRITTEN PROOF OF TOTAL DISABILITY:** For any Total Disability covered by this Policy, written proof must be sent to us within ninety (90) days after the Total Disability occurs. If written proof is not given in that time, the claim will not be invalidated nor reduced if it is shown that written proof was given as soon as was reasonably possible. In any event, proof must be given within one (1) year after the Total Disability occurs, unless the Claimant is legally incapable of doing so.

**PAYMENT OF CLAIMS:** When we receive written proof of Total Disability covered by this Policy, we will pay any benefits due. Benefits that provide for periodic payment will be paid for each period as we become liable.

We will pay benefits to the Insured, if living, or else to his/her estate

If the Insured has died and we have not paid all benefits due, we may pay up to $1,000.00 to any relative by blood or marriage, or to the executor or administrator of the Insured's estate. The payment will only be made to persons entitled to it. An expense incurred as a result of the Insured's last illness, death or burial will entitle a person to this payment. The payments will cease when a valid claim is made for the benefit. We will not be liable for any payment we have made in good faith.

Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

**ARBITRATION OF CLAIMS:** Any claim or dispute arising from or relating to our determination regarding the Insured's Total Disability may be settled by arbitration when agreed to by the Insured and us in accordance with the Rules for Health and Accident Claims of the American Arbitration Association or by any other method agreeable to the Insured and us. In the case of a claim under an Employee Retirement Income Security Act (hereinafter referred to as ERISA) Plan, the Insured's ERISA claim appeal remedies, if applicable, must be exhausted before the claim may be submitted to arbitration. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction over such awards.

Unless otherwise agreed to by the Insured and us, any such award will be binding on the Insured and us for a period of twelve (12) months after it is rendered assuming that the award is not based on fraudulent information and the Insured continues to be Totally Disabled. At the end of such twelve (12) month period, the issue of Total Disability may again be submitted to arbitration in accordance with this provision.

Any costs of said arbitration proceedings levied by the American Arbitration Association or the organization or person(s) conducting the proceedings will be paid by us.

**PHYSICAL EXAMINATION AND AUTOPSY:** We will, at our expense, have the right to have a Claimant interviewed and/or examined:
   (1)  physically;
   (2)  psychologically; and/or
   (3)  psychiatrically;

to determine the existence of any Total Disability which is the basis for a claim. This right may be used as often as it is reasonably required while a claim is pending.

We can have an autopsy made unless prohibited by law.

**LEGAL ACTIONS**: No legal action may be brought against us to recover on this Policy within sixty (60) days after written proof of loss has been given as required by this Policy. No action may be brought after three (3) years (Kansas, five (5) years; South Carolina, six (6) years) from the time written proof of loss is received.

### INDIVIDUAL ELIGIBILITY, EFFECTIVE DATE AND TERMINATION

**GENERAL GROUP:** The general group will be your employees and employees of any subsidiaries, divisions or affiliates named on the Schedule of Benefits page.

**ELIGIBILITY REQUIREMENTS:** A person is eligible for insurance under this Policy if he/she:
(1)  is a member of an Eligible Class, as shown on the Schedule of Benefits page; and
(2)  has completed the Waiting Period, as shown on the Schedule of Benefits page.

**WAITING PERIOD:** A person who is continuously employed on a Full-time basis with you for the period specified on the Schedule of Benefits page has satisfied the Waiting Period. The Waiting Period for Present Employees applies to persons who are members of the Eligible Classes on this Policy's Effective Date. The Waiting Period for Future Employees applies to persons who become members of the Eligible Classes after this Policy's Effective Date.

**EFFECTIVE DATE OF INDIVIDUAL INSURANCE:** If you pay the entire Premium due for an Eligible Person, the insurance for such Eligible Person will go into effect on the Individual Effective Date, as shown on the Schedule of Benefits page.

If an Eligible Person pays a part of the Premium, he/she must apply in writing for the insurance to go into effect. He/she will become insured on the latest of:
(1)  the Individual Effective Date as shown on the Schedule of Benefits page, if he/she applies on or before that date;
(2)  on the date he/she applies, if he/she applies within thirty-one (31) days from the date he/she first met the Eligibility Requirements; or
(3)  on the date we approve any required proof of health acceptable to us. We require this proof if a person applies:
    (a)  after thirty-one (31) days from the date he she first met the Eligibility Requirements; or
    (b)  after he/she terminated this insurance but remained in an Eligible Class as shown on the Schedule of Benefits page.

The insurance for an Eligible Person will not go into effect on a date he/she is not Actively at Work because of a Sickness or Injury. The insurance will go into effect after the person is Actively at Work for one (1) full day in an Eligible Class, as shown on the Schedule of Benefits page.

**TERMINATION OF INDIVIDUAL INSURANCE:** The insurance of an Insured will terminate on the first of the following to occur:
(1)  the first of the Policy month coinciding with or next following the date this Policy terminates;
(2)  the first of the Policy month coinciding with or next following the date the Insured ceases to meet the Eligibility Requirements;
(3)  the end of the period for which Premium has been paid for the Insured; or
(4)  the first of the Policy month coinciding with or next following the date the Insured enters military service (not including Reserve or National Guard).

**INDIVIDUAL REINSTATEMENT:** The insurance of a terminated person may be reinstated if he/she returns to Active Work with you within the period of time as shown on the Schedule of Benefits page. He/she must also be a member of an Eligible Class, as shown on the Schedule of Benefits page, and have been:
(1)  on a leave of absence approved by you; or
(2)  on temporary lay-off.

The person will not be required to fulfill the Eligibility Requirements of this Policy again. The insurance will go into effect after he/she returns to Active Work for one (1) full day. If a person returns after having resigned or having been discharged, he/she will be required to fulfill the Eligibility Requirements of this Policy again. If a person returns after terminating insurance at his/her request or for failure to pay Premium when due, proof of health acceptable to us must be submitted before he she may be reinstated

## PREMIUMS

**PREMIUM PAYMENT:** All Premiums are to be paid by you to us, or to an authorized agent, on or before the due date. The Premium Due Dates are stated on this Policy's face page.

**PREMIUM RATE:** The Premium due will be the rate per $100.00 of the entire amount of Covered Monthly Earnings then in force. We will furnish to you the Premium Rate on this Policy's Effective Date and when it is changed. We have the right to change the Premium Rate:

    (1)   when the extent of coverage is changed by amendment;

    (2)   on any Premium Due Date after the third Policy Anniversary; or

    (3)   on any Premium Due Date on or after the first Policy Anniversary if your entire group's Covered Monthly Earnings changes by 25% or more from such group's Covered Monthly Earnings on this Policy's Effective Date.

We will not change the Premium Rate due to (2) or (3) above more than once in any twelve (12) month period. We will tell you in writing at least 31 days before the date of a change due to (2) or (3) above.

**GRACE PERIOD:** You may pay the Premium up to 31 days after the date it is due. This Policy stays in force during this time. If the Premium is not paid during the grace period, this Policy will terminate. You will still owe us the Premium up to the date this Policy terminates.

**WAIVER OF PREMIUM:** No Premium is due us for an Insured while he/she is receiving Monthly Benefits from us. Once Monthly Benefits cease due to the end of his/her Total Disability, Premium payments must begin again if insurance is to continue.

## BENEFIT PROVISIONS

**INSURING CLAUSE**: We will pay a Monthly Benefit if an Insured:

    (1)  is Totally Disabled as the result of a Sickness or Injury covered by this Policy;

    (2)  is under the regular care of a Physician;

    (3)  has completed the Elimination Period; and

    (4)  submits satisfactory proof of Total Disability to us.

**BENEFIT AMOUNT:** To figure the benefit amount payable:

    (1)  multiply an Insured's Covered Monthly Earnings by the benefit percentage(s), as shown on the Schedule of Benefits page;

    (2)  take the lesser of the amount:

        (a)  of step (1) above; or

        (b)  the Maximum Monthly Benefit, as shown on the Schedule of Benefits page; and

    (3)  subtract Other Income Benefits, as shown below, from step (2) above.

We will pay at least the Minimum Monthly Benefit, if any, as shown on the Schedule of Benefits page.

**OTHER INCOME BENEFITS:** Other Income Benefits are benefits resulting from the same Total Disability for which a Monthly Benefit is payable under this Policy, other than Retirement Benefits. These Other Income Benefits are:

    (1)  disability income benefits an Insured is eligible to receive under any group insurance plan(s);

    (2)  disability income benefits an Insured is eligible to receive under any governmental retirement systems, except benefits payable under a federal government employee pension benefit;

    (3)  all permanent as well as temporary disability benefits, including any damages or settlement made in place of such benefits (whether or not liability is admitted) an Insured is eligible to receive under:

        (a)  Worker's Compensation Laws;

        (b)  occupational disease law;

        (c)  any other laws of like intent as (a) or (b) above; and

        (d)  any compulsory benefit law;

    (4)  with respect to Class A, any of the following that the Insured is entitled to receive:

        (a)  wages or other compensation excluding the amount allowable under the Rehabilitation Provision; and

        (b)  commissions or monies, including vested renewal commissions, but, excluding commissions or monies that the Insured earned prior to Total Disability which are paid after Total Disability has begun;

    (5)  with respect to Class B, any of the following that the Insured is entitled to receive:

        (a)  wages, excluding the amount allowable under the Rehabilitation Provision; and

        (b)  commissions or monies, including vested renewal commissions, but, excluding commissions or monies that the Insured earned prior to Total Disability which are paid after Total Disability has begun;

    (6)  that part of disability or Retirement Benefits paid for by you that an Insured is eligible to receive under a group retirement plan; and

    (7)  disability or Retirement Benefits under the United States Social Security Act, the Canadian pension plans, federal or provincial plans, or any similar law which:

        (a)  an Insured is eligible to receive because of his/her Total Disability or eligibility for Retirement Benefits; and

        (b)  an Insured's dependents are eligible to receive due to (a) above.

Disability and early Retirement Benefits will be offset only if such benefits are elected by the Insured or do not reduce the amount of his/her accrued normal Retirement Benefits then funded.

Retirement Benefits under number 7 above will not apply to disabilities which begin after age 70 for those Insureds already receiving Social Security Retirement Benefits while continuing to work beyond age 70.

Benefits above will be estimated if the benefits:

    (1)  have not been applied for; or

    (2)  have not been awarded; and

    (3)  have been denied and the denial is being appealed.

The Monthly Benefit will be reduced by the estimated amount. If benefits have been estimated, the Monthly Benefit will be adjusted when we receive proof:

(1) of the amount awarded; or
(2) that benefits have been denied and the denial cannot be further appealed.

If we have underpaid the Monthly Benefit for any reason, we will make a lump sum payment. If we have overpaid the Monthly Benefit for any reason, the overpayment must be repaid to us. At our option, we may reduce the Monthly Benefit or ask for a lump sum refund. If we reduce the Monthly Benefit, the Minimum Monthly Benefit, if any, as shown on the Schedule of Benefits page, would not apply.

For each day of a period of Total Disability less than a full month, the amount payable will be 1/30th of the Monthly Benefit.

**COST OF LIVING FREEZE:** After the initial deduction for any Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost of living increases payable under these Other Income Benefits.

**LUMP SUM PAYMENTS:** If Other Income Benefits are paid in a lump sum, the sum will be broken down to a monthly amount for the period of time the sum is payable. If no period of time is given, the sum will be broken down to a monthly amount for the period of time we expect the Insured to be disabled based on actuarial tables of disabled lives.

**TERMINATION OF MONTHLY BENEFIT:** The Monthly Benefit will stop on the earliest of:
(1) the date the Insured ceases to be Totally Disabled;
(2) the date the Insured dies;
(3) the Maximum Duration of Benefits, as shown on the Schedule of Benefits page, has ended;
(4) the date the Insured fails to furnish the required proof of Total Disability; or
(5) the date the Insured refuses to accept or to continue Rehabilitative Employment when such employment has been properly approved.

**RECURRENT DISABILITY:** If, after a period of Total Disability for which benefits are payable, an Insured returns to Active Work for at least six (6) consecutive months, any recurrent Total Disability for the same or related cause will be part of a new period of Total Disability. A new Elimination Period must be completed before any further Monthly Benefits are payable.

If an Insured returns to Active Work for less than six (6) months, a recurrent Total Disability for the same or related cause will be part of the same Total Disability. A new Elimination Period is not required. Our liability for the entire period will be subject to the terms of this Policy for the original period of Total Disability.

This Recurrent Disability section will not apply to an Insured who becomes eligible for insurance coverage under any other group long term disability insurance plan.

## EXCLUSIONS

We will not pay a Monthly Benefit for any Total Disability caused by:

    (1)   an act of war, declared or undeclared;

    (2)   an intentionally self-inflicted Injury;

    (3)   the Insured committing a felony; or

    (4)   an Injury or Sickness that occurs while the Insured is confined in any penal or correctional institution.

## LIMITATIONS

**MENTAL OR NERVOUS DISORDERS:** Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period. The Monthly Benefit will be payable while so confined, but not beyond the Maximum Duration of Benefits.

If an Insured was confined in a Hospital or Institution and:

    (1)  Total Disability continues beyond discharge;

    (2)  the confinement was during a period of Total Disability; and

    (3)  the period of confinement was for at least fourteen (14) consecutive days,

then upon discharge, Monthly Benefits will be payable for the greater of:

    (1)  the unused portion of the twenty-four (24) month period; or

    (2)  ninety (90) days:

but in no event beyond the Maximum Duration of Benefits, as shown on the Schedule of Benefits page.

Mental or Nervous Disorders are defined to include disorders which are diagnosed to include a condition such as:

    (1)  bipolar disorder (manic depressive syndrome);

    (2)  schizophrenia;

    (3)  delusional (paranoid) disorders,

    (4)  psychotic disorders,

    (5)  depressive disorders;

    (6)  anxiety disorders;

    (7)  somatoform disorders (psychosomatic illness);

    (8)  eating disorders: or

    (9)  mental illness.

**SUBSTANCE ABUSE:** Monthly Benefits for Total Disability due to alcoholism or drug addiction will be payable while the Insured is a participant in a Substance Abuse Rehabilitation Program. The Monthly Benefit will not be payable beyond twenty-four (24) months.

If, during a period of Total Disability due to Substance Abuse for which a Monthly Benefit is payable, an Insured is able to perform Rehabilitative Employment, the Monthly Benefit, less 50% of any of the money received from this Rehabilitative Employment will be paid until: (1) the Insured is performing all the material duties of his/her regular occupation on a full-time basis; or (2) the end of twenty-four (24) consecutive months from the date that the Elimination Period is satisfied, whichever is earlier. All terms and conditions of the Rehabilitation Benefit will apply to Rehabilitative Employment due to Substance Abuse.

"Substance Abuse" means the pattern of pathological use of a Substance which is characterized by:

    (1)  impairments in social and/or occupational functioning;

    (2)  debilitating physical condition;

    (3)  inability to abstain from or reduce consumption of the Substance; or

    (4)  the need for daily Substance use for adequate functioning.

"Substance" means alcohol and those drugs included on the Department of Health, Retardation and Hospitals' Substance Abuse list of addictive drugs, except tobacco and caffeine are excluded.

A Substance Abuse Rehabilitative Program means a program supervised by a Physician or a licensed rehabilitation specialist approved by us.

**PRE-EXISTING CONDITIONS:** Applicable To Employees Hired On Or After January 1, 1996: Benefits will not be paid for a Total Disability.

    (1)  caused by;

    (2)  contributed to by. or

    (3)  resulting from,

a Pre-existing Condition unless the Insured has been Actively at Work for one (1) full day following the end of 12 consecutive months from the date he/she became an Insured.

## CONTINUITY OF INSURANCE COVERAGE PROVISION

Continuity of insurance coverage will be allowed for an Eligible Person who would not be entitled to full coverage under this Policy upon changing carriers due to:

(1)  failure to be Actively at Work on the Effective Date of this Policy due to an Injury or Sickness; or
(2)  a Pre-existing Conditions Limitation.

This provision will apply only to an Eligible Person who was insured under:

(1)  the prior carrier's policy on its termination date; or
(2)  any policy of a later acquired employer unit which changed insurance carriers.

**EFFECT OF FAILURE TO BE ACTIVELY AT WORK:** This provision allows insurance to be granted under this Policy to an Eligible Person who was Totally Disabled on or after the Effective Date of this Policy.

The insurance will be that provided under the prior carrier's policy. This insurance is subject to Premium Payment. The insurance we will pay is the benefit the prior carrier would have paid under their policy reduced by any amount for which the prior carrier is liable.

Insurance provided under this provision will end upon the earliest of:

(1)  the date the insurance would end according to the Termination of Individual Insurance provision of this Policy;
(2)  the date an Eligible Person returns to Active Work and becomes insured under this Policy; or
(3)  the end of any period of extension or accrued liability under the prior carrier's policy.

**EFFECT OF A PRE-EXISTING CONDITIONS LIMITATION:**  The following will apply to an Eligible Person who is Actively at Work and insured under this Policy when a Pre-existing Condition is involved:

(1)  if the Insured has satisfied this Policy's Pre-existing Conditions Limitation, then he/she will be paid according to this Policy;
(2)  if the insured cannot satisfy this Policy's Pre-existing Conditions Limitation, we will then apply the prior carrier's Pre-existing Conditions Limitation. If the Insured satisfied the prior carrier's Pre-existing Conditions Limitation, giving consideration towards continuous time insured under both policies, then he/she will be paid according to the prior carrier's policy; or
(3)  if the insured cannot satisfy the Pre-existing Conditions Limitation of:
  (a)  this Policy; and
  (b)  that of the prior carrier;

then no benefit will be paid.

When the Insured has satisfied the Pre-existing Conditions Limitation under this Policy, even if during a period of Recurrent Disability, then the Monthly Benefit will be paid according to this Policy.

## SPECIFIC INDEMNITY BENEFIT

If the Insured suffers any one of the Losses listed below from an accident resulting in an injury, we will pay a guaranteed minimum number of Monthly Benefit payments, as shown below. However:

     (1)   the Loss must occur within one hundred and eighty (180) days; and

     (2)   the Insured must live past the Elimination Period.

| For Loss of: | Number of Monthly Benefit Payments: |
|---|---|
| Both Hands | 46 months |
| Both Feet | 46 months |
| Entire Sight in Both Eyes | 46 months |
| Hearing in Both Ears | 46 months |
| Speech | 46 months |
| One Hand and One Foot | 46 months |
| One Hand and Entire Sight in One Eye | 46 months |
| One Foot and Entire Sight in One Eye | 46 months |
| One Arm | 35 months |
| One Leg | 35 months |
| One Hand | 23 months |
| One Foot | 23 months |
| Entire Sight in One Eye | 15 months |
| Hearing in One Ear | 15 months |

"Loss(es)" with respect to:

     (1)   hand or foot, means the complete severance through or above the wrist or ankle joint;

     (2)   arm or leg, means the complete severance through or above the elbow or knee joint; or

     (3)   sight, speech or hearing, means total and irrecoverable Loss thereof.

If more than one (1) Loss results from any one accident, payment will be made for the Loss for which the greatest number of Monthly Benefit payments is provided.

The amount payable is the Monthly Benefit, as shown on the Schedule of Benefits page, with no reduction from Other Income Benefits. The number of Monthly Benefit payments will not cease if the Insured returns to Active Work.

If death occurs after we begin paying Monthly Benefits, but before the Specific Indemnity Benefit has been paid according to the above schedule, the balance remaining at time of death will be paid to the Insured's estate, unless a beneficiary is on record with us under this Policy.

Benefits may be payable longer than shown above as long as the Insured is still Totally Disabled, subject to the Maximum Duration of Benefits, as shown on the Schedule of Benefits page.

## WORK INCENTIVE AND CHILD CARE BENEFITS

### WORK INCENTIVE BENEFIT

During the first twelve (12) months of Total Disability for which a Monthly Benefit is payable, we will not offset earnings from Rehabilitative Employment until the sum of:

    (1)   the Monthly Benefit prior to offsets with Other Income Benefits; and

    (2)   earnings from Rehabilitative Employment;

exceed 100% of the Insured's Covered Monthly Earnings. If the sum above exceeds 100% of Covered Monthly Earnings, our Benefit Amount will be reduced by such excess amount until the sum of (1) and (2) above equals 100%.

### CHILD CARE BENEFIT

We will allow a Child Care Benefit to an Insured if:

    (1)   the Insured is receiving benefits under the Work Incentive Benefit;

    (2)   the Insured's Child(ren) is (are) under 14 years of age;

    (3)   the child care is provided by a non-relative; and

    (4)   the charges for child care are documented by a receipt from the caregiver, including social security number or taxpayer identification number.

During the 12 month period in which the Insured is eligible for the Work Incentive Benefit, an amount equal to actual expenses incurred for child care, up to a maximum of $250.00 per month, will be added to the Insured's Covered Monthly Earnings when calculating the Benefit Amount under the Work Incentive Benefit.

Child(ren) means: the Insured's unmarried child(ren), including any foster child, adopted child or step child who resides in the Insured's home and is financially dependent on the Insured for support and maintenance.

## LIVING BENEFIT

We will pay a lump sum Living Benefit to an Insured if such Insured:

    (1)   meets all of the requirements of Total Disability of this Policy;
    (2)   is Certified as Terminally Ill; and
    (3)   makes a Written Request for this benefit.

We may, at our option, confirm the Terminal Illness diagnosis with a second medical exam performed at our own expense.

The Living Benefit:

    (1)   will be an amount equal to 12 months of the Insured's Monthly Benefit after offsets with Other Income Benefits;
    (2)   is payable one time only for any one Insured under this Policy;
    (3)   is payable to an Insured only while he/she is living; and
    (4)   is payable in addition to the Monthly Benefit otherwise payable under this Policy for the Insured for his/her Total Disability.

"Certified" or "Certification" refers to a written statement, made by a Physician on a form provided by us, as to the Insured's Terminal Illness.

"Terminally Ill" or "Terminal Illness" means an Insured's illness or physical condition that is Certified by a Physician to reasonably be expected to result in death in less than 12 months.

"Written Request" means a request made, in writing, by the Insured to us.

## REHABILITATION BENEFIT

"Rehabilitative Employment" means work in any gainful occupation for which the Insured's training, education or experience will reasonably allow. The work must be supervised by a Physician or a licensed rehabilitation specialist approved by us. Rehabilitative Employment includes work performed while Partially Disabled, but does not include performing all the material duties of his/her regular occupation on a full-time basis.

If an Insured is receiving a Monthly Benefit because he/she is considered Totally Disabled under the terms of this Policy and is able to perform Rehabilitative Employment, we will continue to pay the Monthly Benefit less an amount equal to 50% of earnings received through such Rehabilitative Employment.

If an Insured is able to perform Rehabilitative Employment when Totally Disabled due to Substance Abuse, we will continue to pay the Monthly Benefit less an amount equal to 50% of earnings received through such Rehabilitative Employment. This Monthly Benefit is payable for a maximum of twenty-four (24) consecutive months from the date the Elimination Period is satisfied.

An Insured will be considered able to perform Rehabilitative Employment if a Physician or licensed rehabilitation specialist approved by us determines that he/she can perform such employment. If an Insured refuses such Rehabilitative Employment, benefits under this Policy will terminate. If an Insured has been performing Rehabilitative Employment, and refuses to continue such employment, even though a Physician or licensed rehabilitation specialist approved by us has determined that he/she is able to perform Rehabilitative Employment, benefits under this Policy will terminate.



April 6, 1998


James E. Radican
3800 N. W. 71 Street
Coconut Creek, FL 33073

> Policyowner : Tarmac America, Inc.
> Policy No. : LSC 98842
> Claim No. : 1997-2346-010

Dear Mr. Radican:

We would like to express our appreciation for your patience and cooperation during the review of your claim for Long Term Disability (LTD) benefits. We have now completed our determination regarding your eligibility for benefits under the above group LTD policy.

To be eligible for benefits, the group policy requires that objective medical documentation must substantiate that a member, while insured under the group policy, meets the group policy's definition of Total Disability. The group policy defines Total Disability as follows:

**"Actively at work" and Active Work" mean actually performing on a full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an injury or sickness.**

**"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.**

We have received documentation from your employer which indicates you began working on a part-time basis on or about November 1, 1995 and continued to work part-time for over one year.

In order to be eligible for Long Term Disability under this policy, you must be actively at work and working on a full-time basis as defined by the policy. Based on information provided by your employer, you were working part-time when the policy became effective on January 1, 1996 and did not returned to full time active work prior to your last day worked Therefore, you have not satisfied the policy definition of a full-time employee and are not eligible for Long Term Disability Benefits coverage.

**Exhibit "B"**


Reliance Standar . Life
Insurance Company

We regret our decision could not be more favorable.  Our determination has been based on the information contained in your file and the policy provisions applicable to your claim.

Under the Employee Retirement Income Security Act of 1974, you may request a review of this denial by writing to:

> Reliance Standard Life Insurance Company
> Quality Review Unit
> P. O. Box 8330
> Philadelphia, PA 19101-8330

The written request for review must be sent within 60 days of receipt of this letter and state the reasons why you feel your claim should not have been denied. Include any documentation which you feel supports your claim. You or your duly authorized representative are also entitleed to review the pertinent documents upon which the denial decision wa predicated.  Under normal circumstances, you will be notified in writing of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request for review is received

Nothing in this letter should be construed as a waiver of any of Reliance Standard Life Insurance Company's rights and defenses under the above captioned policy, and all these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

James A. Wilson, Jr
'Group LTD Claims Department
Extension: 3854

cc:    Tarmac America, Inc.
       Attn: Hope Fischer
       P.O. Box 2016
       Norfolk, VA 23501

# Tarmac

**Tarmac America, Inc.**
P.O. Box 2016
Norfolk, VA 23501
(757) 858-6500
Fax (757) 855-7707
http://www.tarmacamerica.com

February 26, 1998

Reliance Standard Life Insurance Company
Quality Review Unit
P.O. Box 8330
Philadelphia, PA 19101-8330

RE:    **James E. Radican**
       **Policy No. LSC 98842**
       **Claim No 1997-2346-010**

Dear Sir:

I am in receipt of your letter of February 20, 1998, to Mr. James Radican, informing him of an unfavorable determination of his Long Term Disability claim. You have stated that Mr. Radican was working "part-time" when the policy became effective, had not returned to "full time active work" prior to his last day worked and therefore did not satisfy the definition of a full-time employee under the terms of the policy.

Jim Radican was a <u>full-time salaried exempt employee</u> of this company from his date of employment in 1965 until his last day of active work on December 31, 1996. At no time prior to the commencement of his short term disability on January 1, 1997 was he ever on part-time status; he was at all times paid full salary and enjoyed full benefits, including long term disability coverage, for which he paid. The fact that he worked partial days in 1996 following his return to work from surgery should in no way be construed as "part-time" status. Had Mr. Radican been classified a part-time employee, he would have been ineligible for participation in our long term disability benefit at all.

We would appreciate your expeditious reconsideration of Mr. Radican's claim, given his unemployed and disabled status. While doing so, please note that Mr. Radican's middle initial is E., not G., and he does not live in New York. Should you require further information from Tarmac to substantiate his claim for benefits, please do not hesitate to contact me. I look forward to your response.

Sincerely yours,

B. Edward Pittman

B. Edward Pittman
Vice President Human Resources

cc:    ✓ James E. Radican
       Mike Unger, General Manager, Florida Cement
       James A. Wilson, Jr.
       Group LTD Claims Department, Reliance Standard Life

**Composite Exhibit "C"**

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

A Professional Corporation

Offices in
Maryland
Washington, D.C.
Virginia

120 East Baltimore Street
Baltimore, Maryland 21202-1643
410-685-1120 FAX 410-547-0699

June 5, 1998

## BY FACSIMILE TRANSMISSION (215-787-3897)

Reliance Standard Life Insurance Company
Quality Review Unit
P.O. Box 8330
Philadelphia, Pennsylvania 19101-8330

> *Re:* **Policy Owner:** *Tarmac America, Inc.*
> **Policy No.:** *LSC 98842*
> **Claim No.:** *1997-2346-010*
> **Claimant:** *James E. Radican*

Dear Sir or Madam:

This firm represents James E. Radican. The purpose of this letter is to request a review of the denial of Mr. Radican's long term disability benefits under the Group Long Term Disability Policy previously maintained by Tarmac America, Inc.

According to the April 6, 1998 letter sent by James A. Wilson, Jr. of the Group LTD Claims Department, Mr. Radican was denied his long term disability benefits because he was not covered under the policy. In order to be eligible for long term disability under Policy LSC 98842, an individual must meet the policy's eligibility requirements. The group policy defines an individual's effective date as follows:

> EFFECTIVE DATE OF INDIVIDUAL INSURANCE: If you pay the entire Premium due for an Eligible Person, the insurance for such Eligible Person will go into effect on the Individual Effective Date, as shown on the Schedule of Benefits page...The insurance for an Eligible Person will not go into effect on a date

Reliance Standard Life Insurance Company
June 5, 1998
Page 2

> he/she is not Actively at Work because of a Sickness or Injury.
> *The insurance will go into effect when a person is Actively at*
> Work for one (1) full day in an Eligible Class, as shown on the
> Schedule of Benefits page.

The contract defines "Actively at Work" and "Active Work" as "actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and in the manner in which the job is normally performed. This includes approved time off, such as vacation, jury duty and funeral leave, but does not include time off as a result of an Injury or Sickness." The term "Full-time" means working for [Tarmac America, Inc.] for a minimum of forty (40) hours during a person's regular work week.

Mr. Wilson's letter states that Mr. Radican was working part-time when the policy became effective on January 1, 1996, and did not return to full-time active work prior to his last day worked. This information was based on documentation received from a supervisor at Tarmac America, Inc. named Michael Unger. As explained more fully below, Mr. Unger's information was incorrect; Mr. Radican was working on a full-time basis in 1996 and therefore is entitled to the disability benefits.

On September 30, 1995, Mr. Radican had spinal surgery to correct a herniated disk to relieve severe pain in his lower back and legs. On or about October 15, 1995, he returned to work with Tarmac America, Inc. In December, 1995, and February, 1996, Mr. Radican received physical therapy twice a week for a period of six (6) weeks. Each physical therapy session lasted approximately three (3) hours. In October, 1995, and again in August, 1996, Mr. Radican received a series of epidural injections into his back. Except for the interruptions for the injections and the physical therapy, Mr. Radican was working on a full-time basis for Tarmac America, Inc.

During 1996, Mr. Radican was responsible for his sales territory, his sales volume, his forecasting, reporting [in writing], his technical assistance, and all other expected duties during the period of time in which he was receiving physical therapy and the injections. He carried a state-wide company beeper and a company cellular phone. He was in constant contact with his accounts and the company management.

In order to be actively at work under the Reliance LTD contract, an individual must complete the material duties of his job and work forty (40) hours a week. During 1996, Mr. Radican clearly was performing the material duties of his job. He continued to cover his sales territory and have primary responsibilty for his clients. Because Mr. Radican was a salaried employee, Tarmac America, Inc. is unable to produce time sheets to confirm that he was working 40 hours a week during 1996. His full-time status, however, is evident from his work situation. Mr. Radican received full pay and full benefits during 1996. As previously mentioned, he was

Reliance Standard Life Insurance Company
June 5, 1998
Page 3

responsible for his sales territory in 1996 and it was not reassigned until early 1997, after he had filed for disability. Included with this letter is a copy of Mr. Radican's expense reports for December, 1995, and January, 1996. As you will see from the report, Mr. Radican traveled 1,380 miles during the month of December, 1995. In the month of January, 1996, he traveled 1,790 miles. Similarly, in August, 1996, he traveled 1,050 miles. A copy of the relevant expense report for that month is also enclosed.

Reliance disallowed the benefit claim based on the February 4, 1998 letter from Michael Unger, General Manager of Pennsuco Cement and Aggregates, which stated that Mr. Radican was working on a part-time basis and continued to work on a part-time basis for over one (1) year while receiving physical therapy and pain treatments. Mr. Unger's letter also stated that Mr. Radican filed for short-term disability on January 1, 1996. Please be advised that Mr. Unger's letter is incorrect. Mr. Unger was not the supervisor of Mr. Radican when he returned to work in the fall, 1995. Mr. Unger became involved with the situation only in the summer of 1996. His letter also incorrectly stated that Mr. Radican filed for disability on January 1, 1996, when the actual date was January 1, 1997.

The text of Mr. Unger's letter was prompted by the request of James Wilson, a Reliance employee who was investigating Mr. Radican's claim. Mr. Wilson was speaking with Mr. Radican regarding his work history and Mr. Radican had explained to him that he was able to work part-time while he was receiving physical therapy and pain treatments. Mr. Wilson then asked Mr. Radican to have Mr. Unger fax him a letter confirming Mr. Radican's part-time status so that the matter could be resolved. Mr. Unger's letter failed to clarify that Mr. Radican worked part-time on the particular day that he was was receiving physical therapy and/or pain treatments. However, on an overall basis, he was continuing to work as a full-time, salaried employee.

Please note that B. Edward Pittman, Vice President of Human Resources, has sent a letter to Reliance dated February 26, 1998, which confirms that Mr. Radican was indeed working on a full-time basis in 1996.

Mr. Radican was a full-time employee for Tarmac America, Inc. during 1996 and, therefore, is entitled to long term disability benefits under the terms of the Reliance Long Term Disability Policy.

Reliance Standard Life Insurance Company
June 5, 1998
Page 4


I look forward to receiving an immediate response.

Yours truly,

*Marika M. Ostendorf*

Marika McVey Ostendorf


MMO:kmk
Enclosures
cc:   Mr. James E. Radican
      Ms. Hope Fischer

# Lawrence D. Bach

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

| Sent to | |
| Street & Number | |
| Post Office, State, & ZIP Code | |
| Postage | $ |

Fountains Executive Centre
9000 West Sheridan Street, Suite 174
Pembroke Pines, FL 33024
(954) 436-7376; Fax: (954) 436-2926

January 26, 1999

Reliance Standard Life Insurance Co.
Attention: Richard D. Walsh
Assistant Manager, Quality Review Unit
2501 Parkway
Philadelphia, PA 19130-2499

Via Certified Mail
Article # Z 127 195 669

Re:    James E. Radican
       Claim No.: 1997-346-010
       Policy No.: LSC 98842

Dear Mr. Walsh:

The undersigned represents Tarmac America, Inc. employee, James E. Radican.

By letter dated August 3, 1998 to Marika McVey Ostendorf, Esq., my client's claim for long-term disability benefits was denied. More specifically, you found that Mr. Radican was never eligible to participate in the Reliance Plan because there was a "lack of conclusive evidence of full-time work (in 1996)."

The initial denial of the claim, by letter dated April 6, 1998, was made upon a finding that Mr. Radican was not eligible for benefits under the plan because he had "not satisfied the policy definition of a full-time employee . . ." and that "'Full Time' means working for you for a minimum of 40 hours during a person's regular work week."[1]

In response to an initial denial of the claim, Marika McVey Ostendorf, acting on behalf of Mr. Radican, submitted information with letter dated June 5, 1998 in an attempt to establish that Mr. Radican was a full-time employee (as defined in the plan) during the concerned time period, and accurately and truthfully stated:

> Except for the interruptions for the injections and the physical therapy (in 1995 and 1996) Mr. Radican was working on a full-time basis for Tarmac America, Inc.

---

[1] The applicable plan document defines "Full time" on page 2.0 as "working for the policy holder for a minimum of 37.5 hours during your regular work week" rather than 40 hours as stated.

The evidence submitted was apparently deficient per your August 3, 1998 second denial
letter in which you stated you "do not have any conclusive evidence to support that" Mr.
Radican "worked on a full time basis after January 1, 1996."

There has been a misunderstanding as to what information was required to establish that Mr.
Radican was eligible for benefits under the Plan, i.e., that he worked "Full-Time" in 1996
(37.5 hours per week). This is understandable due to the fact that salaried employees do not
punch a time clock and there is no form or other document kept in the routine course of
business which could have been submitted. Accordingly, on behalf of Mr. Radican, and
pursuant to the law and spirit of ERISA, information is submitted herewith to establish the
truth, i.e., that Mr. Radican was a full-time employee during the concerned time period.
Specifically, enclosed please find the sworn original affidavits of Mr. Radican's former co-
workers, Thomas Mendez and Craig Leonard, in which each states under oath that Mr.
Radican was actively at work on a full-time basis (more than 37.5 hours per week) for not
less than 40 weeks during 1996. Also enclosed please find the original affidavit of James
E. Radican in which he states, in concurrence with the affidavits of Mr. Mendez and Mr.
Leonard, that he was actively at work on a full-time basis for not less than 40 weeks during
1996.    In his affidavit Mr. Radican further clarifies what appears to have been a
miscommunication in phone conversations he had with your company. More specifically,
the second denial letter dated August 3, 1998 provides.

> [E]very indication we have points to the fact that your client
> never returned to full-time work after his surgery in 1995. In
> fact, on at least two separate occasions your client (Mr. Radi-
> can) informed us via the telephone that he worked part time
> **throughout** 1996. He (Mr. Radican) informed us that he worked
> part time for about one year but was told that he should apply
> for disability because the company could not longer accommo-
> date him on a part-time schedule. (emphasis added)

As stated in his affidavit, in his phone conversations Mr. Radican did not state that he
worked only part time in 1996. Mr. Radican was simply attempting to explain that he
worked part-time during those weeks (less than 12) when he received physical therapy and/or
pain treatment. The confusion was most probably caused by the use of the word "through-
out" in the context in the conversation. Assuming Mr. Radican used the word "throughout,"
it was a reference to his having received treatments "throughout" 1996.

As a further point of clarification, Marika McVey Ostendorf, in her June 5, 1998 letter,
explained that the February 4, 1998 letter from Michael Unger, General Manager of
Pennsuco Cement and Aggregates, in contained inaccurate statements. In this regard,
enclosed please find the sworn affidavit of Michael Unger in which, under oath, he clarifies

that he did not state or imply that Mr. Radican worked <u>only</u> part time in 1996. He was attempting to convey that he worked part-time during the weeks when he received physical therapy and/or pain treatments. Further, in accordance with Ms. Ostendorf's statement, Mr. Unger attests to his inadvertent error when he referred to January 1, 1996 instead of January 1, 1997.

Notwithstanding your statement in the second denial letter of August 3, 1998 that your "claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of his policy," request is hereby respectfully made for a reconsideration of the claim in light of the understandable confusion respecting the information required to establish Mr. Radican's eligibility for benefits. Bear in mind that 29 C.F.R. § 2560.503-1(f), mandating that claims procedure for ERISA plans be reasonable provides:

> A plan administrator . . . shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
>
> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> **(3) A description of any additional material or information necessary for the claimant to perfect the claim and explanation of why such material or information is necessary; and**
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.[2]

---

[2] Also bear in mind that the Employee Retirement Income Security Act of 1974 ("ERISA") at 29 U.S.C. § 1133 provides:

> [e]very employee benefit plan shall . . . (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

No description of the nature of the additional material or information required for Mr. Radican to perfect his claim was contained in the initial denial letter. It is respectfully submitted that this was the cause of the confusion.

Mr. Radican trusts that the information submitted herewith will be sufficient to establish the truth, i.e., that he was a full-time employee actively at work in 1996 as defined in the plan. His sincere apology for the delay in forwarding this information but the delay has been caused by Mr. Radican's condition (disability) which has affected his ability to determine the nature of the evidence required, and to obtain same. I look forward to hearing from you directly.

Sincerely,

Lawrence D. Bache

cc:    James A. Wilson, Jr. w/o enclosures
       Hope F. Fischer, w/enclosures
       James E. Radican, w/enclosures

enc.

Radican\Walsh 01

## AFFIDAVIT of MICHAEL UNGER

STATE OF FLORIDA                          }
                                          }
COUNTY OF ___ *Broward* ___               }

Before me, the undersigned authority, personally appeared, MICHAEL UNGER who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    I Michael Unger am the General Manager of Pennsuco Cement and Aggregates, a Tarmac America, Inc. company.

2.    Attached hereto is my letter to Mr. James Wilson, Reliance Standard Life Insurance Co., dated February 4, 1998.

3.    My letter dated February 4, 1998 contains the statement.

> Mr Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.

The above statement does not state, nor did I mean to infer that JAMES RADICAN worked only part-time in 1996.  I was attempting to convey that JAMES E. RADICAN worked part-time during the weeks when he received physical therapy and/or pain treatment.

4.    My letter dated February 4, 1998 contains the statement:

> Jim was incapable of performing his duties on this (a full-time) basis and was required to file for short term disability on January 1, 1996.

The reference to January 1, 1996 was an inadvertent error.  The date should have been January 1, 1997.

**Further Affiant Sayeth Not**

MICHAEL UNGER



Sworn to and subscribed before me on December _ _, 1998

Stamp or
Seal:

MARIA YEPES
My Comm Exp. 8/30/2002
No. CC 760747
[ ] Personally Known [ ] Other I.D

_____
Notary Public

My commission expires:

__--Personally Known

_____Produced identification

_____
Type of identification produced

\New Files-Radican Aff 02 Unger

# Tarmac

**Tarmac America, Inc.**
11000 N W 121st Way
Medley, FL 33178
(305) 364-2230
Fax (305) 364-2288

February 4, 1998

Mr. James Wilson
Reliance Standard Life Insurance Co                                      FAX: 215/787-4254
LTD Claim Department
2501 Parkway
Philadelphia, PA  19130-2499

Dear Mr. Wilson:

It is my understanding that, after recovering from back surgery, James Radican returned to work on
or about November 1, 1995.

At that time, Jim reported to Mr. Fred Goudie, Vice President of Production and Sales for Tarmac's
Pennsuco Cement Mill in Medley, Florida. Mr. Goudie allowed Jim to work on a part-time basis,
and continued to work on a part-time basis for over one year while receiving physical therapy and
pain treatments.

Tarmac's policy requires employees to work only on a full-time basis. Jim was incapable of
performing his duties on this basis and was required to file for short-term disability on January 1,
1996.

Sincerely

Michael Unger, General Manager
Pennsuco Cement and Aggregates

## AFFIDAVIT of JAMES E. RADICAN

STATE OF FLORIDA      }

                      }

COUNTY OF BROWARD     }

      Before me, the undersigned authority, personally appeared, JAMES E. RADICAN, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    Throughout 1996, I, JAMES E. RADICAN performed for Tarmac America, Inc., the material duties pertaining to my job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 37.5 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 I was actively at work full-time as defined above totals not less than 40 weeks.

2.    The only weeks I did not work a minimum of 37.5 hours per week in 1996 were those weeks in which I received physical therapy and/or pain treatment and which total not more than 12 weeks.

3.    In the letter from Richard D. Walsh dated August 3, 1998 the following is stated:

> In fact, on at least two separate occasions your client (Mr. Radican) informed us via the telephone that he worked part time throughout 1996.

The reference to "throughout" can be misleading and perhaps there has been some confusion. What I attempted to convey is the truth, i.e., that I worked part time in 1996 but only for those weeks (less than 12) when I received physical therapy and/or pain treatment.

4.    In the letter from Richard D. Walsh dated August 3, 1998 the following is stated:

> He (Mr. Radican) informed us that he worked part time for about one year but was told that he should apply for disability because the company could not longer accommodate him on a part-time schedule.

This is an inaccurate statement. Perhaps I was misunderstood. What I attempted to convey was the truth, i.e., the only time in 1996 in which I did not work full-time was during those weeks when I was receiving medical treatment as referred to above.

**Further Affiant Sayeth Not**

_____
JAMES E. RADICAN

Sworn to and subscribed before me on December 25, 1998.

Michael D Reynolds
My Commission CC461036
Expires May 8, 1999

_____
Notary Public

My commission expires:

_____ Personally Known

_____ Produced identification

_____
Type of identification produced

\New Files\Radican Aff 01

Page 2 of 2

## AFFIDAVIT of THOMAS MENDEZ

STATE OF FLORIDA        )
                        )
COUNTY OF Broward       )

     Before me, the undersigned authority, personally appeared, THOMAS MENDEZ, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.    I have personal knowledge that in 1996 JAMES E. RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 37.5 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**

_____
THOMAS MENDEZ

Sworn to and subscribed before me on December 31, 1998 by Thomas Mendez

Stamp or
Seal:

> OFFICIAL NOTARY SEAL
> SHARON H SULLIVAN
> NOTARY PUBLIC STATE OF FLORIDA
> COMMISSION NO. CC437569
> MY COMMISSION EXP. FEB. 7,1999

_____
Notary Public

My commission expires:

  X Personally Known

_____Produced identification

_____
Type of identification produced

\New Files\Radican Aff 01 Mendez

## AFFIDAVIT of CRAIG LEONARD

STATE OF FLORIDA                    }
COUNTY OF _Palm Beach_              }
                                   }

Before me, the undersigned authority, personally appeared, CRAIG LEONARD, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.      I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.      I have personal knowledge that in 1996 JAMES RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 37.5 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**

_____
CRAIG LEONARD

Sworn to and subscribed before me on ~~December~~ JANUARY _11_, 1998 by .

Stamp or
Seal:

_____
Notary Public

My commission expires:

_X_ Personally Known

____ Produced identification

_____
Type of identification produced

\New Files\Radican\Aff 01 Leonard



**Reliance Standard Life
Insurance Company®**

November 1, 1999

Lawrence D. Bache, Esq.,
9000 West Sheridan Street - Suite 174
Pembroke Pines, FL 33024

Re :            James E. Radican
Claim # :       1997-346-010
Policy # :      LSC 98842

Dear Mr. Bache:

We are writing to you regarding the appeal of our decision to deny your client's claim for Long
Term Disability ("LTD") benefits.

As previously explained, under the Employee Retirement Income Security Act ("ERISA") of
1974, your client was entitled to an independent review of the claim facts and the determination
made regarding his eligibility for benefits. Your client, through counsel, previously requested
such a review during calendar year 1998. On August 3, 1998, Reliance Standard Life Insurance
Company ("RSL") affirmed our prior decision to deny benefits. (We have enclosed copies of
both the original denial letter and the affirmation letter dated August 3, 1998 for your review.) As
your client had been afforded a full and fair review in accordance with ERISA, RSL was under
no obligation to reconsider his claim for benefits. Nevertheless, in good faith, we did reexamine
your client's claim after your request of earlier this year. We apologize for the delay in
responding to your request for a second appeal, however, we could not place your client's file
ahead of those files who had not yet received their first, mandated appeal.

We have completed our review of the claim file and have found that our original decision to deny
benefits and the subsequent affirmation of that denial was appropriate.

As you are aware, Mr. Radican's claim for LTD benefits was denied after RSL determined that
your client did not meet the eligibility requirements of the Policy on the Policy's effective date.
To be specific, RSL determined that your client was not a Full-time employee of Tarmac
America, Inc. ("Tarmac") on the Policy effective date of January 1, 1996 or at anytime thereafter.
The relevant Policy provision states:

*EFFECTIVE DATE OF INDIVIDUAL INSURANCE: If you (Tarmac) pay the entire
Premium due for an Eligible Person, the insurance for such Eligible Person will go into
effect on the Individual Effective Date, as shown on the Schedule of Benefits page.*

**Exhibit "D"**

Eligible Person is defined as follows:

*"Eligible Person" means a person who meets the eligibility requirements of this Policy.*

The Eligibility Requirements are explained on page 5.0 of the Policy. That provision reads:

**ELIGIBILITY REQUIREMENTS:** *A person is eligible for insurance under this Policy if he/she:*

> *(1) is a member of an Eligible Class, as shown on the Schedule of Benefits page; and*
> *(2) has completed the Waiting Period, as shown on the Schedule of Benefits page.*

The Schedule of Benefits page (page 1.0 & 1.1 of the Policy) defines Eligible Class as follows:

**ELIGIBLE CLASSES:** *Each active, Full-time employee except any person employed on a temporary or seasonal basis, according to the following classifications:*

> *CLASS A: employee earning $59,000.00 or more per year who:*
>
> > *(1) is engaged in a non-hazardous occupation; and*
> > *(2) functions primarily in an office environment.*
>
> *CLASS B: salaried employee earning more than $30,000.00 per year but less than $59,000.00*

Finally, the Policy defines "Full-time" as follows:

> *Full-time means working for you (Tarmac) for a minimum of 40 hours during a person's regular work week.*[1]

---

[1] In your letter of appeal dated January 26, 1999 you stated that the applicable plan document states the definition of Full-time work as being 37.5 hours as opposed to 40 hours per week. The Policy, which RSL considers to be the controlling document, (a copy of which is enclosed for your review) states that the definition of Full-time is 40 hours per week. Therefore, we disagree with your assertion that Full-time is defined as 37.5 hours per week. While we disagree with your assessment, however, it is irrelevant for purposes of our review as the evidence in our claim file does not suggest that your client was working even the lower 37.5 hours per week at any point during calendar year 1996 prior to his cessation of work on December 31, 1996.

2

On October 3, 1995, your client underwent a decompressive laminectomy due to his history of back pain and herniated disc with stenosis. Shortly after this surgery, Mr. Radican returned to work as a Sales Representative for Tarmac. Our review of the information contained in Mr. Radican's claim file, however, suggested that he never returned to work on a Full-time basis following the surgery. RSL's Policy with Tarmac took effect on January 1, 1996, approximately three months after Mr. Radican's back surgery. As Mr. Radican was not a Full-time employee when the Policy took effect, or at any time thereafter, he never became eligible for coverage under the terms of the Policy according to the above Policy provisions. This decision is supported by ample evidence contained in Mr. Radican's claim file.

First, we must note that Mr. Radican himself has suggested to RSL that he never returned to work on a Full-time basis. As previously explained, during two telephone conversations with one of our representatives Mr. Radican advised that he had worked part-time for approximately one year prior to being told that Tarmac could no longer accommodate his part-time schedule after December 31, 1996. We realize that your client disputes our interpretation of these phone conversations, however, when viewed in context with all of the additional information in his claim file, it would appear as though our initial understanding of these conversations was accurate. Furthermore, in Mr. Radican's own application for benefits it appears as though he noted that he worked on a part-time basis for the employer. On the Employee's Statement dated November 3, 1997 Mr. Radican was asked:

> Before you stopped working, did your condition require you to change your job or the way you did your job?

His answer:

> Yes

> Date you were first unable to work on a full-time basis

His answer:

> 1/1/97

Next he was asked:

> Last day you worked before the disability:

His answer:

> 12/31/96

3

Finally, he was asked:

Did you work a full day:

His answer:

No - Part time - recovering from surgery

While these answers are not conclusive evidence that your client was working on a part-time basis throughout 1996, the answers certainly could be interpreted to indicate that your client had been working part-time since his surgery in October of 1995. If the answers do not mean that he was working part-time since October of 1995 (as the phone conversations did not mean he was working part-time), then his answers are contradictory on their face. When asked when he was first unable to work on a full-time basis he indicated 1/1/97, but two questions later he indicated that he did not work full-time on 12/31/96, because he was working part-time as he recovered from surgery. Therefore, on three separate occasions (two telephone calls and the initial application), Mr. Radican appeared to indicate to RSL that he had worked on a part-time basis since his surgery. These were all contemporaneous statements made by your client to RSL at the time the questions were posed. Then, after his claim is denied based in large part on these statements, we are informed that we misinterpreted the meaning of these statements. While it is certainly possible that we misinterpreted these statements, when viewed in light of other information contained in the claim file, it appears as though our interpretation of the contemporaneous information was accurate. It was not until the claim had been denied and that denial affirmed on appeal, that the interpretation was questioned.

Information provided by Tarmac throughout the life of the claim suggested that Mr. Radican did not work on a Full-time basis throughout 1996. First, in a letter from Hope B. Fischer, Benefits Administrator for Tarmac, dated January 28, 1998, it was noted that:

(o)ur files on Mr. Radican indicate that he had back surgery in October of 1995 and *was out of work from that time until sometime after mid-year 1996 at the recommendation of his doctor, Manuel Porth.* Sometime during the latter part of 1996, he reported to work, but we have no documentation in the file to substantiate the dates worked.
(Emphasis added)

Furthermore, as previously explained to your client, we received a letter from a Michael Unger (General Manager of Pennsuco Cement and Aggregates) dated February 4, 1998, which indicated that Mr. Radican was working on a part-time basis throughout calendar year 1996. That letter stated:

It is my understanding that, after recovering from back surgery, James Radican returned to work on or about November 1, 1995.

4

> At that time, Jim reported to Mr. Fred Goudie, Vice President of Production and Sales for Tarmac's Pennsuco Cement Mill in Medley, Florida. *Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.*
>
> Tarmac's policy requires employees to work only on a full-time basis. Jim was incapable of performing his duties on this basis and was required to file for short-term disability on January 1, 1996 (sic 1997). (Emphasis added)

Upon appeal you have submitted an affidavit from Mr. Unger which again tries to explain that we misunderstood Mr. Radican's employment status during calendar year 1996. Mr. Unger's affidavit explains that he did not intend to state that Mr. Radican worked only part-time during 1996, but rather that he worked part-time only during those times he was actively treating for physical therapy and pain treatment. Therefore, RSL is asked to accept that we misinterpreted a fourth communication regarding Mr. Radican's employment history. It appears to this reviewer that all of the above communications were quite clear on their face, and that it was not until the claim was denied and the decision upheld that our interpretation of these statements was called into question. Again, we must conclude that the contemporaneous interpretation of Mr. Unger's letter appears to be the most reasonable and accurate interpretation of Mr. Radican's employment history during calendar year 1996.

The letter from Mr. Pittman (Vice President of Human Resources for Tarmac), also implicitly supports our prior decision to deny benefits. As explained in our letter to Ms. McVey Ostendorf dated August 3, 1998, Mr. Pittman's letter specifically avoided the issue of actual hours worked by Mr. Radican, but rather focused on his employment status during calendar year 1996. While certainly not conclusive of the fact that Mr. Radican worked under 40 hours per week (or 37.5), the fact that the issue was avoided by Mr. Pittman lends credence to RSL's determination.

The other affidavits submitted with your client's second appeal are also not persuasive. First, these affidavits would appear to be tainted by self-interest as they were submitted in an attempt to reinstate a valuable benefit which had been previously refused. More importantly, as a sales person who was out on the road for much of his activities, it is difficult to understand how the signers of the affidavits could have personal knowledge of Mr. Radican's work hours. This is especially true in light of the fact that the company itself, did not keep accurate track of the number of hours worked by Mr. Radican.

Ms. McVey Ostendorf's appeal and supporting documentation was not persuasive as previously explained in our letter to her of August 3, 1998. This subsequent review of the claim leads us to conclude that Ms. McVey Ostendorf provided RSL with information which she believed supported Mr. Radican's contention that he worked on a full-time basis while withholding similar information which, arguably, proved RSL's argument that he did not work on a full-time basis. Ms. McVey Ostendorf relied heavily on Mr. Radican's expense reports for January and August of 1996 as support that he had worked on a full-time basis during calendar year 1996. We

5

explained that we found it difficult (if not impossible) to rely on expense reports to determine the number of hours worked in a particular month (see page #2 of our letter dated August 3, 1998). We still contend that the expense reports cannot prove full-time work. We have subsequently received Mr. Radican's expense reports for the other ten months of calendar year 1996 (supplied by Ms McVey Ostendorf acting as counsel for Tarmac). Were we to follow Ms. McVey Ostendorf's logic, these reports clearly suggest that your client did not work on a full-time basis for at least ten months of calendar year 1996. Every month besides the two previously submitted to RSL (1/96 & 8/96) show that your client drove less than 1000 miles per month and had limited appointments scheduled in each of those ten months. Clearly if RSL were to base a decision regarding the number of hours Mr. Radican worked on his expense reports, it would not appear as though he worked on a full-time basis during any month in 1996 (besides, arguably, January and August). It would appear as though the ten other months' expense reports were not previously provided to RSL because they would refute Ms. McVey Ostendorf's position that Mr. Radican was a full-time employee. In any event, RSL has already concluded that expense reports (even the 1/96 & 8/96 reports) cannot support your client's contention that he worked on a full-time basis for Tarmac during calendar year 1996.

Finally, our review of the medical records provided by Mr. Radican's various physician(s) supports RSL's opinion that Mr. Radican did not work on a full-time basis during calendar year 1996. First, a "To Whom it May Concern" letter from Dr. Manuel Porth dated January 1, 1996 suggests that your client was not capable of working at all during the first half of 1996. Dr. Porth wrote:

> A program of rehabilitation is mandatory and *the patient has been advised to remain out of work for the next six months* for medical reasons. It is my opinion that with a strenuous program of therapy and rehabilitation, we can maximize the benefits of the surgical procedure and *hopefully return this patient to work status by June of 1996*. (Emphasis added)

It is our understanding that your client did not heed the advice of Dr. Porth and remain out of work for the first six months of 1996, but rather worked on a part-time basis during this time frame. In any event, it would appear as though Dr. Porth did not believe your client was capable of full-time work as he was suggesting that your client remain out of work completely for six months. RSL believes this is simply further evidence that your client did not work on a full-time basis during (at least the first half of) calendar year 1996.

Dr. Porth's medical records also suggest that your client was not capable of working full-time during calendar year 1996. On March 22, 1996 Dr. Porth noted:

> It is now 6 months following his laminectomy, and the quality of life has not significantly improved. *He is still unable to return to his job* and is aware of his back on a continual basis. (Emphasis added)

6

Again on September 16, 1996 Dr. Porth's medical records noted:

> The 3rd epidural helped to a lesser degree and in spite of continued therapy, epidural blocks, analgesic medications, the use of physical therapy and corset immobilization, the patient continues to be symptomatic and *is unable to return to work.* (Emphasis added)

A "To Whom it May Concern" letter of September 16, 1996 also suggested that your client was not able to work at all, let alone on a full-time basis. Dr. Porth's letter of that date stated:

> Mr. James Radican is a 66 year old gentleman followed in this office with a longstanding history of back pain. He has had decompression laminectomy with essentially no improvement for severe degenerative disease and spinal stenosis. He has had an attempt at multiple epidural blocks and physical therapy with no improvement.
>
> *At this point the patient is found totally disabled with respect to employment and is advised to remain out of work until further notice.* (Emphasis added)

Dr. Porth's medical records and "To Whom it May Concern" letters clearly suggest that your client was incapable of working due to his back condition. Nowhere in his records or letters does he suggest that your client was capable of full-time work following the laminectomy of October 1995. Therefore, while your client claims to have worked on a full-time basis after January 1, 1996, this does not appear to have been medically possible according to your client's own physician.

Based upon all of the above cited information, we have concluded that our prior decision to deny your client's claim for benefits and the subsequent affirmation of that denial were appropriate. All of the information which was gathered contemporaneously with our decision, suggested that your client did not work on a full-time basis after his surgery in October of 1995. It was not until the claim was denied (and subsequently affirmed), that any information was provided to suggest that your client was an active full-time employee of Tarmac on or after January 1, 1996. We find the contemporaneous information gathered during our initial investigation to be more reliable than the subsequently provided information when viewed in context with the entire claim file. Accordingly, we have determined that your client did not have any LTD coverage in force with RSL as of the January 1, 1996 Policy effective date or thereafter. We might suggest investigating whether your client's claimed disability could be covered by Tarmac's prior LTD carrier which was in effect during calendar year 1995.

In your letter dated August 27, 1999, you requested that we provide your client with information as to how he might perfect his claim. Unfortunately, we are unable to provide you with any such suggestions for a number of reasons. First, it would not appear as though there is any documentation which could perfect your client's appeal at this juncture. Tarmac has made it clear that they did not keep attendance records on your client. Given the abundance of information contained in our claim files which suggests that your client was not able to work on a full-time

7

basis after October of 1995, attendance records would appear to be the only documents which could perfect the claim. Second, although not required by ERISA, this was the second appeal RSL provided to your client. During each of these appeals, your client was represented by counsel. In both instances, your client was unable to provide RSL with information which would perfect his claim. His claim file is now closed and it will not be revisited. Accordingly, it will not be possible for your client to perfect his claim at this point in time. We believe he has had adequate opportunity to do so, as he was provided two appeals and he was represented by counsel in each instance.

We regret that our decision could not have been more favorable to your client, however, we are limited by the provisions of the policy. Please be advised that our claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of ERISA.

Nothing in this letter should be construed as a waiver of any of RSL's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

Richard D. Walsh
Manager, Quality Review Unit

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

Case No. **00-624-CIV-ZLOCH-Seltzer**

JAMES E. RADICAN )
)
    Plaintiff, )
)
vs. )
)
RELIANCE STANDARD LIFE )
INSURANCE COMPANY, a Foreign, )
corporation. )
)
    Defendants. )
_____ )

### AFFIDAVIT OF JAMES E. RADICAN IN
### SUPPORT OF MOTION FOR SUMMARY JUDGMENT

STATE OF FLORIDA    }
                  }
COUNTY OF BROWARD    }

    Before me, the undersigned authority, personally appeared, JAMES E. RADICAN,

who, after being duly cautioned and sworn, states upon personal belief and knowledge the

following:

1.    Throughout 1996, I, JAMES E. RADICAN performed for Tarmac America, Inc., the

    material duties pertaining to my job in the place and manner in which my job was

    normally performed on a full-time basis, i.e., a minimum of 40 hours during my

    regular work week, with the exception of those weeks in which I received physical

1

**Exhibit "E"**

therapy and/or pain treatment. The number of weeks in 1996 I was actively at work full-time as defined above totals not less than 40 weeks.

2.    Throughout 1996 I was employed by Tarmac America. Inc. as a full-time worker.

3.    Throughout 1996 I was paid by Tarmac America. Inc. as full-time worker.

4.    Throughout 1996 I was paid by Tarmac America. Inc. in the same way as other full-time employees of the company.

5.    Throughout 1996 I was insured as a full-time employee of Tarmac America, Inc.

6.    Throughout 1996 I enjoyed all benefits and perquisites of other full-time employees of Tarmac America, Inc.

7.    Throughout 1996 I paid premiums for my coverage as a full-time employee of Tarmac America. Inc.

8    Reliance Standard Life Insurance Company ("RELIANCE") accepted payment of my premiums in an amount due for full-time employees throughout 1996 and RELIANCE retained those premiums.

9.    RELIANCE employee Richard D. Walsh stated in his August 3. 1998 denial letter:

> . . . in fact, on at least two separate occasions your client (Mr. Radican) informed us via the telephone that he worked part time throughout 1996.

I provided Mr. Walsh with my sworn affidavit dated January 25. 1999 in which I stated:

> This is an inaccurate statement.    Perhaps I was misunderstood.    What I attempted to convey was the truth, i.e., the only time in 1996 in which I did not work

2

full-time was during those weeks when I was receiving
medical treatment as referred to above.

10.    In his final denial letter dated November 1, 1999 Richard D. Walsh stated:

. . . during two telephone conversations with one of our
representatives Mr. Radican advised that he had worked
part-time for approximately one year prior to being told
that Tarmac could no longer accommodate his part-time
schedule after December 31, 1996.

I never stated by phone or otherwise to any RELIANCE employee or anyone else that

I only worked part time in 1996 and I informed RELIANCE of this. I informed

RELIANCE that perhaps I as misunderstood. What I attempted to convey to the

RELIANCE employee with whom I spoke was the truth, i.e., that I worked part time

in 1996 but only for those weeks (less than 12) when I received physical therapy

and/or pain treatment.

11.    It was not until the final denial of benefits and close of the administrative record that

RELIANCE informed me that in making its determination to deny benefits it was

relying upon.

A.    Statements made by me in my application for benefits.

B.    Statements made by Hope B. Fisher in her letter dated January 28,
1998.

C.    Statements taken from the medical records of Dr. Porth.

Had I been provided an opportunity to respond to this evidence I would have

demonstrated that this evidence was not reliable as follows:

3

A.    Statements made by me in my application for benefits.

I did not state in my application that I worked only part-time throughout 1996. My reference to working part-time was in response to my working on December 31, 1996.

B.    Statements by Hope B. Fisher in her letter dated January 28, 1998.

Ms. Fisher worked out of Norfolk, Virginia and I worked in South Florida. I did not speak or have any dealing with Hope B. Fisher in 1996. The Tarmac human resource/employee benefit persons who worked out of South Florida and with whom I dealt and who were familiar with my employment status were Joan Black and Myra Perez. Had RELIANCE contacted either, they would have discovered the truth, i.e., that I worked the requisite hours of a "Full-time" employee for all weeks in 1996 except for those few weeks when I received physical therapy or pain treatment.

C.    Statements taken from the medical records of Dr. Manuel Porth.

Notwithstanding having back pain and associated problems throughout 1996 and having been advised by Dr. Manuel Porth that I should refrain from working for the first six months in 1996 I did not follow his advice and  the only weeks I did not work a minimum of 40 hours per week in 1996 were those weeks in which I received physical therapy and/or pain treatment and which total not more than 12 weeks.

**Further Affiant Sayeth Not**

_____

JAMES E. RADICAN

4

Sworn to and subscribed before me on April  $\underline{i \; 7}$ , 2000.

Stamp or
Seal:



JIMMY M. BULLARD
MY COMMISSION # CC 848032
EXPIRES June 21, 2003
Bonded Thru Notary Public Underwriters

_____
Notary Public

My commission expires:

_____ Personally Known

_X_ Produced identification

_____
Type of identification produced

AFF 04 Radican wpd

## AFFIDAVIT of CRAIG LEONARD

STATE OF FLORIDA           }
                           }
COUNTY OF PALM BEACH }

Before me. the undersigned authority. personally appeared. CRAIG LEONARD, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.   I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.   I have personal knowledge that in 1996 JAMES RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 40 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**

_____
CRAIG LEONARD

Sworn to and subscribed before me on _____4/26/_____. 2000 by

Stamp or
Seal:         MINERVA YANES
              MY COMMISSION # CC 895024
              EXPIRES: January 14, 2004
              Bonded Thru Notary Public Underwriters

_____
Notary Public

My commission expires:

✓  Personally Known

_____  Produced identification

_____
Type of identification produced

\New Files\Radican\ Aff 03 Leonard.wpd

**Exhibit "F"**

## AFFIDAVIT of THOMAS MENDEZ

STATE OF FLORIDA      }
                       }
COUNTY OF BROWARD    }

     Before me, the undersigned authority, personally appeared, THOMAS MENDEZ, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.    I have personal knowledge that in 1996 JAMES E. RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 40 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**

_____
THOMAS MENDEZ

Sworn to and subscribed before me on _____ 4pril_____, 2000 by .

Stamp or
Seal:



KEITH STRAWSER
MY COMMISSION # CC 907430
EXPIRES: February 2, 2004
Bonded Thru Notary Public Underwriters

_____
Notary Public

My commission expires:

_____ Personally Known

__X__ Produced identification

Florida's Drivers Licence
Type of identification produced

\New Files\Radican  Aff 01 Mendez

**Exhibit "G"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

Case No. **00-624-CIV-ZLOCH-Seltzer**

| | |
|---|---|
| JAMES E. RADICAN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| RELIANCE STANDARD LIFE | ) |
| INSURANCE COMPANY, a Foreign, | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AFFIDAVIT OF B. EDWARD PITTMAN IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

STATE OF VIRGINIA        }
~~COUNTY~~ $City$ OF $NoRFolK$        }

Before me, the undersigned authority, personally appeared, B. EDWARD PITTMAN,

who, after being duly cautioned and sworn, states upon personal belief and knowledge the

following:

1.    I am Vice President of Human Resources for Tarmac  America, Inc., and I have

personal knowledge that:

a.    Tarmac America, Inc. had no part-time or seasonal employees during 1996.

1

**Exhibit "H"**

b.    JAMES E. RADICAN was employed by Tarmac America, Inc. as a full-time worker throughout 1996.

c.    JAMES E. RADICAN was paid by Tarmac America, Inc. as a full-time worker throughout 1996.

d.    JAMES E. RADICAN was paid by Tarmac America, Inc. in the same way as other full-time employees of Tarmac America, Inc. throughout 1996.

e.    JAMES E. RADICAN was insured as a full-time employee of Tarmac America, Inc. throughout 1996.

f.    JAMES E. RADICAN enjoyed all benefits and perquisites of other full-time employees of Tarmac America, Inc. throughout 1996.

g.    JAMES E. RADICAN paid premiums for his coverage as a full-time employee of Tarmac America, Inc. throughout 1996.

h.    Reliance Standard Life Insurance Company ("RELIANCE") accepted payment of premiums for JAMES E. RADICAN in an amount due for full-time employees of Tarmac America, Inc. throughout 1996.

**Further Affiant Sayeth Not**

B. Edward Pittman
B. EDWARD PITTMAN

Sworn to and subscribed before me on April  20 . 2000.

2

Stamp or
Seal:

_____
Notary Public

My commission expires:   04/31/02

__✓__ Personally Known

_____ Produced identification

_____
Type of identification produced

Aff 06 Pittman wpd

August 3, 1998

Marika McVey Ostendorf, Esq.
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re :         James E. Radican
Claim # :    1997-346-010
Policy # :   LSC 98842

Dear Ms. McVey Ostendorf:

We are writing to you regarding the appeal of our decision to deny benefits to your client, James
Radican. Please be advised that Reliance Standard Life Insurance Company ("RSL") strives to
treat all clients fairly and evaluate claims submitted to us in an objective and equitable manner.

Under the Employee Retirement Income Security Act ("ERISA") of 1974 you are entitled to an
independent review of the claim facts and the determination made regarding your client's
eligibility for benefits. Your client's file was referred to our Quality Review Unit to conduct such
a review. This review has been conducted separately from the individual(s) who made the original
determination to deny your benefits.

We have completed our initial review of the claim file and have found that our original
determination to deny liability was appropriate.

We do not have any conclusive evidence to support your client's contention that he *worked* on a
full-time basis for Tarmac America, Inc. after January 1, 1996. The letter from B. Edward
Pittman, Vice President of Human Resources for Tarmac does not report that your client was
working on a full-time basis during 1996 as you report. Rather, the letter states that your client
was always considered a full-time salaried exempt employee and was never placed on part-time
status. Not only does the letter avoid the issue of hours worked by your client, it appears to admit
that he was not working full-time hours when it states:

> The fact that he worked partial days in 1996 following his return to work from surgery
> should in no way be construed as "part-time" status. Had Mr. Radican been classified a
> part-time employee, he would have been ineligible for participation in our long term
> disability benefit at all.

                                                    Exhibit "I"




-2-

The quotation above is representative of much of the letter. Nowhere in the letter does Mr Pittman explain the number of hours your client actually worked but instead talks about what status was assigned to him during calendar year 1996 Unfortunately, we are not interested in the employment classification of your client, but rather in the number of hours per week he actually worked.

Every indication we have points to the fact that your client never returned to full-time work after his surgery in 1995. In fact, on at least two separate occasions your client informed us via the telephone that he worked part-time throughout 1996 He informed us that he worked part-time for about one year but was then told that he should apply for disability because the company could no longer accommodate him on a part-time schedule.

The travel expense reports which you provided do not conclusively demonstrate that your client was working on a full-time basis during any time in 1996. The reports show that your client traveled for business during the months of December 1995, and January/August of 1996, but they do not show that he worked on a full-time basis

Furthermore, we do not understand how you wished us to interpret these expense reports in order to come to the conclusion that they proved your client was a full-time employee. The following example indicates why the expense reports are not a good indicator of hours worked by your client. Your letter relates that your client underwent physical therapy x per week for 3 hours per session during December of 1995 Despite a loss of approximately 6 hours per week (not including travel time to and from physical therapy) your client traveled 1,380 miles for work during that month. When compared to August of 1996, when your client was not undergoing physical therapy, we find that your client traveled significantly less miles than he did in December of 1995. In August of 1996 your client traveled 1,050 miles for business despite an extra six hours per week which were not devoted to physical therapy. If we were to determine hours worked using expense reports we would have to come to the conclusion that Mr. Radican worked more hours in December of 1995 than in August of 1996 because of the significantly greater number of miles which he traveled during December of 1995.  It is my understanding that such a conclusion would be inaccurate as your client actually worked less hours in December of 1995 due to physical therapy. Accordingly, it is impossible for us to determine actual hours worked through the use of Mr. Radican's expense reports

Therefore, based upon the information above and the lack of conclusive evidence of full-time work by your client, we have concluded that our previous decision to deny benefits to your client was appropriate Accordingly, no benefits are payable and your client's file will remain closed at this time.

We regret that our decision could not have been more favorable to your client, however, we are limited by the provisions of the policy Please be advised that our claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of his policy



-3-

Nothing in this letter should be construed as a waiver of any of RSL's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not specifically mentioned herein

Sincerely,

Richard D. Walsh
Assistant Manager, Quality Review Unit