UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. **00-624-CIV-ZLOCH-Seltzer**

JAMES E. RADICAN          )
                          )
          Plaintiff,      )
                          )
vs.                       )
                          )
RELIANCE STANDARD LIFE    )
INSURANCE COMPANY, a Foreign, )
corporation,              )
                          )
          Defendants.     )
_____)

**PLAINTIFF'S MOTION FOR ATTORNEY'S FEES
AND COSTS AND/OR ALTERNATIVELY, TO PERMIT
SUBSEQUENT APPLICATION FOR SAME AND
MEMORANDA OF LAW IN SUPPORT THEREOF**

**COMES NOW** Plaintiff, JAMES E. RADICAN, through undersigned counsel and

pursuant to Rule 7.3 of the Local Rules for the United States District Court, Southern District

of Florida, files this Motion for Attorney's Fees and Costs, and/or Alternatively to Permit

Subsequent Application for same, and Memoranda of Law in support thereof and states:

1.    On January 17, 2001 this Court granted *Plaintiff's Motion to Remand to Plan

      Administrator and Abate Action* and entered a *Final Order Of Remand* "to the Plan

      Administrator for reconsideration of Plaintiff, JAMES E. RADICAN's eligibility for

      benefits based on the Plaintiff's submission of evidence in response to information

-1-

contained in the defendant's final determination of eligibility." Pending Motions for
Summary Judgment filed by the parties were denied as moot.

2.    Plaintiff and the undersigned counsel have a written contingency fee agreement which
provides that the plaintiff is obligated to pay the undersigned counsel a percentage of
his recovery in this litigation, and counsel has accepted the risk of receiving no
compensation in the event plaintiff fails to recover on his claims.

3.    The number of hours reasonably spent by Lawrence D. Bache in representing plaintiff
and his hourly rate is set forth in his sworn affidavit attached hereto as exhibit "A".

4.    An affidavit of counsel who has reviewed the time records and supporting data and
certified the reasonableness of the fees and costs sought by plaintiff's counsel is
attached hereto as exhibit "B".

## MOTION FOR ATTORNEY'S FEES AND
## COSTS AND SUPPORTING MEMORANDUM OF LAW

29 U.S.C. § 1132(g)(1) provides: "[I]n any action under this subchapter . . . by a
participant, beneficiary, or fiduciary, the court in its discretion may allow a 'reasonable
attorney's fees and costs of action to either party." The ERISA attorney fee provision is
viewed as an important mechanism for furthering ERISA's remedial purposes. *Meredith v.
Navistar International Transportation Corp.*, 935 F.2d 128 (7th Cir. 1991); *Nachwalter v.
Christie*, 805 F.2d 956 (11th Cir. 1986).

It must be noted that 29 U.S.C. § 1132(g)(1) is distinct from other attorney fee statutes
in that it does not state that one must be a "prevailing party" in order to recover attorney's

-2-

fees and costs. Attorney's fees in ERISA cases have even be awarded to a losing plaintiff. *McElwaine v. U.S. West, Inc.*, 1999 U.S. App. Lexis 8763 (9th Cir May 10, 1999). *Sharron v. Amalgamated Insurance Agency Services, Inc.* 704 F.2d 562 (11th Cir. 1983). Under ERISA, a party may be entitled to attorney's fees if it obtains substantial relief. More specifically, a party prevails if it "gets substantial relief . . . even if it doesn't win on every claim." See *Slane v. Mariah Boats, Inc.*, 164 F.3d 1065, 1068 (7th Cir. 1999).

Attached hereto as exhibit "C" is an Order from the United States District Court for the Northern District of Georgia, Atlanta Division *(Linda Morris v. Continental Casualty Company d/b/a CNA Insurance Companies*; Case no. 1:99-CV-885A-JEC) dated March 31, 2000, a similar case in that the matter was remanded to the plan administrator for further proceedings. The court in that case on page 24 concluded "that equitable considerations suggest that plaintiff should be reimbursed for attorney's fees incurred up to" the point of remand, and stated in a footnote that "[i]f defendant opposes the grant of attorney fees and costs here, the Court reserves the right to revisit the propriety of remand" and that without remand, "a decision on the merits would likely have gone against Defendant."

ERISA was enacted primarily to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits. *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 103 S.Ct., 2890, 77 L.Ed.2d 490 (1983); *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed. 96 (1985). A plan administrator has a fiduciary duty to "discharge [their] duties with respect to the plan solely

-3-

in the interest of the participants and beneficiaries." 29 U.S.C. 1104(1)(1). *Pegram et. al. v. Herdrich*, U.S. Supreme Court Opinion, case no. 98-1949, decided June 12, 2000.

An award of attorney's fees under ERISA 29 U.S.C. § 1132(g), is discretionary. Although the 11th Circuit in *Freeman v. Continental Ins. Co.*, 996 F.2d 1116 (11th Cir. 1993) citing *Dixon Seafarers Welfare Plan*, 878 F.2d 1411 (11th Cir. 1989) has stated that "[T]he law provides no presumption in favor of granting attorney's fees to a prevailing claimant in an ERISA action," other circuits have held that a prevailing plan beneficiary or participant should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust, *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1356 (8th Cir. 1980), and that the burden of proving that special circumstances exist is on the losing defendant. *Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F.2d 496, 500 (8th Cir. 1989) citing *Landro*, supra.

In determining a plaintiff's entitlement to attorney's fees, the courts have adopted a five-factor ERISA test which requires a determination of:

1)    The degree of the opposing party's culpability or bad faith;

2)    The ability of the opposing party to satisfy an award of attorney's fees;

3)    whether an award of attorney's fees would deter other persons acting under similar circumstances;

4)    whether the party seeking attorney's fees sought to benefit all participants and beneficiaries under an ERISA plan or to resolve a significant legal question under ERISA itself; and

-4-

5)    The relative merits of the party's positions.

No one of the five factors is necessarily decisive, and the weight to be given to each factor depends on the facts of each case. Some may not be apropos in a given case, but together they are a nuclei of concerns that a court should address. See *Freeman*, supra at 1119. In particular types of cases, or in any individual case, considerations other than the five factors may be relevant as well. See *Freeman*, supra, at 1119 and cases cited therein.

An analysis of the five factors as they apply in this case is set forth below.

1)    **The degree of the opposing party's culpability or bad faith**:

Defendant, Reliance Standard Life Insurance Company ("RSL"), is a self-interested fiduciary because benefits, if any, are paid from its assets. RSL was acting in a fiduciary capacity in administering the concerned ERISA plan. Bad faith is a more sensitive issue when it relates to a fiduciary as opposed to a non-fiduciary, particularly when the self-interest of the fiduciary is involved.

RSL exhibited bad faith in administering plaintiff's claim for benefits by concealing until it closed the administrative record (final denial), the basis (evidence) upon which it mainly relied in making its determination to deny benefits. In doing so it denied plaintiff the opportunity to respond thereto, an opportunity which this court has now afforded. An ERISA fiduciary, particularly a self-interested fiduciary, must afford a plan participant a reasonable opportunity to submit responsive evidence bearing on the validity of his claim.

-5-

To fail to do so violates the requirements of 29 C.F.R. § 2560.503[1] and constitutes bad faith.

In opposition to plaintiff's Motion to Remand, RSL argued that plaintiff was afforded a full and fair review of his claim, and that remand was therefore not appropriate. This argument was rejected by the Court. In its *Final Order of Remand*, the Court stated:

> In the instant Motion (DE 17), the Plaintiff asserts that he failed to receive a full and fair review of his claim per 29 U.S.C. § 1132 and 29 C.F.R. § 2560-503-1-(F), as he was denied the opportunity to present evidence which would refute the Defendant's final determination that the Plaintiff was ineligible to receive disability benefits. Consequently, the Plaintiff asserts that the instant action should be remanded to the plan administrator for further consideration.
>
> The Court notes that it has the authority to remand ERISA claims to plan administrators when a plaintiff has additional evidence which might affect his eligibility for benefits. Thomas Shannon v. Jack Eckerd Corp., 113 F.3d 208, 210 (11th Cir. 1997); Jett v. Blue Cross & Blue Shield of Alabama, 890 F.2d 1137, 1140 (11th Cir. 1989). Such is the situation in the instant case, as the Plaintiff has submitted evidence that might affect his eligibility for receiving disability benefits from the Defendant. Specifically, the Plaintiff has evidence which suggest that the was a full-time employee at the

---

[1] 29 C.F.R. § 2560.503-1(f) states that written notice of a denial of benefits by a plan administrator must include:

> (1) The specific reason or reasons for the denial;
> (2) Specific reference to pertinent plan provisions on which the denial is based;
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

> time in question, and as such he would be eligible for the receipt
> of disability benefits from the Defendant. Thus a remand to the
> plan administrator is appropriate.

As detailed above, RSL has exhibited a high degree of culpability and bad faith in this case.

### 2)    The ability of the opposing party to satisfy an award of attorney's fees.

As to the ability of the opposing party to satisfy an award of attorney's fees, RSL is a part of a large insurance group with assets exceeding fourteen billion dollars ($14,000,000,000.) as of 1999 per www.rgh.com. Further, on April 6, 2000 in the case of *Levinson v. Reliance Standard Life Insurance Company*, United States District Court for the Southern District of Florida, case No. 97-935-Civ-GOLD/Simonton, on page 9 of "Defendant's Memorandum in Opposition to Plaintiff's Motion (for in excess of $80,000.00) for Attorney's Fees and Costs," RSL conceded it had the ability to satisfy the amount of attorney's fees and costs sought in those proceedings.

### 3) Whether an award of attorney's fees would deter other persons acting under similar circumstances.

It is within the realm of reasonable expectation to consider that an administrator which is financially penalized for conducting its claim procedure in an unfair manner as was the case herein, would be more scrupulous in doing so in the future, and that other administrators in ERISA cases would be mindful of the court's decision herein.

-7-

**4)    Whether the party seeking attorney's fees sought to benefit all participants and beneficiaries under an ERISA plan or to resolve a significant legal question under ERISA itself.**

The issue resolved to date in the instant ERISA case implicated consideration of the important legal questions respecting what constitutes a full and fair review of a denied claim for benefits. The determination in favor of the plaintiff/beneficiary in this regard must necessarily accrue to the benefit of all participants and beneficiaries of ERISA health plans. More specifically, an ERISA fiduciary is required to act in accordance with its fiduciarial obligation and, in that capacity, to maintain a reasonable claims procedure.

**5)    The relative merits of the party's positions.**

The court's decision in the instant case sufficiently explicates the relative merits of the parties positions. Upon carful analysis of both parties' arguments respecting remand, the court determined RSL was required to consider evidence which it had previously and wrongfully refused to consider.

**ALTERNATIVE MOTION TO DEFER RULING ON PLAINTIFF'S INSTANT MOTION FOR ATTORNEY'S FEES AND COSTS AND PERMITTING SUBSEQUENT RE-APPLICATION FOR SAME**

The matter has been remanded to RSL, and therefore, no final determination on plaintiff's entitlement to benefits has yet been made. Plaintiff believes he will succeed on the merits of his claim for benefits, either in the administrative proceedings upon remand, or in further litigation. In the event plaintiff's instant Motion for attorney's fees and costs

incurred to date is denied, and RSL determines to pay plaintiff's claims in the administrative

proceedings upon remand, plaintiff will be precluded from exercising his statutory right to

seek fees and costs incurred to date, notwithstanding that payment of his benefits was

obtained solely as a result of this litigation. Accordingly, it is respectfully requested that in

the event plaintiff's instant Motion for Attorney's Fees and Costs is denied, the Court direct

that plaintiff be allowed to make a subsequent application for attorney's fees and costs

incurred to date, should he succeed in recovering benefits in the administrative proceedings

upon remand, or in further litigation (if required).

In *Lawrence V. Westerhaus*, 749 F.2d 494 (8ᵗʰ Cir. 1984) the trial court in a similar

case remanded the matter to the fiduciary administrator to consider additional evidence, but

denied plaintiff's application for attorney's fees incurred to the date of remand. The

appellate court reversed the trial court's denial of plaintiff's claim for attorney's fees stating:

> In this case we believe that the denial of attorney's fees may
> have been premature because the plaintiff may still succeed on
> the merits of her action, either in the administrative proceedings
> or otherwise. Accordingly, while agreeing that the district court
> properly denied the request for fees at this time, we direct that
> the district court modify its order to permit plaintiff to reapply
> for fees should she ultimately succeed in her claim for disability
> benefits.

**WHEREFORE**, Plaintiff respectfully requests this Court award $21,900.00 in

attorney's fees and $380.29 in costs for a total of Twenty Two Thousand Two Hundred

Eighty and 20/100 Dollars (**$22,280.29**) and award any and all other relief deemed just and

equitable. Alternatively, in the event this court determines that, at this juncture, plaintiff is

-9-

not entitled to attorney's fees and costs incurred to date, it is respectfully requested that the Court order that plaintiff be permitted to make subsequent application for those and other costs and fees in the event he prevails in recovering benefits in the administrative proceedings or in further litigation.

**Respectfully submitted this 9th day of February, 2001.**

STATE OF FLORIDA    )

COUNTY OF BROWARD    )

BEFORE ME, the undersigned Notary Public, personally appeared, Lawrence D. Bache, Esq., to me well known, who, after being first duly sworn on his oath, deposes and, upon personal knowledge states as follows:

**I HEREBY CERTIFY** THAT I HAVE PREPARED THE FOREGOING MOTION AND SUPPORTING AFFIDAVIT AND VERIFY THE ACCURACY THEREOF .

Further Affiant Sayeth Not.

LAWRENCE D. BACHE
Florida Bar No. 0557935

Sworn to and subscribed before me this 9th day of February, 2001.

Signature of Officer Administering Oath or
Notary Public, State of Florida

Michael D Reynolds
My Commission CC826053
Expires May 8, 2003

Print, Type or Stamp Commissioned Name of Notary
and Commission Expiration

-10-

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via U.S. mail this 9th day of February, 2001, to **Gene D. Lipscher**, Esq., Alley, Maass, Rogers, & Lindsay, P.A., Attorney for RSL, 321 Royal Poinciana Plaza South , P.O. Box 431 Palm Beach, FL 33480-0431, and to **Joshua Bachrach**, Esq., Rawle & Henderson, the Widener Bldg, 16th Floor, One South Penn Square, 1339 Chestnut St., Philadelphia, Pa 19107.


BY: _____

    LAWRENCE D. BACHE
    Florida Bar No. 0557935
Attorney for Plaintiff
Law Office of Lawrence D. Bache
9000 West Sheridan Street, Suite 174
Pembroke Pines, Florida 33024
Phone: (954) 436-7376
Fax: (954) 436-2926

-11-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **00-624-CIV-ZLOCH-Seltzer**

| | |
|---|---|
| JAMES E. RADICAN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| RELIANCE STANDARD LIFE | ) |
| INSURANCE COMPANY, a Foreign, | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

STATE OF FLORIDA )

COUNTY OF BROWARD )

       BEFORE ME, the undersigned Notary Public, personally appeared, Lawrence D.

Bache, Esq., to me well known, who, after being first duly sworn on his oath, deposes and,

upon personal knowledge states as follows:

       1.    I am the attorney for the Plaintiff herein

       2.    That in such capacity, I have personal knowledge of time and costs expended

          in the above-styled action and detailed below.

| Date | Service | Time |
|---|---|---|
| 11/23/98 | Review all documents; Initial meeting with client; Determine viability of claim; Research ERISA law. | 3.8 |
| 11/30/98 | Continue review of documents and plan; Phone conference with client; Review case law. | 2.0 |

**Exhibit "A"**

| | | |
|---|---|---|
| 12/6/98 | Review plan further; Phone conference with client re: unanswered questions. | 0.5 |
| 12/17/98 | Continue review of plan; Research; Phone conference with client; Review work done by predecessor counsel. | 2.5 |
| 12/21/98 | Research case law; Review plan in detail for further administrative appeal rights. | 2.0 |
| 12/23/98 | Meeting with client; Sigh final Retainer Agreement; Go over all details of case; Draft first Affidavit of employee Craig Leonard; Draft first affidavit of James Radican; Draft affidavit of Mike Unger. | 4.5 |
| 1/22/99 | Draft letter to Mr. Walsh at Reliance Standard Life Insurance Co. | 5.2 |
| 3/9/99 | Draft letter to Reliance Standard Life Insurance Co. re: no response to letter. | 0.5 |
| 3/30/99 | Review letter from Reliance Standard Life Insurance Co. re: appeal, send copy to client with status report. | 0.5 |
| 4/19/99 | Review file; Review letter from counsel for Tarmac RSL to Fisher; Phone calls | 0.5 |
| 4/22/99 | Review letter from former counsel to client. | 0.3 |
| 8/27/99 | Letter to RSL. | 0.3 |
| 10/27/99 | Letter to RSL. | 0.3 |
| 11/8/99 | Review final denial letter in detail/Research/Review entire file. | 2.0 |
| 11/30/99 | Review final denial letter in detail; Phone conference with client; Review all correspondence ; Determination re: filing complaint; Draft initial complaint/summons/service information ,etc., Attachments. | 6.5 |
| 1/11/00 | Review Answer and Affirmative Defenses; Removal papers. | 1.0 |
| 1/27/00 | Phone conference with opposing counsel re: Local Rule 16.B. | 0.3 |

| | | |
|---|---|---|
| 1/28/00 | Draft initial proposed Joint Scheduling Order with letter to opposing counsel | 1.5 |
| 1/31/00 | Charges to Report per letter from opposing counsel | 0.3 |
| 2/3/00 | Finalize Joint Scheduling Report and file/transmittal letter. | 0.3 |
| 3/7/00 | Outline issues for Motion for Summary Judgment. | 2.0 |
| 3/15/00 | Draft Motion for Summary Judgment, affidavits, and exhibits. | 6.0 |
| 3/17/00 | Revise Motion for Summary Judgment; Draft affidavits and exhibits. | 2.0 |
| 3/21/00 | Revise Motion for Summary Judgment, affidavits and exhibits. | 0.8 |
| 3/22/00 | Phone conference with Mr. Pittman in Norfolk; Revise affidavit; | 1.0 |
| 3/23/00 | Work on Motion for Summary Judgment. | 0.6 |
| 4/6/00 | Review defendant's Motion for Leave. | 0.3 |
| 4/10/00 | Review court's Order granting defendant's Motion for Leave. | 0.2 |
| 4/12/00 | Phone conference with client re: affidavit testimony; Revisions re: Motion for Summary Judgment and exhibits to attachments. | 1.5 |
| 4/17/00 | Review Motion for pro hac vice and affdiavit. | 0.4 |
| 4/24/00 | Review Order granting pro hac vice. | 0.2 |
| 4/24/00 | Review Court's Order for pre-trial conference/calendar dates. | 0.6 |
| 5/16/00 | Work on Motion for Summary Judgment. | 1.0 |
| 5/24/00 | Motion for Oral argument re: Motion for Summary Judgment; Review | 0.8 |
| 5/25/00 | Complete Motion for Summary Judgment. | 2.8 |
| 6/8/00 | Review response to plaintiff's Motion for Summary Judgment and Cross Motion for Summary Judgment. | 0.7 |

| 6/12/00 | Outline of Response to Cross Motion for Summary Judgment. | 1.5 |
| 6/13/00 | Phone conference with client; Draft Response to Cross Motion for Summary Judgment. | 4.0 |
| 6/14/00 | Work on facts in Response to Cross Motion for Summary Judgment. | 2.0 |
| 6/15/00 | Work on facts in Response to Cross Motion for Summary Judgment. | 5.5 |
| 6/20/00 | Work on Response to Cross Motion for Summary Judgment. | 3.3 |
| 6/21/00 | Work on Response to Cross Motion for Summary Judgment. | 1.8 |
| 6/22/00 | Work on Response to Cross Motion for Summary Judgment. | 1.6 |
| 6/23/00 | Complete Plaintiff's Response to Cross Motion for Summary Judgment. | 3.0 |
| 6/26/00 | Research Law on Remand; Phone conferences with Dr./client, etc. | 2.8 |
| 7/5/00 | Draft Affidavits to Support Motion to Remand/Revise/Research. | 3.0 |
| 7/6/00 | Draft and finalize and serve Motion to Remand. | 3.0 |
| 7/7/00 | Review Reply Brief; Review case law cited by defendant/burden of proof. | 1.0 |
| 7/13/00 | Review defendant's Response to Motion to Remand | 1.0 |
| 7/17/00 | Research/draft Reply Memo to Defendant's Response to Motion to Remand. | 2.5 |
| 7/18/00 | Revise Reply to Defendant's Response to Motion to Remand. | 1.0 |
| 7/19/00 | Revise Reply to Defendant's Response to Motion to Remand. | 1.0 |
| 1/10/01 | Review letter, copy to client. | 0.3 |
| 1/16/01 | Review Court Order in detail re: Motion to Remand and Abate Action; Phone conference with client. | 2.0 |

| 1/26/01 | Research, Motion for Attorney's fees/costs; Draft memo file re: other information; Review letter from opposing counsel; Phone call with opposing counsel. | 5.0 |
| 2/2/01 | Outline Motion and affidavits for attorney's fees. | 2.0 |
| 2/5/01 | Research/draft Motion for Attorney's fees and costs; Affidavits. | 5.5 |
| 2/7/01 | Revise Motion for Attorney's fees and costs. | 1.0 |
|  | TOTAL HOURS: | 109.5 |

TOTAL FEES:

109.5 hours @ $200. per hour = $21,900.00

**COSTS:**

| Clerk of the Court, filing fee: | $200.00 |
| Photocopies (575) | 143.75 |
| Postage: | 21.54 |
| Service of Process | 15.00 |
| TOTAL COSTS: | $380.29 |

**Total Fees and Costs:     $22,280.29**

FURTHER AFFIANT SAYETH NOT.

LAWRENCE D. BACHE

Sworn to and subscribed before me this 8th day of February, 2001.

Signature of Officer Administering Oath or
Notary Public, State of Florida



_____

Print, Type or Stamp Commissioned Name of Notary
and Commission Expiration


Personally Known _____ or Produced Identification _____
Type of Identification Produced _____ N/A _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **00-624-CIV-ZLOCH-Seltzer**

| | |
|---|---|
| JAMES E. RADICAN | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) |
| RELIANCE STANDARD LIFE | ) |
| INSURANCE COMPANY, a Foreign, | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

STATE OF FLORIDA        )
COUNTY OF BROWARD        )

**BEFORE ME,** an officer duly authorized to take acknowledgments and administer oaths, personally appeared DEBRA T. KOPROWSKI, who, after being first duly sworn, deposes and states upon personal knowledge, as follows:

1.      That she is a practicing attorney and a member of the Florida Bar in good standing.

2.      That she is familiar with issues in cases governed by the Employee Retirement Income Security Act ("ERISA") and the amount customarily charged by attorneys and allowed by the Court for attorney's fees.

3.      That she reviewed the file maintained by Lawrence D. Bache in above-styled cause and is aware of the extent of the services rendered by the Plaintiff's attorney in this cause, and that in her opinion the sum of $21,900.00 would be a reasonable attorney's fee to be allowed the Plaintiff's attorney for his services.

-1-

**Exhibit "B"**

_Debra T. Kapran_ .
DEBRA T. KOPROWSKI

SWORN TO AND SUBSCRIBED before me this $8^{7H}$ day of February, 2001.


_Michael D. Reynolds_

Signature of Officer Administering Oath or
Notary Public, State of Florida

> Michael D Reynolds
> My Commission CC826053
> Expires May 8, 2003

_____
Print, Type or Stamp Commissioned Name of Notary
and Commission Expiration


Personally Known $\times$ or Produced Identification_____

Type of Identification Produced_____ $N/A$ _____


\C:\MyFiles\Radican\Affidav DK.wpd

-2-

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LINDA MORRIS,

                    Plaintiff,

                                          CIVIL ACTION NO.

v.                                        1:99-CV-885A-JEC

CONTINENTAL CASUALTY COMPANY,
d/b/a CNA INSURANCE COMPANIES,

                    Defendant.

## ORDER

This case is presently before the Court on plaintiff's Motion
for Summary Judgment [10] and defendant's Motion for Summary
Judgment [12].    The Court has reviewed the record and the
arguments of the parties and, for the reasons set out below,
concludes that plaintiff's Motion for Summary Judgment [10] should
be **DENIED** and defendant's Motion for Summary Judgment [12] should
be **DENIED**.    The case is **REMANDED** to the plan administrator for
further factual findings.

### BACKGROUND

. The parties agree that the material facts of this case are
not in dispute.    The case arises from defendant's denial of
plaintiff's claim for long term disability (hereinafter "LTD")
benefits.    Plaintiff's employer, Landauer & Associates, Inc.,
contracted    with    defendant    to    provide    LTD    benefits    to    its

AO 72A
(Rev.8/82)

**Exhibit "C"**

employees. (Pl.'s Stmt. of Mat. Facts Not in Dispute [10] at ¶ 1;
CNA's Controverting Stmt. of Mat. Facts in Opp'n to Pl.'s Mot. for
Summ. J. [11] at 12.)   To be a plan member, employees were
required to enroll and pay a plan premium. (*Id.*; *Id.*)  Plaintiff
enrolled, paid her premiums, and was given a booklet explaining
her LTD benefits. (*Id.* at ¶ 2; *Id.*)

The LTD booklet, under the heading "What Constitutes Total
Disability?," states: "Normally, your own physician determines the
degree of physical impairment caused by the disabling condition."
(*Id.* at ¶ 6; *Id.* at 13.)   The policy itself defines "Total
Disability" as follows:

> "Total Disability" means that, during the Elimination
> Period and the Insured Employee Occupation Period shown
> in Statement 4 of the Application, the Insured Employee
> because of Injury or Sickness, is:
>
> (1) continually unable to perform substantial and
> material duties of his regular occupation;
>
> (2) under the regular care of a licensed physician other
> than himself; and
>
> (3) not gainfully employed in any occupation for which
> he is or becomes qualified by education, training, or
> experience.

(*Id.* at ¶ 4; *Id.* at 12-13.)   Defendant acted as the "Claim
Administrator," making all decisions as to benefits payable. (*Id.*
at ¶ 3; *Id.* at 12.)  The plan, however, did not grant defendant,
as the Claim Administrator, any discretionary authority in
construing ambiguous terms in the plan or making benefits
determinations.   (*Id.* at ¶ 5; *Id.* at 13.)   All benefit

2

AO 72A
(Rev.8/82)

determinations were to be made in accordance with the policy's definition of total disability.

Plaintiff claims that she began having feeling poorly in early 1993. (*Id.* at ¶ 7.)[1]   Despite these recurring ailments,

---

[1] Plaintiff's medical records show that she made the following visits to her physicians during 1993 and 1994:

| Date | Doctor | Summary of Record |
|------|--------|-------------------|
| 1/8/93 | Dr. Wendy Smith | "*fever and night sweats*" |
| 1/19/93 | Dr. Ferrol Sams | continues to "run a temperature and is feeling extremely weak." |
| 1/25/93 | Dr. Smith | felt poorly & had a fever |
| 2/4/93 | Dr. Eduardo Baetti | diagnosed with Chronic Fatigue Syndrome, noting fever, aches, and fatigue . . . worsening to the point that she [had] to take prolonged sick leave" |
| 3/25/93 | Dr. Smith | Chronic Fatigue Syndrome "somewhat improved," but not sleeping well |
| 4/24/93 | Dr. Smith | "overall is quite *improved*," but still "gets tired" |
| 11/29/93 | Dr. Smith | "weakness and undue fatigue," history of "fever of unknown origin" |
| 1/25/94 | Dr. William Strain | "complaints of fatigue and *malaise* and carries a diagnosis of chronic fatigue syndrome" |
| 10/27/94 | Dr. Richard Vines | "three to four day |

3

plaintiff continued to work for another three and one-half years. (*Id.* at ¶ 9; *Id.* at 13.)  During this three year period, however, plaintiff's visits to doctors, as a result of her constant fatigue, increased.[2]

---

|          |                |  history    of    worsening symptoms  of  cough  and generalized malaise" with fever    and    myalgias; diagnosed  with  severe bronchitis |
| 12/9/94  | Dr. Wendy Goza | fatigue with night sweats and headaches |

(*Id.* at ¶ 7,8; *Id.* at 13.)

[2] Plaintiff's medical history indicate that she made the following doctor's visits during this time period:

| 6/23/95 | Dr. Sams | fever  (99.9°), earache, red pharynx |
| 3/27/96 | Dr. Goza | flu-like symptoms, fevers (101°),    myalgias, diarrhea, and headaches |
| 6/13/96 | Dr. Goza | weak,  tired   for two weeks, fever (100.1°) for 3-4 days, aches |
| 6/25/96 | Dr. Goza | not    feeling better, continued to have fever (100.3°) |
| 6/27/96 | Dr. Goza | tired,  fatigue, headaches;  tests   run: sedimentation rate, Lyme antibody,   arthritic profile, CMV-IgM  titer, and  Epstein-Barr  viral titers |
| 7/1/96  | Dr. Goza | continual low grade fever |

4

Plaintiff appears to have stopped going to work entirely on June 13, 1996. (Compl. [1] at ¶ 10.) Plaintiff claims that she received short term disability benefits for six months after this date. (*Id.*) It is unclear whether plaintiff alleges that these benefits were paid by defendant or another insurance company, but defendant denies paying such benefits. (Answer [5] at 3.)

On December 2, 1996, plaintiff applied for LTD benefits from defendant. (Pl.'s Stmt. of Mat. Facts [10] at ¶ 12; CNA's Controverting Stmt. of Mat. Facts [11] at 12.) The contract stated that to be eligible for LTD benefits, plaintiff "must have been continuously unable to perform substantial and material duties of her job as secretary/word processor from June 13, 1996 (the date she stopped working) through and after December 11, 1996 (the date the Elimination Period expired)." (CNA's Stmt. of Mat. Facts Not in Dispute [12] at ¶ 14; Pl.'s Resp. to Def.'s Stmt. of Mat. Facts [14] at 4.) In her application for LTD benefits, plaintiff asserted that she was physically unable to work during and after this period. Plaintiff included in her application a

---

| 7/9/96 | Dr. Craig Smith | "serologies consistent with a recent Epstein-Barr infection" |
| 8/15/96 | Dr. Goza | "low grade fever and significant fatigue" |

(*Id.* at ¶ 10, 11; *Id.* at 14.)

5

January 6, 1997 diagnosis from Dr. Goza that described her disability as "Class 5-Severe limitation of functional capacity; incapable of minimal (sedentary) activity." (Pl.'s Stmt. of Mat. Facts [10] at ¶ 12; CNA's Controverting Stmt. of Mat. Facts [11] at 12.) Plaintiff also submitted an "Employee's Job Activities Statement," describing her job as "Secretary/Word Processor" and her duties as typing, editing, producing reports, copying, collating, binding, and file management. (*Id.* at ¶ 13; *Id.* at 15.) On January 27, 1997, her employer submitted an "Employer's Job Activities Statement" consistent with her report. (*Id.*; *Id.*) In addition, the employer noted that plaintiff's job also required her to occasionally lift up to twenty-five pounds, to read and interpret documents, to write reports and correspondences, and to speak effectively before employees and clients of the firm (*Id.*; *Id.*)

Defendants denied plaintiff's application on June 4, 1997. (*Id.* at ¶ 14; *Id.*) The letter denying plaintiff's claim stated, "While you may have experienced a period of disability at the time you stopped working based on the medical information reviewed there is no documentation of a disability which was so severe it would prevent you from continuously performing your sedentary occupation as a Secretary through the ninety day elimination period which ended 12/11/96. For these reasons we are denying your claim for benefits under the above referenced disability and

6

your file has been closed." (Compl. [1] at Ex. 6.) The letter
was signed by Colette Cholewa, "Disability Specialist." (*Id.*)

Plaintiff requested a review of the decision and furnished
additional documentation from her treating physicians, including
a letter dated June 6, 1997 from Dr. Goza, which stated:

> [Plaintiff] has been followed by me since 11/10/92 when
> *she came in for evaluation of fatigue* that has been
> present for several months. . . . Her evaluation since
> that time has been extensive, but her symptoms have
> remained. Her fatigue at this time is to the point that
> she is unable to work. Her evaluation since 1992 has
> included chest x-rays, barium enema, upper GI series,
> gallbladder ultrasound, CT scan of the abdomen and
> pelvis, gallium scan and sleep study. She has also had
> extensive lab work including arthritic profile,
> hepatitis serologies, CMV viral antibodies, blood
> cultures and dexamethasone suppression test. She has
> been evaluated by Dr. Craig Smith, infectious diseases,
> for her low grade fevers and no bacterial source can be
> found. She has also been seen by rheumatology, Dr.
> Eduardo Baetti, and diagnosed with chronic fatigue
> syndrome. I believe the patient has, *as a diagnosis of*
> *exclusion*, chronic fatigue syndrome. . . . Please note
> that the patient has been evaluated by psychiatrist Dr.
> Debra Scott and is not felt to have depression that
> would account for her symptoms. *She is currently unable*
> *to work*.

(Pl.'s Stmt. of Mat. Facts [10] at ¶¶ 15-16; CNA's Controverting
Stmt. of Mat. Facts [11] at 15.) (emphasis added) Also submitted
was a July 3, 1997 letter from Dr. Craig Smith in which he
detailed plaintiff's medical history and concluded that she met
"the CDC criteria for chronic fatigue syndrome" and stated that
she had "fatigue reducing her activity level greater than fifty
percent and lasting longer than six months with no obvious
infectious, rheumatological, endocrine or other etiology

7

established."  (*Id.* at ¶ 18; *Id.*)  Dr. Smith's letter concluded,

"[I]n conjunction with her evaluation with her primary care

physician, she is recommended for long term disability."  (*Id.*;

*Id.*)

Defendant again denied plaintiff's claim on July 18, 1997.

(*Id.* at ¶ 19; *Id.* at 15-16.)  The rejection letter stated,

> The information submitted by your physicians does note
> that you have been reporting symptoms of fatigue since
> 1992 and were in treatment for this condition for years
> while you continued to no work.  We have received no
> medical records after 12/18/96 and so have no
> information to document you [sic] condition beyond that
> date.

> We would like you to know that the Criteria noted by Dr.
> Smith and Dr. Goza used to diagnose chronic fatigue
> syndrome do not meet all the criteria established by the
> CDC for establishing this diagnosis, and as noted in our
> earlier letter, the assignment of a diagnosis does not
> in and of itself verify disability.

> We note your doctor's statement that she believes that
> you are disabled due to the symptom of fatigue which you
> report however there is no objective documentation of an
> exacerbation of your symptoms that would cause you to be
> totally disabled beyond the 180 day elimination period
> of your policy.

(Compl. [1] at Ex. 6.)

Plaintiff's claim was then considered by the "Appeals

Committee,"[3] which rejected her claim on October 1, 1997, stating:

> While Dr. Goza and Dr. Smith are of the opinion that you
> are disabled based upon your diagnosis, the medical
> findings do not support the severity of your condition

---

[3] There is no dispute in this case that defendant and
plaintiff complied with the appeals procedure required by
ERISA.

AO 72A
(Rev.8/82)

> that would prevent you from performing the substantial
> and material duties of your sedentary occupation. There
> is no muscle loss, no sensory loss or atrophy. Your
> condition appears to only moderately restrict your
> ability to perform your normal daily activities. The
> medical records do indicate a history of depression
> which has responded well to proper medical treatment.
> Given all medical documentation in your file, the
> medical findings fail to support the severity of a
> physical or mental condition that would preclude you
> from working beyond the 180 day Elimination Period.

(*Id.*)

In addition to pursuing LTD benefits from defendant,
plaintiff also applied for Social Security benefits. On January
30, 1998, an Administrative Law Judge (hereinafter "ALJ") for the
Social Security Administration (hereinafter "SSA") found plaintiff
had been disabled from performing gainful employment since June
13, 1996, and rewarded her full disability benefits under Title II
of the Social Security Act. (Pl.'s Stmt. of Mat. Facts [10] at ¶
22; CNA's Controverting Stmt. of Mat. Facts [11] at 17.)
Plaintiff sent a copy of her Social Security award letter to
defendant to have her claim considered by the Appeals Committee
once again. Defendant rejected plaintiff's appeals on July 1,
1998, and again on September 2, 1998. (*Id.* at ¶ 23; *Id.*)
Throughout the claims process, defendant failed to send plaintiff
for an independent medical evaluation or have her file reviewed by
a physician. (*Id.* at ¶ 24-25; *Id.*)

9

## DISCUSSION

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits.   Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

10

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (1986).

## II. **PLAINTIFF'S ERISA CLAIM**

### A. *Standard of Review*

Plaintiff brings this action as a beneficiary of an ERISA plan against the plan administrator, CNA, to recover benefits allegedly due to her under the terms of the long-term disability policy. 29 U.S.C. § 1132(a)(1)(B). A denial of ERISA benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed under a de novo standard unless the benefit plan gives the plan administrator

11

discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1988). The parties are in agreement that the policy at issue does not confer discretionary authority on the plan administrator and that the Court should review the defendant's eligibility determination de novo. (Compl. [1] at ¶ 23; Brief of CNA in Opp'n to Pl.'s Mot. for Summ. J. [11] at 2.) The Court comes to the same conclusion, and therefore will review defendant's decision to deny plaintiff benefits de novo.[4]

*B.    Plaintiff's Disability*

"Where a plan participant seeks to challenge the denial of benefits, the ERISA statute imposes on the plan participant the burden of showing that he is entitled to the 'benefits . . . under the terms of his plan.'" *Stvartak v. Eastman Kodak Co.*, 945 F.

---

[4] In the Eleventh Circuit, "a district court conducting a *de novo* review of an Administrator's benefits determination is not limited to the facts available to the Administrator at the time of the determination." *Kirwan v. Marriot Corp.*, 10 F.3d 784 (11th Cir. 1994). *See also McNutt v. J.A. Jones Construction Co.*, 33 F. Supp. 2d 1375, 1381 (S.D. Ga. 1998) ("In evaluating plaintiff's qualifications for long-term disability benefits under the plan, all available evidence is evaluated in a *de novo* review. In other words, the court is not limited to the evidence that Aetna initially evaluated in making its determination as to whether Plaintiff is entitled to disability benefits.") This Court, therefore, may look at all evidence, not just that considered by CNA, in determining whether plaintiff was unable to perform the substantial and material duties of her job during the Exclusion Period. This evidence includes plaintiff's medical records, letters from her doctors written during the appeals process, the Social Security Administration determination of benefits, and letters from plaintiff's employer and her husband.

12

Supp. 1532 (M.D. Fla. 1996) (quoting 29 U.S.C. § 1132(a)(1)(B)).
The terms of this plan required that plaintiff (1) be continually
unable to perform substantial and material duties of her regular
occupation; (2) be under the regular care of a licensed physician
other than herself; and (3) not be gainfully employed in any
occupation for which she is or becomes qualified by education,
training, or experience.   There seems to be no dispute about
factors (2) and (3).   The issue in this case is whether
plaintiff's condition resulted in her being continually unable,
from June 13 to December 11, 1996, to perform the substantial and
material duties of her job as a secretary/word-processor.

The CDC defines CFS by two primary criteria and indications
of at least eight out of eleven secondary criteria.   (CNA's Mot.
for Summ. J. [12] at Ex. B (Morris 0158).)   The two primary
criteria are (1) "chronic recurring fatigue that reduces activity
level by at least fifty percent for 6 months or more" and (2) the
absence of any "[o]ther obvious causes of fatigue . . . including
significant depression."   (Id.)   The eleven secondary criteria are
as follows:

(1) low grade fevers
(2) swollen or tender lymph nodes
(3) non-exudative pharyngitis
(4) new onset of headaches
(5) muscle aches and pains
(6) unexplained general muscle weakness
(7) migratory arthralgias
(8) extreme fatigue after minimal exercise
(9) neurocognitive symptoms
(10) sleep disturbance

13

(11) abrupt onset of symptom complex over a few hours
     or a few days[5]

(*Id.*)

While defendant neither admits nor denies that plaintiff

suffers from CFS, it states that a diagnosis in itself is

insufficient to support a determination that a participant is

severely disabled. (CNA's Mot. for Summ. J. [12] at Ex. 3.)  The

very nature of CFS--which calls for a diagnosis of exclusion--

makes an assessment of a participant's medical condition very

difficult.    Although the CDC had recognized CFS as a discreet

medical condition, and the majority of courts who have examined

the subject matter have concluded that CFS is a legitimate medical

disorder, there is still much debate in the medical and legal

communities regarding the cause, scope, and nature of CFS. (CNA's

Mot. for Summ. J. [12] at Ex. 3 ("In fact, there are knowledgeable

researchers who argue even today that CFS is due either to

depression alone, or due to an illness prolonged by a patient's

underlying depressive personality.")  *See also* ROBERT A. ARONOWITZ,

MAKING SENSE OF ILLNESS: SCIENCE, SOCIETY, AND DISEASE 168 (1998)

("Diseases--such as chronic fatigue syndrome--whose mechanisms are

obscure, whose specificity is questionable, and whose definition

---

[5] According to Dorland's Illustrated Medical Dictionary
(28th ed. 1994), pharyngitis is an inflamation of the pharynx,
arthralgias is joint pain, and neurocognitive symptoms
includes such symptoms that relate to perception, thinking,
and memory that stem from the nervous system.  *Id.* at 1272,
140, 1128, 350.

**14**

and meaning are transparently influenced by social factors have had their legitimacy questioned."); Mary Crossley, *The Disability Kaleidoscope*, 74 NOTRE DAME L. REV. 621, 696 (1999) ("Despite the official acceptance of CFS as a legitimate medical condition . . . its existence as a discreet syndrome remains a matter of dispute among medical professionals. Some doctors attribute CFS symptoms to depression, posttraumatic stress disorder, or other psychological ailments.... [Moreover] [n]o simple blood test for CFS exists; instead it is a diagnosis that follows when everything else has been ruled out"); Lars Noah, *Pigeonholing Illness: Medical Diagnosis as a Legal Construct*, 50 HASTINGS L.J. 241, 283 (1999) (noting that "profound skepticism prevails among medical professionals about the supposed pathophysiological as opposed to psychosomatic origin of [CFS] symptoms").

In short, the evidence available to the Court in this record suggests that, assuming that chronic fatigue syndrome is a legitimate physical illness, it is difficult, if not impossible, for a physician to *independently* corroborate the existence of the illness with any degree of certainty. That is, the primary symptom of the syndrome is continuing and extreme tiredness. The diagnosis of CFS is made only after extensive tests are conducted and no explanation can be given for the reported symptoms. Thus, unable to find any cause for the condition, the physician calls it CFS, but only as a default diagnosis because the doctor is unable

to give the symptomology any other label. In short, on the limited evidence available to the Court, it appears that, unable to verify the condition with objective testing, the doctor is necessarily forced to rely almost completely on the assertions of the patient in making the diagnosis. The arguable questionability of such a diagnosis may create no problem in a traditional treatment setting, where the patient likely cares less about a label than about getting better. When litigation seeking financial compensation from a third party for this condition is thrown into the mix, however, the inability of the physician to provide a more objective diagnosis potentially becomes a pivotal issue in the litigation.[6]

---

[6] Indeed, it is questionable to this Court whether, on the above facts, the *Daubert* decision and its progeny would permit a testifying physician to offer an expert opinion on this topic. *See Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). The notion behind *Daubert* is that an expert cannot offer conclusory opinions without first demonstrating the use of an acceptable scientific methodology to confirm the validity of those opinions. In short, *Daubert* aimed to prevent an expert from using his academic pedigree to encourage a jury to simply accept the former's vouching for a proposition when that expert had not subjected this opinion to appropriate testing and analysis. There has been no *evidentiary hearing in this case, nor is one anticipated, so* the question has not arisen. On remand and on return of this case to this Court, however, both the defendant, who implicitly seems to urge this position, and the plaintiff should be prepared to address the relevancy, if any, of *Daubert* to this dispute. The Court notes that its research turned up no reported cases applying *Daubert* to a CFS expert's testimony.

This Court is required to make a de novo determination whether plaintiff has proved that she was disabled; thus, it is the plaintiff's burden to persuade the Court. On this record, the Court is not yet convinced. As the Court is remanding the case to the administrator for further findings, this case will likely return to the jurisdiction of this Court. Accordingly, the plaintiff should be prepared to address the following matters that concern both the legal question whether a diagnosis of CFS can render a person disabled, as well as the factual question whether this plaintiff has satisfied the appropriate standard for determining whether she, in fact, suffered from CFS. As defendant argues that a diagnosis of CFS does not, by itself, mean that the patient is disabled, plaintiff will need to address this legal question. First, the major symptom of chronic fatigue syndrome is extreme tiredness. Assuming that many Americans are operating on a deficit of sleep and energy in their frenetic workday lives, when does tiredness reach a severe enough level that it is considered a disability? An applicant for disability compensation will predictably claim that she is indeed too tired to do any work. In gauging the credibility of her allegation, however, one must also recognize that this patient will receive financial compensation only if she can persuade her doctor that she is, in fact, too tired ever to work again. It is not typically the role of a physician to cross-examine his patient about her professed

17

symptoms. In the legal arena, however, it is appropriate to refuse to accept, without question, the naked allegation of one who stands to gain financially from this allegation. The question then becomes how does a physician or plan administrator objectively decide when a patient's level of tiredness is so extreme that she cannot work again?

Further, the particular facts of this case create some additional questions. That is, plaintiff was able to continue working for a long period of time—over three years—after the onset of her CFS symptoms. The record is unclear as to what objective medical changes had occurred to render plaintiff no longer able to work, however. Moreover, plaintiff quit going to work about the same time that two of her doctors wrote letters indicating that plaintiff could no longer work and recommending her for long-term disability benefits. *See supra* at 7-8. Did plaintiff quit working because her tiredness had increased so badly that she could no longer work or did she quit because she had finally gotten documentation from her doctors that would enable her to claim disability benefits? If the reason for her quitting was the latter, then a finding of disability is problematic. That is, clearly it is undisputed that she was able to work during the three and a half years after the onset of her symptoms. If the symptoms did not increase in severity, plaintiff has not shown why she could no longer continue working. That she

18

might have developed a better argument in support of a disability application does not impact the objective question whether her *symptoms* had substantially *worsened.*

A related issue is whether plaintiff's evidence has demonstrated the existence of any "treatment" for chronic fatigue syndrome, such as shortening the complainant's work hours, that would have allowed her to stay on this job or an equivalent job in at least a part-time capacity.  The record does not reflect whether she requested part-time work or if her employer/defendant would have been willing to provide that accommodation.  If one can perform one's duties only on a part-time basis, does that mean that one is unable to perform "substantial and material duties of his regular occupation"?

Similarly, the record is unclear as to exactly what long-term treatment protocol was recommended by plaintiff's physicians for her.  Unable to know what causes the patient's complaints, the physician appears to be unable to treat the ailment in any way other than to tell the patient to stop working and rest, presumably for the rest of her life.  Does a physician treating this disorder, and did plaintiff's doctor, consider a weight loss program, diet, or exercise as treatment programs that might alleviate plaintiff's symptoms, thereby undoing a diagnosis of

19

AO 72A
(Rev.8/82)

permanent disability?[7]  On remand and upon a return of this case
back to this Court, plaintiff and defendant should be prepared to
clarify this matter.

Finally, the Court is not yet convinced that plaintiff has
demonstrated the validity of a CFS diagnosis, even under the
standard advanced by plaintiff.   That is, the CDC standard sets
out, as one of its two primary criteria for the diagnosis of CFS,
the ruling out of "other obvious causes of fatigue, including
significant depression."  *See* discussion *supra* at 13. In his
letter, Dr. Goza did indicate that plaintiff's psychiatric
evaluation did not reveal depression, *supra* at 7, but defendant,
in its letter rejecting plaintiff's claim, indicated that
plaintiff's prior depression had "responded well to proper medical
treatment."  *Supra* at 8-9. Some development of this evidence by
the parties would be helpful.   Finally, the CDC standard also
provides secondary criteria, including eleven factors.[8] According

---

[7]  Common sense suggests that advising someone who is
chronically listless to stay in bed and avoid activity for a
prolonged period of time will likely only exacerbate the
feelings of tiredness. Perhaps, if developed, the evidence
will be contrary to the Court's common sense notions.

[8]  Plaintiff does not dispute the CDC criteria put forth
by defendant.   The Court notes, however, that defendant's
definition was not taken directly from a CDC publication, and
the Court has seen a discussion of the CDC criteria which
varies slightly from the one put forth by defendant.  *See*
Kevin   F.   Foley,   *Establishing   Medically   Determinable
Impairments*, 35 TRIAL 66, 68 (April 1999). This article stated
that there were eight secondary criteria, and that a patient
must exhibit four of them at the same time. The list of the

20

to the CDC standard, a diagnosis of CFS cannot be given absent an
indication that the plaintiff has met eight of these eleven
criteria. *Supra* at 13. Plaintiff's doctors did not specifically
address these eleven factors or identify which eight of the eleven
factors she might have satisfied. (CNA's Mot. for Summ. J. [12] at
Ex. B (Morris 0158).) Conducting its own review of plaintiff's
medical records, the Court was unable to determine whether
plaintiff actually had indications of eight of the eleven
secondary criteria. Accordingly, this evidentiary matter also
needs to be developed.

The above discussion might suggest that because plaintiff has
the burden of proof, the existence of these unanswered questions
should prompt a verdict for the defendant. Such an inference is
not warranted in this case, however. Specifically, defendant is
just as responsible as plaintiff for not developing the record on
the above points. If plaintiff's physicians may be accused of
announcing    conclusory    opinions    without    much    independent
corroboration, defendant is likewise subject to the same charge,
for its rejection of plaintiff's claims was highly conclusory in
nature. If defendant believed that plaintiff had left questions
unanswered, it should have specified what other steps plaintiff

---

eight criteria is identical to the list of eleven above,
except that it excludes numbers 1, 6, and 11. On remand, the
parties should provide the Court with the CDC's published
definition of CFS if it differs at all from the one originally
put forth by defendant.

AO 72A
(Rev.8/82)

needed to take in order to satisfy defendant that plaintiff was, in fact, disabled. Indeed, defendant has been rather cryptic in its precise basis for rejecting plaintiff's claim. If defendant believed that CFS can never be a disabling condition or that CFS cannot be demonstrated to be a legitimate physical disorder, then it should have articulated that position more clearly and saved plaintiff the inconvenience of arguing a point on which it could never persuade defendant. The issue in this Court would then have focused solely on the above contention. If, on the other hand, defendant believed that plaintiff had simply failed to produce sufficient evidence to persuade defendant that plaintiff, in fact, suffered from CFS, defendant should have so informed plaintiff of the remaining information that it required. Indeed, defendant failed to send plaintiff to another physician for an independent evaluation and did not even have another doctor review her records. While defendant may be justifiably skeptical, as are many members of the medical community, of the viability of a diagnosis of CFS, that skepticism does not justify defendant's refusal to make clear to plaintiff the perceived deficiencies in her evidence. Accordingly, on these facts, a judgment for the defendant would be inappropriate.

As the Court concludes that the record and arguments are not fully developed enough to enable it to render an intelligent decision, the appropriate course is to remand the case to the plan

22

AO 72A
(Rev.8/82)

 v-06024-WJZ   Document 21   Entered on FLSD Docket 02/12/2001   Pa

administrator for further findings,[9] after which the parties will
be given the opportunity to supplement the record and return to
this Court.[10]   *See Mitchell v. Eastman Kodak*, 910 F. Supp. 1044
(M.D. Pa. 1995), *aff'd by* 113 F.3d 433 (3rd Cir. 1997) (district
court remanded to plan administrator for further findings; on

---

[9]     Again, the cursory manner in which defendant denied
plaintiff's claim left many questions unanswered for the
Court.     First, it was unclear from the record whether
defendant denied plaintiff's requested benefits simply because
she did not have medical documentation during the 180 days
exclusion period or because, considering all documentation,
defendant did not conclude that plaintiff has demonstrated the
existence of a disability.   Second,   defendant provided no
criteria to plaintiff as to how defendant analyzed a CFS claim
for disability or an explanation of the circumstances under
which defendant would provide disability benefits for such a
condition.

[10] Although this course is a bit unusual, the Court notes
that it is appropriate when the evidentiary record is lacking.
*See Shannon v. Jack Eckerd Corp.*, 113 F.3d 208 (11th Cir. 1997)
(remanding claim to plan administrator after bench trial in
which district court concluded there was insufficient evidence
to support denial of benefits); *Quesinberry v. Life Ins. Co.
of N. Am.*, 987 F.2d 1017, 1025 n.6 (3d Cir. 1993) ("As
recognized in [*Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003 (4th
Cir. 1985)], remand to the plan administrator is also
available to the district court, where necessary.")     In
addition, in the Social Security context, remand is often the
appropriate remedy when the Court concludes that the
administrative law judge has not pursued all appropriate
inquiries necessary to determine the existence of a
disability.   In SSI cases, a court will quite often remand the
case back to the ALJ to make those inquiries or to have
additional medical examinations performed.   The Court sees
little reason why this result is not appropriate in a
"private" dispute such as this concerning the existence of a
disability.

23

subsequent remand back, district court reversed plan's denial of benefits).

The Court concludes that this development of the record should have occurred to begin with however, and that defendant is primarily responsible for the foot-dragging here, through its cryptic and cursory responses to plaintiff's application.    As defendant's unresponsiveness caused plaintiff to incur unnecessary expense in litigating the case before this Court, only to have to come back and repeat the process again after the remand to the Administrator is complete, the Court concludes that equitable considerations suggest that plaintiff should be reimbursed for attorney's expenses incurred in litigating this case up to this point.    Whether such a remedy is within the Court's power is something that the parties will have to brief, if plaintiff seeks such an award.[11]    Plaintiff should make any motion for attorney's fees or costs within **twenty (20) days** of this Order.

---

[11]    The Court would remind defendant, however, that the only alternative to a remand is a decision on the merits.   As it was left to the Court to discern from defendant's very conclusory response to plaintiff's claim the arguments that the Court, not defendant, has fleshed out in this Order, a decision on the merits would likely have gone against defendant. If defendant opposes the grant of attorney fees and costs here, the Court reserves the right to revisit the propriety of a remand that will subject the plaintiff to additional expense in litigating twice the same issue in this Court. Without a remand, the Court will be forced to a decision on the merits on a record that reveals defendant to have taken no steps to confirm the accuracy of plaintiff's diagnosis.

24

CONCLUSION

For the foregoing reasons, the Court finds that plaintiff's Motion for Summary Judgment [12] is **DENIED** and defendant's Motion for Summary Judgment [10] is **DENIED**.  The case is **REMANDED** to the plan administrator for further factual findings.  The Court will entertain a motion for a scheduling order in the event that the proceedings on remand do not proceed expeditiously.

SO ORDERED, this ____ day of March, 2000

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

25