UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **00-624-CIV-ZLOCH-Seltzer**

|  |  |
|---|---|
| JAMES E. RADICAN | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) |
|  | ) |
| RELIANCE STANDARD LIFE | ) |
| INSURANCE COMPANY, a Foreign, | ) |
| corporation, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**NIGHT BOX
FILED**

SEP 1 7 2001

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## PLAINTIFF'S RENEWED MOTION FOR SUMMARY
## JUDGMENT AFTER REMAND ON THE ISSUE OF LIABILITY

COMES NOW Plaintiff, JAMES E. RADICAN, by and through his undersigned

counsel and, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.5,

files this Renewed Motion for Summary Judgment After Remand on the Issue of Liability

and states:

### CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS:

1.      On July 6, 2000 RADICAN filed a Motion to Remand to Plan Administrator And

Abate Action in this case arguing that remand was appropriate because he was never

afforded an opportunity to provide evidence or information to respond and/or rebut

evidence upon which RELIANCE mainly relied in making its denial of his claim for

benefits.

1

2.    On January 12, 2001 this Court entered an Order granting RADICAN's Motion to

Remand and denying the parties previously filed Motions for Summary Judgment as

moot stating in relevant part in a Final Order of Remand:

> The Court notes that it has the authority to remand ERISA claims to plan administrators when a plaintiff had additional evidence which might affect his eligibility for benefits. Thomas Shannon v. Jack Eckerd Corp., 113 F.3d 208, 210 (11th Cir. 1997); Jett v. Blue Cross and Blue Shield of Alabama, Inc., 890 F.2d 1137, 1140 (11th Cir. 1989). Such is the situation in the instant case, as the Plaintiff has submitted evidence that might affect his eligibility for receiving disability benefits from the Defendant. Specifically, the Plaintiff has evidence which suggests that he was a full-time employee at the time in question, and as such he would be eligible for the receipt of disability benefits from the Defendant. Thus, a remand to the plan administrator is appropriate.
>     Accordingly after due consideration, it is
>     **ORDERED AND ADJUDGED** as follows:
>
>     1.    The above-styled cause be and the same is hereby **REMANDED** to the Plan Administrator for reconsideration of Plaintiff, James E. Radican's eligibility for benefits based on the Plaintiff's submission of evidence in response to information contained in the Defendant's final determination of ineligibility; and
>
>     2.    To the extent not otherwise disposed of herein all pending motions are hereby DENIED as moot.

3.    At all times material defendant Tarmac America, Inc. ("Tarmac") established and

maintained an employee welfare benefit plan (the 'plan') governed by the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et. seq. A

benefit of Tarmac's employee welfare benefit plan was Group Long Term Disability

Insurance under a policy issued and administered by RELIANCE STANDARD LIFE

INSURANCE COMPANY ("RELIANCE"), policy no. LSC 098842. The

RELIANCE group disability policy first took effect on January 1, 1996. A copy of

2

the RELIANCE policy is attached as exhibit "A". (See Complaint, ¶ 3 and defendant's Answer thereto).

4.  In 1996 RADICAN was an employee of Tarmac and a participant in the RELIANCE group disability policy referenced above. (Exhibit "A").

5.  The "Eligibility Requirements" for benefits under the RELIANCE group disability policy are set forth on page 5.0 (exhibit "A") as follows:

> ELIGIBILITY REQUIREMENTS: A person is eligible for insurance under this policy if he/she:
> (1) is a member of an Eligible Class, as shown on the schedule of Benefits page; and
> (2) has completed the Waiting Period, as shown on the Schedule of Benefits page;

6.  The "Schedule of Benefits" on page 1.0 provides:

> ELIGIBLE CLASSES: Each active, Full-time employee except any person employed on a temporary or seasonal basis, according to the following classifications:
>
> CLASS A: employee earning $59,000.00 or more per year who:
> (1) is engaged in a non-hazardous occupation; and
> (2) functions primarily if an office environment.
>
> CLASS B: salaried employee earning more than $30,000.00 per year but less than $59,000.00.

7.  "[A]ctive employee" is not defined in the policy. Under the definition section on page 2.0 the following definitions are found:

> "Actively at work" and "Active Work" mean actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an injury or sickness

3

"Full-time" means working for you for a minimum of 40 hours during a persons's regular work week

8.  In 1996 RADICAN met the "ELIGIBILITY REQUIREMENTS" set forth in

paragraph 5 above because he had completed the Waiting Period, and he met the

"ELIGIBLE CLASSES" provision set forth in paragraph 6 because he was a "Class

B" employee as shown on the Schedule of Benefits page (a salaried employee earning

more than $30,000. per year but less than $59,000.).

9.  Due to back and related health problems including but not limited to severe pain in

the lower back and legs which 1995 surgery was unable to relieve, RADICAN

became disabled and unable to work on or about January 1, 1997.

10. RADICAN timely filed a claim for long term disability benefits with RELIANCE,

claim number 1997-346-010. (See Complaint, ¶ 8 and defendant's Answer thereto).

11. By letter dated April 6, 1998 RELIANCE denied RADICAN's claim for disability

benefits stating in relevant part:

> We have received documentation from your employer which indicates you began working on a part-time basis on or about November 1, 1995 and continued to work part-time for over one year.
>
> In order to be eligible for Long Term Disability under this policy, you mut be actively at work and working on a full-time basis as defined by the policy. Based on information provided by your employer, you were working part-time when the policy became effective on January 1, 1996 and did not returned (sic) to full time active work prior to your last day worked. Therefore, you have not satisfied the policy definition of a full-time employee and are not eligible for Long Term Disability Benefits coverage.

(A copy of RELIANCE's April 6, 1998 initial denial letter is attached as exhibit "B"

4

12.     RADICAN appealed the denial of his claim for benefits and his appeals were denied based upon the reason previously stated, specifically upon a finding that RADICAN failed to work 40 hours per week during any week in 1996 and therefore was never eligible for benefits under the policy. Copies of denial letters dated August 3, 1998, November 1, 1999, and July 23, 2001 (after remand) are attached exhibits "C", "D" and "E" respectively.

13.     In connection with his claim for benefits (either before or after remand), RADICAN provided RELIANCE with the following affidavits in which each affiant swore that RADICAN was a "Full time" employee of Tarmac as that term is defined in the policy, who worked a minimum of 40 hours per week during numerous weeks in 1996:

    A.     Affidavit of RADICAN dated April 17, 2000, a copy attached as exhibit "F";

    B.     Affidavit of Radican's co-worker, Marcel Aragon dated February 19, 2001, a copy attached as exhibit "G";

    C.     Affidavit of RADICAN's co-worker, Thomas Mendez, dated April 25, 2000, a copy attached as exhibit "H";

    D.     Affidavit of RADICAN's co-worker, Craig Leonard, dated April 26, 2000, a copy attached as exhibit "I";

    E.     Affidavit of Tarmac's Employee Benefit Administrator, Hope E. Fisher dated March 2, 2001, a copy attached as exhibit "J".

14.  In addition to the affidavits listed above, RELIANCE was provided with the following documentation in support of RADICAN's claim:

A.  Letter dated June 5, 1998 from attorney Marika McVey Ostendorf in which she explained that RADICAN was a full-time employee for Tarmac America, Inc. during 1996. (Attached as exhibit "K").

B.  Letter dated January 26, 1999 from attorney Lawrence D. Bache in which he explained that RADICAN was a full-time employee of Tarmac America, Inc. during 1996, with attachments in support of RADICAN's claim including:

(1)  The sworn affidavit of Michael Unger dated January 19, 1999 correcting an inadvertent error he made in his letter sent to RELIANCE dated February 4, 1998, which was attached thereto;

(2)  RADICAN's sworn affidavit dated January 25, 1999;

(3)  The sworn affidavit of RADICAN's co-worker, Thomas Mendez, dated December 31, 1998;

(4)  The sworn affidavit of RADICAN's co-worker, Craig Leonard, dated January 11, 1999.

A copy of the letter from attorney Lawrence D. Bache with attachments is attached as composite exhibit "L"

C.  Letter from B. Edward Pittman, Vice President Human Resources for Tarmac (plaintiff's employer), dated February 26, 1998 which provided in relevant part:

6

You (RELIANCE) have stated that Mr. Radican was working "part-time" when the policy became effective, had not returned to "full time active work" prior to his last day worked and therefore did not satisfy the definition of a full-time employee under the terms of the policy.

Jim Radican was a full-time salaried exempt employee of this company from his date of employment in 1965 until his last day of active work on December 31, 1996. At no time prior to the commencement of his short term disability on January 1, 1997 was he ever on part-time status; he was at all times paid full salary and enjoyed full benefits, including long term disability coverage, for which he paid. The fact that he worked partial days in 1996 following his return to work from surgery should in no way be construed as "part-time" status. Had Mr. Radican been classified a part-time employee, he would have been ineligible for participation in our long term disability benefit at all.

A copy of the letter from B. Edward Pittman, is attached as exhibit "M".

D.      A copy of the Affidavit of B. Edward Pittman, Vice President of Human Resources for Tarmac, dated April 20, 2000, attached as exhibit "N".

E.      Affidavit of Dr. Manuel Porth dated June 28, 2000 , attached as exhibit "O".

15.     Benefits under the RELIANCE policy are paid by RELIANCE from its own assets.

16.     RADICAN was employed by Tarmac America, Inc. as a full-time worker throughout 1996 and the entire term of his employment. (See affidavit of B. Edward Pittman, Vice President of Human Resources for Tarmac America, Inc. attached as exhibit "N"; also see exhibits "M", "F", "K", and composite exhibit "L").

17.     RADICAN was paid by Tarmac America, Inc. as full-time worker throughout 1996 and the entire term of his employment. (See exhibits "F", "N" and composite exhibit "L").

18.  RADICAN was paid by Tarmac America, Inc. in the same way as other full-time employees of the company throughout 1996 and the entire term of his employment. (See exhibits "F", "M", and "N").

19.  RADICAN was insured as a full-time employee of Tarmac America, Inc. throughout 1996 and during the entire period of his coverage under the plan. (See exhibits "F" and "N").

20.  RADICAN enjoyed all benefits and perquisites of other full-time employees of Tarmac America, Inc. throughout 1996 and the entire period of his employment. (See exhibits "F" and "N").

21.  RADICAN paid premiums for his coverage as a full-time employee of Tarmac America, Inc. throughout 1996 and the entire period of his coverage under the plan. (See exhibits "F" and "N").

22.  RELIANCE accepted payment of premiums due for a full time employee for RADICAN and has retained those premiums. (See exhibits "F" and "N").

23.  RADICAN performed for Tarmac America, Inc. the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 40 hours during his regular work week during 1996. See exhibits "F" through "O".

## ARGUMENT AND MEMORANDUM OF LAW

### Summary Judgment Procedure

The purpose of summary judgment procedure, as set forth in Fed. R. Civ. P. 56, is to promote expeditious disposition of cases in which there is no genuine issue of material fact or in which only a question of law must be decided and in which the moving party is entitled to judgment as a matter of law. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324 (1986), the United State Supreme Court stated that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses ...." Conclusory allegations or statements will not suffice to create a genuine issue of fact. *Avirgan v. Hull*, 932 F.2d 1572 (11th Cir. 1991) *Cert. denied*, 112 S.Ct. 913 (1992). Thus, when there are no genuine issues of material fact to be decided in a case, the summary judgment procedure may be used to avoid unnecessary trials. Summary Judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The standard for summary judgment in ERISA litigation is synonymous with the standard employed in other civil actions. *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 583 (1st Cir. 1993).

### Standard of Review

### THE HEIGHTENED ARBITRARY AND CAPRICIOUS STANDARD OF REVIEW IS APPLICABLE

There is language on page 4.0 of the policy which expressly grants RELIANCE discretionary authority to determine eligibility for benefits and construe the terms of the policy. In light of this language the arbitrary and capricious/abuse of discretion standard of

9

review is applicable.[1]  However, where there is a conflict of interest, as exists is in this case, the heightened arbitrary and capricious standard of review applies.  *Brown v. Blue Cross and Blue Shield of Alabama, Inc.* 898 F.2d 1556, 1563-64 (11th Cir. 1990);  *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1449 (11th Cir. 1997) (citing *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir. 1997)).  Also see *Godfrey v. BellSouth Telecommunication,* 898 F.2d 1556, 1559 (11th Cir. 1996).

In the Eleventh Circuit, the arbitrary and capricious standard "must be contextually tailored by the circumstances of a case."  *Brown v. Blue Cross and Blue Shield of Alabama, Inc.* 898 F.2d 1556, 1563-64 (11th Cir. 1990).  The degree of deference a court should maintain when reexamining the decisions of an administrator under the arbitrary and capricious standard ranges from "slight to great."  Id. at 1564.  A finding that the administrator is acting under a conflict of interest has a tremendous impact on the evaluation of his determinations.  Id at 1565.  Greatest deference is accorded to a disinterested, impartial decision maker.  Where there is <u>no</u> conflict of interest, the court is limited to determining whether there was a reasonable basis for the administrator's decision based on the facts as knows the administrator at the time the decision was made. *Jett v. Blue Cross & Blue Shield of Alabama*, 890 F.2d 1137, 1139 (11th Cir. 1990). The level of deference is significantly

---

[1] *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101; 109 S.Ct. 948, 955; 103 L.Ed. 80 (1989), refers to the standard of review in discretionary situations as abuse of discretion. The 11th circuit has equated the arbitrary and capricious standard and the abuse of discretion standard in post-*Firestone* cases.  *Brown v. Blue Cross and Blue Shield of Alabama, Inc.* 898 F.2d 1556, 1558 n.1 (11th Cir. 1990) (citations omitted).

diminished, however, where a conflict of interest exits. Under such circumstances, the proper deference "may be slight, even zero." *Brown v. Blue Cross and Blue Shield of Alabama, Inc.* 898 F.2d 1556, 1559 (11th Cir. 1990), cert. denied, 498 U.S. 1040, 111 S.C. 712, 112 LED.2d 701 (1991); *Godfrey v. BellSouth Telecommunication,* 898 F.2d 1556, 1559 (11th Cir. 1990).

When an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business." A "strong conflict of interest [exists] when the fiduciary making the discretionary decision is also the insurance company responsible for paying the claims . . ." *Brown,* supra at 1562, also see *Anderson v. Blue Cross/Blue Shield of Alabama,* 907 F.2d 1072 (11th Cir. 1990). "A wrong but apparently reasonable interpretation of the plan is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Brown,* supra at 1567.

A strong conflict of interest exists in this case because RELIANCE, the fiduciary making the benefits decision, is also the insurance company responsible for paying the claims. A highly deferential standard of review is therefore inappropriate. *Brown,* supra at 1562. A grant of discretion dose not render nugatory a plan administrator's fiduciary duty to act in the interest of beneficiaries under the plan. ". . .[W]hen a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for

11

benefits determinations, as exists in this case because RELIANCE pays benefits from its own assets, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest." *Brown*, supra at 1566.

## I.    IN DENYING RADICAN'S CLAIM FOR BENEFITS, THE ADMINISTRATOR WRONGLY CHARACTERIZED RADICAN AS A PART-TIME WORKER

The administrator denied RADICAN's claim for benefits on the basis that he never met the plan (exhibit "A") "Eligibility Requirements" for coverage. This determination was based upon RELIANCE's misinterpretation of the definition of "Full-time" in the policy.

RELIANCE does not dispute that RADICAN met the "Eligibility Requirements" contained on page 5.0 of the Plan which provides as follows:

> ELIGIBILITY REQUIREMENTS: A person is eligible for insurance under this policy if he/she:
> (1) is a member of an Eligible Class, as shown on the Schedule of Benefits page; and
> (2) has completed the Waiting Period, as shown on the Schedule of Benefits page.

RELIANCE does not dispute that RADICAN was a CLASS B employee as defined on page 1.0 and 1.1 of the "Schedule of Benefits" page as follows:

> LEAVE ELIGIBILITY CLASS: Each active, <u>Full-time employee</u> except any person employed on a temporary or seasonal basis, according to the following classifications:
>
> CLASS A: employee earning $59,000.00 or more per year who:
> (1) is engaged in a non-hazardous occupation; and
> (2) functions primarily if an office environment.

> CLASS B: salaried employee earning more than $30,000.00 per year but less than $59,000.00.

The determination by RELIANCE to deny RADICAN's claim for benefits was based upon a misinterpretation and consequent misapplication of a definition of "Full-time" contained on page 2.0 in the definition section of the policy which provides: "'Full-time' means working for you (Tarmac) for a minimum of 40 hours during a person's regular work week." This is the standard definition of full-time worker in the United States and throughout the English-speaking Western world. Nothing in this definition suggests that the term "full-time" is being given a restricted meaning, or that it is to be interpreted in any way other than that in which it is normally and conventionally understood. In a contract of this nature, any departure from the natural and ordinary meaning of a conventionalized term must be fully and carefully spelled out. Indeed any ambiguity in this regard must necessarily be construed in the plaintiff's favor. The administrator misinterpreted the above-cited provision to mean that a full-time worker is one who must at all times work a minimum of 40 hours per week. However, it is the contract of employment (written or oral) and not performance of the contract of employment which determines the classification or status of an employee. Conventionally, the normal average working hours of a person employed full-time is 40 hours per week, but the status of such a person as a full-time worker does not change to that of a part-time worker because that person fails to work a 40-hour week over any period of time. Classification is a matter of intention and agreement, not of performance.

13

On January 1, 1996, the date the policy was issued, and throughout 1996, plaintiff's

status with Tarmac was that of a "Full-time employee." RADICAN's employer informed

the administrator of this fact in a letter from B. Edward Pittman, Vice President Human

Resources for Tarmac (plaintiff's employer), dated February 26, 1998 ( exhibit "M") which

provided:

> You (RELIANCE) have stated that Mr. Radican was working "part-time"
> when the policy became effective, had not returned to "full time active work"
> prior to his last day worked and therefore did not satisfy the definition of a
> full-time employee under the terms of the policy.
>
> Jim Radican was a full-time salaried exempt employee of this company from
> his date of employment in 1965 until his last day of active work on December
> 31, 1996. At no time prior to the commencement of his short term disability
> on January 1, 1997 was he ever on part-time status; he was at all times paid
> full salary and enjoyed full benefits, including long term disability coverage,
> for which he paid. The fact that he worked partial days in 1996 following his
> return to work from surgery should in no way be construed as "part-time"
> status. Had Mr. Radican been classified a part-time employee, he would have
> been ineligible for participation in our long term disability benefit at all.

RADICAN also provided RELIANCE with his sworn affidavit, and the affidavits of

three of his co-workers, Marcel Aragon, Thomas Mendez, and Craig Leonard, and the

affidavit of Tarmac Benefits Administrator, Hope E. Fischer, in which each affiant stated that

RADICAN was a full-time employee in 1996. (See exhibit "F", "G", "H", "I", and "J").

Further, in his sworn affidavit dated April 17, 2000 (exhibit "F"), RADICAN states in

relevant part: (a) he was employed as a "Full-time" employee throughout 1996; (b) he was

paid as a "Full-time" employee throughout 1996; (c) he was paid in the same way as other

"Full-time" employee of the company throughout 1996; (d) he was insured as a "Full-time"

14

employee throughout 1996; (e) he enjoyed all benefits and perquisites of other "Full-time"

employees throughout 1996; (f) he paid premiums for his coverage as a "Full-time"

employee throughout 1996; and (g) RELIANCE accepted premiums for coverage for him in

an amount due for "Full-time" employees throughout 1996 and RELIANCE has retained

those premiums.  RELIANCE was also provided with the sworn affidavit of B. Edward

Pittman, Vice President of Human Resources for Tarmac dated April 20, 2000 (exhibit "H")

in which he states:

  a.   Tarmac America, Inc. had no part-time or seasonal employees in 1996;

  b.   JAMES E. RADICAN was employed by Tarmac America, Inc. as a full-time worker throughout 1996;

  c.   JAMES E. RADICAN was paid by Tarmac America, Inc. as a full-time worker throughout 1996;

  d.   JAMES E. RADICAN was paid by Tarmac America, Inc. in the same way as other full-time employees of the company throughout 1996;

  e.   JAMES E. RADICAN was insured as a full-time employee of Tarmac America, Inc. throughout 1996;

  f.   JAMES E. RADICAN enjoyed all benefits and perquisites of other full-time employees of Tarmac America, Inc. throughout 1996;

  g.   JAMES E. RADICAN paid premiums for his coverage as a full-time employee of Tarmac America, Inc. throughout 1996;

  h.   Reliance Standard Life Insurance Company ("RELIANCE") accepted payment of premiums for JAMES E. RADICAN in an amount due for full-time employees throughout 1996.

In its second denial letter dated August 3, 1998 on page 2, RELIANCE stated in

relevant part ". . . we are not interested in the employment classification of your client . . ."

15

(exhibit "C"). Nevertheless RELIANCE's denial of the claim is based on its mis-classification of RADICAN as other than a full-time employee of Tarmac. Whereas the term "full-time" worker does contemplate and imply an average work week of 40 hours, a worker's failure to put in 40 hours each week does not ipso facto alter his classification as a full-time employee. The administrator therefore erred and was in contravention of the terms of the policy in refusing to pay benefits on the contention that the RADICAN did not qualify as a "full-time" employee under the plan.

## II.    ASSUMING ARGUENDO THAT IN ORDER TO BECOME ELIGIBLE FOR BENEFITS AN EMPLOYEE WAS REQUIRED TO WORK A MINIMUM OF 40 HOURS DURING ANY WEEK IN 1996, RADICAN MET THIS CRITERION

In determining whether the denial of benefits was proper, the court must consider that RELIANCE pays benefits from its own assets, and its position as a self-interested fiduciary must be factored into the court's determination as to whether benefits have properly been denied.

RELIANCE denied RADICAN's claim for benefits on the basis that he was never an eligible plan participant claiming he failed to prove that he worked 40 hours per week during any week in 1996. In its final denial letter dated July 23, 2001 (exhibit "E") RELIANCE stated RADICAN failed to provide a single tangible piece of documentation which supports his claim that he worked 40 hours per week during 1996. **In support of his claim however, RADICAN provided RELIANCE with his sworn affidavit, the sworn affidavits of three of his co-workers, and the sworn affidavit of Hope E. Fischer, Tarmac's benefits**

16

administrator, in which each stated that RADICAN performed the material duties of his occupation working 40 hours or more per week during numerous weeks in 1996. (Exhibits "F", "G", "H", "I", and "J"). These five sworn affidavits are tangible evidence to support RADICAN's claim. Moreover, RELIANCE stated in its denial letter dated November 1, 1999 (exhibit "D") that "attendance records would appear to be the only documents which could perfect the claim," and, since Tarmac (RADICAN's employer) "... made it clear they did not keep attendance records on [RADICAN] . . . there is [not] any documentation which could perfect . . . (RADICAN's) appeal . . ." RADICAN was a salaried employee in 1996 who did not punch a time clock. The only way for him to establish the compliment of his working hours was via affidavit testimony.

In making the determination to deny RELIANCE rejected the statements contained in the five (5) sworn affidavits referenced above. An ERISA self-interested fiduciary may not properly deny benefits when, as in this case, five sworn affidavits which established plaintiff's eligibility for benefits are not directly controverted or contested by any sworn testimony.[2]

Further, proof that a claimant worked 40 hours per week during the currency of the policy is not a requirement for payment of benefits under the policy.[3] While the policy

---

[2] The affidavit of RELIANCE employee James A. Wilson is not directly contradictory as explained on page 20-21 herein.

[3] The provisions governing payment of benefits are set forth under PAYMENT OF CLAIMS on page 4.0 and INSURING CLAUSE on page 7.0 which provide as follows:

17

provides that in order to be entitled to benefits a claimant is required to submit "satisfactory

proof of Total Disability to" RSL (exhibit "A" pg. 7.0), there is no requirement for a claimant

to submit proof, satisfactory or adequate, of the hours he or she has **actually** worked. The

adequacy or inadequacy of evidence as to the hours actually worked by a full-time employee

is therefore irrelevant to the issue of his entitlement to benefits.

RELIANCE had no reasonable basis for rejecting the evidence submitted by

RADICAN in support of his claim and to deny his claim for benefits. In doing so

RELIANCE claims to have relied upon: (1) oral statements it alleged RADICAN made to

---

**PAYMENT OF CLAIMS:** When we receive written proof of Total Disability covered by
this Policy, we will pay any benefits due. Benefits that provide for periodic payment will be
paid for each period as we become liable.

We will pay benefits to the insured, if living, or else to his/her estate.

If the Insured has died and we have not paid all benefits due, we may pay up to $1,000.00 to
any relative by blood or marriage, or to the executor or administrator of the Insured's estate.
The payment will only be made to persons entitled to it. An expense incurred as a result of
the Insured's last illness, death or burial will entitle a person to this payment. The payments
will cease when a valid claim is made for the benefit. We will not be liable for any payment
we have made in good faith.

Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with
respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary
authority to interpret the Plan and the insurance policy and to determine eligibility for benefits.
Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

**INSURING CLAUSE:** We will pay a Monthly Benefit if an Insured:
- (1)  is Totally Disabled as a result of a Sickness or Injury covered by this Policy;
- (2)  is under the regular care of a Physician;
- (3)  has completed the Elimination Period; and
- (4)  submits satisfactory proof of Total Disability to us.

18

one of its employees; (2) statements made by RADICAN in his application for benefits; (3)

statements made by Michael Unger, General Manager of Pennsuco Cement and Aggregates,

a Tarmac America, Inc. company, in his February 4, 1998 letter; (4) statements made by

Hope E. Fisher, Tarmac's Benefits administrator; and (5) statements made by Dr. Porth,

RADICAN's treating physician.    (See exhibits "B", "C", "D" and "E").

RADICAN provided RELIANCE with documentation which demonstrated that the

evidence upon which RELIANCE based its denial was not reliable.  More specifically, with

respect to no. 1 above, oral statements alleged to have been made to RELIANCE by

RADICAN, employee Richard D. Walsh of RELIANCE stated in his August 3, 1998 denial

letter (exhibit "C" ):

> In fact, on at least two occasions your client (Mr. Radican) informed us via
> telephone that he worked part time throughout 1996.

Responding to this statement RADICAN stated in his sworn affidavit dated January 25,

1999 (Composite exhibit "L"):

> The reference to "throughout" can be misleading and perhaps there has been
> some confusion.  What I attempted to convey is the truth, i.e., that I worked
> part time in 1996 but only for those weeks (less than 12) when I received
> physical therapy and/or pain treatment.

In his denial letter dated August 3, 1998 (exhibit "C") Richard Walsh of RELIANCE further

stated:

> He (Mr. Radican) informed us that he worked part time for about one year but
> was told that he should apply for disability because the company could no
> longer accommodate him on a part-time schedule.

19

Responding to this statement RADICAN provided RELIANCE with a sworn affidavit dated

January 25, 1999 (composite exhibit "L") in which he stated:

> This is an inaccurate statement. Perhaps I was misunderstood. What I attempted to convey was the truth, i.e., the only time in 1996 in which I did not work full-time was during those weeks when I was receiving medical treatment as referred to above.

In the denial letter dated November 1, 1999 (exhibit "D") Richard D. Walsh of RELIANCE

stated:

> . . . during two telephone conversations with one of our representatives Mr. Radican advised that he had worked part-time for approximately one year prior to being told that Tarmac could no longer accommodate his part-time schedule after December 31, 1996.

Responding to this statement RADICAN provided RELIANCE with his affidavit dated April

17, 2000 (exhibit "F") in which he stated:

> I never stated by phone or otherwise to any RELIANCE employee or anyone else that I <u>only</u> worked part time in 1996 and I informed RELIANCE of this. I informed RELIANCE that perhaps I was misunderstood. What I attempted to convey to the RELIANCE employee with whom I spoke was the truth, i.e., that I worked part time in 1996 but only for those weeks (less than 12) when I received physical therapy and/or pain treatment.

In its previously filed Response to Plaintiff's Motion for Summary Judgment and

Cross-motion for Summary Judgment, RELIANCE attached the affidavit of its employee,

James A. Wilson, Jr., (exhibit "P") in which he stated in relevant part:

> 3.  I spoke directly with Mr. Radican on the telephone on two occasion during the investigation of his claim
>
> 4.  During both telephone conversations Mr. Radican <u>told me that he worked part-time for approximately one year</u> before he was told by the

> employer, Tarmac, that they could not accommodate his part-time
> schedule after December 31, 1996. (emphasis added)

5.    At no time during my telephone conversation with Mr. Radican did he
      ever state that he worked full-time at any time during 1996.

As referenced above, RADICAN provided RELIANCE with his sworn affidavit

(exhibit "F") in which he stated in relevant part:

> I never stated by phone or otherwise to any RELIANCE employee or anyone
> else that I only worked part time in 1996 . . . (see quotations above)

Further, the purported statements attributed to RADICAN are hearsay and were allegedly

made to an employee of RELIANCE whose interest would be to deny benefits. Mr. Wilson

does not allege that RADICAN stated he worked only part time (less than 40 hours) for

every week in 1996, a conclusion reached by RELIANCE by conjecture. RADICAN never

disputed that he worked less than 40 hours, "part-time" for some weeks during 1996 (12),

and he clarified the confusion in this regard with his submissions.[4] There is no evidence in

the administrative record to indicate that during the course of the conversations, or at any

other time, RADICAN was ever asked whether he worked "full-time" during any week in

1996.

---

[4] RADICAN had been employed by Tarmac for more than 20 years in 1996. RADICAN's
purported statement that "he worked part-time for approximately one year," even if accurate, could
also mean that he worked part-time for some weeks during that one year period only, and not during
the other years of his employment.

With respect to number 2 above, RELIANCE claims to have relied on statements made by RADICAN in his application for benefits, stating in the denial letter dated November 1, 1999 (exhibit "D"):

. . . in Mr. Radican's own application for benefits it appears as though he noted that he worked on a part-time basis for the employer. On the Employee's statement dated November 3, 1997 Mr. Radican was asked:

> Before you stopped working, did your condition require you to change your job or the way you did your job?
> His answer:
> Yes
> Date you were first unable to work on a full-time basis
> His answer:
> 1/1/97
> Next he was asked:
> Last day you worked before the disability:
> His answer:
> 12/31/96
> Finally, he was asked:
> Did you work a full day:
> His answer:
> No - Part time - recovering from surgery

In the above-cited exchange RADICAN did not state that he only worked part-time throughout 1996. He stated that he was first unable to work on a "full-time basis" on January 1, 1997.[5] Further, his reference to working part-time recovering from surgery is in response to a question directed toward whether he worked a full day on December 31, 1996.

_____

[5] In the denial letter dated November 1, 1999, pg. 4, (exhibit "D") RELIANCE concedes "these answers (in the application) are not conclusive evidence that [RADICAN] . . . was working on a part-time basis throughout 1996 . . ."

22

Accordingly, any conclusion that he failed to work the hours of a "Full-time" employee

during any week in 1996 was obviously wrong and was necessarily based upon speculation.

With respect to no. 3 above, RELIANCE claims to have relied upon the following

statement made by Michael Unger, General Manager of Pennsuco Cement and Aggregates,

a Tarmac America, Inc. company, in his letter to RELIANCE dated February 4, 1998:

> It is my understanding that, after recovering from back surgery, James Radican returned to work on or about November 1, 1995.
> At that time, Jim reported to Mr. Fred Boudie, Vice President of Production and Sales for Tarmac's Pennsuco Mill in Medley, Florida. Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatment.
>
> Tarmac's policy requires employees to work only on a full-time basis. Jim was incapable of performing his duties on this basis and was required to file for short-term disability on January 1, 1996. (Emphasis added)

RADICAN provided RELIANCE with the sworn affidavit of Michael Unger dated

January 18, 1999 (composite exhibit "L") in which Mr. Unger corrected and clarified the two

above underlined statements contained in his February 4, 1998 letter which he attached as

follows:

> My letter dated February 4, 1998 contains the statement:
>
>> Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.
>
> The above statement does not state, nor did I mean to infer that JAMES RADICAN worked only part-time in 1996. I was attempting to convey that JAMES E. RADICAN worked part-time during the weeks when he received physical therapy and/or pain treatment.
>
> My letter dated February 4, 1998 contains the statement:

Jim was incapable of performing his duties on this (a full-time) basis and was required to file for short term disability on January 1, 1996.

The reference to January 1, 1996 was an inadvertent error. The date should have been January 1, 1997.

With respect to number 4 above, RELIANCE claims to have relied upon a statement

made by Hope E. Fischer, Benefits Administrator for Tarmac, in her letter dated January 28,

1998 which she states:

(o)ur files on Mr. Radican indicate that he had back surgery in October of 1995 and was out of work from that time until sometime after mid-year 1996 at the recommendation of his doctor, Manuel Porth. Sometime during the latter part of 1996, he reported to work, but we have no documentation in the file to substantiate the dates worked.

Ms. Fisher did not state that RADICAN failed to work "Full-time" as that term is

defined in the policy during any week in 1996, and any conclusion in this regard would also

have been reached by speculation. In addition RELIANCE was provided with the sworn

affidavit of Hope E. Fischer dated March 2, 2001 (exhibit "J") in which she stated in

pertinent part:

2. I have personal knowledge that Reliance Standard Life Insurance Company has denied James E. Radican's claim for disability benefits upon a finding that in 1996 James E. Radican did not perform the material duties pertaining to his job in the place and manner in which his job was normally performed on a "Full-time" basis, i.e., a minimum of 40 hours during his regular work week. In making its determination, I am also aware that Reliance Standard Life Insurance Company claims to have relied upon the following statement from my letter dated January 28, 1998:

[o]ur files on Mr. Radican indicate that he had back surgery in October of 1995 and was out of work from that time until sometime after mid-year 1996 at the recommendation of his doctor, Manuel Porth.

24

Sometime during the latter part of 1996, he reported to work, but we have no documentation in the file to substantiate the dates worked.

3.      My above-quoted statement should not to be construed or interpreted to support a conclusion that Mr. Radican did not work a minimum of 40 hours during his regular work week in 1996, and any reliance in this regard is unwarranted and misguided. My statement that Mr. Radican "was out of work from that time (October, 1995) until sometime after mid-year 1996," was made without personal knowledge, and I was simply paraphrasing what I had read in a written recommendation from Dr. Manuel Porth.

Further, the company did not require or maintain documents to substantiate the dates worked for any salaried employee including James E. Radican in 1996, and it was solely for this reason that I stated "we have no documentation in the file to substantiate the dates worked." The absence of such documentation does not support a conclusion that Mr. Radican or any other salaried employee did not work for Tarmac for 40 hours per week in 1996.

5.      I received a copy of a letter from Reliance Standard Life Insurance Company to James Radican dated April 6, 1998 in which his claim for disability benefits was denied on the basis that he was not eligible because he failed to work a minimum of 40 hours during his regular work week in 1996 and therefore was not a "Full-time" employee. This determination by Reliance Standard Life Insurance Company is wrong.

6.      I received copies of letters from attorney Marika McVey Ostendorf dated June 5, 1998, and from attorney Lawrence D. Bache dated January 26, 1999 sent to Reliance Standard Life Insurance Company on behalf of James E. Radican. I concur with the positions stated by counsel in those letters that James E. Radican was a "Full-Time" employee for Tarmac America, Inc. in 1996 due not only to his employment status, but also because he performed the material duties pertaining to his job for more than 40 hours per week during numerous weeks in 1996.

With respect to number 5, RELIANCE claims to have relied upon medical reports of

Manuel Porth, M.D., stating in its denial letter dated November 1, 1999 (exhibit "D"):

. . . our review of the medical records provided by Mr. Radican's various physician(s) supports RSL's opinion that Mr. Radican did not work on a full-time basis during calendar year 1996. First , a "To Whom it May Concern"

25

letter from Dr. Manuel Porth dated January 1, 1996 suggests that your client was not capable of working at all during the first half of 1996. Dr. Porth wrote:

> A program of rehabilitation is mandatory and *the patient has been advised to remain out of work for the next six months* for medical reasons. It is my opinion that with a strenuous program of therapy and rehabilitation, we can maximize the benefits of the surgical procedure and *hopefully return this patient to work status by June of 1996. . .* (Emphasis added)

. . . Dr. Porth's medical records also suggest that your client was not capable or working full-time during calendar year 1996. On March 22, 1996 Dr. Porth noted:

> It is now 6 months following his laminectomy, and the quality of life has not significantly improved. *He is still unable to return to his job* and is aware of his back on a continual basis  (Emphasis added)

RADICAN provided RELIANCE with the sworn affidavit of Manuel Porth, M.D.,

dated June 28, 2000 (exhibit "O") in which he clarified his statements in the medical records

stating:

> 2.    That I compiled and maintained medical records in connection with treatment of James Radican and that I provided excerpts of those records and letters with respect thereto to Reliance Standard Life Insurance Company at their request.
>
> 3.    That I stated therein that during certain periods of 1996 I advised James Radican not to work and I also stated that he was unable to return to his job.
>
> 4.    That I naturally assumed Mr. Radican was following my advice that he should not work. I had no personal knowledge when I prepared the referenced reports and letters as to whether Mr. Radican had been following advice and/or was in fact not working.

Further, in his sworn affidavit dated April 17, 2000 (exhibit "F") , provided to RELIANCE,

RADICAN explained:

26

> Notwithstanding having back pain and associated problems throughout 1996
> and having been advised by Dr. Manuel Porth that I should refrain from
> working for the first 6 months in 1996 I did not follow his advice and the only
> weeks I did not work a minimum of 40 hours per week in 1996 were those
> weeks in which I received physical therapy and/or pain treatment and which
> total not more than 12 weeks.[6]

In summary, the evidence which RELIANCE claims to have relied upon in making

the denial did not provide a reasonable basis for denying RADICAN's claim for benefits.

RELIANCE stated in its final denial letter dated July 23, 2001 (after remand) (exhibit

"E"):

> [W]hile your client claims to be able to explain why the numerous references
> to his part-time work status were inaccurate, the fact that so many references
> exist, makes the most plausible explanation that your client in fact worked
> only part-time during calendar year 1996

An ERISA fiduciary, particularly a self-interested insurance company, may not properly

deny benefits based upon what it deems to be the most "plausible explanation," of the

validity of a specific fact, particularly where five sworn affidavits attesting to the validity

of the fact in question are not directly controverted or contested by any sworn testimony.[7]

In its final denial letter (exhibit "E"), RELIANCE raises, for the first time, a new

ground (reason) which it contends may give rise to a denial of benefits, stating that it had

"not reached a determination regarding whether (RADICAN) . . . would have been Totally

---

[6]    RADICAN never disputed that he worked less than 40 hours for some weeks during
1996 (12), and pointed out to RELIANCE that this is what gave rise to the references to "part-time"
upon which RELIANCE claims to have based its denial (exhibits "F" through "O").

[7]    Even if the affidavit of RELIANCE employee James Wilson directly contradicts the five
(5) sworn affidavits on the fact question at issue, it would not provide a reasonable basis for a self-
interested fiduciary to reject the evidence submitted by RADICAN in support of his claim.

27

Disabled beyond December 31, 1996." 29 C.F.R. § 2560.503-1(f) requires a denial in writing to state:

> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;

The sole stated reason for the denial of benefits throughout these proceedings has been that RADICAN was never eligible for benefits because he failed to work 40 hours per week during any week in 1996. (Exhibits "B", "C", "D", and "E"). Assuming arguendo, this new basis for the denial had merit, which it does not, it could and should have been raised in the prior administrative proceedings.

Further, the raising of a new and distinct potential reason for a denial is outside the scope of remand. Plaintiff sought a remand to the plan administrator in this case because RELIANCE previously failed to reveal, until it closed the administrative file, information upon which it mainly relied in making the denial thereby violating the ERISA requirement that a participant be entitled to a full and fair review of his/her claim. The court granted RADICAN's Motion to Remand stating in relevant part:

> the Plaintiff has evidence which suggests <u>that he was a full-time employee at the time in question, and as such he would be eligible for the receipt of disability benefits from the Defendant</u>. Thus, a remand to the plan administrator is appropriate. (Emphasis added)

Because RELIANCE never previously contended it may be entitled to deny benefits on the basis that RADICAN (may have) failed to meet the policy definition of Total Disability, RADICAN was never afforded an opportunity to submit responsive evidence on

this issue in the administrative proceedings. Moreover, the administrative record contains substantial <u>uncontroverted</u> evidence of RADICAN's Total Disability, and any further consideration on this issue by RELIANCE is unwarranted.

### III.    RELIANCE's ACCEPTANCE AND CONTINUING RETENTION OF PREMIUMS PAID BY OR ON BEHALF OF RADICAN CONSTITUTED A WAIVER OF ANY RIGHT TO ALLEGE THAT RADICAN WAS NOT AN ELIGIBLE INSURED UNDER THE PLAN

RELIANCE received and continued to retain the premiums paid (monthly) with respect to coverage for RADICAN for the entire year of 1996. (Exhibits "F", "M", and "N"). In the circumstances of this case, RELIANCE's acceptance and continuing retention of premiums constitutes a waiver of any right they might otherwise have had to deny that RADICAN was an eligible insured under the plan. RELIANCE first denied Radican's benefits on the basis of ineligibility on <u>April 6, 1998</u>. Having denied Radican's claim on April 6, 1998 on the basis that Radican was not covered under the plan because he was not and had never been a full-time worker, RELIANCE nevertheless retained and continues to retain the premiums paid for the entire year of 1996. RELIANCE's retention of Radican's premiums constitutes unjust enrichment and is an outrageous, bad faith, unjust benefit circumstance, and as such mandates a finding of an abuse of discretion.

### CONCLUSION

In denying RADICAN's claim for benefits RELIANCE wrongfully characterized RADICAN as a part-time worker. The undisputed facts demonstrate that plaintiff's status with his employer was that of a full-time employee and it is the contract of employment

29

(written or oral) and not the performance of the contract of employment which determines the classification or status of an employee. In addition, assuming arguendo that in order to become eligible for benefits an employee was required to work a minimum of 40 hours during any week in 1996, the undisputed facts demonstrate that RADICAN met this criterion.

**WHEREFORE**, Plaintiff, respectfully request this Honorable Court grant plaintiff JAMES E. RADICAN's Motion for Summary Judgment on the issue of liability finding RADICAN is entitled to long term disability benefits.

**Respectfully submitted this 17th day of September, 2001.**

By: _____
LAWRENCE D. BACHE
Florida Bar No. 0557935
Law Office of Lawrence D. Bache
9000 West Sheridan Street, Suite 174
Pembroke Pines, Florida 33024
(954) 436-7376; Fax (954) 436-2926

## Certificate of Service

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via U.S. mail this 17th day of September, 2001 to **Gene D. Lipscher**, Esq., Alley, Maass, Rogers, & Lindsay, P.A., Attorney for RSL, 321 Royal Poinciana Plaza South , P.O. Box 431 Palm Beach, FL 33480-0431 and to **Joshua Bachrach**, Esq., Rawle & Henderson, the Widener Bldg, 16th Floor, One South Penn Square, 1339 Chestnut St., Philadelphia, PA 19107.

By: _____
LAWRENCE D. BACHE
Florida Bar No. 0557935
Law Office of Lawrence D. Bache
9000 West Sheridan Street, Suite 174
Pembroke Pines, Florida 33024
(954) 436-7376;  Fax (954) 436-2926

C:\MyFiles\Radican\MSJ Renew 01.wpd

# Reliance Standard Life Insurance Company

Home Office: Chicago, Illinois • Administrative Office: Philadelphia, Pennsylvania

POLICYHOLDER: Tarmac America, Inc.                    POLICY NUMBER: LSC 098842

EFFECTIVE DATE: January 1, 1996

ANNIVERSARY DATES: January 1, 1997 and each January 1 thereafter

PREMIUM DUE DATES: The first Premium is due on the Effective Date. Further Premiums are due monthly, in advance, on the first day of each month.

This Policy is delivered in Virginia and is governed by its laws.

Reliance Standard Life Insurance Company is referred to as "we", "our" or "us" in this Policy.

The Policyholder and any subsidiaries, divisions or affiliates are referred to as "you", "your" or "yours" in this Policy.

We agree to provide insurance to you in exchange for the payment of Premium and a signed Application. This Policy provides income replacement benefits for Total Disability from Sickness or Injury. It insures those Eligible Persons for the Monthly Benefit shown on the Schedule of Benefits. The insurance is subject to the terms and conditions of this Policy.

The Effective Date of this Policy is shown above. This Policy stays in effect as long as Premium is paid when due. The "TERMINATION OF THIS POLICY" section of the GENERAL PROVISIONS explains when the insurance terminates.

This Policy is signed by our President and Secretary.

SECRETARY                    PRESIDENT

Countersigned _____
                          Licensed Resident Agent

**GROUP LONG TERM DISABILITY INSURANCE**
**NON-PARTICIPATING**

RS-6564 Ed. 2/83                    Exhibit "A"

**RELIANCE STANDARD LIFE INSURANCE COMPANY**
Home Office: Chicago, Illinois
Administrative Office: Philadelphia, Pennsylvania

**GROUP POLICY NUMBER:** LSC 098842                    **POLICY EFFECTIVE DATE:** January 1, 1996

**POLICY DELIVERED IN:** Virginia                    **ANNIVERSARY DATE:** January 1 in each year

Application is made to us by: Tarmac America, Inc.

This Application is completed in duplicate, one copy to be attached to your Policy and the other returned to us.

It is agreed that this Application takes the place of any previous application for your Policy.

Signed at _____ this _____ day of _____.

Policyholder: _____    Agent: _____

By: _____    _____
              (Signature)                    (Licensed Resident Agent)

_____
              (Title)

LRS-6564-1 Ed. 2/83

## TABLE OF CONTENTS

Page

SCHEDULE OF BENEFITS ........................................................................ 1.0

DEFINITIONS ................................................................................. 2.0

GENERAL PROVISIONS .......................................................................... 3.0
    Entire Contract
    Changes
    Time Limit On Certain Defenses
    Records Maintained
    Clerical Error
    Misstatement Of Age
    Not In Lieu Of Worker's Compensation
    Conformity With State Laws
    Certificate Of Insurance
    Termination Of This Policy

CLAIMS PROVISIONS ........................................................................... 4.0
    Notice Of Claim
    Claim Forms
    Written Proof Of Total Disability
    Payment of Claims
    Arbitration of Claims
    Physical Examination And Autopsy
    Legal Actions

INDIVIDUAL ELIGIBILITY, EFFECTIVE DATE AND TERMINATION ......................................... 5.0
    General Group
    Eligibility Requirements
    Waiting Period
    Effective Date Of Individual Insurance
    Termination Of Individual Insurance
    Individual Reinstatement

PREMIUMS .................................................................................... 6.0

BENEFIT PROVISIONS ........................................................................... 7.0

EXCLUSIONS .................................................................................. 8.0

LIMITATIONS ................................................................................. 9.0

CONTINUITY OF INSURANCE COVERAGE PROVISION .................................................... 10.0

SPECIFIC INDEMNITY BENEFIT ................................................................... 11.0

WORK INCENTIVE AND CHILD CARE BENEFITS ....................................................... 12.0

LIVING BENEFIT ............................................................................... 13.0

REHABILITATION BENEFIT ....................................................................... 14.0

LRS-6564-2 Ed. 2/83

## SCHEDULE OF BENEFITS

NAME OF SUBSIDIARIES, DIVISIONS OR AFFILIATES TO BE COVERED: None

ELIGIBLE CLASSES: Each active, Full-time employee except any person employed on a temporary or seasonal basis, according to the following classifications:

CLASS A: employee earning $59,000.00 or more per year   who:

(1)  is engaged in a non-hazardous occupation; and
(2)  functions primarily in an office environment.

CLASS B: salaried employee earning more than $30,000.00 per year but less than $59,000.00

WAITING PERIOD:  Present Employees: none
Future Employees: 90 days

INDIVIDUAL EFFECTIVE DATE:  The first of the Policy month coinciding with or next following completion of the Waiting Period, if applicable.

INDIVIDUAL REINSTATEMENT: 6 months

MINIMUM PARTICIPATION REQUIREMENTS: Percentage: 100%  Number of Insureds: 10

LONG TERM DISABILITY BENEFIT

ELIMINATION PERIOD: 270 consecutive days of Total Disability.

MONTHLY BENEFIT:  The Monthly Benefit is an amount equal to:

CLASS A: 67% of Covered Monthly Earnings, payable in accordance with the section entitled Benefit Amount.

CLASS B: 60% of Covered Monthly Earnings, payable in accordance with the section entitled Benefit Amount.

MINIMUM MONTHLY BENEFIT:  In no event will the Monthly Benefit payable to an Insured be less than $100.00

MAXIMUM MONTHLY BENEFIT:

CLASS A: $15,000.00 (this is equal to a maximum Covered Monthly Earnings of $22,388.00); however, Monthly Benefits in excess of $10,500.00 are subject to our approval of a person's proof of health.

CLASS B: $10,000.00 (this is equal to a maximum Covered Monthly Earnings of $16,667.00).

MAXIMUM DURATION OF BENEFITS: Benefits will not accrue beyond the longer of: the Duration of Benefits; or Normal Retirement Age; specified below:

| Age at Disablement | Duration of Benefits (in years) |
|---|---|
| 61 or less | To Age 65 |
| 62 | 3-1/2 |
| 63 | 3 |
| 64 | 2-1/2 |
| 65 | 2 |
| 66 | 1-3/4 |
| 67 | 1-1/2 |
| 68 | 1-1/4 |
| 69 or more | 1 |

OR

Normal Retirement Age as defined by the 1983 Amendments to the United States Social Security Act and determined by the Insured's year of birth, as follows:

| Year of Birth | Normal Retirement Age |
|---|---|
| 1937 or before | 65 years |
| 1938 | 65 years and 2 months |
| 1939 | 65 years and 4 months |
| 1940 | 65 years and 6 months |
| 1941 | 65 years and 8 months |
| 1942 | 65 years and 10 months |
| 1943 thru 1954 | 66 years |
| 1955 | 66 years and 2 months |
| 1956 | 66 years and 4 months |
| 1957 | 66 years and 6 months |
| 1958 | 66 years and 8 months |
| 1959 | 66 years and 10 months |
| 1960 and after | 67 years |

CHANGES IN MONTHLY BENEFIT: Increases in the Monthly Benefit are effective on the date of the change, provided the Insured is Actively at Work on the effective date of the change. If the Insured is not Actively at Work on that date, the effective date of the change will be deferred until the date the Insured returns to Active Work.

Decreases in the Monthly Benefit are effective on the date the change occurs.

CONTRIBUTIONS: Insured: 0%

## DEFINITIONS

"Actively at Work" and "Active Work" mean actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an Injury or Sickness.

"Claimant" means an Insured who makes a claim for benefits under this Policy for a loss covered by this Policy as a result of an Injury to or a Sickness of the Insured.

"Covered Monthly Earnings" means the Insured's monthly salary received from you on the day just before the date of Total Disability. Covered Monthly Earnings do not include commissions, overtime pay, bonuses or any other special compensation not received as Covered Monthly Earnings.

If hourly paid employees are insured, the number of hours worked during a regular work week, not to exceed forty (40) hours per week, times 4.333, will be used to determine Covered Monthly Earnings. If an employee is paid on an annual basis, then the Covered Monthly Earnings will be determined by dividing the basic annual salary by 12.

"Eligible Person" means a person who meets the Eligibility Requirements of this Policy.

"Elimination Period" means a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable. It begins on the first day of Total Disability.

Interruption Period: If, during the Elimination Period, an Insured returns to Active Work for less than 30 days; then the same or related Total Disability will be treated as continuous. Days that the Insured is Actively at Work during this interruption period will not count towards the Elimination Period. This interruption of the Elimination Period will not apply to an Insured who becomes eligible under any other group long term disability insurance plan.

"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.

"Hospital" or "Institution" means a facility licensed to provide care and treatment for the condition causing the Insured's Total Disability.

"Injury" means bodily injury resulting directly from an accident, independent of all other causes. The Injury must cause Total Disability which begins while insurance coverage is in effect for the Insured.

"Insured" means a person who meets the Eligibility Requirements of this Policy and is enrolled for this insurance.

"Physician" means a duly licensed practitioner who is recognized by the law of the state in which treatment is received as qualified to treat the type of Injury or Sickness for which claim is made. The Physician may not be the Insured or a member of his/her immediate family.

"Pre-existing Condition" means any Sickness or Injury for which the Insured received medical treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines, during the 3 months immediately prior to the Insured's effective date of insurance.

"Premium" means the amount of money needed to keep this Policy in force.

"Rehabilitative Employment" means work in any gainful occupation for which the Insured's training, education or experience will reasonably allow. The work must be supervised by a Physician or a licensed rehabilitation specialist approved by us. Rehabilitative Employment includes work performed while Partially Disabled, but does not include performing all the material duties of his/her regular occupation on a Full-time basis.

"Retirement Benefits" mean money which the Insured is entitled to receive upon early or normal retirement or disability retirement under:

(1) any plan of a state, county or municipal retirement system, if such pension benefits include any credit for employment with you;
(2) Retirement Benefits under the United States Social Security Act of 1935, as amended, or under any similar plan or act; or
(3) an employer's retirement plan where payments are made in a lump sum or periodically and do not represent contributions made by an Insured.

Retirement Benefits do not include:
- (1)   a federal government employee pension benefit;
- (2)   a thrift plan;
- (3)   a deferred compensation plan;
- (4)   an individual retirement account (IRA);
- (5)   a tax sheltered annuity (TSA);
- (6)   a stock ownership plan; or
- (7)   a profit sharing plan.

"Sickness" means illness or disease causing Total Disability which begins while insurance coverage is in effect for the Insured. Sickness includes pregnancy, childbirth, miscarriage or abortion, or any complications therefrom.

"Totally Disabled" and "Total Disability" mean, with respect to Class A, that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her regular occupation;
- (1)   "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and
- (2)   "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability.

"Totally Disabled" and "Total Disability' mean, with respect to Class B, that as a result of an Injury or Sickness:
- (1)   during the Elimination Period and for the first 60 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
  - (a)   "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;
  - (b)   "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and
- (2)   after a Monthly Benefit has been paid for 60 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

If an Insured is employed by you and requires a license for such occupation, the loss of such license for any reason does not in and of itself constitute "Total Disability".

However, if an Insured is employed by you as a licensed pilot or as a crew member, "Total Disability" means that, due to an Injury or Sickness, he/she cannot perform the material duties of any gainful occupation for which his/her education, training or experience will reasonably allow. The loss of a pilot's authorization to fly for any reason does not in and of itself constitute "Total Disability".

## GENERAL PROVISIONS

**ENTIRE CONTRACT:** The entire contract between you and us is this Policy, your Application (a copy of which is attached at issue) and any attached amendments.

**CHANGES:** No agent has authority to change or waive any part of this Policy. To be valid, any change or waiver must be in writing, signed by either our President, a Vice President, or a Secretary. The change or waiver must also be attached to this Policy.

**TIME LIMIT ON CERTAIN DEFENSES:** After this Policy has been in force for two (2) years from its Effective Date, no statement made by you shall be used to void this Policy; and no statement by any Insured on a written application for insurance shall be used to reduce or deny a claim after the Insured's insurance coverage, with respect to which claim has been made, has been in effect for two (2) years.

**RECORDS MAINTAINED:** You must maintain records of all Insureds. Such records must show the essential data of the insurance, including new persons, terminations, changes, etc. This information must be reported to us regularly. We reserve the right to examine the insurance records maintained at the place where they are kept. This review will only take place during normal business hours.

**CLERICAL ERROR:** Clerical errors in connection with this Policy or delays in keeping records for this Policy, whether by you, us, or the Plan Administrator:

   (1)   will not terminate insurance that would otherwise have been effective; and
   (2)   will not continue insurance that would otherwise have ceased or should not have been in effect.

If appropriate, a fair adjustment of premium will be made to correct a clerical error.

**MISSTATEMENT OF AGE:** If an Insured's age is misstated, the Premium will be adjusted. If the Insured's benefit is affected by the misstated age, it will also be adjusted. The benefit will be changed to the amount the Insured is entitled to at his/her correct age.

**NOT IN LIEU OF WORKER'S COMPENSATION:** This Policy is not a Worker's Compensation Policy. It does not provide Worker's Compensation benefits.

**CONFORMITY WITH STATE LAWS:** Any section of this Policy, which on its Effective Date, conflicts with the laws of the state in which this Policy is issued, is amended by this provision. This Policy is amended to meet the minimum requirements of those laws.

**CERTIFICATE OF INSURANCE:** We will send to you an individual certificate for each Insured. The certificate will outline the insurance coverage, state this Policy's provisions that affect the Insured, and explain to whom benefits are payable.

**TERMINATION OF THIS POLICY:** You may cancel this Policy at any time by giving us written notice. This Policy will be cancelled on the date we receive your notice or, if later, the date requested in your notice.

This Policy will terminate at the end of the Grace Period if Premium has not been paid by that date.

We may cancel this Policy within thirty-one (31) days of written notice prior to the date of cancellation, only:
   (1)   if the number of Insureds is less than the Minimum Participation Number shown on the Schedule of Benefits; or
   (2)   if the percentage of Eligible Persons insured is less than the Minimum Participation Percentage shown on the Schedule of Benefits.

You will still owe us any Premium that is not paid up to the date this Policy is cancelled. We will return, pro-rata, any part of the Premium paid beyond the date this Policy is cancelled.

Termination of this Policy will not affect any claim which was covered prior to termination, subject to the terms and conditions of this Policy.

## CLAIMS PROVISIONS

**NOTICE OF CLAIM:** Written notice must be given to us within thirty-one (31) days after a Total Disability covered by this Policy occurs, or as soon as reasonably possible. The notice should be sent to us at our Administrative Office or to our authorized agent. The notice should include your name, the Policy Number and the Insured's name.

**CLAIM FORMS:** When we receive the notice of claim, we will send the Claimant the claim forms to file with us. We will send them within fifteen (15) days after we receive notice. If we do not, then proof of Total Disability will be met by giving us a written statement of the type and extent of the Total Disability. The statement must be sent within ninety (90) days after the loss began.

**WRITTEN PROOF OF TOTAL DISABILITY:** For any Total Disability covered by this Policy, written proof must be sent to us within ninety (90) days after the Total Disability occurs. If written proof is not given in that time, the claim will not be invalidated nor reduced if it is shown that written proof was given as soon as was reasonably possible. In any event, proof must be given within one (1) year after the Total Disability occurs, unless the Claimant is legally incapable of doing so.

**PAYMENT OF CLAIMS:** When we receive written proof of Total Disability covered by this Policy, we will pay any benefits due. Benefits that provide for periodic payment will be paid for each period as we become liable.

We will pay benefits to the Insured, if living, or else to his/her estate.

If the Insured has died and we have not paid all benefits due, we may pay up to $1,000.00 to any relative by blood or marriage, or to the executor or administrator of the Insured's estate. The payment will only be made to persons entitled to it. An expense incurred as a result of the Insured's last illness, death or burial will entitle a person to this payment. The payments will cease when a valid claim is made for the benefit. We will not be liable for any payment we have made in good faith.

Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

**ARBITRATION OF CLAIMS:** Any claim or dispute arising from or relating to our determination regarding the Insured's Total Disability may be settled by arbitration when agreed to by the Insured and us in accordance with the Rules for Health and Accident Claims of the American Arbitration Association or by any other method agreeable to the Insured and us. In the case of a claim under an Employee Retirement Income Security Act (hereinafter referred to as ERISA) Plan, the Insured's ERISA claim appeal remedies, if applicable, must be exhausted before the claim may be submitted to arbitration. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction over such awards.

Unless otherwise agreed to by the Insured and us, any such award will be binding on the Insured and us for a period of twelve (12) months after it is rendered assuming that the award is not based on fraudulent information and the Insured continues to be Totally Disabled. At the end of such twelve (12) month period, the issue of Total Disability may again be submitted to arbitration in accordance with this provision.

Any costs of said arbitration proceedings levied by the American Arbitration Association or the organization or person(s) conducting the proceedings will be paid by us.

**PHYSICAL EXAMINATION AND AUTOPSY:** We will, at our expense, have the right to have a Claimant interviewed and/or examined:

   (1)  physically;
   (2)  psychologically; and/or
   (3)  psychiatrically;

to determine the existence of any Total Disability which is the basis for a claim. This right may be used as often as it is reasonably required while a claim is pending.

We can have an autopsy made unless prohibited by law.

LRS-6564-77-0394                                    4.0

**LEGAL ACTIONS:** No legal action may be brought against us to recover on this Policy within sixty (60) days after written proof of loss has been given as required by this Policy. No action may be brought after three (3) years (Kansas, five (5) years; South Carolina, six (6) years) from the time written proof of loss is received.

## INDIVIDUAL ELIGIBILITY, EFFECTIVE DATE AND TERMINATION

**GENERAL GROUP:** The general group will be your employees and employees of any subsidiaries, divisions or affiliates named on the Schedule of Benefits page.

**ELIGIBILITY REQUIREMENTS:** A person is eligible for insurance under this Policy if he/she:
    (1)  is a member of an Eligible Class, as shown on the Schedule of Benefits page; and
    (2)  has completed the Waiting Period, as shown on the Schedule of Benefits page.

**WAITING PERIOD:** A person who is continuously employed on a Full-time basis with you for the period specified on the Schedule of Benefits page has satisfied the Waiting Period. The Waiting Period for Present Employees applies to persons who are members of the Eligible Classes on this Policy's Effective Date. The Waiting Period for Future Employees applies to persons who become members of the Eligible Classes after this Policy's Effective Date.

**EFFECTIVE DATE OF INDIVIDUAL INSURANCE:** If you pay the entire Premium due for an Eligible Person, the insurance for such Eligible Person will go into effect on the Individual Effective Date, as shown on the Schedule of Benefits page.

If an Eligible Person pays a part of the Premium, he/she must apply in writing for the insurance to go into effect. He/she will become insured on the latest of:
    (1)  the Individual Effective Date as shown on the Schedule of Benefits page, if he/she applies on or before that date;
    (2)  on the date he/she applies, if he/she applies within thirty-one (31) days from the date he/she first met the Eligibility Requirements; or
    (3)  on the date we approve any required proof of health acceptable to us. We require this proof if a person applies:
        (a)  after thirty-one (31) days from the date he/she first met the Eligibility Requirements; or
        (b)  after he/she terminated this insurance but remained in an Eligible Class as shown on the Schedule of Benefits page.

The insurance for an Eligible Person will not go into effect on a date he/she is not Actively at Work because of a Sickness or Injury. The insurance will go into effect after the person is Actively at Work for one (1) full day in an Eligible Class, as shown on the Schedule of Benefits page.

**TERMINATION OF INDIVIDUAL INSURANCE:** The insurance of an Insured will terminate on the first of the following to occur:
    (1)  the first of the Policy month coinciding with or next following the date this Policy terminates;
    (2)  the first of the Policy month coinciding with or next following the date the Insured ceases to meet the Eligibility Requirements;
    (3)  the end of the period for which Premium has been paid for the Insured; or
    (4)  the first of the Policy month coinciding with or next following the date the Insured enters military service (not including Reserve or National Guard).

**INDIVIDUAL REINSTATEMENT:** The insurance of a terminated person may be reinstated if he/she returns to Active Work with you within the period of time as shown on the Schedule of Benefits page. He/she must also be a member of an Eligible Class, as shown on the Schedule of Benefits page, and have been:
    (1)  on a leave of absence approved by you; or
    (2)  on temporary lay-off.

The person will not be required to fulfill the Eligibility Requirements of this Policy again. The insurance will go into effect after he/she returns to Active Work for one (1) full day. If a person returns after having resigned or having been discharged, he/she will be required to fulfill the Eligibility Requirements of this Policy again. If a person returns after terminating insurance at his/her request or for failure to pay Premium when due, proof of health acceptable to us must be submitted before he/she may be reinstated.

### PREMIUMS

**PREMIUM PAYMENT:** All Premiums are to be paid by you to us, or to an authorized agent, on or before the due date. The Premium Due Dates are stated on this Policy's face page.

**PREMIUM RATE:** The Premium due will be the rate per $100.00 of the entire amount of Covered Monthly Earnings then in force. We will furnish to you the Premium Rate on this Policy's Effective Date and when it is changed. We have the right to change the Premium Rate:

(1)   when the extent of coverage is changed by amendment;

(2)   on any Premium Due Date after the third Policy Anniversary; or

(3)   on any Premium Due Date on or after the first Policy Anniversary if your entire group's Covered Monthly Earnings changes by 25% or more from such group's Covered Monthly Earnings on this Policy's Effective Date.

We will not change the Premium Rate due to (2) or (3) above more than once in any twelve (12) month period. We will tell you in writing at least 31 days before the date of a change due to (2) or (3) above.

**GRACE PERIOD:** You may pay the Premium up to 31 days after the date it is due. This Policy stays in force during this time. If the Premium is not paid during the grace period, this Policy will terminate. You will still owe us the Premium up to the date this Policy terminates.

**WAIVER OF PREMIUM:** No Premium is due us for an Insured while he/she is receiving Monthly Benefits from us. Once Monthly Benefits cease due to the end of his/her Total Disability, Premium payments must begin again if insurance is to continue.

## BENEFIT PROVISIONS

**INSURING CLAUSE:** We will pay a Monthly Benefit if an Insured:
- (1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy;
- (2) is under the regular care of a Physician;
- (3) has completed the Elimination Period; and
- (4) submits satisfactory proof of Total Disability to us.

**BENEFIT AMOUNT:** To figure the benefit amount payable:
- (1) multiply an Insured's Covered Monthly Earnings by the benefit percentage(s), as shown on the Schedule of Benefits page;
- (2) take the lesser of the amount:
  - (a) of step (1) above; or
  - (b) the Maximum Monthly Benefit, as shown on the Schedule of Benefits page; and
- (3) subtract Other Income Benefits, as shown below, from step (2) above.

We will pay at least the Minimum Monthly Benefit, if any, as shown on the Schedule of Benefits page.

**OTHER INCOME BENEFITS:** Other Income Benefits are benefits resulting from the same Total Disability for which a Monthly Benefit is payable under this Policy, other than Retirement Benefits. These Other Income Benefits are:
- (1) disability income benefits an Insured is eligible to receive under any group insurance plan(s);
- (2) disability income benefits an Insured is eligible to receive under any governmental retirement systems, except benefits payable under a federal government employee pension benefit;
- (3) all permanent as well as temporary disability benefits, including any damages or settlement made in place of such benefits (whether or not liability is admitted) an Insured is eligible to receive under:
  - (a) Worker's Compensation Laws;
  - (b) occupational disease law;
  - (c) any other laws of like intent as (a) or (b) above; and
  - (d) any compulsory benefit law;
- (4) with respect to Class A, any of the following that the Insured is entitled to receive:
  - (a) wages or other compensation excluding the amount allowable under the Rehabilitation Provision; and
  - (b) commissions or monies, including vested renewal commissions, but, excluding commissions or monies that the Insured earned prior to Total Disability which are paid after Total Disability has begun;
- (5) with respect to Class B, any of the following that the Insured is entitled to receive:
  - (a) wages, excluding the amount allowable under the Rehabilitation Provision; and
  - (b) commissions or monies, including vested renewal commissions, but, excluding commissions or monies that the Insured earned prior to Total Disability which are paid after Total Disability has begun;
- (6) that part of disability or Retirement Benefits paid for by you that an Insured is eligible to receive under a group retirement plan; and
- (7) disability or Retirement Benefits under the United States Social Security Act, the Canadian pension plans, federal or provincial plans, or any similar law which:
  - (a) an Insured is eligible to receive because of his/her Total Disability or eligibility for Retirement Benefits; and
  - (b) an Insured's dependents are eligible to receive due to (a) above.

Disability and early Retirement Benefits will be offset only if such benefits are elected by the Insured or do not reduce the amount of his/her accrued normal Retirement Benefits then funded.

Retirement Benefits under number 7 above will not apply to disabilities which begin after age 70 for those Insureds already receiving Social Security Retirement Benefits while continuing to work beyond age 70.

Benefits above will be estimated if the benefits:
- (1) have not been applied for; or
- (2) have not been awarded; and
- (3) have been denied and the denial is being appealed.

The Monthly Benefit will be reduced by the estimated amount. If benefits have been estimated, the Monthly Benefit will be adjusted when we receive proof:

  (1) of the amount awarded; or

  (2) that benefits have been denied and the denial cannot be further appealed.

If we have underpaid the Monthly Benefit for any reason, we will make a lump sum payment. If we have overpaid the Monthly Benefit for any reason, the overpayment must be repaid to us. At our option, we may reduce the Monthly Benefit or ask for a lump sum refund. If we reduce the Monthly Benefit, the Minimum Monthly Benefit, if any, as shown on the Schedule of Benefits page, would not apply.

For each day of a period of Total Disability less than a full month, the amount payable will be 1/30th of the Monthly Benefit.

**COST OF LIVING FREEZE:** After the initial deduction for any Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost of living increases payable under these Other Income Benefits.

**LUMP SUM PAYMENTS:** If Other Income Benefits are paid in a lump sum, the sum will be broken down to a monthly amount for the period of time the sum is payable. If no period of time is given, the sum will be broken down to a monthly amount for the period of time we expect the Insured to be disabled based on actuarial tables of disabled lives.

**TERMINATION OF MONTHLY BENEFIT:** The Monthly Benefit will stop on the earliest of:

  (1) the date the Insured ceases to be Totally Disabled;

  (2) the date the Insured dies;

  (3) the Maximum Duration of Benefits, as shown on the Schedule of Benefits page, has ended;

  (4) the date the Insured fails to furnish the required proof of Total Disability; or

  (5) the date the Insured refuses to accept or to continue Rehabilitative Employment when such employment has been properly approved.

**RECURRENT DISABILITY:** If, after a period of Total Disability for which benefits are payable, an Insured returns to Active Work for at least six (6) consecutive months, any recurrent Total Disability for the same or related cause will be part of a new period of Total Disability. A new Elimination Period must be completed before any further Monthly Benefits are payable.

If an Insured returns to Active Work for less than six (6) months, a recurrent Total Disability for the same or related cause will be part of the same Total Disability. A new Elimination Period is not required. Our liability for the entire period will be subject to the terms of this Policy for the original period of Total Disability.

This Recurrent Disability section will not apply to an Insured who becomes eligible for insurance coverage under any other group long term disability insurance plan.

## EXCLUSIONS

We will not pay a Monthly Benefit for any Total Disability caused by:

    (1)   an act of war, declared or undeclared;

    (2)   an intentionally self-inflicted Injury;

    (3)   the Insured committing a felony; or

    (4)   an Injury or Sickness that occurs while the Insured is confined in any penal or correctional institution.

## LIMITATIONS

**MENTAL OR NERVOUS DISORDERS:** Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period. The Monthly Benefit will be payable while so confined, but not beyond the Maximum Duration of Benefits.

If an Insured was confined in a Hospital or Institution and:
   (1)   Total Disability continues beyond discharge;
   (2)   the confinement was during a period of Total Disability; and
   (3)   the period of confinement was for at least fourteen (14) consecutive days;
then upon discharge, Monthly Benefits will be payable for the greater of:
   (1)   the unused portion of the twenty-four (24) month period; or
   (2)   ninety (90) days;
but in no event beyond the Maximum Duration of Benefits, as shown on the Schedule of Benefits page.

Mental or Nervous Disorders are defined to include disorders which are diagnosed to include a condition such as:
   (1)   bipolar disorder (manic depressive syndrome);
   (2)   schizophrenia;
   (3)   delusional (paranoid) disorders;
   (4)   psychotic disorders;
   (5)   depressive disorders;
   (6)   anxiety disorders;
   (7)   somatoform disorders (psychosomatic illness);
   (8)   eating disorders; or
   (9)   mental illness.

**SUBSTANCE ABUSE:** Monthly Benefits for Total Disability due to alcoholism or drug addiction will be payable while the Insured is a participant in a Substance Abuse Rehabilitation Program. The Monthly Benefit will not be payable beyond twenty-four (24) months.

If, during a period of Total Disability due to Substance Abuse for which a Monthly Benefit is payable, an Insured is able to perform Rehabilitative Employment, the Monthly Benefit, less 50% of any of the money received from this Rehabilitative Employment will be paid until: (1) the Insured is performing all the material duties of his/her regular occupation on a full-time basis; or (2) the end of twenty-four (24) consecutive months from the date that the Elimination Period is satisfied, whichever is earlier. All terms and conditions of the Rehabilitation Benefit will apply to Rehabilitative Employment due to Substance Abuse.

"Substance Abuse" means the pattern of pathological use of a Substance which is characterized by:
   (1)   impairments in social and/or occupational functioning;
   (2)   debilitating physical condition;
   (3)   inability to abstain from or reduce consumption of the Substance; or
   (4)   the need for daily Substance use for adequate functioning.

"Substance" means alcohol and those drugs included on the Department of Health, Retardation and Hospitals' Substance Abuse list of addictive drugs, except tobacco and caffeine are excluded.

A Substance Abuse Rehabilitative Program means a program supervised by a Physician or a licensed rehabilitation specialist approved by us.

**PRE-EXISTING CONDITIONS:** Applicable To Employees Hired On Or After January 1, 1996: Benefits will not be paid for a Total Disability:
   (1)   caused by;
   (2)   contributed to by; or
   (3)   resulting from;
a Pre-existing Condition unless the Insured has been Actively at Work for one (1) full day following the end of 12 consecutive months from the date he/she became an Insured.

## CONTINUITY OF INSURANCE COVERAGE PROVISION

Continuity of insurance coverage will be allowed for an Eligible Person who would not be entitled to full coverage under this Policy upon changing carriers due to:

(1)   failure to be Actively at Work on the Effective Date of this Policy due to an Injury or Sickness; or
(2)   a Pre-existing Conditions Limitation.

This provision will apply only to an Eligible Person who was insured under:

(1)   the prior carrier's policy on its termination date; or
(2)   any policy of a later acquired employer unit which changed insurance carriers.

**EFFECT OF FAILURE TO BE ACTIVELY AT WORK:** This provision allows insurance to be granted under this Policy to an Eligible Person who was Totally Disabled on or after the Effective Date of this Policy.

The insurance will be that provided under the prior carrier's policy. This insurance is subject to Premium Payment. The insurance we will pay is the benefit the prior carrier would have paid under their policy reduced by any amount for which the prior carrier is liable.

Insurance provided under this provision will end upon the earliest of:

(1)   the date the insurance would end according to the Termination of Individual Insurance provision of this Policy;
(2)   the date an Eligible Person returns to Active Work and becomes insured under this Policy; or
(3)   the end of any period of extension or accrued liability under the prior carrier's policy.

**EFFECT OF A PRE-EXISTING CONDITIONS LIMITATION:** The following will apply to an Eligible Person who is Actively at Work and insured under this Policy when a Pre-existing Condition is involved:

(1)   if the Insured has satisfied this Policy's Pre-existing Conditions Limitation, then he/she will be paid according to this Policy;
(2)   if the Insured cannot satisfy this Policy's Pre-existing Conditions Limitation, we will then apply the prior carrier's Pre-existing Conditions Limitation. If the Insured satisfied the prior carrier's Pre-existing Conditions Limitation, giving consideration towards continuous time insured under both policies, then he/she will be paid according to the prior carrier's policy; or
(3)   if the Insured cannot satisfy the Pre-existing Conditions Limitation of:
   (a)   this Policy; and
   (b)   that of the prior carrier;
then no benefit will be paid.

When the Insured has satisfied the Pre-existing Conditions Limitation under this Policy, even if during a period of Recurrent Disability, then the Monthly Benefit will be paid according to this Policy.

## SPECIFIC INDEMNITY BENEFIT

If the Insured suffers any one of the Losses listed below from an accident resulting in an Injury, we will pay a guaranteed minimum number of Monthly Benefit payments, as shown below. However:

    (1)   the Loss must occur within one hundred and eighty (180) days; and
    (2)   the Insured must live past the Elimination Period.

For Loss of:                                                                    Number of Monthly Benefit Payments:

| For Loss of: | Number of Monthly Benefit Payments: |
|---|---|
| Both Hands | 46 months |
| Both Feet | 46 months |
| Entire Sight in Both Eyes | 46 months |
| Hearing in Both Ears | 46 months |
| Speech | 46 months |
| One Hand and One Foot | 46 months |
| One Hand and Entire Sight in One Eye | 46 months |
| One Foot and Entire Sight in One Eye | 46 months |
| One Arm | 35 months |
| One Leg | 35 months |
| One Hand | 23 months |
| One Foot | 23 months |
| Entire Sight in One Eye | 15 months |
| Hearing in One Ear | 15 months |

"Loss(es)" with respect to:

    (1)   hand or foot, means the complete severance through or above the wrist or ankle joint;
    (2)   arm or leg, means the complete severance through or above the elbow or knee joint; or
    (3)   sight, speech or hearing, means total and irrecoverable Loss thereof.

If more than one (1) Loss results from any one accident, payment will be made for the Loss for which the greatest number of Monthly Benefit payments is provided.

The amount payable is the Monthly Benefit, as shown on the Schedule of Benefits page, with no reduction from Other Income Benefits. The number of Monthly Benefit payments will not cease if the Insured returns to Active Work.

If death occurs after we begin paying Monthly Benefits, but before the Specific Indemnity Benefit has been paid according to the above schedule, the balance remaining at time of death will be paid to the Insured's estate, unless a beneficiary is on record with us under this Policy.

Benefits may be payable longer than shown above as long as the Insured is still Totally Disabled, subject to the Maximum Duration of Benefits, as shown on the Schedule of Benefits page.

## WORK INCENTIVE AND CHILD CARE BENEFITS

### WORK INCENTIVE BENEFIT

During the first twelve (12) months of Total Disability for which a Monthly Benefit is payable, we will not offset earnings from Rehabilitative Employment until the sum of:

    (1)   the Monthly Benefit prior to offsets with Other Income Benefits; and

    (2)   earnings from Rehabilitative Employment;

exceed 100% of the Insured's Covered Monthly Earnings. If the sum above exceeds 100% of Covered Monthly Earnings, our Benefit Amount will be reduced by such excess amount until the sum of (1) and (2) above equals 100%.

### CHILD CARE BENEFIT

We will allow a Child Care Benefit to an Insured if:

    (1)   the Insured is receiving benefits under the Work Incentive Benefit;

    (2)   the Insured's Child(ren) is (are) under 14 years of age;

    (3)   the child care is provided by a non-relative; and

    (4)   the charges for child care are documented by a receipt from the caregiver, including social security number or taxpayer identification number.

During the 12 month period in which the Insured is eligible for the Work Incentive Benefit, an amount equal to actual expenses incurred for child care, up to a maximum of $250.00 per month, will be added to the Insured's Covered Monthly Earnings when calculating the Benefit Amount under the Work Incentive Benefit.

Child(ren) means: the Insured's unmarried child(ren), including any foster child, adopted child or step child who resides in the Insured's home and is financially dependent on the Insured for support and maintenance.

## LIVING BENEFIT

We will pay a lump sum Living Benefit to an Insured if such Insured:

(1)   meets all of the requirements of Total Disability of this Policy;
(2)   is Certified as Terminally Ill; and
(3)   makes a Written Request for this benefit.

We may, at our option, confirm the Terminal Illness diagnosis with a second medical exam performed at our own expense.

The Living Benefit:

(1)   will be an amount equal to 12 months of the Insured's Monthly Benefit after offsets with Other Income Benefits;
(2)   is payable one time only for any one Insured under this Policy;
(3)   is payable to an Insured only while he/she is living; and
(4)   is payable in addition to the Monthly Benefit otherwise payable under this Policy for the Insured for his/her Total Disability.

"Certified" or "Certification" refers to a written statement, made by a Physician on a form provided by us, as to the Insured's Terminal Illness.

"Terminally Ill" or "Terminal Illness" means an Insured's illness or physical condition that is Certified by a Physician to reasonably be expected to result in death in less than 12 months.

"Written Request" means a request made, in writing, by the Insured to us.

## REHABILITATION BENEFIT

"Rehabilitative Employment" means work in any gainful occupation for which the Insured's training, education or experience will reasonably allow. The work must be supervised by a Physician or a licensed rehabilitation specialist approved by us. Rehabilitative Employment includes work performed while Partially Disabled, but does not include performing all the material duties of his/her regular occupation on a full-time basis.

If an Insured is receiving a Monthly Benefit because he/she is considered Totally Disabled under the terms of this Policy and is able to perform Rehabilitative Employment, we will continue to pay the Monthly Benefit less an amount equal to 50% of earnings received through such Rehabilitative Employment.

If an Insured is able to perform Rehabilitative Employment when Totally Disabled due to Substance Abuse, we will continue to pay the Monthly Benefit less an amount equal to 50% of earnings received through such Rehabilitative Employment. This Monthly Benefit is payable for a maximum of twenty-four (24) consecutive months from the date the Elimination Period is satisfied.

An Insured will be considered able to perform Rehabilitative Employment if a Physician or licensed rehabilitation specialist approved by us determines that he/she can perform such employment. If an Insured refuses such Rehabilitative Employment, benefits under this Policy will terminate. If an Insured has been performing Rehabilitative Employment, and refuses to continue such employment, even though a Physician or licensed rehabilitation specialist approved by us has determined that he/she is able to perform Rehabilitative Employment, benefits under this Policy will terminate.

April 6, 1998

James E. Radican
3800 N. W. 71 Street
Coconut Creek, FL 33073

        Policyowner : Tarmac America, Inc.
        Policy No.   : LSC 98842
        Claim No.   : 1997-2346-010

Dear Mr. Radican:

We would like to express our appreciation for your patience and cooperation during the review of your claim for Long Term Disability (LTD) benefits. We have now completed our determination regarding your eligibility for benefits under the above group LTD policy.

To be eligible for benefits, the group policy requires that objective medical documentation must substantiate that a member, while insured under the group policy, meets the group policy's definition of Total Disability. The group policy defines Total Disability as follows:

**"Actively at work" and Active Work" mean actually performing on a full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an injury or sickness.**

**"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.**

We have received documentation from your employer which indicates you began working on a part-time basis on or about November 1, 1995 and continued to work part-time for over one year.

In order to be eligible for Long Term Disability under this policy, you must be actively at work and working on a full-time basis as defined by the policy. Based on information provided by your employer, you were working part-time when the policy became effective on January 1, 1996 and did not returned to full time active work prior to your last day worked. Therefore, you have not satisfied the policy definition of a full-time employee and are not eligible for Long Term Disability Benefits coverage.

We regret our decision could not be more favorable. Our determination has been based on the information contained in your file and the policy provisions applicable to your claim.

Under the Employee Retirement Income Security Act of 1974, you may request a review of this denial by writing to:

Reliance Standard Life Insurance Company
Quality Review Unit
P. O. Box 8330
Philadelphia, PA 19101-8330

The written request for review must be sent within 60 days of receipt of this letter and state the reasons why you feel your claim should not have been denied. Include any documentation which you feel supports your claim. You or your duly authorized representative are also entitleed to review the pertinent documents upon which the denial decision wa predicated. Under normal circumstances, you will be notified in writing of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any of Reliance Standard Life Insurance Company's rights and defenses under the above captioned policy, and all these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

James A. Wilson, Jr
Group LTD Claims Department
Extension: 3854

cc:    Tarmac America, Inc.
Attn: Hope Fischer
P.O. Box 2016
Norfolk, VA 23501

August 3, 1998

Marika McVey Ostendorf, Esq.
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re :        James E. Radican
Claim # :   1997-346-010
Policy # :  LSC 98842

Dear Ms. McVey Ostendorf:

We are writing to you regarding the appeal of our decision to deny benefits to your client, James
Radican. Please be advised that Reliance Standard Life Insurance Company ("RSL") strives to
treat all clients fairly and evaluate claims submitted to us in an objective and equitable manner.

Under the Employee Retirement Income Security Act ("ERISA") of 1974 you are entitled to an
independent review of the claim facts and the determination made regarding your client's
eligibility for benefits. Your client's file was referred to our Quality Review Unit to conduct such
a review. This review has been conducted separately from the individual(s) who made the original
determination to deny your benefits.

We have completed our initial review of the claim file and have found that our original
determination to deny liability was appropriate.

We do not have any conclusive evidence to support your client's contention that he *worked* on a
full-time basis for Tarmac America, Inc. after January 1, 1996. The letter from B. Edward
Pittman, Vice President of Human Resources for Tarmac does not report that your client was
working on a full-time basis during 1996 as you report. Rather, the letter states that your client
was always considered a full-time salaried exempt employee and was never placed on part-time
status. Not only does the letter avoid the issue of hours worked by your client, it appears to admit
that he was not working full-time hours when it states:

> The fact that he worked partial days in 1996 following his return to work from surgery
> should in no way be construed as "part-time" status. Had Mr. Radican been classified a
> part-time employee, he would have been ineligible for participation in our long term
> disability benefit at all.

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

## Exhibit "C"


-2-

The quotation above is representative of much of the letter. Nowhere in the letter does Mr.
Pittman explain the number of hours your client actually worked but instead talks about what
status was assigned to him during calendar year 1996. Unfortunately, we are not interested in the
employment classification of your client, but rather in the number of hours per week he actually
worked.

Every indication we have points to the fact that your client never returned to full-time work after
his surgery in 1995. In fact, on at least two separate occasions your client informed us via the
telephone that he worked part-time throughout 1996. He informed us that he worked part-time
for about one year but was then told that he should apply for disability because the company
could no longer accommodate him on a part-time schedule.

The travel expense reports which you provided do not conclusively demonstrate that your client
was working on a full-time basis during any time in 1996. The reports show that your client
traveled for business during the months of December 1995, and January/August of 1996, but they
do not show that he worked on a full-time basis

Furthermore, we do not understand how you wished us to interpret these expense reports in order
to come to the conclusion that they proved your client was a full-time employee. The following
example indicates why the expense reports are not a good indicator of hours worked by your
client Your letter relates that your client underwent physical therapy x per week for 3 hours per
session during December of 1995. Despite a loss of approximately 6 hours per week (not
including travel time to and from physical therapy) your client traveled 1,380 miles for work
during that month. When compared to August of 1996, when your client was not undergoing
physical therapy, we find that your client traveled significantly less miles than he did in December
of 1995. In August of 1996 your client traveled 1,050 miles for business despite an extra six hours
per week which were not devoted to physical therapy. If we were to determine hours worked
using expense reports we would have to come to the conclusion that Mr. Radican worked more
hours in December of 1995 than in August of 1996 because of the significantly greater number of
miles which he traveled during December of 1995. It is my understanding that such a conclusion
would be inaccurate as your client actually worked less hours in December of 1995 due to
physical therapy. Accordingly, it is impossible for us to determine actual hours worked through
the use of Mr. Radican's expense reports.

Therefore, based upon the information above and the lack of conclusive evidence of full-time
work by your client, we have concluded that our previous decision to deny benefits to your client
was appropriate. Accordingly, no benefits are payable and your client's file will remain closed at
this time.

We regret that our decision could not have been more favorable to your client, however, we are
limited by the provisions of the policy. Please be advised that our claim decision is now final as
you have exhausted any administrative remedies available to your client under the terms of his
policy.

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

v-06024-WJZ  Document 28    Entered on FLSD Docket 09/18/2001    Pa


**Reliance Standa.. Life
Insurance Company®**

-3-

Nothing in this letter should be construed as a waiver of any of RSL's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

Richard D. Walsh
Assistant Manager, Quality Review Unit



November 1, 1999

Lawrence D. Bache, Esq.,
9000 West Sheridan Street - Suite 174
Pembroke Pines, FL 33024

Re :           James E. Radican
Claim # :      1997-346-010
Policy # :     LSC 98842

Dear Mr. Bache:

We are writing to you regarding the appeal of our decision to deny your client's claim for Long
Term Disability ("LTD") benefits.

As previously explained, under the Employee Retirement Income Security Act ("ERISA") of
1974, your client was entitled to an independent review of the claim facts and the determination
made regarding his eligibility for benefits. Your client, through counsel, previously requested
such a review during calendar year 1998. On August 3, 1998, Reliance Standard Life Insurance
Company ("RSL") affirmed our prior decision to deny benefits. (We have enclosed copies of
both the original denial letter and the affirmation letter dated August 3, 1998 for your review.) As
your client had been afforded a full and fair review in accordance with ERISA, RSL was under
no obligation to reconsider his claim for benefits. Nevertheless, in good faith, we did reexamine
your client's claim after your request of earlier this year. We apologize for the delay in
responding to your request for a second appeal, however, we could not place your client's file
ahead of those files who had not yet received their first, mandated appeal.

We have completed our review of the claim file and have found that our original decision to deny
benefits and the subsequent affirmation of that denial was appropriate.

As you are aware, Mr. Radican's claim for LTD benefits was denied after RSL determined that
your client did not meet the eligibility requirements of the Policy on the Policy's effective date.
To be specific, RSL determined that your client was not a Full-time employee of Tarmac
America, Inc. ("Tarmac") on the Policy effective date of January 1, 1996 or at anytime thereafter.
The relevant Policy provision states:

*EFFECTIVE DATE OF INDIVIDUAL INSURANCE: If you (Tarmac) pay the entire
Premium due for an Eligible Person, the insurance for such Eligible Person will go into
effect on the Individual Effective Date, as shown on the Schedule of Benefits page.*

1

Eligible Person is defined as follows:

>  *"Eligible Person" means a person who meets the eligibility requirements of this Policy.*

The Eligibility Requirements are explained on page 5.0 of the Policy. That provision reads:

>  *ELIGIBILITY REQUIREMENTS: A person is eligible for insurance under this Policy if he/she:*
>
>>  *(1) is a member of an Eligible Class, as shown on the Schedule of Benefits page; and*
>>  *(2) has completed the Waiting Period, as shown on the Schedule of Benefits page.*

The Schedule of Benefits page (page 1.0 & 1.1 of the Policy) defines Eligible Class as follows:

>  *ELIGIBLE CLASSES: Each active, Full-time employee except any person employed on a temporary or seasonal basis, according to the following classifications:*
>
>>  *CLASS A: employee earning $59,000.00 or more per year who:*
>>
>>>  *(1) is engaged in a non-hazardous occupation; and*
>>>  *(2) functions primarily in an office environment.*
>>
>>  *CLASS B: salaried employee earning more than $30,000.00 per year but less than $59,000.00*

Finally, the Policy defines "Full-time" as follows:

>  *"Full-time" means working for you (Tarmac) for a minimum of 40 hours during a person's regular work week.*[1]

---

[1] In your letter of appeal dated January 26, 1999 you stated that the applicable plan document states the definition of Full-time work as being 37.5 hours as opposed to 40 hours per week. The Policy, which RSL considers to be the controlling document, (a copy of which is enclosed for your review) states that the definition of Full-time is 40 hours per week. Therefore, we disagree with your assertion that Full-time is defined as 37.5 hours per week. While we disagree with your assessment, however, it is irrelevant for purposes of our review as the evidence in our claim file does not suggest that your client was working even the lower 37.5 hours per week at any point during calendar year 1996 prior to his cessation of work on December 31, 1996.

2

On October 3, 1995, your client underwent a decompressive laminectomy due to his history of back pain and herniated disc with stenosis. Shortly after this surgery, Mr. Radican returned to work as a Sales Representative for Tarmac. Our review of the information contained in Mr. Radican's claim file, however, suggested that he never returned to work on a Full-time basis following the surgery. RSL's Policy with Tarmac took effect on January 1, 1996, approximately three months after Mr. Radican's back surgery. As Mr. Radican was not a Full-time employee when the Policy took effect, or at any time thereafter, he never became eligible for coverage under the terms of the Policy according to the above Policy provisions. This decision is supported by ample evidence contained in Mr. Radican's claim file.

First, we must note that Mr. Radican himself has suggested to RSL that he never returned to work on a Full-time basis. As previously explained, during two telephone conversations with one of our representatives Mr. Radican advised that he had worked part-time for approximately one year prior to being told that Tarmac could no longer accommodate his part-time schedule after December 31, 1996. We realize that your client disputes our interpretation of these phone conversations, however, when viewed in context with all of the additional information in his claim file, it would appear as though our initial understanding of these conversations was accurate. Furthermore, in Mr. Radican's own application for benefits it appears as though he noted that he worked on a part-time basis for the employer. On the Employee's Statement dated November 3, 1997 Mr. Radican was asked:

Before you stopped working, did your condition require you to change your job or the way you did your job?

His answer:

Yes

Date you were first unable to work on a full-time basis

His answer:

1/1/97

Next he was asked:

Last day you worked before the disability:

His answer:

12/31/96

3

Finally, he was asked:

> Did you work a full day:

His answer:

> No - Part time - recovering from surgery

While these answers are not conclusive evidence that your client was working on a part-time basis throughout 1996, the answers certainly could be interpreted to indicate that your client had been working part-time since his surgery in October of 1995. If the answers do not mean that he was working part-time since October of 1995 (as the phone conversations did not mean he was working part-time), then his answers are contradictory on their face. When asked when he was first unable to work on a full-time basis he indicated 1/1/97, but two questions later he indicated that he did not work full-time on 12/31/96, because he was working part-time as he recovered from surgery. Therefore, on three separate occasions (two telephone calls and the initial application), Mr. Radican appeared to indicate to RSL that he had worked on a part-time basis since his surgery. These were all contemporaneous statements made by your client to RSL at the time the questions were posed. Then, after his claim is denied based in large part on these statements, we are informed that we misinterpreted the meaning of these statements. While it is certainly possible that we misinterpreted these statements, when viewed in light of other information contained in the claim file, it appears as though our interpretation of the contemporaneous information was accurate. It was not until the claim had been denied and that denial affirmed on appeal, that the interpretation was questioned.

Information provided by Tarmac throughout the life of the claim suggested that Mr. Radican did not work on a Full-time basis throughout 1996. First, in a letter from Hope B. Fischer, Benefits Administrator for Tarmac, dated January 28, 1998, it was noted that:

> (o)ur files on Mr. Radican indicate that he had back surgery in October of 1995 and *was out of work from that time until sometime after mid-year 1996 at the recommendation of his doctor, Manuel Porth.* Sometime during the latter part of 1996, he reported to work, but we have no documentation in the file to substantiate the dates worked. (Emphasis added)

Furthermore, as previously explained to your client, we received a letter from a Michael Unger (General Manager of Pennsuco Cement and Aggregates) dated February 4, 1998, which indicated that Mr. Radican was working on a part-time basis throughout calendar year 1996. That letter stated:

> It is my understanding that, after recovering from back surgery, James Radican returned to work on or about November 1, 1995.

4

> At that time, Jim reported to Mr. Fred Goudie, Vice President of Production and Sales for Tarmac's Pennsuco Cement Mill in Medley, Florida. *Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.*
>
> Tarmac's policy requires employees to work only on a full-time basis. Jim was incapable of performing his duties on this basis and was required to file for short-term disability on January 1, 1996 (sic 1997). (Emphasis added)

Upon appeal you have submitted an affidavit from Mr. Unger which again tries to explain that we misunderstood Mr. Radican's employment status during calendar year 1996. Mr. Unger's affidavit explains that he did not intend to state that Mr. Radican worked only part-time during 1996, but rather that he worked part-time only during those times he was actively treating for physical therapy and pain treatment. Therefore, RSL is asked to accept that we misinterpreted a fourth communication regarding Mr. Radican's employment history. It appears to this reviewer that all of the above communications were quite clear on their face, and that it was not until the claim was denied and the decision upheld that our interpretation of these statements was called into question. Again, we must conclude that the contemporaneous interpretation of Mr. Unger's letter appears to be the most reasonable and accurate interpretation of Mr. Radican's employment history during calendar year 1996.

The letter from Mr. Pittman (Vice President of Human Resources for Tarmac), also implicitly supports our prior decision to deny benefits. As explained in our letter to Ms. McVey Ostendorf dated August 3, 1998, Mr. Pittman's letter specifically avoided the issue of actual hours worked by Mr. Radican, but rather focused on his employment status during calendar year 1996. While certainly not conclusive of the fact that Mr. Radican worked under 40 hours per week (or 37.5), the fact that the issue was avoided by Mr. Pittman lends credence to RSL's determination.

The other affidavits submitted with your client's second appeal are also not persuasive. First, these affidavits would appear to be tainted by self-interest as they were submitted in an attempt to reinstate a valuable benefit which had been previously refused. More importantly, as a sales person who was out on the road for much of his activities, it is difficult to understand how the signers of the affidavits could have personal knowledge of Mr. Radican's work hours. This is especially true in light of the fact that the company itself, did not keep accurate track of the number of hours worked by Mr. Radican.

Ms. McVey Ostendorf's appeal and supporting documentation was not persuasive as previously explained in our letter to her of August 3, 1998. This subsequent review of the claim leads us to conclude that Ms. McVey Ostendorf provided RSL with information which she believed supported Mr. Radican's contention that he worked on a full-time basis while withholding similar information which, arguably, proved RSL's argument that he did not work on a full-time basis. Ms. McVey Ostendorf relied heavily on Mr. Radican's expense reports for January and August of 1996 as support that he had worked on a full-time basis during calendar year 1996. We

explained that we found it difficult (if not impossible) to rely on expense reports to determine the number of hours worked in a particular month (see page #2 of our letter dated August 3, 1998). We still contend that the expense reports cannot prove full-time work. We have subsequently received Mr. Radican's expense reports for the other ten months of calendar year 1996 (supplied by Ms. McVey Ostendorf acting as counsel for Tarmac). Were we to follow Ms. McVey Ostendorf's logic, these reports clearly suggest that your client did not work on a full-time basis for at least ten months of calendar year 1996. Every month besides the two previously submitted to RSL (1/96 & 8/96) show that your client drove less than 1000 miles per month and had limited appointments scheduled in each of those ten months. Clearly if RSL were to base a decision regarding the number of hours Mr. Radican worked on his expense reports, it would not appear as though he worked on a full-time basis during any month in 1996 (besides, arguably, January and August). It would appear as though the ten other months' expense reports were not previously provided to RSL because they would refute Ms. McVey Ostendorf's position that Mr. Radican was a full-time employee. In any event, RSL has already concluded that expense reports (even the 1/96 & 8/96 reports) cannot support your client's contention that he worked on a full-time basis for Tarmac during calendar year 1996.

Finally, our review of the medical records provided by Mr. Radican's various physician(s) supports RSL's opinion that Mr. Radican did not work on a full-time basis during calendar year 1996. First, a "To Whom it May Concern" letter from Dr. Manuel Porth dated January 1, 1996 suggests that your client was not capable of working at all during the first half of 1996. Dr. Porth wrote:

> A program of rehabilitation is mandatory and *the patient has been advised to remain out of work for the next six months* for medical reasons. It is my opinion that with a strenuous program of therapy and rehabilitation, we can maximize the benefits of the surgical procedure and *hopefully return this patient to work status by June of 1996.*
> (Emphasis added)

It is our understanding that your client did not heed the advice of Dr. Porth and remain out of work for the first six months of 1996, but rather worked on a part-time basis during this time frame. In any event, it would appear as though Dr. Porth did not believe your client was capable of full-time work as he was suggesting that your client remain out of work completely for six months. RSL believes this is simply further evidence that your client did not work on a full-time basis during (at least the first half of) calendar year 1996.

Dr. Porth's medical records also suggest that your client was not capable of working full-time during calendar year 1996. On March 22, 1996 Dr. Porth noted:

> It is now 6 months following his laminectomy, and the quality of life has not significantly improved. *He is still unable to return to his job* and is aware of his back on a continual basis. (Emphasis added)

Again on September 16, 1996 Dr. Porth's medical records noted:

> The 3rd epidural helped to a lesser degree and in spite of continued therapy, epidural blocks, analgesic medications, the use of physical therapy and corset immobilization, the patient continues to be symptomatic and *is unable to return to work.* (Emphasis added)

A "To Whom it May Concern" letter of September 16, 1996 also suggested that your client was not able to work at all, let alone on a full-time basis. Dr. Porth's letter of that date stated:

> Mr. James Radican is a 66 year old gentleman followed in this office with a longstanding history of back pain. He has had decompression laminectomy with essentially no improvement for severe degenerative disease and spinal stenosis. He has had an attempt at multiple epidural blocks and physical therapy with no improvement.
>
> *At this point the patient is found totally disabled with respect to employment and is advised to remain out of work until further notice.* (Emphasis added)

Dr. Porth's medical records and "To Whom it May Concern" letters clearly suggest that your client was incapable of working due to his back condition. Nowhere in his records or letters does he suggest that your client was capable of full-time work following the laminectomy of October 1995. Therefore, while your client claims to have worked on a full-time basis after January 1, 1996, this does not appear to have been medically possible according to your client's own physician.

Based upon all of the above cited information, we have concluded that our prior decision to deny your client's claim for benefits and the subsequent affirmation of that denial were appropriate. All of the information which was gathered contemporaneously with our decision, suggested that your client did not work on a full-time basis after his surgery in October of 1995. It was not until the claim was denied (and subsequently affirmed), that any information was provided to suggest that your client was an active full-time employee of Tarmac on or after January 1, 1996. We find the contemporaneous information gathered during our initial investigation to be more reliable than the subsequently provided information when viewed in context with the entire claim file. Accordingly, we have determined that your client did not have any LTD coverage in force with RSL as of the January 1, 1996 Policy effective date or thereafter. We might suggest investigating whether your client's claimed disability could be covered by Tarmac's prior LTD carrier which was in effect during calendar year 1995.

In your letter dated August 27, 1999, you requested that we provide your client with information as to how he might perfect his claim. Unfortunately, we are unable to provide you with any such suggestions for a number of reasons. First, it would not appear as though there is any documentation which could perfect your client's appeal at this juncture. Tarmac has made it clear that they did not keep attendance records on your client. Given the abundance of information contained in our claim files which suggests that your client was not able to work on a full-time

basis after October of 1995, attendance records would appear to be the only documents which could perfect the claim. Second, although not required by ERISA, this was the second appeal RSL provided to your client. During each of these appeals, your client was represented by counsel. In both instances, your client was unable to provide RSL with information which would perfect his claim. His claim file is now closed and it will not be revisited. Accordingly, it will not be possible for your client to perfect his claim at this point in time. We believe he has had adequate opportunity to do so, as he was provided two appeals and he was represented by counsel in each instance.

We regret that our decision could not have been more favorable to your client, however, we are limited by the provisions of the policy. Please be advised that our claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of ERISA.

Nothing in this letter should be construed as a waiver of any of RSL's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

Richard D. Walsh
Manager, Quality Review Unit

8



2001 Market Street, Suite 1500,Philadelphia, Pennsylvania 19103
(267) 256-3500 (800-351-7500)

July 23, 2001

Lawrence D. Bache, Esq.,
9000 West Sheridan Street - Suite 174
Pembroke Pines, FL 33024

Re :                  James E. Radican v. Reliance Standard Life Insurance Company
Our Claim # :    1997-346-010
Our Policy # :    LSC 98842

Dear Mr. Bache:

We are writing to you regarding the appeal of our decision to deny your client's claim for Long
Term Disability ("LTD") benefits. Please be advised that Reliance Standard Life Insurance
Company ("RSL") strives to treat all claimants fairly and evaluate claims submitted to us in an
objective and equitable manner.

As you are certainly aware, RSL refused your client's claim for benefits in April of 1998 after it
was determined that he was not eligible for coverage be cause he was never an active, full-time
employee of Tarmac America, Inc. ("Tarmac") after the Policy effective date of January 1, 1996.
Your client was advised of his right to appeal that decision in accordance with the Employee
Retirement Income Security Act ("ERISA") of 1974, and he took advantage of that right when
Ms. McVey Ostendorf appealed the decision on his behalf via letter dated June 5, 1998. On
August 3, 1998, RSL's Quality Review Unit ("QRU") wrote to Ms. McVey Ostendorf and
explained that we had concluded our previous decision to deny benefits was appropriate.
Specifically, RSL's QRU determined that Mr. Radican had failed to provide adequate proof of
his claimed full-time work status beyond January 1, 1996. On January 26, 1999, your office
submitted a letter to RSL requesting a second appeal of the decision to refuse Mr. Radican's
claim for benefits. Despite the fact that the company was under no obligation to do so, RSL again
considered Mr. Radican's claim that he worked greater than the required 40 hours per week after
January 1, 1996. On November 1, 1999, we wrote to you and advised that the additional
information provided by your office would not allow us to reverse our prior decisions to refuse
benefits. Specifically, we advised that RSL concluded that the additional information provided by
your office failed to demonstrate that Mr. Radican was an active, full-time employee at any point
after January 1, 1996.

Following our second affirmation of your client's claim denial, your office commenced suit
against RSL on your client's behalf. RSL's QRU has been asked to review the decision again in
light of additional information from your office.

1

**Exhibit "E"**

The additional information supplied by your office for this review consists of affidavits from the following persons: Hope E. Fischer, Benefits Administrator for Tarmac; Marcel Aragon a person who claims to have worked with Mr. Radican at Tarmac, position unspecified; James E. Radican, the plaintiff; and Dr. Manuel Porth, Mr. Radican's physician. We have reviewed this additional information and considered it in light of the information contained within the entire claim file. Unfortunately, this information does not allow us to reverse our prior decisions to refuse benefits.

We believe that our prior letters have provided adequate, detailed explanations as to why the information contained in Mr. Radican's claim file did not adequately prove that he had ever worked the required forty (40) hours per week after January 1, 1996. For this reason, we will not review all of that information in this letter again, but would suggest that you revisit those letters for additional information. Instead, we will address each of the recently provided affidavits below and explain why we believe they fail to provide proof of your client's status as an active full-time employee of Tarmac after January 1, 1996.

### Affidavit of Ms. Hope Fischer

Ms. Fischer's affidavit fails to provide proof of Mr. Radican's full-time employment for a number of reasons. First, her affidavit notes that RSL "relied upon" a statement in a letter from her dated January 28, 1998 to refuse Mr. Radican's claim. We would point out that Ms. Fischer's statement in the January 28, 1999 letter was but one of many pieces of evidence relied upon in making our decision. This statement alone did not provide the basis for our decision. Rather when viewed in light of all of the other information contained in the claim file, it supported RSL's decision to refuse benefits.

Second, Ms. Fischer states that the fact that no documentation existed in their files to substantiate the dates/hours worked by Mr. Radican, should not lead to the conclusion that he worked less than forty (40) hours per week. Again we would point out that RSL did not rely solely upon Ms. Fischer's statement nor upon the fact that no documentation of Mr. Radican's hours existed. Rather we relied upon these items along with many other pieces of evidence contained within the claim file to conclude that Mr. Radican failed to provide proof that he ever worked on a full-time basis after January 1, 1996.

Third, under #3 of the affidavit Ms. Fischer states that the information provided in her letter of January 28, 1998, was *not* based upon personal knowledge but rather she was simply paraphrasing what she had read in documentation from Dr. Porth. Yet under #5 of the affidavit she now swears that she has personal knowledge that RSL's determination that Mr. Radican worked less than forty (40) hours was wrong. Under #6 of the affidavit she swears that she now has personal knowledge that Mr. Radican worked at least the requisite forty (40) hours per week during numerous weeks in 1996. She provides no basis to explain how she lacked personal knowledge of his work hours when asked during the initial claim investigation, but has since

2

gained such knowledge. She also still is apparently unable to provide any documentation to support the claim that Mr. Radican worked the requisite forty (40) hours per week for numerous weeks during 1996 (we must assume that if such documentation existed you would have provided it to RSL).

Fourth, Ms. Fischer's affidavit notes that she read your letter of January 26, 1999 and Ms. McVey Ostendorf's letter of June 5, 1998 and that she concurs with counsels' position in those letters. Query whether she was provided with copies of any of RSL's letters regarding Mr. Radican's claim and whether that would have impacted her position regarding Mr. Radican's work hours. As noted above, it is unclear how she obtained any personal knowledge of Mr. Radican's actual hours worked during calendar year 1996. If her personal knowledge came solely from the information suggested by yourself and Ms. McVey Ostendorf, we cannot reasonably accept this as proof of Mr. Radican's working forty (40) hours per week during calendar year 1996 for the numerous reasons stated in our prior correspondence.

### Affidavit of Marcel Aragon

Ms. Aragon's affidavit states that she worked with James Radican during calendar year 1996 and had personal knowledge that he worked for over forty (40) hours per week for at least forty (40) weeks during that year. Ms. Aragon does not explain in what capacity she worked with Mr. Radican nor does she explain the basis for her claim that he worked over forty (40) hours for at least forty (40) weeks during that year. As stated in our letter dated November 1, 1999, we previously received similar affidavits from Mr. Radican's co-workers in support of his claim that he was an active , full-time employee during calender year 1996.[1] As previously advised, it was our understanding that Mr. Radican's position as a sales representative required that he be on the road much of the time making sales calls. We have never been advised that Ms. Aragon or any other employee of Tarmac accompanied Mr. Radican on these sales calls nor does she so advise in her affidavit. As such, it is difficult for us to understand how Ms. Aragon had personal knowledge of Mr. Radican's work hours. This is especially puzzling in light of the fact that his own employer did not keep track of the number of hours he worked on a regular basis.

### Affidavit of James E. Radican

Mr. Radican's most recent affidavit cannot be accepted as proof of his alleged forty (40) hour work week for all but twelve (12) weeks during calendar year 1996 for a number of reasons. First, the affidavit does not provide any documentation to support Mr. Radican's claim that he worked the required forty (40) hours per week during calendar year 1996.

---

[1]We find it interesting to note that all of the affidavits which were previously submitted to RSL for review (including that of Mr. Radican himself) stated that those persons had personal knowledge that Mr. Radican had worked at least 37.5 hours per week during calendar year 1996. After you discovered that the Policy required Mr. Radican to be at work at least forty (40) hours per week during calendar year 1996 in order to have coverage (not 37.5 hours as you previously believed), we have now received affidavits from persons (including Mr. Radican himself) claiming to have personal knowledge that he worked forty (40) hours per week during that year.

Second, the affidavit is obviously produced by a fully interested party in the matter at hand and as such is arguably tainted by self-interest. For example, in a prior affidavit Mr. Radican advised that he had worked the required 37.5 hours per week, but after he was informed that the Policy actually required him to work forty (40) hours per week, his new affidavit states that he had worked the requisite forty (40) hour work week throughout most of 1996. Mr. Radican again asks RSL to accept his claim that information obtained from numerous sources (including his employer, his physician and himself) was either inaccurate or misinterpreted by RSL. Mr. Radican attempts to explain away each of a number of communications between various parties involved in this case in an effort to prove that he is entitled to a valuable benefit. For example, he again explains that comments made to one of RSL's claim examiners were misinterpreted, and that discussions between himself and his physician regarding his ability to work were all false as he was working full-time all along. While all of Mr. Radican's explanations may be possible, it seems more plausible that RSL's interpretation of the available evidence was more accurate. All of the information which Mr. Radican tries to refute is information which was provided/produced prior to his understanding that his claim for benefits might be affected by his part-time work status. After his claim was denied due to his part-time work status, he has attempted to explain why numerous seemingly clear communications were in fact not clear, and why we should accept his self reported full-time work status despite no documentation to support his claim of working forty (40) hours per week for the bulk of 1996. We must conclude that the information which was provided and produced contemporaneously with the initial claim investigation is more reliable than information provided years later in an effort to get benefits reinstated.

Mr. Radican's affidavit also suggests that he was not advised of problems with his claim file until our final decision on appeal and that he could have cleared up any errors had he been advised of the problems sooner. We must respectfully disagree with his assertions. First, our original denial letter explained that information in the claim file suggested he did not work on a full-time basis and that his claim was being denied for that reason. The denial letter also advised him of his right to review all of the pertinent documents in his claim file and he did not choose to take advantage of that right. He was also represented by two different attorneys and was provided two opportunities to appeal the negative claim determination and provide any additional information to perfect his claim. Again, during neither of these appeal processes did he or his attorneys ask to review our claim file. We would suggest that the above series of events suggests that Mr. Radican had numerous opportunities to address perceived errors in his claim file, but chose not to take advantage of those opportunities. We would also suggest that Mr. Radican has had the assistance of counsel and a number of years to clear up any misinformation contained in his claim file, but has still been unable to do so.

Finally, Mr. Radican's affidavit suggests that RSL should have contacted two local human resource persons in Florida rather than contacting Tarmac's home office for information regarding his work history. Please be advised that RSL was never presented with these persons names until Mr. Radican's recent affidavit. All of the information previously received from Tarmac was obtained through their Virginia offices. In fact, on the Employer's Portion of the initial claim application we were advised that Mr. Radican worked in Florida but that information should be obtained care of the Virginia address. We should also point out that Mr.

Radican was certainly aware that our reasons for refusing his claim were due to his failure to provide proof that he had worked the requisite forty (40) hour work week after January 1, 1996. If he believed that the two persons from Tarmac's Florida Human Resources Department could have provided information in support of his claim, he had ample opportunity to provide such information to RSL. He never did so during the investigation of his claim nor during the two appeal processes. He has even failed to provide such information to date.

### Affidavit of Manuel Porth, M.D.

Dr. Manuel Porth's affidavit also fails to provide any proof that Mr. Radican worked over forty (40) hours per week at any time during calendar year 1996. Dr. Porth's affidavit states that he had no personal knowledge as to whether or not Mr. Radican was following his advice and not working. While Dr. Porth may not have had personal knowledge of Mr. Radican's work schedule, it is clear that when one reviews his records that the issue was a topic of discussion between the doctor and his patient. For instance, on March 22, 1996 Dr. Porth's office notes state:

> It is now 6 months following his laminectomy, and the quality of life has not significantly improved. He is still unable to return to his job and is aware of his back on a continual basis.

Dr. Porth's comments regarding your quality of life and awareness of your back pain were certainly not issues which he invented, but rather appear to have been based upon subjective comments which you provided to him during your office visit. We find it difficult to believe that the comment regarding your ability to return to your job was based solely upon speculation from your doctor and was not based upon some discussion of the issue (especially given the fact that it is dictated right in the middle of other issues which were clearly discussed by the two of you). As with your client's explanations of other information in the claim file which he believes to be erroneous, however, it is possible that this comment was added solely by Dr. Porth and was not based upon any discussion of Mr. Radican's ability to work between the two gentleman. When one views all of the medical records, reports and letters produced by Dr. Porth with regards to Mr. Radican's condition and sees the number of times that the issue of work capacity is raised, the more plausible explanation for the references is that it had been a topic of discussion between the doctor and his patient during the course of their visits. This is certainly not to say or suggest that Dr. Porth is being less than truthful in his affidavit. He probably does not have any personal knowledge as to whether or not Mr. Radican actually worked and whether or not he actually worked on a full-time basis.

Dr. Porth wrote "To Whom it May Concern" letters dated January 1, 1996 and September 6, 1996. In each of these letters he comments on the fact that Mr. Radican was not able to work due to his back problems. Query why these letters were drafted if not done so at the request of your client. We find it difficult to believe that Dr. Porth decided to draft "To Whom it May Concern" letters on his own accord and my experience suggests that most physicians do not draft such a letter unless prodded to do so by their patient or by some other source. Obviously, if prodded to write such a letter by your client, the issue of Mr. Radican's ability to work had been discussed by the two gentleman.

5

In addition to the problems noted above, we again point out that Dr. Porth's affidavit does not provide any evidence to suggest that your client worked at least forty (40) hours per week at any time during calendar year 1996. Rather the affidavit merely states that he does not know if your client followed his medical advice and remained out of work over the course of that year. This certainly does not prove that your client was an active, full-time employee of Tarmac during calendar year 1996.

## Summary

The additional affidavits which you recently provided to RSL for review do not allow us to reverse our previous decision to refuse your client's claim for benefits. Your client has not been able to provide RSL with a single tangible piece of documentation which supports his claim that he worked at least forty (40) hours per week for at least forty (40) weeks during calendar year 1996. Rather he has only been able to provide affidavits from a number of persons who claim to have knowledge that he worked forty (40) hours per week during that year. None of these persons has been able to explain how they have such knowledge, nor have they been able to provide any evidence to support their assertions. As a sales person who spent a great deal of his work time alone making sales calls, it is difficult to understand how these persons had personal knowledge of his work hours, especially in light of the fact that the company did not even keep track of his work hours. While your client claims to be able to explain why the numerous references to his part-time work status were inaccurate, the fact that so many such references exist, makes the most plausible explanation that your client in fact worked only part-time during calendar year 1996. His efforts to explain otherwise are not persuasive and are tainted by self interest.

Finally, assuming *arguendo* that your client had actually worked full-time during calendar year 1996, it would be difficult to convince this reviewer that he suddenly became unable to continue to work as of January 1, 1997. As your client was not eligible for benefits because due to his failure to be an active, full-time employee after January 1, 1996, RSL has not reached a determination regarding whether or not your client would have been considered Totally Disabled beyond December 31, 1996. Our review of the information which has been presented to date, however, would suggest that he might not satisfy this Policy requirement. If we were to accept your client's claims that he was able to successfully complete the material duties of his regular occupation on a full-time basis throughout 1996, we would expect that the medical records would document a significant deterioration of that condition on or around December 31, 1996 if he were unable to work beyond that date. The medical records which have been presented to RSL provide no such documentation. There is nothing in the records to suggest that his condition worsened on or around December 31, 1996. If he was able to work until that date, we would suggest he could continue to do so unless his condition worsened. Information in our files suggests that your client planned to cease working on December 31, 1996 because the relationship between himself and his former employer was no longer working in the latter half of 1996. We would suggest that the December 31, 1996 work stoppage sounds more like a conscious decision to retire and sever the relationship with Tarmac, rather than a work stoppage precipitated by medical necessity.

6

We regret that our decision could not have been more favorable to your client, however, we are limited by the provisions of the policy.

Nothing in this letter should be construed as a waiver of any of RSL's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

Richard D. Walsh
Manager, Quality Review Unit

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

Case No. **00-624-CIV-ZLOCH-Seltzer**

| | |
|---|---|
| JAMES E. RADICAN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| RELIANCE STANDARD LIFE | ) |
| INSURANCE COMPANY, a Foreign, | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## AFFIDAVIT OF JAMES E. RADICAN IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| STATE OF FLORIDA | } |
| | } |
| COUNTY OF BROWARD | } |

Before me, the undersigned authority, personally appeared, JAMES E. RADICAN,

who, after being duly cautioned and sworn, states upon personal belief and knowledge the

following:

1.     Throughout 1996, I, JAMES E. RADICAN performed for Tarmac America, Inc., the

material duties pertaining to my job in the place and manner in which my job was

normally performed on a full-time basis, i.e., a minimum of 40 hours during my

regular work week, with the exception of those weeks in which I received physical

1

**Exhibit "F"**

\

therapy and/or pain treatment. The number of weeks in 1996 I was actively at work full-time as defined above totals not less than 40 weeks.

2.    Throughout 1996 I was employed by Tarmac America, Inc. as a full-time worker.

3.    Throughout 1996 I was paid by Tarmac America, Inc. as full-time worker.

4.    Throughout 1996 I was paid by Tarmac America, Inc. in the same way as other full-time employees of the company.

5.    Throughout 1996 I was insured as a full-time employee of Tarmac America, Inc.

6.    Throughout 1996 I enjoyed all benefits and perquisites of other full-time employees of Tarmac America, Inc.

7.    Throughout 1996 I paid premiums for my coverage as a full-time employee of Tarmac America, Inc.

8.    Reliance Standard Life Insurance Company ("RELIANCE") accepted payment of my premiums in an amount due for full-time employees throughout 1996 and RELIANCE retained those premiums.

9.    RELIANCE employee Richard D. Walsh stated in his August 3, 1998 denial letter:

> . . . In fact, on at least two separate occasions your client (Mr. Radican) informed us via the telephone that he worked part time throughout 1996.

I provided Mr. Walsh with my sworn affidavit dated January 25, 1999 in which I stated:

> This is an inaccurate statement.    Perhaps I was misunderstood.    What I attempted to convey was the truth, i.e., the only time in 1996 in which I did not work

2

full-time was during those weeks when I was receiving
medical treatment as referred to above.

10.   In his final denial letter dated November 1, 1999 Richard D. Walsh stated:

> . . . during two telephone conversations with one of our
> representatives Mr. Radican advised that he had worked
> part-time for approximately one year prior to being told
> that Tarmac could no longer accommodate his part-time
> schedule after December 31, 1996.

I never stated by phone or otherwise to any RELIANCE employee or anyone else that

I only worked part time in 1996 and I informed RELIANCE of this. I informed

RELIANCE that perhaps I as misunderstood. What I attempted to convey to the

RELIANCE employee with whom I spoke was the truth, i.e., that I worked part time

in 1996 but only for those weeks (less than 12) when I received physical therapy

and/or pain treatment.

11.   It was not until the final denial of benefits and close of the administrative record that

RELIANCE informed me that in making its determination to deny benefits it was

relying upon:

    A.   Statements made by me in my application for benefits.

    B.   Statements made by Hope B. Fisher in her letter dated January 28,
       1998.

    C.   Statements taken from the medical records of Dr. Porth.

Had I been provided an opportunity to respond to this evidence I would have

demonstrated that this evidence was not reliable as follows:

3

A.    Statements made by me in my application for benefits.

I did not state in my application that I worked only part-time throughout 1996.

My reference to working part-time was in response to my working on December 31,

1996.

B.    Statements by Hope B. Fisher in her letter dated January 28, 1998.

Ms. Fisher worked out of Norfolk, Virginia and I worked in South Florida. I

did not speak or have any dealing with Hope B. Fisher in 1996. The Tarmac human

resource/employee benefit persons who worked out of South Florida and with whom

I dealt and who were familiar with my employment status were Joan Black and Myra

Perez. Had RELIANCE contacted either, they would have discovered the truth, i.e.,

that I worked the requisite hours of a "Full-time" employee for all weeks in 1996

except for those few weeks when I received physical therapy or pain treatment.

C.    Statements taken from the medical records of Dr. Manuel Porth.

Notwithstanding having back pain and associated problems throughout 1996

and having been advised by Dr. Manuel Porth that I should refrain from working for

the first six months in 1996 I did not follow his advice and the only weeks I did not

work a minimum of 40 hours per week in 1996 were those weeks in which I received

physical therapy and/or pain treatment and which total not more than 12 weeks.

**Further Affiant Sayeth Not**

_James E. Radican_
JAMES E. RADICAN

4

Sworn to and subscribed before me on April __17__, 2000.

Stamp or
Seal:



_____
Notary Public

My commission expires:

_____Personally Known

__X__Produced identification

F C  D L
_____
Type of identification produced

\Aff 04 Radican.wpd

5

## AFFIDAVIT of MARCEL ARAGON

STATE OF FLORIDA    }
                      }
COUNTY OF _DADE____  }

     Before me, the undersigned authority, personally appeared, MARCEL ARAGON, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.     I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.     I have personal knowledge that in 1996 JAMES RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 40 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**

_____
MARCEL ARAGON

Sworn to and subscribed before me on _____ 2 - / 9 _____, 2001 by

Stamp or
Seal:

_____
Notary Public

My commission expires:

  ✓ Personally Known

  _____ Produced identification

Conrado Yero
Notary Public, State of Florida
Commission No. CC 678349
My Commission Exp. 09/22/2001
1-800-3-NOTARY - Fla. Notary Service & Bonding Co.

_____
Type of identification produced

\New Files\Radican\ Aff 08 Aragon.wpd

**Exhibit "G"**

## AFFIDAVIT of THOMAS MENDEZ

STATE OF FLORIDA        }
                        }
COUNTY OF BROWARD       }

Before me, the undersigned authority, personally appeared, THOMAS MENDEZ, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.    I have personal knowledge that in 1996 JAMES E. RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 40 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**



_____
THOMAS MENDEZ

Sworn to and subscribed before me on ___05___ __April__ _____, 2000 by .

Stamp or
Seal:

> KEITH STRAWSER
> MY COMMISSION # CC 907430
> EXPIRES: February 2, 2004
> Bonded Thru Notary Public Underwriters

_____
Notary Public

My commission expires:

_____Personally Known

___X___Produced identification        Florida's Driver's Licence
                                       Type of identification produced

\New Files\Radican\ Aff 01 Mendez

Page 1 of 1                **Exhibit "H"**

i

**AFFIDAVIT of CRAIG LEONARD**

STATE OF FLORIDA           }
                           }
COUNTY OF PALM BEACH }

    Before me, the undersigned authority, personally appeared, CRAIG LEONARD, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.    I have personal knowledge that in 1996 JAMES RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 40 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**



                      CRAIG LEONARD

Sworn to and subscribed before me on     4/26/     , 2000 by

Stamp or
Seal:

> MINERVA YANES
> MY COMMISSION # CC 895024
> EXPIRES: January 14, 2004
> Bonded Thru Notary Public Underwriters

                      Notary Public

My commission expires:

✓   Personally Known

_____Produced identification                         Type of identification produced

\New Files\Radican\ Aff 03 Leonard.wpd

        **Exhibit "I"**

## AFFIDAVIT of HOPE E. FISCHER

STATE OF VIRGINIA      }
                                 }
                                 }

Before me, the undersigned authority, personally appeared, HOPE E. FISCHER, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    I was employed by Tarmac America, Inc. as Benefits Administrator in 1996, and I worked at their United States corporate headquarters in Norfolk, Virginia.   James E. Radican worked in South Florida in 1996, and I did not speak with him or have any dealings with him in that year, and I have never met Mr. Radican.

2.   I have personal knowledge that Reliance Standard Life Insurance Company has denied James E. Radican's claim for disability benefits upon a finding that in 1996 James E. Radican did not perform the material duties pertaining to his job in the place and manner in which his job was normally performed on a "Full-time" basis, i.e., a minimum of 40 hours during his regular work week. In making its determination, I am also aware that Reliance Standard Life Insurance Company claims to have relied upon the following statement from my letter dated January 28, 1998:

> [o]ur files on Mr. Radican indicate that he had back surgery in October of 1995 and was out of work from that time until sometime after mid-year 1996 at the recommendation of his doctor, Manuel Porth. Sometime during the

Page 1 of 3

### Exhibit "J"

latter part of 1996, he reported to work, but we have no documentation in the file to substantiate the dates worked.

3.    My above-quoted statement should not to be construed or interpreted to support a conclusion that Mr. Radican did not work a minimum of 40 hours during his regular work week in 1996, and any reliance in this regard is unwarranted and misguided. My statement that Mr. Radican "was out of work from that time (October, 1995) until sometime after mid-year 1996," was made without personal knowledge, and I was simply paraphrasing what I had read in a written recommendation from Dr. Manuel Porth.

Further, the company did not require or maintain documents to substantiate the dates worked for any salaried employee including James E. Radican in 1996, and it was solely for this reason that I stated "we have no documentation in the file to substantiate the dates worked." The absence of such documentation does not support a conclusion that Mr. Radican or any other salaried employee did not work for Tarmac for 40 hours per week in 1996.

5.    I received a copy of a letter from Reliance Standard Life Insurance Company to James Radican dated April 6, 1998 in which his claim for disability benefits was denied on the basis that he was not eligible because he failed to work a minimum of 40 hours during his regular work week in 1996 and therefore was not a "Full-time" employee.    This determination by Reliance Standard Life Insurance Company is wrong.

6.    I received copies of letters from attorney Marika McVey Ostendorf dated June 5, 1998, and from attorney Lawrence D. Bache dated January 26, 1999 sent to Reliance

Standard Life Insurance Company on behalf of James E. Radican. I concur with the

positions stated by counsel in those letters that James E. Radican was a "Full-Time"

employee for Tarmac America, Inc. in 1996 due not only to his employment status, but also

because he performed the material duties pertaining to his job for more than 40 hours per

week during numerous weeks in 1996.

**Further Affiant Sayeth Not**

Hope E. Fischer
HOPE B. FISCHER

Sworn to and subscribed before me on _____March 2_____, 2001 by

Stamp or
Seal:

Notary Public

My commission expires: 6/30/02

_____ Personally Known

_____ Produced identification

_____
Type of identification produced

\New Files\Radican\ Aff 09 Fischer.wpd

Page 3 of 3

Ober, Kaler, Grimes & Shriver
Attorneys at Law

Offices In
Maryland
Washington, D.C.
Virginia

120 East Baltimore Street
Baltimore, Maryland 21202-1643
410-685-1120 FAX 410-547-0699

* law other than Maryland

June 5, 1998

## BY FACSIMILE TRANSMISSION (215-787-3897)

Reliance Standard Life Insurance Company
Quality Review Unit
P.O. Box 8330
Philadelphia, Pennsylvania 19101-8330

    *Re:    Policy Owner: Tarmac America, Inc.*
              *Policy No.: LSC 98842*
              *Claim No.: 1997-2346-010*
              *Claimant:  James E. Radican*

Dear Sir or Madam:

This firm represents James E. Radican. The purpose of this letter is to request a review of the denial of Mr. Radican's long term disability benefits under the Group Long Term Disability Policy previously maintained by Tarmac America, Inc.

According to the April 6, 1998 letter sent by James A. Wilson, Jr. of the Group LTD Claims Department, Mr. Radican was denied his long term disability benefits because he was not covered under the policy. In order to be eligible for long term disability under Policy LSC 98842, an individual must meet the policy's eligibility requirements. The group policy defines an individual's effective date as follows:

> EFFECTIVE DATE OF INDIVIDUAL INSURANCE: If you pay the entire Premium due for an Eligible Person, the insurance for such Eligible Person will go into effect on the Individual Effective Date, as shown on the Schedule of Benefits page...The insurance for an Eligible Person will not go into effect on a date

MMO:195830.1:6/5/98: 2:10 PM

**Exhibit "K"**

Reliance Standard Life Insurance Company
June 5, 1998
Page 2

> he/she is not Actively at Work because of a Sickness or Injury.
> The insurance will go into effect when a person is Actively at
> Work for one (1) full day in an Eligible Class, as shown on the
> Schedule of Benefits page.

The contract defines "Actively at Work" and "Active Work" as "actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and in the manner in which the job is normally performed. This includes approved time off, such as vacation, jury duty and funeral leave, but does not include time off as a result of an Injury or Sickness." The term "Full-time" means working for [Tarmac America, Inc ] for a minimum of forty (40) hours during a person's regular work week.

Mr. Wilson's letter states that Mr. Radican was working part-time when the policy became effective on January 1, 1996, and did not return to full-time active work prior to his last day worked. This information was based on documentation received from a supervisor at Tarmac America, Inc. named Michael Unger. As explained more fully below, Mr. Unger's information was incorrect; Mr. Radican was working on a full-time basis in 1996 and therefore is entitled to the disability benefits.

On September 30, 1995, Mr. Radican had spinal surgery to correct a herniated disk to relieve severe pain in his lower back and legs. On or about October 15, 1995, he returned to work with Tarmac America, Inc. In December, 1995, and February, 1996, Mr. Radican received physical therapy twice a week for a period of six (6) weeks. Each physical therapy session lasted approximately three (3) hours. In October, 1995, and again in August, 1996, Mr. Radican received a series of epidural injections into his back. Except for the interruptions for the injections and the physical therapy, Mr. Radican was working on a full-time basis for Tarmac America, Inc.

During 1996, Mr. Radican was responsible for his sales territory, his sales volume, his forecasting, reporting [in writing], his technical assistance, and all other expected duties during the period of time in which he was receiving physical therapy and the injections. He carried a state-wide company beeper and a company cellular phone. He was in constant contact with his accounts and the company management.

In order to be actively at work under the Reliance LTD contract, an individual must complete the material duties of his job and work forty (40) hours a week. During 1996, Mr. Radican clearly was performing the material duties of his job. He continued to cover his sales territory and have primary responsibilty for his clients. Because Mr. Radican was a salaried employee, Tarmac America, Inc. is unable to produce time sheets to confirm that he was working 40 hours a week during 1996. His full-time status, however, is evident from his work situation. Mr. Radican received full pay and full benefits during 1996. As previously mentioned, he was



Reliance Standard Life Insurance Company
June 5, 1998
Page 3

responsible for his sales territory in 1996 and it was not reassigned until early 1997, after he had filed for disability. Included with this letter is a copy of Mr. Radican's expense reports for December, 1995, and January, 1996. As you will see from the report, Mr. Radican traveled 1,380 miles during the month of December, 1995. In the month of January, 1996, he traveled 1,790 miles. Similarly, in August, 1996, he traveled 1,050 miles. A copy of the relevant expense report for that month is also enclosed.

Reliance disallowed the benefit claim based on the February 4, 1998 letter from Michael Unger, General Manager of Pennsuco Cement and Aggregates, which stated that Mr. Radican was working on a part-time basis and continued to work on a part-time basis for over one (1) year while receiving physical therapy and pain treatments. Mr Unger's letter also stated that Mr. Radican filed for short-term disability on January 1, 1996. Please be advised that Mr. Unger's letter is incorrect. Mr. Unger was not the supervisor of Mr. Radican when he returned to work in the fall, 1995. Mr. Unger became involved with the situation only in the summer of 1996. His letter also incorrectly stated that Mr. Radican filed for disability on January 1, 1996, when the actual date was January 1, 1997.

The text of Mr. Unger's letter was prompted by the request of James Wilson, a Reliance employee who was investigating Mr. Radican's claim. Mr. Wilson was speaking with Mr. Radican regarding his work history and Mr. Radican had explained to him that he was able to work part-time while he was receiving physical therapy and pain treatments. Mr. Wilson then asked Mr. Radican to have Mr. Unger fax him a letter confirming Mr. Radican's part-time status so that the matter could be resolved. Mr. Unger's letter failed to clarify that Mr. Radican worked part-time on the particular day that he was was receiving physical therapy and/or pain treatments. However, on an overall basis, he was continuing to work as a full-time, salaried employee.

Please note that B. Edward Pittman, Vice President of Human Resources, has sent a letter to Reliance dated February 26, 1998, which confirms that Mr. Radican was indeed working on a full-time basis in 1996.

Mr. Radican was a full-time employee for Tarmac America, Inc. during 1996 and, therefore, is entitled to long term disability benefits under the terms of the Reliance Long Term Disability Policy.

Reliance Standard Life Insurance Company
June 5, 1998
Page 4

I look forward to receiving an immediate response.

Yours truly,

*Marika M. Ostendorf*

Marika McVey Ostendorf

MMO:kmk
Enclosures
cc:    Mr. James E. Radican
       Ms. Hope Fischer

Fountains Executive Centre
9000 West Sheridan Street, Suite 174
Pembroke Pines, FL 33024
(954) 436-7376; Fax: (954) 436-2926

US Postal Service
Receipt for Certified Mail
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

| Sent to | |
|---|---|
| Street & Number | |
| Post Office, State, & ZIP Code | |
| Postage | $ |

January 26, 1999

Reliance Standard Life Insurance Co.
Attention: Richard D. Walsh
Assistant Manager, Quality Review Unit
2501 Parkway
Philadelphia, PA 19130-2499

Via Certified Mail
Article # Z 127 195 669

Re:     James E. Radican
        Claim No.: 1997-346-010
        Policy No.: LSC 98842

Dear Mr. Walsh:

The undersigned represents Tarmac America, Inc. employee, James E. Radican.

By letter dated August 3, 1998 to Marika McVey Ostendorf, Esq., my client's claim for long-term disability benefits was denied. More specifically, you found that Mr. Radican was never eligible to participate in the Reliance Plan because there was a "lack of conclusive evidence of full-time work (in 1996)."

The initial denial of the claim, by letter dated April 6, 1998, was made upon a finding that Mr. Radican was not eligible for benefits under the plan because he had "not satisfied the policy definition of a full-time employee . . ." and that "'Full Time' means working for you for a minimum of 40 hours during a person's regular work week."[1]

In response to an initial denial of the claim, Marika McVey Ostendorf, acting on behalf of Mr. Radican, submitted information with letter dated June 5, 1998 in an attempt to establish that Mr. Radican was a full-time employee (as defined in the plan) during the concerned time period, and accurately and truthfully stated:

> Except for the interruptions for the injections and the physical therapy (in 1995 and 1996) Mr. Radican was working on a full-time basis for Tarmac America, Inc.

---

[1] The applicable plan document defines "Full time" on page 2.0 as "working for the policy holder for a minimum of 37.5 hours during your regular work week" rather than 40 hours as stated.

**Composite Exhibit "L"**

The evidence submitted was apparently deficient per your August 3, 1998 second denial letter in which you stated you "do not have any conclusive evidence to support that" Mr. Radican "worked on a full time basis after January 1, 1996."

There has been a misunderstanding as to what information was required to establish that Mr. Radican was eligible for benefits under the Plan, i.e., that he worked "Full-Time" in 1996 (37.5 hours per week). This is understandable due to the fact that salaried employees do not punch a time clock and there is no form or other document kept in the routine course of business which could have been submitted. Accordingly, on behalf of Mr. Radican, and pursuant to the law and spirit of ERISA, information is submitted herewith to establish the truth, i.e., that Mr. Radican was a full-time employee during the concerned time period. Specifically, enclosed please find the sworn original affidavits of Mr. Radican's former co-workers, Thomas Mendez and Craig Leonard, in which each states under oath that Mr. Radican was actively at work on a full-time basis (more than 37.5 hours per week) for not less than 40 weeks during 1996. Also enclosed please find the original affidavit of James E. Radican in which he states, in concurrence with the affidavits of Mr. Mendez and Mr. Leonard, that he was actively at work on a full-time basis for not less than 40 weeks during 1996. In his affidavit Mr. Radican further clarifies what appears to have been a miscommunication in phone conversations he had with your company. More specifically, the second denial letter dated August 3, 1998 provides:

> [E]very indication we have points to the fact that your client never returned to full-time work after his surgery in 1995. In fact, on at least two separate occasions your client (Mr. Radican) informed us via the telephone that he worked part time throughout 1996. He (Mr. Radican) informed us that he worked part time for about one year but was told that he should apply for disability because the company could not longer accommodate him on a part-time schedule. (emphasis added)

As stated in his affidavit, in his phone conversations Mr. Radican did not state that he worked only part time in 1996. Mr. Radican was simply attempting to explain that he worked part-time during those weeks (less than 12) when he received physical therapy and/or pain treatment. The confusion was most probably caused by the use of the word "through-out" in the context in the conversation. Assuming Mr. Radican used the word "throughout," it was a reference to his having received treatments "throughout" 1996.

As a further point of clarification, Marika McVey Ostendorf, in her June 5, 1998 letter, explained that the February 4, 1998 letter from Michael Unger, General Manager of Pennsuco Cement and Aggregates, in contained inaccurate statements. In this regard, enclosed please find the sworn affidavit of Michael Unger in which, under oath, he clarifies

that he did not state or imply that Mr. Radican worked <u>only</u> part time in 1996. He was attempting to convey that he worked part-time during the weeks when he received physical therapy and/or pain treatments. Further, in accordance with Ms. Ostendorf's statement, Mr. Unger attests to his inadvertent error when he referred to January 1, 1996 instead of January 1, 1997.

Notwithstanding your statement in the second denial letter of August 3, 1998 that your "claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of his policy," request is hereby respectfully made for a reconsideration of the claim in light of the understandable confusion respecting the information required to establish Mr. Radican's eligibility for benefits. Bear in mind that 29 C.F.R. § 2560.503-1(F), mandating that claims procedure for ERISA plans be reasonable provides:

> A plan administrator . . . shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
>
> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and explanation of why such material or information is necessary; and
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.[2]

---

[2] Also bear in mind that the Employee Retirement Income Security Act of 1974 ("ERISA") at 29 U.S.C. § 1133 provides:

> [e]very employee benefit plan shall . . . (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

No description of the nature of the additional material or information required for Mr. Radican to perfect his claim was contained in the initial denial letter. It is respectfully submitted that this was the cause of the confusion.

Mr. Radican trusts that the information submitted herewith will be sufficient to establish the truth, i.e., that he was a full-time employee actively at work in 1996 as defined in the plan. His sincere apology for the delay in forwarding this information but the delay has been caused by Mr. Radican's condition (disability) which has affected his ability to determine the nature of the evidence required, and to obtain same. I look forward to hearing from you directly.

Sincerely,

Lawrence D. Bache

cc: James A. Wilson, Jr. w/o enclosures
Hope E. Fischer, w/enclosures
James E. Radican, w/enclosures

enc.

\Radican\Walsh 01

## AFFIDAVIT of MICHAEL UNGER

STATE OF FLORIDA        }

COUNTY OF ___*BROWARD*___    }

Before me, the undersigned authority, personally appeared, MICHAEL UNGER who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.  I Michael Unger am the General Manager of Pennsuco Cement and Aggregates, a Tarmac America, Inc. company.

2.  Attached hereto is my letter to Mr. James Wilson, Reliance Standard Life Insurance Co., dated February 4, 1998.

3.  My letter dated February 4, 1998 contains the statement:

    > Mr Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.

    The above statement does not state, nor did I mean to infer that JAMES RADICAN worked only part-time in 1996. I was attempting to convey that JAMES E. RADICAN worked part-time during the weeks when he received physical therapy and/or pain treatment.

4.  My letter dated February 4, 1998 contains the statement:

    > Jim was incapable of performing his duties on this (a full-time) basis and was required to file for short term disability on January 1, 1996.

    The reference to January 1, 1996 was an inadvertent error. The date should have been January 1, 1997.

Further Affiant Sayeth Not

_____
MICHAEL UNGER

Sworn to and subscribed before me on December ___, 1998

Stamp or
Seal:

MARIA YEPES
My Comm Exp. 8/30/2002
No. CC 780747
[ ] Personally Known  [ ] Other I.D.

_/Rellens ../l/lle_
Notary Public

My commission expires:

L—Personally Known

_____Produced identification

Type of identification produced

\New Files\Radican Aff'02 Unger

**Tarmac**

Tarmac America, Inc.
11000 N.W. 121st Way
Medley, FL 33178
(305) 364-2230
Fax (305) 364-2288

February 4, 1998

*I*

Mr. James Wilson
Reliance Standard Life Insurance Co.                    FAX: 215/787-4254
LTD Claim Department
2501 Parkway
Philadelphia, PA 19130-2499

Dear Mr. Wilson:

It is my understanding that, after recovering from back surgery, James Radican returned to work on or about November 1, 1995.

At that time, Jim reported to Mr. Fred Goudie, Vice President of Production and Sales for Tarmac's Pennsuco Cement Mill in Medley, Florida. Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.

Tarmac's policy requires employees to work only on a full-time basis. Jim was incapable of performing his duties on this basis and was required to file for short-term disability on January 1, 1996.

Sincerely,

Michael Unger, General Manager
Pennsuco Cement and Aggregates

## AFFIDAVIT of JAMES E. RADICAN

STATE OF FLORIDA            }
                           }
COUNTY OF $\underline{\text{Broward}}$            }

Before me, the undersigned authority, personally appeared, JAMES E. RADICAN, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.  Throughout 1996, I, JAMES E. RADICAN performed for Tarmac America, Inc., the material duties pertaining to my job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 37.5 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 I was actively at work full-time as defined above totals not less than 40 weeks.

2.  The only weeks I did not work a minimum of 37.5 hours per week in 1996 were those weeks in which I received physical therapy and/or pain treatment and which total not more than 12 weeks.

3.  In the letter from Richard D. Walsh dated August 3, 1998 the following is stated:

    > In fact, on at least two separate occasions your client (Mr. Radican) informed us via the telephone that he worked part time throughout 1996.

    The reference to "throughout" can be misleading and perhaps there has been some confusion. What I attempted to convey is the truth, i.e., that I worked part time in 1996 but only for those weeks (less than 12) when I received physical therapy and/or pain treatment.

4.  In the letter from Richard D. Walsh dated August 3, 1998 the following is stated:

    > He (Mr. Radican) informed us that he worked part time for about one year but was told that he should apply for disability because the company could not longer accommodate him on a part-time schedule.

This is an inaccurate statement. Perhaps I was misunderstood. What I attempted to convey was the truth, i.e., the only time in 1996 in which I did not work full-time was during those weeks when I was receiving medical treatment as referred to above.

**Further Affiant Sayeth Not**

_JAMES E. RADICAN_

Sworn to and subscribed before me on December 25, 1998.

Michael D. Reynolds
My Commission CC461036
Expires May 8, 1999

_Notary Public_

My commission expires:

___ Personally Known

___ Produced identification

_Type of identification produced_

\New Files\Radican AfT 01

## AFFIDAVIT of THOMAS MENDEZ

STATE OF FLORIDA ............)
................................................)
COUNTY OF *Broward* .......)

    Before me, the undersigned authority, personally appeared, THOMAS MENDEZ, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.   I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.   I have personal knowledge that in 1996 JAMES E. RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 37.5 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**

                                    _____
                                      THOMAS MENDEZ

Sworn to and subscribed before me on December _3/_, 1998 by *Tomas Mendez*

Stamp or
Seal:
| OFFICIAL NOTARY SEAL |
| SHARON H SULLIVAN |
| NOTARY PUBLIC STATE OF FLORIDA |
| COMMISSION NO. CC43756 |
| MY COMMISSION EXP. FEB. 7,1999 |

                                    _____
                                      Notary Public

My commission expires:

   _X_ Personally Known

   _____ Produced identification

                                      _____
                                     Type of identification produced

\New Files\Radican\ Aff'01 Mendez

## AFFIDAVIT of CRAIG LEONARD

STATE OF FLORIDA )
)
COUNTY OF _Palm Beach_ )

Before me, the undersigned authority, personally appeared, CRAIG LEONARD, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1. I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2. I have personal knowledge that in 1996 JAMES RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 37.5 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**

_____
CRAIG LEONARD

Sworn to and subscribed before me on ~~December~~ January _11_, 1998 by .

_____
Notary Public

Stamp or
Seal:

My commission expires:

_X_ Personally Known

_____ Produced identification

_____
Type of identification produced

\New Files\Radican\ Aff 01 Leonard

# Tarmac

Tarmac America, Inc.
P.O. Box 2016
Norfolk, VA 23501
(757) 858-6500
Fax (757) 855-7707
http://www.tarmacamerica.com

February 26, 1998

Reliance Standard Life Insurance Company
Quality Review Unit
P.O. Box 8330
Philadelphia, PA 19101-8330

RE:   **James E. Radican**
      **Policy No. LSC 98842**
      **Claim No 1997-2346-010**

Dear Sir:

I am in receipt of your letter of February 20, 1998, to Mr. James Radican, informing him of an unfavorable determination of his Long Term Disability claim. You have stated that Mr. Radican was working "part-time" when the policy became effective, had not returned to "full time active work" prior to his last day worked and therefore did not satisfy the definition of a full-time employee under the terms of the policy.

Jim Radican was a full-time salaried exempt employee of this company from his date of employment in 1965 until his last day of active work on December 31, 1996. At no time prior to the commencement of his short term disability on January 1, 1997 was he ever on part-time status; he was at all times paid full salary and enjoyed full benefits, including long term disability coverage, for which he paid. The fact that he worked partial days in 1996 following his return to work from surgery should in no way be construed as "part-time" status. Had Mr. Radican been classified a part-time employee, he would have been ineligible for participation in our long term disability benefit at all.

We would appreciate your expeditious reconsideration of Mr. Radican's claim, given his unemployed and disabled status. While doing so, please note that Mr. Radican's middle initial is E., not G., and he does not live in New York. Should you require further information from Tarmac to substantiate his claim for benefits, please do not hesitate to contact me. I look forward to your response.

Sincerely yours,

B. Edward Pittman

B. Edward Pittman
Vice President Human Resources

cc:   ✓ James E. Radican
      Mike Unger, General Manager, Florida Cement
      James A. Wilson, Jr.
      Group LTD Claims Department, Reliance Standard Life

**Exhibit "M"**

A Tarmac Group company

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

Case No. **00-624-CIV-ZLOCH-Seltzer**

JAMES E. RADICAN          )
                              )
     Plaintiff,           )
                              )
vs.                           )
                              )
RELIANCE STANDARD LIFE    )
INSURANCE COMPANY, a Foreign,  )
corporation,             )
                              )
     Defendants.         )
_____  )

## AFFIDAVIT OF B. EDWARD PITTMAN IN
## SUPPORT OF MOTION FOR SUMMARY JUDGMENT

STATE OF VIRGINIA      }
~~COUNTY~~ *City* OF _Norfolk_   }

Before me, the undersigned authority, personally appeared, B. EDWARD PITTMAN,

who, after being duly cautioned and sworn, states upon personal belief and knowledge the

following:

1.    I am Vice President of Human Resources for Tarmac America, Inc., and I have

    personal knowledge that:

    a.    Tarmac America, Inc. had no part-time or seasonal employees during 1996.

1

**Exhibit "N"**

b.    JAMES E. RADICAN was employed by Tarmac America, Inc. as a full-time worker throughout 1996.

c.    JAMES E. RADICAN was paid by Tarmac America, Inc. as a full-time worker throughout 1996.

d.    JAMES E. RADICAN was paid by Tarmac America, Inc. in the same way as other full-time employees of Tarmac America, Inc. throughout 1996.

e.    JAMES E. RADICAN was insured as a full-time employee of Tarmac America, Inc. throughout 1996.

f.    JAMES E. RADICAN enjoyed all benefits and perquisites of other full-time employees of Tarmac America, Inc. throughout 1996.

g.    JAMES E. RADICAN paid premiums for his coverage as a full-time employee of Tarmac America, Inc. throughout 1996.

h.    Reliance Standard Life Insurance Company ("RELIANCE") accepted payment of premiums for JAMES E. RADICAN in an amount due for full-time employees of Tarmac America, Inc. throughout 1996.

**Further Affiant Sayeth Not**

B. Edward Pittman
B. EDWARD PITTMAN

Sworn to and subscribed before me on April _20_ , 2000.

2

Stamp or
Seal:

_Emily Duke_
Notary Public

My commission expires:  04/31/02

___✓__ Personally Known

_____Produced identification

_____
Type of identification produced

\AJT 06 Pittman.wpd

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

Case No. 00-624-CIV-ZLOCH-Seltzer

| | |
|---|---|
| JAMES E. RADICAN | ) |
| Plaintiff, | ) |
| vs. | ) |
| RELIANCE STANDARD LIFE INSURANCE COMPANY, a Foreign, corporation, | ) |
| Defendants. | ) |

## AFFIDAVIT OF MANUEL PORTH, M.D.

STATE OF FLORIDA     )
                     )
COUNTY OF _____  )

Before me, the undersigned authority, personally appeared, MANUEL PORTH, M.D., who, after being duly cautioned and sworn, states upon personal belief and knowledge the following:

I MANUEL PORTH, M.D., being duly sworn, make oath and say as follows:

1.  That I am a medical practitioner licensed to practice medicine in the state of Florida and I have offices in Broward County, Florida.

1

**Exhibit "O"**

I

2.    That I compiled and maintained medical records in connection with treatment of

James Radican and that I provided excerpts of those records and letters with respect

thereto to Reliance Standard Life Insurance Company at their request.

3.    That I stated therein that during certain periods of 1996 I advised James Radican not

to work and I also stated that he was unable to return to his job.

4.    That I naturally assumed Mr. Radican was following my advice that he should not

work. I had no personal knowledge when I prepared the referenced reports and letters

as to whether Mr. Radican had been following advice and/or was in fact not working.

**Further Affiant Sayeth Not**


MANUEL PORTH, M.D.

Sworn to and subscribed before me on June 2⅘ , 2000.


Stamp or
Seal:

> KATHY D. ELLIS
> MY COMMISSION # CC 654598
> EXPIRES: September 28, 2001
> Bonded Thru Notary Public Underwriters


Notary Public
Kathy D. Ellis

My commission expires:

___ Personally Known

_____ Produced identification

                                        N/A
                                Type of identification produced

\Aff 07 Porth.wpd

2

## AFFIDAVIT OF JAMES A. WILSON, JR.

I, James A. Wilson, Jr., being duly sworn according to law, depose and state as follows:

1.    I am employed by Reliance Standard Life Insurance Company in the Group Long Term Disability Claims Department.

2.    I was involved in the investigation of Mr. Radican's claim for benefits under Policy No. LSC 98842.

3.    I spoke directly with Mr. Radican on the telephone on two occasions during the investigation of his claim for benefits.

4.    During both telephone conversations Mr. Radican told me that he worked part-time for approximately one year before he was told by the employer, Tarmac, that they could not accommodate his part-time schedule after December 31, 1996.

5.    At no time during my telephone conversations with Mr. Radican did he ever state that he worked full-time at any time during 1996.

6.    On the disability claim form completed by Mr. Radican he stated that he was working part-time, recovering from surgery, prior to claiming disability on January 1, 1997.

7.    My decision to deny the claim was based solely on the evidence in the administrative record.

8.    I am not compensated in any manner based on the number of claims that I deny.

0408127.01

**Exhibit "P"**

9.   Denial of this claim promotes the interests of the plan because it ensures that only

qualified individuals receive benefits, thus maintaining the premiums at an

affordable level for the policy holder.

COMMONWEALTH OF PENNSYLVANIA)
                              ) ss:
COUNTY OF PHILADELPHIA       )

Date: _6/5/2000_

_James A. Wils_____

James A. Wilson, Jr.

> Notarial Seal
> Marie Czarkowski, Notary Public
> Philadelphia, Philadelphia County
> My Commission Expires June 1, 2002

Member, Pennsylvania Association of Notaries

0408127.01