## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA

JAMES E. RADICAN           :         00-6024

                        :

    v.                    :    CASE NO.: 00-6024-CIV-ZLOCH-

                        :    Magistrate: Judge B. Seltzer

RELIANCE STANDARD      :

LIFE INSURANCE COMPANY  :

### NOTICE OF FILING ADMINISTRATIVE RECORD

Defendant, RELIANCE STANDARD LIFE INSURANCE COMPANY, by and through

its undersigned counsel, hereby files a Bates stamped copy of Administrative Record in this action

numbered RSL00001 through RSL00345 in the within action.

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by via

First Class U.S. Mail, postage prepaid, to Lawrence D. Bache, Esq., Fountains Executive Center,

9000 West Sheridan Street, Suite 174, Pembroke Pines, FL 33024, this 3rd day of July, 2002.

ALLEY, MAASS, ROGERS & LINDSAY, P.A.
Attorneys for Defendant
P.O. Box 431
321 Royal Poinciana Plaza, South
Palm Beach, FL 33480-0431
(561) 659-1770/ (561) 833-2261 Fax


By: _____
    GENE D. LIPSCHER
    Florida Bar No. 904228

0676563.01

RETURN FILE TO IRON MOUNTAIN
**Reliance Standard Life Insuran**
Richard Walsh
2501 Parkway Dr

Philadelphia, PA 19130

Order 0138207 on 03/25/1999    Cust 200095
REF:
ID James E. radican 97-346-010
PHLA

CTN BC: 381499102
FILE BC: 1337176
LOC ID: 4203170
LOC: 204 01 30 02 AA 08

FILE OUT CARD

RSL00001

TARMAC AMERICA, INC.
1997-346-010    LSC 98842
RADICAN, JAMES E.

A R 97 1

# Reliance Standard Life Insurance Company

Home Office: Chicago, Illinois  •  Administrative Office: Philadelphia, Pennsylvania

**POLICYHOLDER:** Tarmac America, Inc.

**POLICY NUMBER:** LSC 098842

**EFFECTIVE DATE:** January 1, 1996

**ANNIVERSARY DATES:** January 1, 1997 and each January 1 thereafter

**PREMIUM DUE DATES:** The first Premium is due on the Effective Date. Further Premiums are due monthly, in advance, on the first day of each month.

This Policy is delivered in Virginia and is governed by its laws.

Reliance Standard Life Insurance Company is referred to as "we", "our" or "us" in this Policy.

The Policyholder and any subsidiaries, divisions or affiliates are referred to as "you", "your" or "yours" in this Policy.

We agree to provide insurance to you in exchange for the payment of Premium and a signed Application. This Policy provides income replacement benefits for Total Disability from Sickness or Injury. It insures those Eligible Persons for the Monthly Benefit shown on the Schedule of Benefits. The insurance is subject to the terms and conditions of this Policy.

The Effective Date of this Policy is shown above. This Policy stays in effect as long as Premium is paid when due. The "TERMINATION OF THIS POLICY" section of the GENERAL PROVISIONS explains when the insurance terminates.

This Policy is signed by our President and Secretary.

SECRETARY

PRESIDENT

Countersigned _____
Licensed Resident Agent

**GROUP LONG TERM DISABILITY INSURANCE**
**NON-PARTICIPATING**

LRS-6564 Ed. 2/83

**RSL00002**

**RELIANCE STANDARD LIFE INSURANCE COMPANY**
Home Office: Chicago, Illinois
Administrative Office: Philadelphia, Pennsylvania

**GROUP POLICY NUMBER:** LSC 098342          **POLICY EFFECTIVE DATE:** January 1, 1996

**POLICY DELIVERED IN:** Virginia          **ANNIVERSARY DATE:** January 1 in each year

Application is made to us by: Tarmac America, Inc.

This Application is completed in duplicate, one copy to be attached to your Policy and the other returned to us.

It is agreed that this Application takes the place of any previous application for your Policy.

Signed at _____ this _____ day of _____.

Policyholder: _____    Agent: _____

By: _____             _____
       (Signature)                                           (Licensed Resident Agent)

_____
       (Title)

LRS-6564-1 Ed. 2/83

**RSL00003**

# TABLE OF CONTENTS

| | Page |
|---|---|
| SCHEDULE OF BENEFITS | 1.0 |
| DEFINITIONS | 2.0 |
| GENERAL PROVISIONS | 3.0 |
|     Entire Contract | |
|     Changes | |
|     Time Limit On Certain Defenses | |
|     Records Maintained | |
|     Clerical Error | |
|     Misstatement Of Age | |
|     Not In Lieu Of Worker's Compensation | |
|     Conformity With State Laws | |
|     Certificate Of Insurance | |
|     Termination Of This Policy | |
| CLAIMS PROVISIONS | 4.0 |
|     Notice Of Claim | |
|     Claim Forms | |
|     Written Proof Of Total Disability | |
|     Payment of Claims | |
|     Arbitration of Claims | |
|     Physical Examination And Autopsy | |
|     Legal Actions | |
| INDIVIDUAL ELIGIBILITY, EFFECTIVE DATE AND TERMINATION | 5.0 |
|     General Group | |
|     Eligibility Requirements | |
|     Waiting Period | |
|     Effective Date Of Individual Insurance | |
|     Termination Of Individual Insurance | |
|     Individual Reinstatement | |
| PREMIUMS | 6.0 |
| BENEFIT PROVISIONS | 7.0 |
| EXCLUSIONS | 8.0 |
| LIMITATIONS | 9.0 |
| CONTINUITY OF INSURANCE COVERAGE PROVISION | 10.0 |
| SPECIFIC INDEMNITY BENEFIT | 11.0 |
| WORK INCENTIVE AND CHILD CARE BENEFITS | 12.0 |
| LIVING BENEFIT | 13.0 |
| REHABILITATION BENEFIT | 14.0 |

LRS-6564-2 Ed. 2 83

**RSL00004**

## SCHEDULE OF BENEFITS

NAME OF SUBSIDIARIES, DIVISIONS OR AFFILIATES TO BE COVERED: None

ELIGIBLE CLASSES:  Each active, Full-time employee except any person employed on a temporary or seasonal basis, according to the following classifications:

CLASS A: employee earning $59,000.00 or more per year   who:

    (1)   is engaged in a non-hazardous occupation; and
    (2)   functions primarily in an office environment.

CLASS B: salaried employee earning more than $30,000.00 per year but less  than $59,000.00

WAITING PERIOD:  Present Employees: none
                      Future Employees: 90 days

INDIVIDUAL EFFECTIVE DATE:  The first of the Policy month coinciding with or next following completion of the Waiting Period, if applicable.

INDIVIDUAL REINSTATEMENT: 6 months

MINIMUM PARTICIPATION REQUIREMENTS: Percentage: 100% Number of Insureds: 10

LONG TERM DISABILITY BENEFIT

ELIMINATION PERIOD: 270 consecutive days of Total Disability.

MONTHLY BENEFIT:  The Monthly Benefit is an amount equal to:

CLASS A: 67% of Covered Monthly Earnings, payable in accordance with the section entitled Benefit Amount.

CLASS B: 60% of Covered Monthly Earnings, payable in accordance with the section entitled Benefit Amount.

MINIMUM MONTHLY BENEFIT:  In no event will the Monthly Benefit payable to an Insured be less than $100.00

MAXIMUM MONTHLY BENEFIT:

CLASS A: $15,000.00 (this is equal to a maximum Covered Monthly Earnings of $22,388.00); however, Monthly Benefits in excess of $10,500.00 are subject to our approval of a person's proof of health.

CLASS B: $10,000.00 (this is equal to a maximum Covered Monthly Earnings of $16,667.00).

**RSL00005**

MAXIMUM DURATION OF BENEFITS:  Benefits will not accrue beyond the longer of: the Duration of Benefits; or Normal Retirement Age; specified below:

| Age at Disablement | Duration of Benefits (in years) |
|---|---|
| 61 or less | To Age 65 |
| 62 | 3-1/2 |
| 63 | 3 |
| 64 | 2-1/2 |
| 65 | 2 |
| 66 | 1-3/4 |
| 67 | 1-1/2 |
| 68 | 1-1/4 |
| 69 or more | 1 |

OR

Normal Retirement Age as defined by the 1983 Amendments to the United States Social Security Act and determined by the Insured's year of birth, as follows:

| Year of Birth | Normal Retirement Age |
|---|---|
| 1937 or before | 65 years |
| 1938 | 65 years and 2 months |
| 1939 | 65 years and 4 months |
| 1940 | 65 years and 6 months |
| 1941 | 65 years and 8 months |
| 1942 | 65 years and 10 months |
| 1943 thru 1954 | 66 years |
| 1955 | 66 years and 2 months |
| 1956 | 66 years and 4 months |
| 1957 | 66 years and 6 months |
| 1958 | 66 years and 8 months |
| 1959 | 66 years and 10 months |
| 1960 and after | 67 years |

CHANGES IN MONTHLY BENEFIT:  Increases in the Monthly Benefit are effective on the date of the change, provided the Insured is Actively at Work on the effective date of the change. If the Insured is not Actively at Work on that date, the effective date of the change will be deferred until the date the Insured returns to Active Work.

Decreases in the Monthly Benefit are effective on the date the change occurs.

CONTRIBUTIONS:  Insured: 0%

**RSL00006**

## DEFINITIONS

"Actively at Work" and "Active Work" mean actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an Injury or Sickness.

"Claimant" means an Insured who makes a claim for benefits under this Policy for a loss covered by this Policy as a result of an Injury to or a Sickness of the Insured.

"Covered Monthly Earnings" means the Insured's monthly salary received from you on the day just before the date of Total Disability. Covered Monthly Earnings do not include commissions, overtime pay, bonuses or any other special compensation not received as Covered Monthly Earnings

If hourly paid employees are insured, the number of hours worked during a regular work week, not to exceed forty (40) hours per week, times 4.333, will be used to determine Covered Monthly Earnings. If an employee is paid on an annual basis, then the Covered Monthly Earnings will be determined by dividing the basic annual salary by 12.

"Eligible Person" means a person who meets the Eligibility Requirements of this Policy.

"Elimination Period" means a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable. It begins on the first day of Total Disability.

Interruption Period: If, during the Elimination Period, an Insured returns to Active Work for less than 30 days, then the same or related Total Disability will be treated as continuous. Days that the Insured is Actively at Work during this interruption period will not count towards the Elimination Period. This interruption of the Elimination Period will not apply to an Insured who becomes eligible under any other group long term disability insurance plan.

"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.

"Hospital" or "Institution" means a facility licensed to provide care and treatment for the condition causing the Insured's Total Disability.

"Injury" means bodily injury resulting directly from an accident, independent of all other causes. The Injury must cause Total Disability which begins while insurance coverage is in effect for the Insured.

"Insured" means a person who meets the Eligibility Requirements of this Policy and is enrolled for this insurance.

"Physician" means a duly licensed practitioner who is recognized by the law of the state in which treatment is received as qualified to treat the type of Injury or Sickness for which claim is made. The Physician may not be the Insured or a member of his/her immediate family.

"Pre-existing Condition" means any Sickness or Injury for which the Insured received medical treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines, during the 3 months immediately prior to the Insured's effective date of insurance.

"Premium" means the amount of money needed to keep this Policy in force.

"Rehabilitative Employment" means work in any gainful occupation for which the Insured's training, education or experience will reasonably allow. The work must be supervised by a Physician or a licensed rehabilitation specialist approved by us. Rehabilitative Employment includes work performed while Partially Disabled, but does not include performing all the material duties of his/her regular occupation on a Full-time basis.

"Retirement Benefits" mean money which the Insured is entitled to receive upon early or normal retirement or disability retirement under:

(1) any plan of a state, county or municipal retirement system, if such pension benefits include any credit for employment with you;

(2) Retirement Benefits under the United States Social Security Act of 1935, as amended, or under any similar plan or act; or

(3) an employer's retirement plan where payments are made in a lump sum or periodically and do not represent contributions made by an Insured.

**RSL00007**

Retirement Benefits do not include:

    (1)   a federal government employee pension benefit;
    (2)   a thrift plan;
    (3)   a deferred compensation plan;
    (4)   an individual retirement account (IRA);
    (5)   a tax sheltered annuity (TSA);
    (6)   a stock ownership plan; or
    (7)   a profit sharing plan.

"Sickness" means illness or disease causing Total Disability which begins while insurance coverage is in effect for the Insured. Sickness includes pregnancy, childbirth, miscarriage or abortion, or any complications therefrom.

"Totally Disabled" and "Total Disability" mean, with respect to Class A, that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her regular occupation;

    (1)   "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and

    (2)   "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability.

"Totally Disabled" and "Total Disability" mean, with respect to Class B, that as a result of an Injury or Sickness:

    (1)   during the Elimination Period and for the first 60 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;

        (a)   "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;

        (b)   "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and

    (2)   after a Monthly Benefit has been paid for 60 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

If an Insured is employed by you and requires a license for such occupation, the loss of such license for any reason does not in and of itself constitute "Total Disability".

However, if an Insured is employed by you as a licensed pilot or as a crew member, "Total Disability" means that, due to an Injury or Sickness, he/she cannot perform the material duties of any gainful occupation for which his/her education, training or experience will reasonably allow. The loss of a pilot's authorization to fly for any reason does not in and of itself constitute "Total Disability".

**RSL00008**

## GENERAL PROVISIONS

**ENTIRE CONTRACT:** The entire contract between you and us is this Policy, your Application (a copy of which is attached at issue) and any attached amendments.

**CHANGES:** No agent has authority to change or waive any part of this Policy. To be valid, any change or waiver must be in writing, signed by either our President, a Vice President, or a Secretary. The change or waiver must also be attached to this Policy.

**TIME LIMIT ON CERTAIN DEFENSES:** After this Policy has been in force for two (2) years from its Effective Date, no statement made by you shall be used to void this Policy; and no statement by any Insured on a written application for insurance shall be used to reduce or deny a claim after the Insured's insurance coverage, with respect to which claim has been made, has been in effect for two (2) years.

**RECORDS MAINTAINED:** You must maintain records of all Insureds. Such records must show the essential data of the insurance, including new persons, terminations, changes, etc. This information must be reported to us regularly. We reserve the right to examine the insurance records maintained at the place where they are kept. This review will only take place during normal business hours.

**CLERICAL ERROR:** Clerical errors in connection with this Policy or delays in keeping records for this Policy, whether by you, us, or the Plan Administrator:

(1) will not terminate insurance that would otherwise have been effective; and
(2) will not continue insurance that would otherwise have ceased or should not have been in effect.

If appropriate, a fair adjustment of premium will be made to correct a clerical error.

**MISSTATEMENT OF AGE:** If an Insured's age is misstated, the Premium will be adjusted. If the Insured's benefit is affected by the misstated age, it will also be adjusted. The benefit will be changed to the amount the Insured is entitled to at his/her correct age.

**NOT IN LIEU OF WORKER'S COMPENSATION:** This Policy is not a Worker's Compensation Policy. It does not provide Worker's Compensation benefits.

**CONFORMITY WITH STATE LAWS:** Any section of this Policy, which on its Effective Date, conflicts with the laws of the state in which this Policy is issued, is amended by this provision. This Policy is amended to meet the minimum requirements of those laws.

**CERTIFICATE OF INSURANCE:** We will send to you an individual certificate for each Insured. The certificate will outline the insurance coverage, state this Policy's provisions that affect the Insured, and explain to whom benefits are payable.

**TERMINATION OF THIS POLICY:** You may cancel this Policy at any time by giving us written notice. This Policy will be cancelled on the date we receive your notice or, if later, the date requested in your notice.

This Policy will terminate at the end of the Grace Period if Premium has not been paid by that date.

We may cancel this Policy within thirty-one (31) days of written notice prior to the date of cancellation, only:
(1) if the number of Insureds is less than the Minimum Participation Number shown on the Schedule of Benefits; or
(2) if the percentage of Eligible Persons insured is less than the Minimum Participation Percentage shown on the Schedule of Benefits.

You will still owe us any Premium that is not paid up to the date this Policy is cancelled. We will return, pro-rata, any part of the Premium paid beyond the date this Policy is cancelled.

Termination of this Policy will not affect any claim which was covered prior to termination, subject to the terms and conditions of this Policy.

**RSL00009**

## CLAIMS PROVISIONS

**NOTICE OF CLAIM:** Written notice must be given to us within thirty-one (31) days after a Total Disability covered by this Policy occurs, or as soon as reasonably possible. The notice should be sent to us at our Administrative Office or to our authorized agent. The notice should include your name, the Policy Number and the Insured's name.

**CLAIM FORMS:** When we receive the notice of claim, we will send the Claimant the claim forms to file with us. We will send them within fifteen (15) days after we receive notice. If we do not, then proof of Total Disability will be met by giving us a written statement of the type and extent of the Total Disability. The statement must be sent within ninety (90) days after the loss began.

**WRITTEN PROOF OF TOTAL DISABILITY:** For any Total Disability covered by this Policy, written proof must be sent to us within ninety (90) days after the Total Disability occurs. If written proof is not given in that time, the claim will not be invalidated nor reduced if it is shown that written proof was given as soon as was reasonably possible. In any event, proof must be given within one (1) year after the Total Disability occurs, unless the Claimant is legally incapable of doing so.

**PAYMENT OF CLAIMS:** When we receive written proof of Total Disability covered by this Policy, we will pay any benefits due. Benefits that provide for periodic payment will be paid for each period as we become liable.

We will pay benefits to the Insured, if living, or else to his/her estate.

If the Insured has died and we have not paid all benefits due, we may pay up to $1,000.00 to any relative by blood or marriage, or to the executor or administrator of the Insured's estate. The payment will only be made to persons entitled to it. An expense incurred as a result of the Insured's last illness, death or burial will entitle a person to this payment. The payments will cease when a valid claim is made for the benefit. We will not be liable for any payment we have made in good faith.

Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties.

**ARBITRATION OF CLAIMS:** Any claim or dispute arising from or relating to our determination regarding the Insured's Total Disability may be settled by arbitration when agreed to by the Insured and us in accordance with the Rules for Health and Accident Claims of the American Arbitration Association or by any other method agreeable to the Insured and us. In the case of a claim under an Employee Retirement Income Security Act (hereinafter referred to as ERISA) Plan, the Insured's ERISA claim appeal remedies, if applicable, must be exhausted before the claim may be submitted to arbitration. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction over such awards.

Unless otherwise agreed to by the Insured and us, any such award will be binding on the Insured and us for a period of twelve (12) months after it is rendered assuming that the award is not based on fraudulent information and the Insured continues to be Totally Disabled. At the end of such twelve (12) month period, the issue of Total Disability may again be submitted to arbitration in accordance with this provision.

Any costs of said arbitration proceedings levied by the American Arbitration Association or the organization or person(s) conducting the proceedings will be paid by us.

**PHYSICAL EXAMINATION AND AUTOPSY:** We will, at our expense, have the right to have a Claimant interviewed and/or examined:
(1)  physically;
(2)  psychologically; and/or
(3)  psychiatrically;

to determine the existence of any Total Disability which is the basis for a claim. This right may be used as often as it is reasonably required while a claim is pending.

We can have an autopsy made unless prohibited by law.

LRS-6564-77-0394                    4.0

**RSL00010**

**LEGAL ACTIONS:** No legal action may be brought against us to recover on this Policy within sixty (60) days after written proof of loss has been given as required by this Policy. No action may be brought after three (3) years (Kansas, five (5) years; South Carolina, six (6) years) from the time written proof of loss is received.

**RSL00011**

## INDIVIDUAL ELIGIBILITY, EFFECTIVE DATE AND TERMINATION

**GENERAL GROUP:** The general group will be your employees and employees of any subsidiaries, divisions or affiliates named on the Schedule of Benefits page.

**ELIGIBILITY REQUIREMENTS:** A person is eligible for insurance under this Policy if he/she:
  (1)  is a member of an Eligible Class, as shown on the Schedule of Benefits page; and
  (2)  has completed the Waiting Period, as shown on the Schedule of Benefits page.

**WAITING PERIOD:** A person who is continuously employed on a Full-time basis with you for the period specified on the Schedule of Benefits page has satisfied the Waiting Period. The Waiting Period for Present Employees applies to persons who are members of the Eligible Classes on this Policy's Effective Date. The Waiting Period for Future Employees applies to persons who become members of the Eligible Classes after this Policy's Effective Date.

**EFFECTIVE DATE OF INDIVIDUAL INSURANCE:** If you pay the entire Premium due for an Eligible Person, the insurance for such Eligible Person will go into effect on the Individual Effective Date, as shown on the Schedule of Benefits page.

If an Eligible Person pays a part of the Premium, he/she must apply in writing for the insurance to go into effect. He/she will become insured on the latest of:
  (1)  the Individual Effective Date as shown on the Schedule of Benefits page, if he/she applies on or before that date;
  (2)  on the date he/she applies, if he/she applies within thirty-one (31) days from the date he/she first met the Eligibility Requirements; or
  (3)  on the date we approve any required proof of health acceptable to us. We require this proof if a person applies:
      (a)  after thirty-one (31) days from the date he/she first met the Eligibility Requirements; or
      (b)  after he/she terminated this insurance but remained in an Eligible Class as shown on the Schedule of Benefits page.

The insurance for an Eligible Person will not go into effect on a date he/she is not Actively at Work because of a Sickness or Injury. The insurance will go into effect after the person is Actively at Work for one (1) full day in an Eligible Class, as shown on the Schedule of Benefits page.

**TERMINATION OF INDIVIDUAL INSURANCE:** The insurance of an Insured will terminate on the first of the following to occur:
  (1)  the first of the Policy month coinciding with or next following the date this Policy terminates;
  (2)  the first of the Policy month coinciding with or next following the date the Insured ceases to meet the Eligibility Requirements;
  (3)  the end of the period for which Premium has been paid for the Insured; or
  (4)  the first of the Policy month coinciding with or next following the date the Insured enters military service (not including Reserve or National Guard).

**INDIVIDUAL REINSTATEMENT:** The insurance of a terminated person may be reinstated if he/she returns to Active Work with you within the period of time as shown on the Schedule of Benefits page. He/she must also be a member of an Eligible Class, as shown on the Schedule of Benefits page, and have been:
  (1)  on a leave of absence approved by you; or
  (2)  on temporary lay-off.

The person will not be required to fulfill the Eligibility Requirements of this Policy again. The insurance will go into effect after he/she returns to Active Work for one (1) full day. If a person returns after having resigned or having been discharged, he/she will be required to fulfill the Eligibility Requirements of this Policy again. If a person returns after terminating insurance at his/her request or for failure to pay Premium when due, proof of health acceptable to us must be submitted before he/she may be reinstated.

LRS-6564-7-0391                                    5.0

**RSL00012**

## PREMIUMS

**PREMIUM PAYMENT:** All Premiums are to be paid by you to us, or to an authorized agent, on or before the due date. The Premium Due Dates are stated on this Policy's face page.

**PREMIUM RATE:** The Premium due will be the rate per $100.00 of the entire amount of Covered Monthly Earnings then in force. We will furnish to you the Premium Rate on this Policy's Effective Date and when it is changed. We have the right to change the Premium Rate:

(1)   when the extent of coverage is changed by amendment;

(2)   on any Premium Due Date after the third Policy Anniversary; or

(3)   on any Premium Due Date on or after the first Policy Anniversary if your entire group's Covered Monthly Earnings changes by 25% or more from such group's Covered Monthly Earnings on this Policy's Effective Date.

We will not change the Premium Rate due to (2) or (3) above more than once in any twelve (12) month period. We will tell you in writing at least 31 days before the date of a change due to (2) or (3) above.

**GRACE PERIOD:** You may pay the Premium up to 31 days after the date it is due. This Policy stays in force during this time. If the Premium is not paid during the grace period, this Policy will terminate. You will still owe us the Premium up to the date this Policy terminates.

**WAIVER OF PREMIUM:** No Premium is due us for an Insured while he/she is receiving Monthly Benefits from us. Once Monthly Benefits cease due to the end of his/her Total Disability, Premium payments must begin again if insurance is to continue.

RSL00013

## BENEFIT PROVISIONS

**INSURING CLAUSE:** We will pay a Monthly Benefit if an Insured:
- (1)  is Totally Disabled as the result of a Sickness or Injury covered by this Policy;
- (2)  is under the regular care of a Physician;
- (3)  has completed the Elimination Period; and
- (4)  submits satisfactory proof of Total Disability to us.

**BENEFIT AMOUNT:**  To figure the benefit amount payable:
- (1)  multiply an Insured's Covered Monthly Earnings by the benefit percentage(s), as shown on the Schedule of Benefits page;
- (2)  take the lesser of the amount:
  - (a)  of step (1) above; or
  - (b)  the Maximum Monthly Benefit, as shown on the Schedule of Benefits page; and
- (3)  subtract Other Income Benefits, as shown below, from step (2) above.

We will pay at least the Minimum Monthly Benefit, if any, as shown on the Schedule of Benefits page.

**OTHER INCOME BENEFITS:** Other Income Benefits are benefits resulting from the same Total Disability for which a Monthly Benefit is payable under this Policy, other than Retirement Benefits. These Other Income Benefits are:
- (1)  disability income benefits an Insured is eligible to receive under any group insurance plan(s);
- (2)  disability income benefits an Insured is eligible to receive under any governmental retirement systems, except benefits payable under a federal government employee pension benefit;
- (3)  all permanent as well as temporary disability benefits, including any damages or settlement made in place of such benefits (whether or not liability is admitted) an Insured is eligible to receive under:
  - (a)  Worker's Compensation Laws;
  - (b)  occupational disease law;
  - (c)  any other laws of like intent as (a) or (b) above; and
  - (d)  any compulsory benefit law;
- (4)  with respect to Class A, any of the following that the Insured is entitled to receive:
  - (a)  wages or other compensation excluding the amount allowable under the Rehabilitation Provision; and
  - (b)  commissions or monies, including vested renewal commissions, but, excluding commissions or monies that the Insured earned prior to Total Disability which are paid after Total Disability has begun;
- (5)  with respect to Class B, any of the following that the Insured is entitled to receive:
  - (a)  wages, excluding the amount allowable under the Rehabilitation Provision; and
  - (b)  commissions or monies, including vested renewal commissions, but, excluding commissions or monies that the Insured earned prior to Total Disability which are paid after Total Disability has begun;
- (6)  that part of disability or Retirement Benefits paid for by you that an Insured is eligible to receive under a group retirement plan; and
- (7)  disability or Retirement Benefits under the United States Social Security Act, the Canadian pension plans, federal or provincial plans, or any similar law which:
  - (a)  an Insured is eligible to receive because of his/her Total Disability or eligibility for Retirement Benefits; and
  - (b)  an Insured's dependents are eligible to receive due to (a) above.

Disability and early Retirement Benefits will be offset only if such benefits are elected by the Insured or do not reduce the amount of his/her accrued normal Retirement Benefits then funded.

Retirement Benefits under number 7 above will not apply to disabilities which begin after age 70 for those Insureds already receiving Social Security Retirement Benefits while continuing to work beyond age 70.

Benefits above will be estimated if the benefits:
- (1)  have not been applied for; or
- (2)  have not been awarded; and
- (3)  have been denied and the denial is being appealed.

The Monthly Benefit will be reduced by the estimated amount. If benefits have been estimated, the Monthly Benefit will be adjusted when we receive proof:

LRS-6564-9-0994                                7.0

**RSL00014**

(1)   of the amount awarded; or
(2)   that benefits have been denied and the denial cannot be further appealed.

If we have underpaid the Monthly Benefit for any reason, we will make a lump sum payment. If we have overpaid the Monthly Benefit for any reason, the overpayment must be repaid to us. At our option, we may reduce the Monthly Benefit or ask for a lump sum refund. If we reduce the Monthly Benefit, the Minimum Monthly Benefit, if any, as shown on the Schedule of Benefits page, would not apply.

For each day of a period of Total Disability less than a full month, the amount payable will be 1/30th of the Monthly Benefit.

**COST OF LIVING FREEZE:** After the initial deduction for any Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost of living increases payable under these Other Income Benefits.

**LUMP SUM PAYMENTS:** If Other Income Benefits are paid in a lump sum, the sum will be broken down to a monthly amount for the period of time the sum is payable. If no period of time is given, the sum will be broken down to a monthly amount for the period of time we expect the Insured to be disabled based on actuarial tables of disabled lives.

**TERMINATION OF MONTHLY BENEFIT:** The Monthly Benefit will stop on the earliest of:
(1)   the date the Insured ceases to be Totally Disabled;
(2)   the date the Insured dies;
(3)   the Maximum Duration of Benefits, as shown on the Schedule of Benefits page, has ended;
(4)   the date the Insured fails to furnish the required proof of Total Disability; or
(5)   the date the Insured refuses to accept or to continue Rehabilitative Employment when such employment has been properly approved.

**RECURRENT DISABILITY:** If, after a period of Total Disability for which benefits are payable, an Insured returns to Active Work for at least six (6) consecutive months, any recurrent Total Disability for the same or related cause will be part of a new period of Total Disability. A new Elimination Period must be completed before any further Monthly Benefits are payable.

If an Insured returns to Active Work for less than six (6) months, a recurrent Total Disability for the same or related cause will be part of the same Total Disability. A new Elimination Period is not required. Our liability for the entire period will be subject to the terms of this Policy for the original period of Total Disability.

This Recurrent Disability section will not apply to an Insured who becomes eligible for insurance coverage under any other group long term disability insurance plan.

## EXCLUSIONS

We will not pay a Monthly Benefit for any Total Disability caused by:

    (1)   an act of war, declared or undeclared;

    (2)   an intentionally self-inflicted Injury;

    (3)   the Insured committing a felony; or

    (4)   an Injury or Sickness that occurs while the Insured is confined in any penal or correctional institution.

RSL00016

# LIMITATIONS

**MENTAL OR NERVOUS DISORDERS:** Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period. The Monthly Benefit will be payable while so confined, but not beyond the Maximum Duration of Benefits.

If an Insured was confined in a Hospital or Institution and:
  (1)  Total Disability continues beyond discharge;
  (2)  the confinement was during a period of Total Disability; and
  (3)  the period of confinement was for at least fourteen (14) consecutive days;
then upon discharge, Monthly Benefits will be payable for the greater of:
  (1)  the unused portion of the twenty-four (24) month period; or
  (2)  ninety (90) days;
but in no event beyond the Maximum Duration of Benefits, as shown on the Schedule of Benefits page.

Mental or Nervous Disorders are defined to include disorders which are diagnosed to include a condition such as:
  (1)  bipolar disorder (manic depressive syndrome);
  (2)  schizophrenia;
  (3)  delusional (paranoid) disorders;
  (4)  psychotic disorders;
  (5)  depressive disorders;
  (6)  anxiety disorders;
  (7)  somatoform disorders (psychosomatic illness);
  (8)  eating disorders; or
  (9)  mental illness.

**SUBSTANCE ABUSE:** Monthly Benefits for Total Disability due to alcoholism or drug addiction will be payable while the Insured is a participant in a Substance Abuse Rehabilitation Program. The Monthly Benefit will not be payable beyond twenty-four (24) months.

If, during a period of Total Disability due to Substance Abuse for which a Monthly Benefit is payable, an Insured is able to perform Rehabilitative Employment, the Monthly Benefit, less 50% of any of the money received from this Rehabilitative Employment will be paid until: (1) the Insured is performing all the material duties of his/her regular occupation on a full-time basis; or (2) the end of twenty-four (24) consecutive months from the date that the Elimination Period is satisfied, whichever is earlier. All terms and conditions of the Rehabilitation Benefit will apply to Rehabilitative Employment due to Substance Abuse.

"Substance Abuse" means the pattern of pathological use of a Substance which is characterized by:
  (1)  impairments in social and/or occupational functioning;
  (2)  debilitating physical condition;
  (3)  inability to abstain from or reduce consumption of the Substance; or
  (4)  the need for daily Substance use for adequate functioning.

"Substance" means alcohol and those drugs included on the Department of Health, Retardation and Hospitals' Substance Abuse list of addictive drugs, except tobacco and caffeine are excluded.

A Substance Abuse Rehabilitative Program means a program supervised by a Physician or a licensed rehabilitation specialist approved by us.

**PRE-EXISTING CONDITIONS:** Applicable To Employees Hired On Or After January 1, 1996: Benefits will not be paid for a Total Disability:
  (1)  caused by;
  (2)  contributed to by; or
  (3)  resulting from;
a Pre-existing Condition unless the Insured has been Actively at Work for one (1) full day following the end of 12 consecutive months from the date he/she became an Insured.

LRS-6564-11-0994                                9.0

RSL00017

## CONTINUITY OF INSURANCE COVERAGE PROVISION

Continuity of insurance coverage will be allowed for an Eligible Person who would not be entitled to full coverage under this Policy upon changing carriers due to:

(1)   failure to be Actively at Work on the Effective Date of this Policy due to an Injury or Sickness; or
(2)   a Pre-existing Conditions Limitation.

This provision will apply only to an Eligible Person who was insured under:

(1)   the prior carrier's policy on its termination date; or
(2)   any policy of a later acquired employer unit which changed insurance carriers.

**EFFECT OF FAILURE TO BE ACTIVELY AT WORK:** This provision allows insurance to be granted under this Policy to an Eligible Person who was Totally Disabled on or after the Effective Date of this Policy.

The insurance will be that provided under the prior carrier's policy. This insurance is subject to Premium Payment. The insurance we will pay is the benefit the prior carrier would have paid under their policy reduced by any amount for which the prior carrier is liable.

Insurance provided under this provision will end upon the earliest of:

(1)   the date the insurance would end according to the Termination of Individual Insurance provision of this Policy;
(2)   the date an Eligible Person returns to Active Work and becomes insured under this Policy; or
(3)   the end of any period of extension or accrued liability under the prior carrier's policy.

**EFFECT OF A PRE-EXISTING CONDITIONS LIMITATION:** The following will apply to an Eligible Person who is Actively at Work and insured under this Policy when a Pre-existing Condition is involved:

(1)   if the Insured has satisfied this Policy's Pre-existing Conditions Limitation, then he/she will be paid according to this Policy;
(2)   if the Insured cannot satisfy this Policy's Pre-existing Conditions Limitation, we will then apply the prior carrier's Pre-existing Conditions Limitation. If the Insured satisfied the prior carrier's Pre-existing Conditions Limitation, giving consideration towards continuous time insured under both policies, then he/she will be paid according to the prior carrier's policy; or
(3)   if the Insured cannot satisfy the Pre-existing Conditions Limitation of:
    (a)   this Policy; and
    (b)   that of the prior carrier;
then no benefit will be paid.

When the Insured has satisfied the Pre-existing Conditions Limitation under this Policy, even if during a period of Recurrent Disability, then the Monthly Benefit will be paid according to this Policy.

**RSL00018**

## SPECIFIC INDEMNITY BENEFIT

If the Insured suffers any one of the Losses listed below from an accident resulting in an injury, we will pay a guaranteed minimum number of Monthly Benefit payments, as shown below. However:

    (1)   the Loss must occur within one hundred and eighty (180) days; and
    (2)   the Insured must live past the Elimination Period.

| For Loss of: | Number of Monthly Benefit Payments: |
|---|---|
| Both Hands | 46 months |
| Both Feet | 46 months |
| Entire Sight in Both Eyes | 46 months |
| Hearing in Both Ears | 46 months |
| Speech | 46 months |
| One Hand and One Foot | 46 months |
| One Hand and Entire Sight in One Eye | 46 months |
| One Foot and Entire Sight in One Eye | 46 months |
| One Arm | 35 months |
| One Leg | 35 months |
| One Hand | 23 months |
| One Foot | 23 months |
| Entire Sight in One Eye | 15 months |
| Hearing in One Ear | 15 months |

"Loss(es)" with respect to:

    (1)   hand or foot, means the complete severance through or above the wrist or ankle joint;
    (2)   arm or leg, means the complete severance through or above the elbow or knee joint; or
    (3)   sight, speech or hearing, means total and irrecoverable Loss thereof.

If more than one (1) Loss results from any one accident, payment will be made for the Loss for which the greatest number of Monthly Benefit payments is provided.

The amount payable is the Monthly Benefit, as shown on the Schedule of Benefits page, with no reduction from Other Income Benefits. The number of Monthly Benefit payments will not cease if the Insured returns to Active Work.

If death occurs after we begin paying Monthly Benefits, but before the Specific Indemnity Benefit has been paid according to the above schedule, the balance remaining at time of death will be paid to the Insured's estate, unless a beneficiary is on record with us under this Policy.

Benefits may be payable longer than shown above as long as the Insured is still Totally Disabled, subject to the Maximum Duration of Benefits, as shown on the Schedule of Benefits page.

**RSL00019**

## WORK INCENTIVE AND CHILD CARE BENEFITS

**WORK INCENTIVE BENEFIT**

During the first twelve (12) months of Total Disability for which a Monthly Benefit is payable, we will not offset earnings from Rehabilitative Employment until the sum of:

    (1)   the Monthly Benefit prior to offsets with Other Income Benefits; and

    (2)   earnings from Rehabilitative Employment;

exceed 100% of the Insured's Covered Monthly Earnings. If the sum above exceeds 100% of Covered Monthly Earnings, our Benefit Amount will be reduced by such excess amount until the sum of (1) and (2) above equals 100%.

**CHILD CARE BENEFIT**

We will allow a Child Care Benefit to an Insured if:

    (1)   the Insured is receiving benefits under the Work Incentive Benefit;

    (2)   the Insured's Child(ren) is (are) under 14 years of age;

    (3)   the child care is provided by a non-relative; and

    (4)   the charges for child care are documented by a receipt from the caregiver, including social security number or taxpayer identification number.

During the 12 month period in which the Insured is eligible for the Work Incentive Benefit, an amount equal to actual expenses incurred for child care, up to a maximum of $250.00 per month, will be added to the Insured's Covered Monthly Earnings when calculating the Benefit Amount under the Work Incentive Benefit.

Child(ren) means: the Insured's unmarried child(ren), including any foster child, adopted child or step child who resides in the Insured's home and is financially dependent on the Insured for support and maintenance.

**RSL00020**

## LIVING BENEFIT

We will pay a lump sum Living Benefit to an Insured if such Insured:

    (1)    meets all of the requirements of Total Disability of this Policy;
    (2)    is Certified as Terminally Ill; and
    (3)    makes a Written Request for this benefit.

We may, at our option, confirm the Terminal Illness diagnosis with a second medical exam performed at our own expense.

The Living Benefit:

    (1)    will be an amount equal to 12 months of the Insured's Monthly Benefit after offsets with Other Income Benefits;
    (2)    is payable one time only for any one Insured under this Policy;
    (3)    is payable to an Insured only while he/she is living; and
    (4)    is payable in addition to the Monthly Benefit otherwise payable under this Policy for the Insured for his/her Total Disability.

"Certified" or "Certification" refers to a written statement, made by a Physician on a form provided by us, as to the Insured's Terminal Illness.

"Terminally Ill" or "Terminal Illness" means an Insured's illness or physical condition that is Certified by a Physician to reasonably be expected to result in death in less than 12 months.

"Written Request" means a request made, in writing, by the Insured to us.

LRS-6564-64-0292                         13.0                     **RSL00021**

## REHABILITATION BENEFIT

"Rehabilitative Employment" means work in any gainful occupation for which the Insured's training, education or experience will reasonably allow. The work must be supervised by a Physician or a licensed rehabilitation specialist approved by us. Rehabilitative Employment includes work performed while Partially Disabled, but does not include performing all the material duties of his/her regular occupation on a full-time basis.

If an Insured is receiving a Monthly Benefit because he/she is considered Totally Disabled under the terms of this Policy and is able to perform Rehabilitative Employment, we will continue to pay the Monthly Benefit less an amount equal to 50% of earnings received through such Rehabilitative Employment.

If an Insured is able to perform Rehabilitative Employment when Totally Disabled due to Substance Abuse, we will continue to pay the Monthly Benefit less an amount equal to 50% of earnings received through such Rehabilitative Employment. This Monthly Benefit is payable for a maximum of twenty-four (24) consecutive months from the date the Elimination Period is satisfied.

An Insured will be considered able to perform Rehabilitative Employment if a Physician or licensed rehabilitation specialist approved by us determines that he/she can perform such employment. If an Insured refuses such Rehabilitative Employment, benefits under this Policy will terminate. If an Insured has been performing Rehabilitative Employment, and refuses to continue such employment, even though a Physician or licensed rehabilitation specialist approved by us has determined that he/she is able to perform Rehabilitative Employment, benefits under this Policy will terminate.

RSL00022

RELIANCE STANDARD LIFE INSURANCE COMPANY

BOA - DOCUWISE

EXCEPTIONAL CONDITIONAL REPORT

PAGE  1

04/16/96

POLICY NUMBER: LTD-098842
POLICYHOLDER: Tarmac America, Inc.
SUBMITTING OFFICE: ORLANDO

- SPECIAL CONTRACT PROVISIONS EXIST FOR THIS POLICY

- ADMINISTRATION PROVISIONS EXIST FOR THIS POLICY

RSL00023

RLS015-0426                          BENEFITS FACE SHEET                          APR-06-1998

```
                INSURED DATA                              DEPENDENT DATA

NAME  RADICAN,JAMES,E                           NAME  _____

      RT. 145 BOX C                                   _____
      _____                    _____
      _____                    _____
      PRESTON HOLLOW          NY  12469-              _____  __  ____-____
TEL   (518)239-4036                             TEL   _____

EXAMINER JAMES5      COMPANY 001                 DEP. CODE __
BIRTHDATE 04/17/1926  SEX M  SS# 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    BIRTHDATE __/__/____  SEX _  SS# ___-__-____  REL _
HIRE DATE 06/25/1965  SAL CODE M  SALARY    $4,824.08
MEMO                                             MEMO
60%, 10K, $100. LESS FFSS, STATE, WC, GRP DIS, PENSION, EE 100%  _____
WAGES. NC, 2 YR HIS OCC, 2 YRS MIL, 50% RH, SWP NONE, 3/12 PREX, _____
YNLNG, YFRZ, NCOLA, NSB, MI, 2 YR A/D, 12 MONTHS HK INCT, Y CHIL _____
CARE, Y COC,YES PARTIAL, YES RESIDUAL EP, CLASS 2, F/T 37.5       _____
ER 0% CTB                                                        _____

CLAIM INFORMATION
CLAIM #  1997-346-010   DATE RECVD 12/12/1997   LOSS DATE 01/01/1997   ST FL   CAUSE AE   DIAGN E870   OCCUP 009
COVERAGE  LTD   LOB CODE 725   TAXABLE %   0.00   RG RESERVE _____   ADJ RES/NET BEN _____
MEMO
67 Y/O CEMENT SALES REP.
DX: SEVERE BACK PAIN
TO DO: VERIFY AND CORRECT MONTHLY SAL
RCD 12/12/1997 SMN 12/12/1997
PTD 8/97 NOC

COVERAGE INFORMATION
PLCY/CERT# 313247215    GROUP # LSC0098842-       EFF DATE 01/01/1996   STATUS A   CLASS __   EMPL CONTR % _____
PLAN CODE 34500   ELIM DAYS 0270 DURATION    18 M  BENEFIT      $3,232.13   REINSURANCE      $22.65


AGENT INFORMATION                               GROUP INFORMATION
ADAMS GROUP INSURANC                            TARAMAC AMERICA, INC.
ADAMS GROUP INSURANCE                           ATTN:  PAUL PISHKO
ATTN: EVELYN INLOW                              1151 AZALEA GARDEN RD.
PO BOX 25666                                    _____
SARASOTA              FL  34277-2666            NORFOLK              VA  28502-
(800)942-0320                                   (804)858-6521

SECOND AGENT                                    GROUP HEADQUARTERS
,                                               _____
_____                    _____
_____                    _____
_____                    _____
_____  __  ____-____             _____  __  ____-____
                                                _____
```

RSL00024

RLS015-0426                          BENEFITS FACE SHEET                          DEC-12-1997

```
              INSURED DATA                                DEPENDENT DATA

NAME  RADICAN,JAMES,G                     NAME  _____

      RT. 145 BOX C                             _____
      _____             _____
                                                _____
      PRESTON HOLLOW         NY  12469-          _____
TEL   (518)239-4036                       TEL   _____

EXAMINER JEFFRY    COMPANY 001            DEP. CODE __
BIRTHDATE 04/17/1926  SEX M  SS# 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   BIRTHDATE __/__/____  SEX _  SS# ___-__-____  REL _
HIRE DATE 06/25/1965  SAL CODE M  SALARY    $4,824.08
MEMO                                      MEMO
66 2/3%, $9000, $100. LESS FFSS, STATE, WC, GRP DIS, PENSION,   _____
WAGES. NC, 2 YR HIS OCC, 2 YRS MIL, 50% RH, SWP NONE, 3/12 PREX,  _____
YRLNG, YFRZ, NCOLA, NSB, MI, 2 YR A/O.                            _____
                                                                 _____
                                                                 _____
                                                                 _____
```

```
CLAIM INFORMATION
CLAIM #   1997-346-010   DATE RECVD 12/12/1997   LOSS DATE 12/31/1996  ST FL   CAUSE AE   DIAGN E870   OCCUP 009
COVERAGE  LTD   LOB CODE 725   TAXABLE %   0.00   RG RESERVE _____   ADJ RES/NET BEN _____
MEMO
```

```
RCD 12/12/1997 SMM 12/12/1997
PTD 8/97 NOC
```

```
COVERAGE INFORMATION
PLCY/CERT# 313247215    GROUP # LSC0098842-    EFF DATE 01/01/1996   STATUS A   CLASS __   EMPL CONTR % _____
PLAN CODE 34500   CLIM DAYS 0270 DURATION   18  M  BENEFIT     $3,232.13     REINSURANCE_____
```

```
AGENT INFORMATION                         GROUP INFORMATION
ADAMS GROUP INSURANC                      TARAMAC AMERICA, INC.
ADAMS GROUP INSURANCE                     ATTN: PAUL PISHKO
ATTN: EVELYN INLOW                        1151 AZALEA GARDEN RD.
PO BOX 25666                              _____
SARASOTA              FL  34277-2666      NORFOLK               VA  28502-
(800)942-0320                             (804)858-6521

SECOND AGENT                              GROUP HEADQUARTERS
,                                         _____
_____             _____
_____             _____
_____             _____
_____  __ ___-____ _____  __ ___-____
_____             _____
```

RSL00025

# CLAIM MANAGEMENT PLAN

**Claimant Name:** _____     **Claim #:** _____

**Date of Loss:** _____     **Any Occ Date:** _____

**Claim Synopsis:** _____

_____

_____

_____

_____

MRI and office notes are not current. MRI is dated [illegible]

Dr. Porth recent office note is dated 4/16/96.

**Primary Plan Direction:** _____

_____

_____

**RSL00026**

**Examiner Name:** _____     **Date:** _____

CMP(10/97)

## CLAIM FACE SHEET

| Claim Number | Date of Disability | Policy Number | Effective Date | Comments |
|---|---|---|---|---|
| 1497.5 | 1/1/97 | LSC | | |

| Claim Received | State | Sex | Diagnosis | Cause | Date of Hire |
|---|---|---|---|---|---|
| Set-Up | FL | M | | | |

| Phone Number | Date of Birth | Age | Occupation | Certificate# |
|---|---|---|---|---|
| (954) 421-1841 | | 63 | | |

**Name & Address**
James Rudd

Coconut Creek, FL 33073

**Policyholder**

**Ind. Eff. Date**

**Definition of TD**
Standard

___% of Salary to Max of $10K   Min $___
Less SS, State, WC, Grp Dis, Pension, Wages
NC or ___% of CTB, 5 yr his occ, yes M&N
SO % Rehab, SWP= , 3/12 Pre-ex yes NLNG
yes Imm Freeze, COLA, Surv. Ben
Work Incentive, yes A/D, yes Child C.
___ COC, yes Partial Dis, yes Residual EP
___ % All Source, Back Door, Class 2
F/T 31.5 Hrs, ER ___% CTB

**Elimination Period** 270
9/28/97

**His Occ Over**

**Termination**

| Cause & Nature of Disability | | Salary or Hourly ___ x ___ x ___ Other |
|---|---|---|
| | MO Sal $ | ESSD $ FL State |
| **Pre-existing Period** | MO Ben $2,874.45 | PSSD $ |
| **Prognosis** | Max $ | DSSD $ |
| | 60 % $2,574.45 WC $ | |
| **Pay To:** | Monthly Ben. | STD $ |
| | $ 1,562.45 | Pen $ |
| **Mail To:** | | Wages $ |

ESSD Begins _____

FICA Ends

| From | To | Code | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | Total | | |

**Information To Follow-Up**

COD
NR
HR
JD
OD
OE
SS
RA
BC
EC
Other

**RSL00027**

 **Reliance Standard Life Insurance Company®**

**ELIMINATION PERIOD**_____     **ELIGIBILITY**_____

| REQUIREMENT | HAVE | NEED | WAIVED | PLAN & FOLLOW-UP |
|---|---|---|---|---|
| Applicable | | | | |
| Worker's Comp. | | | | |
| PSS | | | | |
| FSS | | | | |
| Salary | | | | |
| Short Term | | | | |
| State | | | | |
| Other | | | | |
| RS 1143 | | | | |
| RS 1109 | | | | |
| RS 1241 | | | | |
| Job Description | | | | |
| Enrollment Card | | | | |
| Activity Check | | | | |
| IME | | | | |
| Narratives | | | | |
| Hospital Records | | | | |
| Late Submission | | | | |
| Attendance Records | | | | |
| Pre-existing? | | | | |
| Competency? | | | | |
| No loss - No gain | | | | |
| Reinsurance | | | | |
| ASO procedures | | | | |
| COD from LDW | | | | |

ADDITIONAL RECOMMENDED ACTION _____

_____

_____

_____

                                                    Initials_____  Date_____

APPROVAL COMMENTS _____

_____

_____

_____

                                                    Initials_____  Date_____

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

RSL00028

**RSL** Reliance Standard Life
Insurance Company

## Payment Calculation Worksheet

Claimant:                                           Pre-disability earnings:

Claim Number:                                       % of Benefit:
                                                    (Gross Monthly Benefit)

Benefit Period:    To:
                                                    70% of Benefit:
                   From:                            (For 70% Backdoor and
                                                    70% All Source Calculations)

_____

### OFFSETS:

Awarded Social Security (182): $          Dependent Social Security: $

Estimated Social Security (092): $        Pension or Retirement: $

Salary Continuance (089): $               State Disability (084): $

Workers' Compensation (083): $

### CALCULATIONS:

**1) Full Family Direct:**                          **2) 70% Backdoor:**

$              Gross Monthly Benefit          $              Gross Monthly Benefit

-$             Offset                         +$             Offset

-$             Offet                          +$             Offset
_____                      _____

=$             Net Monthly Benefit           =$             Subtotal

                                             -$             70% of Salary
                                             _____

**3) 70% Allsource:**                               =$             Excess Offset

$              Gross Monthly Benefit          NMB =          GMB

+$             Offset                          -             Primary Social Security

+$             Offset                          -             Excess
_____                      _____

               Subtotal                       $             NMB

-$             70%
_____

=$             Excess

NMB =          GMB

 -             Excess

_____

               NMB

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

RSL00029

# Reliance Standard Life Insurance Company

Home Office: Chicago, Illinois  •  Administrative Office: Philadelphia, Pennsylvania

---

**POLICYHOLDER:** Tarmac America, Inc.

**POLICY NUMBER:** LSC 096842

**EFFECTIVE DATE:** January 1, 1996

**ANNIVERSARY DATES:** January 1, 1997 and each January 1 thereafter

**PREMIUM DUE DATES:** The first Premium is due on the Effective Date. Further Premiums are due monthly, in advance, on the first day of each month.

This Policy is delivered in Virginia and is governed by its laws.

Reliance Standard Life Insurance Company is referred to as "we", "our" or "us" in this Policy.

The Policyholder and any subsidiaries, divisions or affiliates are referred to as "you", "your" or "yours" in this Policy.

We agree to provide insurance to you in exchange for the payment of Premium and a signed Application. This Policy provides income replacement benefits for Total Disability from Sickness or Injury. It insures those Eligible Persons for the Monthly Benefit shown on the Schedule of Benefits. The insurance is subject to the terms and conditions of this Policy.

The Effective Date of this Policy is shown above. This Policy stays in effect as long as Premium is paid when due. The "TERMINATION OF THIS POLICY" section of the GENERAL PROVISIONS explains when the insurance terminates.

This Policy is signed by our President and Secretary.

SECRETARY

PRESIDENT

Countersigned _____
Licensed Resident Agent

### GROUP LONG TERM DISABILITY INSURANCE
### NON-PARTICIPATING

**RSL00030**

LRS-6564 Ed 2 93

Retirement Benefits do not include:

    (1)   a federal government employee pension benefit;

    (2)   a thrift plan;

    (3)   a deferred compensation plan;

    (4)   an individual retirement account (IRA);

    (5)   a tax sheltered annuity (TSA);

    (6)   a stock ownership plan; or

    (7)   a profit sharing plan.

"Sickness" means illness or disease causing Total Disability which begins while insurance coverage is in effect for the Insured. Sickness includes pregnancy, childbirth, miscarriage or abortion, or any complications therefrom.

"Totally Disabled" and "Total Disability" mean, with respect to Class A, that as a result of an Injury or Sickness, during the Elimination Period and thereafter an Insured cannot perform the material duties of his/her regular occupation:

    (1)   "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and

    (2)   "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability.

"Totally Disabled" and "Total Disability" mean, with respect to Class B, that as a result of an Injury or Sickness:

    (1)   during the Elimination Period and for the first 60 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;

        (a)   "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;

        (b)   "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and

    (2)   after a Monthly Benefit has been paid for 60 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

If an Insured is employed by you and requires a license for such occupation, the loss of such license for any reason does not in and of itself constitute "Total Disability".

However, if an Insured is employed by you as a licensed pilot or as a crew member, "Total Disability" means that, due to an Injury or Sickness, he/she cannot perform the material duties of any gainful occupation for which his/her education, training or experience will reasonably allow. The loss of a pilot's authorization to fly for any reason does not in and of itself constitute "Total Disability".

## DEFINITIONS

"Actively at Work" and "Active Work" mean actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an Injury or Sickness.

"Claimant" means an Insured who makes a claim for benefits under this Policy for a loss covered by this Policy as a result of an Injury to or a Sickness of the Insured.

"Covered Monthly Earnings" means the Insured's monthly salary received from you on the day just before the date of Total Disability. Covered Monthly Earnings do not include commissions, overtime pay, bonuses or any other special compensation not received as Covered Monthly Earnings.

If hourly paid employees are insured, the number of hours worked during a regular work week, not to exceed forty (40) hours per week, times 4.333, will be used to determine Covered Monthly Earnings. If an employee is paid on an annual basis, then the Covered Monthly Earnings will be determined by dividing the basic annual salary by 12.

"Eligible Person" means a person who meets the Eligibility Requirements of this Policy.

"Elimination Period" means a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable. It begins on the first day of Total Disability.

Interruption Period: If, during the Elimination Period, an Insured returns to Active Work for less than 30 days, then the same or related Total Disability will be treated as continuous. Days that the Insured is Actively at Work during this interruption period will not count towards the Elimination Period. This interruption of the Elimination Period will not apply to an Insured who becomes eligible under any other group long term disability insurance plan.

"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.

"Hospital" or "Institution" means a facility licensed to provide care and treatment for the condition causing the Insured's Total Disability.

"Injury" means bodily injury resulting directly from an accident, independent of all other causes. The Injury must cause Total Disability which begins while insurance coverage is in effect for the Insured.

"Insured" means a person who meets the Eligibility Requirements of this Policy and is enrolled for this insurance.

"Physician" means a duly licensed practitioner who is recognized by the law of the state in which treatment is received as qualified to treat the type of Injury or Sickness for which claim is made. The Physician may not be the Insured or a member of his/her immediate family.

"Pre-existing Condition" means any Sickness or Injury for which the Insured received medical treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines, during the 3 months immediately prior to the Insured's effective date of insurance.

"Premium" means the amount of money needed to keep this Policy in force.

"Rehabilitative Employment" means work in any gainful occupation for which the Insured's training, education or experience will reasonably allow. The work must be supervised by a Physician or a licensed rehabilitation specialist approved by us. Rehabilitative Employment includes work performed while Partially Disabled, but does not include performing all the material duties of his/her regular occupation on a Full-time basis.

"Retirement Benefits" mean money which the Insured is entitled to receive upon early or normal retirement or disability retirement under:

  (1)  any plan of a state, county or municipal retirement system, if such pension benefits include any credit for employment with you;
  (2)  Retirement Benefits under the United States Social Security Act of 1935, as amended, or under any similar plan or act; or
  (3)  an employer's retirement plan where payments are made in a lump sum or periodically and do not represent contributions made by an Insured.

RSL00032

MAXIMUM DURATION OF BENEFITS: Benefits will not accrue beyond the longer of: the Duration of Benefits; or Normal Retirement Age; specified below:

| Age at Disablement | Duration of Benefits (in years) |
| --- | --- |
| 61 or less | To Age 65 |
| 62 | 3-1/2 |
| 63 | 3 |
| 64 | 2-1/2 |
| 65 | 2 |
| 66 | 1-3/4 |
| 67 | 1-1/2 |
| 68 | 1-1/4 |
| 69 or more | 1 |

OR

Normal Retirement Age as defined by the 1983 Amendments to the United States Social Security Act and determined by the Insured's year of birth, as follows:

| Year of Birth | Normal Retirement Age |
| --- | --- |
| 1937 or before | 65 years |
| 1938 | 65 years and 2 months |
| 1939 | 65 years and 4 months |
| 1940 | 65 years and 6 months |
| 1941 | 65 years and 8 months |
| 1942 | 65 years and 10 months |
| 1943 thru 1954 | 66 years |
| 1955 | 66 years and 2 months |
| 1956 | 66 years and 4 months |
| 1957 | 66 years and 6 months |
| 1958 | 66 years and 8 months |
| 1959 | 66 years and 10 months |
| 1960 and after | 67 years |

CHANGES IN MONTHLY BENEFIT: Increases in the Monthly Benefit are effective on the date of the change, provided the Insured is Actively at Work on the effective date of the change. If the Insured is not Actively at Work on that date, the effective date of the change will be deferred until the date the Insured returns to Active Work.

Decreases in the Monthly Benefit are effective on the date the change occurs.

CONTRIBUTIONS: Insured: 0%

RSL00033

## SCHEDULE OF BENEFITS

NAME OF SUBSIDIARIES, DIVISIONS OR AFFILIATES TO BE COVERED: None

ELIGIBLE CLASSES:  Each active, Full-time employee except any person employed on a temporary or seasonal basis, according to the following classifications:

CLASS A: employee earning $59,000.00 or more per year   who:

    (1)    is engaged in a non-hazardous occupation; and

    (2)    functions primarily in an office environment.

CLASS B: salaried employee earning more than $30,000.00 per year but less  than $59,000.00

WAITING PERIOD:  Present Employees: none
Future Employees: 90 days

INDIVIDUAL EFFECTIVE DATE:  The first of the Policy month coinciding with or next following completion of the Waiting Period, if applicable.

INDIVIDUAL REINSTATEMENT: 6 months

MINIMUM PARTICIPATION REQUIREMENTS: Percentage: 100% Number of Insureds: 10

<u>LONG TERM DISABILITY BENEFIT</u>

ELIMINATION PERIOD: 270 consecutive days of Total Disability.

MONTHLY BENEFIT:  The Monthly Benefit is an amount equal to:

CLASS A: 67% of Covered Monthly Earnings, payable in accordance with the section entitled Benefit Amount.

CLASS B: 60% of Covered Monthly Earnings, payable in accordance with the section entitled Benefit Amount.

MINIMUM MONTHLY BENEFIT:  In no event will the Monthly Benefit payable to an insured be less than $100.00

MAXIMUM MONTHLY BENEFIT:

CLASS A: $15,000.00 (this is equal to a maximum Covered Monthly Earnings of $22,388.00); however, Monthly Benefits in excess of $10,500.00 are subject to our approval of a person's proof of health.

CLASS B: $10,000.00 (this is equal to a maximum Covered Monthly Earnings of $16,667.00).

**RSL00034**

 **Reliance Standard Life Insurance Company®**

Claim Number: _____

Policy Number: _LSC 098842_

## AUTHORIZATION

To Whom It May Concern:

I, _____ JAMES E. RADICAN _____ , hereby authorize any hospital, physician, medical practitioner, clinic, other medical or medically-related facility, pharmacy, insurance company or Government Agency (including the Social Security Administration and the Internal Revenue Service) or any past or present employer to disclose or furnish to Reliance Standard Life Insurance Company or its representatives, any and all information with respect to any illness including mental illness, drug/alcohol abuse, injury, medical history, consultations, prescriptions, treatments or benefits, or other documents and copies of all applicable records that may be requested.  I also authorize any employer to disclose all information needed to process my claim.

The information provided to Reliance Standard Life Insurance Company or its representatives is to be used solely for the administration of claim(s).  A photostatic copy of this authorization is to be considered as valid as the original and is effective for the duration of the claim.

_____November 3, 1997_____          _~James E. Radi~_

Date                                              Signature

NOTE:  A true copy of this authorization is available to the employee at any time upon request.

**RSL00035**

 **Reliance Standard Life Insurance Company®**

Claim Number: _____

Policy Number: _LSC 098842_

## AUTHORIZATION

To Whom It May Concern:

I, _____ JAMES E. RADICAN _____ , hereby authorize any hospital, physician, medical practitioner, clinic, other medical or medically-related facility, pharmacy, insurance company or Government Agency (including the Social Security Administration and the Internal Revenue Service) or any past or present employer to disclose or furnish to Reliance Standard Life Insurance Company or its representatives, any and all information with respect to any illness including mental illness, drug/alcohol abuse, injury, medical history, consultations, prescriptions, treatments or benefits, or other documents and copies of all applicable records that may be requested. I also authorize any employer to disclose all information needed to process my claim.

The information provided to Reliance Standard Life Insurance Company or its representatives is to be used solely for the administration of claim(s). A photostatic copy of this authorization is to be considered as valid as the original and is effective for the duration of the claim.

_November 3, 1997_
Date

_James E. Rail_
Signature

NOTE: A true copy of this authorization is available to the employee at any time upon request.

**RSL00036**

 **Reliance Standard Life Insurance Company®**

Claim Number: _____

Policy Number: _LSC 098842_

## AUTHORIZATION

To Whom It May Concern:

I, _____ JAMES E. RADICAN _____ , hereby authorize any hospital, physician, medical practitioner, clinic, other medical or medically-related facility, pharmacy, insurance company or Government Agency (including the Social Security Administration and the Internal Revenue Service) or any past or present employer to disclose or furnish to Reliance Standard Life Insurance Company or its representatives, any and all information with respect to any illness including mental illness, drug/alcohol abuse, injury, medical history, consultations, prescriptions, treatments or benefits, or other documents and copies of all applicable records that may be requested. I also authorize any employer to disclose all information needed to process my claim.

The information provided to Reliance Standard Life Insurance Company or its representatives is to be used solely for the administration of claim(s). A photostatic copy of this authorization is to be considered as valid as the original and is effective for the duration of the claim.

_____November 3, 1997_____                    _~James E. Rad~_

Date                                           Signature

NOTE: A true copy of this authorization is available to the employee at any time upon request.

RSL00037

**RSL** Reliance Standard
Insurance Company

2001 Market Street, Suite 1500,Philadelphia, Pennsylvania 19103
(267) 256-3500 (800-351-7500)

July 23, 2001

Lawrence D. Bache, Esq.,
9000 West Sheridan Street - Suite 174
Pembroke Pines, FL 33024

Re :              James E. Radican v. Reliance Standard Life Insurance Company
Our Claim # :     1997-346-010
Our Policy # :    LSC 98842

Dear Mr. Bache:

We are writing to you regarding the appeal of our decision to deny your client's claim for Long
Term Disability ("LTD") benefits. Please be advised that Reliance Standard Life Insurance
Company ("RSL") strives to treat all claimants fairly and evaluate claims submitted to us in an
objective and equitable manner.

As you are certainly aware, RSL refused your client's claim for benefits in April of 1998 after it
was determined that he was not eligible for coverage be cause he was never an active, full-time
employee of Tarmac America, Inc. ("Tarmac") after the Policy effective date of January 1, 1996.
Your client was advised of his right to appeal that decision in accordance with the Employee
Retirement Income Security Act ("ERISA") of 1974, and he took advantage of that right when
Ms. McVey Ostendorf appealed the decision on his behalf via letter dated June 5, 1998. On
August 3, 1998, RSL's Quality Review Unit ("QRU") wrote to Ms. McVey Ostendorf and
explained that we had concluded our previous decision to deny benefits was appropriate.
Specifically, RSL's QRU determined that Mr. Radican had failed to provide adequate proof of
his claimed full-time work status beyond January 1, 1996. On January 26, 1999, your office
submitted a letter to RSL requesting a second appeal of the decision to refuse Mr. Radican's
claim for benefits. Despite the fact that the company was under no obligation to do so, RSL again
considered Mr. Radican's claim that he worked greater than the required 40 hours per week after
January 1, 1996. On November 1, 1999, we wrote to you and advised that the additional
information provided by your office would not allow us to reverse our prior decisions to refuse
benefits. Specifically, we advised that RSL concluded that the additional information provided by
your office failed to demonstrate that Mr. Radican was an active, full-time employee at any point
after January 1, 1996.

Following our second affirmation of your client's claim denial, your office commenced suit
against RSL on your client's behalf. RSL's QRU has been asked to review the decision again in
light of additional information from your office.

1

**RSL00038**

The additional information supplied by your office for this review consists of affidavits from the following persons: Hope E. Fischer, Benefits Administrator for Tarmac; Marcel Aragon a person who claims to have worked with Mr. Radican at Tarmac, position unspecified; James E. Radican, the plaintiff; and Dr. Manuel Porth, Mr. Radican's physician. We have reviewed this additional information and considered it in light of the information contained within the entire claim file. Unfortunately, this information does not allow us to reverse our prior decisions to refuse benefits.

We believe that our prior letters have provided adequate, detailed explanations as to why the information contained in Mr. Radican's claim file did not adequately prove that he had ever worked the required forty (40) hours per week after January 1, 1996. For this reason, we will not review all of that information in this letter again, but would suggest that you revisit those letters for additional information. Instead, we will address each of the recently provided affidavits below and explain why we believe they fail to provide proof of your client's status as an active full-time employee of Tarmac after January 1, 1996.

<u>Affidavit of Ms. Hope Fischer</u>

Ms. Fischer's affidavit fails to provide proof of Mr. Radican's full-time employment for a number of reasons. First, her affidavit notes that RSL "relied upon" a statement in a letter from her dated January 28, 1998 to refuse Mr. Radican's claim. We would point out that Ms. Fischer's statement in the January 28, 1999 letter was but one of many pieces of evidence relied upon in making our decision. This statement alone did not provide the basis for our decision. Rather when viewed in light of all of the other information contained in the claim file, it supported RSL's decision to refuse benefits.

Second, Ms. Fischer states that the fact that no documentation existed in their files to substantiate the dates/hours worked by Mr. Radican, should not lead to the conclusion that he worked less than forty (40) hours per week. Again we would point out that RSL did not rely solely upon Ms. Fischer's statement nor upon the fact that no documentation of Mr. Radican's hours existed. Rather we relied upon these items along with many other pieces of evidence contained within the claim file to conclude that Mr. Radican failed to provide proof that he ever worked on a full-time basis after January 1, 1996.

Third, under #3 of the affidavit Ms. Fischer states that the information provided in her letter of January 28, 1998, was *not* based upon personal knowledge but rather she was simply paraphrasing what she had read in documentation from Dr. Porth. Yet under #5 of the affidavit she now swears that she has personal knowledge that RSL's determination that Mr. Radican worked less than forty (40) hours was wrong. Under #6 of the affidavit she swears that she now has personal knowledge that Mr. Radican worked at least the requisite forty (40) hours per week during numerous weeks in 1996. She provides no basis to explain how she lacked personal knowledge of his work hours when asked during the initial claim investigation, but has since

2

**RSL00039**

gained such knowledge. She also still is apparently unable to provide any documentation to support the claim that Mr. Radican worked the requisite forty (40) hours per week for numerous weeks during 1996 (we must assume that if such documentation existed you would have provided it to RSL).

Fourth, Ms. Fischer's affidavit notes that she read your letter of January 26, 1999 and Ms. McVey Ostendorf's letter of June 5, 1998 and that she concurs with counsels' position in those letters. Query whether she was provided with copies of any of RSL's letters regarding Mr. Radican's claim and whether that would have impacted her position regarding Mr. Radican's work hours. As noted above, it is unclear how she obtained any personal knowledge of Mr. Radican's actual hours worked during calendar year 1996. If her personal knowledge came solely from the information suggested by yourself and Ms. McVey Ostendorf, we cannot reasonably accept this as proof of Mr. Radican's working forty (40) hours per week during calendar year 1996 for the numerous reasons stated in our prior correspondence.

Affidavit of Marcel Aragon

Ms. Aragon's affidavit states that she worked with James Radican during calendar year 1996 and had personal knowledge that he worked for over forty (40) hours per week for at least forty (40) weeks during that year. Ms. Aragon does not explain in what capacity she worked with Mr. Radican nor does she explain the basis for her claim that he worked over forty (40) hours for at least forty (40) weeks during that year. As stated in our letter dated November 1, 1999, we previously received similar affidavits from Mr. Radican's co-workers in support of his claim that he was an active , full-time employee during calender year 1996.[1] As previously advised, it was our understanding that Mr. Radican's position as a sales representative required that he be on the road much of the time making sales calls. We have never been advised that Ms. Aragon or any other employee of Tarmac accompanied Mr. Radican on these sales calls nor does she so advise in her affidavit. As such, it is difficult for us to understand how Ms. Aragon had personal knowledge of Mr. Radican's work hours. This is especially puzzling in light of the fact that his own employer did not keep track of the number of hours he worked on a regular basis.

Affidavit of James E. Radican

Mr. Radican's most recent affidavit cannot be accepted as proof of his alleged forty (40) hour work week for all but twelve (12) weeks during calendar year 1996 for a number of reasons. First, the affidavit does not provide any documentation to support Mr. Radican's claim that he worked the required forty (40) hours per week during calendar year 1996.

---

[1]We find it interesting to note that all of the affidavits which were previously submitted to RSL for review (including that of Mr. Radican himself) stated that those persons had personal knowledge that Mr. Radican had worked at least 37.5 hours per week during calendar year 1996. After you discovered that the Policy required Mr. Radican to be at work at least forty (40) hours per week during calendar year 1996 in order to have coverage (not 37.5 hours as you previously believed), we have now received affidavits from persons (including Mr. Radican himself) claiming to have personal knowledge that he worked forty (40) hours per week during that year.

**RSL00040**

Second, the affidavit is obviously produced by a fully interested party in the matter at hand and as such is arguably tainted by self-interest. For example, in a prior affidavit Mr. Radican advised that he had worked the required 37.5 hours per week, but after he was informed that the Policy actually required him to work forty (40) hours per week, his new affidavit states that he had worked the requisite forty (40) hour work week throughout most of 1996. Mr. Radican again asks RSL to accept his claim that information obtained from numerous sources (including his employer, his physician and himself) was either inaccurate or misinterpreted by RSL. Mr. Radican attempts to explain away each of a number of communications between various parties involved in this case in an effort to prove that he is entitled to a valuable benefit. For example, he again explains that comments made to one of RSL's claim examiners were misinterpreted, and that discussions between himself and his physician regarding his ability to work were all false as he was working full-time all along. While all of Mr. Radican's explanations may be possible, it seems more plausible that RSL's interpretation of the available evidence was more accurate. All of the information which Mr. Radican tries to refute is information which was provided/produced prior to his understanding that his claim for benefits might be affected by his part-time work status. After his claim was denied due to his part-time work status, he has attempted to explain why numerous seemingly clear communications were in fact not clear, and why we should accept his self reported full-time work status despite no documentation to support his claim of working forty (40) hours per week for the bulk of 1996. We must conclude that the information which was provided and produced contemporaneously with the initial claim investigation is more reliable than information provided years later in an effort to get benefits reinstated.

Mr. Radican's affidavit also suggests that he was not advised of problems with his claim file until our final decision on appeal and that he could have cleared up any errors had he been advised of the problems sooner. We must respectfully disagree with his assertions. First, our original denial letter explained that information in the claim file suggested he did not work on a full-time basis and that his claim was being denied for that reason. The denial letter also advised him of his right to review all of the pertinent documents in his claim file and he did not choose to take advantage of that right. He was also represented by two different attorneys and was provided two opportunities to appeal the negative claim determination and provide any additional information to perfect his claim. Again, during neither of these appeal processes did he or his attorneys ask to review our claim file. We would suggest that the above series of events suggests that Mr. Radican had numerous opportunities to address perceived errors in his claim file, but chose not to take advantage of those opportunities. We would also suggest that Mr. Radican has had the assistance of counsel and a number of years to clear up any misinformation contained in his claim file, but has still been unable to do so.

Finally, Mr. Radican's affidavit suggests that RSL should have contacted two local human resource persons in Florida rather than contacting Tarmac's home office for information regarding his work history. Please be advised that RSL was never presented with these persons names until Mr. Radican's recent affidavit. All of the information previously received from Tarmac was obtained through their Virginia offices. In fact, on the Employer's Portion of the initial claim application we were advised that Mr. Radican worked in Florida but that information should be obtained care of the Virginia address. We should also point out that Mr.

RSL00041

Radican was certainly aware that our reasons for refusing his claim were due to his failure to provide proof that he had worked the requisite forty (40) hour work week after January 1, 1996. If he believed that the two persons from Tarmac's Florida Human Resources Department could have provided information in support of his claim, he had ample opportunity to provide such information to RSL. He never did so during the investigation of his claim nor during the two appeal processes. He has even failed to provide such information to date.

<u>Affidavit of Manuel Porth, M.D.</u>

Dr. Manuel Porth's affidavit also fails to provide any proof that Mr. Radican worked over forty (40) hours per week at any time during calendar year 1996. Dr. Porth's affidavit states that he had no personal knowledge as to whether or not Mr. Radican was following his advice and not working. While Dr. Porth may not have had personal knowledge of Mr. Radican's work schedule, it is clear that when one reviews his records that the issue was a topic of discussion between the doctor and his patient. For instance, on March 22, 1996 Dr. Porth's office notes state:

> It is now 6 months following his laminectomy, and the quality of life has not significantly improved. He is still unable to return to his job and is aware of his back on a continual basis.

Dr. Porth's comments regarding your quality of life and awareness of your back pain were certainly not issues which he invented, but rather appear to have been based upon subjective comments which you provided to him during your office visit. We find it difficult to believe that the comment regarding your ability to return to your job was based solely upon speculation from your doctor and was not based upon some discussion of the issue (especially given the fact that it is dictated right in the middle of other issues which were clearly discussed by the two of you). As with your client's explanations of other information in the claim file which he believes to be erroneous, however, it is possible that this comment was added solely by Dr. Porth and was not based upon any discussion of Mr. Radican's ability to work between the two gentlemen. When one views all of the medical records, reports and letters produced by Dr. Porth with regards to Mr. Radican's condition and sees the number of times that the issue of work capacity is raised, the more plausible explanation for the references is that it had been a topic of discussion between the doctor and his patient during the course of their visits. This is certainly not to say or suggest that Dr. Porth is being less than truthful in his affidavit. He probably does not have any personal knowledge as to whether or not Mr. Radican actually worked and whether or not he actually worked on a full-time basis.

Dr. Porth wrote "To Whom it May Concern" letters dated January 1, 1996 and September 6, 1996. In each of these letters he comments on the fact that Mr. Radican was not able to work due to his back problems. Query why these letters were drafted if not done so at the request of your client. We find it difficult to believe that Dr. Porth decided to draft "To Whom it May Concern" letters on his own accord and my experience suggests that most physicians do not draft such a letter unless prodded to do so by their patient or by some other source. Obviously, if prodded to write such a letter by your client, the issue of Mr. Radican's ability to work had been discussed by the two gentleman.

RSL00042

In addition to the problems noted above, we again point out that Dr. Porth's affidavit does not provide any evidence to suggest that your client worked at least forty (40) hours per week at any time during calendar year 1996. Rather the affidavit merely states that he does not know if your client followed his medical advice and remained out of work over the course of that year. This certainly does not prove that your client was an active, full-time employee of Tarmac during calendar year 1996.

Summary

The additional affidavits which you recently provided to RSL for review do not allow us to reverse our previous decision to refuse your client's claim for benefits. Your client has not been able to provide RSL with a single tangible piece of documentation which supports his claim that he worked at least forty (40) hours per week for at least forty (40) weeks during calendar year 1996. Rather he has only been able to provide affidavits from a number of persons who claim to have knowledge that he worked forty (40) hours per week during that year. None of these persons has been able to explain how they have such knowledge, nor have they been able to provide any evidence to support their assertions. As a sales person who spent a great deal of his work time alone making sales calls, it is difficult to understand how these persons had personal knowledge of his work hours, especially in light of the fact that the company did not even keep track of his work hours. While your client claims to be able to explain why the numerous references to his part-time work status were inaccurate, the fact that so many such references exist, makes the most plausible explanation that your client in fact worked only part-time during calendar year 1996. His efforts to explain otherwise are not persuasive and are tainted by self interest.

Finally, assuming *arguendo* that your client had actually worked full-time during calendar year 1996, it would be difficult to convince this reviewer that he suddenly became unable to continue to work as of January 1, 1997. As your client was not eligible for benefits because due to his failure to be an active, full-time employee after January 1, 1996, RSL has not reached a determination regarding whether or not your client would have been considered Totally Disabled beyond December 31, 1996. Our review of the information which has been presented to date, however, would suggest that he might not satisfy this Policy requirement. If we were to accept your client's claims that he was able to successfully complete the material duties of his regular occupation on a full-time basis throughout 1996, we would expect that the medical records would document a significant deterioration of that condition on or around December 31, 1996 if he were unable to work beyond that date. The medical records which have been presented to RSL provide no such documentation. There is nothing in the records to suggest that his condition worsened on or around December 31, 1996. If he was able to work until that date, we would suggest he could continue to do so unless his condition worsened. Information in our files suggests that your client planned to cease working on December 31, 1996 because the relationship between himself and his former employer was no longer working in the latter half of 1996. We would suggest that the December 31, 1996 work stoppage sounds more like a conscious decision to retire and sever the relationship with Tarmac, rather than a work stoppage precipitated by medical necessity.

**RSL00043**

We regret that our decision could not have been more favorable to your client, however, we are limited by the provisions of the policy.

Nothing in this letter should be construed as a waiver of any of RSL's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,


Richard D. Walsh
Manager, Quality Review Unit

**RSL00044**

FACSIMILE MESSAGE
FROM
# RAWLE & HENDERSON LLP

DATE: March 8, 2001          FILE #:433881                    ATTY #: 54

FROM: Joshua Bachrach, Esquire                     EXTENSION: 61

NUMBER OF PAGES INCLUDING COVER PAGE: 8

| TO: MR. RICHARD WALSH | COMPANY: Reliance Standard Life Ins. Co. |
|---|---|
| FAX NUMBER: 215-767-4897 | COMPANY NUMBER: 215-787-4100 |
| | 267 256 3500 |

| TO: | COMPANY: |
|---|---|
| FAX NUMBER: | COMPANY NUMBER: |

| TO: | COMPANY: |
|---|---|
| FAX NUMBER: | COMPANY NUMBER: |

| TO: | COMPANY: |
|---|---|
| FAX NUMBER: | COMPANY NUMBER: |

COMMENT:

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (215) 575-4422 AND ASK FOR
THE FAX OPERATOR. AFTER 5:00 P.M., PLEASE CALL (215) 575-4391. R&H
TELECOPIER (215) 563-2583.
*****CONFIDENTIALITY NOTE*****

The documents accompanying this telecopy transmission contain information from the law firm of Rawle
& Henderson which is confidential and/or legally privileged. The information is intended only for the use
of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are
hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the
contents of this telecopied information is strictly prohibited, and that the documents should be returned to
this Firm immediately. In this regard, if you have received this telecopy in error, please notify us by
telephone immediately so that we may arrange for the return of the original documents to us at no cost to
you.

RSL00045

**From:**     Joshua Bachrach <JBachrach@rawle.com>
**To:**       "'richard.walsh@rsli.com'" <richard.walsh@rsli.com>, "'peter.sailor@rsli.com'"
<peter.sailor@rsli.com>
**Date:**     3/8/01 10:11AM
**Subject:**  Radican

     I am sending to you additional affidavits that plaintiff would like
to be considered.  One is from Hope Fischer in which she tries to take back
all that she said about Radican's employment status.

     The new information attempts to support his claim that he worked
full time.  His position has been that he worked full time for 40 weeks,
except when he received PT.  I suggest that you get his PT records and check
the dates of treatment.  If it shows treatment for more than he is claiming.
you have a strong argument.

**RSL00046**

**Joshua Bachrach**

To:         richard.walsh@rsli.com; peter.sailor@rsli.com
Subject:    Radican

I am sending to you additional affidavits that plaintiff would like to be considered. One is from Hope Fischer in which she tries to take back all that she said about Radican's employment status.

The new information attempts to support his claim that he worked full time. His position has been that he worked full time for 40 weeks, except when he received PT. I suggest that you get his PT records and check the dates of treatment. If it shows treatment for more than he is claiming, you have a strong argument.

3/3/01  Spoke w/ Jt Bachar and down to send
draft  letter to attorney to the regarding our right
to further appeal after the

        RON

1

**RSL00047**

The Law Office Of
## Lawrence D. Bache

| | |
|---|---|
| 3000 West Sheridan Street, Suite 174 | Phone: (954) 436-7376 |
| Pembroke Pines, FL 33024 | Fax: (954) 436-2926 |

March 8, 2001

Joshua Bachrach, Esq.                          Via fax (215-563-2583) and mail
Rawle & Henderson
The Widener Bldg, 16ᵗʰ Floor
One South Penn Square
1339 Chestnut Street
Philadelphia, PA 19107

Re:   *Radican v. First Reliance*; Case No. 00-624-CIV-ZLOCH

Dear Mr. Bachrach:

In response to your letter dated January 23, 2001, please supplement the administrative record with the following:

1.   Affidavits of James Radican and Dr. Manuel Porth attached to plaintiff's Motion to Remand to Plan Administrator and Abate Action, date of service July 6, 2000;

2.   Original affidavit of Hope E. Fischer submitted herewith;

3.   Original affidavit of Marcel Aragon submitted herewith.

In the event of a continued denial, I anticipate and expect Reliance will act in accordance with its fiduciarial status and provide Radican with an opportunity to respond in the administrative process if he deems it appropriate to do so.

Sincerely,

Lawrence D. Bache

enc.

Radican\JB Let 02B.wpd

RSL00048

## AFFIDAVIT of HOPE E. FISCHER

STATE OF VIRGINIA    }
                   }
                   }

Before me, the undersigned authority, personally appeared, HOPE E. FISCHER, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1. I was employed by Tarmac America, Inc as Benefits Administrator in 1996, and I worked at their United States corporate headquarters in Norfolk, Virginia. James E. Radican worked in South Florida in 1996, and I did not speak with him or have any dealings with him in that year, and I have never met Mr. Radican.

2. I have personal knowledge that Reliance Standard Life Insurance Company has denied James E. Radican's claim for disability benefits upon a finding that in 1996 James E Radican did not perform the material duties pertaining to his job in the place and manner in which his job was normally performed on a "Full-time" basis, i.e., a minimum of 40 hours during his regular work week. In making its determination, I am also aware that Reliance Standard Life Insurance Company claims to have relied upon the following statement from my letter dated January 28, 1998:

> [o]ur files on Mr. Radican indicate that he had back surgery in October of 1995 and was out of work from that time until sometime after mid-year 1996 at the recommendation of his doctor, Manuel Porth. Sometime during the

RSL00049

latter part of 1996, he reported to work, but we have no documentation in the file to substantiate the dates worked.

3.   My above-quoted statement should not to be construed or interpreted to support a conclusion that Mr. Radican did not work a minimum of 40 hours during his regular work week in 1996, and any reliance in this regard is unwarranted and misguided. My statement that Mr. Radican "was out of work from that time (October, 1995) until sometime after mid-year 1996," was made without personal knowledge, and I was simply paraphrasing what I had read in a written recommendation from Dr. Manuel Porth.

Further, the company did not require or maintain documents to substantiate the dates worked for any salaried employee including James E. Radican in 1996, and it was solely for this reason that I stated "we have no documentation in the file to substantiate the dates worked." The absence of such documentation does not support a conclusion that Mr. Radican or any other salaried employee did not work for Tarmac for 40 hours per week in 1996.

4.   I received a copy of a letter from Reliance Standard Life Insurance Company to James Radican dated April 6, 1998 in which his claim for disability benefits was denied on the basis that he was not eligible because he failed to work a minimum of 40 hours during his regular work week in 1996 and therefore was not a "Full-time" employee. This determination by Reliance Standard Life Insurance Company is wrong.

5.   I received copies of letters from attorney Marika McVey Ostendorf dated June 5, 1998, and from attorney Lawrence D. Bache dated January 26, 1999 sent to Reliance

Page 2 of 3

**RSL00050**

standard Life Insurance Company on behalf of James E. Radican. I concur with the positions stated by counsel in those letters that James E. Radican was a "Full-Time" employee for Tarmac America, Inc. in 1996 due not only to his employment status, but also because he performed the material duties pertaining to his job for more than 40 hours per week during numerous weeks in 1996.

**Further Affiant Sayeth Not**

Hope E. Fischer
HOPE E. FISCHER

Sworn to and subscribed before me on __March 2__, 2001 by

Notary Public

My commission expires: 6/30/02

___ Personally Known

___ Produced identification

Type of identification produced

\\New Files\Radican\ Aff 09 Fischer.wpd

Page 3 of 3

RSL00051

# AFFIDAVIT of MARCEL ARAGON

STATE OF FLORIDA        }
                        }
COUNTY OF DADE _____ }

    Before me, the undersigned authority, personally appeared, MARCEL ARAGON,

who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996

2.    I have personal knowledge that in 1996 JAMES RADICAN performed for Tarmac
     America, Inc., the material duties pertaining to his job in the place and manner in
     which his job was normally performed on a full-time basis, i.e., a minimum of 30
     hours during his regular work week, with the exception of those weeks in which he
     received physical therapy and/or pain treatment. The number of weeks in 1996
     JAMES E. RADICAN was actively at work full-time as defined above totals not less
     than 40 weeks.

**Further Affiant Sayeth Not**

_____
MARCEL ARAGON

     Sworn to and subscribed before me on _____ 2 - 19 _____ 2001 by

Stamp or
Seal:
_____
Notary Public

My commission expires:

✔ Personally Known

_____ Produced identification

_____
Type of identification produced

'New Inter/Radican/AFOX Aragon.wpd

Page 1 of 1

RSL00052

# LAW OFFICE LAWRENCE D. BACHE

9000 West Sheridan St. Suite 174, Pembroke Pines, FL 33024
Phone: 954-436-7376; Fax: 954-436-2926

# FAX COVER SHEET

FAX NUMBER TRANSMITTED TO: 215-563-2583

To:     **Joshua Bachrach, Esq.**
Rawle & Henderson
The Widener Bldg. 16th Floor
One South Penn Square
1339 Chestnut Street
Philadelphia, PA 19107

From:   Lawrence D. Bache

Date:   March 8, 2001

Re:     *Radican v. First Reliance*; Case No. 00-624-CIV-ZLOCH

Number of pages including cover sheet:  6

Original fax:  Will follow via mail

**Message:  Letter with attachments being faxed herewith**

*The information contained in this facsimile message is information protected by attorney-client and/or the attorney work product privilege. It is intended only for the use of the individual named above and the privileges are not waived by virtue of this having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient or the employee or agent responsible to deliver it to the named recipient any use, dissemination, distribution or copying of the communication is strictly prohibited. If you have received this communication in error please immediately notify us by telephone and return the original message to us at the above address via U.S. Postal Service.*

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE TELEPHONE US IMMEDIATELY AT (954) 436-7376 (COLLECT)

RSL00053



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

Case No. 00-624-CIV-ZLOCH-Seltzer

JAMES E. RADICAN          )
                          )
        Plaintiff,        )
                          )
vs.                       )
                          )
RELIANCE STANDARD LIFE    )
INSURANCE COMPANY, a Foreign, )
corporation,              )
                          )
        Defendants.       )
                          )
_____

### AFFIDAVIT OF JAMES E. RADICAN IN
### SUPPORT OF MOTION FOR SUMMARY JUDGMENT

STATE OF FLORIDA          }
                          }
COUNTY OF BROWARD         }

Before me, the undersigned authority, personally appeared, JAMES E. RADICAN, who, after being duly cautioned and sworn, states upon personal belief and knowledge the following:

1.    Throughout 1996, I, JAMES E. RADICAN performed for Tarmac America, Inc., the material duties pertaining to my job in the place and manner in which my job was normally performed on a full-time basis, i.e., a minimum of 40 hours during my regular work week, with the exception of those weeks in which I received physical

1

EXHIBIT "A"

RSL00054

therapy and/or pain treatment. The number of weeks in 1996 I was actively at work full-time as defined above totals not less than 40 weeks.

2.  Throughout 1996 I was employed by Tarmac America, Inc. as a full-time worker.

3.  Throughout 1996 I was paid by Tarmac America, Inc. as full-time worker.

4.  Throughout 1996 I was paid by Tarmac America, Inc. in the same way as other full-time employees of the company.

5.  Throughout 1996 I was insured as a full-time employee of Tarmac America, Inc.

6.  Throughout 1996 I enjoyed all benefits and perquisites of other full-time employees of Tarmac America, Inc.

7.  Throughout 1996 I paid premiums for my coverage as a full-time employee of Tarmac America, Inc.

8.  Reliance Standard Life Insurance Company ("RELIANCE") accepted payment of my premiums in an amount due for full-time employees throughout 1996 and RELIANCE retained those premiums.

9.  RELIANCE employee Richard D. Walsh stated in his August 3, 1998 denial letter:

> . . . In fact, on at least two separate occasions your client (Mr. Radican) informed us via the telephone that he worked part time throughout 1996.

I provided Mr. Walsh with my sworn affidavit dated January 25, 1999 in which I stated:

> This is an inaccurate statement. Perhaps I was misunderstood. What I attempted to convey was the truth, i.e., the only time in 1996 in which I did not work

2

RSL00055

full-time was during those weeks when I was receiving
medical treatment as referred to above.

10.    In his final denial letter dated November 1, 1999 Richard D. Walsh stated:

> ... during two telephone conversations with one of our
> representatives Mr. Radican advised that he had worked
> part-time for approximately one year prior to being told
> that Tarmac could no longer accommodate his part-time
> schedule after December 31, 1996.

I never stated by phone or otherwise to any RELIANCE employee or anyone else that

I only worked part time in 1996 and I informed RELIANCE of this    I informed

RELIANCE that perhaps I as misunderstood.  What I attempted to convey to the

RELIANCE employee with whom I spoke was the truth, i.e., that I worked part time

in 1996 but only for those weeks (less than 12) when I received physical therapy

and/or pain treatment.

11.    It was not until the final denial of benefits and close of the administrative record that

RELIANCE informed me that in making its determination to deny benefits it was

relying upon:

   A     Statements made by me in my application for benefits.

   B.    Statements made by Hope B. Fisher in her letter dated January 28,

         1998.

   C.    Statements taken from the medical records of Dr. Porth.

Had I been provided an opportunity to respond to this evidence I would have

demonstrated that this evidence was not reliable as follows:

3

**RSL00056**

A.   Statements made by me in my application for benefits.

I did not state in my application that I worked only part-time throughout 1996.

My reference to working part-time was in response to my working on December 31,

1996.

B.   Statements by Hope B. Fisher in her letter dated January 28, 1998.

Ms. Fisher worked out of Norfolk, Virginia and I worked in South Florida. I

did not speak or have any dealing with Hope B. Fisher in 1996. The Tarmac human

resource/employee benefit persons who worked out of South Florida and with whom

I dealt and who were familiar with my employment status were Joan Black and Myra

Perez. Had RELIANCE contacted either, they would have discovered the truth, i.e.,

that I worked the requisite hours of a "Full-time" employee for all weeks in 1996

except for those few weeks when I received physical therapy or pain treatment.

C.   Statements taken from the medical records of Dr. Manuel Porth.

Notwithstanding having back pain and associated problems throughout 1996

and having been advised by Dr. Manuel Porth that I should refrain from working for

the first six months in 1996 I did not follow his advice and  the only weeks I did not

work a minimum of 40 hours per week in 1996 were those weeks in which I received

physical therapy and/or pain treatment and which total not more than 12 weeks.

Further Affiant Sayeth Not

JAMES E. RADICAN

4

RSL00057

Sworn to and subscribed before me on April 17, 2000.

Stamp or
Seal:



JIMMY M. BULLARD
MY COMMISSION # CC 646032
EXPIRES: June 21, 2003
Bonded Thru Notary Public Underwriters

_____
Notary Public

My commission expires:

_____ Personally Known

__X__ Produced identification          FL DL
                                  _____
                                  Type of identification produced

\AP\04 Redican.wpd

RSL00058

FROM : SEACOAST MUSIC          PHONE NO. : 5614831461          Jun. 13 2000 03:28PM P01
Jun-22-00 02:14P Lawrence D. Bacho          9544362926          P.02

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

Case No. 00-624-CIV-ZLOCH-Seltzer

JAMES E. RADICAN          )
                          )
     Plaintiff,           )
                          )
vs.                       )
                          )
RELIANCE STANDARD LIFE    )
INSURANCE COMPANY, a Foreign, )
corporation,              )
                          )
     Defendants.          )
_____   )

## AFFIDAVIT OF MANUEL PORTH, M.D.

STATE OF FLORIDA          )
                          )
COUNTY OF _____   )

Before me, the undersigned authority, personally appeared MANUEL PORTH, M.D.,

who, after being duly cautioned and sworn, states upon personal belief and knowledge the

following:

I MANUEL PORTH, M.D., being duly sworn, make oath and say as follows:

1.     That I am a medical practitioner licensed to practice medicine in the state of Florida

and I have offices in Broward County, Florida.

1

RSL00059

EXHIBIT "B"

FROM : SEACOAST MUSIC     PHONE NO. : 5614931461     Jun. 23 2000 03:29PM P02
JUN-22-00 02:14P Lawrence D. Bacha                9644362926        P.03

2.  That I compiled and maintained medical records in connection with treatment of James Radican and that I provided excerpts of those records and letters with respect thereto to Reliance Standard Life Insurance Company at their request.

3.  That I stated therein that during certain periods of 1996 I advised James Radican not to work and I also stated that he was unable to return to his job

4.  That I naturally assumed Mr. Radican was following my advice that he should not work. I had no personal knowledge when I prepared the referenced reports and letters as to whether Mr. Radican had been following advice and/or was in fact not working.

**Further Affiant Sayeth Not**



MANUEL BORTH, M.D.

Sworn to and subscribed before me on June 28, 2000.

Stamp or
Seal:

KATHY D. ELLIS
MY COMMISSION # CC 654398
EXPIRES: September 26, 2001
Bonded Thru Notary Public Underwriters

Kathy Ellis CC654398
Notary Public
Kathy D Ellis

My commission expires:

___ Personally Known

___ Produced identification

N/A
Type of identification produced

\AFF 07 Borth.wpd

2

**RSL00060**

JUL 07 2000 11:52 AM                              ** TOTAL PAGE.03 **

**To:**     Lawrence D. Bache, Esq.,            FACSIMILE
**Fax #:**  (954)436-2926
**Re:**     James E. Radican
**Date:**   November 2, 1999
**Pages:**  14, including this cover sheet.

# COPIES TO FOLLOW VIA U.S. MAIL

From the desk of...

**Richard D. Walsh**
Manager, Quality Review Unit
Reliance Standard Life Insurance Company
2501 Parkway
Philadelphia, PA 19130-2499

1(800)351-7500 ext. 4165.
Fax: (215)787-3876

RSL00061

 **Reliance Standard Life Insurance Company** ®

November 1, 1999

Lawrence D. Bache, Esq.,
9000 West Sheridan Street - Suite 174
Pembroke Pines, FL 33024

Re :        James E. Radican
Claim # :    1997-346-010
Policy # :    LSC 98842

Dear Mr. Bache:

We are writing to you regarding the appeal of our decision to deny your client's claim for Long Term Disability ("LTD") benefits.

As previously explained, under the Employee Retirement Income Security Act ("ERISA") of 1974, your client was entitled to an independent review of the claim facts and the determination made regarding his eligibility for benefits. Your client, through counsel, previously requested such a review during calendar year 1998. On August 3, 1998, Reliance Standard Life Insurance Company ("RSL") affirmed our prior decision to deny benefits. (We have enclosed copies of both the original denial letter and the affirmation letter dated August 3, 1998 for your review.) As your client had been afforded a full and fair review in accordance with ERISA, RSL was under no obligation to reconsider his claim for benefits. Nevertheless, in good faith, we did reexamine your client's claim after your request of earlier this year. We apologize for the delay in responding to your request for a second appeal, however, we could not place your client's file ahead of those files who had not yet received their first, mandated appeal

We have completed our review of the claim file and have found that our original decision to deny benefits and the subsequent affirmation of that denial was appropriate.

As you are aware, Mr. Radican's claim for LTD benefits was denied after RSL determined that your client did not meet the eligibility requirements of the Policy on the Policy's effective date. To be specific, RSL determined that your client was not a Full-time employee of Tarmac America, Inc. ("Tarmac") on the Policy effective date of January 1, 1996 or at anytime thereafter. The relevant Policy provision states:

***EFFECTIVE DATE OF INDIVIDUAL INSURANCE:*** *If you (Tarmac) pay the entire Premium due for an Eligible Person, the insurance for such Eligible Person will go into effect on the Individual Effective Date, as shown on the Schedule of Benefits page.*

1

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

**RSL00062**

Eligible Person is defined as follows:

> *"Eligible Person" means a person who meets the eligibility requirements of this Policy.*

The Eligibility Requirements are explained on page 5.0 of the Policy. That provision reads:

> **ELIGIBILITY REQUIREMENTS:** *A person is eligible for insurance under this Policy if he/she:*
>
> > *(1) is a member of an Eligible Class, as shown on the Schedule of Benefits page; and*
> > *(2) has completed the Waiting Period, as shown on the Schedule of Benefits page.*

The Schedule of Benefits page (page 1.0 & 1.1 of the Policy) defines Eligible Class as follows:

> **ELIGIBLE CLASSES:** *Each active, Full-time employee except any person employed on a temporary or seasonal basis, according to the following classifications:*
>
> > *CLASS A: employee earning $59,000.00 or more per year who:*
> >
> > > *(1) is engaged in a non-hazardous occupation; and*
> > > *(2) functions primarily in an office environment.*
> >
> > *CLASS B: salaried employee earning more than $30,000.00 per year but less than $59,000.00*

Finally, the Policy defines "Full-time" as follows:

> *"Full-time" means working for you (Tarmac) for a minimum of 40 hours during a person's regular work week.*[1]

---

[1]In your letter of appeal dated January 26, 1999 you stated that the applicable plan document states the definition of Full-time work as being 37.5 hours as opposed to 40 hours per week. The Policy, which RSL considers to be the controlling document, (a copy of which is enclosed for your review) states that the definition of Full-time is 40 hours per week. Therefore, we disagree with your assertion that Full-time is defined as 37.5 hours per week. While we disagree with your assessment, however, it is irrelevant for purposes of our review as the evidence in our claim file does not suggest that your client was working even the lower 37.5 hours per week at any point during calendar year 1996 prior to his cessation of work on December 31, 1996.

2

**RSL00063**

On October 3, 1995, your client underwent a decompressive laminectomy due to his history of back pain and herniated disc with stenosis. Shortly after this surgery, Mr. Radican returned to work as a Sales Representative for Tarmac. Our review of the information contained in Mr. Radican's claim file, however, suggested that he never returned to work on a Full-time basis following the surgery. RSL's Policy with Tarmac took effect on January 1, 1996, approximately three months after Mr. Radican's back surgery. As Mr. Radican was not a Full-time employee when the Policy took effect, or at any time thereafter, he never became eligible for coverage under the terms of the Policy according to the above Policy provisions. This decision is supported by ample evidence contained in Mr. Radican's claim file.

First, we must note that Mr. Radican himself has suggested to RSL that he never returned to work on a Full-time basis. As previously explained, during two telephone conversations with one of our representatives Mr. Radican advised that he had worked part-time for approximately one year prior to being told that Tarmac could no longer accommodate his part-time schedule after December 31, 1996. We realize that your client disputes our interpretation of these phone conversations, however, when viewed in context with all of the additional information in his claim file, it would appear as though our initial understanding of these conversations was accurate. Furthermore, in Mr. Radican's own application for benefits it appears as though he noted that he worked on a part-time basis for the employer. On the Employee's Statement dated November 3, 1997 Mr. Radican was asked:

> Before you stopped working, did your condition require you to change your job or the way you did your job?

His answer:

> Yes

> Date you were first unable to work on a full-time basis

His answer:

> 1/1/97

Next he was asked:

> Last day you worked before the disability:

His answer:

> 12/31/96

3

RSL00064

Finally, he was asked:

Did you work a full day:

His answer:

No - Part time - recovering from surgery

While these answers are not conclusive evidence that your client was working on a part-time basis throughout 1996 the answers certainly could be interpreted to indicate that your client had been working part-time since his surgery in October of 1995. If the answers do not mean that he was working part-time since October of 1995 (as the phone conversations did not mean he was working part-time), then his answers are contradictory on their face. When asked when he was first unable to work on a full-time basis he indicated 1/1/97, but two questions later he indicated that he did not work full-time on 12/31/96, because he was working part-time as he recovered from surgery. Therefore, on three separate occasions (two telephone calls and the initial application), Mr. Radican appeared to indicate to RSL that he had worked on a part-time basis since his surgery. These were all contemporaneous statements made by your client to RSL at the time the questions were posed. Then, after his claim is denied based in large part on these statements, we are informed that we misinterpreted the meaning of these statements. While it is certainly possible that we misinterpreted these statements, when viewed in light of other information contained in the claim file, it appears as though our interpretation of the contemporaneous information was accurate. It was not until the claim had been denied and that denial affirmed on appeal, that the interpretation was questioned.

Information provided by Tarmac throughout the life of the claim suggested that Mr. Radican did not work on a Full-time basis throughout 1996. First, in a letter from Hope B. Fischer, Benefits Administrator for Tarmac, dated January 28, 1998, it was noted that:

(o)ur files on Mr. Radican indicate that he had back surgery in October of 1995 and *was out of work from that time until sometime after mid-year 1996 at the recommendation of his doctor, Manuel Porth.* Sometime during the latter part of 1996, he reported to work, but we have no documentation in the file to substantiate the dates worked. (Emphasis added)

Furthermore, as previously explained to your client, we received a letter from a Michael Unger (General Manager of Pennsuco Cement and Aggregates) dated February 4, 1998, which indicated that Mr. Radican was working on a part-time basis throughout calendar year 1996. That letter stated:

It is my understanding that, after recovering from back surgery, James Radican returned to work on or about November 1, 1995.

4

RSL00065

At that time, Jim reported to Mr. Fred Goudie, Vice President of Production and Sales for Tarmac's Pennsuco Cement Mill in Medley, Florida. *Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.*

Tarmac's policy requires employees to work only on a full-time basis. Jim was incapable of performing his duties on this basis and was required to file for short-term disability on January 1, 1996 (sic 1997). (Emphasis added)

Upon appeal you have submitted an affidavit from Mr. Unger which again tries to explain that we misunderstood Mr. Radican's employment status during calendar year 1996. Mr. Unger's affidavit explains that he did not intend to state that Mr. Radican worked only part-time during 1996, but rather that he worked part-time only during those times he was actively treating for physical therapy and pain treatment. Therefore, RSL is asked to accept that we misinterpreted a fourth communication regarding Mr. Radican's employment history. It appears to this reviewer that all of the above communications were quite clear on their face, and that it was not until the claim was denied and the decision upheld that our interpretation of these statements was called into question. Again, we must conclude that the contemporaneous interpretation of Mr. Unger's letter appears to be the most reasonable and accurate interpretation of Mr. Radican's employment history during calendar year 1996.

The letter from Mr. Pittman (Vice President of Human Resources for Tarmac), also implicitly supports our prior decision to deny benefits. As explained in our letter to Ms. McVey Ostendorf dated August 3, 1998, Mr. Pittman's letter specifically avoided the issue of actual hours worked by Mr. Radican, but rather focused on his employment status during calendar year 1996. While certainly not conclusive of the fact that Mr. Radican worked under 40 hours per week (or 37.5), the fact that the issue was avoided by Mr. Pittman lends credence to RSL's determination.

The other affidavits submitted with your client's second appeal are also not persuasive. First, these affidavits would appear to be tainted by self-interest as they were submitted in an attempt to reinstate a valuable benefit which had been previously refused. More importantly, as a sales person who was out on the road for much of his activities, it is difficult to understand how the signers of the affidavits could have personal knowledge of Mr. Radican's work hours. This is especially true in light of the fact that the company itself, did not keep accurate track of the number of hours worked by Mr. Radican.

Ms. McVey Ostendorf's appeal and supporting documentation was not persuasive as previously explained in our letter to her of August 3, 1998. This subsequent review of the claim leads us to conclude that Ms. McVey Ostendorf provided RSL with information which she believed supported Mr. Radican's contention that he worked on a full-time basis while withholding similar information which, arguably, proved RSL's argument that he did not work on a full-time basis. Ms. McVey Ostendorf relied heavily on Mr. Radican's expense reports for January and August of 1996 as support that he had worked on a full-time basis during calendar year 1996. We

5

RSL00066

explained that we found it difficult (if not impossible) to rely on expense reports to determine the number of hours worked in a particular month (see page #2 of our letter dated August 3, 1998). We still contend that the expense reports cannot prove full-time work. We have subsequently received Mr. Radican's expense reports for the other ten months of calendar year 1996 (supplied by Ms. McVey Ostendorf acting as counsel for Tarmac). Were we to follow Ms. McVey Ostendorf's logic, these reports clearly suggest that your client did not work on a full-time basis for at least ten months of calendar year 1996. Every month besides the two previously submitted to RSL (1/96 & 8/96) show that your client drove less than 1000 miles per month and had limited appointments scheduled in each of those ten months. Clearly if RSL were to base a decision regarding the number of hours Mr. Radican worked on his expense reports, it would not appear as though he worked on a full-time basis during any month in 1996 (besides, arguably, January and August). It would appear as though the ten other months' expense reports were not previously provided to RSL because they would refute Ms. McVey Ostendorf's position that Mr. Radican was a full-time employee. In any event, RSL has already concluded that expense reports (even the 1/96 & 8/96 reports) cannot support your client's contention that he worked on a full-time basis for Tarmac during calendar year 1996.

Finally, our review of the medical records provided by Mr. Radican's various physician(s) supports RSL's opinion that Mr. Radican did not work on a full-time basis during calendar year 1996. First, a "To Whom it May Concern" letter from Dr. Manuel Porth dated January 1, 1996 suggests that your client was not capable of working at all during the first half of 1996. Dr. Porth wrote:

> A program of rehabilitation is mandatory and *the patient has been advised to remain out of work for the next six months* for medical reasons. It is my opinion that with a strenuous program of therapy and rehabilitation, we can maximize the benefits of the surgical procedure and *hopefully return this patient to work status by June of 1996.*
> (Emphasis added)

It is our understanding that your client did not heed the advice of Dr. Porth and remain out of work for the first six months of 1996, but rather worked on a part-time basis during this time frame. In any event, it would appear as though Dr. Porth did not believe your client was capable of full-time work as he was suggesting that your client remain out of work completely for six months. RSL believes this is simply further evidence that your client did not work on a full-time basis during (at least the first half of) calendar year 1996.

Dr. Porth's medical records also suggest that your client was not capable of working full-time during calendar year 1996. On March 22, 1996 Dr. Porth noted:

> It is now 6 months following his laminectomy, and the quality of life has not significantly improved. *He is still unable to return to his job* and is aware of his back on a continual basis. (Emphasis added)

6

RSL00067

Again on September 16, 1996 Dr. Porth's medical records noted:

> The 3rd epidural helped to a lesser degree and in spite of continued therapy, epidural blocks, analgesic medications, the use of physical therapy and corset immobilization, the patient continues to be symptomatic and *is unable to return to work*. (Emphasis added)

A "To Whom it May Concern" letter of September 16, 1996 also suggested that your client was not able to work at all, let alone on a full-time basis. Dr. Porth's letter of that date stated:

> Mr. James Radican is a 66 year old gentleman followed in this office with a longstanding history of back pain. He has had decompression laminectomy with essentially no improvement for severe degenerative disease and spinal stenosis. He has had an attempt at multiple epidural blocks and physical therapy with no improvement.
>
> *At this point the patient is found totally disabled with respect to employment and is advised to remain out of work until further notice.* (Emphasis added)

Dr. Porth's medical records and "To Whom it May Concern" letters clearly suggest that your client was incapable of working due to his back condition. Nowhere in his records or letters does he suggest that your client was capable of full-time work following the laminectomy of October 1995. Therefore, while your client claims to have worked on a full-time basis after January 1, 1996, this does not appear to have been medically possible according to your client's own physician.

Based upon all of the above cited information, we have concluded that our prior decision to deny your client's claim for benefits and the subsequent affirmation of that denial were appropriate. All of the information which was gathered contemporaneously with our decision, suggested that your client did not work on a full-time basis after his surgery in October of 1995. It was not until the claim was denied (and subsequently affirmed), that any information was provided to suggest that your client was an active full-time employee of Tarmac on or after January 1, 1996. We find the contemporaneous information gathered during our initial investigation to be more reliable than the subsequently provided information when viewed in context with the entire claim file. Accordingly, we have determined that your client did not have any LTD coverage in force with RSL as of the January 1, 1996 Policy effective date or thereafter. We might suggest investigating whether your client's claimed disability could be covered by Tarmac's prior LTD carrier which was in effect during calendar year 1995.

In your letter dated August 27, 1999, you requested that we provide your client with information as to how he might perfect his claim. Unfortunately, we are unable to provide you with any such suggestions for a number of reasons. First, it would not appear as though there is any documentation which could perfect your client's appeal at this juncture. Tarmac has made it clear that they did not keep attendance records on your client. Given the abundance of information contained in our claim files which suggests that your client was not able to work on a full-time

7

RSL00068

basis after October of 1995, attendance records would appear to be the only documents which could perfect the claim. Second, although not required by ERISA, this was the second appeal RSL provided to your client. During each of these appeals, your client was represented by counsel. In both instances, your client was unable to provide RSL with information which would perfect his claim. His claim file is now closed and it will not be revisited. Accordingly, it will not be possible for your client to perfect his claim at this point in time. We believe he has had adequate opportunity to do so, as he was provided two appeals and he was represented by counsel in each instance.

We regret that our decision could not have been more favorable to your client, however, we are limited by the provisions of the policy. Please be advised that our claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of ERISA.

Nothing in this letter should be construed as a waiver of any of RSL's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,


Richard D. Walsh
Manager, Quality Review Unit

8

RSL00069

**RSL** Reliance Standard Life
Insurance Company®

August 3, 1998

Marika McVey Ostendorf, Esq.
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re :          James E. Radican
Claim # :     1997-346-010
Policy # :    LSC 98842

Dear Ms. McVey Ostendorf:

We are writing to you regarding the appeal of our decision to deny benefits to your client, James
Radican. Please be advised that Reliance Standard Life Insurance Company ("RSL") strives to
treat all clients fairly and evaluate claims submitted to us in an objective and equitable manner.

Under the Employee Retirement Income Security Act ("ERISA") of 1974 you are entitled to an
independent review of the claim facts and the determination made regarding your client's
eligibility for benefits. Your client's file was referred to our Quality Review Unit to conduct such
a review. This review has been conducted separately from the individual(s) who made the original
determination to deny your benefits.

We have completed our initial review of the claim file and have found that our original
determination to deny liability was appropriate.

We do not have any conclusive evidence to support your client's contention that he *worked* on a
full-time basis for Tarmac America, Inc. after January 1, 1996. The letter from B. Edward
Pittman, Vice President of Human Resources for Tarmac does not report that your client was
working on a full-time basis during 1996 as you report. Rather, the letter states that your client
was always considered a full-time salaried exempt employee and was never placed on part-time
status. Not only does the letter avoid the issue of hours worked by your client, it appears to admit
that he was not working full-time hours when it states:

> The fact that he worked partial days in 1996 following his return to work from surgery
> should in no way be construed as "part-time" status. Had Mr. Radican been classified a
> part-time employee, he would have been ineligible for participation in our long term
> disability benefit at all.

**RSL00070**



**Reliance Standard Life Insurance Company**

-2-

The quotation above is representative of much of the letter. Nowhere in the letter does Mr Pittman explain the number of hours your client actually worked but instead talks about what status was assigned to him during calendar year 1996. Unfortunately, we are not interested in the employment classification of your client, but rather in the number of hours per week he actually worked.

Every indication we have points to the fact that your client never returned to full-time work after his surgery in 1995. In fact, on at least two separate occasions your client informed us via the telephone that he worked part-time throughout 1996. He informed us that he worked part-time for about one year but was then told that he should apply for disability because the company could no longer accommodate him on a part-time schedule.

The travel expense reports which you provided do not conclusively demonstrate that your client was working on a full-time basis during any time in 1996. The reports show that your client traveled for business during the months of December 1995, and January/August of 1996, but they do not show that he worked on a full-time basis.

Furthermore, we do not understand how you wished us to interpret these expense reports in order to come to the conclusion that they proved your client was a full-time employee. The following example indicates why the expense reports are not a good indicator of hours worked by your client. Your letter relates that your client underwent physical therapy 2x per week for 3 hours per session during December of 1995. Despite a loss of approximately 6 hours per week (not including travel time to and from physical therapy) your client traveled 1,380 miles for work during that month. When compared to August of 1996, when your client was not undergoing physical therapy, we find that your client traveled significantly less miles than he did in December of 1995. In August of 1996 your client traveled 1,050 miles for business despite an extra six hours per week which were not devoted to physical therapy. If we were to determine hours worked using expense reports we would have to come to the conclusion that Mr Radican worked more hours in December of 1995 than in August of 1996 because of the significantly greater number of miles which he traveled during December of 1995. It is my understanding that such a conclusion would be inaccurate as your client actually worked less hours in December of 1995 due to physical therapy. Accordingly, it is impossible for us to determine actual hours worked through the use of Mr. Radican's expense reports.

Therefore, based upon the information above and the lack of conclusive evidence of full-time work by your client, we have concluded that our previous decision to deny benefits to your client was appropriate. Accordingly, no benefits are payable and your client's file will remain closed at this time.

We regret that our decision could not have been more favorable to your client, however, we are limited by the provisions of the policy. Please be advised that our claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of his policy.

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

**RSL00071**

 **Reliance Standard Life Insurance Company**®

-3-

Nothing in this letter should be construed as a waiver of any of RSL's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

Richard D. Walsh
Assistant Manager, Quality Review Unit

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

RSL00072

 **Reliance Standard Life Insurance Company®**

April 6, 1998

James E. Radican
3800 N. W. 71 Street
Coconut Creek, FL 33073

> Policyowner : Tarmac America, Inc.
> Policy No. : LSC 98842
> Claim No. : 1997- 346-010

Dear Mr. Radican:

We would like to express our appreciation for your patience and cooperation during the review of your claim for Long Term Disability (LTD) benefits. We have now completed our determination regarding your eligibility for benefits under the above group LTD policy.

To be eligible for benefits, the group policy requires that objective medical documentation must substantiate that a member, while insured under the group policy, meets the group policy's definition of Total Disability. The group policy defines Total Disability as follows:

**"Actively at work" and Active Work" mean actually performing on a full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an injury or sickness.**

**"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.**

We have received documentation from your employer which indicates you began working on a part-time basis on or about November 1, 1995 and continued to work part-time for over one year.

In order to be eligible for Long Term Disability under this policy, you must be actively at work and working on a full-time basis as defined by the policy. Based on information provided by your employer, you were working part-time when the policy became effective on January 1, 1996 and did not returned to full time active work prior to your last day worked. Therefore, you have not satisfied the policy definition of a full-time employee and are not eligible for Long Term Disability Benefits coverage.

 **Reliance Standa ..ife Insurance Company**®

We regret our decision could not be more favorable. Our determination has been based on the information contained in your file and the policy provisions applicable to your claim

Under the Employee Retirement Income Security Act of 1974, you may request a review of this denial by writing to:

> Reliance Standard Life Insurance Company
> Quality Review Unit
> P. O. Box 8330
> Philadelphia, PA 19101-8330

The written request for review must be sent within 60 days of receipt of this letter and state the reasons why you feel your claim should not have been denied. Include any documentation which you feel supports your claim. You or your duly authorized representative are also entitleed to review the pertinent documents upon which the denial decision wa predicated. Under normal circumstances, you will be notified in writing of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any of Reliance Standard Life Insurance Company's rights and defenses under the above captioned policy, and all these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

James A. Wilson, Jr
Group LTD Claims Department
Extension: 3854


cc:    Tarmac America, Inc.
       Attn: Hope Fischer
       P.O. Box 2016
       Norfolk, VA 23501

**RSL00074**

NSMISSION VERIFICATION REPORT

TIME : 11/02/1999 09:19

| | |
|---|---|
| DATE,TIME | 11/02 09:13 |
| FAX NO./NAME | 919544362926 |
| DURATION | 00:06:14 |
| PAGE(S) | 14 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

**RSL00075**

The Law Office Of
# Lawrence D. Bache

| | |
|---|---|
| Fountains Executive Centre | Lawrence D. Bache |
| 9000 West Sheridan Street, Suite 174 | Of Counsel |
| Pembroke Pines, FL 33024 | Roy L. Taylor |
| (954) 436-7376; Fax: (954) 436-2926 | |

October 7, 1999

Reliance Standard Life Insurance Co.
Attention: Richard D. Walsh
Assistant Manager, Quality Review Unit
2501 Parkway
Philadelphia, PA 19130-2499

Re:    James E. Radican
       Claim No.: 1997-346-010
       Policy No.: LSC 98842

Dear Mr. Walsh:

As you are aware, the undersigned represents James E. Radican. Attached hereto is my letter dated August 27, 1999 in which an update on my client's claim was requested. I have received no response. If I do not hear from you on or before October 31, 1999 I will assume you have upheld your original denial of plaintiff's claim for benefits.

Sincerely,

Lawrence D. Bache

cc: James Radican

Radican\Walsh 02

RSL00076

The Law Office Of

# Lawrence D. Bache

Fountains Executive Centre
9000 West Sheridan Street, Suite 174
Pembroke Pines, FL 33024
(954) 436-7376; Fax: (954) 436-2926

Lawrence D. Bache
Of Counsel:
Roy L. Taylor

August 27, 1999

Reliance Standard Life Insurance Co.
Attention: Richard D. Walsh
Assistant Manager, Quality Review Unit
2501 Parkway
Philadelphia, PA 19130-2499

Re:    James E. Radican
       Claim No.: 1997-346-010
       Policy No.: LSC 98842

Dear Mr. Walsh:

In your letter dated March 26, 1999 you stated you would complete your review of the above-reference claim "as expeditiously as possible." Request is hereby made for an update as to the status of my client's claim including but not limited to what if any other information need be provided to perfect the claim.

Sincerely,

Lawrence D. Bache

Radican\Walsh 02

RSL00077

OBER | KALER
A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699

**Marika M. Ostendorf**
mmostendf@ober.com
410-347-7390

**Offices In**
Maryland
Washington, D.C.
Virginia

May 24, 1999

Mr. Richard D. Walsh
Assistant Manager
Quality Review Unit
Reliance Standard Life Insurance Co.
2501 Parkway
Philadelphia, PA 19130-2499

> Re:   *James E. Radican*
>       *Claim No: 1997-346-010*
>       *Policy No: LSC98842*
>       *SSN: 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*

Dear Mr. Walsh:

As you are aware, this firm serves as the outside benefit counsel to Tarmac America, Inc. This letter is in response to your March 26, 1999 letter to Hope Fischer requesting additional information in order to reevaluate the denial of long-term disability benefits for a former employee, James E. Radican.

Enclosed is a copy of Mr. Radican's personnel file from 1995 through the present. Tarmac America, Inc.'s "sick leave" or short-term disability policy with respect to salaried employees is basically that of salary continuation. Salary continuation for exempt employees is for a period of time up to nine months at full-pay, followed by three months at half-pay. Mr. Radican received nine months of full-pay from the period from January 1, 1997 through September 30, 1997, followed by three months of half-pay for the final quarter of 1997. There are "Personnel Action Forms" in his personnel file to substantiate his pay. Aside from the personnel papers, there were never any additional short-term disability papers completed.

Mr. Radican is not receiving any pension or retirement benefits from Tarmac. He was a participant in the Tarmac America, Inc. 401(k) Retirement Savings Plan and voluntarily elected to receive a distribution of his account balance from that plan.

MMO:255098.1:5/24/99: 1:16 PM

**RSL00078**

Mr. Richard D. Walsh
May 24, 1999
Page 2

If you need any additional information, please contact me at (410) 347-7390.

Sincerely,

Marika M. Ostendorf

MMO:dld
cc:   Ms. Hope B. Fischer
     Mr. James E. Radican
     Lawrence D. Bache, Esq.

MMO:255098.1:5/24/99: 1:16 PM

**RSL00079**

Case 0:00-cv-06024-WJZ    Document 43    Entered on FLSD Docket 07/07/2010    Page 81 of 345

## Form W-2 Wage and Tax Statement 1996

OMB No. 1545-0008                                      Department of the Treasury-Internal Revenue Service

Copy B To Be Filed With Employee's FEDERAL Tax Return. This information is being furnished to the Internal Revenue Service.

| | |
|---|---|
| 1 Wages, tips, other compensation | 50544.97 |
| 2 Federal income tax withheld | 10985.28 |

977

TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

59-1729143
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

JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

| 3 Social security wages | 59214.85 |
| 4 Social security tax withheld | 3671.32 |
| 5 Medicare wages and tips | 59214.85 |
| 6 Medicare tax withheld | 858.62 |

13   C   1663.20
     D   8669.88

1895.53

---

## Form W-2 Wage and Tax Statement 1996

OMB No. 1545-0008                                      Department of the Treasury-Internal Revenue Service

977     Copy 2 To Be Filed With Employee's State Income Tax Return

| | |
|---|---|
| 1 Wages, tips, other compensation | 50544.97 |
| 2 Federal income tax withheld | 10985.28 |

TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

59-1729143
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

JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

| 3 | 59214.85 |
| 4 | 3671.32 |
| 5 | 59214.85 |
| 6 | 858.62 |

13   C   1663.20
     D   8669.88

1895.53

---

## Form W-2 Wage and Tax Statement 1996

OMB No. 1545-0008                                      Department of the Treasury-Internal Revenue Service

977     Copy 2 To Be Filed with Employee's City or Local Income Tax Return

| | |
|---|---|
| 1 Wages, tips, other compensation | 50544.97 |
| 2 Federal income tax withheld | 10985.28 |

TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

59-1729143
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

JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

| 3 | 59214.85 |
| 4 | 3671.32 |
| 5 | 59214.85 |
| 6 | 858.62 |

13   C   1663.20
     D   8669.88

1895.53

---

977     Copy C For EMPLOYEE'S RECORDS (See Notice on back.)

| | |
|---|---|
| 1 Wages, tips, other compensation | 50544.97 |
| 2 Federal income tax withheld | 10985.28 |

TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

59-1729143
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

JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

| 3 | 59214.85 |
| 4 | 3671.32 |
| 5 | 59214.85 |
| 6 | 858.62 |

13   C   1663.20
     D   8669.88

1895.53

RSL00080

## Form W-2 Wage and Tax Statement 1996

OMB No. 1545-0008                                      Department of the Treasury-Internal Revenue Service

Tarmac America, Inc.
Job Description

JOB TITLE
Sales Representative

EXEMPT:
SALARY LEVEL:

SUMMARY: Responsible for selling Tarmac's products and services to existing customers and new prospects. Applies a broad knowledge of the organization's services, products, and marketing techniques to finalize sales.

ESSENTIAL DUTIES AND RESPONSIBILITIES:

Sells the organization's products and services to existing customers and new prospects.

Maintains a sales program within the territory based on customer's estimated requirements. Identifies new markets and stimulates demand.

Informs customers of supply and price trends and assists in inventory control.

Keeps informed on new products/services and other general information of interest to customers. Participates in trade association meetings.

Assists accounts receivable in the collection of moneys.

Secures and renews orders and arranges delivery dates.

Exhibits good interpersonal and customer service skills.

Works to resolve customer issues, problems, and concerns.

QUALIFICATION REQUIREMENTS: To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the minimum knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

EDUCATION and/or EXPERIENCE: Bachelor degree (B.A.) from college or university; 1-3 years job-related prior experience.

RSL00081

COMMUNICATION SKILLS: Ability to read, analyze, and interpret professional journals and financial reports. Ability to respond to common inquiries or complaints from customers, regulatory agencies, or members of the community. Write complex documents in a prescribed format. Ability to effectively present information to top management, public groups, and/or boards of directors. Ability to communicate complex ideas and beliefs to top management.

MATHEMATICAL SKILLS: Ability to apply moderately complex mathematical equations as applicable.

REASONING ABILITY: Ability to define problems, collect data, establish facts, and draw valid conclusions. Ability to interpret an extensive variety of technical instructions and deal with several abstract and concrete variables.

PHYSICAL DEMANDS: The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

| Activity | Never | Occasionally | Frequently | Regularly |
|---|---|---|---|---|
| Sit | | | | ✓ |
| Talk | | | | ✓ |
| Hear | | | | ✓ |
| Use hands to finger/handle objects, tools, controls | | | ✓ | |
| Stand | | ✓ | | |
| Walk | | | ✓ | |
| Drive | | | | ✓ |
| Reach with hands and arms | | ✓ | | |
| Stoop, kneel, crouch, crawl | | ✓ | | |
| Climb or balance | | ✓ | | |

RSL00082

The employee may be required to lift:

| Activity | Never | Occasionally | Frequently | Regularly |
|---|---|---|---|---|
| Up to 10 pounds | | | | ✓ |
| 11-25 pounds | | | ✓ | |
| 26-50 pounds | | ✓ | | |
| 51-100 pounds | ✓ | | | |
| More than 100 pounds | ✓ | | | |

<u>WORK ENVIRONMENT:</u> The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

| Activity | Never | Occasionally | Frequently | Regularly |
|---|---|---|---|---|
| Wet, humid conditions (non-weather) | | ✓ | | |
| Work near moving mechanical parts | | ✓ | | |
| Work in high, precarious places | ✓ | | | |
| Fumes or airborne particles | ✓ | | | |
| Toxic or caustic chemicals | ✓ | | | |
| Outdoor weather conditions | | | | ✓ |
| Extreme cold (non-weather) | ✓ | | | |
| Extreme heat (non-weather) | ✓ | | | |
| Risk of electrical shock | ✓ | | | |
| Work with explosives | ✓ | | | |
| Vibration | ✓ | | | |

*The above statements are intended to describe the general nature and level of work being performed. They are not intended to be construed as an exhaustive list of all essential duties, responsibilities and requirements of personnel.*

RSL00083

June 21, 1996

James Radican
3800 Nw 71 Street
Coconut Creek, FL 33073

Dear James,

Effective January 1, 1996, your long-term disability (LTD) benefit was substantially upgraded. The previous own occupation period of 24 months was changed to 60 months. This could have a significant impact on the total amount of benefit you could receive in the event of total disability.

We are pleased to announce that your disability benefit has now been even further enhanced in the following way. Effective July 1, 1996, the company will no longer pay the premium for your LTD coverage; instead, this cost will automatically be deducted from your pay check, unless you choose to discontinue your LTD coverage. The benefit to you will be that if you are ever the recipient of disability benefits on this plan, you will receive them tax free. Prior to this change, any recipient of a disability benefit on this plan received a net amount **after** income tax deductions for their tax bracket were taken.

The current annual premium that will be deducted from your pay will be $178.90, which will be prorated over each pay period.

$$\text{ANNUAL SALARY} \div 100 \ * \ \$0.31 \ = \ \text{ANNUAL PREMIUM}$$

Note that for most employees, salary increases will take effect on July 1, 1996 so the actual effect on your check should be minimal with the change in the LTD.

If you do not wish to continue your LTD coverage, please complete the attached form and return it to Yvonne Smith, 1151 Azalea Garden Road, Norfolk, VA 23502 prior to July 1, 1996. *Please understand if you choose not to participate at this time, you will not have the opportunity to opt for this coverage again until approximately January 1997. You will also have to provide Evidence of Insurability at your own expense.* If you do not return a form, it will be assumed that you do want the LTD coverage.

We are in the process of having Summary Plan Description booklets printed. They will be forwarded to you as soon as they are received. If you have any questions, please contact the Benefits Department at (804)858-6500.

Sincerely,

Ed Pittman
Vice President Human Resources

**RSL00084**

cc:    Personnel File

011: 1417
Division II

## Hope Fischer

**From:**      Yvonne Smith
**To:**        Hope Fischer
**Subject:**   FW: Jim Radican
**Date:**      Wednesday, December 24, 1997 12:02PM

FYI
----------
From: Terrie Weston
To: Yvonne Smith
Subject: RE: Jim Radican
Date: Wednesday, December 24, 1997 12:00PM

Received it today 12-24-97
----------
From: Yvonne Smith
To: Terrie Weston
Subject: Jim Radican
Date: Tuesday, December 23, 1997 5:40PM
Priority: High

Please be on the "look out" for termination paperwork for the above employee.  His STD expires on
12/31/97.  Thanks.

RSL00085



Tarma    merica, Inc.
P.O. Box 2016, Norfolk, Va 23501  (804) 858-6500
Fax:  (804)  855-7707

January 1, 1995

TO:      JAMES E RADICAN

SUBJECT:  **1995 Salary Increase**

I am pleased to confirm that your salary will increase from  $54,400.00 to $56,030.00 per year, effective January 1, 1995.  In 1994, we all experienced a great deal of change through restructure.  With your continued efforts, we can develop our "New Beginnings" into a successful 1995 and beyond.

Your dedication and contributions are always appreciated.

Sincerely,

_____

BS/ew

SalInc95.

RSL00086

# BellSouth Mobility
*A BELL SOUTH Company*

## Customer Order

No: 231950 7

MOBILE NUMBER

Sales/Install Branch
Inventory Branch

**ORDER TYPE**
☐ SALES ORDER  ☐ BWS ORDER  ☐ CREDIT ORDER  ORIGINAL ORDER #  ☐ BWS CREDIT  ORIGINAL ORDER #

| SOLD TO | CUSTOMER NUMBER 2872 | SHIP TO | CUSTOMER NUMBER |
|---|---|---|---|
| CUSTOMER NAME | | CUSTOMER NAME | |
| ATTENTION  JIM RADICAN | | ATTENTION | |
| ADDRESS | | ADDRESS | |
| CITY, STATE, ZIP  Deerfield Beach Fl 33441 | | CITY, STATE, ZIP | |
| WORK PHONE  ( )  455-4777 | HOME PHONE | WORK PHONE | HOME PHONE |

**TAX AREA:** _____ STATE • BRANCH • COUNTY   ☐ TAX EXEMPT

All tax exempt sales require exemption certificate to be attached to Customer Order.

SPECIAL PROGRAM

| QTY | REQUIRED ITEM NUMBER | DESCRIPTION | SERIAL NUMBER | NET UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| 1 | MOTOROLA | GSP1550 | MSN @743USHV92Y | | 299 |
| 1 | DOS DISCOUNT | 443 OTR PROMO | ESN | | (197) |
| | | TRADE | ESN | | (75.00) |
| | | | MSN | | |
| | | | ESN | | |
| | | | MSN | | |
| | | | ESN | | |
| | | | MSN | | |
| | | | ESN | | |

RSL00087

# TARMAC AMERICA, INC.
## PERSONNEL ACTION FORM
(All appropriate areas must be completed to process)

☒ WAGE
☐ SALARY

**ALL ACTIONS**

| ENTER UP TO 3 PERSONNEL ACTIONS FROM THE LIST AT RIGHT AND THE EFFECTIVE DATE BELOW | | 01 – INITIAL EMPLOYMENT<br>02 – SALARY ADJUSTMENT<br>03 – PROMOTION<br>04 – TRANSFER<br>05 – JOB ASSIGNMENT CHANGE | 06 – JOB RECLASSIFY<br>07 – DEMOTION<br>08 – DISABILITY/ LEAVE OF ABSENCE<br>09 – LEAVE OF ABSENCE | 10 – WAGE TO SALARY<br>11 – SALARY TO WAGE<br>12 – REHIRE<br>13 – OTHER DATA CHG |
|---|---|---|---|---|
| ACTIONS: 06 | EFFECTIVE DATE: 01 01 96 | | | |

| (NAME PER SOCIAL SECURITY CARD) | LAST: RADICAN | FIRST: JAMES | M.I.: E |
|---|---|---|---|

| SOCIAL SECURITY #: 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 | EMPLOYEE #: 1417 | COMPANY: 011 | AREA: Penns | PLANT: PN | COST CENTER: 35152 |
|---|---|---|---|---|---|

**NEW HIRE**

| POSITION TITLE | POSITION CODE | JOB CODE |
|---|---|---|

| ANNUAL RATE | HOURLY RATE |
|---|---|

| SALARY GRADE | MINIMUM RANGE | MID RANGE | MAX RANGE |
|---|---|---|---|

| KRONOS BADGE # | REPORTS TO |
|---|---|

**CHANGES**

| TRANSACTION | FROM (CURRENT): | | | TO (NEW): | | | |
|---|---|---|---|---|---|---|---|
| | ANNUAL RATE | GRADE | HOURLY RT | %ADJ | ANNUAL RATE | GRADE | HOURLY RT |
| [ ] RATE CHANGE<br>[ ] REHIRE | | | | | | | |
| | SEMI–MONTHLY | MONTHLY | | SEMI–MONTHLY | MONTHLY | | |
| | MIN | MID | MAX | MIN | MID | MAX | |

| | COMPANY | AREA | PLANT | COST CTR | COMPANY | AREA | PLANT | COST CTR |
|---|---|---|---|---|---|---|---|---|
| [X] REHIRE<br>[X] POSITION/ JOB CHANGE | 011 | Penns | PN | 35152 | 011 | Penns | PN | 35152 |
| [ ] COST CENTER CHANGE | POSITON TITLE | | POS. CODE | | POSITION TITLE | | POS. CODE | |
| [ ] AREA/PLANT CHANGE | SALES REP | | SLSRP | | SPECIAL REP | | PNVTSP | |
| | REPORTS TO: PNVT52 | | | | REPORTS TO: | | | |

| | [ ] REG | [ ] TEMP | REG HRS PPP: | [ ] REG | [ ] TEMP | REG HRS PPP: |
|---|---|---|---|---|---|---|
| [ ] WORK STATUS<br>[ ] REHIRE | [ ] FULL–TIME | [ ] PART–TIME | | [ ] FULL–TIME | [ ] PART–TIME | |
| | [ ] EXEMPT | [ ] NON–EXEMPT | | [ ] EXEMPT | [ ] NON–EXEMPT | |

| [ ] OTHER | COMMENTS: |
|---|---|

| INITIATOR: | DATE: | APPROVAL: | DATE: 1/8/96 | APPROVAL: BBP 1/10/96 | DATE: |
|---|---|---|---|---|---|

# CIGNA Dental Health Enrollment Form

CIGNA Dental Health
Connecticut General Life Insurance Company



Date 12-13-95

**Please Print**

**EFFECTIVE DATE:** 01-01-96

Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

PLEASE MARK APPROPRIATE BOX:
- [ ] New enrollment
- [ ] Change
- [x] Reinstate
- [ ] Cancellation

Reason for Cancellation:
- [ ] Leave employment
- [ ] Transfer out of CIGNA Dental Health area
- [ ] Transfer to another plan

## NOTE: PLEASE COMPLETE ALL INFORMATION

NAME (Last, First, Middle Initial): RADICAN JAMES E
SOCIAL SECURITY NUMBER: 3 3 2 4 7 2 1 5

ADDRESS: 3800 NW 71 St   City: Coconut Crk   State: FL   Zip Code: 33073

TELEPHONE
Home: (305) 421-1641   Work: (305) 823-8800

EMPLOYER: Tarmac America Inc   DATE EMPLOYED: 6-25-65   DATE OF BIRTH: 4-20-30

SELECT PLAN:
- [ ] Network Plan
- [x] Traditional Plan

EMPLOYEE IDENTIFICATION NUMBER (if applicable):

CIGNA DENTAL HEALTH GROUP #: 08-504   DIVISION / CLASS / LOCATION:   CONNECTICUT GENERAL GROUP # (if applicable): 0544274

Please submit proof of student or handicapped status for overage dependents.

### COMPLETE FOR ALL PERSONS TO BE COVERED

| RELATION-SHIP | NAME (include last name if different) | ADDRESS (if different) | SEX | DATE OF BIRTH | DENTAL OFFICE SELECTION 1st Choice | 2nd Choice | ADD | CANCEL |
|---|---|---|---|---|---|---|---|---|
| Self / Soc. Sec. # | JIM | | M/F | | | | | |
| Spouse / Soc. Sec. # | | | M/F | | | | | |
| Child / Soc. Sec. # | | | M/F | | | | | |
| Child / Soc. Sec. # | | | M/F | | | | | |
| Child / Soc. Sec. # | | | M/F | | | | | |

I have read and accept the provisions printed below:

[ ] PLEASE CHECK HERE IF YOU OR MEMBERS OF YOUR FAMILY ARE CURRENTLY PATIENTS AT ANY OF THE DENTAL OFFICES SELECTED ABOVE.

SIGNATURE: J.E. Radican   DATE: 12-1-95

I accept the coverage / insurance benefits provided by this group dental plan and authorize the processing of my enrollment in the dental coverage as indicated on this form. I authorize deduction from my earnings of the required contributions, if any, toward the cost of the coverage.

I authorize payment of dental benefits to the provider of dental care.

I authorize CIGNA Dental Health or any participating dental office to release my dental records to any CIGNA Company for plan administration purposes.

531685a 4-95   DISTRIBUTION: White - CIGNA Dental Health   Canary - CIGNA   Pink - Group   Tan - Member

RSL00089

**Tarmac**

Tarmac America, Inc.

P. O. Box 2016, Norfolk, VA 23501
804-858-6500, FAX (804) 855-2919

---

January 3, 1996

TO:      RADICAN, JAMES E

SUBJECT:    **1996 Salary Increase**

---

I am pleased to confirm that your salary will increase from $56,029.92 to $57,710.00 per year, effective January 1, 1996. In 1995, we continued our restructure working toward the future.

Your continued efforts and team work are the essential ingredients in our success.

Your contributions and efforts at continual improvement are greatly appreciated. Thank you.

Sincerely,

BS\ew

cc:    FG

SalInc96.

**RSL00090**

June 21, 1996

James Radican
3800 Nw 71 Street
Coconut Creek, FL 33073

Dear James,

Effective January 1, 1996, your long-term disability (LTD) benefit was substantially upgraded. The previous own occupation period of 24 months was changed to 60 months. This could have a significant impact on the total amount of benefit you could receive in the event of total disability.

We are pleased to announce that your disability benefit has now been even further enhanced in the following way. Effective July 1, 1996, the company will no longer pay the premium for your LTD coverage; instead, this cost will automatically be deducted from your pay check, unless you choose to discontinue your LTD coverage. The benefit to you will be that if you are ever the recipient of disability benefits on this plan, you will receive them tax free. Prior to this change, any recipient of a disability benefit on this plan received a net amount **after** income tax deductions for their tax bracket were taken.

The current annual premium that will be deducted from your pay will be $178.90, which will be prorated over each pay period.

ANNUAL SALARY ÷ 100 * $0.31 = ANNUAL PREMIUM

Note that for most employees, salary increases will take effect on July 1, 1996 so the actual effect on your check should be minimal with the change in the LTD.

If you do not wish to continue your LTD coverage, please complete the attached form and return it to Yvonne Smith, 1151 Azalea Garden Road, Norfolk, VA 23502 prior to July 1, 1996. *Please understand if you choose not to participate at this time, you will not have the opportunity to opt for this coverage again until approximately January 1997. You will also have to provide Evidence of Insurability at your own expense.* If you do not return a form, it will be assumed that you do want the LTD coverage.

We are in the process of having Summary Plan Description booklets printed. They will be forwarded to you as soon as they are received. If you have any questions, please contact the Benefits Department at (804)858-6500.

Sincerely,

Ed Pittman
Vice President Human Resources

cc:    Personnel File

**RSL00091**

011: 1417
Division II

# LONG TERM DISABILITY COVERAGE

_____ **I do not** wish to continue my long term disability coverage. I understand I will not have an opportunity to enroll in this plan again until approximately January 1997. I understand that if I want to enroll at a later date, Evidence of Insurability at my own expense will be required.


_____     _____
Signature                                Date




_____
PRINT YOUR FULL NAME HERE


_____
SOCIAL SECURITY NUMBER


_____
LOCATION


_____
WORK NUMBER




**011: 1417**
**Division II**

RSL00092



**Tarmac America, Inc.**
Post Office Box 2016
Norfolk, Virginia 23501
1151 Azalea Garden Road
Norfolk, Virginia 23502
Telephone (804) 858-6500
Fax (804) 855-7707

NOTE TO FILE

July 1, 1996

Effective July 1, 1996, James Radican's annual salary increased from $57,710.00 to $57,888.90.

*Edward Pittman*

ENTERED JUL 0 5 1996

PERSONNEL USE ONLY:

ER #: 011          EE#: 1417

NEW ANNUAL:          $57,888.90

AMT OF INCREASE:     $178.90

SEMI-MO
RATE 1:              $2,412.0375

HOURLY
RATE2:               $27.8301

MONTHLY
RATE 3:              $4,824.0750

ltd.chg

RSL00093

**TARMAC AMERICA, INC.**
**PERSONNEL ACTION FORM**

# PERSONNEL FILE

| WAGE |
|---|
| SALARY |

**(All appropriate areas must be completed to process)**

| ENTER UP TO 3 PERSONNEL ACTIONS FROM THE LIST AT RIGHT AND THE EFFECTIVE DATE BELOW | 01-INITIAL EMPLOYMENT<br>02-SALARY ADJUSTMENT<br>03-PROMOTION<br>04-TRANSFER<br>05-JOB ASSIGNMENT CHANGE | 06-JOB RECLASSIFY<br>07-DEMOTION<br>08-DISABILITY/LEAVE OF ABSENCE<br>09-LEAVE OF ABSENCE<br>10-WAGE TO SALARY | 11-SALARY TO WAGE<br>12-REHIRE<br>13-OTHER DATA CHG |
|---|---|---|---|

| ACTIONS | | | EFFECTIVE DATE | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 3 | 0 | 9 | 1 | 8 | 9 | 6 |

| NAME PER SOCIAL SECURITY CARD | LAST: RADICAN | FIRST: JAMES | MI: E |
|---|---|---|---|

| SOCIAL SECURITY #: | | | | | | | | EMPLOYEE # | COMPANY | AREA | PLANT | COST CENTER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 1 | 3 | - | 2 | 4 | - | 7 2 1 5 | 1417 | 011 | PENNS | PN | 35152 |

| POSITION TITLE | POSITION CODE | JOB CODE |
|---|---|---|
| | | |

| HIRE DATE | STATUS | | | SEX | ETHNIC CODE |
|---|---|---|---|---|---|
| | [ ] REGULAR   [ ] FULL-TIME   [ ] EXEMPT<br>[ ] TEMP   [ ] PART-TIME   [ ] NON-EXEMPT | | | | |

| ANNUAL BASE RATE | HOURLY RATE | MONTHLY RATE | SEMI-MONTHLY RATE |
|---|---|---|---|
| | | | |

| SALARY GRADE | MINIMUM RANGE | MID RANGE | MAX RANGE |
|---|---|---|---|
| | | | |

| KRONOS BADGE # | REPORTS TO |
|---|---|
| | |

| TRANSACTION | FROM (CURRENT): | | | TO (NEW): | | | |
|---|---|---|---|---|---|---|---|
| | ANNUAL RATE | GRADE | HOURLY RATE | %ADJ | ANNUAL RATE | GRADE | HOURLY RATE |
| [ ] RATE CHANGE<br>[ ] REHIRE | | 15 | | | | 15 | |
| | SEMI-MONTHLY | MONTHLY | | SEMI-MONTHLY | | MONTHLY | |
| | MIN | MID | MAX | MIN | MID | MAX | |

| | COMPANY | AREA | PLANT | COST CTR | COMPANY | AREA | PLANT | COST CTR |
|---|---|---|---|---|---|---|---|---|
| [ ] REHIRE<br>[X] POSITION/ JOB CHANGE | 011 | PENNS | PN | 35152 | 011 | PENNS | PN | 35152 |
| | POSITION TITLE | | POSITION CODE | | POSITION TITLE | | POSITION CODE | |
| [ ] COST CENTER CHANGE<br>[ ] AREA/PLANT CHANGE | SPECIAL REPRESENTATIVE ( PNVTSP | | | | SALES REPRESENTATIVE (E)  PNVTSR | | | |
| | REPORTS TO: | | | | REPORTS TO: | | | |

| | [ ] REG | [ ] TEMP | REG. HRS | [ ] REG | [ ] TEMP | REG. HRS |
|---|---|---|---|---|---|---|
| [ ] WORK STATUS<br>[ ] REHIRE | [ ] FULL-TIME | [ ] PART-TIME | PPP: | [ ] FULL-TIME | [ ] PART-TIME | PPP: |
| | [ ] EXEMPT | [ ] NON-EXEMPT | | [ ] EXEMPT | [ ] NON-EXEMPT | |

| [ ] OTHER | COMMENTS |
|---|---|

**RSL00094**

| INITIATOR: | DATE: 9/18/96 | APPROVAL: | DATE: | APPROVAL: | DATE: 9/18/ |
|---|---|---|---|---|---|
| APPROVAL: | DATE | APPROVAL: | DATE | APPROVAL: | DATE |

**TARMAC AMERICA, INC.**

**PERSONNEL ACTION FORM**

PERSONNEL FILE

| | WAGE |
|---|---|
| X | SALARY |

**(All appropriate areas must be completed to process)**

| ENTER UP TO 3 PERSONNEL ACTIONS | 01-INITIAL EMPLOYMENT | 06-JOB RECLASSIFY | 11-SALARY TO WAGE |
|---|---|---|---|
| FROM THE LIST AT RIGHT AND THE | 02-SALARY ADJUSTMENT | 07-DEMOTION | 12-REHIRE |
| EFFECTIVE DATE BELOW | 03-PROMOTION | 08-DISABILITY/LEAVE OF ABSENCE | 13-OTHER DATA CHG |

| ACTIONS | EFFECTIVE DATE | 04-TRANSFER | 09-LEAVE OF ABSENCE | |
|---|---|---|---|---|
| 02 | 10 01 97 | 05-JOB ASSIGNMENT CHANGE | 10-WAGE TO SALARY | |

| NAME PER SOCIAL SECURITY CARD | LAST: Radican | FIRST: James | MI: |
|---|---|---|---|

| SOCIAL SECURITY #: 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 | EMPLOYEE # 1417 | COMPANY 011 | AREA PENNS | PLANT PN | COST CENTER 35152 |
|---|---|---|---|---|---|

| POSITION TITLE Sales Represtative | POSITION CODE PNVTSR | JOB CODE SLSR1 |
|---|---|---|

| HIRE DATE | STATUS | | | SEX | ETHNIC CODE |
|---|---|---|---|---|---|
| | [ ] REGULAR | [ ] FULL-TIME | [ ] EXEMPT | | |
| | [ ] TEMP | [ ] PART-TIME | [ ] NON-EXEMPT | | |

| ANNUAL BASE RATE | HOURLY RATE | MONTHLY RATE | SEMI-MONTHLY RATE |
|---|---|---|---|

| SALARY GRADE | MINIMUM RANGE | MID RANGE | MAX RANGE |
|---|---|---|---|

| KRONOS BADGE # | REPORTS TO |
|---|---|

| TRANSACTION | FROM (CURRENT): | | | TO (NEW): | | | |
|---|---|---|---|---|---|---|---|
| | ANNUAL RATE | GRADE | HOURLY RATE | %ADJ | ANNUAL RATE | GRADE | HOURLY RATE |
| [ X ] RATE CHANGE | 57888.9 | | | | 28,944.45 | | 13.9151 |
| [ ] REHIRE | SEMI-MONTHLY | MONTHLY | | SEMI-MONTHLY | | MONTHLY | |
| | | | | 1206.0188 | | 2,412.0375 | |
| | MIN | MID | MAX | MIN | MID | MAX | |

| | COMPANY | AREA | PLANT | COST CTR | COMPANY | AREA | PLANT | COST CTR |
|---|---|---|---|---|---|---|---|---|
| [ ] REHIRE | | | | | | | | |
| [ ] POSITION/ JOB CHANGE | POSITION TITLE | | POSITION CODE | | POSITION TITLE | | POSITION CODE | |
| [ ] COST CENTER CHANGE | REPORTS TO: | | | | REPORTS TO: | | | |
| [ ] AREA/PLANT CHANGE | | | | | | | | |

| | [ ] REG | [ ] TEMP | REG. HRS | [ ] REG | [ ] TEMP | REG. HRS |
|---|---|---|---|---|---|---|
| [ ] WORK STATUS | [ ] FULL-TIME | [ ] PART-TIME | PPP: | [ ] FULL-TIME | [ ] PART-TIME | PPP: |
| [ ] REHIRE | [ ] EXEMPT | [ ] NON-EXEMPT | | [ ] EXEMPT | [ ] NON-EXEMPT | |
| [ ] OTHER | COMMENTS | reduce to half pay - he us on disability | | | | |

| INITIATOR: | DATE | APPROVAL: | DATE | APPROVAL: | DATE |
|---|---|---|---|---|---|
| APPROVAL: | DATE | APPROVAL: | DATE | APPROVAL: | DATE |

entered 10-22

**RSL00095**

**Internal memo**

# Tarmac 

| To | Yvonne Smith/Darlene Wallace | **Date** | October 17, 1997 | **From** | Hope Fischer |
|---|---|---|---|---|---|
| **cc** | Joan Black | **Ref** | Jim Radican - Short Term Disability | **Tel no.** | |

James Radican (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) has been on short term disability since January 1, 1997. He has completed nine months at full pay and beginning October 1, 1997 should have begun receiving half pay through December 31, 1997.

Please make this adjustment to his pay (he is well aware of it and that he received a full check on October 15) through year-end. I apologize for not informing you of this change and realized that for all your great work over in Payroll, you are not mind-readers--I'll try to keep you posted on these things from now on!!

RSL00096

**TARMAC AMERICA, INC.**
HUMAN RESOURCE ~~PAYROLL COPY~~
SEPARATION (TERMINATION) REPORT

DISABILITY

[ ] WAGE
[X] SALARY

(PLEASE COMPLETE ALL DATA)

| COMPANY | EMPLOYEE # | SOCIAL SECURITY #: | POSITION/TITLE |
|---|---|---|---|
| 011 | 1417 | 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 | SALES REP |

| NAME PER SOCIAL SECURITY CARD | LAST: RADICAN | FIRST: JAMES | MI: E |
|---|---|---|---|

**ADDRESS** 3800 NW 71 ST, COCONUT CREEK FL 33073

| EFFECTIVE DATE OF TERM | LAST DAY WORKED | PAYROLL SEP DATE (END SEVERENCE) | DATE OF HIRE | LENGTH OF SERVICE |
|---|---|---|---|---|
| 12 31 97 | | | 06 25 65 | YEARS: 32   MONTHS: 6 |

**STATUS** [X] EXEMPT   [ ] NON-EXEMPT   [ ] FULL-TIME   [ ] PART-TIME   [ ] REGULAR   [ ] TEMP

| TRANSACTION | REASON |
|---|---|
| [ ] RESIGNATION | [ ] OTHER POSITION       [ ] LEAVING JOB MARKET       [ ] OTHER (EXPLAIN IN REMARKS) |
| | [ ] DISSATISFIED W/POSITION    [ ] RETURNING TO SCHOOL |
| [X] OTHER | [ ] MUTUAL AGREEMENT    [ ] LAYOFF/RIF       [ ] DEATH |
| | [ ] DISCHARGE W/CAUSE    [ ] RETIREMENT       [X] OTHER (EXPLAIN REMARKS) |
| | [ ] DISCHARGE OTHER |

REMARKS: DISABILITY

| EVALUATION RATING | UNSATISFACTORY | BELOW AVERAGE | AVERAGE | ABOVE AVERAGE | EXCELLENT |
|---|---|---|---|---|---|
| ATTENDANCE | | | | | |
| JOB KNOWLEDGE | | | | | |
| QUALITY OF WORK | | | | | |
| QUANTITY OF WORK | | | | | |

-0-

| ANNUAL BASE RATE AT TERM | HOURLY RATE | OVERTIME DUE | SEVERENCE DUE | | VACATION DUE | | OTHER |
|---|---|---|---|---|---|---|---|
| | | | WEEKS | DAYS | WEEKS | DAYS | |
| | | | | | | | |

| | YES | NO | | | YES | NO |
|---|---|---|---|---|---|---|
| BENEFITS CONTINUED? | | | MEDICAL/DENTAL | COBRA | ELIGIBLE? | | |
| (BEYOND NORMAL | | | PENSION/RETIRE | | INFO MAILED? | | |
| END-OF-MONTH) | | | LIFE/AD&D | DATE INFO MAILED | | | |
| | | | 401(K) | | | | |

DATE OF CANCELLATION
[ ] END OF MONTH
[ ] OTHER:

COMMENTS   PPE 1/15 - NO HOURS
PAT = -0-  ✓

**RSL00097**

| INITIATOR: | DATE 12/23/97 | APPROVAL: | DATE | APPROVAL: | DATE |
|---|---|---|---|---|---|
| APPROVAL: | DATE | APPROVAL: | DATE | APPROVAL: | DATE |

entered 1-2-98 TW

**TARMAC AMERICA, INC.**
**HUMAN RESOURCE**
SEPARATION (TERMINATION) REPORT
(PLEASE COMPLETE ALL DATA)

12-24
PERSONNEL FILE

**WAGE**
**SALARY**

| COMPANY | EMPLOYEE # | SOCIAL SECURITY #: | POSITION/TITLE |
|---|---|---|---|
| 011 | 1417 | 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 | SALES REP |

NAME PER SOCIAL SECURITY CARD — LAST: RADICAN  F.RST: JAMES  MI: E

ADDRESS 3800 NW 71 ST Coconut Creek FL 33073

| EFFECTIVE DATE OF TERM | LAST DAY WORKED | PAYROLL SEP DATE (END SEVERENCE) | DATE OF HIRE | LENGTH OF SERVICE |
|---|---|---|---|---|
| 12.31.97 | | | 06 25 65 | YEARS: 32  MONTHS: 6 |

STATUS  [✓] EXEMPT  [ ] NON-EXEMPT  [ ] FULL-TIME  [ ] PART-TIME  [ ] REGULAR  [ ] TEMP

| TRANSACTION | REASON | | | |
|---|---|---|---|---|
| [ ] RESIGNATION | [ ] OTHER POSITION | [ ] LEAVING JOB MARKET | | [ ] OTHER (EXPLAIN IN REMARKS) |
| | [ ] DISSATISFIED W/POSITION | [ ] RETURNING TO SCHOOL | | |
| [✓] OTHER | [ ] MUTUAL AGREEMENT | [ ] LAYOFF/RIF | | [ ] DEATH |
| | [ ] DISCHARGE W/CAUSE | [ ] RETIREMENT | | [✓] OTHER (EXPLAIN REMARKS) |
| | [ ] DISCHARGE OTHER | | | |

REMARKS: DISABILITY

| EVALUATION RATING | UNSATISFACTORY | BELOW AVERAGE | AVERAGE | ABOVE AVERAGE | EXCELLENT |
|---|---|---|---|---|---|
| ATTENDANCE | | | | | |
| JOB KNOWLEDGE | | | | | |
| QUALITY OF WORK | | | | | |
| QUANTITY OF WORK | | | | | |

| ANNUAL BASE RATE AT TERM | HOURLY RATE | OVERTIME DUE | SEVERENCE DUE | | VACATION DUE | | OTHER |
|---|---|---|---|---|---|---|---|
| | | | WEEKS | DAYS | WEEKS | DAYS | |

| | | | YES | NO | | | YES | NO |
|---|---|---|---|---|---|---|---|---|
| BENEFITS CONTINUED? | MEDICAL/DENTAL | | | | COBRA | ELIGIBLE? | | |
| (BEYOND NORMAL | PENSION/RETIRE | | | | | INFO MAILED? | | |
| END-OF-MONTH) | LIFE/AD&D | | | | DATE INFO MAILED | | | |
| | 401(K) | | | | | | | |

DATE OF CANCELLATION
[ ] END OF MONTH
[ ] OTHER:

COMMENTS

**RSL00098**

| INITIATOR: | DATE 12/23/97 | APPROVAL: | DATE | APPROVAL: | DATE |
|---|---|---|---|---|---|
| APPROVAL: | DATE | APPROVAL: | DATE | APPROVAL: | DATE |

entered 1-2-98 TW

05/08/1998 14:01   9549583901   CYBERGUARD CORP   PAGE  01



**CYBERGUARD** CORPORATION

**FAX: 954-958-3901 / PHONE: 954-958-3300**

# FACSIMILE TRANSMISSION REQUEST

**To:** HOPE FISHER
HR DEPARTMENT

**Fax:** 757-853-5462

**Date:** 5/8/98

**Sender:** Jim Radican
**Sender Telephone #:**
**Subject:**

_____

*You should receive __6__ pages, including this cover sheet.*

COMMENTS:

_____

**2000 West Commercial Boulevard, Suite 200
Fort Lauderdale, FL 33309**

**RSL00099**



**Reliance Standard Life Insurance Company**

April 6, 1998

James E. Radican
3800 N. W. 71 Street
Coconut Creek, FL 33073

    Policyowner : Tarmac America, Inc.
    Policy No.  : LSC 98842
    Claim No.  : 1997-2346-010

Dear Mr. Radican:

We would like to express our appreciation for your patience and cooperation during the review of your claim for Long Term Disability (LTD) benefits. We have now completed our determination regarding your eligibility for benefits under the above group LTD policy.

To be eligible for benefits, the group policy requires that objective medical documentation must substantiate that a member, while insured under the group policy, meets the group policy's definition of Total Disability. The group policy defines Total Disability as follows:

**"Actively at work" and Active Work" mean actually performing on a full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an injury or sickness.**

**"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.**

We have received documentation from your employer which indicates you began working on a part-time basis on or about November 1, 1995 and continued to work part-time for over one year.

In order to be eligible for Long Term Disability under this policy, you must be actively at work and working on a full-time basis as defined by the policy. Based on information provided by your employer, you were working part-time when the policy became effective on January 1, 1996 and did not returned to full time active work prior to your last day worked. Therefore, you have not satisfied the policy definition of a full-time employee and are not eligible for Long Term Disability Benefits coverage.

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

RSL00100


**RSL** Reliance Standard Life Insurance Company®

We regret our decision could not be more favorable. Our determination has been based on the information contained in your file and the policy provisions applicable to your claim.

Under the Employee Retirement Income Security Act of 1974, you may request a review of this denial by writing to:

<div align="center">

Reliance Standard Life Insurance Company
Quality Review Unit
P. O. Box 8330
Philadelphia, PA 19101-8330

</div>

The written request for review must be sent within 60 days of receipt of this letter and state the reasons why you feel your claim should not have been denied. Include any documentation which you feel supports your claim. You or your duly authorized representative are also entitled to review the pertinent documents upon which the denial decision wa predicated. Under normal circumstances, you will be notified in writing of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any of Reliance Standard Life Insurance Company's rights and defenses under the above captioned policy, and all these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

James A. Wilson, Jr
Group LTD Claims Department
Extension: 3854


cc:     Tarmac America, Inc.
        Attn: Hope Fischer
        P.O. Box 2016
        Norfolk, VA 23501


<div align="center">

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

</div>

<div align="right">

RSL00101

</div>

JAMES E. RADICAN
3800 NW 71ST Street
Coconut Creek, FL 33309

(954) 421-1641

On September 30, 1995, I had spinal surgery to correct a herniated disc to relieve severe pain in my lower back and legs. On or about October 15, 1995, I returned to work with the understanding that I was still convalescing. At that time I reported to Fred Goudie, Vice President and General Manager of the Tarmac/Pennsuco Cement Mill in Medley, Florida. Mr. Goudie was aware of my situation and advised me to take whatever time off from work necessary to receive treatments that would aid my recovery. In fact, I was scheduled the first week of November 1995, to undergo a series of epidural injections of steroids and cortisone into my spinal column and trigger point in my lower back. These injections took place at the Holy Cross Hospital Pain Center in Ft. Lauderdale, Florida. Minimal time from work was lost during this series because temporary relief was obtained.

In November 1995, my post surgery condition was evaluated by Dr. Manual Porth, Orthopedic Physician and Surgeon. Dr. Porth prescribed physical therapy twice weekly for a period of six weeks. I did receive the therapy and an additional six weeks of therapy starting in February, 1996, total of 12 weeks. Lost time while receiving physical therapy was approximately three hours for each session.

Dr. Porth later prescribed a series of Epidural Steroid injections and injections at painful trigger points. The injections were scheduled one every 10 days for a total of three.

Six months later Dr. Porth prescribed the same type and number of injections. Both series of injections were performed at the Columbia Outpatient Center in Coral Springs, Florida.

Lost time from work was on the days I received the injections, or a total of six days for both series.

In September 1996, Mike Unger, the new General Manager of Tarmac/Pennsuco Cement Mill, advised me that Tarmac's Human Resource office was questioning my ability to continue to perform at 100% efficiency do to the severity of my condition. I explained to Mr. Unger that I planned to submit a letter from Dr. Porth regarding my physical condition and would file for Short Term Disability by October 1st, 1996. Mr. Unger requested that I delay filing until January 1, 1997. Mr. Unger said he had obtained approval from Hardy Johnson, Vice President of Cement and Ready Mix, for me to draft various cement product manuals to be used by our customers and architects. I spent the last three months of 1996 drafting four manuals and product data sheets as requested by Mr. Unger.

RSL00102

Page 2

On January 1, 1997, as planned, I filed for Short Term Disability and received the proper benefits for the period of one year. In the last quarter of 1997, I filed a claim for my long term disability benefits for which I had contributed.

During February of 1998, I had several conversations with James Wilson of Reliance Life. In one conversation James questioned my employment records. James said that in a recent conversation with Mike Unger, Mike said he had little information to add except that I was an exempt salaried employee. James stated that he needed more information than Mike had given him. James questioned my ability to work full time because of my medical history. I explained to James that the former General Manager, Fred Goudie allowed me to work part time while receiving physical therapy and pain treatments. James said, at that point, " I am not telling you to put words into Mr. Unger's mouth, but you could advise him of our conversation and have him fax me a letter to that effect". James said he would forward the letter and my file to his supervisor for final review. Within a few days of receipt of Mike Unger's letter my claim was denied.

In April of 1998, I was notified by Reliance Life Insurance Company that my claim was denied because I failed to satisfy the policy definition of a full time employee.

To say that I was allowed to work part time while receiving treatments is not to say that I did not work full time all other times for over a year. My medical treatments took place at various periods of time:

|          |                  |
|----------|------------------|
| Oct, 1995 | Pain Injections  |
| Dec. 1996 | Physical Therapy |
| Feb. 1996 | Physical Therapy |
| Aug. 1996 | Pain Injections  |
| Dec. 1996 | Pain Injections  |

During my recovery period, my lost time from work was normal under the circumstances. Whether my lost time is called part-time, partial time loss or sick time, I consider it full time because my job classification was full time exempt employee with over thirty years of service. The policy states 37.5 hours during regular work week. This could be considered part time by most managers I have reported to in the past years. My normal work week as a Sales Representative was 50 hours. Even with my time loss I averaged over 40 hours per week on an annual basis. Mr. Unger's letter, stating that I worked part time while receiving various treatments, did not state that I worked less than 37.5 hours per week.

RSL00103

Page 3

During this entire time frame, I was fully responsible for my sales territory, sales volume, forecasting, reporting (in writing), technical assistance and all other expected duties. My territory was not re-assigned until sometime in early 1997. I received full salary in 1995, 1996, and as designated under Short Term Disability in 1997. At all times I carried a state-wide company beeper and a company cellular phone. I was in constant contact with my accounts and with company management.

I have remained, at all times, a loyal productive employee. I based all my actions on statements from management, Human Resources, and I thought I was following company policy to the letter. The denial of this claim for 18 months Long Term Disability at 60% of my salary is unjustified and I will seek legal assistance.

5/8/98

RSL00104

**TARMAC AMERICA, INC.**

**PERSONNEL ACTION FORM**

**BENEFITS COPY**

| | WAGE |
|---|---|
| X | SALARY |

(All appropriate areas must be completed to process)

| ENTER UP TO 3 PERSONNEL ACTIONS | 01-INITIAL EMPLOYMENT | 06-JOB RECLASSIFY | 11-SALARY TO WAGE |
|---|---|---|---|
| FROM THE LIST AT RIGHT AND THE | 02-SALARY ADJUSTMENT | 07-DEMOTION | 12-REHIRE |
| EFFECTIVE DATE BELOW | 03-PROMOTION | 08-DISABILITY/LEAVE OF ABSENCE | 13-OTHER DATA CHG |

| ACTIONS | EFFECTIVE DATE | 04-TRANSFER | 09-LEAVE OF ABSENCE | |
|---|---|---|---|---|
| 02 | 10 01 97 | 05-JOB ASSIGNMENT CHANGE | 10-WAGE TO SALARY | |

| NAME PER SOCIAL SECURITY CARD | LAST: Radican | FIRST: James | MI: |
|---|---|---|---|

| SOCIAL SECURITY #: | EMPLOYEE # | COMPANY | AREA | PLANT | COST CENTER |
|---|---|---|---|---|---|
| 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 | 1417 | 011 | PENNS | PN | 35152 |

| POSITION TITLE | POSITION CODE | JOB CODE |
|---|---|---|
| Sales Represtrative | PNVTSR | SLSR1 |

| HIRE DATE | STATUS | | | SEX | ETHNIC CODE |
|---|---|---|---|---|---|
| | [ ] REGULAR  [ ] FULL-TIME  [ ] EXEMPT | | | | |
| | [ ] TEMP  [ ] PART-TIME  [ ] NON-EXEMPT | | | | |

| ANNUAL BASE RATE | HOURLY RATE | MONTHLY RATE | SEMI-MONTHLY RATE |
|---|---|---|---|
| | | | |

| SALARY GRADE | MINIMUM RANGE | MID RANGE | MAX RANGE |
|---|---|---|---|
| | | | |

| KRONOS BADGE # | REPORTS TO |
|---|---|
| | |

| TRANSACTION | FROM (CURRENT): | | | | TO (NEW): | | |
|---|---|---|---|---|---|---|---|
| | ANNUAL RATE | GRADE | HOURLY RATE | %ADJ | ANNUAL RATE | GRADE | HOURLY RATE |
| [ X ] RATE CHANGE | 57888.9 | | | | 28,944.45 | | 13.9151 |
| [ ] REHIRE | SEMI-MONTHLY | | MONTHLY | | SEMI-MONTHLY | | MONTHLY |
| | | | | | 1206.0188 | | 2,412.0375 |
| | MIN | MID | MAX | | MIN | MID | MAX |
| | | | | | | | |

| [ ] REHIRE | COMPANY | AREA | PLANT | COST CTR | COMPANY | AREA | PLANT | COST CTR |
|---|---|---|---|---|---|---|---|---|
| [ ] POSITION/ JOB CHANGE | | | | | | | | |
| | POSITION TITLE | | POSITION CODE | | POSITION TITLE | | POSITION CODE | |
| [ ] COST CENTER CHANGE | | | | | | | | |
| | REPORTS TO: | | | | REPORTS TO: | | | |
| [ ] AREA/PLANT CHANGE | | | | | | | | |

| | [ ] REG | [ ] TEMP | REG. HRS | [ ] REG | [ ] TEMP | REG. HRS |
|---|---|---|---|---|---|---|
| [ ] WORK STATUS | [ ] FULL-TIME | [ ] PART-TIME | PPP: | [ ] FULL-TIME | [ ] PART-TIME | PPP: |
| [ ] REHIRE | [ ] EXEMPT | [ ] NON-EXEMPT | | [ ] EXEMPT | [ ] NON-EXEMPT | |
| | COMMENTS | reduce to half pay - he us on disabili | | | | |
| [ ] OTHER | | | | | | |

| INITIATOR: | DATE | APPROVAL: | DATE | APPROVAL: | DATE |
|---|---|---|---|---|---|
| APPROVAL: | DATE | APPROVAL: | DATE | APPROVAL: | DATE |

entered 10-22

RSL00105

# PARK PLACE THERAPEUTIC CENTER

January 1, 1996

Re: James Radican
102566-0

To Whom it May Concern:

Mr. James Radican is status post laminectomy for severe degenerative arthritis of the lumbar spine with spinal stenosis. The patient continues to be symptomatic following his surgery.

A program of rehabilitation is mandatory and the patient has been advised to remain out of work for the next six months for medical reasons. It is my opinion that with a strenuous program of therapy and rehabilitation, we can maximize the benefits of the surgical procedure and hopefully return this patient to work status by June of 1996.

Very truly yours,

MANUEL PORTH, M. D.

MP/jcg

**RSL00106**



301 N.W. 84th Avenue
Plantation, Florida 33324

7171 N. University Drive
Tamarac, Florida 33321

IAC

TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35252

Location: Beth Crout

Employee Vendor #: ____

Date: 10/4/20

Name: Jim Brinton
16.00 N. W. 71 St.
Coconut Crk. FL 33023
Mailing Address:

Daytime Phone #: 1-800-458-4250

| Date | Description of Expense | Transportation Co. Car | Other | Hotel | Meals | Entertain. | Other |
|------|------------------------|--------|-------|-------|-------|-----------|-------|
| 1-3 | Lunch (Beth Int.) | | | | 16.— | | |
| 1-5 | Dinette (Mr. Pastrnig) | | | | 24.— | | |
| " | Tolls for WK | 3.— | | | | | |
| 1-11 | Lunch (Osprey Bldg Mtls) | | | | 17.— | | |
| 1-12 | " (Creative Plastering) | | | | 103.— | | |
| " | Dinner (Garlo Sup.) | | | | 28.— | | |
| 1-15 | Phone & Dist. | | | | | | 25.45 |
| 1-17 | Lunch (Cape Supply) | | | | 21.— | | |
| " | Dinner (Seacoast Sup) (Ft Myers) | | | | 42.— | | |
| 1-17 | Addition Trvl | | | 54.45 | | | |
| 1-18 | Lunch (AAA Supply) | | | | 20.— | | |
| " | Tolls for WK | 10.— | | | | | |
| 1-19 | Dinner (Clenney Plast.) | | | | 22.— | | |
| 1-23 | Lunch (Palm Sup Plast) | | | | 25.— | | |
| 1-24 | (Valient Plast.) | | | | 22.— | | |
| 1-25 | " (Boch Sup. Co.) | | | | 25.— | | |
| 1-26 | " (North Spanish Plast.) | | | | 17.— | | |

Brought Forward from Cont'l Sheet No. _____

Mileage Allowance @ _____ Per Mile x Number of Business Miles

Charges paid by Termex (such as airfare, memo only)

Mileage Allowance $ _____

| | Transportation | Other | Hotel | Meals | Entertain. | Other |
|---|---|---|---|---|---|---|
| | 635-101 | 635-106 | 635-104 | 635-105 | 635-102 | 635-103 |
| Column Totals | 13.— | | 54.45 | 385.— | ✓ | 25.45 |

Approver's Signature: _____

Current Odometer Reading: 53,000.—
Previous Odometer Reading: 51,200.—
Total Miles Traveled: 1,790.—
Business Miles: _____
Private Miles: 10.0

Employee Signature: [signature] J. Robin

Name: _____    Date: 1-31-96

RSL00107

Total of All Expense Paid By Employee
Less Cash Advance
Amount Due Employee (Termex)

Termex, 1181 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

Forward to: _____

# TARMAC

## TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35152

Location: Pork Grout

Employee/Vendor #: JV025

Employee/Vendor Name: Jim Barbera
Mailing Address: 3600 N.W. 71 St, Coconut Creek, FL 33073
Daytime Phone #: 1-800-458-4250

Date: 10/4/01

| Date | Description of Expense | Transaction On Car | Other | Hotel | Meals | Entertain | Other |
|------|------------------------|--------------------|-------|-------|-------|-----------|-------|
| 11-1 | Auto Supplies / New Wiper Blades | 21.18 | 21.18 | | | | |
| " | Car Wash | 8.25 | 8.25 | | | | |
| 11-7 | Danish, Rolls (Putnam - Miami) | | | | | 6.54 | 6.54 |
| 11-12 | C.S.I. Meeting (Lounge Et.) | | | | | 10.00 | .00 |
| " | " | | | | | 22.00 | 22.— |
| 11-13 | Car Wash | 8.25 | 8.25 | | | | |
| " | Rolls for NVA (2-Trips to Miami) | 5.00 | 5.00 | | | | |
| 11-14 | Lunch (E. Scott - FLA - Plastering) | | | | 16.— | | 16.— |
| 11-25 | Belt Cover Replacement parts | | | | | | 9.16 |
| " | Car Wash | 11.25 | 11.25 | | | | |
| " | Lunch (Gaston Stone - D. Griffin) | | | | | 25.— | (59.82) |
| 11-30 | Belt South Mobility | | | | | | |

RSL00108

Brought Forward from Cont'n Sheet No. _____

Mileage Allowance ● _____  Per Mile x Number of Business Miles

Charges paid by Tarmac (such as airfare, memo only): _____

Current Odometer Reading: 61,600.0
Previous Odometer Reading: 60,900.0
Total Miles Traveled: 700.0
Business Miles: 650.0
Private Miles: 50.0

Employee Signature: [signature]
Date: 11-30-96

Approver's Signature: [signature]
Name: Michael Unger
Date: 12/3/96

| | Mileage Allowance $ | 635-101 | 635-106 | 635-105 | 635-104 | 635-103 | 635-102 |
|---|---|---|---|---|---|---|---|
| Column Totals | | 53.93 | 3.93 | | | 189.32 | 282.45 |

635-101: 53.93
635-106: 3.93
635-102: 77.39
635-103: 189.32

150.96

Total of All Expenses Paid By Employee: 282.45
Less Cash Advance: 
Amount Due Employee/(Tarmac): 282.45

Forward to: Tarmac, 1161 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

# TARMAC

## TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35752

Location: _____

NON PROFIT

Employee/Vendor #: 10/4801
Name: Jim Bartlett
Mailing Address: 1800 NW 71 St, Coconut Crk. FL 33073
Daytime Phone #: 1-800-458-4250

Bill Grant

| Date | Description of Expense | Transportation Ov. Car | Other | Hotel | Meals | Entertain | Other |
|------|------------------------|------------------------|-------|-------|-------|-----------|-------|
| 12-6 | Tolls - 2 days at 2.50 | $5.00 | 5— | | | | |
| 12-13 | " 3 days " " | 7.50 | 7.50 | | | | |
| 12-13 | Car Wash | 8.25 | 8.25 | | | | |
| 12-20 | Tolls - 2 days at 2.50 | 5.00 | 5— | | | | |
| 12-31 | Bell So. Mobility | | | | | | 62.37 |

| | 635-101 | 635-108 | 635-104 | 635-105 | 635-102 | 635-103 |
|---|---------|---------|---------|---------|---------|---------|
| Column Totals | 25.75 | 25.75 | | | | 62.37 |

Mileage Allowance @ _____ Per Mile x Number of Business Miles _____

Brought Forward from Cont'n Sheet No. _____

Charges paid by Tarmac (hotel as airfare, memo only) _____

Current Odometer Reading 64,100.0
Previous Odometer Reading _____
Total Miles Traveled _____
Business Miles _____
Private Miles _____

Employee Signature: [signature]    Date: 12-31-96

Approver Signature: [signature]
Name: Michael Unger    Date: 12/7/97

Total of All Expenses Paid By Employee _____
Less Cash Advance _____
Amount Due Employee/(Tarmac) _____

58.12
500.—
411.88

Forward to: Tarmac, 1181 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

RSL00109

129604 M

## OF FORT LAUDERDALE

RADIOLOGY

ULTRASONOGRAPHY
COMPUTERIZED TOMOGRAPHY

TELEPHONE 772-9220
FAX 772-9226

4542 NORTH FEDERAL HIGHWAY
FORT LAUDERDALE, FLORIDA 33308

226 SOUTHEAST TWELFTH AVENUE
FORT LAUDERDALE, FLORIDA 33301

J. P. KELLER, M.D.
G. MENDEZ, JR., M.D.
M. J. SIMON, M.D.
A. J. MARTI, M.D.
R. L. KALETT, M.D.
O. R. COHEN, M.D.
A. CONVERS, M.D.

UNIVERSITY HOSPITAL
7201 N. UNIVERSITY DRIVE
TAMARAC, FLORIDA 33521

LAS OLAS COMMUNITY HOSPITAL
1516 LAS OLAS BOULEVARD
FORT LAUDERDALE, FLORIDA 33301

HCA NORTHWEST REGIONAL HOSPITAL
5801 COLONIAL DRIVE
MARGATE, FLORIDA 33063

Dear Dr.Peicher:

RADICAN, James E.
January 17,1992

### LUMBAR SPINE:

Today's examination included flexion and extension
maneuvers. Comparison is made to routine lumbar spine
series performed in August of 1991. The examination
again demonstrates mild disc space narrowing at the
anterior aspect of the L5-S1 interspace level. Today's
examination does not reveal the minimal posterior
osteophytic spurring suggested previously involving
the inferior endplate of L4. Furthermore,flexion
and extension maneuvers were performed and there is
no abnormal motion or instability involving lumbar
vertebral bodies.No significant compression of lumbar
vertebral bodies. Anterior spurring affects some upper
lumbar vertebral bodies. Again, we note the presence
of laminectomy at L5-S1 interspace level  with posterior
effusion.

### PELVIS:

The bony pelvis is unchanged in appearance from December
of last year. Again, noted are mild degenerative changes
of both hip joints in the form of minimal acetabular spurring
bilaterally and minimal sclerosis.No appreciable narrowing
of the joint spaces.

Again, noted are prostatic calcifications.

RSL00241

### CONCLUSION:

A lumbar spine examination is essentially stable from last
August.Mild disc space narrowing at the operative site at
the L5-S1 level. There is no abnormal motion or instability
with special flexion and extension maneuvers. The bony pelvis
and hip joints are stable from prior examination.

Thank you for this referral.

Robert L. Kalett, M.D.

129604 M

## ...A. OF FORT LAUDERDALE

IMAGING          RADIOLOGY

ULTRASONOGRAPHY
COMPUTERIZED TOMOGRAPHY

TELEPHONE 772-9220
FAX 772-9226

4542 NORTH FEDERAL HIGHWAY
FORT LAUDERDALE, FLORIDA 33308

G. MENDEZ, JR., M.D.
M. J. SIMON, M.D.
A. J. MARTI, M.D.
O. R. COHEN, M.D.
A. CONVERS, M.D.
M. ALARCON, M.D.
A. ALARCON, M.D.
W. P. CALVERT, M.D.

226 SOUTHEAST TWELFTH AVENUE
FORT LAUDERDALE, FLORIDA 33301

UNIVERSITY HOSPITAL
7201 N. UNIVERSITY DRIVE
TAMARAC, FLORIDA 33321

VENCOR HOSPITAL
1516 LAS OLAS BOULEVARD
FORT LAUDERDALE, FLORIDA 33301

HCA NORTHWEST REGIONAL HOSPITAL
5801 COLONIAL DRIVE
MARGATE, FLORIDA 33063

Dear Dr. Peicher:

RADICAN, James
May 18, 1994

### LUMBAR SPINE SERIES:(COMPLETE)

A complete plain film evaluation was performed of the lumbar
spine including attempted flexion and oblique projections.

There is evidence of prior surgery involving the lower lumbar
spine with a laminectomy defect involving the L5-S1 level and
evidence of prior bony fusion extending from the L4 level through
the S1-S2 level related to the posterior elements. There is
evidence of severe interspace narrowing secondary to degenerative
disc disease involving the L5-S1 and to a lesser extent the
L4-L5 and L1-L2 levels. Mild to moderate interspace narrowing
secondary to degenerative disc disease involve the L3-L4 and
to a lesser extent the L2-L3 level. There is mild posterior
osteophyte formation involving the L4-L5 and L5-S1 levels
and there is evidence of facet hypertrophy involving the lower
lumbar spine in addition to the changes related to prior
bony fusion. The possibility of a component of bony spinal
stenosis involving the lower lumbar spine cannot be excluded.
If clinically warranted, a CT scan may be indicated for further
evaluation and correlation. During attempted flexion which
appears limited, there is no evidence of instability identified.
There is no evidence of a fracture, subluxation or a focal lytic
or blastic process.

## RSL00242

### IMPRESSION:

Post-surgical and degenerative changes are identified involving the
lower lumbar spine. Additional findings of a degenerative nature
are evident involving the remainder of the lumbar spine. Depending
upon clinical circumstances additional imaging studies may be
indicated for further evaluation. Please read above comments.
There is no evidence of a fracture, subluxation or a focal lytic
or blastic process. Please read above comments.
Thank you for this referral.

Alex J. Marti, M.D.

**OF FORT LAUDERDALE**

RADIOLOGY

ULTRASONOGRAPHY
COMPUTERIZED TOMOGRAPHY

TELEPHONE 772-9220
FAX 772-9226

4542 NORTH FEDERAL HIGHWAY
FORT LAUDERDALE, FLORIDA 33308

226 SOUTHEAST TWELFTH AVENUE
FORT LAUDERDALE, FLORIDA 33301

J. P. SPILER, M.D.
G. MENDEZ, JR., M.D.
M. J. SIMON, M.D.
A. J. MARTI, M.D.
R. L. KALETT, M.D.
O. R. COHEN, M.D.
A. CONYERS, M.D.

UNIVERSITY HOSPITAL
7201 N. UNIVERSITY DRIVE
TAMARAC, FLORIDA 33321

LAS OLAS COMMUNITY HOSPITAL
1516 LAS OLAS BOULEVARD
FORT LAUDERDALE, FLORIDA 33301

HCA NORTHWEST REGIONAL HOSPITAL
5801 COLONIAL DRIVE
MARGATE, FLORIDA 33063

Dear Dr. Peicher:

RADICAN, James
December 2, 1991

PELVIS & RIGHT HIP:

AP view of the bony pelvis was performed along with AP
and frog lateral views of the right hip. As concerns the
right hip there is no evidence for acute fracture. Lateral
acetabular spurring is noted with mild sclerosis of the acetabulum.
The same descriptive findings can be said of the left hip as well.

Evaluation of the bony pelvis does show abundant prostatic
calcifications about the symphysis pubis for which clinical
correlation would be recommended. The sacroiliac joints are
patent.

CONCLUSION:

1. Mild degenerative changes affect the right hip.

2. Abundant prostatic calcifications.

Thank you for this referral.

RLK:mr
cc: Dr. Waters

Robert L. Kalett, M.D.

**RSL00243**

129604 M

............OCIATES, P.A.

RADIOLOGY

ULTRASONOGRAPHY
COMPUTERIZED TOMOGRAPHY

TELEPHONE 772-9220
FAX 772-9226

4542 NORTH FEDERAL HIGHWAY
FORT LAUDERDALE, FLORIDA 33308

226 SOUTHEAST TWELFTH AVENUE
FORT LAUDERDALE, FLORIDA 33301

J. P. KELLER, M.D.
G. NERBEE JR., M.D.
M. J. RIVOLI, M.D.
A. J. MARTI, M.D.
R. L. BALITT, M.D.
O. R. COHEN, M.D.
A. CONYERS, M.D.

UNIVERSITY HOSPITAL
7201 N. UNIVERSITY DRIVE
TAMARAC, FLORIDA 33521

LAS OLAS COMMUNITY HOSPITAL
1516 LAS OLAS BOULEVARD
FORT LAUDERDALE, FLORIDA 33301

HCA NORTHWEST REGIONAL HOSPITAL
5801 COLONIAL DRIVE
MARGATE, FLORIDA 33063

Dear Dr. Peicher:

RADICAN, James E.
August 12, 1991

CERVICAL SPINE:

Cervical spine series does demonstrate the presence of disc
space narrowing of C5-C6 interspace level and also there is
evidence of bilateral foraminal encroachment on the neural
foramina at this interspace level by posterior osteophyte
formation. No evidence of abnormal motion or instability
of cervical vertebral bodies.

THORACIC SPINE:

AP and lateral views of the thoracic spine show    vertebral
body height to be maintained and pedicles appear intact. Note
is made of previous coronary bypass surgery and aortic valvular
replacement is likewise suggested.

LUMBAR SPINE:

The examination shows evidence of laminectomy at the last two
lumbar levels and evidence of posterior fusion of the L5-S1
level.

There is evidence of disc space narrowing at the L5-S1 level.
Evaluation of the L4-L5 interspace level raises the possibility
of posterior spurring of the inferior endplate of L4. If spinal
stenosis would be a clinical consideration then further evaluation
by means of CT would be recommended.

continued

RSL00244

Page 2                                          RADICAN, James E.
                                                August 12, 1991

CONCLUSION:

1.   Focal degenerative changes in the cervical spine at the
     C5-C6 level as discussed above.

2.   Unremarkable thoracic spine.

3.   Status post operative laminectomy and posterior fusion
     as discussed above with degenerative disc disease at the
     L5-S1 level.  Please see above comments referrable to the
     L4-L5 interspace level.


Thank you for this referral.


RLK:mr
cc: Dr. Waters                          Robert L. Kalett, M.D.

## COLUMBIA SURGERY CENTER AT CORAL SPRINGS
### CORAL SPRINGS, FL.

PATIENT NAME:        RADICAN, JAMES
ROOM NO.:
MR NUMBER:           298451
ADMIT DATE:          07/18/96

*102 566*

REFERRING PHYSICIAN:     Manuel Porth, M.D.
CONSULTING PHYSICIAN:    Alan Siegel, M.D.
DATE OF CONSULTATION:    07/18/96


### DEPARTMENT OF ANESTHESIOLOGY PAIN SERVICE CONSULT


DATE OF PROCEDURE:       07/18/96

CONSULTING PHYSICIAN:    Alan Siegel, M.D.

CHIEF COMPLAINT:         Spinal stenosis.    Her for epidural
                         steroid injection.


**HISTORY OF PRESENT ILLNESS:**

The patient returns for his second in a series of three epidural
steroid injections.  He is a 66-year-old gentleman with a history
of herniated discs at L1-2 and L3-4 with previous spinal fusion
from L4-5 to L5-S1.  He also has some component of myofascial pain
in the lower part of his back.  His first epidural injection done
nearly two weeks ago at the T12-L1 level in the midline produced
significant pain relief, but only for approximately one week.
Following that one week period of analgesia, his pain gradually
returned to its baseline state and he has his pain back for the
past week or so.  He seems to be a little bit more mobile and can
sit for longer periods of time than he could previously.  The
patient is motivated to continue to improve and desires his second
injection today.

The risks were re-discussed with him and he agreed to proceed.


**DESCRIPTION OF PROCEDURE:**

The patient was placed in the sitting position and standard
monitors were applied.  The back was prepped and draped sterilely
with Betadine solution.  1% Lidocaine plain times 3 ml. was
injected into the skin and underlying ligaments in the midline at
the T12-L1 interspace.

## CONSULTATION REPORT                    **RSL00246**

## COLUMBIA SURGERY CENTER AT CORAL SPRINGS
### CORAL SPRINGS, FL.

**PATIENT NAME:**            **RADICAN, JAMES**
**DICTATING PHYSICIAN:**     Alan Siegel, M.D.

A #20 gauge 3.5 cm. Tuohy needle was introduced into the epidural space easily with an air loss of resistance technique with the bevel directed downward.   The loss of resistance was so superficial, however, that the needle was removed and replaced again to confirm the relatively superficial location of the epidural space at this level.   Again, the loss of resistance was quite definite and without heme, cerebrospinal fluid, or paresthesias.

Injection was then carried out with Depo-Medrol 120 mg. plus Bupivacaine 0.25% times 5 ml. plus preservative free normal saline to dilute the total injectate to 15 ml. total volume.   The patient said that he felt some tingling down to the buttocks bilaterally, right greater than left, upon injection indicating to me that the medication did reach the correct location in the epidural space. The needle was cleared with 2 ml. of preservative free normal saline removed.

The patient then underwent two trigger point injections with a total of 40 mg. of Depo-Medrol and Bupivacaine 0.25% times 9 ml.   The trigger points were located on either side of the midline scar in the upper sacral region at the mid-scapula level.

He tolerated this injection as well.

He was observed for a period of 20 minutes, during which time his vital signs remained stable.   He did not develop any significant sensory or motor blockade.

He was discharged Home from the Center in good condition and will return in 7-10 days for his third injection.

He states that he has already undergone some physical therapy at Dr. Porth's office which did not help him, so I will not try this presently.   However, following his course of epidural steroid treatment, he might benefit from a renewed course of physical therapy and this will be suggested to his referring physicians.

_____
Alan Siegel, M.D.

AS/ls  :23109
D: 07/18/96  T: 07/19/96 1:02 pm
cc:      Manuel Porth, M.D.

CC:      Jack Peicher, M.D.

## CONSULTATION REPORT

**RSL00247**

**Doctor's Copy**            PAGE 2

# UNIVERSITY HOSPITAL, LTD.

Tamarac, FL.

**PATIENT NAME:**     RIVALDO, CONSTANCE
**ROOM NO.:**          U218
**MR NUMBER:**         247661

**HISTORY OF HOSPITALIZATION:**
The patient was admitted to the skilled nursing unit at University
Hospital in stable condition.  She was evaluated and treated.
While in the skilled nursing unit, the patient had no significant
problems.  Her vital signs remained stable.  Laboratory studies,
April 15, 1996, sodium 140, potassium 4.8, CO2 26, glucose 88, BUN
14, creatinine 0.7.  White count 6.6, hemoglobin 13.1, platelet
count 368,000.  Urinalysis showed trace leukocytes, trace blood.

**CONDITION AT THE TIME OF DISCHARGE:**
Stable.

**DISCHARGE MEDICATIONS:**
Fosamax 10 milligrams p.o. q.d.; Capoten 25 milligrams q.12h.;
Nitro-Dur 10 patch q.d.; Zantac 150 milligrams qhs; Macrotin 50
milligrams q.d.; Os-cal 500 milligrams b.i.d.

**DISCHARGE DIAGNOSES:**
1.   Status post pinning of a stress of the right hip.
2.   Osteoporosis.
3.   Polymyalgia rheumatica.
4.   Coronary artery disease.
5.   Status post stress fracture of the left femoral head in 1987.
6.   Status post left femoral endarterectomy and aortic-iliac
     bypass.
7.   Status post left carotid endarterectomy.
8.   Hypertension, compensated.
9.   Hypothyroidism, compensated.

_____
Alan Kramer, M.D.

AK/cd  :06134
D: 06/10/96  T: 06/10/96 2:44 pm
cc:       Manuel Porth, M.D.

**RSL00248**

# DISCHARGE SUMMARY

Doctor's Copy                    PAGE 1

MAGNETIC RESONANCE IMAGING



**Coral Ridge MRI**

1951 N.E. 47th Street
Fort Lauderdale, Florida 33308
(305) 491-8881

| PATIENT INFORMATION | AGE | DATE | SCAN NO. | REFERRING PHYSICIAN |
|---|---|---|---|---|
| RADICAN, JAMES | 63 | 3-18-94 | 13,191 | J. PEICHER, M.D. |

## AREA OF STUDY: LUMBAR SPINE WITH AND WITHOUT CONTRAST MEDIUM

### SUMMARY OF FINDINGS:

MRI study of the lumbar spine was carried out using multiple sagittal and transvere views.

There is evidence of narrowing of the L3-4, L4-5, and L5-S1 interspaces. There is moderate bulge at the L3-4 level. There is spurring seen on the inferior cortical end-plates of the L3,4,and 5 vertebral bodies.

With T2 weighted pulse sequences, there is decreased signal intensity of all cervical discs.

Transaxial views show no evidence of midline or lateral disc herniation. There is evidence of prior lumbar laminectomy site at the L4-5 and L5-S1 levels.

The patient received a 16cc. injection of gadolinum and no additional changes were identified.

### INTERPRETATION:

1. Degenerative disc disease of the lumbar spine.

2. Evidence of a prior lumbar laminectomy at L4-5 and L5-S1.

3. Rather lumbar spondylitis with spurring seen most marked at the L2-3 and L3-4 levels.

4. Negative enhanced MRI study.

ROGER G. SCHNELL, M.D.

RGS/mm

RSL00249



MAGNETIC RESONANCE IMAGING



1951 N.E. 47th Street
Fort Lauderdale, Florida 33308
(305) 491-8881

| PATIENT INFORMATION | AGE | DATE | SCAN NO. | REFERRING PHYSICIAN |
|---|---|---|---|---|
| RADICAN, JAMES | 63 | 3-18-94 | 13,191 | J. PEICHER, M.D. |

AREA OF STUDY: LUMBAR SPINE WITH AND WITHOUT CONTRAST MEDIUM

### SUMMARY OF FINDINGS:

MRI study of the lumbar spine was carried out using multiple sagittal and transvere views.

There is evidence of narrowing of the L3-4, L4-5, and L5-S1 interspaces. There is moderate bulge at the 13-4 level. There is spurring seen on the inferior cortical end-plates of the L3,4,and 5 vertebral bodies.

With T2 weighted pulse sequences, there is decreased signal intensity of all cervical discs.

Transaxial views show no evidence of midline or lateral disc herniation. There is evidence of prior lumbar laminectomy site at the L4-5 and L5-S1 levels.

The patient received a 16cc. injection of gadolinum and no additional changes were identified.

### INTERPRETATION:

1. Degenerative disc disease of the lumbar spine.

2. Evidence of a prior lumbar laminectomy at L4-5 and L5-S1.

3. Rather lumbar spondylitis with spurring seen most marked at the 12-3 and L3-4 levels.

4. Negative enhanced MRI study.

ROGER G. SCHNELL,M.D.

RGS/mm

**RSL00250**

MANUEL PORTH, M.D.

PATIENT:  RADICAN, JAMES          FILE:   102566-0

DATE:    11-09-95                 D/A:
         MP/jcg


HISTORY:    The patient is a 65 year old gentleman presenting for evaluation of chronic back pain, giving a history of at least 23 years of back problems, having had a fusion of the lower lumbar segment at L5-S1 23 years ago, stating that for 10 years he had absolutely no back discomfort.  He advises me that he had a fusion and was kept in some type of a rigid orthotic for ten weeks and then for ten years he did well.  About eight years ago he redeveloped back pain, contributing some of the back pain to the type of work he use to do.  He use to sell cement, was a salesman on the road traveling at least 3,000 miles a month.  The long sitting appeared to have aggravated the situation.  He had a number of injections prior to the most recent surgery.  He was seen by Dr. Gieseke, had a myelogram, was advised that there was a disc herniation, and had surgery six weeks ago at Holy Cross Hospital where he had the benefit of disc excision at a level above the previous level of fusion.

At this point he gets up in the morning and has difficulty standing, has difficulty putting on his clothes, and has difficulty putting on his socks and shoes.  Since his surgery, he has had some local trigger point injections, with the last one given just 48 hours ago.

PHYSICAL EXAMINATION:  There is some fluctuance and fullness in the area of the previous incision. The incision which is now six weeks old consists of the upper portion of the previous utilized incision for the fusion. Fluctuance would suggest some fluid collection in the subcutaneous tissue.  The patient is able to stand on his tiptoes and walk on his heels.   The straight leg raising is unremarkable bilaterally. Motor and sensory function, reflexes and peripheral pulses appear to be intact.  The patient is extremely uncomfortable in flexion and appears to be a bit more comfortable when he stands in a hyperextended position suggesting an element of instability.

RADIOGRAPHY:  X-rays brought by the patient, as well as medical records brought   by the patient, are reviewed.  Evidence of previous fusion is identified at the lower lumbar segment with the L4-5 and L5-S1 levels appearing to be involved in the fusion mass.

A MRI scan from March of 1994 is available again confirming the presence of degenerative disc disease of the lumbar spine, evidence of prior lumbar laminectomy and fusion at 4-5 and 5-1, and degenerative changes at the level above the previous fusion level with bony osteophytic spurring at L3-4 and levels above L3-4.

RSL00251

RADICAN, JAMES                    -2-                 MANUEL PORTH, M.D.
102566-0


<u>11-09-95</u>
MP/jcg     (Cont'd)

CT/myelogram studies dated August of 1995, just prior to the
surgery, demonstrate osseous fusion at L4-5 and 5-1 with
degenerative spinal stenosis at L3-4. The spinal stenosis that is
noted is due to progressive posterior central disc herniation, as
well as facet joint changes.

I have personally reviewed the MR scan of 1994 and the CT/myelogram
studies of 1995 and am extremely impressed at the degree of
stenosis at L3-4 which would suggest that this was the primary
reason for the patient having had the surgical procedure.

All of the studies brought by the patient, including the
CT/myelogram, as well as the most recent MRI scan, all confirm
stenosis at the level above the previous fusion level and that
stenosis appears to be a combination of disc and bony material
creating the stenosis.

I suspect on the basis of the diagnostic studies done prior to
surgery that the patient most likely had a decompression at that
level and an operative report from Dr. Gieseke's office would be
welcomed.

An x-ray of the patient's pelvis, as well as additional flexion and
extension views, will be obtained today to evaluate the
significance of the arthritic changes previously noted in the
patient's hip x-rays, and also to again evaluate the possibility of
instability associated with flexion and extension.

My plan is to obtain a copy of the operative report and then
discuss the case with the operating surgeon. If instability can be
determined and documented, then the patient should be placed in
some type of an orthotic device for comfort. Fully realizing it
has only been six weeks since his surgery, I'm hesitant to make any
recommendations regarding additional surgical intervention at this
time.

Additional x-rays obtained today of the pelvis demonstrate
essentially normal appearing hip joints. The arthritic changes on
the right side are minimal and in my opinion not contributing to
the patient's clinical picture. The lateral view of the lumbar
spine is reviewed including a flexion and extension view. I'm
unable to demonstrate significant instability. I'm unable to
demonstrate any displacement of the vertebrae in either flexion or
extension at the level of L-2,3, or 4. I would expect if there is
going to be instability, it's going to be at a level proximal to
the fusion level which would be between 3-4 or between 2-3.

RSL00252

RADICAN, JAMES                    -3-                    MANUEL PORTH, M.D.
102566-0

<u>11-09-95</u>
MP/jcg      (Cont'd)

I'm going to be advising the patient that we hold off on any
additional injections.  I'm a bit concerned about the fluctuant
nature of the subcutaneous tissue in the area.  I will be
discussing that with Dr. Gieseke.  I will be getting an operative
report and I will be advising an orthotic for support.  I think it
is premature at this point to repeat any diagnostic studies and
it's premature at this point to assume that the most recent
operative procedure will not result in positive change for the
patient and improvement for the patient.


                                    _____
                                    MANUEL PORTH, M.D.

cc: Jack Peicher, M.D.


RSL00253

RADICAN, JAMES                    -4-              MANUEL PORTH, M.D.
102566-0

12-20-95
MP/jcg Mr. James Radican is status post laminectomy, continuing to
experience back discomfort. The operative area is sensitive and he
is continuing therapy and benefiting from the therapy.

It is my opinion that therapy is mandatory and needs to be
continued. A lot of energy and effort have been invested in
decompressing this patient's lumbar spine. He continues to
demonstrate significant weakness of his back and lower extremity
muscles, and therapy will make the difference with respect to
regaining strength, regaining mobility, and reducing his symptoms
of back and leg pain.

I would strongly advise that additional therapy be authorized by
his insurance carrier.

                                   _____
                                   MANUEL PORTH, M.D.

ADDENDUM: FINAL REPORT: The notations from Dr. Gieseke's office
dated 11/15/95 are reviewed. The patient continues to experience
discomfort in the back, buttocks and leg areas and points to the
lower lumbar region in the midline. It is an area of sensitivity
and trigger point tenderness. There lower extremity strength is
improving, but still requires additional effort to regain some of
the strength that has been lost as a result of the long period of
stenosis and the long period of symptoms and inactivity. The need
for weight loss, the need for isometric strengthening, the need for
Williams flexion, the need for pool activity have all been
thoroughly outlined and discussed.

I am advising that he take time off from work and concentrate on
rehabilitating his back and legs and hopefully maximize on the
results of the surgery.

                                   _____
                                   MANUEL PORTH, M.D.

RSL00254

RADICAN, JAMES                  -5-              MANUEL PORTH, M.D.
102566-0

03/22/96
MP/jif     The patient returns for re-evaluation.  It is now 6
months following his laminectomy, and the quality of life has not
significantly improved. He is still unable to return to his job and
is aware of his back on a continual basis.  The pain radiates from
the back down to each of the lateral iliac crest areas and to the
lateral proximal thighs.  The patient finds it difficult to get a
good night sleep.  Spending more than 6 or 7 hours in bed causes
him discomfort and he finds that he has to get up and walk around.

Reviewing the medical history and reviewing the operative report,
I am reminded that the patient had a CT myelogram done before his
surgery, and had an MRI done March 1994, which demonstrates a
degenerative disc disease of the lumbar spine.  It had fusion at L4
to S1 in 1973.  Chronic back pain, disc herniation at L3-4, and L2-
3 and a coronary bypass surgery.

My recommendation at this point would be to proceed with a follow-
up MRI scan, and specifically look at the fusion mass at 4, 5 and
1, and address the area of stenosis at 3-4 and 2-3, and determine
whether or not that spine is patent at L2-3 and 3-4.

I will be seeing him back in follow-up.  I am going to ask him to
try to get the March 18, 1994 MR scan to take with him for the most
recent scan that will be ordered.


                                 _____
                                 MANUEL PORTH, M.D.

RSL00255

```
RADICAN, JAMES               -6-             MANUEL PORTH, M.D.
102566-0
```

05/10/96
MP/jif    The patient presents for evaluation.  He is a 65-year-old
gentleman that was last seen March of 1996.  The back pain has
persisted.  There has been very little improvement following his
laminectomy.  The most recent MRI scan, which was brought today and
reviewed with the patient, suggests progressive degenerative
arthritic disease throughout the entire lumbar area extending down
from the thoracolumbar junction to the lower sacral region.  The
areas of surgery and decompression continues to demonstrate
degenerative changes on MR scan, with the most recent scan
suggesting residual of degenerative disease and disc herniation.

I am going to personally review the MRI scan with the radiology
staff at the hospital.  I am of the opinion that most of the
abnormalities that are identified on the scan are a combination of
degenerative disc disease and post surgical changes.  I do not
believe that acute disc herniation at the L1-2 and L3-4, which is
described as herniated disc in the paracentral area is of surgical
significance, and in my opinion additional surgical intervention is
not indicated.

Local trigger point injections are performed today.  The patient
will be re-evaluated in 4-6 weeks.  He is going to continue the
swimming activity which are strongly recommended and outlined to
the patient.  I will see him back for re-evaluation.  It is hopeful
that with trigger point injections we will be able to maintain some
comfort level for him.  At this point, additional surgical
intervention in my opinion is not indicated.


                                    _____
                                    MANUEL PORTH, M.D.

RSL00256

RADICAN, JAMES                    -7-                MANUEL PORTH, M.D.
102566-0

06-26-96
MP/jcg   The patient returns for re-evaluation.  It has been about
6 weeks since I have seen him on 5-10-96.  I am gratified at the
fact that he did notice some improvement with the trigger point
injections which lasted about 2-3 weeks and am of the opinion that
at this point an epidural block would be appropriate.

I'm going to obtain authorization from Cigna and recommend an
epidural block be initiated for this patient.  I would welcome
discussing the actual location and position of the block with the
anesthesia staff prior to performing the block.


                                   _____
                                   MANUEL PORTH, M.D.
cc:  Dr. J. Peicher

RSL00257

RADICAN, JAMES                 -8-              MANUEL PORTH, M.D.
102566-0

09/16/96
MP/es  The patient returns for re-evaluation.  He has had another
series of epidurals x 3, with minimal improvement.  The second
epidural helped only a bit.  It was supplemented by trigger point
injections.  The 3rd epidural helped to a lesser degree and in
spite of continued therapy, epidural blocks, analgesic medications,
the use of physical therapy and corset immobilization, the patient
continues to be symptomatic and is unable to return to work.

I am advising that he remain out of work until further notice,  I
will see him back in a 3 month interval.  Swimming is encouraged
and back strengthening exercises are advised.

With respect to his left wrist, he has some local tenderness at the
ulnar styloid on the ulnar border, dorsal surface of the wrist.
There is some local tenderness in the area. There is no crepitation
or ROM.

The x-rays of the wrist are unremarkable. Dated 1/96.  No active
treatment is indicated.


                              _____
                              MANUEL PORTH, M.D.

RSL00258

MAGNETIC RESONANCE IMAGING



**Coral Ridge MRI**

MAGNETIC RESONANCE IMAGING

1951 N.E. 47th Street
Fort Lauderdale, Florida 33308
(305) 491-8881

| PATIENT INFORMATION | AGE | DATE | SCAN NO. | REFERRING PHYSICIAN |
|---|---|---|---|---|
| RADICAN, JAMES | 65 | 03/29/96 | 13,191-2 | MANUEL PORTH, M.D. |

**AREA OF STUDY:**    LUMBAR SPINE WITHOUT AND WITH GADOLINUM

**SUMMARY OF FINDINGS:**

MRI study of the lumbar spine was carried out using multiple sagittal and transverse views.

With T1 weighted pulse sequences, there is narrowing of the L2-3, L4-5, and L5-S1 interspaces. There are post-surgical changes noted opposite L1, l2, and L3 with evidence of a lumbar laminectomy running almost from L1-2 through L4-5.

With the heavily weighted T2 pulse sequences, there is decreased signal intensity of all lumbar discs. There is evidence of a disc herniation at L1-2 which protrudes into the midline and a moderate herniation at L3-4 which also appears midline.

Transaxial views show the midline discs at L1-2 and L3-4. Post-operative changes are seen with the hemilaminectomy.

**INTERPRETATION:**

1. Degenerative disc disease of the lumbar spine.

2. Herniated disc at L1-2, paracentral

3. Herniated disc at L3-4, paracentral.

4. Post-operative changes seen at L1-2 through L4-5.

5. Moderate lumbar spondylitis.

When compared to the prior study of March 18, 1994, this study has progressed and the disc herniations are now apparent.

ROGER G. SCHNELL, MD..

RSL00259

Holy Cross
Hospital
Ft Lauderdale, Florida

RADICAN ,JAMES E
397167 954034729
4WA 0487 1

DSCH DATE:                    INIT:ATSSF   10/03/95

SURGEON:  DR. F. G. GIESEKE              ASSISTANT:  DR. J. COATS

ANESTHESIOLOGIST:   DR. REYES - GENERAL

PREOPERATIVE DIAGNOSIS:       HERNIATED DISK L3-4 WITH SEVERE STENOSIS, RULE
                              OUT HERNIATED DISK L2-3 AND L1-2, BUT HAS
                              STENOSIS L1-2, L2-3.

OPERATION:                    DECOMPRESSIVE LAMINECTOMY, FORAMINOTOMY, L1-2,
                              L2-3, L3-4, PLUS MICRO LASER DISCECTOMY L3-4
                              USING MICROSCOPE GREATER THAN 250 POWER.

POSTOPERATIVE DIAGNOSIS:      HERNIATED DISK WITH STENOSIS SEVERE, L3-4,
                              STENOSIS L2-3.  NO HERNIATED DISK, STENOSIS
                              L1-2, NO HERNIATED DISK.

PROCEDURE:
This patient was taken to surgery, general anesthesia was initiated, the
patient was intubated.  The patient had been cleared preoperatively by Dr.
Peicher and group.   He was carefully placed in a prone position on the
Wilson frame with anesthesia taking care to avoid pressure on peripheral
nerves and plexuses.   The entire lumbosacral region was carefully prepped
according to Holy Cross Hospital prep recommendations.  This was then dried
and prospective incision marked.   Sterile drapes applied.   Two grams of
Rocephin given IV piggyback.  Sterile drapes were applied including Vi-drape.

The incision made upper L-1 to L-4.   Self-retaining retractor inserted.
Bleeding points controlled. Fascia incised, paravertebral musculature drawn
laterally on each side and self-retaining retractor inserted.   Towel clips
were placed in spinous processes.   Transverse x-ray was taken for
localization and the various spinous processes carefully identified.

Decompressive laminectomy was carried out at L3-4 where there was severe
stenosis and this was alleviated and foraminotomy carried out.  Microscope
was brought in to position.   Herniated disk was seen to be present.   The
annulus was incised on the right side since it was the most symptomatic site.
Disk material was removed.  Large amounts were removed very carefully using
the conventional instruments plus the laser used to vaporize the edges of the
annulus and also down in the depths.  Decompression was carried out of the
nerve roots and the dural sac.

Date                          Date
Dictated: 9/29/95             Transcribed: October 3, 1995
cc: DR. J. PEICHER

Transcribed By:  saf
                                          _____  9/29/95
                                          F. GARY GIESEKE, M.D.        Date of
                                                                       Surgery

                                                                       Page 1

                    O P E R A T I V E   N O T E



Reliance Standard Life
Insurance Company®

December 26, 1997

Dr. Gary Gieseke
1930 NE 47th Street, Suite 200
Ft. Lauderdale, Florida

| | | |
|---|---|---|
| Regarding | : | James E. Radican |
| Social Security No. | : | 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 |
| Date of Birth | : | 04/17/1926 |
| Claim No | : | 1997-346-010 |
| Policy No. | : | LSC LSC 98842 |

Dear Dr. Gieseke:

We are the Long Term Disability Insurance carrier for the insured listed above. As your patient has applied for Long Term Disability benefits under their policy, we are requesting the following information from you to determine if your patient is eligible for those benefits:

❑    **A COPY OF YOUR FILE FROM  01/01/97  TO THE PRESENT**.  Be sure to include consultation, laboratory and/or diagnostic study reports and discharge summaries.

❑    Supply the names and **mailing** addresses of any other physicians you know to be treating the claimant.  *neil Tytler m.a. (954) 583-0412*

Please return this correspondence (or a copy) with your response.  An authorization to release information completed by the insured is attached.

Sincerely,

*James W. Wilson*
James A. Wilson
LTD Claims Examiner
215.787.3854

## IF THERE IS A CHARGE FOR COPYING THESE RECORDS, PLEASE INCLUDE YOUR FEDERAL TAX IDENTIFICATION NUMBER TO RELEASE PAYMENT.

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

RSL00261

PATIENT:  RADICE, JAMES A.
CHART:    0619296

<u>MRI SCAN OF THE LUMBAR SPINE - PAGE 2 - 09/26/97</u>:

<u>CONCLUSION</u>:
1.  L3-4  BROAD  BASED  AND  RIGHT  PARACENTRAL  HERNIATED  DISK
    EXTRUSION  MIGRATING SUPERIORLY BEHIND THE L3 VERTEBRAL BODY
    IMPINGING THE RIGHT VENTRAL  THECAL SAC AT THE LEVEL  OF THE
    RIGHT LATERAL RECESS.

2.  L2-3  POSTERIOR VERTEBRAL  BODY OSTEOPHYTOSIS  WITH MODERATE
    CANAL IMPINGEMENT.

3.  L4-5  BROAD  BASED   HERNIATED  DISK  WITH   MODERATE  CANAL
    IMPINGEMENT.

4.  L5-S1 SPONDYLITIC CHANGES ABUTTING THE VENTRAL THECAL SAC.


                    Electronically Signed
                    Fred Steinberg, M.D.
FS/cts
D: 09/28/97
T: 09/28/97

**RSL00262**

## MRI OF OAKLAND PARK

REF. DR.:    NEIL SCHECHTER         PATIENT: RADICE, JAMES A.
TELEPHONE:   (954)-476-8800            DOB: 06/27/29
FAX:         476-1362              CHART #: 0619296
                                     SCAN: 09/26/97


### MRI SCAN OF THE LUMBAR SPINE:

#### TECHNIQUE:
1. Sag. T1W SE.
2. Sag. T2W SE.
3. Ax. T1W SE.
4. Cor. T1W SE.

#### FINDINGS:
There is mild scoliosis seen in the lumbar spine convex to the left at
the L1-2 level and convex to the right at the L3-4 level. Diffuse
desiccated degenerative disks are seen in the lumbar spine at the L2-
3, L3-4, and L4-5 levels. Anterior disk bulges and osteophytes extend
into the prevertebral space at the L2-3, L3-4, and L4-5 levels. No
fractures nor infiltrating lesions of the L1 through S1 vertebral
bodies are detected. The conus medullaris tip ends normally at the
level of T12-L1.

L5-S1:    There is a desiccated disk with mild spondylitic
          changes abutting the ventral thecal sac.
          Sclerotic hypertrophic changes are seen in the
          posterior facet joints.

L4-5:     There is a broad based ventral extradural defect
          compatible with a small broad based herniated disk
          impinging the ventral thecal sac.

L3-4:     There is degenerative disk space narrowing with a
          broad based ventral extradural defect with a right
          paracentral component that extends superiorly
          behind the L3 vertebral body into the right
          lateral recess compressing the thecal sac
          compatible with a right paracentral herniated disk
          extrusion superiorly migrating behind the L3
          vertebral body.

L2-3:     There is degenerative disk space narrowing with
          posterior vertebral body osteophytosis impinging
          the ventral thecal sac with moderate canal
          impingement.

L1-2:     There is a desiccated disk.

continued...

RSL00263



**NSA** NEUROLOGICAL SURGERY ASSOCIATES



- *F. GARY GIESEKE, M.D. - F.A.C.S.*
- *MATTHEW R. MOORE, M.D.*
- *JOHN A. COATS, M.D.*

RE: James Radice
DATE:  10/13/97

Page 2

IMPRESSION:     1.     Probable herniated disc L3-4 left.
                2.     Diffuse herniation L4-5.
                3.     Rule out asymptomatic herniated disc L2-3 right.

DISCUSSION:  This patient does appear to be a candidate for surgical intervention,
however, we certainly must see the spine better than on the MRI.  I feel that the
herniated disc at L3-4 is to the left while the official report states it is to the right.  I
will thus set up a lumbar myelogram with CT scanning.  This was discussed in detail
with the patient and his wife and they give full consent.

F. Gary Gieseke, M.D.

FGG:wjr
cc:  Neil Tytler, M.D. (fax) ( ̣  ̣  ̣ ̣ )

1930 N.E. 47th Street
Ft. Lauderdale
suite 200
Florida
33308
954 / 771-4251
fax • 954 / 491-4892

RSL00264

# NSA

**NEUROLOGICAL SURGERY ASSOCIATES**

- *F. GARY GIESEKE, M.D. - F.A.C.S.*
- *MATTHEW R. MOORE, M.D.*
- *JOHN A. COATS, M.D.*

RE: James Radice
DATE:  10/13/97

This patient is a 68 year old male who on 12/20/96 was lifting some items out of the back of his car and developed back and some left leg pain and did see Dr. Reitman at that time and was started on conservative management and did have an MRI, but fortunately he improved and just had some aching pain until 3 months ago when the pain increased in severity radiating down the left leg with a weak and numb sensation. No sphincter disturbance is noted.

PAST MEDICAL HISTORY:  Hypertension under treatment by Dr. Tytler.  Prostate surgery for carcinoma 3 years ago -- states complete removal and did not require any radiation.

ALLERGIES:  None.

MEDICATIONS:  Cardura.

PHYSICAL EXAMINATION:  The patient is awake, alert and conversant.  Speech is normal.
GAIT:  He favors the left leg.
BACK:  Tenderness lumbosacral and left buttock.
STRAIGHT LEG RAISING:  Positive on the left.
EXTREMITIES:  Some decreased tone and slight atrophy left calf.
MOTOR:  No real specific weakness.
SENSATION:  Some vague decrease medial left calf.
REFLEXES:  With reinforcement reveal knee jerks -- right 1+, left 1; ankle jerks essentially -1 and equal.

MRI of 1/15/97 was available for review and reveals evidence of a herniated disc L3-4 to the left with a fragment behind the L3 body but, in addition, some protrusion at L4-5.

A more recent MRI of 9/26/97 was available for review and the films are quite dark, and I wonder if this was done in an open unit.  There appears to be a herniated disc at L3-4, but I think it is to the left not the right, as is stated in the official report.  At L4-5 there is some diffuse herniation but no free fragment with some stenosis.  In addition, I question at L2-3 whether there may be something toward the right side.

1930 N.E. 47th Street
Ft. Lauderdale
suite 200
Florida
33308

954 / 771-4251
fax • 954 / 491-4892

RSL00265

```
REPORT NO: RARPTC                     R A D I O L O G Y   R E P O R T                TIME:      11:19:27
AS OF DATE: 04NOV97                                                                  PREPARED: 04NOV97
RETENTION: 1 DAY                          N BROWARD HOSP DISTRICT                    PAGE NO:         1
```

Radiologist: HUGHES, JOHN J., MD

```
Patient Name: RADICE, JAMES              Medical Record Nbr: (0003)078220013
DOB: 06/27/29    Age: 68   Sex: M    Location:  IOPD·    -     Admit Dr: GIESEKE F GARY
```

Order Doctor: GIESEKE F GARY            Status: FINAL

```
Case Number          Procedure Name               Exam date/time
CT-97-26751          CT LUMBAR SPINE               10/31/97 16:17
```

CTLSP    R
POST MYELOGRAM CT OF THE LUMBAR SPINE


Images were obtained from L2 to S1.

L2-3:  There is moderate circumferential annular bulge at this level.  No
focal disc protrusion is demonstrated.  There is mild bilateral facet
hypertrophy and marginal osteophytes affecting the vertebral bodies.  These
findings result in mild stenosis of the spinal canal.

L3-4:  At this level there is a large focal disc protrusion on the left
side.  This extends from the left lateral aspect of the spinal canal through
the neural foramen and its lateral margins lateral to the neural foramen.  The
nerve root is compressed at this level and effacement of the thecal sac is
noted.  These findings are seen just above the plane of the disc space.  At
the plane of the disc space there is moderate annular bulge displayed.  Gas
bubbles are noted within disc material compatible with disc degeneration.
Mild spinal stenosis secondary to facet hypertrophy is noted.

L4-5:  At this level there is moderate annular bulge with no focal disc
protrusion demonstrated.  Moderate spinal stenosis is noted associated with
moderate bilateral facet hypertrophy.  Vacuum disc phenomenon is noted.  This
indicates disc degeneration.

L5-S1:  There is mild to moderate circumferential annular bulge.  No focal
disc protrusions demonstrated.  Mild facet hypertrophy is noted with no
significant spinal stenosis at this level.


CTLSP    I
MULTI-LEVEL ANNULAR BULGE IS SEEN THROUGHOUT THE LUMBAR SPINE.

THERE IS A LARGE LEFT L3-4 FOCAL DISC PROTRUSION WHICH EXTENDS FROM THE LEFT
LATERAL ASPECT OF THE SPINAL CANAL THROUGH THE NEURAL FORAMEN AND EXTENDS OUT
THE NEURAL FORAMEN.

DEGENERATIVE STENOSIS OF THE SPINAL CANAL IS SEEN AT MULTIPLE LEVELS.


                       * * * END OF REPORT * * *
```

**RSL00266**

EPORT NO: RARPTC
S OF DATE: 04NOV97
ETENTION: 1 DAY

R A D I O L O G Y   R E P O R T

N BROWARD HOSP DISTRICT

TIME:        11:19:14
PREPARED: 04NOV97
PAGE NO:        2

adiologist: HUGHES, JOHN J., MD

atient Name: RADICE, JAMES          Medical Record Nbr: (0003)078220013
OB: 06/27/29    Age:  68    Sex: M    Location:   IOPD·      ·      Admit Dr: GIESEKE F GARY

rder Doctor: GIESEKE F GARY          Status: FINAL

| ase Number | Procedure Name | Exam date/time |
|---|---|---|
| 07-304-1789 | LUMBAR MYELOGRAM | 10/31/97 14:19 |

(Continued)

MYELOGRAPHIC FINDINGS ARE COMPATIBLE WITH MULTILEVEL ANNULAR BULGE AT L3-4,
.4-5 AND L5-S1.  IN ADDITION, MULTIPLE EXTRADURAL DEFECTS ARE SEEN, MOST
ROMINENTLY AMPUTATING THE LEFT-SIDED NERVE ROOT AT L3-4.

* * * END OF REPORT * * *

RSL00267

EPORT NO: RARPTC                    R A D I O L O G Y   R E P O R T          TIME:    11:19:14
3 OF DATE: 04NOV97                                                           PREPARED: 04NOV97
ETENTION: 1 DAY                        N BROWARD HOSP DISTRICT               PAGE NO:        1

adiologist: HUGHES, JOHN J., MD

atient Name: RADICE, JAMES              Medical Record Nbr: (0003)078220013
OB: 06/27/29   Age: 68   Sex: M   Location:  IOPD-    -    Admit Dr: GIESEKE F GARY

rder Doctor: GIESEKE F GARY             Status: FINAL

ase Number          Procedure Name           Exam date/time
7-304-1789          LUMBAR MYELOGRAM          10/31/97 14:19

ALUMMYL R
UMBAR MYELOGRAM

X: Low back and left leg pain. Previous MR showed extruded disc at L3-4.

nformed consent was obtained.

P and lateral views of the lumbar spine were obtained as scout films. There
s chronic degenerative osteoarthritis affecting virtually every level of the
umbar spine. Disc space narrowing is noted at L2-3, L3-4 and L4-5 with mild
isc space narrowing noted at L4-5. Surgical clips overlie the pelvis in this
atient with a history of previous prostate carcinoma. Right upper quadrant
urgical clips were also noted.

he midline of the back was prepped and draped in sterile fashion.

luoroscopy was used to localized the intraspinous space at L2-3. This area
as infiltrated with local anesthetic using Lidocaine.

22 gauge spinal needle was used to perform lumbar puncture at L2-3.

ml. of cerebrospinal fluid was drained into three separate test tubes. A
mall amount of blood was noted in the hub of the needle at the beginning of
SF drainage. The spinal fluid itself appeared clear. These specimens were
ent for diagnostic testing.

5 ml. of Iso-Vue M 200 was instilled slowly under fluoroscopic control and
filled the lumbar portion of the thecal sac. Spot films and overhead films
ere made.

There are ventral defects on the thecal sac at L3-4, L4-5 and L5-S1.

At L3-4, on the left there is a large extradural defect which amputates the
nerve root. A smaller right-sided extradural defect is noted compressing the
nerve root on the right side.

At L4-5: There is extradural defect which effaces the nerve root sleeve on
the left and the right-sided nerve root appears markedly compressed.

At L5-S1: The left-sided nerve root has normal appearance. There is mild
compression of the right-sided nerve root by extradural filling defect. The
contrast column was seen as high as T12 and no cauda equina mass is
demonstrated.

RALUMMYL I

* * * CONTINUED * * *

RSL00268

 **NSA**

NEUROLOGICAL SURGERY ASSOCIATES



• *F. GARY GIESEKE, M.D. - F.A.C.S.*
• *MATTHEW R. MOORE, M.D.*
• *JOHN A. COATS, M.D.*

RE:  James Radice
DATE:  11/4/97
TELEPHONE CONVERSATION

This patient did have a lumbar myelogram and CT scan on 10/31/97 and I reviewed these films.  He appears to have a herniated disc at L3-4 to the left.  This fits well with the side of his symptoms and also with the depressed knee jerk on that side. He also shows some other changes to be present, but most of those are on the right side which is the asymptomatic side.

I called the patient and discussed the above with him and he is going to see how he does over the holidays and then make a decision.

F. Gary Gieseke, M.D.

1930 N.E. 47th Street
Ft. Lauderdale
suite 200
Florida
33308

FGG:wjr                                                954 / 771-4251
cc:  Neil Tytler, M.D. (fax) \1·8-97                   fax • 954 / 491-4892

RSL00269



NEUROLOGICAL SURGERY ASSOC.
DRS. GIESEKE, MOORE & COATS
1930 N.E. 47 ST., SUITE 200
FT. LAUDERDALE, FL 33308
771-4251

RELIANCE STANDARD LIFE INSURANCE COMPANY
ATTN: James Nilson
PO BOX 8330
PHILADELPHIA PA 19101-8330

RSL00270

**RSL** Reliance Standard Life Insurance Company

**Social Security Questionnaire And Authorization**

Since you may be eligible for disability benefits, it is important that you advise Reliance Standard Life Insurance Company of any Awards and Denials you may receive from Social Security. The Reliance Standard Life benefit is reduced by any amounts you receive from Social Security. Dependent Awards may also affect your group insurance benefits. Social Security Disability benefits are generally available if you have been totally disabled for five months and the disability is expected to continue for twelve months. We urge you to apply, if you meet this criteria. Until you submit proof that Social Security Benefits have been applied for and are not payable we can deduct the estimated amount of Social Security Award from your salary continuance benefit. Any overpayment must be refunded to Reliance Standard Life Insurance Company. Please answer the following questions.

| | | |
|---|---|---|
| Have you applied for Social Security benefits? | ☒ Yes   ☐ No | If yes, what is the date of your application? *1-1-97* |
| Address of Local Social Security Office | | |
| Have you received an Award or Denial? | ☒ Yes   ☐ No   If yes, please attach a copy. | If you have not applied for Social Security benefits, do you intend to?   ☐ Yes   ☐ No |
| If yes, when? | | If no, why? |

### Dependent Information

| | | |
|---|---|---|
| If married, state: | Name Of Spouse | Date of Birth |
| If spouse is employed: | Name and Address of Employer | Date of Employment |

Please list all children under 18 years of age.

| Name | Date of Birth | | Name | Date of Birth |
|---|---|---|---|---|
| 1 | | 4 | | |
| 2 | | 5 | | |
| 3 | | 6 | | |

I understand and agree that my salary continuance benefits will be reduced according to the terms of the group long term disability policy issued by Reliance Standard Life Insurance Company under which I am claiming benefits. I understand that the disability benefit is also affected by all retroactive Social Security Awards.

"A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a statement of claim containing false, incomplete or misleading information commits a fraudulent insurance act, which is a crime."

| | |
|---|---|
| Signature *James E. Rodin* | Date *12-18-97* |
| Address *3800 N W 71 St* | Social Security Number *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* |
| *Coconut Crk. Fl. 33073* | Date of Birth *4-30-30* |

Please Return This Form To:   Reliance Standard Life Insurance Company
LTD Claims Department
P.O. Box 8330
Philadelphia, PA 19101-8330

**RSL00271**

EF-1045

10/96

# Medicare Information

Mid-America Program Service Center
601 East Twelfth Street
Kansas City, Missouri 64106

NOTICE OF MEDICAL INSURANCE ENROLLMENT AND PREMIUM DEDUCTION

JAMES E RADICAN
3800 NW 71ST ST
COCONUT CREEK FL  33073-4805

Date:     05/27/97

Claim No.:  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 A

This is in reference to your enrollment in the medical insurance
part of Medicare. A red, white, and blue health insurance card
showing the date your coverage begins for both hospital and medical
insurance protection has been mailed to you.

The premium for your medical insurance is deducted from benefits
when possible. The information below shows how your payment has
been adjusted to collect these premiums.

| Coverage Begins | Monthly Premium | Premium Amount Deducted | This Pays For The Month(s) of |
|---|---|---|---|
| A   JUL 1997 | $48.20 | $48.20 | JUL 1997 |

| Your Next Payment Will Be Received Shortly After | Amount of Your Next Payment | Old Monthly Payment Amount | New Monthly Payment Amount |
|---|---|---|---|
| JUL 03, 1997 | $1339.00 | $1388.00 | $1339.00 |

If you have any questions about your benefits or Medicare coverage,
or if you have not previously received your health insurance card
and do not receive one within 4 weeks after the receipt of this notice,
please get in touch with any social security office. If you visit an
office, please bring this letter. It will help us answer your questions.

## RSL00273

Department of Health and Human Services
Health Care Financing Administration

Form HCFA-1585 (10-87)

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A                                    Page  3 of  3

**If You Have Any Questions**

If you have any questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-954-968-7413. We can answer most questions over the phone. You can also write or visit any Social Security office. The office that serves your area is located at:

> BRANCH OFFICE
> BG 6 SUITE 4A
> 2201 W SAMPLE ROAD
> POMPANO BEACH, FL 33073

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Shirley S. Chater
Commissioner
of Social Security

**RSL00274**



RELIANCE STANDARD LIFE INSURANCE COMPANY
ATTN:
PO BOX 8330
PHILADELPHIA PA 19101-8330



James Radican
3600 NW 71st St.
Coconut Creek, FL
33073

RSL00275



**Reliance Standard Life Insurance Company**®

************** DOT  OCCUPATION  DESCRIPTION **************

Title: SALES REPRESENTATIVE, BUILDING EQUIPMENT AND         DOT Code: 274.357-018
Industry: Wholesale Trade

TASKS:

1. Sells building materials, equipment, and supplies, such as heating or
   air-conditioning equipment, insulation, glass, floor tiles, bricks,
   lumber, plumbing fixtures, and roofing, following blueprints and
   applying knowledge of building construction.

2. Performs other duties as described under SALES REPRESENTATIVE (retail
   trade; wholesale tr.) Master Title.

Date of Last Update: 1980

MASTER TITLE: SALES REPRESENTATIVE (retail trade; wholesale tr.)

Sells products to business and industrial establishments or individual for
manufacturer or distributor at sales office, store, showroom, or customer's
place of business, utilizing knowledge of product sold:

TASKS:

1. Compiles lists of prospective customers for use as sales leads, based
   on information from newspapers, business directories, and other
   sources.

2. Travels throughout assigned territory to call on regular and
   prospective customers to solicit orders or talks with customers on
   sales floor or by phone.

3. Displays or demonstrates product, using samples or catalog, and
   emphasizes salable features.

4. Quotes prices and credit terms and prepares sales contracts for
   orders obtained.

5. Estimates date of delivery to customer, based on knowledge of own
   firm's production and delivery schedules.

6. Prepares reports of business transactions and keeps expense accounts.

7. Classifications are made according to products sold as SALES
   REPRESENTATIVE, FOOD PRODUCTS (wholesale tr.); SALES REPRESENTATIVE,
   INDUSTRIAL MACHINERY (wholesale tr.).

Alternate Titles:

12-29-97                    Reliance Standard Life Insurance         Page 1



D O ~~C~~ ~~C~~ ~~U~~ ~~P~~ ~~A~~ ~~T~~ I ~~O~~ ~~N~~ A L    D E M A N D S -------------------------------------

************ DOT  OCCUPATION  DESCRIPTION *************

Title: SALES REPRESENTATIVE, BUILDING EQUIPMENT AND      DOT Code: 274.357-018
Industry: Wholesale Trade

      Sales Agent; Sales Associate

      ************** OCCUPATION DEMANDS **************

Title: SALES REPRESENTATIVE, BUILDING EQUIPMENT AND      DOT Code: 274.357-018

Specific Vocational
      Preparation: 6   Over 1 Year to 2 Years

General Educational
      Development:
            Reasoning Level 4 - Apply principles of rational systems
            to solve practical problems and deal with a variety of
            concrete variables in situations where only limited
            standardization exists.

            Math      Level 3 - Compute discount, interest, markup,
            ratio, proportion, and percentage.  Calculate surface,
            volumes, weights and measures.

            Language  Level 4 - Reads novels, poems, periodicals,
            journals, manuals, dictionaries, and thesauruses.
            Prepare business letters, summaries and reports.
            Participate in panel discussions, dramatizations and
            debates.

      Strength: L   Light - Lift up to 20 Pounds

Physical Demands: Reaching            Frequently
            Handling            Frequently
            Fingering           Occasionally
            Talking             Constantly
            Hearing             Constantly
            Color Vision        Occasionally

      Environmental
      Conditions: Exposure To Weather      Occasionally

      Noise: 3  Moderate

Work Situations:      Influencing People
            Dealing With People
            Making Judgments/Decisions

12-29-97            Reliance Standard Life Insurance      Page 2

RSL00277

 D O C C U P A T I O N A L   D E M A N D S------------------------------

```
Aptitudes:
                                    DOT                    OAP
G: General Learning Ability    3 (34 -  67%)         3= (46-54%)
V: Verbal                      3 (34 -  67%)         3= (46-54%)
N: Numerical                   3 (34 -  67%)         3- (34-44%)
S: Spatial Perception          3 (34 -  67%)         Not Included
P: Form Perception             3 (34 -  67%)         Not Included
Q: Clerical Perception         3 (34 -  67%)         3= (46-54%)
K: Motor Coordination          4 (11 -  33%)         Not Included
F: Finger Dexterity            4 (11 -  33%)         Not Included
M: Manual Dexterity            4 (11 -  33%)         Not Included
E: Eye-Hand-Foot Coordination  4 (11 -  33%)
C: Color Discrimination        4 (11 -  33%)

        Data: 3    Compiling
        People: 5    Persuading
        Things: 7    Handling
```

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

RSL00278

# TEL PHONE CONVERSATION RE ~~~D

Check here if Initial Interview ___

*Circle all that apply:*    LIFE    WOP    (LTD)    STD    Other: _____

| | |
|---|---|
| Insured name: James Radican | SS #: _____ |
| Claim Number: 1997-346-010 | Policy Number: _____ |

Conversation with: Lynn _____    ~~Call taken~~/made by: James

☐ Incoming Call    ☐ Outgoing Call    Telephone Number (757) 858-6500

## Don't forget to include Date & Time!

| Date | Time | |
|---|---|---|
| 12/29/97 | | Called Plt at 9:30 am to verify Clmnt's Salary before Comm, STD Amt and Salary continuance Amt. Hope was out the office. I'm on ans machine |
| | | Sal before comm ~~$57,888.90 (not)~~ |
| | | Sal continuance $1214.42  began 11/14/97 |
| | | Hope Fischer returned my P/C. |
| 12/30/97 9:30 am | | No comm, Full Sal    57,888.90 mnthly $4,824.07,  Sal continuance $2412.04 Full Sal for 4 months, Half Sal for 3 months  12/31/97. |
| | | Selling Cements Products |

RSL00279

tcr9/97

 **Reliance Standard Life Insurance Company**®

December 26, 1997

Dr. Manual Porth
7171 N. University Drive
Tamarac, Florida 33321

| | | |
|---|---|---|
| Regarding | : | James E. Radican |
| Social Security No. | : | 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 |
| Date of Birth | : | 04/17/1926 |
| Claim No | : | 1997-346-010 |
| Policy No. | : | LSC LSC 98842 |

Dear Dr. Porth:

We are the Long Term Disability Insurance carrier for the insured listed above. As your patient has applied for Long Term Disability benefits under their policy, we are requesting the following information from you to determine if your patient is eligible for those benefits:

❑  **A COPY OF YOUR FILE FROM  01/01/97 TO THE PRESENT**. Be sure to include consultation, laboratory and/or diagnostic study reports and discharge summaries.

❑  Supply the names and **mailing** addresses of any other physicians you know to be treating the claimant.

Please return this correspondence (or a copy) with your response. An authorization to release information completed by the insured is attached.

Sincerely,

James A. Wilson
LTD Claims Examiner
215.787.3854

**IF THERE IS A CHARGE FOR COPYING THESE RECORDS, PLEASE INCLUDE YOUR FEDERAL TAX IDENTIFICATION NUMBER TO RELEASE PAYMENT.**



**Reliance Standa.. Life Insurance Company**®

December 26, 1997

Dr. Gary Gieseke
1930 NE 47th Street, Suite 200
Ft. Lauderdale, Florida

| | | |
|---|---|---|
| Regarding | : | James E. Radican |
| Social Security No. | : | 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 |
| Date of Birth | : | 04/17/1926 |
| Claim No | : | 1997-346-010 |
| Policy No. | : | LSC LSC 98842 |

Dear Dr. Gieseke:

We are the Long Term Disability Insurance carrier for the insured listed above. As your patient has applied for Long Term Disability benefits under their policy, we are requesting the following information from you to determine if your patient is eligible for those benefits:

❑　**A COPY OF YOUR FILE FROM  01/01/97  TO THE PRESENT**. Be sure to include consultation, laboratory and/or diagnostic study reports and discharge summaries.

❑　Supply the names and **mailing** addresses of any other physicians you know to be treating the claimant.

Please return this correspondence (or a copy) with your response. An authorization to release information completed by the insured is attached.

Sincerely,

James A. Wilson
LTD Claims Examiner
215.787.3854

**IF THERE IS A CHARGE FOR COPYING THESE RECORDS, PLEASE INCLUDE YOUR FEDERAL TAX IDENTIFICATION NUMBER TO RELEASE PAYMENT.**

 **Reliance Standard Life Insurance Company®**

December 26, 1997


Dr. Manual Porth
7171 N. University Drive
Tamarac, Florida 33321

| | | |
|---|---|---|
| Regarding | : | James E. Radican |
| Social Security No. | : | 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 |
| Date of Birth | : | 04/17/1926 |
| Claim No | : | 1997-346-010 |
| Policy No. | : | LSC LSC 98842 |

Dear Dr. Porth:

We are the Long Term Disability Insurance carrier for the insured listed above. As your patient has applied for Long Term Disability benefits under their policy, we are requesting the following information from you to determine if your patient is eligible for those benefits:

❏    **A COPY OF YOUR FILE FROM  01/01/97 TO THE PRESENT**. Be sure to include consultation, laboratory and/or diagnostic study reports and discharge summaries.

❏    Supply the names and **mailing** addresses of any other physicians you know to be treating the claimant.

Please return this correspondence (or a copy) with your response. An authorization to release information completed by the insured is attached.

Sincerely,

James A. Wilson
LTD Claims Examiner
215.787.3854

**IF THERE IS A CHARGE FOR COPYING THESE RECORDS, PLEASE INCLUDE YOUR FEDERAL TAX IDENTIFICATION NUMBER TO RELEASE PAYMENT.**

 **Reliance Standard Life Insurance Company®**

December 26, 1997

Dr. Gary Gieseke
1930 NE 47th Street, Suite 200
Ft. Lauderdale, Florida

| | | |
|---|---|---|
| Regarding | : | James E. Radican |
| Social Security No. | : | 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 |
| Date of Birth | : | 04/17/1926 |
| Claim No | : | 1997-346-010 |
| Policy No. | : | LSC LSC 98842 |

Dear Dr. Gieseke:

We are the Long Term Disability Insurance carrier for the insured listed above. As your patient has applied for Long Term Disability benefits under their policy, we are requesting the following information from you to determine if your patient is eligible for those benefits:

❏    **A COPY OF YOUR FILE FROM  01/01/97  TO THE PRESENT**. Be sure to include consultation, laboratory and/or diagnostic study reports and discharge summaries.

❏    Supply the names and **mailing** addresses of any other physicians you know to be treating the claimant.

Please return this correspondence (or a copy) with your response. An authorization to release information completed by the insured is attached.

Sincerely,

James A. Wilson
LTD Claims Examiner
215.787.3854

## IF THERE IS A CHARGE FOR COPYING THESE RECORDS, PLEASE INCLUDE YOUR FEDERAL TAX IDENTIFICATION NUMBER TO RELEASE PAYMENT.

# TEL 'HONE CONVERSATION RE )RD

**Circle all that apply:**  LIFE  WOP  LTD  STD  Other: _____

| | |
|---|---|
| Insured name: *James Radican* | Policy Number: _____ |
| Claim Number: _____ | Call taken/made by: *Robert* |
| Conversation with: *Jim LaPrel* | Relationship: *Broker* |
| ☑ Incoming Call  ☐ Outgoing Call | Telephone Number: *(804) 282-2553* |

### Things to remember to ascertain when conducting phone interviews for disability claims:
- Treating sources and type of specialties
- Frequency of evaluations
- Diagnostic testing within 6-12 months
- Hospitalizations; involvement in Pain Program
- Use of assistive devices
- Daily activities especially motivation; volunteer work
- Driving and distances
- Involvement in vocational rehab for RTW; Work Hardening
- Status of SSDI or other offsets

## ◆ Don't forget to include Date & Time!

| Date and Time | |
|---|---|
| 12/23/97 @ 3:50PM | Mr. LaPrel called to check up on the status of the claim for Mr. Radican. Please call him back at: Acordia (804) 282-2553 |
| 12/24/97 11AM | Called Jim LaPrel back, w/ status update. Lm on voice mail |

RSL00284

tcr(2/97)

# SOCIAL SECURITY REVIEW
## (INITIAL)

Claimant's Name: _JAMES E. RADICAN_ Referred By : _JAMES_    Date: _____

Claim Number: _1997-346-010_    Reviewed By: _Thomas_ Date: _12-15-97_

Reason for referral: _New Claim_

Summary:

Action To Be Taken: _Yes (SSRIB Claimant is over 65_

RSL00285



Acordia of Virginia
8001 Franklin Farms Drive, Suite 238
Richmond, VA 23229
(804) 282-2553
(804) 282-2478 Fax
(800) 538-0955

December 12, 1997

DEC 1 5 1997

Robert Dombrowski
LTD Claims
Reliance Standard Life Insurance
2501 Parkway
Philadelphia PA 19101

Re:    LTD Claim Group Policy LSC098842
       James E. Radican 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

Dear Robert:

Enclosed is the physician's statement I received today and a copy of what I had previously sent to the Annandale, Virginia office.

I am simply trying to help this client expedite this claim. They had had problems with their previous broker which had placed the LTD with Reliance.

Let me know if you require any additional information.

Sincerely,

*James J. LePrell*

James J. LePrell

JJL/lpa

**RSL00286**

# Tarmac

Tarmac America, Inc.
P.O. Box 2016
Norfolk VA 23501
Norfolk (757) 858-6500
Fax (757) 855-7707

December 4, 1997

James J. LePrell, CLU
Acordia of Virginia
8001 Franklin Farms Drive
suite 238
Richmond, VA 23229

**RE: - LTD Claim - Reliance Standard Life (Policy # LSC 098842)**
     **James E. Radican (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)**

Dear Jim:

Enclosed as promised is the claim for the above referenced employee. I believe we have enclosed everything except the doctor's portion of the claim, although there are some letters from doctors enclosed as well, including the one in question.

As I mentioned, time is of the essence here, since Mr. Radican's salary continuation ends on December 31, 1997. Anything you can do to expedite the processing of this application would be greatly appreciated. If you think that contacting the recalcitrant specialist would do any good, his name is Dr. Manuel Porth and his phone number is (954) 724-9300. His assistant is Susie at X315.

Thank you for your assistance with this matter. If you have any questions or need any further information, please do not hestitate to contact me at (757) 858-6502.

Sincerely,

Hope E. Fischer, PHR
Benefits Administrator

Enclosures

cc:    L. Armistead

**RSL00287**

**Reliance Standard**
**Insurance Company**

**TO BE COMPLETED BY THE EMPLOYEE**

## A. INFORMATION ABOUT YOU

| | | |
|---|---|---|
| 1. LAST NAME RADICAN | FIRST JAMES | MIDDLE INITIAL E. |

2. ADDRESS 3800 NW 71st Street — CITY Coconut Creek — STATE/PROVINCE FL — ZIP 33073

3. TELEPHONE AREA CODE ( 954 ) 421-1641  4. SOCIAL SECURITY NUMBER 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

5. DATE OF BIRTH (MONTH, DAY, YR.) 4/20/30   6. HEIGHT 5'9"   WEIGHT 180 lb.   7. [X] MALE [ ] FEMALE   8. MARITAL STATUS [ ] SINGLE [X] MARRIED [ ] WIDOWED [ ] DIVORCED

9. YOUR EMPLOYER (INCLUDE DIVISION IF APPLICABLE) Tarmac America Inc.      Cement Division

10. OCCUPATION Special Sales Representative

11. DOMINANT HAND RIGHT [XX] LEFT [ ]

## B. INFORMATION ABOUT YOUR FAMILY
### (REQUIRED TO DETERMINE YOUR ELIGIBILITY FOR SOCIAL SECURITY BENEFITS)

1. SPOUSE'S NAME (LAST, FIRST) RADICAN, MARIAN

2. SPOUSE'S SOCIAL SECURITY NUMBER 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   3. DATE OF BIRTH (MONTH, DAY, YR.) 9/24/33   4. IS YOUR SPOUSE EMPLOYED? [X] YES [ ] NO

5. DO YOU HAVE ANY CHILDREN UNDER AGE 18? [ ] YES [X] NO   6. DO YOU HAVE HANDICAPPED CHILDREN (REGARDLESS OF AGE)? [ ] YES [XX] NO

7. DO YOU HAVE ANY CHILDREN AGE 18-19, WHO ARE FULL TIME STUDENTS IN ELEMENTARY OR SECONDARY SCHOOLS? [ ] YES [XX] NO

IF YOU ANSWERED YES TO ANY OF THE ABOVE QUESTIONS, PLEASE LIST NAMES. (LAST, FIRST)      DATE OF BIRTH

## C. INFORMATION ABOUT THE CONDITION CAUSING YOUR DISABILITY

PLEASE ANSWER THE FOLLOWING QUESTIONS:

1. WHAT WERE YOUR FIRST SYMPTOMS? Low back pain

2. WHEN DID YOU NOTICE THEM? 1989   3. DATE YOU WERE FIRST TREATED BY A PHYSICIAN? (MONTH, DAY, YR) 1989

4. WHY ARE YOU UNABLE TO WORK? Severe Back Pain

5. BEFORE YOU STOPPED WORKING, DID YOUR CONDITION REQUIRE YOU TO CHANGE YOUR JOB OR THE WAY YOU DID YOUR JOB? [X] YES [ ] NO

6. HAVE YOU FILED, OR DO YOU INTEND TO FILE A WORKER'S COMPENSATION CLAIM? [ ] YES [X] NO

FOR AN INJURY, ANSWER THE FOLLOWING QUESTIONS:

7. WHERE AND HOW DID THE INJURY OCCUR? Over long period of time.

8. DATE THE INJURY OCCURRED (MONTH, DAY, YR.) --   9. DATE YOU WERE FIRST TREATED FOR THIS INJURY BY A PHYSICIAN (MONTH, DAY, YR.) --

## D. INFORMATION ABOUT THE DISABILITY

1. DATE YOU WERE FIRST UNABLE TO WORK ON A FULL TIME BASIS (MONTH, DAY, YR.) 1/1/97

2. LAST DAY YOU WORKED BEFORE THE DISABILITY (MONTH, DAY, YR.) 12/31/96

3. DID YOU WORK A FULL DAY? [ ] YES [X] NO   Part time - recovering from surgery
IF NO, EXPLAIN.

4. HAVE YOU RETURNED TO WORK? [ ] YES [X] NO

PART TIME (DATE) _____   FULL TIME (DATE) _____

5. IF YOU HAVE NOT RETURNED TO WORK, DO YOU EXPECT TO? [ ] YES [X] NO

PART TIME (DATE) _____   FULL TIME (DATE) _____

**RSL00288**

RSI00289
68200189

## E. INFORMATION ABOUT PHYSICIANS AND HOSPITALS

1. DATE YOU WERE FIRST TREATED FOR THE CURRENT ILLNESS OR INJURY:

**LIST ALL MEDICAL PRACTITIONERS CONSULTED FOR THIS CONDITION:**

| | | |
|---|---|---|
| DOCTOR'S NAME Gary Gieseke, MD | TELEPHONE (954) 771-4251 FAX (954) 491-4892 | SPECIALTY: Neurological Surgery |
| ADDRESS (STREET, CITY, STATE, ZIP) 1930 NE 47th Street, Ft. Lauderdale, Florida 33308 | | DATES SEEN Surgery, Sept. 1995 |
| DOCTOR'S NAME Manuel Porth, MD | TELEPHONE (954) 724-9300 FAX (954) | SPECIALTY: Orthopedic Surgery |
| ADDRESS (STREET, CITY, STATE, ZIP) 7171 N. University Dr. Tamarac, FL 33321 | | DATES SEEN Starting Nov. 1995 |

**PLEASE ATTACH ADDITIONAL INFORMATION ON SEPARATE SHEET IF MORE DOCTORS WERE CONSULTED.**

| | |
|---|---|
| HOSPITAL Holy Cross Hospital | |
| ADDRESS (STREET, CITY, STATE, ZIP) Federal Highway, Ft. Lauderdale, FL | DATES OF CONFINEMENT FROM 9/29/95 TO 10/1/95 |

## F. INFORMATION ABOUT OTHER DISABILITY INCOME

(CHECK THE OTHER INCOME BENEFITS YOU ARE RECEIVING OR ARE ELIGIBLE TO RECEIVE AS A RESULT OF YOUR DISABILITY AND COMPLETE THE INFORMATION REQUESTED)

| SOURCE OF INCOME | AMOUNT (WK, MONTH) | DATE CLAIM WAS FILED | DATE PAYMENTS BEGAN | DATE PAYMENTS ENDED |
|---|---|---|---|---|
| SALARY CONTINUANCE ✓ | $ _____ / _____ | | | |
| SHORT TERM DISABILITY | $ 5,000.00 | 1/1/97 | 1/1/97 | 12/31/97 |
| STATE DISABILITY | $ _____ / _____ | | | |
| WORKER'S COMPENSATION | $ _____ / _____ | | | |
| SOCIAL SECURITY/RETIREMENT | $ 1,332.00 | 1/1/97 | 1/1/97 | |
| SOCIAL SECURITY/DISABILITY | $ _____ / _____ | | | |
| SOCIAL SECURITY FOR DEPENDANTS | $ _____ / _____ | | | |
| CANADIAN PENSION PLAN | $ _____ / _____ | | | |
| PENSION/RETIREMENT | $ _____ / _____ | | | |
| PENSION/DISABILITY | $ _____ / _____ | | | |
| UNEMPLOYMENT | $ _____ / _____ | | | |
| NO-FAULT INSURANCE | $ _____ / _____ | | | |
| JONES ACT | $ _____ / _____ | | | |
| RAILROAD RETIREMENT | $ _____ / _____ | | | |
| OTHER (INCLUDE INDIVIDUAL OR GROUP) | $ _____ / _____ | | | |

## G. INFORMATION ABOUT INCOME TAX WITHOLDING

IF YOUR REQUEST FOR BENEFITS IS APPROVED, SHOULD INCOME TAXES BE WITHELD FROM YOUR BENEFIT CHECKS? ☐ YES ☒ NO  IF YES, HOW MUCH SHOULD BE WITHELD FROM EACH CHECK.

FEDERAL TAXES (MINIMUM IS $87.00 PER MONTH)  $ _____ .00

STATE TAXES (MINIMUM IS $10.00 PER MONTH)  $ _____ .00

## H. SIGNATURE (REQUIRED FOR ALL CLAIMS)

"A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE AN INSURANCE COMPANY FILES A STATEMENT OF CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

*I CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE.*

X _James E. Padua_                    11/3/97

SIGNATURE EMPLOYEE                    DATE

## I. EMPLOYMENT AND EDUCATION INFORMATION

**PLEASE PRINT ALL INFORMATION**

1. CLAIMANT'S NAME:   JAMES E. RADICAN

2. POLICY NUMBER:   LSC 098842

3. SOCIAL SECURITY NUMBER:   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

**PLEASE COMPLETE THE FOLLOWING INFORMATION AS ACCURATELY AS POSSIBLE. THIS DATA IS NEEDED TO HELP MAKE A THOROUGH EVALUATION OF YOUR CLAIM.**

**EDUCATION/TRAINING**

**HIGH SCHOOL:**

1. COURSE OF STUDY:   Standard Requirements

2. HIGHEST GRADE COMPLETED:   Grade 12

3. DID YOU OBTAIN YOUR GED IF YOU DID NOT GRADUATE FROM HIGH SCHOOL?   ☐ YES   ☐ NO
   IF YES, WHEN? _____
   IF NO, DO YOU PLAN TO?   ☐ YES   ☐ NO

**COLLEGE:**

1. DID YOU ATTEND COLLEGE?   ☐ YES   ☒ NO

2. WHERE?

3. COURSE OF STUDY:

4. DEGREE   ☐ YES   ☐ NO     5. NUMBER OF YEARS COMPLETED:

6. TYPE OF DEGREE:     WHEN?

**VOCATIONAL TRAINING:**

1. WHERE?

2. WHAT TYPE?

3. CERTIFICATE OR LICENSE OBTAINED:

4. WHAT SPECIALIZED TRAINING HAVE YOU HAD INCLUDING EQUIPMENT/MACHINERY USED?
   _____
   _____
   _____
   _____

5. DO YOU HAVE KNOWLEDGE OR PROFICIENCY WITH PERSONAL COMPUTERS?   ☐ YES   ☒ NO

6. IF YES, PLEASE LIST SOFTWARE PROGRAMS YOU HAVE USED:
   _____
   _____

**RSL00290**

RSL00291

**EMPLOYMENT HISTORY**

STARTING WITH PRESENT EMPLOYER, PLEASE LIST AND DESCRIBE ALL JOBS YOU HAVE HELD IN THE PAST 15 YEARS. IF MORE THAN 1 JOB WITH ANY EMPLOYER, PLEASE LIST EACH.

1. NAME OF EMPLOYER: TARMAC AMERICA INC.

| 2. START DATE: 6/25/65 | 3. JOB TITLE: Special Sales Rep. | 4. MONTHLY SALARY: 5,000.00 |
|---|---|---|

5. REASON FOR LEAVING:

6. DETAIL YOUR JOB DUTIES:   To make routine sales and promotional calls on customers and contractors through out the State of Florida.

7. WHAT WERE THE PHYSICAL/MENTAL REQUIREMENTS? Normal

8. NAME OF EMPLOYER:

| 9. START DATE: | 10. JOB TITLE: | 11. MONTHLY SALARY: |
|---|---|---|

12. REASON FOR LEAVING:

13. DETAIL YOUR JOB DUTIES:

14. WHAT WERE THE PHYSICAL/MENTAL REQUIREMENTS?

15. NAME OF EMPLOYER:

| 16. START DATE: | 17. JOB TITLE: | 18. MONTHLY SALARY: |
|---|---|---|

19. REASON FOR LEAVING:

20. DETAIL YOUR JOB DUTIES:

21. WHAT WERE THE PHYSICAL/MENTAL REQUIREMENTS?

22. WHAT IS YOUR PROJECTED RETURN TO WORK DATE? None

23. HAVE YOU CONTACTED YOUR FORMER EMPLOYER? ☐ YES ☒ NO

24. HAVE YOU BEEN LOOKING FOR A JOB? ☐ YES ☒ NO

25. ARE YOU FAMILIAR WITH YOUR LTD POLICY REGARDING RETURN TO WORK INCENTIVES AND REHABILITATION SERVICES?

# RSL Reliance Standard Life Insurance Company®

**DISABILITY CLAIM**
**(LONG TERM, WAIVER OF PREMIUM)**
**EMPLOYER'S STATEMENT**

**TO BE COMPLETED BY THE EMPLOYER**

| THIS CLAIM IS FOR (EMPLOYEE NAME) | SOCIAL SECURITY NUMBER | DATE OF BIRTH |
|---|---|---|
| JAMES E. RADICAN | 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 | 04-20-30 |

## A. INFORMATION ABOUT THE EMPLOYER

1. COMPANY'S NAME
TARMAC AMERICA, INC.

2. GROUP POLICY NUMBER
LIFE
LONG TERM DISABILITY   LSC 098842

3. ADDRESS (STREET, CITY, STATE, ZIP)
1151 AZALEA GARDEN RD., NORFOLK, VA 23502

TELEPHONE: ( ) 757-858-6500
FAX: ( ) 757-853-5462

4. NAME AND ADDRESS OF DIVISION WHERE EMPLOYEE WORKS (IF DIFFERENT FROM ABOVE)
FLORIDA DIVISION, c/o ABOVE

## B. INFORMATION ABOUT THE EMPLOYEE

1. DATE EMPLOYEE WAS HIRED? (MTH, DAY,YR)
06-25-1965

2. DATE EMPLOYEE BECAME INSURED
UNDER THIS PLAN? 01 / 01 / 96   MTH DAY YR
UNDER YOUR PRIOR PLAN? 08 / 01 / 88   MTH DAY YR

3. WHAT WAS THE EMPLOYEE'S REGULARLY SCHEDULED WORK WEEK?
40 hrs./wk.

4. PLEASE IDENTIFY THE CLASS OF THIS EMPLOYEE: B

5. DATE TO WHICH PREMIUM IS PAID FOR THIS EMPLOYEE: 08 / 31 / 97   MTH DAY YR

6. THE EMPLOYEE IS (CHECK ALL THAT APPLY)
- [ ] HOURLY (RATE: )
- [X] SALARIED
- [ ] UNION
- [X] NON-UNION
- [X] EXEMPT
- [ ] NON-EXEMPT
- [X] FULL-TIME
- [ ] PART-TIME
- [ ] COMMISSIONED
- [ ] RECEIVES BONUSES

7. IF SALARIED, BASIC MONTHLY EARNINGS AS OF LAST DAY WORKED
$4,824.08

8. EFFECTIVE DATE OF CURRENT SALARY OR HOURLY RATE:
07 / 01 / 96   MTH DAY YR

9. WILL EMPLOYEE FILE FOR DISABILITY BENEFITS PROVIDED BY ANY EMPLOYER/EMPLOYEE LABOR MANAGEMENT, STATE DISABILITY OR UNION WELFARE PLAN?   [ ] YES   [X] NO

A. IF YES, WHAT IS THE WEEKLY AMOUNT? $_____   B. WHAT TYPE OF BENEFIT? _____

C. WHEN DO BENEFITS BEGIN? _____   END? _____

10. IS EMPLOYEE'S CONDITION WORK RELATED?   [ ] YES   [X] No

11. HAS CLAIM BEEN FILED WITH WORKER'S COMPENSATION?   [ ] YES   [X] NO
IF YES, SEND INITIAL REPORT OF ILLNESS OR INJURY AND AWARD NOTICE.

12. NAME AND ADDRESS OF YOUR WORKER'S COMPENSATION CARRIER:
N/A

13. NAME AND ADDRESS OF YOUR MEDICAL INSURANCE CARRIER OR ADMINISTRATOR IF SELF FUNDED:
CIGNA HEALTHCARE OF FLORIDA, P.O. BOX 5023, HARTFORD, CT 06102-5023

## C. INFORMATION NEEDED FOR WITHOLDING AND REPORTING TAXES

1. DOES EMPLOYEE CONTRIBUTE TOWARDS THE PREMIUM?   [X] YES   [ ] NO

2. IF YES, WHAT PERCENT IS PAID BY THE EMPLOYEE? ON A PRE TAX BASIS _____ %   ON A POST TAX BASIS 100 %
IF YOU LEAVE THIS SECTION BLANK, WE WILL ASSUME IT IS 100% EMPLOYER CONTRIBUTION AND CALCULATE FICA TAXES ACCORDINGLY.

## D. INFORMATION ABOUT THE CLAIM

1. WERE THERE ANY CHANGES TO THE EMPLOYEE'S JOB RESPONSIBILITIES DUE TO THE DISABLING CONDITION BEFORE THE EMPLOYEE BECAME FULLY DISABLED?   [ ] YES   [X] NO   IF YES, WHAT WERE THE CHANGES AND WHEN WERE THEY MADE?

2. WHAT WAS THE EMPLOYEE'S PERMANENT JOB ON HIS OR HER LAST DAY AT WORK? SALES REPRESENTATIVE - CEMENT

3. HOW LONG HAS THE EMPLOYEE BEEN IN THIS JOB? 30 YEARS

4. LAST DAY EMPLOYEE ACTUALLY WORKED (MONTH, DAY, YR.) 12 / 31 / 96

5. ON THAT DAY, DID THE EMPLOYEE WORK A FULL DAY?   [ ] YES   [X] NO   IF NO, HOW MANY HOURS WERE WORKED? PARTIAL DAY

6. WHY DID EMPLOYEE STOP WORKING?
- [ ] LAYOFF
- [ ] TERMINATION FOR CAUSE
- [ ] FAMILY MEDICAL LEAVE ACT
- [ ] RESIGNATION
- [ ] RETIRED
- [X] DISABILITY

RS-1936

RSL00292

RSL000083

**DISABILITY CLAIM EMPLOYER'S STATEMENT**

## E. INFORMATION ABOUT YOUR PENSION PLAN (DO NOT COMPLETE FOR MATERNITY CLAIM)

1. DO YOU HAVE A PENSION PLAN?    [X] YES    [ ] NO
2. IF YES, WHAT TYPE?
   [ ] DEFINED BENEFIT SHARING    [X] 401K    [X] DEFINED CONTRIBUTION    [ ] PROFIT SHARING    [ ] OTHER (EXPLAIN)

3. IS THE EMPLOYEE ELIGIBLE FOR YOUR PENSION PLAN?    [X] YES    [ ] NO
4. IF ELIGIBLE, DOES THE EMPLOYEE CONTRIBUTE?    [X] YES    [ ] NO
5. IF YES, WHAT PERCENTAGE?    **3%**
6. IF THE EMPLOYEE IS PARTICIPATING, WHEN IS HE OR SHE ELIGIBLE FOR BENEFITS UNDER THE PLAN? (MONTH/DAY/YEAR)

   CURRENTLY ELIGIBLE (OVER AGE OF 59½)

## F. INFORMATION ABOUT YOUR REHIRE OR RETURN-TO-WORK POLICIES

1. DOES YOUR COMPANY HAVE A REHIRE OR RETURN-TO-WORK POLICY FOR DISABLED EMPLOYEES?    [X] YES    [ ] NO
2. DO YOU HAVE FULL OR PART-TIME POSITIONS AVAILABLE THAT THIS EMPLOYEE WOULD BE SUITED FOR UNDER A SUPERVISED REHABILITATION
   PROGRAM?    [ ] YES    [X] NO
3. WHAT IS THE NAME, TITLE AND TELEPHONE NUMBER OF THE INDIVIDUAL WE SHOULD CONTACT IF WE IDENTIFY A REHABILITATION OR RETURN-
   TO-WORK OPTION?    HOPE FISCHER, BENEFITS ADMINISTRATOR (757)858-6502

## G. REQUIRED ATTACHMENTS AND SIGNATURE

IF EMPLOYEE WAS COVERED UNDER A PRIOR PLAN, INCLUDE COPY OF PRIOR PLAN.    see CIGNA SPD enclosed.
IF THE EMPLOYEE CONTRIBUTES TO THE PREMIUMS, ATTACH A COPY OF THE ENROLLMENT FORM.    see attached letter. Did not waive
IF SALARY IS BASED ON W-2, K1, 1099, OR SIMILAR DOCUMENT, ATTACH A COPY OF THE DOCUMENT.    coverage.
IF YOU HAVE MEDICAL INFORMATION FROM THE EMPLOYEE'S FILE RELATING TO DISABILITY, PLEASE ATTACH COPIES.
IF A WORKER'S COMPENSATION CLAIM IS FILED, SEND INITIAL REPORT OF INJURY OR ILLNESS AND AWARD NOTICE.

NAME/TITLE OF PERSON COMPLETING THIS FORM.

HOPE E. FISCHER, BENEFITS ADMINISTRATOR, TARMAC AMERICA

"A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE AN INSURANCE COMPANY, FILES A
STATEMENT OF CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION COMMITS A FRAUDULENT
INSURANCE ACT, WHICH IS A CRIME."

*I CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE.*

x *Hope E. Fischer*
SIGNATURE

DECEMBER 2, 1997
DATE

BENEFITS ADMINISTRATOR
TITLE

Insurance Compan...

LONG TERM, WAIVER OF PREMIUM)

TO BE COMPLETED BY THE EMPLOYER

| THIS CLAIM IS FOR (EMPLOYEE'S NAME) | SOCIAL SECURITY NUMBER | DATE OF DISABILITY (MONTH, DAY, YEAR) |
|---|---|---|
| JAMES E. RADICAN | 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 | 01-01-1997 |

## A. GENERAL INFORMATION ABOUT THE EMPLOYEE'S JOB

| JOB TITLE | DOT CODE (DICTIONARY OF OCCUPATIONAL TITLES) | MINIMUM EDUCATION OR TRAINING REQUIRED |
|---|---|---|
| SALES REPRESENTATIVE | | HIGH SCHOOL |

DOES THE EMPLOYEE PERFORM SUPERVISORY FUNCTIONS? ☐ YES ☒ NO IF YES, HOW MANY PEOPLE ARE SUPERVISED? _____
DESCRIBE JOB DUTIES.

CHECK THE ITEMS BELOW THAT RELATE TO THE EMPLOYEE'S JOB. USE THESE DEFINITIONS FOR THE FREQUENCY OF OCCURRENCE:

**OCCASIONALLY** MEANS THE PERSON DOES THE ACTIVITY 1% TO 33% OF THE TIME
**FREQUENTLY** MEANS THE PERSON DOES THE ACTIVITY 34% TO 66% OF THE TIME
**CONTINUOUSLY** MEANS THE PERSON DOES THE ACTIVITY 67% TO 100% OF THE TIME

| | OCCASIONALLY | FREQUENTLY | CONTINUOUSLY |
|---|---|---|---|
| RELATE TO OTHERS | ☐ | ☐ | ☒ |
| WRITTEN AND VERBAL COMMUNICATIONS | ☐ | ☐ | ☒ |
| REASONING, MATH AND LANGUAGE | ☐ | ☒ | ☐ |
| MAKE INDEPENDENT JUDGEMENTS | ☐ | ☒ | ☐ |

WHICH OF THE FOLLOWING DESCRIBE THE EMPLOYEE'S WORKING ENVIRONMENT? CHECK ALL THAT APPLY.

☒ UNPROTECTED HEIGHTS         ☒ CHANGES IN TEMPERATURE OR HUMIDITY
☒ EXPOSURE TO DUST, FUMES, AND GASES    ☒ BEING NEAR MOVING MACHINERY
☒ DRIVING AUTOMOTIVE EQUIPMENT      ☐ OTHER HAZARDS

IS THE EMPLOYEE REQUIRED TO TRAVEL? ☒ YES ☐ NO
IF YES, COMPLETE THE FOLLOWING INFORMATION:

| HOW DOES THE EMPLOYEE TRAVEL? (AUTOMOBILE, PLANE, TRAIN, ETC.) | WHERE DOES THE EMPLOYEE TRAVEL? | WHAT PERCENT OF THE TIME DOES THE EMPLOYEE TRAVEL? |
|---|---|---|
| AUTO | SOUTH FLORIDA | DAILY |

## B. INFORMATION ABOUT THE PHYSICAL ASPECT OF THE EMPLOYEE'S JOB

CHECK THE ITEMS BELOW THAT RELATE TO THE EMPLOYEE'S JOB AND COMPLETE THE INFORMATION REQUESTED. USE THESE DEFINITIONS FOR THE FREQUENCY OF OCCURRENCE:

**OCCASIONALLY** MEANS THE PERSON DOES THE ACTIVITY 1% TO 33% OF THE TIME
**FREQUENTLY** MEANS THE PERSON DOES THE ACTIVITY 34% TO 66% OF THE TIME
**CONTINUOUSLY** MEANS THE PERSON DOES THE ACTIVITY 67% TO 100% OF THE TIME

| ACTIVITY | NEVER | OCCASIONALLY | FREQUENTLY | CONTINUOUSLY |
|---|---|---|---|---|
| STANDING | ☐ | ☒ | ☐ | ☐ |
| WALKING | ☐ | ☐ | ☒ | ☐ |
| SITTING | ☐ | ☐ | ☐ | ☒ |
| BALANCING | ☐ | ☒ | ☐ | ☐ |
| STOOPING | ☐ | ☒ | ☐ | ☐ |
| KNEELING | ☐ | ☒ | ☐ | ☐ |
| CROUCHING | ☐ | ☒ | ☐ | ☐ |
| CRAWLING | ☐ | ☒ | ☐ | ☐ |
| REACHING/WORKING OVERHEAD | ☐ | ☒ | ☐ | ☐ |
| CLIMBING | ☐ | ☒ | ☐ | ☐ |
| STAIRS Number of Stairs: | ☐ | ☒ | ☐ | ☐ |
| LADDERS Height of Ladder: | ☐ | ☒ | ☐ | ☐ |
| **Describe Activity** | | | | |
| PUSHING. _____ LBS. | ☐ | ☐ | ☐ | ☐ |
| PULLING. _____ LBS. | ☐ | ☐ | ☐ | ☐ |
| LIFTING/CARRYING 26-60 LBS. | ☐ | ☒ | ☐ | ☐ |
| 11-25 LBS. | | | X | |
| UP TO 10 LBS. | | | | X |

CAN THE JOB BE PERFORMED BY ALTERNATING SITTING AND STANDING? ☐ YES ☒ NO

DOES THE JOB REQUIRE USING FEET TO OPERATE FOOT CONTROLS? ☒ YES ☐ NO IF YES, ON WHAT TYPE OF EQUIPMENT.
AUTOMOBILE

IS GOOD VISUAL ACUITY REQUIRED IN THE JOB?
YES

| WHAT ARE THE MAJOR TASKS REQUIRING USE OF ONE OR BOTH HANDS | ONE HAND | BOTH HANDS |
|---|---|---|
| DRIVING, WRITING, SAMPLE MATERIALS | | X |

RSL00294

RSL00295

## C. INFORMATION ABOUT THE JOB AS IT RELATES TO THE DISABILTY

CAN THE JOB BE MODIFIED TO ACCOMMODATE THE DISABILITY EITHER TEMPORARILY OR PREMANENTLY?  ☐ YES  ☒ NO   IF YES, EXPLAIN.

IS IT POSSIBLE TO OFFER THE EMPLOYEE ASSISTANCE IN DOING THE JOB (THROUGH USE OF TECHNOLOGY OR PERSONAL ASSISTANCE FOR EXAMPLE)?  ☐ YES  ☒ NO   IF YES, EXPLAIN.

## D. ATTACHMENTS AND SIGNATURE (ATTACH COPY OF THE EMPLOYEE'S JOB DESCRIPTION)
***ATTACHED***

"A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE AN INSURANCE COMPANY, FILES A STATEMENT OF CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

*I CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE.*

x  _Hope E. Fischer_
SIGNATURE

DECEMBER 2, 1997
DATE

(    )  757-858-6502
TELEPHONE

_BENEFITS ADMINISTRATOR_
TITLE

(    )  757-853-5462
FAX

MAGNETIC RESONANCE IMAGING



**Coral Ridge MRI**

1951 N.E. 47th Street
Fort Lauderdale, Florida 33308
(305) 491-8881

| PATIENT INFORMATION | AGE | DATE | SCAN NO. | REFERRING PHYSICIAN |
|---|---|---|---|---|
| RADICAN, JAMES | 63 | 3-18-94 | 13,191 | J. PEICHER, M.D. |

AREA OF STUDY: LUMBAR SPINE WITH AND WITHOUT CONTRAST MEDIUM

**SUMMARY OF FINDINGS:**

MRI study of the lumbar spine was carried out using multiple
sagittal and transvere views.

There is evidence of narrowing of the L3-4, L4-5, and L5-S1
interspaces. There is moderate bulge at the 13-4 level. There
is spurring seen on the inferior cortical end-plates of the
L3,4,and 5 vertebral bodies.

With T2 weighted pulse sequences, there is decreased signal
intensity of all cervical discs.

Transaxial views show no evidence of midline or lateral
disc herniation. There is evidence of prior lumbar laminectomy
site at the L4-5 and L5-S1 levels.

The patient received a 16cc. injection of gadolinum and no
additional changes were identified.

**INTERPRETATION:**

1. Degenerative disc disease of the lumbar spine.

2. Evidence of a prior lumbar laminectomy at L4-5 and L5-S1.

3. Rather lumbar spondylitis with spurring seen most marked
   at the 12-3 and L3-4 levels.

4. Negative enhanced MRI study.

ROGER G. SCHNELL,M.D.

**RSL00296**

RGS /mm

# NSA

NEUROLOGICAL SURGERY ASSOCIATES



* F. GARY GIESEKE, M.D. · F.A.C.S.
* MATTHEW R. MOORE, M.D.
* JOHN A. COATS, M.D.

NOVEMBER 16, 1995

TO WHOM IT MAY CONCERN:

RE:  JAMES RADICAN

The above patient has had major back surgery and, unfortunately, is still having problems.  I feel he is unable to work full-time.  He might, however, be able to work part-time depending on his condition.  He is undergoing physical therapy at this time.

F. GARY GIESEKE, M.D.

FGG:wjr

1930 N.E. 47th Street
Ft. Lauderdale
suite 200
Florida
33308
954 / 771-4251
fax · 954 / 491-4892

RSL00297

# PARK PLACE THERAPEUTIC CENTER

December 20, 1995

Re:  James Radican
102566-0

To Whom it May Concern:

Mr. James Radican is status post laminectomy, continuing to experience back discomfort. The operative area is sensitive and he is continuing therapy and benefiting from the therapy.

It is my opinion that therapy is mandatory and needs to be continued.  A lot of energy and effort have been invested in decompressing this patient's lumbar spine.  He continues to demonstrate significant weakness of his back and lower extremity muscles, and therapy will make the difference with respect to regaining strength, regaining mobility, and reducing his symptoms of back and leg pain.

I would strongly advise that additional therapy be authorized by his insurance carrier.

Very truly yours,

MANUEL PORTH, M. D.

MP/jcg

**RSL00298**

301 N.W. 84th Avenue
Plantation, Florida 33324
(305) 475-4500



7171 N. University Drive
Tamarac, Florida 33321
(305) 724-9300

MAGNETIC RESONANCE IMAGING



**Coral Ridge MRI**

1961 N.E. 47th Street
Fort Lauderdale, Florida 33308
(305) 491-8881

| PATIENT INFORMATION | AGE | DATE | SCAN NO. | REFERRING PHYSICIAN |
|---|---|---|---|---|
| RADICAN, JAMES | 65 | 03/29/96 | 13,191-2 | MANUEL PORTH, M.D. |

**AREA OF STUDY:**   LUMBAR SPINE WITHOUT AND WITH GADOLINUM

**SUMMARY OF FINDINGS:**

MRI study of the lumbar spine was carried out using multiple sagittal and transverse views.

With T1 weighted pulse sequences, there is narrowing of the L2-3, L4-5, and L5-S1 interspaces. There are post-surgical changes noted opposite L1, 12, and L3 with evidence of a lumbar laminectomy running almost from L1-2 through L4-5.

With the heavily weighted T2 pulse sequences, there is decreased signal intensity of all lumbar discs. There is evidence of a disc herniation at L1-2 which protrudes into the midline and a moderate herniation at L3-4 which also appears midline.

Transaxial views show the midline discs at L1-2 and L3-4. Post-operative changes are seen with the hemilaminectomy.

**INTERPRETATION:**

1. Degenerative disc disease of the lumbar spine.

2. Herniated disc at L1-2, paracentral

3. Herniated disc at L3-4, paracentral.

4. Post-operative changes seen at L1-2 through L4-5.

5. Moderate lumbar spondylitis.

**RSL00299**

When compared to the prior study of March 18, 1994, this study has progressed and the disc herniations are now apparent.

ROGER G. SCHNELL, MD.

**Tarmac America, Inc.**
Job Description

<u>JOB TITLE</u>
Sales Representative

EXEMPT:
SALARY LEVEL:

<u>SUMMARY:</u> Responsible for selling Tarmac's products and services to existing customers and new prospects. Applies a broad knowledge of the organization's services, products, and marketing techniques to finalize sales.

<u>ESSENTIAL DUTIES AND RESPONSIBILITIES</u>:

Sells the organization's products and services to existing customers and new prospects.

Maintains a sales program within the territory based on customer's estimated requirements. Identifies new markets and stimulates demand.

Informs customers of supply and price trends and assists in inventory control.

Keeps informed on new products/services and other general information of interest to customers. Participates in trade association meetings.

Assists accounts receivable in the collection of moneys.

Secures and renews orders and arranges delivery dates.

Exhibits good interpersonal and customer service skills.

Works to resolve customer issues, problems, and concerns.

<u>QUALIFICATION REQUIREMENTS:</u> To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the minimum knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

<u>EDUCATION and/or EXPERIENCE:</u> Bachelor degree (B.A.) from college or university; 1-3 years job-related prior experience.

RSL00300

COMMUNICATION SKILLS:  Ability to read, analyze, and interpret professional journals and financial reports.  Ability to respond to common inquiries or complaints from customers, regulatory agencies, or members of the community.  Write complex documents in a prescribed format.  Ability to effectively present information to top management, public groups, an/or boards of directors.  Ability to communicate complex ideas and beliefs to top management.

MATHEMATICAL SKILLS:  Ability to apply moderately complex mathematical equations as applicable.

REASONING ABILITY:  Ability to define problems, collect data, establish facts, and draw valid conclusions.  Ability to interpret an extensive variety of technical instructions and deal with several abstract and concrete variables.

PHYSICAL DEMANDS:  The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job.  Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

| Activity | Never | Occasionally | Frequently | Regularly |
|---|---|---|---|---|
| Sit | | | | ✓ |
| Talk | | | | ✓ |
| Hear | | | | ✓ |
| Use hands to finger/handle objects, tools, controls | | | ✓ | |
| Stand | | ✓ | | |
| Walk | | | ✓ | |
| Drive | | | | ✓ |
| Reach with hands and arms | | ✓ | | |
| Stoop, kneel, crouch, crawl | | ✓ | | |
| Climb or balance | | ✓ | | |

RSL00301

The employee may be required to lift:

| Activity | Never | Occasionally | Frequently | Regularly |
|---|---|---|---|---|
| Up to 10 pounds | | | | ✓ |
| 11-25 pounds | | | ✓ | |
| 26-50 pounds | | ✓ | | |
| 51-100 pounds | ✓ | | | |
| More than 100 pounds | ✓ | | | |

<u>WORK ENVIRONMENT:</u>  The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job.  Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

| Activity | Never | Occasionally | Frequently | Regularly |
|---|---|---|---|---|
| Wet, humid conditions (non-weather) | | ✓ | | |
| Work near moving mechanical parts | | ✓ | | |
| Work in high, precarious places | ✓ | | | |
| Fumes or airborne particles | ✓ | | | |
| Toxic or caustic chemicals | ✓ | | | |
| Outdoor weather conditions | | | | ✓ |
| Extreme cold (non-weather) | ✓ | | | |
| Extreme heat (non-weather) | ✓ | | | |
| Risk of electrical shock | ✓ | | | |
| Work with explosives | ✓ | | | |
| Vibration | ✓ | | | |

*The above statements are intended to describe the general nature and level of work being performed.  They are not intended to be construed as an exhaustive list of all essential duties, responsibilities and requirements of personnel.*

RSL00302

June 21, 1996

James Radican
3800 Nw 71 Street
Coconut Creek, FL  33073

Dear James,

Effective January 1, 1996, your long-term disability (LTD) benefit was substantially upgraded.  The previous own occupation period of 24 months was changed to 60 months.  This could have a significant impact on the total amount of benefit you could receive in the event of total disability.

We are pleased to announce that your disability benefit has now been even further enhanced in the following way.  Effective July 1, 1996, the company will no longer pay the premium for your LTD coverage; instead, this cost will automatically be deducted from your pay check, unless you choose to discontinue your LTD coverage.  The benefit to you will be that if you are ever the recipient of disability benefits on this plan, you will receive them tax free.  Prior to this change, any recipient of a disability benefit on this plan received a net amount **after** income tax deductions for their tax bracket were taken.

The current annual premium that will be deducted from your pay will be $178.90, which will be prorated over each pay period.

$$\text{ANNUAL SALARY} \div 100 \; * \; \$0.31 \; = \; \text{ANNUAL PREMIUM}$$

Note that for most employees, salary increases will take effect on July 1, 1996 so the actual effect on your check should be minimal with the change in the LTD.

If you do not wish to continue your LTD coverage, please complete the attached form and return it to Yvonne Smith, 1151 Azalea Garden Road, Norfolk, VA 23502 prior to July 1, 1996. *Please understand if you choose not to participate at this time, you will not have the opportunity to opt for this coverage again until approximately January 1997. You will also have to provide Evidence of Insurability at your own expense.* If you do not return a form, it will be assumed that you do want the LTD coverage.

We are in the process of having Summary Plan Description booklets printed.  They will be forwarded to you as soon as they are received.  If you have any questions, please contact the Benefits Department at (804)858-6500.

Sincerely,

Ed Pittman
Vice President Human Resources

**RSL00303**

cc:     Personnel File

011: 1417
Division II

## LONG TERM DISABILITY COVERAGE

_____ **I do not** wish to continue my long term disability coverage. I understand I will not have an opportunity to enroll in this plan again until approximately January 1997. I understand that if I want to enroll at a later date, Evidence of Insurability at my own expense will be required.

_____        _____
Signature                               Date


_____
PRINT YOUR FULL NAME HERE


_____
SOCIAL SECURITY NUMBER


_____
LOCATION


_____
WORK NUMBER

RSL00304

## Copy B To Be Filed With Employee's FEDERAL Tax Return

| | | |
|---|---|---|
| 977 | Copy B To P — This informa — sing furnished to the Internal Revenue Service. | 1 Wages, tips, other compensation **50544.97** — 2 Federal income tax withheld **10985.28** |

TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

59-1729143

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

3 Social secur. **59214.85** — 4 Social security tax withheld **3671.32**
5 Medicare wages and tips **59214.85** — 6 Medicare tax withheld **858.62**

JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

13 See instr. for box 13:
C **1663.20**
D **8669.88**

12 **1895.53**

---

## Copy 2 To Be Filed With Employee's State Income Tax Return

| | | |
|---|---|---|
| 977 | Copy 2 To Be Filed With Employee's State Income Tax Return | 1 Wages, tips, other compensation **50544.97** — 2 Federal income tax withheld **10985.28** |

TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

59-1729143

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

3 Social security wages **59214.85** — 4 Social security tax withheld **3671.32**
5 Medicare wages and tips **59214.85** — 6 Medicare tax withheld **858.62**

JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

13
C **1663.20**
D **8669.88**

12 **1895.53**

Form W-2 Wage and Tax Statement 1996    OMB No. 1545-0008    Department of the Treasury-Internal Revenue Service

---

Form W-2 Wage and Tax Statement 1996    OMB No. 1545-0008    Department of the Treasury-Internal Revenue Service

| | | |
|---|---|---|
| 977 | Copy 2 To Be Filed with Employee's City or Local Income Tax Return | 1 Wages, tips, other compensation **50544.97** — 2 Federal income tax withheld **10985.28** |

TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

59-1729143

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

3 Social security wages **59214.85** — 4 Social security tax withheld **3671.32**
5 Medicare wages and tips **59214.85** — 6 Medicare tax withheld **858.62**

JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

13
C **1663.20**
D **8669.88**

12 **1895.53**

---

| | | |
|---|---|---|
| 977 | Copy C For EMPLOYEE'S RECORDS (See Notice on back.) | 1 Wages, tips, other compensation **50544.97** — 2 Federal income tax withheld **10985.28** |

TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

59-1729143

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

3 Social security wages **59214.85** — 4 Social security tax withheld **3671.32**
5 Medicare wages and tips **59214.85** — 6 Medicare tax withheld **858.62**

JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

13 See instr. for box 13:
C **1663.20**
D **8669.88**

12 **1895.53**

RSL00305

Form W-2 Wage and Tax Statement 1996    OMB No. 1545-0008    Department of the Treasury-Internal Revenue Service

DUPLICATE



**Tarmac America, Inc.**
P.O. Box 2016
Norfolk VA 23501
Norfolk (757) 858-6500
Fax (757) 855-7707

December 11, 1997

James J. LePrell, CLU
Acordia of Virginia
8001 Franklin Farms Drive
Suite 238
Richmond, VA 23229

**RE:    LTD Claim - Reliance Standard Life (Policy # LSC 098842)**
**        James E. Radican (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)**

Dear Jim:

Enclosed are the papers from the doctor who treated Mr. Radican for his disability.  Would you kindly see that they are processed with the paperwork I forwarded to you last week.

Jim, if you would keep me informed of the progress of this application, I would be most grateful.  Please let me know if there is anything I can do from here to expedite the processing of this claim.

Thank you much for your assistance.

Sincerely,

Hope E. Fischer, PHR
Benefits Administrator

Enclosures

cc:    L. Armistead

**RSL00306**

**Reliance Standard Life
Insurance Company** ®

Claim Numb: _____

Policy Number: _LSC 098842_

# AUTHORIZATION

To Whom It May Concern:

I, _____ JAMES E. RADICAN _____ , hereby authorize any hospital, physician,

medical practitioner, clinic, other medical or medically-related facility, pharmacy, insurance company or

Government Agency (including the Social Security Administration and the Internal Revenue Service) or

any past or present employer to disclose or furnish to Reliance Standard Life Insurance Company or its

representatives, any and all information with respect to any illness including mental illness, drug/alcohol

abuse, injury, medical history, consultations, prescriptions, treatments or benefits, or other documents

and copies of all applicable records that may be requested. I also authorize any employer to disclose all

information needed to process my claim.


The information provided to Reliance Standard Life Insurance Company or its representatives is to be

used solely for the administration of claim(s). A photostatic copy of this authorization is to be

considered as valid as the original and is effective for the duration of the claim.


November 3, 1997
_____
Date

_____
Signature

NOTE: A true copy of this authorization is available to the employee at any time upon request.


**RSL00307**



**Reliance Standard Life Insurance Company®**

Claim Numb. _____

Policy Number: _LSC 098842_

# AUTHORIZATION

To Whom It May Concern:

I, _____ JAMES E. RADICAN _____ , hereby authorize any hospital, physician, medical practitioner, clinic, other medical or medically-related facility, pharmacy, insurance company or Government Agency (including the Social Security Administration and the Internal Revenue Service) or any past or present employer to disclose or furnish to Reliance Standard Life Insurance Company or its representatives, any and all information with respect to any illness including mental illness, drug/alcohol abuse, injury, medical history, consultations, prescriptions, treatments or benefits, or other documents and copies of all applicable records that may be requested. I also authorize any employer to disclose all information needed to process my claim.

The information provided to Reliance Standard Life Insurance Company or its representatives is to be used solely for the administration of claim(s). A photostatic copy of this authorization is to be considered as valid as the original and is effective for the duration of the claim.

_____November 3, 1997_____                    _____James E. R..._____
Date                                          Signature

NOTE: A true copy of this authorization is available to the employee at any time upon request.

**RSL00308**

RS—1815-A



**Reliance Standard Life Insurance Company®**

Claim Number: _____

Policy Number: _LSC 098842_

# AUTHORIZATION

To Whom It May Concern:

I, _____ JAMES E. RADICAN _____ , hereby authorize any hospital, physician,

medical practitioner, clinic, other medical or medically-related facility, pharmacy, insurance company or

Government Agency (including the Social Security Administration and the Internal Revenue Service) or

any past or present employer to disclose or furnish to Reliance Standard Life Insurance Company or its

representatives, any and all information with respect to any illness including mental illness, drug/alcohol

abuse, injury, medical history, consultations, prescriptions, treatments or benefits, or other documents

and copies of all applicable records that may be requested. I also authorize any employer to disclose all

information needed to process my claim.


The information provided to Reliance Standard Life Insurance Company or its representatives is to be

used solely for the administration of claim(s). A photostatic copy of this authorization is to be

considered as valid as the original and is effective for the duration of the claim.


_____November 3, 1997_____                    _____James E. Radican_____

Date                                          Signature


NOTE: A true copy of this authorization is available to the employee at any time upon request.


RSL00309

RS—!815-A

**RSL Reliance Standard Life Insurance Company®**

DISABILITY CLAIM
(LONG TERM, WAIVER OF PREMIUM)
PHYSICIAN'S STATEMENT

This form should be completed by the physician who was treating the claimant when he or she last worked.

## TO BE COMPLETED BY THE ATTENDING PHYSICIAN

### A. GENERAL INFORMATION

This claim is for (Patient's Name): JAMES E. RADICAN

Policy Number:

| Date of Birth (Month, Day, Year) | Height (Ft. Inches) | Weight (lbs) | Blood Pressure | Patient's Social Security Number. |
|---|---|---|---|---|
| 4/20/30 | 5'9" | 180 | | 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 |

Primary Diagnosis including ICD 9 or DSM code: 724.0 Spinal Stenosis –

### B: PREGNANCY: PHYSICIAN COMPLETES THIS SECTION FOR NORMAL PREGNANCY

| 1. DATE OF LAST MENSTRUAL PERIOD | 2. EXPECTED DATE OF DELIVERY | 3. TYPE OF DELIVERY EXPECTED | 4. DATE OF DELIVERY |
|---|---|---|---|
| | | | |

| 5. INITIAL VISIT FOR THIS PREGNANCY | 6. LAST DATE OF TREATMENT | 7. EXPECTED LENGTH OF POSTPARTUM RECOVERY |
|---|---|---|
| | | |

### C: PHYSICIAN COMPLETES THIS SECTION FOR ALL CONDITIONS EXCEPT NORMAL PREGNANCY

1. PRIMARY DIAGNOSIS (INCLUDING ICD-9 OR DSM III R CODE): Spinal Stenosis – Arthritis – Jt Disease   724.0   715.9   722.6   Degenerative Disc Disease

2. SYMPTOMS (subjective): Chronic Back Pain – Lower Extremity pains.

3. OBJECTIVE FINDINGS: (PLEASE PROVIDE COPIES OF TEST RESULTS AND OFFICE NOTES) See Attached

4. ARE THERE ANY SECONDARY CONDITIONS CONTRIBUTING TO DISABILITY? IF YES, WHAT ARE THEY? (INCLUDING ICD-9 OR DSM III R CODE): Multiple previous Operative procedures –

| 5. WHEN DID SYMPTOMS FIRST APPEAR | 6. DATE OF PATIENT'S FIRST VISIT | 7. DATE OF PATIENT'S LAST VISIT | 8. FREQUENCY OF VISITS |
|---|---|---|---|
| Prior to '91 MTH DAY YR | 11, 09, 95 MTH DAY YR | 9, 16, 96 MTH DAY YR | As needed |

9. WAS THE PATIENT REFERRED BY ANOTHER MEDICAL PRACTITIONER? YES

10. IF SO, FURNISH THE NAME AND ADDRESS: J. Reicher MD 4701 N. Federal Hwy, Ft. Lauderdale Fl 33308

11. IS THE PATIENT'S CONDITION WORK RELATED? YES ☐ NO ☑ IF YES, EXPLAIN:

12. HAS THE PATIENT UNDERGONE A SURGICAL PROCEDURE? YES ☑ NO ☐ IF NO, SKIP TO 13
See medical records

| 12a. PROCEDURE: | 12b. DATE: | 12c. FACILITY: (NAME/ADDRESS) |
|---|---|---|
| Spinal Fusion | 10-3-1995 | 4725 N. Fed. Hwy Holy Cross Hosp. Pampano Beh, Fl 33308 |

13. DO YOU EXPECT SURGERY IN THE NEAR FUTURE? YES ☑ NO ☐ IF NO, SKIP TO 14
Possibly

| 13a. PROCEDURE: | 13b. DATE: | 13c. FACILITY: (NAME/ADDRESS) |
|---|---|---|
| Reexploration of Lumbar Spine | To be determined | To be determined |

14. WHAT PRESCRIBED MEDICATION IS THE PATIENT CURRENTLY TAKING AND WHAT DOSAGE? Hydrocodone 7.5

15. HAVE YOU REFERRED THE PATIENT FOR OTHER TYPES OF CONSULTATIONS? YES ☑ NO ☐ IF YES, EXPLAIN: Epidural Steroid Injection - x3 –

16. HAVE YOU REFERRED THE PATIENT TO A MEDICAL REHABILITATION OR THERAPY PROGRAM? IF YES, PLEASE IDENTIFY: Park Place Therapeutic Center - 7171 N. Univ. Dr. Tamarac, Fl 33321

### D: PHYSICIAN COMPLETES FOR ANY HOSPITAL CONFINEMENTS

| 1. NAME AND ADDRESS OF HOSPITAL | 2. DATE(S) CONFINED FROM/TO IN THE PRIOR 2 YEARS |
|---|---|
| | |

RSL00310

# E. DESCRIPTION OF PATIENT'S RESTRICTIONS AND LIMITATIONS

1) In an 8 hour work day patient can stand: [X] None  [] 1-3 Hours  [] 3-5 Hours  [] 5-8 Hours
2) In an 8 hour work day patient can sit: [X] None  [] 1-3 Hours  [] 3-5 Hours  [] 5-8 Hours
3) In an 8 hour work day patient can walk: [X] None  [] 1-3 Hours  [] 3-5 Hours  [] 5-8 Hours
4) In an 8 hour work day patient can drive: [X] None  [] 1-3 Hours  [] 3-5 Hours  [] 5-8 Hours

5) Patient can use upper extremities for repetitive:

| A. Simple Grasping | B. Pushing/Pulling | C. Fine Manipulation |
|---|---|---|
| Right [X] Yes [] No | Right [] Yes [X] No | Right [X] Yes [] No |
| Left [X] Yes [] No | Left [] Yes [X] No | Left [X] Yes [] No |

6) Patient is able to:  (RSL00311)

| | CONTINUOUS 67-100% | FREQUENT 34-66% | OCCASIONAL 0-33% |
|---|---|---|---|
| A. Bend (at waist) | [] | [] | [] |
| B. Squat (at knees) | [] | [] | [] |
| C. Climb | [] | [] | [] |
| D. Reach above Shoulder | [] | [] | [] |
| E. Kneel | [] | [] | [] |
| F. Crawl | [] | [] | [] |
| G. Use Feet (foot controls) | [] | [] | [] |

*(NONE written across section)*

7) In an 8 hour day patient can lift/carry:

[] 10 lbs maximum and occasionally carry small objects: SEDENTARY WORK
[] 20 lbs maximum and frequently lift/carry up to 10 lbs: LIGHT WORK
[] 50 lbs maximum and frequently lift/carry up to 25 lbs: MEDIUM WORK
[] 100 lbs maximum and frequently lift/carry up to 50 lbs: HEAVY WORK
[] In excess of 100 lbs and frequently lift/carry 50 lbs: VERY HEAVY WORK

*(NONE written across section)*

# F: PHYSICIAN COMPLETES IF LIMITATIONS ARE MENTAL/NERVOUS IN NATURE

TO WHAT DEGREE, IF ANY, ARE THE FOLLOWING CAPACITIES AFFECTED?

| CAPACITY | NOT LIMITED | MODERATELY LIMITED | EXTREMELY LIMITED |
|---|---|---|---|
| Ability to relate to other people beyond giving and receiving instructions | [X] | [] | [] |
| Ability to complete and follow instructions | [X] | [] | [] |
| Ability to perform simple and repetitive tasks | [X] | [] | [] |
| Ability to perform complex and varied tasks | [] | [] | [X] |
| Ability to accept and carry out responsibility for direction, control and planning | [X] | [] | [] |

In your opinion, does the claimant possess the mental capacity to understand his/her financial affairs and to direct the use of his/her funds? [] Yes  [] No

# G: PHYSICIAN COMPLETES ONLY IF THE CONDITION IS CARDIAC IN NATURE

Functional Capacity
(American Heart Ass'n)

[] Class 1 (no limitation)   [] Class 2 (slight limitation)
[] Class 3 (marked limitation)   [X] Class 4 (complete limitation)

# H: PHYSICIAN COMPLETES FOR ALL CONDITIONS: PROGNOSIS FOR RECOVERY

1. HAS THE PATIENT ACHIEVED MAXIMUM MEDICAL IMPROVEMENT? [X] YES  [] NO

2. IF YES, AS OF WHAT DATE CAN PATIENT RETURN TO WORK? _____ MTH _____ DAY _____ YR    *Problem. Total*

3. IF NO, WHEN DO YOU EXPECT PATIENT WILL ACHIEVE MAXIMUM MEDICAL IMPROVEMENT?

[] < 2 weeks   [] < 4 weeks   [] < 2 months   [] 3-4 months
[] 5-6 months   [] 6-8 months   [] < 12 months   [] < 16 months

4. WHEN THE ABOVE CHANGE OCCURS, WHAT FUNCTIONAL CAPACITY WILL THE PATIENT RECEIVE?

[] FULL RECOVERY   [] IMPROVED OVER CURRENT BUT NOT FULL   [X] REMAIN AT PRESENT

"A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE AN INSURANCE COMPANY FILES A STATEMENT OF CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."
*"I CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE."*

Your Name: Manuel Porth MD    Degree: MD

Specialty: Orthopaedic Surgeon    Telephone: (954) 724-9300  Fax: (954) 724-9140

Address: 7171 N. University Dr.
Tamarac, FL 33321

Date: 12/5/9?

# PARK PLACE THERAPEUTIC CENTER

| | |
|---|---|
| **301 N.W 84th AVENUE**<br>**PLANTATION FL. 33324**<br>**PHONE (954) 475-4500**<br>**FAX     (954) 370-0498** | **7171 N. UNIVERSITY DR.**<br>**TAMARAC FL. 33321**<br>**PHONE (954) 724-9300**<br>**FAX     (954) 724-9137** |

**ORTHOPAEDIC SURGERY**
**SPORTS MEDICINE**
**JOINT REPLACEMENT**

MARTIN E. HALE M.D.

ALAN M. LAZAR M.D.

RICHARD M. LINN M.D.

GEORGE I. MAY M.D.

MARTIN M. MAY M.D.

MANUEL PORTH M.D.

JOEL L. RUSH D.O.

DOUGLAS STRINGHAM M.D.

**HAND & MICROSURGERY**

PAUL ZIDEL M.D.

**PHYSIATRY**

ALAN NOVICK M.D.

DEBRA WEISS D.O.

**PSYCHOLOGY**

GINA DELGARDO PhD.

**ADMINISTRATOR**

CHERYL CANNELLA

**C.E.O.**

JAY L. KNIGHT

September 16, 1996

MEDICAL STATEMENT

RE:  RADICAN, JAMES
(102566-1)

To Whom it May Concern:

Mr. James Radican is a 66 year old gentleman followed in this office with a longstanding history of back pain. He has had decompression laminectomy with essentially no improvement for severe degenerative disease and spinal stenosis. He has had an attempt at multiple epidural blocks and physical therapy with no improvement.

At this point the patient is found totally disabled with respect to employment and is advised to remain out of work until further notice.

Very truly yours,

MANUEL PORTH, M.D.

MP/jcg

**RSL00312**

COMPLETE COMPREHENSIVE EVALUATION & TREATMENT IN ALL MUSCULOSKELETAL PROBLEMS

**MANUEL PORTH, M.D.**

PATIENT:  RADICAN, JAMES                   FILE:  102566-0

DATE:     11-09-95                         D/A:
          MP/jcg

HISTORY:   The patient is a 65 year old gentleman presenting for evaluation of chronic back pain, giving a history of at least 23 years of back problems, having had a fusion of the lower lumbar segment at L5-S1 23 years ago, stating that for 10 years he had absolutely no back discomfort.  He advises me that he had a fusion and was kept in some type of a rigid orthotic for ten weeks and then for ten years he did well.   About eight years ago he redeveloped back pain, contributing some of the back pain to the type of work he use to do.  He use to sell cement, was a salesman on the road traveling at least 3,000 miles a month.  The long sitting appeared to have aggravated the situation.  He had a number of injections prior to the most recent surgery.  He was seen by Dr. Gieseke, had a myelogram, was advised that there was a disc herniation, and had surgery six weeks ago at Holy Cross Hospital where he had the benefit of disc excision at a level above the previous level of fusion.

At this point he gets up in the morning and has difficulty standing, has difficulty putting on his clothes, and has difficulty putting on his socks and shoes.  Since his surgery, he has had some local trigger point injections, with the last one given just 48 hours ago.

PHYSICAL EXAMINATION:  There is some fluctuance and fullness in the area of the previous incision. The incision which is now six weeks old consists of the upper portion of the previous utilized incision for the fusion. Fluctuance would suggest some fluid collection in the subcutaneous tissue.  The patient is able to stand on his tiptoes and walk on his heels.   The straight leg raising is unremarkable bilaterally.  Motor and sensory function, reflexes and peripheral pulses appear to be intact.   The patient is extremely uncomfortable in flexion and appears to be a bit more comfortable when he stands in a hyperextended position suggesting an element of instability.

RADIOGRAPHY:  X-rays brought by the patient, as well as medical records brought  by the patient, are reviewed.  Evidence of previous fusion is identified at the lower lumbar segment with the L4-5 and L5-S1 levels appearing to be involved in the fusion mass.

A MRI scan from March of 1994 is available again confirming the presence of degenerative disc disease of the lumbar spine, evidence of prior lumbar laminectomy and fusion at 4-5 and 5-1, and degenerative changes at the level above the previous fusion level with bony osteophytic spurring at L3-4 and levels above L3-4.

RSL00313

RADICAN, JAMES                    -2-              MANUEL PORTH, M.D.
102566-0

<u>11-09-95</u>
MP/jcg    (Cont'd)

CT/myelogram studies dated August of 1995, just prior to the
surgery, demonstrate osseous fusion at L4-5 and 5-1 with
degenerative spinal stenosis at L3-4. The spinal stenosis that is
noted is due to progressive posterior central disc herniation, as
well as facet joint changes.

I have personally reviewed the MR scan of 1994 and the CT/myelogram
studies of 1995 and am extremely impressed at the degree of
stenosis at L3-4 which would suggest that this was the primary
reason for the patient having had the surgical procedure.

All of the studies brought by the patient, including the
CT/myelogram, as well as the most recent MRI scan, all confirm
stenosis at the level above the previous fusion level and that
stenosis appears to be a combination of disc and bony material
creating the stenosis.

I suspect on the basis of the diagnostic studies done prior to
surgery that the patient most likely had a decompression at that
level and an operative report from Dr. Gieseke's office would be
welcomed.

An x-ray of the patient's pelvis, as well as additional flexion and
extension views, will be obtained today to evaluate the
significance of the arthritic changes previously noted in the
patient's hip x-rays, and also to again evaluate the possibility of
instability associated with flexion and extension.

My plan is to obtain a copy of the operative report and then
discuss the case with the operating surgeon. If instability can be
determined and documented, then the patient should be placed in
some type of an orthotic device for comfort. Fully realizing it
has only been six weeks since his surgery, I'm hesitant to make any
recommendations regarding additional surgical intervention at this
time.

Additional x-rays obtained today of the pelvis demonstrate
essentially normal appearing hip joints. The arthritic changes on
the right side are minimal and in my opinion not contributing to
the patient's clinical picture. The lateral view of the lumbar
spine is reviewed including a flexion and extension view. I'm
unable to demonstrate significant instability. I'm unable to
demonstrate any displacement of the vertebrae in either flexion or
extension at the level of L-2,3, or 4. I would expect if there is
going to be instability, it's going to be at a level proximal to
the fusion level which would be between 3-4 or between 2-3.

RSL00314

RADICAN, JAMES                    -3-              MANUEL PORTH, M.D.
102566-0

<u>11-09-95</u>
MP/jcg    (Cont'd)

I'm going to be advising the patient that we hold off on any
additional injections.  I'm a bit concerned about the fluctuant
nature of the subcutaneous tissue in the area.  I will be
discussing that with Dr. Giesekc.  I will be getting an operative
report and I will be advising an orthotic for support.  I think it
is premature at this point to repeat any diagnostic studies and
it's premature at this point to assume that the most recent
operative procedure will not result in positive change for the
patient and improvement for the patient.


                                    _____
                                    MANUEL PORTH, M.D.
cc: Jack Peicher, M.D.

RSL00315

RADICAN, JAMES                    -4-              MANUEL PORTH, M.D.
102566-0

12-20-95
MP/jcg Mr. James Radican is status post laminectomy, continuing to
experience back discomfort. The operative area is sensitive and he
is continuing therapy and benefiting from the therapy.

It is my opinion that therapy is mandatory and needs to be
continued.  A lot of energy and effort have been invested in
decompressing this patient's lumbar spine.   He continues to
demonstrate significant weakness of his back and lower extremity
muscles, and therapy will make the difference with respect to
regaining strength, regaining mobility and reducing his symptoms
of back and leg pain.

I would strongly advise that additional therapy be authorized by
his insurance carrier.


                              _____
                              MANUEL PORTH, M.D.

ADDENDUM:  FINAL REPORT:  The notations from Dr. Gieseke's office
dated 11/15/95 are reviewed.  The patient continues to experience
discomfort in the back, buttocks and leg areas and points to the
lower lumbar region in the midline.  It is an area of sensitivity
and trigger point tenderness.  There lower extremity strength is
improving, but still requires additional effort to regain some of
the strength that has been lost as a result of the long period of
stenosis and the long period of symptoms and inactivity.  The need
for weight loss, the need for isometric strengthening, the need for
Williams flexion, the need for pool activity have all been
thoroughly outlined and discussed.

I am advising that he take time off from work and concentrate on
rehabilitating his back and legs and hopefully maximize on the
results of the surgery.


                              _____
                              MANUEL PORTH, M.D.


RSL00316

RADICAN, JAMES                    -5-
102566-0                                       MANUEL PORTH, M.D.

03/22/96
MP/jif     The patient returns for re-evaluation.    It is now 6
months following his laminectomy, and the quality of life has not
significantly improved. He is still unable to return to his job and
is aware of his back on a continual basis.  The pain radiates from
the back down to each of the lateral iliac crest areas and to the
lateral proximal thighs.  The patient finds it difficult to get a
good night sleep.  Spending more than 6 or 7 hours in bed causes
him discomfort and he finds that he has to get up and walk around.

Reviewing the medical history and reviewing the operative report,
I am reminded that the patient had a CT myelogram done before his
surgery, and had an MRI done March 1994, which demonstrates a
degenerative disc disease of the lumbar spine.  It had fusion at L4
to S1 in 1973.  Chronic back pain, disc herniation at L3-4, and L2-
3 and a coronary bypass surgery.

My recommendation at this point would be to proceed with a follow-
up MRI scan, and specifically look at the fusion mass at 4, 5 and
1, and address the area of stenosis at 3-4 and 2-3, and determine
whether or not that spine is patent at L2-3 and 3-4.

I will be seeing him back in follow-up.  I am going to ask him to
try to get the March 18, 1994 MR scan to take with him for the most
recent scan that will be ordered.


                                    _____
                                    MANUEL PORTH, M.D.

RSL00317

```
RADICAN, JAMES                    -6-              MANUEL PORTH, M.D.
102566-0
```

<u>05/10/96</u>
MP/jif    The patient presents for evaluation. He is a 65-year-old
gentleman that was last seen March of 1996. The back pain has
persisted. There has been very little improvement following his
laminectomy. The most recent MRI scan, which was brought today and
reviewed with the patient, suggests progressive degenerative
arthritic disease throughout the entire lumbar area extending down
from the thoracolumbar junction to the lower sacral region. The
areas of surgery and decompression continues to demonstrate
degenerative changes on MR scan, with the most recent scan
suggesting residual of degenerative disease and disc herniation.

I am going to personally review the MRI scan with the radiology
staff at the hospital. I am of the opinion that most of the
abnormalities that are identified on the scan are a combination of
degenerative disc disease and post surgical changes. I do not
believe that acute disc herniation at the L1-2 and L3-4, which is
described as herniated disc in the paracentral area is of surgical
significance, and in my opinion additional surgical intervention is
not indicated.

Local trigger point injections are performed today. The patient
will be re-evaluated in 4-6 weeks. He is going to continue the
swimming activity which are strongly recommended and outlined to
the patient. I will see him back for re-evaluation. It is hopeful
that with trigger point injections we will be able to maintain some
comfort level for him. At this point, additional surgical
intervention in my opinion is not indicated.

```
                                    MANUEL PORTH, M.D.
```

RSL00318

RADICAN, JAMES                    -7-            MANUEL PORTH, M.D.
102566-0

06-26-96
MP/jcg    The patient returns for re-evaluation.  It has been about
6 weeks since I have seen him on 5-10-96.  I am gratified at the
fact that he did notice some improvement with the trigger point
injections which lasted about 2-3 weeks and am of the opinion that
at this point an epidural block would be appropriate.

I'm going to obtain authorization from Cigna and recommend an
epidural block be initiated for this patient.  I would welcome
discussing the actual location and position of the block with the
anesthesia staff prior to performing the block.


                              _____
                              MANUEL PORTH, M.D.
cc:  Dr. J. Peicher


RSL00319

RADICAN, JAMES                -8-              MANUEL PORTH, M.D.
102566-0

<u>09/16/96</u>
MP/es  The patient returns for re-evaluation.  He has had another
series of epidurals x 3, with minimal improvement.  The second
epidural helped only a bit.  It was supplemented by trigger point
injections.  The 3rd epidural helped to a lesser degree and in
spite of continued therapy, epidural blocks, analgesic medications,
the use of physical therapy and corset immobilization, the patient
continues to be symptomatic and is unable to return to work.

I am advising that he remain out of work until further notice,  I
will see him back in a 3 month interval.  Swimming is encouraged
and back strengthening exercises are advised.

With respect to his left wrist, he has some local tenderness at the
ulnar styloid on the ulnar border, dorsal surface of the wrist.
There is some local tenderness in the area. There is no crepitation
or ROM.

The x-rays of the wrist are unremarkable. Dated 1/96.  No active
treatment is indicated.


                              _____
                              MANUEL PORTH, M.D.


RSL00320

# TELEPHONE CONVERSATION RECORD

Check here if Initial Interview ✓

Circle all that apply:  LIFE  **WOP**  LTD  STD  Other: _____

Insured name: James Radican

Claim Number: 1997-346-0/0

SS #: _____

Policy Number: _____

Conversation with: Mr. Radican

Call taker/made by: James Wilson

☒ Incoming Call    ☐ Outgoing Call

Telephone Number: _____

## Don't forget to include Date & Time!

| Date | Time |
| --- | --- |
| | 11:40 am |

for LTD $1999 and $1534.00 monthly. Have submitted award LTC to us on 12/18/97

Primary Phy: Dr. Jack Peicher
4701 N. Federal Hwy
Bldg #10
Ft Lauderdale Fl. 33308
(954) 351-1100
Sec: Donna
w/ Dr. For 8 yrs

- Saw Dr. Gieseke after surgery IN Sept 1995 One office visit.
- Dr. Porth - Clmnt saw Dr. Porth about a year ago. Dr. Porth advised him surger is not solving the Problem so he referred him for PT.
- Clmnt is only doing home exercise. he has not seen a doctor w/ in a year except his primary for his other conditions.

- Clmnt do not do yard work. He has yard services. He only do his exercise.

RSL00321

tcr9/97



**Reliance Standard Life Insurance Company®**

December 15, 1997

James E. Radican
3800 NW 71st. Street
Coconut Creek, FL 33073

RE:     Claimant       :James E.  Radican
        Policy No      :LSC 98842
        Claim No.      :1997-346-010

Dear Mr.  Radican:

We have received your claim for Long Term Disability benefits under the above noted policy.  Initial processing activities have begun and continue at this time.

We  will be contacting you shortly to discuss your claim.  Be assured that once we have obtained the necessary information, a decision will be made and communicated in a timely manner.

Additionally,  if  you feel you have an illness or injury  that is expected to prevent you from performing substantial work activity for a period of not less than twelve (12) months, you should apply for Social Security Disability Insurance Benefits. You can call the Social Security Administration office to apply for these benefits.  For instructions on the application process, you can contact the Social Security Administration at (800) SSA-1213.  Social Security has some special advantages that group disability insurance cannot provide for you.

Enclosed you will find a list of Social Security Disability Benefits, and a Social Security Questionnaire and  Authorization  Form . Please complete the Social Security Questionnaire and Authorization  form and return it to me as soon as possible. A self addressed envelope is enclosed for your convenience.

If you have questions about the claim administration process, want to inquire about the status of your claim,  or would like to provide us with additional information,  please feel free to contact us at   (800) 351-7500, extension 3854.

Sincerely,

James Wilson,  Examiner
LTD Claims Department

JW/jc

Enclosures

cc:    Tarmac America, Inc.
RGO:  Orlando  757

**RSL00322**


**Reliance Standard Life Insurance Company®**

## ADVANTAGES OF SOCIAL SECURITY DISABILITY BENEFITS

If you have an illness or injury that is expected to prevent you from performing substantial work activity for a period of not less than twelve (12) months and you are under the age of 64 years and six (6) months, you should apply for Social Security Disability benefits.

There are many advantages to applying for and becoming entitled to Social Security Disability Insurance.

1)   The Social Security Administration will stop your record of earnings at the point in which you are found to be disabled. This results in:

   a)   a higher Social Security benefit amount and

   b)   if you improve such that you are able to return to work, the period that you were determined to be disabled is closed thus giving you a higher benefit amount if you become disabled again or at the point in which you become entitled to Social Security Retirement benefits.

2)   Social Security benefits may be payable to:

   a)   your spouse over the age of 62

   b)   your spouse who is caring for your children under the age of sixteen (16)

   c)   your dependent children. Social Security defines a dependent child as a child under age sixteen (16) or over age sixteen (16) attending high school on a full time basis.

   d)   your adult child who because of a disability, which began before age 22, is unable to work

   e)   your parent (s) if you are providing ½ of their support

3)   Under the Social Security provisions, as they currently exist, each December you will receive a Cost of Living Adjustment (COLA). In other words, you will receive an increase in the amount of your Social Security check. Most LTD policies exclude the increase due to a COLA as countable income. (It should be noted that an increase due to COLA is different from an increase to Social Security benefits due to earnings.)

4)   After twenty-four (24) consecutive months of entitlement to Social Security Disability benefits, you are entitled to medical coverage (Medicare). Medicare is in two (2) parts. There is no premium for Hospital Insurance. There is a minimal premium for the Medical Insurance.

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

**RSL00323**





**Tarmac America, Inc.**
P.O. Box 2016
Norfolk VA 23501
Norfolk (757) 858-6500
Fax (757) 855-7707

December 4, 1997

James J. LePrell, CLU
Acordia of Virginia
8001 Franklin Farms Drive
suite 238
Richmond, VA 23229

RE:  **LTD Claim - Reliance Standard Life (Policy # LSC 098842)**
      **James E. Radican (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)**

Dear Jim:

Enclosed as promised is the claim for the above referenced employee. I believe we have
enclosed everything except the doctor's portion of the claim, although there are some letters
from doctors enclosed as well, including the one in question.

As I mentioned, time is of the essence here, since Mr. Radican's salary continuation ends on
December 31, 1997. Anything you can do to expedite the processing of this application
would be greatly appreciated. If you think that contacting the recalcitrant specialist would do
any good, his name is Dr. Manuel Porth and his phone number is (954) 724-9300. His
assistant is Susie at X315.

Thank you for your assistance with this matter. If you have any questions or need any further
information, please do not hestitate to contact me at (757) 858-6502.

Sincerely,

Hope

Hope E. Fischer, PHR
Benefits Administrator

Enclosures

cc:    L. Armistead

**RSL00324**

A Tarmac Group company



**RSL** Reliance Standard Life
Insurance Company®

**DISABILITY CLAIM**
**(LONG TERM, WAIVER OF PREMIUM)**
**EMPLOYER'S STATEMENT**

**TO BE COMPLETED BY THE EMPLOYER**

| THIS CLAIM IS FOR (EMPLOYEE NAME) | SOCIAL SECURITY NUMBER | DATE OF BIRTH |
|---|---|---|
| JAMES E. RADICAN | 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 | 04-20-30 |

## A. INFORMATION ABOUT THE EMPLOYER

1. COMPANY'S NAME
TARMAC AMERICA, INC.

2. GROUP POLICY NUMBER    LSC 098842
LIFE        LONG TERM DISABILITY

3. ADDRESS (STREET, CITY, STATE, ZIP)
1151 AZALEA GARDEN RD., NORFOLK, VA 23502

TELEPHONE: ( ) 757-858-6500
FAX: ( ) 757-853-5462

4. NAME AND ADDRESS OF DIVISION WHERE EMPLOYEE WORKS (IF DIFFERENT FROM ABOVE)
FLORIDA DIVISION, c/o ABOVE

## B. INFORMATION ABOUT THE EMPLOYEE

1. DATE EMPLOYEE WAS HIRED? (MTH, DAY,YR)
06-25-1965

2. DATE EMPLOYEE BECAME INSURED
UNDER THIS PLAN? 01 / 01 / 96
    MTH  DAY  YR
UNDER YOUR PRIOR PLAN? 08 / 01 / 88
    MTH  DAY  YR

3. WHAT WAS THE EMPLOYEE'S REGULARLY SCHEDULED WORK WEEK?
    40    hrs/wk.

4. PLEASE IDENTIFY THE CLASS OF THIS EMPLOYEE:   B

5. DATE TO WHICH PREMIUM IS PAID FOR THIS EMPLOYEE: 08 / 31 / 97
    MTH  DAY  YR

6. THE EMPLOYEE IS (CHECK ALL THAT APPLY)

☐ HOURLY (RATE:         )      ☐ UNION           ☒ EXEMPT        ☒ FULL-TIME      ☐ COMMISSIONED
☒ SALARIED                      ☒ NON-UNION       ☐ NON-EXEMPT    ☐ PART-TIME      ☐ RECEIVES BONUSES

7. IF SALARIED, BASIC MONTHLY EARNINGS AS OF LAST DAY WORKED
$4,824.08

8. EFFECTIVE DATE OF CURRENT SALARY OR HOURLY RATE:
07 / 01 / 96
MTH  DAY  YR

9. WILL EMPLOYEE FILE FOR DISABILITY BENEFITS PROVIDED BY ANY EMPLOYER/EMPLOYEE LABOR MANAGEMENT, STATE DISABILITY OR UNION WELFARE PLAN?   ☐ YES  ☒ NO

A. IF YES, WHAT IS THE WEEKLY AMOUNT? $ _____    B. WHAT TYPE OF BENEFIT? _____

C. WHEN DO BENEFITS BEGIN? _____    END? _____

10. IS EMPLOYEE'S CONDITION WORK RELATED?   ☐ YES  ☒ NO

11. HAS CLAIM BEEN FILED WITH WORKER'S COMPENSATION?   ☐ YES  ☒ NO
IF YES, SEND INITIAL REPORT OF ILLNESS OR INJURY AND AWARD NOTICE.

12. NAME AND ADDRESS OF YOUR WORKER'S COMPENSATION CARRIER:
N/A

13. NAME AND ADDRESS OF YOUR MEDICAL INSURANCE CARRIER OR ADMINISTRATOR IF SELF FUNDED:
CIGNA HEALTHCARE OF FLORIDA, P.O. BOX 5023, HARTFORD, CT 06102-5023

## C. INFORMATION NEEDED FOR WITHOLDING AND REPORTING TAXES

1. DOES EMPLOYEE CONTRIBUTE TOWARDS THE PREMIUM?   ☒ YES  ☐ NO

2. IF YES, WHAT PERCENT IS PAID BY THE EMPLOYEE? ON A PRE TAX BASIS ____ %   ON A POST TAX BASIS   100   %
IF YOU LEAVE THIS SECTION BLANK, WE WILL ASSUME IT IS 100% EMPLOYER CONTRIBUTION AND CALCULATE FICA TAXES ACCORDINGLY.

## D. INFORMATION ABOUT THE CLAIM

1. WERE THERE ANY CHANGES TO THE EMPLOYEE'S JOB RESPONSIBILITIES DUE TO THE DISABLING CONDITION BEFORE THE EMPLOYEE BECAME FULLY DISABLED?  ☐ YES  ☒ NO    IF YES, WHAT WERE THE CHANGES AND WHEN WERE THEY MADE?

2. WHAT WAS THE EMPLOYEE'S PERMANENT JOB ON HIS OR HER LAST DAY AT WORK? SALES REPRESENTATIVE - CEMENT

3. HOW LONG HAS THE EMPLOYEE BEEN IN THIS JOB?   30 YEARS

4. LAST DAY EMPLOYEE ACTUALLY WORKED (MONTH, DAY, YR.)   12 / 31 / 96

5. ON THAT DAY, DID THE EMPLOYEE WORK A FULL DAY?  ☐ YES  ☒ NO   IF NO, HOW MANY HOURS WERE WORKED?   PARTIAL DAY

6. WHY DID EMPLOYEE STOP WORKING?

☐ LAYOFF   ☐ TERMINATION FOR CAUSE   ☐ FAMILY MEDICAL LEAVE ACT   ☐ RESIGNATION   ☐ RETIRED   ☒ DISABILITY

RS-1936

**RSL00325**

**DISABILITY CLAIM EMPLOYER'S STATEMENT**

## E. INFORMATION ABOUT YOUR PENSION PLAN (DO NOT COMPLETE FOR MATERNITY CLAIM)

1. DO YOU HAVE A PENSION PLAN?   [X] YES   [ ] NO
2. IF YES, WHAT TYPE?
   [ ] DEFINED BENEFIT SHARING   [X] 401K   [X] DEFINED CONTRIBUTION   [ ] PROFIT SHARING   [ ] OTHER (EXPLAIN)

3. IS THE EMPLOYEE ELIGIBLE FOR YOUR PENSION PLAN?   [X] YES   [ ] NO
4. IF ELIGIBLE, DOES THE EMPLOYEE CONTRIBUTE?   [X] YES   [ ] NO
5. IF YES, WHAT PERCENTAGE?   3%
6. IF THE EMPLOYEE IS PARTICIPATING, WHEN IS HE OR SHE ELIGIBLE FOR BENEFITS UNDER THE PLAN? (MONTH/DAY/YEAR)

   CURRENTLY ELIGIBLE (OVER AGE OF 59½)

## F. INFORMATION ABOUT YOUR REHIRE OR RETURN-TO-WORK POLICIES

1. DOES YOUR COMPANY HAVE A REHIRE OR RETURN-TO-WORK POLICY FOR DISABLED EMPLOYEES?   [X] YES   [ ] NO
2. DO YOU HAVE FULL OR PART-TIME POSITIONS AVAILABLE THAT THIS EMPLOYEE WOULD BE SUITED FOR UNDER A SUPERVISED REHABILITATION PROGRAM?   [ ] YES   [X] NO
3. WHAT IS THE NAME, TITLE AND TELEPHONE NUMBER OF THE INDIVIDUAL WE SHOULD CONTACT IF WE IDENTIFY A REHABILITATION OR RETURN-TO-WORK OPTION?   HOPE FISCHER, BENEFITS ADMINISTRATOR (757)858-6502

## G. REQUIRED ATTACHMENTS AND SIGNATURE

IF EMPLOYEE WAS COVERED UNDER A PRIOR PLAN, INCLUDE COPY OF PRIOR PLAN.   see CIGNA SPD enclosed.

IF THE EMPLOYEE CONTRIBUTES TO THE PREMIUMS, ATTACH A COPY OF THE ENROLLMENT FORM.   see attached letter. Did not waive coverage.

IF SALARY IS BASED ON W-2, K1, 1099, OR SIMILAR DOCUMENT, ATTACH A COPY OF THE DOCUMENT.

IF YOU HAVE MEDICAL INFORMATION FROM THE EMPLOYEE'S FILE RELATING TO DISABILITY, PLEASE ATTACH COPIES.

IF A WORKER'S COMPENSATION CLAIM IS FILED, SEND INITIAL REPORT OF INJURY OR ILLNESS AND AWARD NOTICE.

NAME/TITLE OF PERSON COMPLETING THIS FORM.

   HOPE E. FISCHER, BENEFITS ADMINISTRATOR, TARMAC AMERICA

"A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE AN INSURANCE COMPANY, FILES A STATEMENT OF CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

*I CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE.*

x _Hope E. Fischer_                          DECEMBER 2, 1997
SIGNATURE                                     DATE

BENEFITS ADMINISTRATOR
TITLE

**RSL** Reliance Standard Life
Insurance Company

DISABILITY CLAIM
(LONG TERM, WAIVER OF PREMIUM)
**EMPLOYEE'S STATEMENT**

**TO BE COMPLETED BY THE EMPLOYEE**

## A. INFORMATION ABOUT YOU

| 1. LAST NAME  RADICAN | FIRST  JAMES | MIDDLE INITIAL  E. |
|---|---|---|

| 2. ADDRESS  3800 NW 71st Street | CITY  Coconut Creek | STATE/PROVINCE  FL | ZIP  33073 |
|---|---|---|---|

| 3. TELEPHONE  AREA CODE ( 954 ) 421-1641 | 4. SOCIAL SECURITY NUMBER  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 |
|---|---|

| 5. DATE OF BIRTH (MONTH, DAY, YR.)  4/20/30 | 6. HEIGHT  5'9" | WEIGHT  180 lb. | 7. [X] MALE  [ ] FEMALE | 8. MARITAL STATUS | [ ] SINGLE  [X] MARRIED | [ ] WIDOWED  [ ] DIVORCED |
|---|---|---|---|---|---|---|

| 9. YOUR EMPLOYER (INCLUDE DIVISION IF APPLICABLE)  Tarmac America Inc.          Cement Division |
|---|

| 10. OCCUPATION  Special Sales Representative | 11. DOMINANT HAND  RIGHT [XX]   LEFT [ ] |
|---|---|

## B. INFORMATION ABOUT YOUR FAMILY
### (REQUIRED TO DETERMINE YOUR ELIGIBILITY FOR SOCIAL SECURITY BENEFITS)

| 1. SPOUSE'S NAME (LAST, FIRST)  RADICAN, MARIAN |
|---|

| 2. SPOUSE'S SOCIAL SECURITY NUMBER  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 | 3. DATE OF BIRTH (MONTH, DAY, YR.)  9/24/33 | 4. IS YOUR SPOUSE EMPLOYED?  [X] YES  [ ] NO |
|---|---|---|

5. DO YOU HAVE ANY CHILDREN UNDER AGE 18? [ ] YES [X] NO   6. DO YOU HAVE HANDICAPPED CHILDREN (REGARDLESS OF AGE)? [ ] YES [XX] NO

7. DO YOU HAVE ANY CHILDREN AGE 18-19, WHO ARE FULL TIME STUDENTS IN ELEMENTARY OR SECONDARY SCHOOLS? [ ] YES [XX] NO

IF YOU ANSWERED YES TO ANY OF THE ABOVE QUESTIONS, PLEASE LIST NAMES. (LAST, FIRST)                DATE OF BIRTH

## C. INFORMATION ABOUT THE CONDITION CAUSING YOUR DISABILITY

**PLEASE ANSWER THE FOLLOWING QUESTIONS:**

| 1. WHAT WERE YOUR FIRST SYMPTOMS?  Low back pain |
|---|

| 2. WHEN DID YOU NOTICE THEM?  1989 | 3. DATE YOU WERE FIRST TREATED BY A PHYSICIAN? (MONTH, DAY, YR.)  1989 |
|---|---|

| 4. WHY ARE YOU UNABLE TO WORK?  Severe Back Pain |
|---|

5. BEFORE YOU STOPPED WORKING, DID YOUR CONDITION REQUIRE YOU TO CHANGE YOUR JOB OR THE WAY YOU DID YOUR JOB? [X] YES [ ] NO

6. HAVE YOU FILED, OR DO YOU INTEND TO FILE A WORKER'S COMPENSATION CLAIM? [ ] YES [X] NO

**FOR AN INJURY, ANSWER THE FOLLOWING QUESTIONS:**

| 7. WHERE AND HOW DID THE INJURY OCCUR?  Over long period of time. |
|---|

| 8. DATE THE INJURY OCCURRED (MONTH, DAY, YR.)  -- | 9. DATE YOU WERE FIRST TREATED FOR THIS INJURY BY A PHYSICIAN (MONTH, DAY, YR.)  -- |
|---|---|

## D. INFORMATION ABOUT THE DISABILITY

| 1. DATE YOU WERE FIRST UNABLE TO WORK ON A FULL TIME BASIS (MONTH, DAY, YR.)  1/1/97 |
|---|

| 2. LAST DAY YOU WORKED BEFORE THE DISABILITY (MONTH, DAY, YR.)  12/31/96 |
|---|

| 3. DID YOU WORK A FULL DAY? [ ] YES [X] NO   Part time - recovering from surgery  IF NO, EXPLAIN. |
|---|

| 4. HAVE YOU RETURNED TO WORK? [ ] YES [ ] NO  PART TIME (DATE)            FULL TIME (DATE) |
|---|

| 5. IF YOU HAVE NOT RETURNED TO WORK, DO YOU EXPECT TO? [ ] YES [X] NO  PART TIME (DATE)            FULL TIME (DATE) |
|---|

**RSL00327**

**DISABILITY CLAIM EMPLOYEES'S STATEMENT**

RSI 00328

## E. INFORMATION ABOUT PHYSICIANS AND HOSPITALS

1. DATE YOU WERE FIRST TREATED FOR THE CURRENT ILLNESS OR INJURY:
**LIST ALL MEDICAL PRACTITIONERS CONSULTED FOR THIS CONDITION:**

DOCTOR'S NAME: Gary Gieseke, MD
TELEPHONE (954) 771-4251  FAX (954) 491-4892
SPECIALTY: Neurological Surgery

ADDRESS (STREET, CITY, STATE, ZIP): 1930 NE 47th Street, Ft. Lauderdale, Florida
DATES SEEN: Surgery, Sept. 1995

DOCTOR'S NAME: Manuel Porth, MD
TELEPHONE (954) 724-9300  FAX (954)
SPECIALTY: Orthopedic Surgery

ADDRESS (STREET, CITY, STATE, ZIP): 7171 N. University Dr. Tamarac, FL
DATES SEEN: Starting Nov. 1995

**PLEASE ATTACH ADDITIONAL INFORMATION ON SEPARATE SHEET IF MORE DOCTORS WERE CONSULTED.**

HOSPITAL: Holy Cross Hospital

ADDRESS (STREET, CITY, STATE, ZIP): Federal Highway, Ft. Lauderdale, FL
DATES OF CONFINEMENT FROM 9/29/95 TO 10/1/95

## F. INFORMATION ABOUT OTHER DISABILITY INCOME

(CHECK THE OTHER INCOME BENEFITS YOU ARE RECEIVING OR ARE ELIGIBLE TO RECEIVE AS A RESULT OF YOUR DISABILITY AND COMPLETE THE INFORMATION REQUESTED)

| SOURCE OF INCOME | AMOUNT (WK, MONTH) | DATE CLAIM WAS FILED | DATE PAYMENTS BEGAN | DATE PAYMENTS ENDED |
|---|---|---|---|---|
| SALARY CONTINUANCE ✓ | $ | | | |
| SHORT TERM DISABILITY | $ 5,000.00 | 1/1/97 | 1/1/97 | 12/31/97 |
| STATE DISABILITY | $ | | | |
| WORKER'S COMPENSATION | $ | | | |
| SOCIAL SECURITY/RETIREMENT | $ 1,332.00 | 1/1/97 | 1/1/97 | |
| SOCIAL SECURITY/DISABILITY | $ | | | |
| SOCIAL SECURITY FOR DEPENDANTS | $ | | | |
| CANADIAN PENSION PLAN | $ | | | |
| PENSION/RETIREMENT | $ | | | |
| PENSION/DISABILITY | $ | | | |
| UNEMPLOYMENT | $ | | | |
| NO-FAULT INSURANCE | $ | | | |
| JONES ACT | $ | | | |
| RAILROAD RETIREMENT | $ | | | |
| OTHER (INCLUDE INDIVIDUAL OR GROUP) | $ | | | |

## G. INFORMATION ABOUT INCOME TAX WITHOLDING

IF YOUR REQUEST FOR BENEFITS IS APPROVED, SHOULD INCOME TAXES BE WITHELD FROM YOUR BENEFIT CHECKS? ☐ YES ☒ NO IF YES, HOW MUCH SHOULD BE WITHELD FROM EACH CHECK.

FEDERAL TAXES (MINIMUM IS $87.00 PER MONTH) $ _____ .00
STATE TAXES (MINIMUM IS $10.00 PER MONTH) $ _____ .00

## H. SIGNATURE (REQUIRED FOR ALL CLAIMS)

"A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE AN INSURANCE COMPANY FILES A STATEMENT OF CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

**I CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE.**

x _James E. Padua_
SIGNATURE EMPLOYEE

11/3/97
DATE


## I. EMPLOYMENT AND EDUCATION INFORMATION

**PLEASE PRINT ALL INFORMATION**

1. CLAIMANT'S NAME:   JAMES E. RADICAN

2. POLICY NUMBER:   LSC 098842

3. SOCIAL SECURITY NUMBER:   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

**PLEASE COMPLETE THE FOLLOWING INFORMATION AS ACCURATELY AS POSSIBLE. THIS DATA IS NEEDED TO HELP MAKE A THOROUGH EVALUATION OF YOUR CLAIM.**

**EDUCATION/TRAINING**

**HIGH SCHOOL:**

1. COURSE OF STUDY:   Standard Requirements

2. HIGHEST GRADE COMPLETED:   Grade 12

3. DID YOU OBTAIN YOUR GED IF YOU DID NOT GRADUATE FROM HIGH SCHOOL?   ☐ YES   ☐ NO

IF YES, WHEN? ————————

IF NO, DO YOU PLAN TO?   ☐ YES   ☐ NO

**COLLEGE:**

1. DID YOU ATTEND COLLEGE?   ☐ YES   ☒ NO

2. WHERE?

3. COURSE OF STUDY:

4. DEGREE   ☐ YES   ☐ NO          5. NUMBER OF YEARS COMPLETED:

6. TYPE OF DEGREE:                          WHEN?

**VOCATIONAL TRAINING:**

1. WHERE?

2. WHAT TYPE?

3. CERTIFICATE OR LICENSE OBTAINED:

4. WHAT SPECIALIZED TRAINING HAVE YOU HAD INCLUDING EQUIPMENT/MACHINERY USED?

_____

_____

_____

5. DO YOU HAVE KNOWLEDGE OR PROFICIENCY WITH PERSONAL COMPUTERS?   ☐ YES   ☒ NO

6. IF YES, PLEASE LIST SOFTWARE PROGRAMS YOU HAVE USED:

_____

_____

RSL00329

RSL00330

---

**EMPLOYMENT HISTORY**

**STARTING WITH PRESENT EMPLOYER, PLEASE LIST AND DESCRIBE ALL JOBS YOU HAVE HELD IN THE PAST 15 YEARS. IF MORE THAN 1 JOB WITH ANY EMPLOYER, PLEASE LIST EACH.**

1. NAME OF EMPLOYER:  TARMAC AMERICA INC.

| 2. START DATE: 6/25/65 | 3. JOB TITLE: Special Sales Rep. | 4. MONTHLY SALARY: 5,000.00 |
|---|---|---|

5. REASON FOR LEAVING:

6. DETAIL YOUR JOB DUTIES: _____ To make routine sales and promotional calls on customers and contractors through out the State of Florida.

7. WHAT WERE THE PHYSICAL/MENTAL REQUIREMENTS? _____ Normal

8. NAME OF EMPLOYER:

| 9. START DATE: | 10. JOB TITLE: | 11. MONTHLY SALARY: |
|---|---|---|

12. REASON FOR LEAVING:

13. DETAIL YOUR JOB DUTIES:

14. WHAT WERE THE PHYSICAL/MENTAL REQUIREMENTS?

15. NAME OF EMPLOYER:

| 16. START DATE: | 17. JOB TITLE: | 18. MONTHLY SALARY: |
|---|---|---|

19. REASON FOR LEAVING:

20. DETAIL YOUR JOB DUTIES:

21. WHAT WERE THE PHYSICAL/MENTAL REQUIREMENTS?

22. WHAT IS YOUR PROJECTED RETURN TO WORK DATE?  None

23. HAVE YOU CONTACTED YOUR FORMER EMPLOYER? ☐ YES ☒ NO

24. HAVE YOU BEEN LOOKING FOR A JOB? ☐ YES ☒ NO

25. ARE YOU FAMILIAR WITH YOUR LTD POLICY REGARDING RETURN TO WORK INCENTIVES AND REHABILITATION SERVICES?

RSL Insurance Company

**TO BE COMPLETED BY THE EMPLOYER**

| THIS CLAIM IS FOR (EMPLOYEE'S NAME) | SOCIAL SECURITY NUMBER | DATE OF DISABILITY (MONTH, DAY, YEAR) |
|---|---|---|
| JAMES E. RADICAN | 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 | 01-01-1997 |

## A. GENERAL INFORMATION ABOUT THE EMPLOYEE'S JOB

| JOB TITLE | DOT CODE (DICTIONARY OF OCCUPATIONAL TITLES) | MINIMUM EDUCATION OR TRAINING REQUIRED |
|---|---|---|
| SALES REPRESENTATIVE | | HIGH SCHOOL |

DOES THE EMPLOYEE PERFORM SUPERVISORY FUNCTIONS? ☐ YES ☒ NO  IF YES, HOW MANY PEOPLE ARE SUPERVISED? _____
DESCRIBE JOB DUTIES.

CHECK THE ITEMS BELOW THAT RELATE TO THE EMPLOYEE'S JOB. USE THESE DEFINITIONS FOR THE FREQUENCY OF OCCURRENCE:

OCCASIONALLY MEANS THE PERSON DOES THE ACTIVITY 1% TO 33% OF THE TIME
FREQUENTLY MEANS THE PERSON DOES THE ACTIVITY 34% TO 66% OF THE TIME
CONTINUOUSLY MEANS THE PERSON DOES THE ACTIVITY 67% TO 100% OF THE TIME

| | OCCASIONALLY | FREQUENTLY | CONTINUOUSLY |
|---|---|---|---|
| RELATE TO OTHERS | ☐ | ☐ | ☒ |
| WRITTEN AND VERBAL COMMUNICATIONS | ☐ | ☐ | ☒ |
| REASONING, MATH AND LANGUAGE | ☐ | ☒ | ☐ |
| MAKE INDEPENDENT JUDGEMENTS | ☐ | ☒ | ☐ |

WHICH OF THE FOLLOWING DESCRIBE THE EMPLOYEE'S WORKING ENVIRONMENT? CHECK ALL THAT APPLY.

☒ UNPROTECTED HEIGHTS          ☒ CHANGES IN TEMPERATURE OR HUMIDITY
☒ EXPOSURE TO DUST, FUMES, AND GASES    ☒ BEING NEAR MOVING MACHINERY
☒ DRIVING AUTOMOTIVE EQUIPMENT      ☐ OTHER HAZARDS

IS THE EMPLOYEE REQUIRED TO TRAVEL? ☒ YES  ☐ NO
IF YES, COMPLETE THE FOLLOWING INFORMATION:

| HOW DOES THE EMPLOYEE TRAVEL? (AUTOMOBILE, PLANE, TRAIN, ETC.) AUTO | WHERE DOES THE EMPLOYEE TRAVEL? SOUTH FLORIDA | WHAT PERCENT OF THE TIME DOES THE EMPLOYEE TRAVEL? DAILY |
|---|---|---|

## B. INFORMATION ABOUT THE PHYSICAL ASPECT OF THE EMPLOYEE'S JOB

CHECK THE ITEMS BELOW THAT RELATE TO THE EMPLOYEE'S JOB AND COMPLETE THE INFORMATION REQUESTED. USE THESE DEFINITIONS FOR THE FREQUENCY OF OCCURRENCE:

OCCASIONALLY MEANS THE PERSON DOES THE ACTIVITY 1% TO 33% OF THE TIME
FREQUENTLY MEANS THE PERSON DOES THE ACTIVITY 34% TO 66% OF THE TIME
CONTINUOUSLY MEANS THE PERSON DOES THE ACTIVITY 67% TO 100% OF THE TIME

| ACTIVITY | NEVER | OCCASIONALLY | FREQUENTLY | CONTINUOUSLY |
|---|---|---|---|---|
| STANDING | ☐ | ☒ | ☐ | ☐ |
| WALKING | ☐ | ☐ | ☒ | ☐ |
| SITTING | ☐ | ☐ | ☐ | ☒ |
| BALANCING | ☐ | ☒ | ☐ | ☐ |
| STOOPING | ☐ | ☒ | ☐ | ☐ |
| KNEELING | ☐ | ☒ | ☐ | ☐ |
| CROUCHING | ☐ | ☒ | ☐ | ☐ |
| CRAWLING | ☐ | ☒ | ☐ | ☐ |
| REACHING/WORKING OVERHEAD | ☐ | ☒ | ☐ | ☐ |
| CLIMBING | ☐ | ☒ | ☐ | ☐ |
| STAIRS Number of Stairs: | ☐ | ☒ | ☐ | ☐ |
| LADDERS Height of Ladder: | ☐ | ☒ | ☐ | ☐ |

Describe Activity
| | | | | |
|---|---|---|---|---|
| PUSHING. _____ LBS. | ☐ | ☐ | ☐ | ☐ |
| PULLING. _____ LBS. | ☐ | ☐ | ☐ | ☐ |
| LIFTING/CARRYING _____ LBS. | ☐ | ☒ | ☐ | ☐ |

26-60
11-25 LBS.          X          X
UP TO 10 LBS.

CAN THE JOB BE PERFORMED BY ALTERNATING SITTING AND STANDING? ☐ YES ☒ NO

DOES THE JOB REQUIRE USING FEET TO OPERATE FOOT CONTROLS? ☒ YES  ☐ NO  IF YES, ON WHAT TYPE OF EQUIPMENT.
AUTOMOBILE

IS GOOD VISUAL ACUITY REQUIRED IN THE JOB?
YES

| WHAT ARE THE MAJOR TASKS REQUIRING USE OF ONE OR BOTH HANDS | ONE HAND | BOTH HANDS |
|---|---|---|
| DRIVING, WRITING, SAMPLE MATERIALS | | X |

RSL00331

RSL00332

## C. INFORMATION ABOUT THE JOB AS IT RELATES TO THE DISABILTY

CAN THE JOB BE MODIFIED TO ACCOMMODATE THE DISABILITY EITHER TEMPORARILY OR PREMANENTLY?  ☐ YES  ☒ NO   IF YES, EXPLAIN.

IS IT POSSIBLE TO OFFER THE EMPLOYEE ASSISTANCE IN DOING THE JOB (THROUGH USE OF TECHNOLOGY OR PERSONAL ASSISTANCE FOR EXAMPLE)?  ☐ YES  ☒ NO   IF YES, EXPLAIN.

## D.  ATTACHMENTS AND SIGNATURE (ATTACH COPY OF THE EMPLOYEE'S JOB DESCRIPTION)
***ATTACHED***

"A PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE AN INSURANCE COMPANY, FILES A STATEMENT OF CLAIM CONTAINING FALSE, INCOMPLETE OR MISLEADING INFORMATION COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

*I CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE.*

x _Hope E. Fischer_
SIGNATURE

_DECEMBER 2, 1997_
DATE

( ) 757-858-6502
TELEPHONE

_BENEFITS ADMINISTRATOR_
TITLE

( ) 757-853-5462
FAX



MAGNETIC RESONANCE IMAGING

PATIENT INFORMATION | AGE | DATE | SCAN NO. | REFERRING PHYSICIAN

AREA OF STUDY:

SUMMARY OF FINDINGS:

IMPRESSION:



RSL00333

 NEUROLOGICAL SURGERY ASSOCIATES



- F. GARY GIESEKE M.D., F.A.C.S.
- MATTHEW R. MOORE, M.D.
- JOHN A. GENTS M.D.

# NOVEMBER 16, 1995

## TO WHOM IT MAY CONCERN:

## RE: JAMES RADICAN

The above patient has had major back surgery and, unfortunately, is still having problems. I feel he is unable to work full-time. He might, however, be able to work part-time depending on his condition. He is undergoing physical therapy at this time.

GARY GIESEKE, M.D.

RSL00334

 **Reliance Standard Life Insurance Company®**

Claim Number: _____

Policy Number: _LSC 098842_

## AUTHORIZATION

To Whom It May Concern:

I, _____ JAMES E. RADICAN _____ , hereby authorize any hospital, physician, medical practitioner, clinic, other medical or medically-related facility, pharmacy, insurance company or Government Agency (including the Social Security Administration and the Internal Revenue Service) or any past or present employer to disclose or furnish to Reliance Standard Life Insurance Company or its representatives, any and all information with respect to any illness including mental illness, drug/alcohol abuse, injury, medical history, consultations, prescriptions, treatments or benefits, or other documents and copies of all applicable records that may be requested. I also authorize any employer to disclose all information needed to process my claim.

The information provided to Reliance Standard Life Insurance Company or its representatives is to be used solely for the administration of claim(s). A photostatic copy of this authorization is to be considered as valid as the original and is effective for the duration of the claim.

_____November 3, 1997_____          _James E Radi...._

Date          Signature

NOTE: A true copy of this authorization is available to the employee at any time upon request.

**RSL00335**

RS—1815·A

# PARK PLACE THERAPEUTIC CENTER

[illegible] 19[illegible]

Re: James [illegible]
10256[illegible]

[illegible] May Concern

[illegible] post [illegible]ectomy. [illegible] operative area [illegible] from the therapy.

[illegible] therapy [illegible] mandatory and [illegible] effort have been [illegible] spine. [illegible] significant [illegible] of his back and lower extremity [illegible] will make the difference with respect [illegible] strength [illegible] and restore [illegible] gain.

[illegible] therapy [illegible]

[illegible] yours,

[illegible]

MAGNETIC RESONANCE IMAGING



**Coral Ridge MRI**

1951 N.E. 47th Street
Fort Lauderdale, Florida 33308
(305) 491-8621

| PATIENT INFORMATION | AGE | DATE | SCAN NO. | REFERRING PHYSICIAN |
|---|---|---|---|---|
| RADICAN, JAMES | 65 | 03/23/96 | 13,191-2 | MANUEL PORTH, M.D. |

AREA OF STUDY:    LUMBAR SPINE WITHOUT AND WITH GADOLINIUM

SUMMARY OF FINDINGS:

This study of the lumbar spine was carried out using multiple sagittal and transverse views.

On the ... ... pulse sequences, there is narrowing of the ... , 5-S1 interspaces. There are post-surgical ... ... opposite L1, L2, and S2 with evidence of a ... ... running almost from L2-3 through L4-5.

On the ... weighted T2 pulse sequences, there is ... ... intensity of all lumbar discs. There is ... ... disc herniation at L1-2 which protrudes into ... ... a moderate herniation at L3-4 which ... ... midline.

... ... show the midline discs at L1-2 and L3-4. ... ... changes are seen with the Gadolinium ...

INTERPRETATION:

... Degenerative disc disease of the lumbar spine.

... Herniated disc at L1-2, paracentral

... ... herniated disc at L3-4, paracentral.

... Post-operative changes seen at L1-2 through L4-5.

5. Moderate lumbar spondylitis.

When compared to the prior study of March 15, 1994, this study has progressed and the disc herniation is now more apparent.

RSL00337

**Tarmac America, Inc.**
Job Description

<u>JOB TITLE</u>
Sales Representative

EXEMPT:
SALARY LEVEL:

<u>SUMMARY:</u> Responsible for selling Tarmac's products and services to existing customers and new prospects. Applies a broad knowledge of the organization's services, products, and marketing techniques to finalize sales.

<u>ESSENTIAL DUTIES AND RESPONSIBILITIES:</u>

Sells the organization's products and services to existing customers and new prospects.

Maintains a sales program within the territory based on customer's estimated requirements. Identifies new markets and stimulates demand.

Informs customers of supply and price trends and assists in inventory control.

Keeps informed on new products/services and other general information of interest to customers. Participates in trade association meetings.

Assists accounts receivable in the collection of moneys.

Secures and renews orders and arranges delivery dates.

Exhibits good interpersonal and customer service skills.

Works to resolve customer issues, problems, and concerns.

<u>QUALIFICATION REQUIREMENTS:</u> To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the minimum knowledge, skill, and/or ability required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

<u>EDUCATION and/or EXPERIENCE:</u> Bachelor degree (B.A.) from college or university; 1-3 years job-related prior experience.

RSL00338

<u>COMMUNICATION SKILLS:</u>  Ability to read, analyze, and interpret professional journals and financial reports.  Ability to respond to common inquiries or complaints from customers, regulatory agencies, or members of the community.  Write complex documents in a prescribed format.  Ability to effectively present information to top management, public groups, an/or boards of directors.  Ability to communicate complex ideas and beliefs to top management.

<u>MATHEMATICAL SKILLS:</u>  Ability to apply moderately complex mathematical equations as applicable.

<u>REASONING ABILITY:</u>  Ability to define problems, collect data, establish facts, and draw valid conclusions.  Ability to interpret an extensive variety of technical instructions and deal with several abstract and concrete variables.

<u>PHYSICAL DEMANDS:</u>  The physical demands described here are representative of those that must be met by an employee to successfully perform the essential functions of this job.  Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

| Activity | Never | Occasionally | Frequently | Regularly |
|---|---|---|---|---|
| Sit | | | | ✓ |
| Talk | | | | ✓ |
| Hear | | | | ✓ |
| Use hands to finger/handle objects, tools, controls | | | ✓ | |
| Stand | | ✓ | | |
| Walk | | | ✓ | |
| Drive | | | | ✓ |
| Reach with hands and arms | | ✓ | | |
| Stoop, kneel, crouch, crawl | | ✓ | | |
| Climb or balance | | ✓ | | |

RSL00339

The employee may be required to lift:

| Activity | Never | Occasionally | Frequently | Regularly |
|---|---|---|---|---|
| Up to 10 pounds | | | | ✓ |
| 11-25 pounds | | | ✓ | |
| 26-50 pounds | | ✓ | | |
| 51-100 pounds | ✓ | | | |
| More than 100 pounds | ✓ | | | |

<u>WORK ENVIRONMENT:</u>  The work environment characteristics described here are representative of those an employee encounters while performing the essential functions of this job.  Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

| Activity | Never | Occasionally | Frequently | Regularly |
|---|---|---|---|---|
| Wet, humid conditions (non-weather) | | ✓ | | |
| Work near moving mechanical parts | | ✓ | | |
| Work in high, precarious places | ✓ | | | |
| Fumes or airborne particles | ✓ | | | |
| Toxic or caustic chemicals | ✓ | | | |
| Outdoor weather conditions | | | | ✓ |
| Extreme cold (non-weather) | ✓ | | | |
| Extreme heat (non-weather) | ✓ | | | |
| Risk of electrical shock | ✓ | | | |
| Work with explosives | ✓ | | | |
| Vibration | ✓ | | | |

*The above statements are intended to describe the general nature and level of work being performed.  They are not intended to be construed as an exhaustive list of all essential duties, responsibilities and requirements of personnel.*

RSL00340

June 21, 1996

James Radican
3800 Nw 71 Street
Coconut Creek, FL 33073

Dear James,

Effective January 1, 1996, your long-term disability (LTD) benefit was substantially upgraded. The previous own occupation period of 24 months was changed to 60 months. This could have a significant impact on the total amount of benefit you could receive in the event of total disability.

We are pleased to announce that your disability benefit has now been even further enhanced in the following way. Effective July 1, 1996, the company will no longer pay the premium for your LTD coverage; instead, this cost will automatically be deducted from your pay check, unless you choose to discontinue your LTD coverage. The benefit to you will be that if you are ever the recipient of disability benefits on this plan, you will receive them tax free. Prior to this change, any recipient of a disability benefit on this plan received a net amount **after** income tax deductions for their tax bracket were taken.

The current annual premium that will be deducted from your pay will be $178.90, which will be prorated over each pay period.

$$ \text{ANNUAL SALARY} \div 100 \; * \; \$0.31 \; = \; \text{ANNUAL PREMIUM} $$

Note that for most employees, salary increases will take effect on July 1, 1996 so the actual effect on your check should be minimal with the change in the LTD.

If you do not wish to continue your LTD coverage, please complete the attached form and return it to Yvonne Smith, 1151 Azalea Garden Road, Norfolk, VA 23502 prior to July 1, 1996. *Please understand if you choose not to participate at this time, you will not have the opportunity to opt for this coverage again until approximately January 1997. You will also have to provide Evidence of Insurability at your own expense.* If you do not return a form, it will be assumed that you **do** want the LTD coverage.

We are in the process of having Summary Plan Description booklets printed. They will be forwarded to you as soon as they are received. If you have any questions, please contact the Benefits Department at (804)858-6500.

Sincerely,

Ed Pittman
Vice President Human Resources

cc:    Personnel File

RSL00341

011: 1417
Division II

## LONG TERM DISABILITY COVERAGE

_____ **I do not** wish to continue my long term disability coverage.  I understand I will not have an opportunity to enroll in this plan again until approximately January 1997.  I understand that if I want to enroll at a later date, Evidence of Insurability at my own expense will be required.


_____     _____
Signature                                                                  Date




_____
PRINT YOUR FULL NAME HERE


_____
SOCIAL SECURITY NUMBER


_____
LOCATION


_____
WORK NUMBER




**011: 1417**
**Division II**

RSL00342

**Form W-2 Wage and Tax Statement 1996**  OMB No. 1545-0008  Department of the Treasury-Internal Revenue Service

Copy B To Be Filed With Employee's FEDERAL Tax Return
This information is being furnished to the Internal Revenue Service.

| | |
|---|---|
| a Control number **977** | 1 Wages, tips, other compensation **50544.97** | 2 Federal income tax withheld **10985.28** |

b Employer's name, address, and ZIP code
TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

b Employer identification number **59-1729143**
3 Social security wages **59214.85**
4 Social security tax withheld **3671.32**
d Employee's social security number **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**
5 Medicare wages and tips **59214.85**
6 Medicare tax withheld **858.62**

e Employee's name, address, and ZIP code
JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

13 See instrs. for box 13    C **1663.20**    D **8669.88**
12 Benefits included in box 1 **1895.53**

---

**Form W-2 Wage and Tax Statement 1996**  OMB No. 1545-0008  Department of the Treasury-Internal Revenue Service

Copy 2 To Be Filed With Employee's State Income Tax Return

| | | |
|---|---|---|
| a Control number **977** | 1 Wages, tips, other compensation **50544.97** | 2 Federal income tax withheld **10985.28** |

b Employer's name, address, and ZIP code
TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

b Employer identification number **59-1729143**
3 Social security wages **59214.85**
4 Social security tax withheld **3671.32**
d Employee's social security number **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**
5 Medicare wages and tips **59214.85**
6 Medicare tax withheld **858.62**

e Employee's name, address, and ZIP code
JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

C **1663.20**    D **8669.88**
12 Benefits included in box 1 **1895.53**

---

**Form W-2 Wage and Tax Statement 1996**  OMB No. 1545-0008  Department of the Treasury-Internal Revenue Service

Copy 2 To Be Filed with Employee's City or Local Income Tax Return

| | | |
|---|---|---|
| a Control number **977** | 1 Wages, tips, other compensation **50544.97** | 2 Federal income tax withheld **10985.28** |

b Employer's name, address, and ZIP code
TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

b Employer identification number **59-1729143**
3 Social security wages **59214.85**
4 Social security tax withheld **3671.32**
d Employee's social security number **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**
5 Medicare wages and tips **59214.85**
6 Medicare tax withheld **858.62**

e Employee's name, address, and ZIP code
JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

C **1663.20**    D **8669.88**
12 Benefits included in box 1 **1895.53**

---

Copy C For EMPLOYEE'S RECORDS (See Notice on back.)

| | | |
|---|---|---|
| a Control number **977** | 1 Wages, tips, other compensation **50544.97** | 2 Federal income tax withheld **10985.28** |

b Employer's name, address, and ZIP code
TARMAC FLORIDA, INC
1151 AZALEA GARDEN ROAD
P.O. BOX 2016
NORFOLK VA
23502

b Employer identification number **59-1729143**
3 Social security wages **59214.85**
4 Social security tax withheld **3671.32**
d Employee's social security number **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**
5 Medicare wages and tips **59214.85**
6 Medicare tax withheld **858.62**

**RSL00343**

e Employee's name, address, and ZIP code
JAMES E RADICAN
3800 NW 71 STREET
COCONUT CREEK FL
33073

C **1663.20**    D **8669.88**
12 Benefits included in box 1 **1895.53**

**Form W-2 Wage and Tax Statement 1996**  OMB No. 1545-0008  Department of the Treasury-Internal Revenue Service



Reliance Standard Life
Insurance Company®

G R A D S
G R O U P    B R O W S E

PAGE 1 OF
SCREEN GBBG0

CANCEL (Y/N): N          POLICY: LTD098842          SUB-POLICY: 01

ENTER THE SELECTION NUMBER OR "M" TO VIEW MORE:    M

| SELECTION | ID | EFFECTIVE MM/DD/YY | STATUS | REMIT | BILLED-TO MM/YY | PAID-TO MM/YY |
|---|---|---|---|---|---|---|
| 1 | 000001 | 01/01/96 | TERM | GROSS | 11/97 | 08/97 |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |

NO MORE BG SEGMENTS PRESENT

**RSL00344**

N.O.C.

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

8/97

**RSL** Reliance Standard Life
Insurance Company®

G R A D S
B I L L   G R O U P

PAGE 1 OF
SCREEN GFBG0

```
SELECT K/M:                POLICY: LTD098842           MODE: INQUIRY
SUB POLICY: 01                                  BILL GROUP: 000001

--DAYS--                 --DATES--              MONTH MODE : 01
PREMIUM DUE : 01    EFFECTIVE  : 010196         COMM AGENT : 000000
BILL NOTICE : 24    TERMINATE  : 090197         TERM REASON: 7
GRACE PERIOD:  75   HIST START : 010196         BG STATUS  : 9
MODAL/TERM  : M           END: 090197           NET/GROSS  : G
BILL ON DAY :           BILLED TO: 1197         PART PAYMNT: F
PRINT ALL EE: N (Y/N)    PAID TO: 0897          MED. CONVER: N
                                                DELETE ALL EB: Y (Y/N)

NAME: ADAMS GROUP INSURANCE, INC.
ADDR: ATTN: GARY ADAMS
ADDR: P.O. BOX 25666
CITY: SARASOTA                    ST: FL   ZIP: 34277

CLIENT-NUMBER: LTD098842   COMBINED FOR BILLING: N (Y/N)
CHECK VARIANCE: Y (Y/N)    MANUAL REVIEW: N (Y/N)
```

**RSL00345**

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

 **Reliance Standard Life Insurance Company**®

2501 Parkway ●Philadelphia, PA 19130-2499

June 11, 1998

Marika McVey Ostendorf
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

RE:   James E. Radican
      Claim Number:      1997-346-010
      Policy Number:     LSC 98842

Dear Ms. Ostendorf,

We have received your letter appealing the denial of the claim for James E. Radican.

The file will be reviewed in accordance with the Employee Retirement Income Security Act of 1974, as amended (ERISA).

The representative handling your request will be conducting a review of the claim file and will contact you if any additional information is needed or if there will be any delay.

In the interim, if you have any new or additional information regarding your appeal, please contact your claim examiner.

Sincerely,


Claims Department

cc: James E. Radican


RSL00177

# CLAIMS REFERRAL

| | |
|---|---|
| From: | To: |
| Department: | Department: |
| Extension: | Date: |

Insured's Name: _____ Claim Number: _____

Policyholder: _____ Policy Number: _____

Coverage
(Check all that apply):  ☐ Life   ☐ AD&D   ☒ LTD   ☐ STD   ☐ Other: _____

Reason For Referral:   ☐ Medical   ☐ Underwriting   ☐ Legal   ☐ Other: _____

**Claim Facts:** _____

**Examiner's Recommendation:** _____

**Reply:** _____

**RSL00178**

| | | |
|---|---|---|
| Name: | Date: | Phone: |

OBER | KALER
A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

Offices In
Maryland
Washington, D.C.
Virginia

120 East Baltimore Street
Baltimore, Maryland 21202-1643
410-685-1120  FAX 410-547-0699

Thomas D. Washburne
Lewis C. Strudwick
Lawrence D. Holman*
Jervis Spencer Finney
Manfred W. Leckszas
George T. Tyler
Stephen L. Parker
Donald C. Greenman
Richard W. Schwartzman*
Jerald J. Oppel
Paul M. Vincent
Alan J. Mogol
Leonard C. Homer
Aldrich B. Davis
John Anthony Wolf
Harry B. Gilvar*
John C. Baldwin
David D. Queen
John J. Miles*
Donald R. Mering
Geoffrey S. Tobias
Marc K. Cohen
Terence M. Finn
Steven J. Fox
Robert L. Ash

Sanford V. Teplitzky
M. Hamilton Whitman, Jr.
Jerome D. Carr
Pamela J. White
Martha Purcell Rogers*
Patrick K. Cameron
Robert F. Mazer
Thomas S. Spencer
Carel T. Hedlund
Robert E. Scher
Howard L. Sollins
Guy W. Warfield
Paul S. Sugar
Frank C. Bonaventure, Jr
Kevin A. Dunne
Bruce B. Stewart*
S. Craig Holden
James E. Edwards, Jr
Peter J. McNamara
John N. Roddock*
Edward K. Gross
J. Michael Broumas
Thomas K. Pryatt*
Carol M. McCarthy
John F. Morkan, III

Richard M. Pollex
David B. Hamilton
Charles M. English, Jr.
Jefferson M. Gray*
Bruce H. Jurist
Matthew W. Nayden
Laurence B. Russell
Joel S. Aronson
John J. Eller
Charles T. Smith, II
Darlene R. Margolies
Matthew A. Mace
Malinda B. Antalek
Karen S. Gussina
John M.G. Murphy
Diane Festino Schmitt
Markis M. Ostendorf
Monique D. Almy
Sharon A. Snyder
George W. Foly
Melissa Allison Warren

Betty Docket Barron
George F. Jones

Leslie Demarie Goldsmith
Laria S. Macwork
Robert W. Biddle
Robert B. Hopkins
E. Scott Johnson
Mary Baran Edwards
Mark D. Keller
E. Juan Staren
Eric R. Stanco
David L. Cole, Jr.
Randall L. Hagen
Melissa A. Lengyel
John C. Poulton
Patricia M. McGillan
H. Allen Black, III
J. Keith Fowler, Jr
Lori J. Parra
Kenneth B. Abel
David L. Manzelmann*
Nancy Swerman*
Drena E. Brown
Vera L. Case
George H. Fetter, III
Stephanie A. Bandak
Lawson D. Green

Lynn W. Stroth
Harold G. Belkowitz
George A. Aitken
Kelly A. Cameron
John W. DiNucci, III
Delvan S. Serquis
Anne K. Shenk
Jillian Wilson
Kenneth D. O'Smith
Jason C. Buckel
Samuel P. Funk
Fengbli J. Kilens
Salah C. Richards

Counsel
James I. Keith
J. Paul Bright, Jr
James R. Worsley, Jr
Carine C. Bing, Jr*
Edward G. Davila-Blasse

*Admitted other than Maryland

June 5, 1998

**BY FACSIMILE TRANSMISSION (215-787-3897)**

Reliance Standard Life Insurance Company
Quality Review Unit
P.O. Box 8330
Philadelphia, Pennsylvania 19101-8330

     *Re:*    *Policy Owner:  Tarmac America, Inc.*
            *Policy No.:  LSC 98842*
            *Claim No.:  1997-2346-010*
            <u>*Claimant:   James E. Radican*</u>

Dear Sir or Madam:

       This firm represents James E. Radican. The purpose of this letter is to request a review of the denial of Mr. Radican's long term disability benefits under the Group Long Term Disability Policy previously maintained by Tarmac America, Inc.

       According to the April 6, 1998 letter sent by James A. Wilson, Jr. of the Group LTD Claims Department, Mr. Radican was denied his long term disability benefits because he was not covered under the policy. In order to be eligible for long term disability under Policy LSC 98842, an individual must meet the policy's eligibility requirements. The group policy defines an individual's effective date as follows:

           EFFECTIVE DATE OF INDIVIDUAL INSURANCE:   If you pay the entire Premium due for an Eligible Person, the insurance for such Eligible Person will go into effect on the Individual Effective Date, as shown on the Schedule of Benefits page...The insurance for an Eligible Person will not go into effect on a date

MMG\195830.1 6/5/98  2:10 PM

**RSL00179**



Reliance Standard Life Insurance Company
June 5, 1998
Page 2

> he/she is not Actively at Work because of a Sickness or Injury
> The insurance will go into effect when a person is Actively at
> Work for one (1) full day in an Eligible Class, as shown on the
> Schedule of Benefits page.

The contract defines "Actively at Work" and "Active Work" as "actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and in the manner in which the job is normally performed  This includes approved time off, such as vacation, jury duty and funeral leave, but does not include time off as a result of an Injury or Sickness." The term "Full-time" means working for [Tarmac America, Inc.] for a minimum of forty (40) hours during a person's regular work week.

Mr. Wilson's letter states that Mr. Radican was working part-time when the policy became effective on January 1, 1996, and did not return to full-time active work prior to his last day worked.  This information was based on documentation received from a supervisor at Tarmac America, Inc. named Michael Unger  As explained more fully below, Mr. Unger's information was incorrect; Mr. Radican was working on a full-time basis in 1996 and therefore is entitled to the disability benefits.

On September 30, 1995, Mr. Radican had spinal surgery to correct a herniated disk to relieve severe pain in his lower back and legs  On or about October 15, 1995, he returned to work with Tarmac America, Inc.  In December, 1995, and February, 1996, Mr. Radican received physical therapy twice a week for a period of six (6) weeks.  Each physical therapy session lasted approximately three (3) hours.  In October, 1995, and again in August, 1996, Mr. Radican received a series of epidural injections into his back.  Except for the interruptions for the injections and the physical therapy, Mr. Radican was working on a full-time basis for Tarmac America, Inc.

During 1996, Mr. Radican was responsible for his sales territory, his sales volume, his forecasting, reporting [in writing], his technical assistance, and all other expected duties during the period of time in which he was receiving physical therapy and the injections  He carried a state-wide company beeper and a company cellular phone.  He was in constant contact with his accounts and the company management.

In order to be actively at work under the Reliance LTD contract, an individual must complete the material duties of his job and work forty (40) hours a week. During 1996, Mr. Radican clearly was performing the material duties of his job.  He continued to cover his sales territory and have primary responsibilty for his clients.  Because Mr. Radican was a salaried employee, Tarmac America, Inc. is unable to produce time sheets to confirm that he was working 40 hours a week during 1996.  His full-time status, however, is evident from his work situation. Mr. Radican received full pay and full benefits during 1996.  As previously mentioned, he was

RSL00180



Reliance Standard Life Insurance Company
June 5, 1998
Page 3

responsible for his sales territory in 1996 and it was not reassigned until early 1997, after he had filed for disability. Included with this letter is a copy of Mr. Radican's expense reports for December, 1995, and January, 1996. As you will see from the report, Mr. Radican traveled 1,380 miles during the month of December, 1995. In the month of January, 1996, he traveled 1,790 miles. Similarly, in August, 1996, he traveled 1,050 miles. A copy of the relevant expense report for that month is also enclosed.

Reliance disallowed the benefit claim based on the February 4, 1998 letter from Michael Unger, General Manager of Pennsuco Cement and Aggregates, which stated that Mr. Radican was working on a part-time basis and continued to work on a part-time basis for over one (1) year while receiving physical therapy and pain treatments. Mr. Unger's letter also stated that Mr. Radican filed for short-term disability on January 1, 1996. Please be advised that Mr. Unger's letter is incorrect. Mr. Unger was not the supervisor of Mr. Radican when he returned to work in the fall, 1995. Mr. Unger became involved with the situation only in the summer of 1996. His letter also incorrectly stated that Mr. Radican filed for disability on January 1, 1996, when the actual date was January 1, 1997.

The text of Mr. Unger's letter was prompted by the request of James Wilson, a Reliance employee who was investigating Mr. Radican's claim. Mr. Wilson was speaking with Mr. Radican regarding his work history and Mr. Radican had explained to him that he was able to work part-time while he was receiving physical therapy and pain treatments. Mr. Wilson then asked Mr. Radican to have Mr. Unger fax him a letter confirming Mr. Radican's part-time status so that the matter could be resolved. Mr. Unger's letter failed to clarify that Mr. Radican worked part-time on the particular day that he was was receiving physical therapy and/or pain treatments. However, on an overall basis, he was continuing to work as a full-time, salaried employee.

Please note that B. Edward Pittman, Vice President of Human Resources, has sent a letter to Reliance dated February 26, 1998, which confirms that Mr. Radican was indeed working on a full-time basis in 1996.

Mr. Radican was a full-time employee for Tarmac America, Inc. during 1996 and, therefore, is entitled to long term disability benefits under the terms of the Reliance Long Term Disability Policy.

RSL00181



Reliance Standard Life Insurance Company
June 5, 1998
Page 4


      I look forward to receiving an immediate response.

                    Yours truly,

                    Marika McVey Ostendorf


MMO:kmk
Enclosures
cc:     Mr. James E. Radican
       Ms. Hope Fischer

**RSL00182**

# TARMAC

## TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35752

Location: Bank Count.

Employee Vendor #: 101420/

Name: Jim Badiett

Mailing Address: 18 00 W W. 71 St.

Pompart Cak Fl 33023

Daytime Phone #: 1-800-458-4250

| Date | Description of Expenses | Transportation Co. Car | Transportation Other | Hotel/Motel | Entertain Other |
|---|---|---|---|---|---|
| 12-6 | Childrens Tour | | | 65.45 | |
| " | Lunch (Cape Simon) | | | | 10.— |
| " | Dinner (Suncoast Sup.) | | | | 25.— |
| 12-7 | Lunch (Florida Stereo) | | | | 20.— |
| -8 | (E Mother - Sup.) | | | | 16.— |
| " | Tolls Fort Worth | | | | 131.60 |
| 12-11 | Basket Ball Tickt (All Sta Sup) | | 10.— | | |
| " | Lunch (Stereoest Sup.) | | | | 11.— |
| 12-15 | E Duit Riche | | | | 33.14 |
| " | Tolls For Wt | | | | |
| 12-22 | X-Mas Fruit Baskets | | 5.— | | 135.63 |
| " | Dinner (Bradco Sup. Co.) | | | | 82.— |
| 12-24 | Tolls For Work | | | | |
| 12-26 | Dinner (Aprodo Stereo) | | | | 23.0 |
| 12-30 | Bill South Mobile | | 4.— | | 122.97 |
| " | Tolls For Wt | | | | |

Brought Forward from Cont'n Sheet No.

Mileage Allowance @ _____ Per Mile x Number of Business Miles

| | Column Totals | Mileage Allowance $ 855-101 | Other 855-106 | Hotel/Meals 855-108 | Entertain 855-102 | Other 855-109 |
|---|---|---|---|---|---|---|
| | | 2 N. | | 68.45 | 336.60 | 311.59 |

Total all Expense Paid by Employee: 740.89

Amount Due (Employee)(Tarmac): 740.89

Current Odometer Reading: 51,200.0
Previous Odometer Reading: 49,300.0
Total Miles Traveled: 1,900.0
Business Miles: 1,390.0
P. Vak. Miles: 20.0

Employee Signature: [signature]   Date: 12-31-95

Approver Signature: [signature]   Name: _____ Date: _____

Charges paid by Tarmac (such as airfare, memo only): _____

Forwarded to: Tarmac, 1151 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

**RSL00183**

**TRAVEL AND ENTERTAINMENT EXPENSE REPORT**

Cost Center: AC 35152
Location: Bank Client

Employee Vendor #: 10/4201
Name: Jim Babicca
Mailing Address: 2400 N.W. 71 St
Coconut Cove, FL 33023
Daytime Phone #: 1-800-458-9250

| Date | Description of Expense | Transportation Co. Car | Transportation Other | Hotel | Meals | Entertain | Other |
|------|------------------------|------------------------|----------------------|-------|-------|-----------|-------|
| 1-3 | Lunch (Bob's Int.) | | | | 18.- | | |
| 1-5 | Dinner (Jax. Rosenwig) | | | | 24.- | | |
| " | Tolls Fla NK | | 3.- | | | | |
| 1-11 | Lunch (Osprey Bldg - Matls) | | | | 17.- | | |
| 12 | Dinner (Creative Chairfactory) | | | | 103.- | | |
| " | Dinner (Badge Sys) | | | | 26.- | | 25.45 |
| 1-15 | Phone & Int. | | | | | | |
| " | Lunch (Cane Supply) | | | | 21.- | | |
| 1-17 | Dinner (Seacoast Sys) (Ft Myers) | | | | 42.- | | |
| 1-17 | Radison Inn | | | 54.45 | | | |
| " | Lunch (AAA Supply) | | 10.- | | 20.- | | |
| " | Tolls Fla NK | | | | | | |
| 1-18 | Dinner (Fleming Plast) | | | | 22.- | | |
| 1-23 | Lunch (Delta Sys) | | | | 25.- | | |
| 1-24 | " (Valient Plast) | | | | 22.- | | |
| 1-25 | " (Bob's Sys Co.) | | | | 25.- | | |
| 1-26 | " (North Springs Plast) | | | | 17.- | | |
| | Brought Forward from Cont'n Sheet No. | | | | | | |
| | Mileage Allowance @ | | | | | | |
| | Per Mile x Number of Business Miles | | | | | | |
| | **Column Totals:** | Mileage Allowance $ 13.- | 635-101 | 635-105 54.45 | 635-101 385.- | 635-105 5 | 635-102 | 635-103 25.45 |

Charge paid by Termac (such as airfare, memo only)

Current Odometer Reading: 53,000.-
Previous Odometer Reading: 51,200.-
Total Miles Traveled: 1,800.-
Business Miles: 1,790.-
Private Miles: 10.0

Employee Signature: _[signature]_  Date: 1-31-96
Approver's Signature: _____  Name: _____  Date: _____

| | | |
|---|---|---|
| Total of All Expenses Paid by Employee | | |
| Less Cash Advance | | |
| Amount Due Employee (Termac) | | 25.45 |

Forward to: Termac, 1161 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

**TARMAC**

**TRAVEL AND ENTERTAINMENT EXPENSE REPORT**

Employee/Vendor #:

Name: Jim Adrian

Mailing Address: 1800 N.W. 71 St.

Broward Cnt., FL 33023

Daytime Phone #: 1-800-458-4250

Date: 35152

Location: Bank Count

NORKL 0528

| Date | Description of Expenses | Transportation | Other | Hotel | Meals | Other |
|---|---|---|---|---|---|---|
| 6-1 | Lunch ( R. Scott - Bus. Building) | 6.25 | | | | |
| 6-7 | Car Wash | 10.00 | | | | |
| 6-11 | Auto Inspection (Emissions) | 61.00 | | | | |
| " | Auto Tag Renewal | | | | | |
| 12 | Lunch (North Springs Stucco) | | | | 69.- | |
| | | | | | 27.- | |
| 8-19 | Lunch (Chas. Fleming Plastering) | | | | | |
| 8-19 | Bell South Mobility | | 18.7 | | | |
| 8-30 | Tolls for month | 8.00 | 8.- | | | |
| | 1-Trip to miami 3.50 | | | | | |
| | 1-Trip to Ft. Myers 5.50 | | | | | |
| | 9.- | | | | | |

Column Total: 6.25  79.- 134.- 59.82

Mileage Allowance $

Previous Odometer Reading 57,400.0

Current Odometer Reading 58,500.0

Total Miles Traveled 1,100.0

Business Miles 1,050.0

P. Miles x Mile 50.0

Employee Signature

Approver Signature

Total of All Expenses Paid By Employee: 281.07

Less Cash Advance

Amount Due Employee/(Owed) 281.07

Tarmac, 1101 Azalea Garden Road, Norfolk, Va 23502

Attention: Accounts Payable

RSL00185



Ober, Kaler, Grimes & Shriver
Attorneys at Law
120 E. Baltimore Street
Baltimore, MD 21202-1643

A Professional Corporation



P 567 859 834



Reliance Standard Life Insurance Company
Quality Review Unit
P.O. Box 8330
Philadelphia, Pennsylvania 19101-8330



RSL00186

JUN-05-1998  15:00        OBER KALER GRIMES                410 547 0699   P.01/08

# OBER | KALER
A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

120 E. Baltimore Street
Baltimore, Maryland 21202-1643
410-685-1120 FAX 410-547-0699

1401 H Street, NW
Washington, D.C. 20005-3324
202-408-8400 FAX 202-408-0640

# FACSIMILE

To Contact Sender, Call
410-685-1120 Ext. 1295

---

**TO:** Reliance Standard
   Life Insurance Company
   *Quality Review Unit*
**FACSIMILE NO:** (215) 787-3897

**FROM:** Marika McVey Ostendorf, Esq.

**RE:** Policy Owner: Tarmac America, Inc.
   Policy No.: LSC 98842
   Claim No.: 1997-2346-010
   Claimant:  James E. Radican

**DATE:**  June 5, 1998

**TIME:**  2:45pm

**FILE NO:** 018598.058963

**TOTAL PAGES:** 8

---

*** IMPORTANT NOTICE ***

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT. YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU. <NOCOVER>

MMO:156754.1/6/5/98; 2:45 PM

RSL00187

# OBER | KALER
A Professional Corporation

Ober, Kaler, Grimes & Shriver
Attorneys at Law

Offices In
Maryland
Washington, D.C.
Virginia

120 East Baltimore Street
Baltimore, Maryland 21202-1643
410-885-1120  FAX 410-547-0699

June 5, 1998

<u>BY FACSIMILE TRANSMISSION (215-787-3897)</u>

Reliance Standard Life Insurance Company
Quality Review Unit
P.O. Box 8330
Philadelphia, Pennsylvania 19101-8330

     Re:    *Policy Owner:  Tarmac America, Inc.*
              *Policy No.:  LSC 98842*
              *Claim No.:  1997-2346-010*
              <u>*Claimant:    James E. Radican*</u>

Dear Sir or Madam:

     This firm represents James E. Radican.  The purpose of this letter is to request a review of the denial of Mr. Radican's long term disability benefits under the Group Long Term Disability Policy previously maintained by Tarmac America, Inc.

     According to the April 6, 1998 letter sent by James A. Wilson, Jr. of the Group LTD Claims Department, Mr. Radican was denied his long term disability benefits because he was not covered under the policy.  In order to be eligible for long term disability under Policy LSC 98842, an individual must meet the policy's eligibility requirements.  The group policy defines an individual's effective date as follows:

          EFFECTIVE DATE OF INDIVIDUAL INSURANCE:  If you pay the entire Premium due for an Eligible Person, the insurance for such Eligible Person will go into effect on the Individual Effective Date, as shown on the Schedule of Benefits page...The insurance for an Eligible Person will not go into effect on a date

MMO:195830.1:6/5/98: 2:10 PM

RSL00188

OBER|KALER
A Professional Corporation

Reliance Standard Life Insurance Company
June 5, 1998
Page 2

> he/she is not Actively at Work because of a Sickness or Injury.
> The insurance will go into effect when a person is Actively at
> Work for one (1) full day in an Eligible Class, as shown on the
> Schedule of Benefits page.

The contract defines "Actively at Work" and "Active Work" as "actually performing on a Full-time basis the material duties pertaining to his/her job in the place where and in the manner in which the job is normally performed. This includes approved time off, such as vacation, jury duty and funeral leave, but does not include time off as a result of an Injury or Sickness." The term "Full-time" means working for [Tarmac America, Inc.] for a minimum of forty (40) hours during a person's regular work week.

Mr. Wilson's letter states that Mr. Radican was working part-time when the policy became effective on January 1, 1996, and did not return to full-time active work prior to his last day worked. This information was based on documentation received from a supervisor at Tarmac America, Inc. named Michael Unger. As explained more fully below, Mr. Unger's information was incorrect; Mr. Radican was working on a full-time basis in 1996 and therefore is entitled to the disability benefits.

On September 30, 1995, Mr. Radican had spinal surgery to correct a herniated disk to relieve severe pain in his lower back and legs. On or about October 15, 1995, he returned to work with Tarmac America, Inc. In December, 1995, and February, 1996, Mr. Radican received physical therapy twice a week for a period of six (6) weeks. Each physical therapy session lasted approximately three (3) hours. In October, 1995, and again in August, 1996, Mr. Radican received a series of epidural injections into his back. Except for the interruptions for the injections and the physical therapy, Mr. Radican was working on a full-time basis for Tarmac America, Inc.

During 1996, Mr. Radican was responsible for his sales territory, his sales volume, his forecasting, reporting [in writing], his technical assistance, and all other expected duties during the period of time in which he was receiving physical therapy and the injections. He carried a state-wide company beeper and a company cellular phone. He was in constant contact with his accounts and the company management.

In order to be actively at work under the Reliance LTD contract, an individual must complete the material duties of his job and work forty (40) hours a week. During 1996, Mr. Radican clearly was performing the material duties of his job. He continued to cover his sales territory and have primary responsibility for his clients. Because Mr. Radican was a salaried employee, Tarmac America, Inc. is unable to produce time sheets to confirm that he was working 40 hours a week during 1996. His full-time status, however, is evident from his work situation. Mr. Radican received full pay and full benefits during 1996. As previously mentioned, he was

MMO:195830.1:6/5/98: 2:10 PM

RSL00189

JUN-05-1998  15:01     OBER KALER CRIMES                                    P.24/25

OBER | KALER
A Professional Corporation

Reliance Standard Life Insurance Company
June 5, 1998
Page 3

responsible for his sales territory in 1996 and it was not reassigned until early 1997, after he had filed for disability. Included with this letter is a copy of Mr. Radican's expense reports for December, 1995, and January, 1996. As you will see from the report, Mr. Radican traveled 1,380 miles during the month of December, 1995. In the month of January, 1996, he traveled 1,790 miles. Similarly, in August, 1996, he traveled 1,050 miles. A copy of the relevant expense report for that month is also enclosed.

Reliance disallowed the benefit claim based on the February 4, 1998 letter from Michael Unger, General Manager of Pennsuco Cement and Aggregates, which stated that Mr. Radican was working on a part-time basis and continued to work on a part-time basis for over one (1) year while receiving physical therapy and pain treatments. Mr. Unger's letter also stated that Mr. Radican filed for short-term disability on January 1, 1996. Please be advised that Mr. Unger's letter is incorrect. Mr. Unger was not the supervisor of Mr. Radican when he returned to work in the fall, 1995. Mr. Unger became involved with the situation only in the summer of 1996. His letter also incorrectly stated that Mr. Radican filed for disability on January 1, 1996, when the actual date was January 1, 1997.

The text of Mr. Unger's letter was prompted by the request of James Wilson, a Reliance employee who was investigating Mr. Radican's claim. Mr. Wilson was speaking with Mr. Radican regarding his work history and Mr. Radican had explained to him that he was able to work part-time while he was receiving physical therapy and pain treatments. Mr. Wilson then asked Mr. Radican to have Mr. Unger fax him a letter confirming Mr. Radican's part-time status so that the matter could be resolved. Mr. Unger's letter failed to clarify that Mr. Radican worked part-time on the particular day that he was was receiving physical therapy and/or pain treatments. However, on an overall basis, he was continuing to work as a full-time, salaried employee.

Please note that B. Edward Pittman, Vice President of Human Resources, has sent a letter to Reliance dated February 26, 1998, which confirms that Mr. Radican was indeed working on a full-time basis in 1996.

Mr. Radican was a full-time employee for Tarmac America, Inc. during 1996 and, therefore, is entitled to long term disability benefits under the terms of the Reliance Long Term Disability Policy.

MMO:195830.1 6/5/98 2:10 PM

RSL00190

O B E R | K A L E R
A Professional Corporation

Reliance Standard Life Insurance Company
June 5, 1998
Page 4

I look forward to receiving an immediate response.

Yours truly,

*Marika M. Ostendorf*

Marika McVey Ostendorf

MMO:kmk
Enclosures
cc:     Mr. James E. Radican
        Ms. Hope Fischer

MMO.195830.1 6/5/98 2:10 PM

**RSL00191**

ARMAC

**TRAVEL AND ENTERTAINMENT EXPENSE REPORT**

NORSKO544

Employee/Vendor #:
Name: Jim Bauval
Mailing Address: 1100 n h al 71 st
Pompano Beach, FL 33012
Daytime Phone #: 1-800-458-8250

35752

Bank Deposit



RSL00192

# TRAVEL AND ENTERTAINMENT EXPENSE REPORT

**AC**

35152

Bank Count

Employee Vendor #:
Name: Jim Breard
Mailing Address: 3E 60 N W, 21 ST
Avent Oak Fl 33033
Daytime Phone #: 1-800-451-6250

10/14/20/

| Date | Description of Expenses | | | Amount |
|---|---|---|---|---|
| 3 | Lunch (Bus Exp) | | | 16.— |
| 5 | Dinner (No Partners) | | | 24.— |
| 5 | Tolls for NY | 3.— | | |
| 11 | Lunch (Emergency Bldg - Mats) | | 17.— | |
| 11 | " (Central Business) | | 103.— | |
| 12 | Dinner (Barber Sup) | | 28.— | |
| 15 | Phone & Dist | | | 25.45 |
| 17 | Lunch (Equip Supply) | | 21.— | |
| 17 | Dinner (Secara Sup) (Et Mgmt) | | 42.— | |
| 17 | Robbery Total | | 54.45 | |
| 17 | Lunch (Add Supply) | | 20.— | |
| 17 | Tolls for NY | 10.— | | |
| 19 | Dinner (Alessio Plast) | | 23.— | |
| 23 | Lunch (Delta Sup) | | 25.— | |
| 23 | " (Polliot Plast) | | 22.— | |
| 25 | " (Beck Sup & | | 25.— | |
| 26 | " (North Spanish Plast) | | 17.— | |

|  |  |  |
|---|---|---|
| 13.— | 54.45 | 385.— |
|  |  | 25.45 |

Total: 7,000.— $1,800.— 1,500.— 1,790.— 10.0

Employee Signature G Roche
Date: 1-31-96

RSL00193

**ARMAC**

**TRAVEL AND ENTERTAINMENT EXPENSE REPORT**

NOR KL   0528

## TELE    IONE CONVERSATION REC    D

Check here if Initial Interview __

*Circle all that apply:*    LIFE    WOP    LTD    STD    Other: _____

Insured name: James Radican                    SS #: _____

Claim Number: 1997-346-010                    Policy Number: _____

Conversation with: Linda Armstead        Call taken/made by: 757-858-3485

☐ Incoming Call    ☑ Outgoing Call    Telephone Number: _____

### *Don't forget to include Date & Time!*

| Date | Time | |
|------|------|---|
| 4/15 | 1:15 | Advised Linda we were correct in our assessment. Mr. Radican did not meet the eligible class — <br> - claimant went out 1995 <br> - returned in 1996 on a PT basis not working a full 40 hr week. <br><br> If Mr. Radican would like to appeal he must send an appeal letter |

**RSL00195**

tcr9/97

# TELEPHONE CONVERSATION RECORD

Check here if Initial Interview ___

*Circle all that apply:*    LIFE    WOP    LTD    STD    Other: _____

Insured name: _James Radican_          SS #: _____

Claim Number: _1997-346-010_          Policy Number: _____

Conversation with: _Linda Armstead / Pt_    Call taken/made by: _James_

☐ Incoming Call    ☐ Outgoing Call    Telephone Number: _(715) 858-6483_

## Don't forget to include Date & Time!

| Date | Time | |
|------|------|---|
| 4/13/98 | 4PM | Rec'd p/c from Ms Armstead RE Mr Radican's Clm Ms Armstead Stated Mr Radican was working as a F/T Employee and was Under a F/T Employee Status w/ Taramed I explained my reasons for denying the clm and She understood but insisted She wanted to speak w/ My Manager Supervisor to clear up the Matter |

**RSL00196**

tcr9/97

 **Reliance Standard Life Insurance Company**

April 6, 1998

James E. Radican
3800 N. W. 71 Street
Coconut Creek, FL 33073

> Policyowner : Tarmac America, Inc.
> Policy No.   : LSC 98842
> Claim No.    : 1997- 346-010

Dear Mr. Radican:

We would like to express our appreciation for your patience and cooperation during the review of your claim for Long Term Disability (LTD) benefits. We have now completed our determination regarding your eligibility for benefits under the above group LTD policy.

To be eligible for benefits, the group policy requires that objective medical documentation must substantiate that a member, while insured under the group policy, meets the group policy's definition of Total Disability. The group policy defines Total Disability as follows:

**"Actively at work" and Active Work" mean actually performing on a full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an injury or sickness.**

**"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.**

We have received documentation from your employer which indicates you began working on a part-time basis on or about November 1, 1995 and continued to work part-time for over one year.

In order to be eligible for Long Term Disability under this policy, you must be actively at work and working on a full-time basis as defined by the policy. Based on information provided by your employer, you were working part-time when the policy became effective on January 1, 1996 and did not returned to full time active work prior to your last day worked. Therefore, you have not satisfied the policy definition of a full-time employee and are not eligible for Long Term Disability Benefits coverage.

RSL00197



We regret our decision could not be more favorable. Our determination has been based on the information contained in your file and the policy provisions applicable to your claim

Under the Employee Retirement Income Security Act of 1974, you may request a review of this denial by writing to:

<div align="center">

Reliance Standard Life Insurance Company
Quality Review Unit
P. O. Box 8330
Philadelphia, PA 19101-8330

</div>

The written request for review must be sent within 60 days of receipt of this letter and state the reasons why you feel your claim should not have been denied. Include any documentation which you feel supports your claim. You or your duly authorized representative are also entitleed to review the pertinent documents upon which the denial decision wa predicated. Under normal circumstances, you will be notified in writing of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any of Reliance Standard Life Insurance Company's rights and defenses under the above captioned policy, and all these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

James A. Wilson, Jr
Group LTD Claims Department
Extension: 3854


cc:    Tarmac America, inc.
       Attn: Hope Fischer
       P.O. Box 2016
       Norfolk, VA 23501

RSL00198

## TELE_HONE CONVERSATION REC_RD

Check here if Initial Interview __
*Circle all that apply:*    LIFE    WOP    (LTD)    STD    Other:

| | |
|---|---|
| Insured name: _James Bachrau_ | SS #: _____ |
| Claim Number: _1007-346-016_ | Policy Number: _____ |

Conversation with: _Fifa Fischer_    Call taken/made by: _James_

☐ Incoming Call    ☑ Outgoing Call    Telephone Number: _757 854-6352_

### *Don't forget to include Date & Time!*

| Date | Time | |
|---|---|---|
| 4/8/98 | 10:38am | Returned P/H Phone Call & Lm on voice mail. |
| | | Recd P/c from P/H re Ltr dated 3/26/98 to Mr. Pittman |
| | | Mrs Fischer wanted to know if the Ltr to Mr. |
| | | Pittman Send would begin the appeal Process |
| | | Explained that the appeal Process come from the |
| | | INSD or his Authorized REP |
| | | She also sta—d that I did not Rcvd the |
| | | appeal Ltr She ask if I wld—d if deceased on |
| | | in N.V |
| | | |
| | | |

RSL00199

tcr9/97





March 20, 1998

Tarmac America, Inc
Attn. B. Edward Pittman, Vice President Human Resources
P O Box 2016
Norfolk, VA 23501

|  | RE: | Claimant | : | James E. Radican |
|---|---|---|---|---|
|  |  | Policy No. | : | LSC 98842 |
|  |  | Claim No. | : | 1997-346-010 |

Dear Mr. Pittman:

We received your letter dated February 26, 1998 regarding the denial of Mr Radican's claim for Long Term Disability benefits and we would like to clarify the policy requirements of eligibility.

In order to be eligible for Long Term Disability under policy # LSC98842, an individual must meet the policy's eligibility requirements. The group policy defines individual effective date as follows:

**EFFECTIVE DATE OF INDIVIDUAL INSURANCE:** If you pay the entire Premium due for an Eligible Person, the insurance for such Eligible Person will go into effect on the Individual Effective Date, as shown on the Schedule of Benefits page.
The insurance for an Eligible person will not go into effect on the date he/she is not Actively at Work because of a Sickness or Injury. The insurance will go into effect after the person is Actively at Work for one (1) full day in an Eligible Class, as shown on the schedule of Benefit page.

**"Actively at work" and Active Work" mean actually performing on a full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an injury or sickness.**

**"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.**

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

RSL00200

 Reliance Standard Life
Insurance Company®

Our records show that policy Number LSC98842 became effective on January 1, 1996
Information received from Mr. Unger indicates that Mr. Radican worked on a part-time basis
from November 1, 1995 to his last day worked December 31, 1996  Therefore, Mr. Radican did
not satisfy the eligibility requirements of the group policy.

If the Insured disagrees with our determination, a written appeal must be received within 60 days
from the date of the original denial letter. The request must come from the insured or his
authorized representative as stated Under The Employee Retirement Income Act of 1974.

If you have any questions, please feel free to write or call me.

Sincerely,

James A. Wilson, LTD Claims Examiner
Claims Department, Ext. 3854

RSL00201

# CLAIMS REFERRAL

From:                                                    To:

Department:                                              Department:

Extension:                                               Date:

Insured's Name:                                          Claim Number:

Policyholder:                                            Policy Number:

Coverage
(Check all that apply):    ☐  Life   ☐  AD&D   ☐  LTD   ☐  STD   ☐  Other:

Reason For Referral:   ☐  Medical   ☐  Underwriting   ☐  Legal   ☐  Other:

Claim Facts:

Examiner's Recommendation:

**RSL00202**

Reply:

Name:                                    Date:            Phone:            (c) 10-96)

**Tarmac**

Tarmac America, Inc.
P.O. Box 2016
Norfolk, VA 23501
(757) 858-6500
Fax (757) 855-2707
http://www.tarmacamerica.com

February 26, 1998

Reliance Standard Life Insurance Company
Quality Review Unit
P.O. Box 8330
Philadelphia, PA 19101-8330

**RE:   James E. Radican**
   **Policy No. LSC 98842**
   **Claim No 1997-2346-010**

Dear Sir:

I am in receipt of your letter of February 20, 1998, to Mr. James Radican, informing him of an unfavorable determination of his Long Term Disability claim. You have stated that Mr. Radican was working "part-time" when the policy became effective, had not returned to "full time active work" prior to his last day worked and therefore did not satisfy the definition of a full-time employee under the terms of the policy.

Jim Radican was a <u>full-time salaried exempt employee</u> of this company from his date of employment in 1965 until his last day of active work on December 31, 1996. At no time prior to the commencement of his short term disability on January 1, 1997 was he ever on part-time status; he was at all times paid full salary and enjoyed full benefits, including long term disability coverage, for which he paid. The fact that he worked partial days in 1996 following his return to work from surgery should in no way be construed as "part-time" status. Had Mr. Radican been classified a part-time employee, he would have been ineligible for participation in our long term disability benefit at all.

We would appreciate your expeditious reconsideration of Mr. Radican's claim, given his unemployed and disabled status. While doing so, please note that Mr. Radican's middle initial is E., not G., and he does not live in New York. Should you require further information from Tarmac to substantiate his claim for benefits, please do not hesitate to contact me. I look forward to your response.

Sincerely yours,

B. Edward Pittman
B. Edward Pittman
Vice President Human Resources

**RSL00203**

cc:    James E. Radican
    Mike Unger, General Manager, Florida Cement
    James A. Wilson, Jr.
      Group LTD Claims Department, Reliance Standard Life

A Tarmac Group company

FEB 20     :39 FR RSL C' MS          215 787 4254 TO 917578554852     P.02/03

**RSL** Relia, Standard Life
Insura, e Company®

February 20, 1998

James G. Radican
RT. 145 Box C
Preston Hollow, NY 12469

      Policyowner : Tarmac America, Inc.
      Policy No.  : LSC 98842
      Claim No.   : 1997-2346-010

Dear Mr. Radican:

We would like to express our appreciation for your patience and cooperation during the review of your claim for Long Term Disability (LTD) benefits.  We have now completed our determination regarding your eligibility for benefits under the above group LTD policy.

To be eligible for benefits, the group policy requires that objective medical documentation must substantiate that a member, while insured under the group policy, meets the group policy's definition of Total Disability.  The group policy defines Total Disability as follows:

**"Actively at work" and Active Work" mean actually performing on a full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed.  This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an injury or sickness.**

**"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.**

We have received documentation from your employer which indicates you began working on a part-time basis on or about November 1, 1995 and continued to work part-time for over one year.

In order to be eligible for Long Term Disability under this policy, you must be actively at work and working on a full-time basis as defined by the policy.   Based on information provided by your employer, you were working part-time when the policy became effective on January 1, 1996 and did not returned to full time active work prior to your last day worked.  Therefore, you have not satisfied the policy definition of a full-time employee and are not eligible for Long Term Disability Benefits coverage.

RSL00204



We regret our de ision could not be more favorable. Our determination has been based on the information contained in your file and the policy provisions applicable to your claim.

Under the Employee Retirement Income Security Act of 1974, you may request a review of this denial by writing to:

<div align="center">

Reliance Standard Life Insurance Company
Quality Review Unit
P. O. Box 8330
Philadelphia, PA 19101-8330

</div>

The written request for review must be sent within 60 days of receipt of this letter and state the reasons why you feel your claim should not have been denied. Include any documentation which you feel supports your claim. You or your duly authorized representative are also entitled to review the pertinent documents upon which the denial decision wa predicated. Under normal circumstances, you will be notified in writing of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any of Reliance Standard Life Insurance Company's rights and defenses under the above captioned policy, and all these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

James A. Wilson, Jr
Group LTD Claims Department
Extension: 3854


cc:    Tarmac America, Inc.
       Attn: Hope Fischer
       P.O. Box 2016
       Norfolk, VA 23501

<div align="center">

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

</div>

**RSL00205**

** TOTAL PAGE.03 **



**Tarmac America, Inc.**
P.O. Box 2016
Norfolk, VA 23501
(757) 858-6500
Fax (757) 855-7707
http://www.tarmacamerica.com

February 26, 1998

Reliance Standard Life Insurance Company
Quality Review Unit
P.O. Box 8330
Philadelphia, PA 19101-8330

**RE:   James E. Radican**
**Policy No. LSC 98842**
**Claim No 1997-2346-010**

Dear Sir:

I am in receipt of your letter of February 20, 1998, to Mr. James Radican, informing him of an unfavorable determination of his Long Term Disability claim. You have stated that Mr. Radican was working "part-time" when the policy became effective, had not returned to "full time active work" prior to his last day worked and therefore did not satisfy the definition of a full-time employee under the terms of the policy.

Jim Radican was a <u>full-time salaried exempt employee</u> of this company from his date of employment in 1965 until his last day of active work on December 31, 1996. At no time prior to the commencement of his short term disability on January 1, 1997 was he ever on part-time status; he was at all times paid full salary and enjoyed full benefits, including long term disability coverage, for which he paid. The fact that he worked partial days in 1996 following his return to work from surgery should in no way be construed as "part-time" status. Had Mr. Radican been classified a part-time employee, he would have been ineligible for participation in our long term disability benefit at all.

We would appreciate your expeditious reconsideration of Mr. Radican's claim, given his unemployed and disabled status. While doing so, please note that Mr. Radican's middle initial is E., not G., and he does not live in New York. Should you require further information from Tarmac to substantiate his claim for benefits, please do not hesitate to contact me. I look forward to your response.

Sincerely yours,

*B. Edward Pittman*

B. Edward Pittman
Vice President Human Resources

cc:   James E. Radican
      Mike Unger, General Manager, Florida Cement
      James A. Wilson, Jr.
        Group LTD Claims Department, Reliance Standard Life

**RSL00206**

A Tarmac Group company


**RSL** Reliance Standa . Life
Insurance Company®

February 20, 1998

James G. Radican
RT. 145 Box C
Preston Hollow, NY 12469

> Policyowner : Tarmac America, Inc.
> Policy No. : LSC 98842
> Claim No. : 1997-2346-010

Dear Mr. Radican:

We would like to express our appreciation for your patience and cooperation during the review of your claim for Long Term Disability (LTD) benefits. We have now completed our determination regarding your eligibility for benefits under the above group LTD policy.

To be eligible for benefits, the group policy requires that objective medical documentation must substantiate that a member, while insured under the group policy, meets the group policy's definition of Total Disability. The group policy defines Total Disability as follows:

**"Actively at work" and Active Work" mean actually performing on a full-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed. This includes approved time off such as vacation, jury duty and funeral leave, but does not include time off as a result of an injury or sickness.**

**"Full-time" means working for you for a minimum of 40 hours during a person's regular work week.**

We have received documentation from your employer which indicates you began working on a part-time basis on or about November 1, 1995 and continued to work part-time for over one year.

In order to be eligible for Long Term Disability under this policy, you must be actively at work and working on a full-time basis as defined by the policy. Based on information provided by your employer, you were working part-time when the policy became effective on January 1, 1996 and did not returned to full time active work prior to your last day worked. Therefore, you have not satisfied the policy definition of a full-time employee and are not eligible for Long Term Disability Benefits coverage.

**RSL00207**

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500



**RSL** Reliance Standa.. _ Life
Insurance Company ®

We regret our decision could not be more favorable. Our determination has been based on the information contained in your file and the policy provisions applicable to your claim.

Under the Employee Retirement Income Security Act of 1974, you may request a review of this denial by writing to:

> Reliance Standard Life Insurance Company
> Quality Review Unit
> P. O. Box 8330
> Philadelphia, PA 19101-8330

The written request for review must be sent within 60 days of receipt of this letter and state the reasons why you feel your claim should not have been denied. Include any documentation which you feel supports your claim. You or your duly authorized representative are also entitleed to review the pertinent documents upon which the denial decision wa predicated. Under normal circumstances, you will be notified in writing of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any of Reliance Standard Life Insurance Company's rights and defenses under the above captioned policy, and all these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

James A. Wilson, Jr
Group LTD Claims Department
Extension: 3854


cc:    Tarmac America, Inc.
       Attn: Hope Fischer
       P.O. Box 2016
       Norfolk, VA 23501

**RSL00208**

# CLAIMS REFERRAL

From: _____  To: _____
Department: _____  Department: _____
Extension: _____  Date: _____

Insured's Name: _____  Claim Number: _____
Policyholder: _____  Policy Number: _____

Coverage
(Check all that apply):  ☐ Life  ☐ AD&D  ☐ LTD  ☑ STD  ☐ Other:

Reason For Referral:  ☐ Medical  ☐ Underwriting  ☐ Legal  ☐ Other:

Claim Facts: _(handwritten, illegible)_

Examiner's Recommendation: _(handwritten, illegible)_

**RSL00209**

Reply: _____

Name: _____  Date: _____  Phone: _____



**Tarmac America, Inc.**
11000 N.W. 121st Way
Medley, FL 33178
(305) 554-2230
Fax (305) 554-2268

February 4, 1998

Mr. James Wilson
Reliance Standard Life Insurance Co.                    FAX: 215/787-4254
LTD Claim Department
2501 Parkway
Philadelphia, PA 19130-2499

Dear Mr. Wilson:

It is my understanding that, after recovering from back surgery, James Radican returned to work on or about November 1, 1995.

At that time, Jim reported to Mr. Fred Goudie, Vice President of Production and Sales for Tarmac's Pennsuco Cement Mill in Medley, Florida. Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.

Tarmac's policy requires employees to work only on a full-time basis. Jim was incapable of performing his duties on this basis and was required to file for short-term disability on January 1, 1996.

Sincerely,

Michael Unger, General Manager
Pennsuco Cement and Aggregates



**RSL00210**

A Tarmac Group company

## TELE HONE CONVERSATION REC RD

Check here if Initial Interview __
*Circle all that apply:*    LIFE    WOP    LTD    STD    Other: _____

| | |
|---|---|
| Insured name: James Radican | SS #: _____ |
| Claim Number: 1997-346-010 | Policy Number: _____ |
| Conversation with: INSURED | Call taken/made by: _____ |
| ☐ Incoming Call    ☒ Outgoing Call | Telephone Number: (954) 471-164_ |

## Don't forget to include Date & Time!

| Date / Time | |
|---|---|
| 2/10/98 3³⁴pm | Returned Clmnt's Plc. Advised him that the file is being reviewed by my Sr Examiner and hopefully I will her from her by 2/13/98 or 2/17/98. |

**RSL00211**

tcr9/97

# Tarmac

Tarmac America, Inc.
11000 N.W. 121st Way
Medley, FL 33178
(305) 364-2230
Fax (305) 364-2288

February 4, 1998

Mr. James Wilson
Reliance Standard Life Insurance Co.            FAX: 215/787-4254
LTD Claim Department
2501 Parkway
Philadelphia, PA  19130-2499

Dear Mr. Wilson:

It is my understanding that, after recovering from back surgery, James Radican returned to work on or about November 1, 1995.

At that time, Jim reported to Mr. Fred Goudie, Vice President of Production and Sales for Tarmac's Pennsuco Cement Mill in Medley, Florida.  Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.

Tarmac's policy requires employees to work only on a full-time basis.  Jim was incapable of performing his duties on this basis and was required to file for short-term disability on January 1, 1996.

Sincerely,

Michael Unger, General Manager
Pennsuco Cement and Aggregates

**RSL00212**

A Tarmac Group Company

# *RSL* Reliance Standard Life Insurance Company®

## FAX MESSAGE

TO: _James Wilson, 4th, Claims_   DATE: _2/4/98_

FAX#: _____

FROM:  ( ) Jim Holland       ( ) Terri Boggs

( ) Matt Williamson    ( ) Linda Gloss

(✓) Jeanene Dvorsky    ( ) Debi Parks

No. of pages, including cover sheet _____

---

*Reliance Standard Life* (RSL) provides a full spectrum of life insurance, disability income, personal accident and payroll deduction programs to groups and individuals.

### RSL'S EMPLOYEE BENEFIT PRODUCT PORTFOLIO
◆ Group LTD
◆ Group Life and AD&D
◆ Group Weekly Income
◆ Business Travel Accident
◆ Group Voluntary Life
◆ Group Voluntary AD&D
◆ Group Voluntary LTD
◆ Qualified Group Annuities
◆ Small Group LTD
◆ Small Group Life and AD&D
◆ Dental

_Tarmac - LTD_

_Copy of prior carrier's booklet per your request._

---

**ORLANDO REGIONAL SALES OFFICE**
Jim Holland, Regional Sales Manager
2301 Lucien Way, Suite 170
P.O. Box 945225
Maitland, FL 32794-5225
(407) 875-1200 ◆ (800) 221-2693 ◆ FAX (407) 875-1202

RSL00213

# Long-Term Disability Income Plan



# Tarmac

# Tarmac America, Inc.

CIGNA

UNDERWRITTEN BY:
Life Insurance Company of North America
a CIGNA company

**RSL00214**

Class 1
11-92

--- FOREWORD ---

Long Term Disability Income Insurance helps to protect your income when, due to a covered illness or injury, you are disabled. The Long Term Disability Income Insurance Plan described in this booklet has been designed to cover a disability sustained on or off the job. This important coverage helps to meet day to day living expenses during extended periods of disability, when your regular income has been affected adversely and need is greatest.

In an effort to make sure your benefit program is comprehensive and responsive to your needs, your employer is providing this coverage at no cost to you.

--- YOUR LONG TERM DISABILITY PLAN ---

MONTHLY BENEFIT: . . . . . . . . . . 60.00% OF YOUR BA-
SIC MONTHLY EARN-
INGS Reduced by
benefits payable from
the other sources listed
in the Certificate

MAXIMUM MONTHLY BENEFIT: . . . $10,000

BENEFIT PERIOD: . . . . . . . . . . . . . Based on your age at
onset of disability as
defined in the Certificate

BENEFIT WAITING PERIOD: . . . . . . 180 days of disability

The Certificate of Insurance on the following pages describes the coverage in detail, including all benefits, limitations and exclusions.

1

**RSL00215**

# LONG TERM DISABILITY CERTIFICATE OF INSURANCE

## LIFE INSURANCE COMPANY OF NORTH AMERICA

1601 CHESTNUT STREET, PHILADELPHIA, PA 19192

A STOCK INSURANCE COMPANY

We, the Life Insurance Company of North America, have issued a Group Long Term Disability Policy to the Policyholder named on page 4.

We hereby certify that we insure all eligible persons who are defined on page 4, for whom written application is made and accepted by us, and for whom the premium is paid.

Your coverage will begin according to the terms of the Master Policy. This is subject to the provisions on page 4 of this certificate.

This certificate is not a contract of insurance. It contains only a summary of the Group Policy, which alone is the contract under which payments are made.

This certificate replaces any and all certificates which have been issued to you in the past under the Group Policy.

## LIFE INSURANCE COMPANY OF NORTH AMERICA

*GORDON E. MURPHY, President*

### TABLE OF CONTENTS

| | |
|---|---|
| Eligible Classes | 4 |
| Definitions | 11 |
| Effective Date | 4 |
| Exclusions | 13 |
| Termination | 4 |
| Description of Benefits | 14 |
| Schedule of Benefits | 5 |
| General Provisions | 19 |

LM-6N37

2

3

RSL00216

# LONG TERM DISABILITY CERTIFICATE OF INSURANCE

**Policyholder:** TARMAC AMERICA, INC.

**Policy Number:** LK-544973

## WHO IS ELIGIBLE

You will become eligible for insurance:

a) on the day you complete the Waiting Period, and

b) you are in a Class of Eligible Employees.

## WAITING PERIOD.

Initial Employee Group:

None

New Employee Group:

None

## CLASSES OF ELIGIBLE PERSONS.

### Class 1

All active full-time salaried employees of Tarmac America, Inc. and their subsidiaries, over age 18 working a minimum of 30 hours per week and earning in excess of $30,000 annually.

## EFFECTIVE DATE

You will become insured for Employee Insurance on the date you become eligible for it. If you are not in Active Service on the date you would otherwise become insured, you will become insured on the date you return to Active Service.

## TERMINATION OF INSURANCE

Your insurance will cease on the earliest date below:

(1) the date you cease to be eligible for the insurance;

(2) the last day for which you have paid your share of the premium;

(3) the date the policy is cancelled; or

(4) the date your Active Service ends.

If your Active Service ends due to Disability for which Monthly Benefits are or may become payable, your insurance will continue as long as Monthly Benefits are payable for Disability or Residual Disability.

## WAIVER OF PREMIUM

You will not need to pay any premium while Monthly Benefits for Disability or Residual Disability are payable to you.

LM-9N41

4

---

# SCHEDULE OF BENEFITS

## BENEFIT WAITING PERIOD.

The Benefit Waiting Period will be 180 days of continuous Disability. A period of Disability will be considered continuous even if you return to full-time work in your regular job for up to a total of 30 days during the Benefit Waiting Period. The Benefit Waiting Period will be extended by the number of days you temporarily returned to work.

## MONTHLY BENEFIT.

The Monthly Benefit for any month is:

1. The lesser of:

  a. 60.00% of your Basic Monthly Earnings rounded to the nearest dollar; or

  b. $10,000; and

2. minus Other Benefits for that month.

The Monthly Benefit will not be less than $100. or 10% of your Monthly Benefit before reductions due to "Other Benefits" whichever is greater, regardless of any reductions shown in this Schedule. Monthly Benefits will be pro-rated if payable for any period less than a month.

5

## RSL00217

## SCHEDULE OF BENEFITS (Continued)

### OTHER BENEFITS

Other Benefits include:

(1) any amounts which you or your dependents receive on account of disability under:

  (a) any group insurance or similar plan for persons in a group;

  (b) the Canada and Quebec Pension Plans;

  (c) any local, provincial or federal government disability or retirement plan or law;

  (d) any state disability or retirement benefits which you receive (or are assumed to receive*) on your own behalf;

  (e) any salary or wage continuation plan of the Employer;

  (f) the Jones Act, or any workers' compensation, occupational disease or similar law including all permanent as well as temporary disability benefits;

  (g) any work loss provision in the mandatory part of any "No-Fault" auto insurance policy.

(2) any disability or Old Age benefits payable under the Federal Social Security Act, which you receive (or are assumed to receive*) on your own behalf;

(3) any disability or Old Age benefits payable under the Federal Social Security Act, which you receive (or are assumed to receive*) on behalf of your dependents, or which your dependents receive on account of your receipt (or assumed receipt*) of such benefits; and

(4) any retirement benefits which you receive under: (a) a Retirement Plan sponsored by the Employer; (b) the Canada and Quebec Pension Plans; (c) the Railroad Retirement Act or the Railroad Unemployment Insurance Act - to the extent these benefits are funded by the Employer.

*See the Assumed Receipt of Benefits provision.

6

## SCHEDULE OF BENEFITS (Continued)

### OTHER INSURANCE

If there is other Group Disability Insurance which:

  (a) applies to the same claim for Disability; and

  (b) contains the same or similar provision for reduction because of Other Benefits;

this policy shall be liable for its pro rata share of the total claim.

"Pro rata share" means the proportion of the total benefit that the amount payable under one policy in the absence of such other insurance bears to the total applicable benefits under all such policies.

7

**RSL00218**

## SCHEDULE OF BENEFITS (Continued)

### RESIDUAL DISABILITY BENEFIT

The Monthly Benefit for any month during which you are Residually Disabled will be:

1. the Monthly Benefit as figured above for the first 12 months Residual Disability Benefits are payable; and

2. the Monthly Benefit as figured above minus 50% of your monthly earnings received while you are Residually Disabled after the first 12 months Residual Disability Benefits are payable.

II. during any month you return to work, the sum of your Residual Disability Benefit, your earnings, and any Other Benefits, exceed:

1. 100% of your Indexed Basic Monthly Earnings for the first 12 months benefits are payable for Residual Disability; or

2. 80% of your Indexed Basic Monthly Earnings after the first 12 months benefits are payable for Residual Disability, your Residual Disability Benefit will be further reduced by such excess amount.

The Residual Disability Benefit will continue until the earlier of the following dates:

1. the date you are no longer Disabled;
or

2. the date Monthly Benefits are no longer payable.

The Insurance Company will, from time to time, review your status and may require an account of your earnings and proof of continued Disability.

The Monthly Benefit during a period of Residual Disability will not be less than $100. or 10% of your Monthly Benefit before reductions due to "Other Benefits" whichever is greater, regardless of any reductions shown in this Schedule. Residual Disability Benefits will be pro-rated if payable for any period less than a month.

8

## SCHEDULE OF BENEFITS (Continued)

### ASSUMED RECEIPT OF BENEFITS

If you are covered under the Federal Social Security Act, for any disability or Old Age benefit, Statutory Disability (if applicable), Worker's Compensation, or similar laws, you will be assumed to be receiving such benefits for yourself, (and your dependents, if applicable). These assumed benefits will be the amount we estimate you (and your dependents, if applicable) are eligible to receive. This assumption will not be made if you give the proof that:

(1) you have applied for these benefits; and

(2) payments were denied.

However, if payments for disability were denied solely because the disability was not expected to last at least 12 consecutive months, you will be assumed to be receiving such benefits after your disability has continued for 12 consecutive months. This assumption will not be made if you give the proof that:

(1) you have re-applied for benefits; and

(2) payments were again denied.

The Insurance Company will not assume receipt of, nor reduce the Monthly Benefit by, any elective, actuarially reduced, early retirement benefits under such laws until you actually receive such benefits.

### INCREASE IN OTHER BENEFITS

We will not consider any cost of living increase in any Other Benefits which is effective after:

(1) the first payment of such Other Benefits becomes due; and

(2) Monthly Benefits become payable under the policy.

### RECOVERY OF OVERPAYMENTS

If the Monthly Benefit for any month is overpaid, we have the right to recover the amount overpaid by either of the following methods:

(1) a deduction of the overpaid amount from any future payments by the Insurance Company; or

(2) a lump sum repayment of the overpaid amount.

9

RSL00219

## SCHEDULE OF BENEFITS (Continued)

## LUMP SUM PAYMENTS

Any Other Benefits paid in a lump sum (except as shown below) will be deemed to be paid in monthly amounts prorated over the time for which the sum was paid. If no such time is stated, the lump sum will be prorated monthly over your expected life span. We will determine that expected life span.

Lump Sum Payments under:

(1) a Retirement Plan will be deemed to be paid in the monthly amount which you could have chosen to receive in installment payments under the Plan;

(2) the Jones Act or any workers' compensation, occupational disease or similar law (which includes benefits paid under a Compromise and Release) will be deemed to be paid monthly:

   (a) at the rate stated in the award;

   (b) at the rate paid prior to the lump sum (if no rate is stated in the award); or

   (c) at the maximum rate set by the law (if no rate is stated and you did not receive a periodic award).

## DEFINITIONS

You will find terms that start with capital letters throughout your certificate. All of these terms are defined in the policy. Definitions included here are to help you understand the benefits. When the male pronoun is used it will include the female.

**ACTIVE SERVICE** - You will be considered in Active Service:

(1) on any of your Employer's scheduled work days if you are performing the regular duties of your work on a full time basis on that day, either at one of your Employer's usual place of business or at some location to which you are required to travel for your Employer's business.

(2) on a day which is not one of your Employer's scheduled work days if you were in Active Service on the preceding scheduled work day.

**INJURY** - means an accidental bodily injury.

**SICKNESS** - means a physical or mental illness. It also includes pregnancy.

**RETIREMENT PLAN** - Any defined benefit plan or defined contribution plan (including a profit sharing plan) sponsored by your Employer. It does not include: (1) an individual deferred compensation agreement; (2) a profit sharing or any other retirement or savings plan that is maintained in addition to a defined benefit or other defined contribution pension plan; or (3) any employee savings plan including a thrift, stock option or stock bonus plan, individual retirement account or 401(K) plan.

RSL00220



## DEFINITIONS (Continued)

**BASIC EARNINGS.** The term Basic Earnings means your rate of pay reported by your Employer. It does not include overtime, bonus, additional compensation or pay for more than 40 hours a week.

If you are paid wholly or in part by commissions, the term Basic Earnings will also include commissions based on an average of the commissions paid by your Employer for the 24 months immediately preceding the onset of Disability. If you were not in the employ of your Employer during the entire preceding 24 month period, your commissions will be based on an average of the total number of months you were so employed.

Basic Earnings are determined initially on the date you become insured. A change in the amount of Basic Earnings will be considered effective on the date of the change. If you are not in Active Service on that day, no increase in Basic Earnings will be considered effective until you return to Active Service for one full day. In no event will an increase in your Basic Earnings be considered effective if it occurs:

(1) between separate periods of Disability which are considered one period under the Successive Periods of Disability provision; or

(2) during a Benefit Waiting Period.

**INDEXED BASIC EARNINGS.** Your Indexed Basic Earnings is an amount determined as follows:

For the first year you are Disabled, your Indexed Basic Earnings will be equal to your Basic Earnings. After you have been Disabled for 1 year, your Basic Earnings will be increased on each annual anniversary of the date you became Disabled. The amount of each increase will equal A or B, whichever is less where:

A = 10% of your Indexed Basic Earnings during the preceding year of Disability.

B = The rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

Your Basic Earnings will not be decreased by a drop in the Consumer Price Index (CPI-W).

CPI-W means the Consumer Price Index for Urban Wage Earners and Clerical Workers published by the US Department of Labor. If the index is discontinued or changed, another nationally published index that is comparable to the CPI-W will be used.

12

## DEFINITIONS (Continued)

**DISABILITY.** You will be considered Disabled if because of Injury or Sickness:

1. you are unable to perform all the material duties of your regular occupation; and

after Monthly Benefits have been payable for 24 months, you are unable to perform all the material duties of any occupation for which you are or may reasonably become qualified based on your education, training or experience.

**RESIDUAL DISABILITY.** You will be considered Residually Disabled if, while you are Disabled, you return to any work for wage or profit.

### EXCLUSIONS

No Monthly Benefits will be paid if your Disability or Residual Disability results, directly or indirectly, from:

(1) injuries intentionally self-inflicted while sane or insane; or

(2) any act or hazard of a declared or undeclared war.

No Monthly Benefits will be paid for a period of Disability or Residual Disability when you are not under the care of a licensed physician.

RSL00221

02-04-1998 11:03 407 875 1202 RELIANCE STD LIFE ORLANDO

# LONG TERM DISABILITY BENEFITS

## COMMENCEMENT OF BENEFITS

We will begin paying Monthly Benefits in the amount determined from the Schedule when we receive due proof that:
(1) you became Disabled while insured for this Long Term Disability Insurance; and
(2) your Disability has continued for a period longer than the Benefit Waiting Period shown in the Schedule.

## DURATION OF BENEFITS

We will stop paying Monthly Benefits on the earlier following dates:
(1) the date you cease to be Disabled; or
(2) whichever of the following dates is applicable to you:

| Age When Disability Began | Date Monthly Benefits Cease |
| --- | --- |
| Age 60 or under | The later of: (a) your 65th birthday; or (b) the date the 42nd Monthly Benefit is payable. |
| Age 63 | The date the 36th Monthly Benefit is payable. |
| Age 64 | The date the 30th Monthly Benefit is payable. |
| Age 65 | The date the 24th Monthly Benefit is payable. |
| Age 66 | The date the 21st Monthly Benefit is payable. |
| Age 67 | The date the 18th Monthly Benefit is payable. |
| Age 68 | The date the 15th Monthly Benefit is payable. |
| Age 69 or over | The date the 12th Monthly Benefit is payable. |

14

# LONG TERM DISABILITY BENEFITS (Continued)

## MENTAL ILLNESS, ALCOHOLISM AND DRUG ABUSE LIMITATION

The Insurance Company will pay Monthly Benefits for no more than 24 months during your lifetime for Disability or Residual Disability caused or contributed to by mental illness, alcoholism or drug abuse while you are not confined in a hospital. You will be considered confined in a hospital only if you are confined continuously for at least 14 days in a hospital licensed to provide care and treatment for the condition causing the Disability.

## PRE-EXISTING CONDITION LIMITATION

We will not pay Monthly Benefits for any period of Disability which results, directly or indirectly, from an Injury or Sickness for which you, during the 3 months prior to the most recent effective date of your insurance: (1) incurred expenses; (2) received medical treatment; (3) took prescribed drugs or medicines; or (4) consulted a physician. This limitation will not apply to a period of Disability which begins more than 12 months after the most recent effective date of your insurance.

15

RSL00222

# LONG TERM DISABILITY BENEFITS (Continued)

## CONTINUITY OF COVERAGE AND PRE-EXISTING CONDITION LIMITATION

The Pre-existing Condition Limitation will be waived, as described below, if you were insured on the day before the Effective Date of this policy under a group long term disability policy: (a) sponsored by your Employer; and (b) replaced by this policy; provided you:

(1) are in Active Service on the Effective Date of this Policy; and
(2) have fulfilled the requirements of any Pre-existing Condition Limitation of the replaced policy.

However, if you:

(1) are in Active Service on the Effective Date of this policy; and
(2) have not fulfilled the requirements of any Pre-existing Condition Limitation of the replaced policy because the time period required prior to start of Disability has not been satisfied;

any portion of time which may have been satisfied under such Pre-existing Condition Limitation will be applied toward the satisfaction of that time period requirement of the Pre-existing Condition Limitation of this policy.

Il Monthly Benefits are determined to be payable, they will be paid according to the provisions of this policy.

## SUCCESSIVE PERIOD OF DISABILITY

Separate periods of Disability resulting from the same or related causes will be considered one period of Disability unless separated by your return to Active Service for at least 6 consecutive months.

Separate periods of Disability resulting from unrelated causes will be considered one period of Disability unless separated by your return to Active Service for at least one full day.

These provisions do not apply:

(1) to the Benefit Waiting Period; or
(2) when you become eligible for benefits under any group long term disability policy.

# LONG TERM DISABILITY BENEFITS (Continued)

## FAMILY SURVIVOR BENEFITS

We will pay Family Benefits as set forth below for up to 3 months if:

(1) you become Disabled while insured for Family Benefits;
(2) the Disability has continued for at least 6 months beyond the Benefit Waiting Period; and
(3) you die while Monthly Benefits are being paid for that Disability and we receive due proof of death.

## PAYMENT OF FAMILY BENEFITS

Family Benefits will be payable Monthly beginning one month after your death. Family Benefits will be paid to your lawful spouse if living. If your lawful spouse is not living when any Family Benefit is due, it will be paid in equal shares to each of your children. No Family Benefits will be paid if there is no lawful spouse or child.

The term child means your unmarried child (including a stepchild living with you at the time of death) who is less than 21 years old. Family Benefits may not be assigned. Payment to anyone as provided above will release us from all liability for Family Benefits to the extent of the payments made.

## AMOUNT OF FAMILY BENEFITS

The amount payable for Family Benefits will be equal to 100% of the sum of:

(1) the Monthly Benefit due for the last full month of Disability before your death; and
(2) any amount by which such Monthly Benefit was reduced because of wage or profit received for work performed.



RSL00223

RELIANCE STD LIFE ORLANDO RSD                                    P. 12

LM-6N42

# CONVERSION PRIVILEGE

**HOW AND WHEN TO CONVERT** - When your Long Term Disability Insurance under this policy ceases, you may be eligible to be insured under another group policy providing converted long term disability benefits (called Converted Insurance). You are Entitled to Convert; and (2) apply in writing and pay the first premium for Converted Insurance to the Insurance Company within either of the following periods of time after the date your insurance under this policy ceases:

(a) within 31 days, without evidence of good health; or

(b) after 31 days but not more than 62 days, with evidence of good health.

**ENTITLED TO CONVERT** - You are Entitled to Convert Long Term Disability Insurance only if:

(1) you have been insured for at least 12 consecutive months under this policy or under this and a prior Long Term Disability group policy issued to the Policyholder; and

(2) your insurance under this policy ceased because you were no longer in Active Service because of resignation, involuntary termination, layoff or an uninsured leave of absence.

**NOT ENTITLED TO CONVERT** - You are not Entitled to Convert if:

(1) you are no longer in a Class of Eligible Employees;

(2) you have attained age 70;

(3) you are retired;

(4) you are not in Active Service because of disability; or

(5) this policy is cancelled for any reason.

**CONVERTED INSURANCE** - Converted Insurance will be provided under the plan of benefits offered by the Insurance Company at the time the first premium is received.

A certificate under the group converted policy will be issued to you describing your benefits. Converted Insurance will take effect on: (a) the day after your insurance under this policy ceases; or (b) in the case that you are required to submit evidence of good health, the day the Insurance Company accepts the evidence. The premium on the day it takes effect will be based on: (a) class of risk; (b) age; and (c) benefits.

The Insurance Company or the Policyholder will give you further details of the available Converted Insurance.

# GENERAL PROVISIONS

**NOTICE OF CLAIM** - Written notice of claim must be given to us within 30 days after the occurrence or start of the loss on which a claim is based.

If notice is not given in that time, the claim will not be invalidated or reduced if it is shown that written notice was given as soon as was reasonably possible.

**CLAIM FORMS** - When we receive the notice of claim, we will give to the claimant, the claim forms we use for filing proof of loss. If the claimant does not get these claim forms within 15 days after we receive notice of claim, he will be considered to have met the proof of loss requirements if he submits written proof of loss within 90 days after the date of loss. This proof must describe the occurrence, character and extent of the loss for which a claim is made.

**PROOF OF LOSS** - Written proof of loss must be given to us within 90 days after the date of the loss for which a claim is made. If written proof of loss is not given in that time, the claim will not be invalidated nor reduced if it is shown that written proof of loss was given as soon as was reasonably possible.

**PHYSICAL EXAMINATION** - At our expense, we have the right to examine any person for whom a claim is pending as often as we may reasonably require.

**LEGAL ACTIONS** - No action at law or in equity will be brought to recover on the policy until at least 60 days after proof of loss has been filed with us. No action will be brought at all unless brought within 3 years after the time within which proof of loss is required by the policy. (Kansas: 5 years; South Carolina: 6 years).

RSL00224

FEB 04 '98 11:36                         407 875 1202          PAGE.12

# GENERAL PROVISIONS (Continued)

## PAYMENT OF BENEFITS

**TO WHOM PAYABLE** - Any benefits that are payable for disability will be paid to you. Family Benefits will be paid to the eligible survivor(s) according to the terms of that section.

If any person to whom benefits are payable is a minor or, in our opinion, is not able to give a valid receipt for any payment due you, such payment will be made to your legal guardian. However, if no request for payment has been made by your legal guardian, we may at our option make payment to the person or institution appearing to have assumed your custody and support.

If you die while any of your disability benefits remain unpaid, we may, at our option, make direct payment to any of your following living relatives: spouse, mother, father, children, brothers or sisters; or to the executors or administrators of your estate. Payment in the manner described above will release us from all liability to the extent of any payment made.

**TIME OF PAYMENT** - Any disability benefits will be paid at regular intervals of not more than one month. Any balance which remains unpaid at the end of any period for which we are liable will be paid at that time.

LM-6N40

20

RSL00225

RSL002226

< CONFIRMATION REPORT >

01-24-1996(WED) 14:33

[ TRANSMIT ]

| NO. | DATE | TIME | DESTINATION | PG. | DURATION | MODE | RESULT |
|-----|------|------|-------------|-----|----------|------|--------|
| 12108 | 1-24 | 14:27 | RELIANCE STANDARD | 13 | 0'05'49" | NORM.E | OK |
| | | | | 13 | 0'05'49" | | |

## TELE[PH]ONE CONVERSATION REC[O]RD

Check here if Initial Interview ___

*Circle all that apply:*   LIFE   WOP   (LTD)   STD   Other: _____

Insured name: _James Radican_          SS #: _____

Claim Number: _1997-346-010_          Policy Number: _____

Conversation with: _INSURED_          Call taken/~~made~~ by: _James_

☐ Incoming Call   ☐ Outgoing Call   Telephone Number: _____

### Don't forget to include Date & Time!

| Date | Time |
|------|------|
| 2/2/98 | 4:30 PM |

Clmnt had surger on 9/29/95 RTW w/in
one month after surger on a PT basis for
about 1 yr. Tarmac advised Clmnt to RTW F/T
VP at time he returned to wk was
Fred Goude
or go out on STD. STD began 11/1/97
to 12/31/97 Clmnt stated He RTW 11/1/95
after his surger on a PT basis.

RSL00227

tcr9/97

## TELE_HONE CONVERSATION REC_RD

Check here if Initial Interview ___

**Circle all that apply:**    LIFE    WOP    (LTD)    STD    Other: _____

Insured name: _James Radican_     SS #: _____

Claim Number: _1997-346-CNO_     Policy Number: _____

Conversation with: _____     Call taken/made by: _James_

☐ Incoming Call    ☑ Outgoing Call    Telephone Number: _305 364-2293_

### Don't forget to include Date & Time!

| Date | Time | |
|------|------|---|
| 1/30/98 2PM | | Called MR. Unger ~~Radican's~~ office re Insureds attendance records. Lm voice mail. |
| 1/30/98 1PM | | Rec'd call from Jeanene at the Orlando Sales office re Prior Carrier Policy. She will inv and get back to me. |
| | | Rec'd f/c from ~~rec'd~~ Mr. Unger who sttd due to Mr. Radican Status w/in the Co. he doesn't required to subm at attendance records. |
| | | doing pray at home |
| ~~2/2/98~~ | | |

**RSL00228**

tcr9/97

**Fax message**

# Tarmac 

**Tarmac America, Inc.**
Post Office Box 2016
Norfolk, Virginia 23501
1151 Azalea Garden Road
Norfolk, Virginia 23502
Telephone (757) 858-6500
Fax (757) 855-7707

| To | James Wilson | From | Hope Fischer |
|---|---|---|---|
| Company | Reliance Standard Life | Tel no. | (800) 351-7500, X 3854 |
| Fax no. | (215) 787-4254 | Date | January 28, 1998 |
| Subject | James Radican | No. of pages Incl. front cover | 2 |

Please let me know if you require further information. Thank you for your assistance on this claim.

**Confidential Information**

Privileged information may be contained in this fax which is intended for the addressee only. If you are not the addressee, please do not copy or deliver this to anyone else. If you receive this fax by mistake, please telephone the sender and return the original message to us at the address above via post.

RSL00229

# Tarmac

Tarmac America, Inc.
P.O. Box 2016
Norfolk VA 23501
Norfolk (757) 858-6500
Fax (757) 855-7707

January 28, 1998

Reliance Standard Life Insurance Company
ATTN: James Wilson

**RE:    LTD Claim - Policy #LSC 098842**
**       James E. Radican (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)**

Dear Mr. Wilson:

Following on our telephone conversation yesterday, I am writing, at your request, to provide information regarding the short term disability provisions of Tarmac America, Inc. as they relate to Mr. Radican's situation. You asked if we had any information in our records to establish Mr. Radican's attendance at work during 1995 and 1996.

Tarmac America, Inc.'s "sick leave" or short term disability policy with respect to salaried employees is basically that of salary continuation. If an employee is out of work due to illness or injury, it is his responsibility to inform his supervisor or manager that he will be out, and his pay continues. The onus to track time out of work is on the manager; there is no formal system in place to record time missed due to illness. Salary continuation for exempt employees is for a period of time up to nine months at full pay, followed by three months at half pay. Mr. Radican was an exempt employee, he recently completed the allowed maximum for short term disability and has now applied for long term disability.

Our files on Mr. Radican indicate that he had back surgery in October 1995 and was out of work from that time until sometime after mid-year 1996 at the recommendation of his doctor, Manuel Porth. Sometime during the latter part of 1996, he reported to work, but we have no documentation in the file to substantiate the dates worked. Finally, he went out again on short term disability on or about January 1, 1997 and did not return for the entire year. His employment ended on December 31, 1997, following nine months of STD at full pay and three more months at half pay. This is all the information we have in his personnel file.

If you require further substantiation of Mr. Radican's attendance record, I can only recommend that you speak with his former manager, Mike Unger. Mr. Unger is the General Manager at our Pennsuco cement operations in Florida. He can be reached at (305) 364-2293.

Sincerely,

*Hope Fischer*

Hope E. Fischer, PHR
Benefits Administrator

**RSL00230**

# CLAIMS REFERRAL

| | |
|---|---|
| From: _James_ | To: _Sue_ |
| Department: _LTD_ | Department: _LTD_ |
| Extension: _355_ | Date: _10/7/8_ |

| | |
|---|---|
| Insured's Name: _James Radican_ | Claim Number: _159-332-010_ |
| Policyholder: _____ | Policy Number: _08607_ |

Coverage
(Check all that apply):  ☐ Life   ☐ AD&D   ☒ LTD   ☐ STD   ☐ Other: _____

Reason For Referral:   ☐ Medical   ☐ Underwriting   ☐ Legal   ☐ Other: _____

**Claim Facts:** _A 58 y/o Sales Rep in the cement dvsn suffering from severe lower back pain going back 23 years. Mr Radican did not experienced any back pains for about 10 years. The clmnt started experiencing the pains 8 years ago due to driving 3000 miles per month. MRI on 3/29/96 shows the following: degenerative disc disease, herniated disc at L1-2 & L3-4. Clmnt has had decompressive laminectomy w/ no improvement from the above MRI findings. He also had epidural blocks & PT w/ no improvement in his condition. MRI on _____ and 9/26/96 continued to support severe bulging of herniated disc at the L3-4. Dr. Gieseke verified the herniated disc at L3-4 was b/both thigh w/ a lumbar myelogram & CT Scan on 10/31/97. This fits well w/ 5 dr. of the clmnt's symptoms and also w/ the distressed knee jerk on the right._

**Examiner's Recommendation:** _Although based on this Mr Radican does have his potential to get worse due to his occ and the number of miles he drives each month. Medical supports TTD his occ. Claim will be set prior to award interest to the clmnt & casting._

**RSL00231**

**Reply:** _MRI 3/29/96 shows herniation at L1-L3-4 w/ degeneration of discs w/ disc being reabsorbed _____ Mr Radican _____ _____ _____ _____ _____ _____ _____ _____ _____ _____

| | | |
|---|---|---|
| Name: _____ | Date: _____ | Phone: _____  (cr 10/96) |

## TELEPHONE CONVERSATION RECORD

Check here if Initial Interview __
**Circle all that apply:**    LIFE    WOP    (LTD)    STD    Other: _____

| | | |
|---|---|---|
| Insured name: James Radican | SS #: | |
| Claim Number: INSURED | Policy Number: | |

Conversation with: INSURER    Call taken/made by: _____

☐ Incoming Call    ☒ Outgoing Call    Telephone Number: (954) 421-1640

### *Don't forget to include Date & Time!*

| Date | Time | |
|---|---|---|
| 11/20/98 | 11:30AM | Called clmnt re his RTW date and Dr. who treated him around DOL. |
| | | Clmnt was advised by his doctor to wk PT. His employer did not allowed him to work PT therefore he had to go out on disability. He worked PT for about 1 yr after his surgery until he was 1996. Dr. Porth was his treating Dr around DOL. |
| | | Dr. Porth send him to a clinic for epidural block trisser point. |

RSL00232

tcr9/97

## TELE_HONE CONVERSATION REC_RD

Check here if Initial Interview ___

*Circle all that apply:*    LIFE    WOP    (LTD)    STD    Other: _____

| | | | |
|---|---|---|---|
| Insured name: *James Radican* | | SS #: _____ | |
| Claim Number: *1447-346-010* | | Policy Number: _____ | |

Conversation with: *Ms. Fischer*     Call taken/made by: *James*

[X] Incoming Call    ☐ Outgoing Call    Telephone Number: *757 858-6502*

### *Don't forget to include Date & Time!*

| Date | Time | |
|---|---|---|
| 1/27/98 | 10:55Am | Salary EE on Sal continuance. He continued to Rec'd Salary. They did not keep accurate time when Claim. NO attendance recds on Expt Salary EE. He may have RTW in Feb, 1996. Ms. Fischer will submt this info VIA Fax to my attention. |
| 1/27/98 | 2pm | Called Sale Orlandos Sales office at 1800 221-2693 for a copy of Tarmac Americas prior carrier Policy. Lm on Jeanene Voice mail. |

RSL00233

tcr9/97

**TELE.. .ONE CONVERSATION REC  .D**

Check here if Initial Interview __

*Circle all that apply:*    LIFE    WOP    LTD    STD    Other: _____

Insured name: _____    SS #: _____

Claim Number: _____    Policy Number: _____

Conversation with: _____    Call taken/made by: _____

☐ Incoming Call    ☐ Outgoing Call    Telephone Number: _____

## *Don't forget to include Date & Time!*

Date    Time

RSL00234

tcr9/97


**Reliance Standard Life Insurance Company®**

162566

December 26, 1997

Dr. Manual Porth
7171 N. University Drive
Tamarac, Florida 33321

|                        |   |                    |
|------------------------|---|--------------------|
| Regarding              | : | James E. Radican   |
| Social Security No.    | : | 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        |
| Date of Birth          | : | 04/17/1926         |
| Claim No               | : | 1997-346-010       |
| Policy No.             | : | LSC LSC 98842      |

Dear Dr. Porth:

We are the Long Term Disability Insurance carrier for the insured listed above. As your patient has applied for Long Term Disability benefits under their policy, we are requesting the following information from you to determine if your patient is eligible for those benefits:

❏   **A COPY OF YOUR FILE FROM _01/01/97 TO THE PRESENT_**. Be sure to include consultation, laboratory and/or diagnostic study reports and discharge summaries.

❏   Supply the names and **mailing** addresses of any other physicians you know to be treating the claimant.

Please return this correspondence (or a copy) with your response. An authorization to release information completed by the insured is attached.

Sincerely,

James A. Wilson
LTD Claims Examiner
215.787.3854

## IF THERE IS A CHARGE FOR COPYING THESE RECORDS, PLEASE INCLUDE YOUR FEDERAL TAX IDENTIFICATION NUMBER TO RELEASE PAYMENT.

**RSL00235**

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500



## COLUMBIA SURGERY CENTER AT CORAL SPRINGS
CORAL SPRINGS, FL.

**PATIENT NAME:**          **RADICAN, JAMES**
**ROOM NO.:**
**MR NUMBER:**             298451
**ADMIT DATE:**            07/26/96


**REFERRING PHYSICIAN:**       Manuel Porth, M.D.
**CONSULTING PHYSICIAN:**      Alan Siegel, M.D.
**DATE OF CONSULTATION:**      07/26/96


Dear Dr. Porth:

Thank you for your referral of Mr. James Radican. As you can recall, he is a gentleman with herniated discs at L1-L2 and L3-L4. He had undergone a spinal fusion from L4-L5 go L5-S1 and also probably had some component of myofascial back pain in the lower part of his back. Since your referral of this nice gentleman to the Pain Center here, he has undergone a full series of three epidural steroid injections at the T12-L1 level. The injections were performed at this level due to a scar extending from the low sacral region all the way up to and including the L1-L2 interspace. The patient has responded fairly well to the injections with what he describes as mild to moderate symptomatic relief. He states that he notes less pain in the left lower extremity and buttock as compared to before the treatment and he feels that his level of activity is less impaired by pain. He certainly has not had a dramatic improvement but I feel that it was certainly beneficial for him to have the treatment.

At this point, because he has completed his series of injections, I have referred the patient back to you for further course of action. Perhaps continued physical therapy and possibly a trial of tricyclic anti-depressant medication at night (Elavil 25 milligrams q.hs or Sinequan at the same dose) would be of benefit to the patient. I would expect the primary care physician to deal with this. The patient was advised that he could return for another injection in no less than six

RSL00236

## CONSULTATION REPORT
PAGE 1

*102566-0*

## COLUMBIA SURGERY CENTER AT CORAL SPRINGS
### CORAL SPRINGS, FL.

| | |
|---|---|
| **PATIENT NAME:** | **RADICAN, JAMES** |
| **ROOM NO.:** | |
| **MR NUMBER:** | 298451 |
| **DATE:** | 02/25/97 |
| **ATTENDING PHYSICIAN:** | Alan Siegel, M.D. |

### PAIN RELIEF CENTER

| | |
|---|---|
| **REFERRING PHYSICIAN:** | Manuel Porth, M.D. |
| **PRIMARY CARE PHYSICIAN:** | Dr. Jack Peicher |
| **DATE OF PROCEDURE:** | February 25, 1997 |
| **NAME OF PROCEDURE:** | Epidural steroid injection and trigger point injection X 1. |
| **SURGEON:** | Alan Siegel, M.D. |

**INDICATIONS:**

The patient is a pleasant 66-year-old gentleman well known to me who returns for his second injection as treatment for chronic low back and leg radicular pain secondary to a mixed diagnosis of herniated disc at L1-L2, L3-L4, and myofascial pain syndrome. The patient has had spinal fusion at L4-L5 and L5-S1 in the past. We did his last injection approximately one week ago and he feels that he is starting to get back to where he was after the first series of injections with marked decrease in the radicular pain of the left leg. He still notes some pain in the lower back region. He desires one more injection today to attempt to achieve additional pain relief. No further injections will be performed thereafter because of the concern over steroid side effects.

**DESCRIPTION OF PROCEDURE:**

The patient was placed in the sitting position and standard monitors were applied. The T12-L1 interspace was identified. This corresponded to the first interspace noted above the superior aspect of his well healed midline lumbar scar. The skin was prepped sterilely with Betadine solution X 3 and a drape applied. The skin and underlying ligaments were anesthetized with 1% Plain Lidocaine X 5 ml. A #20 gauge 3.5 centimeter Tuohy needle was introduced into the epidural space with a midline air loss of resistance technique. No heme, cerebrospinal fluid, or paresthesias were noted. Injection was carried out with Bupivacaine 0.25% Plain X 4 ml followed by an injectate containing

## OPERATIVE REPORT
RSL00237
### PAGE 1

## COLUMBIA SURGERY CENTER AT CORAL SPRINGS
CORAL SPRINGS, FL.

**PATIENT NAME:**              RADICAN, JAMES
**DICTATING PHYSICIAN:**       Alan Siegel, M.D.


Depo-Medrol 120 milligrams plus Bupivacaine 0.25% Plain X 5 ml, total volume diluted to 12 ml with preservative free normal saline. The patient tolerated the injection well.  He was observed in the right lateral decubitus position for the next 20 minutes, during which time his vital signs remained stable.  He did not develop a significant sensory or motor block and was eventually discharged from the facility in good condition.

**PLAN:**

The patient was informed that he could return for an additional injection in no less than six months.  If he continues to have pain that is mostly in the lower back and without radicular symptoms, we could consider doing trigger points only without any steroid if he desires.  In addition, I have advised him to continue taking the hs dose of Doxepin which was prescribed for him on his last visit.


_____
Alan Siegel, M.D.

AS/kr  :61854
D: 02/25/97  T: 02/26/97 10:11 am
cc:       Manuel Porth, M.D.

cc:       Dr. Jack Peicher

**RSL00238**

## OPERATIVE REPORT
### PAGE 2

## COLUMBIA SURGERY CENTER AT CORAL SPRINGS
CORAL SPRINGS, FL.

**PATIENT NAME:**        RADICAN, JAMES
**DICTATING PHYSICIAN:**     Alan Siegel, M.D.


months should he note an exacerbation of his pain and desire an injection.  Again, I thank you very much for your referral of this very pleasant gentleman.

Sincerely yours,

_____
Alan Siegel, M.D.
Medical Director
Columbia Surgery Center at
Coral Springs


AS/kb  :xx
**D:** 07/29/96  **T:** 07/29/96 9:29 am
cc:

cc:  Dr. Jack Peicher
     4700 Federal Highway
     Ft. Lauderdale, Florida


**RSL00239**

# CONSULTATION REPORT
PAGE 2

# RADIOLOGY ASSOCIATES, P.A. OF FORT LAUDERDALE

NUCLEAR MEDICINE                                        ULTRASONOGRAPHY

MAGNETIC RESONANCE IMAGING          RADIOLOGY          COMPUTERIZED TOMOGRAPHY

TELEPHONE 772-9220                  4542 NORTH FEDERAL HIGHWAY
FAX 772-9226                        FORT LAUDERDALE, FLORIDA 33308

G. MENDEZ, JR., M.D.                                    226 SOUTHEAST TWELFTH AVENUE
M. J. SIMON, M.D.                                       FORT LAUDERDALE, FLORIDA 33301
A. J. MARTI, M.D.
O. R. COHEN, M.D.                                       UNIVERSITY HOSPITAL
A. CONYERS, M.D.                                        7201 N. UNIVERSITY DRIVE
M. ALARCON, M.D.                                        TAMARAC, FLORIDA 33521
A. ALARCON, M.D.                                        VENCOR HOSPITAL
W. P. CALVERT, M.D.                                     1516 LAS OLAS BOULEVARD
                                                        FORT LAUDERDALE, FLORIDA 33301

                                                        HCA NORTHWEST REGIONAL HOSPITAL
                                                        5801 COLONIAL DRIVE
Dear Dr. Gieseke:          129604 M                     MARGATE, FLORIDA 33063

                           **RADICAN, James E.**
                           **August 8, 1995**

**LUMBAR SPINE SERIES:**
Frontal and lateral projections were performed before attempted flexion and extension were
performed. This study is evaluated with comparison to a prior lumbar spine series dated 5/18/94.

There is a stable appearance of previously described postsurgical findings involving the lower
lumbar spine and upper sacrum. Findings of degenerative disc disease and severe interspace
narrowing is again demonstrated involving the L5-S1 level and, to a lesser extent, the remaining
lumbar levels. There is no interval development of a fracture, subluxation, or focal lytic or
blastic process. During attempted flexion and extension, which appear limited, there is no
instability identified.

**IMPRESSION:**
Compared to a prior exam dated 5/18/94, there is no significant change in the appearance of
extensive postsurgical and degenerative changes involving the lumbosacral region. There is no
interval development of a fracture, subluxation, or a focal lytic or blastic process. There is no
instability identified during attempted flexion and extension.

Thank you for your referral.

                           Alex J. Marti, M.D.

AJM:db

CC: Report faxed to Dr. Jack Peicher (Fax #351-1197)

RSL00240

# TARMAC
## TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35152

Location: Bank Client

Employee Vendor #:

Name: Tom Radical

Mailing Address: 3800 NW 71 St. / Coconut Creek FL 33073

Daytime Phone: 1-800-458-4250

Date: 10/4/01

| Date | Description of Expenses | Transportation Or Car | Other | Hotel | Meals | Entertain | Other |
|------|------------------------|------|------|------|------|------|------|
| 10-1 | Car Wash | 1.25 | | | | | 1.— |
| 10-2 | Extra Batteries | | | | | | 1.69 |
| 10-18 | Car Wash | 1.25 | | | | | |
| " | Tolls 2 Taxis to Miami at $2.50 | 5.00 | | | | | |
| 10-23 | " | 2.50 | | | | | |
| 10-23 | Lunch (D. Versailles – M. Exter Co. | | | | | 20.— | |
| 10-28 | (Col. Nicholson – HAN Exhibit) | | | | | 12.— | |
| 10-29 | 3 Tolls to Miami 2. at $2.50 | 5.7 | | | | | |
| 10-30 | | | | | | | 53.72 |
| 10-30 | Bill So. Mob. Lift | | | | | | |

Brought Forward from Cont'n Sheet No.

Mileage Allowance @ _____ Per Mile x Number of Business Miles

Charges paid by Tarmac (such as airfare, memo only)

Column Total: 29.— | | | | | 39.— | 61.51

|  | | | |
|--|--|--|--|
| 855-101 | 855-102 | 855-103 | 855-104 | 855-105 | 855-106 | 855-107 | 855-108 |
| | | | | | | 39.— | 61.51 |

| Current Odometer Reading | 62,400.0 |
| Previous Odometer Reading | 58,500.0 |
| Total Miles Traveled | 900.0 |
| Business Miles | 850.0 |
| Private Miles | 50.0 |

Employee Signature: [signature]  Date: 10-30-96

Approved Signature: [signature]  Name: Michael ____ Date: 10/30/96

Total All Expenses Paid By Employee: 129.51
Less Cash Advance:
Amount Due Employee (Tarmac): 129.51

Forward to: Tarmac, 1101 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

RSL00110

TARMAC

TRAVEL AND ENTERTAINMENT EXPENSE REPORT
NOR

Cost Center: 35152

Location: Bill Crout

Employee Vendor #:
Name: Jim Harlan
Mailing Address: 1800 N.W. 71 St
Bacnut Cah, FL 33013
Daytime Phone #: 1-800-458-4230

| Date | Description of Expense | Transportation | | | Hotel | | Meals | Entertain | Other |
|---|---|---|---|---|---|---|---|---|---|
| | | Car | Other | | | | | | |
| 9-17 | Lunch (L. Caswell - Caswell Plant) | | | | | | | 19.7 | 52.82 |
| 9-30 | Bill South Mobility | | | | | | | | |
| 9-30 | Tolls for month 2-days to Miami | 5.7 | | | | | | | |
| | | | | | | | | | |

Brought Forward from Cont'n Sheet No.

Mileage Allowance @ _____ Per Mile x Number of Business Miles _____

Charges paid by Tarmac (such as airfare, memo only)

| | Column Totals | | $5- | | ess-101 | ess-101 | ess-101 | ess-101 | ess-101 |
| | | | | | | | 15- | 57.82 |

Current Odometer Reading 57,800.0
Previous Odometer Reading 55,500.0
Total Miles Traveled 1,800.0
Business Miles 950.0
Private Miles 50.0

Mileage Allowance @

Employee Signature: [signature]
Date: 9-30-96

Approver Signature: [signature]
Name: Michael Unger
Date: 10/1/96

Total of All Expense Paid By Employee 82.52
Less Cash Advance
Amount Due Employee (Tarmac) 83.82

Tarmac, 1151 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

RSL00111

# TARMAC

TRAVEL AND ENTERTAINMENT EXPENSE REPORT

NORRC 05 28

Cost Center: 35752
Location: ANN CLINT

Employee/Vendor #:
Name: JIM BADEAU
Mailing Address: 1F 00 N W. 71 St.
Coconut Cala, FL 33015
Daytime Phone #: 1-800-459-4250

| Date | Description of Expenses | Transportation Co. Car | Other | Mileage Allowance $ | Hotel | Meals | Entertn | Other |
|---|---|---|---|---|---|---|---|---|
| 1-1 | Lunch (R. Scott - FLA. Parking) | | | | | | 27.— | |
| 8-7 | Car Wash | 5.25 | | | | | | |
| 8-8 | Auto Inspection (Emissions) | 10.00 | 10.— | | | | | |
| " | Auto Tag Renewal | 61.00 | 81.— | | | | | |
| 8-12 | Lunch (North Spancji Stucco) | | | | | | 89.— | |
| | (M. Becker) | | | | | | | |
| | (D. " ) | | | | | | | |
| | (J. " ) | | | | | | | |
| | (R. " ) | | | | | | | |
| 8-19 | Lunch (Chas. Fleming Plasterer) | | | | | | 18.7 | |
| 8-30 | Bill South Mobility | 8.00 | 8.— | | | | | |
| 8-30 | Tolls for month | | | | | | | |
| | 1- Trip to Miami 2.50 | | | | | | | |
| | 1- Trip to Ft Myers 5.50 | | | | | | | |
| | 8.— | | | | | | 57.82 | |
| | Column Totals | 8.25 | 79.— | 60.25 | 134.— | | 57.62 | |

RSL00112

Brought Forward from Cont'l Sheet No. _____

Mileage Allowance @ _____ Per Mile x Number of Business Miles _____

Charges paid by Tarmac (such as airfare, memo only) _____

Current Odometer Reading 58,500.0
Previous Odometer Reading 57,400.0
Total Miles Traveled 1,100.0
Business Miles _____
S.O. Code 8-30-96

Approver/es Signature
Employee Signature
Name: MYCHAEL UNGER
Date: 9/9/96

Tarmac, 1181 Azalea Garden Road, Norfolk, Va. 23502
Attention: Accounts Payable

655-101  655-102  655-103  655-104  655-105  655-106
Total of All Expenses Paid By Employee
Less Cash Advance
Amount Due Employee/(Tarmac)

281.07
281.07

# TARMAC

## TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35152

Location: B.H. Grant

NUI.

Employee Vendor #: 10/4/20/N

Name: Jim Ardean

Mailing Address: 1400 N.W. 71 St.

V 2572 Coconut Oak, Fl 33015

Daytime Phone #: 1-800-458-4250

| Date | Description of Expense | Transportation Co. Car | Other | Hotel | Meals | Entertain | Other |
|---|---|---|---|---|---|---|---|
| 7-3 | North Sponge Store (Mike & David) (lunch) | | | | 852 = | 63.— | |
| 7-24 | Florida Steve (John Roland) (lunch) | | | | | 23.— | |
| 7-24 | L-dist. Phone | | | | | | 1648 |
| 7-31 | Tolls - 2 days in Miami 42.50 Award Trip | 5.00 | 5 | | | | |
| 7-25 | BGCC South Mobility | | | | | | 55.82 |
| | | | | | | | |
| | | 635-101 | 635-108 | 635-104 | 635-105 | 635-102 | 635-103 |
| | Column Totals | 5.00 | 5.— | | | 86.— | 7628 |

Brought Forward from Cont'n. Sheet No. _____

Mileage Allowance @ _____ Per Mile x Number of Business Miles _____

Charges paid by Tarmac (such as airfare, memo only) _____

Current Odometer Reading 57,400.0

Previous Odometer Reading 56,700.0

Total Miles Traveled 700.0

Business Miles 650.0

Private Miles 50.0

Forwarded to: _____

Approved Signature: B.R. Ardean

Employee Signature: [signature]

Name: R.N. Anderson

Date: 7/31/96

Date: 7-31-96

Total of All Expenses paid by Employee 162.28

Less Cash Advance _____

Amount Due Employee (if none) 162.28

Tarmac 1151 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

RSL00113

# TRAVEL AND ENTERTAINMENT EXPENSE REPORT

TARMC

Cost Center: 35152

Location: Polk Elliott

Employee/Vendor #: 521 Jo

Name: Jim Barker
Mailing Address: 1800 NW 71 St
Coconut Creek, FL 33073
Daytime Phone #: 1-800-458-4250

| Date | Description of Expense | Transportation Pub. Car | Other | Mileage Allowance @ | Paid | Meals | Entertain | Other |
|---|---|---|---|---|---|---|---|---|
| 6-7 | Lounge & Whips (A. Aschu) (Coral Springs Mall) | | | | | | | |
| 6-18 | Lunch (W. Coleman — Barber Sup.) | | | | | 30.— | | |
| 6-19 | Car Wash | | ✓ | | | 17.— | | |
| 6-30 | Phone Exp. — Bell South | 11.25 | | | | | | |
| " | Bell South Mobility | | | | | | | 22.81 |
| | | | | | | | | $2.92 |

635-101: 11.25
635-104: 30.—
635-102: 47.—
635-100: $2.63

Column Totals

Pre Mile x Number of Business Miles

Mileage Allowance @ _____

Charges paid by Tarmac (such as airfare, memo only)

Employee Signature: [signature]    Date: 6-30-96

Approver Signature: [signature]    Name: R.N. Andros    Date: 7/5/96

| | |
|---|---|
| Current Odometer Reading | 56,700.0 |
| Previous Odometer Reading | 55,900.0 |
| Total Miles Traveled | 900.0 |
| Business Miles | |
| Private Miles | 50.0 |

Total of All Expenses Paid By Employee: 140.88
Less Cash Advance:
Amount Due Employee (Vendor): 140.88

Brought Forward from Cont'n Sheet No. _____

Forward to: Tarmac, 1151 Azalea Garden Road, Norfolk, Va. 23502
Attention: Accounts Payable

**RSL00114**

# TARMAC

## TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35152

Location: Palm Court

JUN 6 1996

Employee Vendor #:

Name: Jim Andrews

Mailing Address: 1600 N.W. 71 St. Coconut Oak, FL 33013

Daytime Phone #: 1-800-458-4250

| Date | Description of Expense | Transportation Co. Car | Other | Mileage Allowance $ | 835-101 | 835-100 | 835-104 | 835-102 | 835-106 | Meals | Entertain | Other |
|------|------------------------|----|----|----|----|----|----|----|----|----|----|----|
| 5-21 | Lunch (All-Star Bldg Sys) R. Willis | | | | | | | | | | | 59.82 |
| 5-86 | Lunch (Clancy Plat.) M/m C. Clancy | | | | | | | | 16.— | | | |
| 5-31 | Bell South Mobility | | | | | | | | 53.— | | | |
| | | | | | | | | | | | | |
| Column Totals | | | | | | | | | 69.— | | | 59.82 |

Brought Forward from Cont'n Sheet No.

Mileage Allowance @ _____ Per Mile x Number of Business Miles _____

Charges paid by Tarmac (such as airfare, memo only)

| | | | Employee Signature | | Total of All Expense Paid By Employee | 128.82 |
|--|--|--|--|--|--|--|
| Current Odometer Reading | 55,500.0 | | | | Less Cash Advance | |
| Previous Odometer Reading | 55,200.0 | Name: | | | Amount Due Employee (Tarmac) | 128.82 |
| Total Miles Traveled | 600.0 | Date: 5-31-96 | | | | |
| Business Miles | 550.0 | | | | | |
| Private Miles | 50.0 | | | | | |

Forward to: Tarmac, 1151 Azalea Garden Road, Norfolk, Va 23502

Attention: Accounts Payable

RSL00115

# TARMAC — TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35152

Location: Bulk Cement

Employee Vendor #: 1017601

Name: Jim Adkins

Mailing Address: 1800 N.W. 71 St. Coconut Crk. FL 33073

Daytime Phone #: 1-800-458-4250

| Date | Description of Expense | Transportation Co. Car | Mileage Allowance $ | Other | Hotel | Meals | Entertain. | Other |
|------|------------------------|------------------------|---------------------|-------|-------|-------|-----------|-------|
| | | 635-101 | 635-101 | 635-103 | 635-104 | 635-105 | 635-102 | |
| 4-30 | Bulk Sale N. | | | | | | | 59.82 |

Approver's Signature: (signature) 6/3/96

Name:

Date:

Brought Forward from Cont'n Sheet No.

Mileage Allowance @ ___ Per Mile x Number of Business Miles _____

Charges paid by Tarmac (such as airfare, memo only)

Employee Signature: G. Rubin

Date: 4-30-96

Current Odometer Reading: 55,200.0
Previous Odometer Reading: 54,500.0
Total Miles Traveled: 700.0
Business Miles: 650.0
Private Miles: 50.0

Forward to: Tarmac, 1181 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

Column Totals: 59.82

Total All Expenses Paid By Employee: 59.82
Less Cash Advance:
Amount Due Employee (Tarmac): 59.82

RSL00116

# TARMAC

## TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35152

Location: Palm Beach

APR 8 1996

1/14/01

Employee Vendor #: _____
Name: Jim Barreau
Mailing Address: 1800 N W 21 St.
Pompano Cak, FL 33055
1-800-858-4250
Daytime Phone #: _____

| Date | Description of Expense | Transportation Co. Car | Other | Mileage Allowance $ 635-101 | 635-105 | 635-104 | Hotel | Meals 635-102 | Entertain 635-103 | Other |
|------|-----------------------|-------------------------|-------|------------------------------|---------|---------|-------|----------------|--------------------|-------|
| 3-21 | L. Dist. Phone | | | | | | | | | 27.45 |
| 5-29 | Bell South Mobility | | | | | | | | | 59.82 |

Column Totals: 87.27

Approver Signature: _____

Brought Forward from Cont'n Sheet No. _____

Mileage Allowance @ _____  Per Mile x Number of Business Miles: _____

Charges paid by Tarmac (such as airfare, memo only): _____

Employee Signature: _____
Name: _____
Date: 5-31-96

Current Odometer Reading: 54,550.0
Previous Odometer Reading: 53,900.0
Total Miles Traveled: 700.0
Business Miles: 650.0
Private Miles: 50.0

Total of All Expenses Paid By Employee: 87.27
Less Cash Advance: _____
Amount Due Employee (Tarmac): 87.27

Forward to: Tarmac, 1151 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

RSL00117

RMAC

TRAVEL AND ENTERTAINMENT EXPENSE REPORT

35152

Park Crout

Employee/Vendor #: 101706/

Name: Jim Adreu

Mailing Address: 1600 N.W. 71 St.

Bacout Cak. Fl. 33023

Daytime Phone #: 1-800-458-4250

| Date | Description of Expense | Transportation Co. Car | Other | Hotel | Meals | Enterain | Other |
|---|---|---|---|---|---|---|---|
| 2-17 | (Honda Classic - Coral Springs Fl. | | | | | 232.5 | |
| 2-31 | Lunch (North Springs Store) | | | | | 22.- | |
| " | L-Dist Phone | | | | | | 56.58 |
| 2-16 | Tolls | 6.- | | | | | |
| 2-28 | " | 4.- | | | | | |
| 2-25 | Lunch (All Star Bldg Sys) | | | | | 81.- | |
| 2-29 | Bell South Mobility | | | | | | 81.58 |

Brought Forward from Cont'n Sheet No.

Mileage Allowance @ _____ Per Mile x Number of Business Miles _____

Charges paid by Tamac (such as airfare, memo only)

Column Totals: 635-101 10.- | 635-106 | 635-104 | 635-105 | 635-102 355.- | 635-103 118.56

Current Odometer Reading 53,500.0
Previous Odometer Reading 53,000.0
Total Miles Traveled 500.0
Business Miles 750.0
Private Miles 50.0  Date: 2-29-96

Approver Signature

Employee Signature

Name:
Date: 3/5/96

Total of All Expenses Paid By Employee 933.56
Less Cash Advance
Amount Due Employee/(Tamac) 933.56

Mileage Allowance $

Forward to: Tamac, 1151 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

RSL00118

# TARMAC / TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Cost Center: 35752

Location: BANK CREDIT

Employee/Vendor #: 10174x0

Name: JIM BARICH

Mailing Address: 1100 N.W. 7L ST  Chestnut Oak Fl 31015

Daytime Phone #: 1-800-458-4250

| Date | Description of Expense | Transportation Co. Car | Other 855-106 | Hotel 855-107 | Meals 856-105 | Entertn 856-102 | Other 855-100 |
|------|------------------------|------------------------|---------------|---------------|---------------|-----------------|---------------|
| 12-6 | Rubbish Tun | | | 65.45 | | | |
| " | Lunch (Cape Supply) | | | | 10.— | 18.— | |
| " | Dinner (Sinco+3 Sup) | | | | 34.— | 35.— | |
| 12-7 | Lunch (Florida Steel) | | | | 20.— | 20.— | |
| 12-8 | " (Hughes Sup.) | | | | 16.— | 16.— | |
| " | Tolls for Week | 10.— | | | | 177.00 | |
| " | Basket Ball Toticth (All Star Sup) | | | | | 131.60 | |
| 12-11 | Lunch (Stancast Sup.) | | | | | 11.— | |
| 12-15 | L-Dit Mode | | | | | | 33.15 |
| " | Tolls for Wk | 5.— | | | | | |
| 12-27 | X-Mas Fruit Baskets | | | | | | 135.69 |
| 12-22 | Dinner (Bordeo Sup. Co.) | | | | | 81.— | |
| " | Tolls for Week | 5.— | | | | | |
| 12-26 | Dinner (Apocta Steel) | | | | | 23.— | |
| 12-30 | Bell South Mobilit | | | | | | 17.6.97 |
| " | Tolls for Wk | 4.— | | | | | |
| | | | | | | | |
| Column Totals | | 24.— | | 65.45 | | 336.60 | 311.39 |

Brought Forward from Cont'in Sheet No.

| | Mileage Allowance @ | Per Mile x Number of Business Miles | Mileage Allowance $ |
|---|---|---|---|

Charges paid by Tarmac (such as air fare, memo only)

Employee Signature:

Approver Signature:

Name:

Date: 12-31-95

| Current Odometer Reading | 54,800.0 |
|---|---|
| Previous Odometer Reading | 49,600.0 |
| Total Miles Traveled | 4,800.0 |
| Business Miles | 3,380.0 |
| Private Miles | 20.0 |

Total of All Expenses Paid By Employee: 740.87

Less Cash Advance:

Amount Due Employee/(Tarmac): 740.87

Forward to: Tarmac, 1151 Azalea Garden Road, Norfolk, Va 23502  
Attention: Accounts Payable

RSL00119

TRAVEL AND ENTERTAINMENT EXPENSE REPORT

Employee Vendor #:
Name: Jim Radich
Mailing Address: 3800 N.W. 71 St.
Coconut Creek, FL 33073
Daytime Phone #: 1-800-451-4250

Ref: 35752
Beth Crout

| Date | Description of Expenses | Transportation Bs. Car | Other | Hotel | Meals | Entertain | Other |
|------|------------------------|------------------------|-------|-------|-------|-----------|-------|
| 1-26 | Tolls for wk 2-days 2.50 | 5.- | | | | | |
| 1-29 | Lunch (Suncoast Sys) | | | | 31.- | | |
| 1-30 | Bell South mobility | | | | | | 65.38 |
| 1-31 | Tolls for wk | 4.- | | | | | |
| | | | | | | | |
| | | | | | | | |
| | Column Totals | 13.- | | | 54.45 | 589.- | 25.45 |
| | Mileage Allowance $ | | | | | | |
| | | 655-101 | 655-103 | 655-104 | 655-105 | 635-102 | 655-100 |
| | | -22- | | 54.45 | 420.- | | 89.83 |

Brought Forward from Con't Sheet No.

Mileage Allowance @ _____ Per Mile x Number of Business Miles _____

Charges paid by Tamsco (such as airfare, memo only) _____

Employee Signature: _____
Date: 1-31-96

Approver Signature: _____
Name: _____
Date: 2/7/96

Total All Expenses Paid By Employee     585.23
Less Cash Advance
Amount Due Employee/(Tamsco)     585.23

Current Odometer Reading
Previous Odometer Reading
Total Miles Traveled
Business Miles
Private Miles

Forward to: Tamsco, 1101 Azalea Garden Road, Norfolk, Va 23502
Attention: Accounts Payable

RSL00120

 **Reliance Standard Life Insurance Company**

May 7, 1999

Hope B. Fischer
Tarmac America, Inc
1151 Azalea Garden Road
Norfolk, VA 23502

Re:          James E. Radican
Claim #:     1997-346-010
Policy #:    LSC 98842
S.S. #:      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

Dear Ms. Fischer:

We are writing to you regarding the Long Term Disability ("LTD") claim for one of your former employees, James E. Radican. On March 26, 1999, we wrote to you with a request for some additional information which was needed to help us evaluate Mr. Radican's eligibility for benefits under the terms of your policy. (We have enclosed a copy of that request for your review.) To date, we have not yet received a reply to our request for additional information.

Could you please respond to our letter dated March 26, 1999 at your earliest convenience? Should you have any questions, please feel free to contact me at 1(800)351-7500 ext. 4165.

Sincerely,

Richard D. Walsh
Assistant Manager, Quality Review Unit


cc:     Lawrence D. Bache, Esq. (w/o enclosures)



**Reliance Standard ,fe
Insurance Company**®

March 26, 1999


Gary Gieske, M.D.
1930 NE 47th Street - Suite 200
Fort Lauderdale, FL 33308

Re:          James E. Radican
Claim #:     1997-346-010
Policy #:    LSC 98842
S.S. #:      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
D.O.B.:      4/20/30

Dear Dr. Gieske:

As you may be aware, we are the Long Term Disability Carrier for the above named patient. We
are currently in the process of reviewing this claim but we have found that we are in need of
some additional information. We have previously (12/97) requested records from your office
regarding Mr. Radican. Unfortunately, we realized that the records which you sent to us in early
1998 were for a James A. Radice not the records for James E. Radican as per our request.
Accordingly, we need to request the records for James E. Radican again. (Please be assured that
the records regarding Mr. Radice which were sent to us in error have not and will not be released
outside of our office.)

**Could you please forward copies of any and all office notes/treatment records; diagnostic
test results; consulting physician reports; etc. regarding JAMES E. RADICAN from
Janaury of 1995 to the present.**

Enclosed is an authorization signed by the insured which allows you to release this information
to Reliance Standard.

Reliance Standard is willing to reimburse you a reasonable fee for this service. Should you
require such a fee simply enclose a bill, including your Federal Tax ID number, with your reply.

Should you have any questions please feel free to call me at 1(800)351-7500 ext. 4165

Sincerely,



Richard D. Walsh
Assistant Manager, Quality Review

**RSL00122**

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

 **NSA**

NEUROLOGICAL SURGERY ASSOCIATES



• F. GARY GIESEKE, M.D. - F.A.C.S.
• MATTHEW R. MOORE, M.D.
• JOHN A. COATS, M.D.

F. Gary Gieseke, M.D., PA.
1930 N.E. 47th Street
Fort Lauderdale, Florida 33308

FAX: 491-4892

4/13 19 99

Neurological Surgery
F. Gary Gieseke, M.D., F.A.C.S.
Matthew R. Moore, M.D.
John A. Coats, M.D.
Reliance Standard Life
2501 Parkway
Philadelphia PA 19130-2499

For Professional Services:  James Radican

There is a fee of $25.00 for the copying of our records. Please remit
payment at your earliest convenience. Thank you.

Tax i.d.: 59-1222190

1930 N.E. 47th Street
Ft Lauderdale
suite 200
Florida
33308

954 / 771-4251
fax • 954 / 431-4892

**RSL00123**

 **NEUROLOGICAL SURGERY ASSOCIATES**    

• F. GARY GIESEKE, M.D. - F.A.C.S.
• MATTHEW R. MOORE, M.D.

RE: James Radican
DATE: 1/31/94

This patient is a 63 year old male who had back problems back in 1973 and had a laminectomy and fusion in Indiana, apparently L4 distally. He has had problems with his back off and on over the years, and in 1992 was having considerable difficulty and was evaluated by Dr. Gomez and also apparently had a course of epidural steroids.

The patient describes the pain as being across his back and really does not go down the legs at all. This has been extremely severe. He saw Dr. Merkle and five days ago received an injection on the right side in approximately the sacroiliac area and had rather marked improvement which has continued. The patient denies any weakness or numbness and tingling in the lower extremities.

REVIEW OF SYSTEMS: Intermittent migratory joint pain.

ALLERGIES: Penicillin, and states one anti-inflammatory, but he cannot recall the name.

PAST MEDICAL HISTORY: Quadruple bypass in 1987. Right shoulder surgery, kidney stone surgery and two hernia repairs.

MEDICATIONS: Feldene and Mevacor.

PHYSICAL EXAMINATION: The patient is awake, alert and conversant.
Speech is normal.
GAIT: Appears normal.
BACK: Tenderness in the lumbosacral region.
STRAIGHT LEG RAISING: Limited at around 55 degrees.
EXTREMITIES: No atrophy.
MOTOR: No weakness.
SENSATION: Intact to pin-prick.
REFLEXES: Knee jerks 1+ and equal. Ankle jerks 1+ and equal.

The patient did have a myelogram in April 1992 at Holy Cross Hospital which reveals fusion at L4 distally. No definite herniated disc is felt to be present, but there is some slight stenosis at L3-4.

1930 N.E. 47th Street
Fort Lauderdale
Florida
33308

305 / 771 - 4251
Fax • 305 / 431 - 4320

RSL00124

 NEUROLOGICAL SURGERY ASSOCIATES



- F. GARY GIESEKE, M.D. - F.A.C.S.
- MATTHEW R. MOORE, M.D.

RE:  James Radican
DATE:  1/31/94

Page 2

MRI performed in January 1990 is reported as showing multiple level disc disease and degenerative changes with some scarring at the L5 level.

X-rays from January 1992 in flexion-extension revealed no abnormal movement.

IMPRESSION:  1.  Status post-op discectomy and fusion, L4 to sacrum -- 1973.
2.  Probable arthritis -- sacroiliac – bilateral.
3.  Possibility of central herniated disc -- L3-4.

DISCUSSION:  I would be very hesitant to consider surgical intervention on this patient.  I would be more in favor of a conservative course.  Would stop the Feldene and switch to Voltaren 50mg tid with meals.  Also, sometimes Elavil helps with pain like this and this would be 25mg qam and 50mg qhs.  In the meantime, you might try him on some Talwin NX or something that is not very addictive.

F. Gary Gieseke, M.D.

FGG:wjr
cc:  Jack Peicher, M.D. (fax)- つ-つ-c-{

1930 N.E. 47th Street
Fort Lauderdale
Suite 200
Florida
33308

305 / 771 - 4251
Fax • 305 / 491 - 4392



NEUROLOGICAL SURGERY ASSOCIATES



• F. GARY GIESEKE, M.D. - F.A.C.S.
• MATTHEW R. MOORE, M.D.

RE:  James Radican
DATE:  5/13/94

This patient is seen in follow-up and did see Dr. Szeinfeld, and had epidural steroids plus injection of trigger points.  He was helped temporarily, but unfortunately the pain has returned.  The pain is still the same.  That is, across the low back only and really no radicular pain down his legs at all.  He has had some hip pain in the past from some degenerative arthritis, and has had his hips injected, but he can tell the difference in the type of pain; this feels more like it is from the back.  There is no weakness or numbness of the lower extremities.

EXAMINATION:  Unchanged from that of January 1994 when I first saw him, as there is no weakness, numbness and reflexes are equal.

He did have an MRI dated 3/18/94 with and without contrast and this was read by Dr. Schnell, and no abnormalities were seen on the enhanced study, and there was just degenerative changes and no herniated disc was present.

DISCUSSION:  I would be hesitant about rushing into any surgery.  He could have an instability problem, but he did have x-rays in flexion and extension of the lumbar spine in January 1992 which did not show any definite movement, but I feel that these should be repeated.  We will have him get these at Holy Cross.  If it does show some movement, he might be a candidate for a fusion, but I would be extremely hesitant to consider this unless it is something clear-cut.  If there is no movement, I feel that we will have him return to see Dr. Szeinfeld for evaluation for a stimulator insertion.

F. Gary Gieseke, M.D.

FGG:wjr
cc:  Jack Peicher, M.D. (fax)
     Marcos Szeinfeld, M.D. (fax)

1930 N.E. 47th Street
Fort Lauderdale
Suite 200
Florida
33308

305 / 771 - 4251
Fax • 305 / 491 - 4399

RSL00126



# NSA

**NEUROLOGICAL SURGERY ASSOCIATES**

• F. GARY GIESEKE, M.D. - F.A.C.S.
• MATTHEW R. MOORE, M.D.
• JOHN A. COATS, M.D.

RE:    James Radican
DATE:   8/14/95
WEST OFFICE

This patient is seen in follow-up. I have actually not seen him since January 31, 1994, which is the first time he was here, and his history is as documented then. Since that time he has seen Dr. Merkle, Orthopedics, and received some back injections which helped temporarily. He was told he could not have any more. He did go to the epidural steroids with Dr. Szeinfeld.

The patient's pain is across the back and is quite severe, and he is not even comfortable at night. He has found he cannot do anything and states that even having sex is impossible, as it simply hurts too much. There really is no radicular leg pain.

MEDICATIONS:   Naprosyn, Tagamet, Accupril, and Mevacor.

PHYSICAL EXAMINATION:
GAIT:    Stiff, but does not favor either leg.
BACK:   Tenderness, sacral.
MOTOR:   No weakness.
SENSATION:   Intact.
REFLEXES:   Depressed but equal.

This patient's last myelogram was at Holy Cross in April of 1992. It revealed fusion of the L4 distally, but I really did not see any herniated disk. There was slight stenosis of L3-4.

On August 8, 1995 the patient had flexion and extension x-rays performed by Dr. Marti, and this showed no instability during attempted flexion and extension.

RECOMMENDATIONS:   Will need a current myelogram with films done in the upright position with axial loading, as at times any disk appears to be more prominent. I am hesitant to consider surgical intervention unless one can actually see for sure what the problem is. If this does not show a definite surgical problem, he might then be a candidate for a spinal cord stimulator via Dr. Szeinfeld.

F. Gary Gieseke, M.D.

FGG:lmm

1930 N.E. 47th Street
Fort Lauderdale
Suite 200
Florida
33308

305 / 771 - 4251
Fax • 305 / 491 - 4892

RSL00127

# Holy Cross Hospital
4725 N. Federal Hwy. Ft Lauderdale, Florida

| | |
|---|---|
| NAME: | RADICAN ,JAMES E 953057579 |
| LOCATION: | OP |
| DATE: | 08/29/95 |
| DOB: | 04/20/30 |
| MR #: | 397167 |
| X-RAY NO.: | |

F GARY GIESEKE, M.D.

J.H. SLOVES, M.D.
Radiologist

H.R. WILKOV, M.D.
Radiologist

K.R. STEIN, M.D.
Radiologist

R.T. BAKER III, M.D.
Radiologist

T.B. McGINTY, M.D.
Radiologist

H.F. GARDINER, M.D.
Radiologist

C.F. TATE III, M.D.
Radiologist

T.B. BACHOW, M.D.
Radiologist

CLINICAL INFO:　**PERSISTENT LOW BACK PAIN. PREVIOUS LOW BACK FUSION 20 YEARS AGO.**

**LUMBAR MYELOGRAM;　　PROCEDURE;** Utilizing sterile technique and local anesthesia percutaneous insertion of a 25 gauge needle at L2-3 is accomplished without incident.　After removal of 1.5 cc of non-ionic contrast, 9 cc of Isovue M-200 is injected.　The needle is removed.　Multiple films are obtained.

**SUPERVISION AND INTERPRETATION;** The initial films in the direct upright position show evidence of a solid osseous fusion from the mid L4 body to S1 that is similar to the preceding study.　There are no ventral extradural defects below L4.

There is a moderate focal central ventral extradural defect at L3-4.　This central ventral extradural defect is increased from the preceding myelogram study of 4-1-92.　There is now evidence of moderate to high grade degenerative spinal stenosis present at L3-4.

There is a small focal central ventral extradural defect at L2-3. This is slightly increased from the previous study.　In the horizontal position there is slight posterior position of L2 on L3. This posterior position is accentuated in the upright position.　No significant spinal stenosis at L2-3 is present.

There is degenerative disc narrowing at L1-2 similar to the previous study.　There is a small focal posterior central ventral extradural defect at L1-2.　No spinal stenosis at L1-2 is present. The appearance of the conus medullaris and lower thoracic spinal cord are normal.　The patient has had previous CABG surgery.

**CT LUMBAR SPINE POST MYELOGRAM;** Multiple axial images are performed in the supine position through the five lumbar disc spaces and T12-L1.

CONTINUED.......................................　RSL00128

2

# Holy Cross Hospital
4725 N. Federal Hwy., Ft. Lauderdale, Florida

| | |
|---|---|
| NAME: | RADICAN ,JAMES E 953057579 |
| LOCATION: | OR |
| DATE: | 08/29/95 |
| DOB: | 04/20/30 |
| MR #: | 397167 |
| X-RAY NO: | |

F GARY GIESEKE, M.D.

| | |
|---|---|
| J.H. SLOVES, M.D.<br>Radiologist | T.B. McGINTY, M.D.<br>Radiologist |
| H.R. WILKOV, M.D.<br>Radiologist | H.F. GARDINER, M.D.<br>Radiologist |
| K.R. STEIN, M.D.<br>Radiologist | C.F. TATE III, M.D.<br>Radiologist |
| R.T. BAKER III, M.D.<br>Radiologist | T.B. BACHOW, M.D.<br>Radiologist |

PAGE TWO......................................................

CLINICAL INFO

There is no disc herniation present at T12-L1. The conus medullaris at this level is normal.

There is mild diffuse circumferential bulging of the posterior and posterior lateral annulus bilaterally at L1-2. No significant spinal stenosis is present at this level. The cauda equina is normal.

There is a small amount of gas in the degenerated L2-3 annulus. There is a minor focal left posterior lateral extradural defect on the subarachnoid space at L2-3. This change represents either asymmetric synovial proliferation or a small fragment of a disc herniation in this area.

There is diffuse circumferential bulging of the L3-4 annulus. There is gas in the left facet joint at L3-4 due to articular cartilage erosion. This articular cartilage erosion was present on the previous study. There has been progressive sagittal spinal stenosis produced at L3-4 since the previous CT study post myelogram of 4-1-92. This is due to progressive posterior central bulging of the L3-4 annulus.

There is solid osseous fusion at L4-5 and L5-S1. No evidence of a posterior disc herniation at L4-5 or L5-S1 is present.

There is calcification in a non-dilated infrarenal abdominal aorta and in both common iliac arteries.

RSL00129

CONTINUED ON NEXT PAGE............................

FORM 121403
REV 5/95

# Holy Cross Hospital
4725 N. Federal Hwy., Ft. Lauderdale, Florida 33308

NAME: **RADICAN ,JAMES E 953057579**
LOCATION: **OP**
DATE: **08/29/95**
DOB: **04/20/30**
MR #: **397167**
X-RAY NO.:

F GARY GIESEKE, M.D.

J.H. SLOVES, M.D. Radiologist
P.R. WALKOV, M.D. Radiologist
K.R. STEIN, M.D. Radiologist
R.T. BAKER III, M.D. Radiologist

T.B. McGINTY, M.D Radiologist
H.F. GARDINER, M.D. Radiologist
C.F. TATE III, M.D. Radiologist
T.B. BACHOW, M.D. Radiologist

CLINICAL INFO.

**PAGE THREE.................................**

**SAGITTAL/CORONAL/AXIAL RECONSTRUCTED IMAGES LUMBAR SPINE POST MYELOGRAM;** Multiple reconstructed images in the supine position show posterior position of L1 on L2 and L2 on L3 related to the degenerative disc disease at these levels. Anterior prolapse of the L1-2 and L2-3 annulus is present. There are posterior central ventral protruded disc herniations at L1-2, L2-3 and L3-4. The degree of spinal stenosis at L3-4 is not as advanced in the supine position as is present on the upright myelogram. There is documentation of solid osseous fusion from L4 through S1.

**IMPRESSION:** The combination of the lumbar myelogram and CT when compared to the previous study of 4-1-92 show the following findings:
1. There is a solid osseous fusion from L4 through S1 that has been present for approximately 20 years.
2. Progressive degenerative spinal stenosis at L3-4 that has occurred since 4-1-92. Moderate to high grade sagittal spinal stenosis is present at L3-4 on the present study. This is due to progressive posterior central disc herniation at this level. There is stable left facet joint articular cartilage erosion.
3. Small posterior central protruded disc herniations at L1-2 and L2-3 associated with degenerative disc disease that are similar to the previous study.
4. There is a small left posterior lateral protruded disc herniation at L2-3.

HRW\TW
8/29/95    17:30

**RSL00130**

FORM 12140G
REV 5/95

2



**Holy Cross Hospital**

Department of Pathology

Fred W. Reineke, MD
Raul H. Tapia, MD
Leonardo Castaneda, MD
Jon R. Fichtelman, MD

```
S95-7349
RADICAN,JAMES E
04/20/1930          65Y M
MR#:  397167
ACCT#: 000954034729
ATT. PHYS.: GIESEKE, GARY
ORD. PHYS.: GIESEKE, GARY
CC PHYS.:

PATIENT LOC.: 0487 1
```

```
DATE COLLECTED: 09/29/95
DATE RECEIVED:  09/29/95

PRE-OP DIAGNOSIS: HERNIATED DISC L2,L3,L4
POST-OP DIAGNOSIS: SAME

SPECIMEN:  DISC MATERIAL

MACROSCOPIC DESCRIPTION: 6 gm. aggregate of shredded fibrocartilage.
                        (RHT:cb)

MICROSCOPIC DESCRIPTION: Microscopic examination performed.

FINAL DIAGNOSIS: Debridement Tissue, Lumbar Spine:
                - Degenerated Fibrocartilage Consistent With
                  Herniated Nucleus Pulposus.



                          RAUL H. TAPIA, MD
                          PATHOLOGIST


RHT:seg
September 30, 1995
```

RSL00131

Holy Cross
Hospital
Ft Lauderdale, Florida

RADICAN ,JAMES
397167 954034729
4WA 0487 1

DSCH DATE:                          INIT:ATSSF     10/03/95

SURGEON:  DR. F. G. GIESEKE                 ASSISTANT:  DR. J. COATS

ANESTHESIOLOGIST:   DR. REYES - GENERAL

PREOPERATIVE DIAGNOSIS:       HERNIATED DISK L3-4 WITH SEVERE STENOSIS, RULE
                              OUT HERNIATED DISK L2-3 AND L1-2, BUT HAS
                              STENOSIS L1-2, L2-3.

OPERATION:                    DECOMPRESSIVE LAMINECTOMY, FORAMINOTOMY, L1-2,
                              L2-3, L3-4, PLUS MICRO LASER DISCECTOMY L3-4
                              USING MICROSCOPE GREATER THAN 250 POWER.

POSTOPERATIVE DIAGNOSIS:      HERNIATED DISK WITH STENOSIS SEVERE, L3-4,
                              STENOSIS L2-3.  NO HERNIATED DISK, STENOSIS
                              L1-2, NO HERNIATED DISK.

PROCEDURE:
This patient was taken to surgery, general anesthesia was initiated, the
patient was intubated.  The patient had been cleared preoperatively by Dr.
Peicher and group.   He was carefully placed in a prone position on the
Wilson frame with anesthesia taking care to avoid pressure on peripheral
nerves and plexuses.   The entire lumbosacral region was carefully prepped
according to Holy Cross Hospital prep recommendations.  This was then dried
and prospective incision marked.  Sterile drapes applied.   Two grams of
Rocephin given IV piggyback.  Sterile drapes were applied including Vi-drape.

The incision made upper L-1 to L-4.    Self-retaining retractor inserted.
Bleeding points controlled.  Fascia incised, paravertebral musculature drawn
laterally on each side and self-retaining retractor inserted.   Towel clips
were placed in spinous processes.   Transverse x-ray was taken for
localization and the various spinous processes carefully identified.

Decompressive laminectomy was carried out at L3-4 where there was severe
stenosis and this was alleviated and foraminotomy carried out.  Microscope
was brought in to position.  Herniated disk was seen to be present.   The
annulus was incised on the right side since it was the most symptomatic site.
Disk material was removed.   Large amounts were removed very carefully using
the conventional instruments plus the laser used to vaporize the edges of the
annulus and also down in the depths.  Decompression was carried out of the
nerve roots and the dural sac.

Date
Dictated: 9/29/95
cc: DR. J. PEICHER

Date
Transcribed:  October 3, 1995

**RSL00132**

Transcribed By:  saf

_____
F. GARY GIESEKE, M.D.

9/29/95
Date of
Surgery

Page 1

O P E R A T I V E   N O T E

Holy Cross
Hospital
Ft Lauderdale, Florida

RADIC... , .MES E
397167
4WA 0487 1

Decompressive laminectomy was carried out at L2-3. Stenosis was present but a herniated disk was actually partially calcified and was not herniated. Foraminotomy was carried out.

Decompressive laminectomy was carried out at L1-2. Foraminotomy carried out. Disk was not herniated but was simply bulging.

Epidural veins were a problem during the case and were difficult to control. Estimated blood loss was around 700 cc. Hemostasis was carried out with Gelfoam and thrombin and bipolar electrocautery. Irrigation was carried out. Sponge and patties were all removed and counts confirmed as correct on more than two occasions. Irrigation carried out with antibiotic solution. 80 mg of Depo-Medrol was then placed in the epidural space and adipose tissue from the subcutaneous area placed over the dura. The wound was then closed in multiple layers. Sterile dressing applied.

**RSL00133**

Date
Dictated: 9/29/95
cc: DR. J. PEICHER

Date
Transcribed: October 3, 1995

Transcribed By:  saf

9/29/95
Date of
Surgery

_____
F. GARY GIESEKE, M.D.

Page 2

O P E R A T I V E   N O T E

# NSA

**NEUROLOGICAL SURGERY ASSOCIATES**



- *F. GARY GIESEKE, M.D. - F.A.C.S.*
- *MATTHEW R. MOORE, M.D.*
- *JOHN A. COATS, M.D.*

RE:  James Radican
DATE: 10/9/95

This patient is seen in follow-up, following surgery at Holy Cross Hospital where we did a decompressive laminectomy at L3-4 where there was severe stenosis with herniated disc and also just decompressive at L2-3 and partially L1-2, but no herniated disc.  Postoperatively, he developed an ileus which finally cleared.

Unfortunately, the patient really has not improved that much.  He is still having pain across the back and hips.  There is really no significant pain in the legs whatsoever, however.  The pain is worse when he moves around.  He did see Dr. Szeinfeld on Friday, 10/6, and had some trigger points injected but it only helped temporarily.

**EXAMINATION** today reveals the incision to be well healed and sutures were removed.  There are points of tenderness along the iliac crest both medially and laterally.  None at the sciatic notch.

**RECOMMENDATIONS:**  He will see Dr. Szeinfeld again and consider injecting all of the trigger points and might do the right side mainly, as this appears to be the worst.  Surgically, there really is not that much more to do, and I am surprised that he was not improved since we found enough at surgery.  If this fails, we will try to see if we can get him a TENS unit for at least a trial of some 1-2 days since he says that his insurance will not reimburse it.  If it does work, we will then see about him purchasing one.

F. Gary Gieseke, M.D.

FGG:wjr
cc:  Jack Peicher, M.D. (fax)
      Marcos Szeinfeld, M.D. (fax)

*1930 N.E. 47th Street*
*Fort Lauderdale*
*Florida*
*33309*

*305 / 771 - 4251*
*Fax • 305 / 491 - 4892*

**RSL00134**



**NSA**  NEUROLOGICAL SURGERY ASSOCIATES

- *F. GARY GIESEKE, M.D. - F.A.C.S.*
- *MATTHEW R. MOORE, M.D.*
- *JOHN A. COATS, M.D.*

RE:  James Radican
DATE:  10/19/95

This patient is seen in follow-up and did see Dr. Szeinfeld and had trigger point injections but, unfortunately, has continued to have pain in the back.

**EXAMINATION:**  The patient has tenderness at the sacroiliac joints and also on each side in the lumbar region.  There is no leg pain.

He just received the TENS unit yesterday but no one came to give him instructions. No weakness is noted.

**RECOMMENDATIONS:**  We will try him on Daypro 600mg 2 qam with Tagamet 150mg.  He should take all of this with breakfast.  He also will be calling the insurance company to have the therapist come by for instruction on use of the TENS unit.

If he fails to improve, we might get EMGs to see if we can map this out or otherwise he will have to return to see Dr. Szeinfeld to see if there is anything else in a pain-relieving nature that he could do for him, as I cannot see any further surgical indications.

F. Gary Gieseke, M.D.

FGG:wjr
cc: Jack Peicher, M.D. (fax)
    Marcos Szeinfeld, M.D. (fax)   10-19-95

1930 N.E. 47th Street
Fort Lauderdale
Suite 200
Florida
33309

305 / 771 - 4251
Fax • 305 / 491 - 4892

**RSL00135**

 **NSA**  NEUROLOGICAL SURGERY ASSOCIATES



• F. GARY GIESEKE, M.D. - F.A.C.S.
• MATTHEW R. MOORE, M.D.
• JOHN A. COATS, M.D.

RE:  James Radican
DATE:  11/16/95

This patient is seen in follow-up and, unfortunately, is still having his pain despite the injections of the trigger points and the like.  He has seen Dr. Porth and has been started on a therapy program and will be fitted for a lumbosacral support brace.  I think this is a good idea, and I will fax my records to Dr. Porth.

At the present time, the patient still has pain in the low back on both sides and nothing down the legs whatsoever.  The tenderness is at the medial iliac crest area and the sacroiliac joint.

EXAMINATION:  Unchanged.

DISCUSSION:  One must recall that he does have vascular impairment to the lower extremities and apparently had an 80% stenosis of the left femoral artery and 50% on the right and stents were inserted by Dr. Guben at Broward General Medical Center in September 1995 for this.  I do not think this has anything to do, however, with his back pain.  He also has a history of a quadruple bypass in 1987.

We will ask Dr. Porth to also fax the patient's medical doctor, Dr. Jack Peicher -- Fax - 351-1197 any follow-up reports.

F. Gary Gieseke, M.D.

FGG:wjr
cc:  Jack Peicher, M.D. (fax)
     Marcos Szeinfeld, M.D. (fax)    ⟩ 11-17-95
     Manuel Porth, M.D. (fax)

1930 N.E. 47th Street
Ft. Lauderdale
suite 200
Florida
33306
954 / 771-4251
fax • 954 / 491-4892

RSL00136

MAGNETIC RESONANCE IMAGING



**Coral Ridge MRI**

1951 N.E. 47th Street
Fort Lauderdale, Florida 33308
(305) 491-8881

| PATIENT INFORMATION | AGE | DATE | SCAN NO. | REFERRING PHYSICIAN |
|---|---|---|---|---|
| RADICAN, JAMES | 65 | 03/29/96 | 13,191-2 | MANUEL PORTH, M.D. |

**AREA OF STUDY:** LUMBAR SPINE WITHOUT AND WITH GADOLINUM

**SUMMARY OF FINDINGS:**

MRI study of the lumbar spine was carried out using multiple sagittal and transverse views.

With T1 weighted pulse sequences, there is narrowing of the L2-3, L4-5, and L5-S1 interspaces. There are post-surgical changes noted opposite L1, 12, and L3 with evidence of a lumbar laminectomy running almost from L1-2 through L4-5.

With the heavily weighted T2 pulse sequences, there is decreased signal intensity of all lumbar discs. There is evidence of a disc herniation at L1-2 which protrudes into the midline and a moderate herniation at L3-4 which also appears midline.

Transaxial views show the midline discs at L1-2 and L3-4. Post-operative changes are seen with the hemilaminectomy.

**INTERPRETATION:**

1. Degenerative disc disease of the lumbar spine.

2. Herniated disc at L1-2, paracentral

3. Herniated disc at L3-4, paracentral.

4. Post-operative changes seen at L1-2 through L4-5.

5. Moderate lumbar spondylitis.

When compared to the prior study of March 18, 1994, this study has progressed and the disc herniations are now apparent.

RSL00137



**NSA** *NEUROLOGICAL SURGERY ASSOCIATES*



• *F. GARY GIESEKE, M.D. - F.A.C.S.*
• *MATTHEW R. MOORE, M.D.*
• *JOHN A. COATS, M.D.*

RE:  James Radican
DATE:  2/26/98

This patient is a 67 year old male who has had back problems for some 28 years or
so.  In 1973 he had a laminectomy and fusion in Indiana from L4 distally.  He had
had back problems off and on since that time.  In 1992 he had a course of epidural
steroids and has seen several physicians in this area.  I took care of him back in
1995 when he was found to have extremely severe stenosis from a herniated disc at
L3-4 and we ended up doing a decompressive laminectomy L1, L2, L3 and L4 and
removed a large herniated disc at L3-4 but just a decompressive laminectomy at L1
and L2.  The patient really did not do as well as we had hoped, as he still had some
back pain with pain in the legs, primarily on the right.  He went through a course of
epidural steroids with Dr. Szeinfeld and since that time has followed up with Dr.
Porth and, around late 1996 had another course of epidural steroids at University
Hospital.  He has been seeing Dr. Porth.

PAST MEDICAL HISTORY:  Significant in that he had a triple coronary bypass in
1987, right shoulder surgery, kidney stone surgery and two hernia repairs.  He also
had a pulmonary embolus some 30 years ago.  He also has a history of vascular
impairment to the lower extremities and apparently back in 1994 this was 80%
stenosis of the left femoral artery and 50% on the right, and this was treated by Dr.
Guben at Broward General Medical Center -- radiology -- where a stent was inserted
on the left on 9/15/95 and on the right on 9/22/95.

REVIEW OF SYSTEMS:  Significant in that he still has some shortness of breath
and chest pain, and has seen Dr. Russo and is scheduled for a thallium stress test
on 3/3/98 and possibly a cardiac cath.

ALLERGIES:  Penicillin.

MEDICATIONS:  Mevacor, Naprosyn, Tagamet, Accupril, Procardia, Cardura,
Vicodin ES 2 qd.

PHYSICAL EXAMINATION:  The patient is awake, alert and conversant.  Speech is
normal.
GAIT:  Abnormal as he moves slowly and favors the right leg mainly.
BACK:  Marked tenderness lumbar right.  No spasm.

1930 N.E. 47th Str
Ft. Lauderd
suite 2
Flori
333
954 / 771-42
fax • 954 / 491-48

RSL00138

# NSA

**NEUROLOGICAL SURGERY ASSOCIATES**

- *F. GARY GIESEKE, M.D. - F.A.C.S.*
- *MATTHEW R. MOORE, M.D.*
- *JOHN A. COATS, M.D.*

RE:  James Radican
DATE:  2/26/98

Page 2

STRAIGHT LEG RAISING:  Limited on the right at around 35 degrees and on the left at 45 degrees.
EXTREMITIES:  Pulses are diminished in the lower extremities at the knees and I could not feel the dorsalis pedis.  Feet are not cold, however.  No atrophy.
MOTOR:  Intact, except he has some difficulty with elevation of the right leg (iliopsoas) but he does develop pain during this, thus it is difficult to tell if this is true weakness or not.
SENSATION:  Actually seems to be intact to pin-prick.
REFLEXES:  Absent but with reinforcement knee jerks are 1+ and equal while ankle jerks are barely obtainable at -1 and equal.

No new studies are available for review.  The last MRI apparently was 3/29/96.

IMPRESSION:
1. Chronic back syndrome.
2. Rule out recurrent herniated disc or new herniated disc -- lumbar.
3. History of vascular impairment lower extremities.
4. History of triple coronary bypass.
5. Rule out coronary artery pathology -- persistent (scheduled for thallium stress test and possible cardiac cath).
6. History of pulmonary embolus 30 years ago.

RECOMMENDATIONS:  I feel he should complete his work-up with Dr. Russo prior to any further tests, because we really do not know if he can be cleared for surgery or not.  I would advise vascular study of the lower extremities just to see if this has gotten worse and could have anything to do with some of his pain.  After this has all been done and he has been cleared by Dr. Russo and Dr. Peicher, we would need to get an MRI of the lumbar spine with and without contrast in a high quality unit such as at Holy Cross, and then

*1930 N.E. 47th Street*
*Ft. Lauderdale*
*suite 200*
*Florida*
*33308*
*954 / 771-4251*
*fax • 954 / 491-4892*

RSL00139

 NEUROLOGICAL SURGERY ASSOCIATES

- F. GARY GIESEKE, M.D. - F.A.C.S.
- MATTHEW R. MOORE, M.D.
- JOHN A. COATS, M.D.

RE:  James Radican
DATE:  2/26/98

Page 3

likely he would need a lumbar myelogram and CT scan with films in the
upright position with axial loading, plus flexion, extension and neutral x-
rays of the lumbar spine to rule out instability as he may be unstable and
require a fusion.

F. Gary Gieseke, M.D.

FGG:wjr
cc:  Jack Peicher, M.D. (fax)
     Manual Porth, M.D. (fax)
     Charles Russo, M.D. (fax)

FAXED 2-27-98 JC

1930 N.E. 47th Street
Ft. Lauderdale
suite 200
Florida
33308
954 / 771-4251
fax • 954 / 491-4892

RSL00140



**Reliance Standard**
**Insurance Company**®

March 26, 1999

Gary Gieske, M.D.
1930 NE 47th Street - Suite 200
Fort Lauderdale, FL 33308

Re:        James E. Radican
Claim #:   1997-346-010
Policy #:  LSC 98842
S.S. #:    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
D.O.B.:    4/20/30

Dear Dr. Gieske:

As you may be aware, we are the Long Term Disability Carrier for the above named patient. We are currently in the process of reviewing this claim but we have found that we are in need of some additional information. We have previously (12/97) requested records from your office regarding Mr. Radican. Unfortunately, we realized that the records which you sent to us in early 1998 were for a James A. Radice not the records for James E. Radican as per our request. Accordingly, we need to request the records for James E. Radican again. (Please be assured that the records regarding Mr. Radice which were sent to us in error have not and will not be released outside of our office.)

**Could you please forward copies of any and all office notes/treatment records; diagnostic test results; consulting physician reports; etc. regarding JAMES E. RADICAN from Janaury of 1995 to the present.**

Enclosed is an authorization signed by the insured which allows you to release this information to Reliance Standard.

Reliance Standard is willing to reimburse you a reasonable fee for this service. Should you require such a fee simply enclose a bill, including your Federal Tax ID number, with your reply.

Should you have any questions please feel free to call me at 1(800)351-7500 ext. 4165

Sincerely,

Richard D. Walsh
Assistant Manager, Quality Review

RSL00141

 **Reliance Standard** fe
**Insurance Company**®

March 26, 1999

Lawrence D. Bache, Esq.,
Fountains Executive Center
9000 West Sheridan St. - Suite 174
Pembroke Pines, FL 33024

Re:         James E. Radican
Claim #:    1997-346-010
Policy #:   LSC 98842

Dear Mr. Bache:

We are writing to you regarding your appeal of our decision to deny Long Term Disability
("LTD") benefits to your client, James E. Radican. We are in receipt of your letters dated January
26, 1999 and March 9, 1999. We apologize for the delay in not responding sooner, however, Mr.
Radican's claim file needed to be retrieved from our off-premises storage facility.

The Employee Retirement Income Security Act of 1974 ("ERISA") provides for an independent
review of a negative LTD claims decision for employees covered under the Tarmac, Inc. LTD
plan. Mr. Radican was already afforded such an appeal and our decision to affirm our previous
denial of benefits was communicated to your client's former attorney in a letter dated August 3,
1998. ERISA does not provide for more than one independent review of a negative claims
decision. Accordingly, Reliance Standard Life Insurance Company ("RSL") is under no
obligation to reconsider the merits of your client's claim.

Notwithstanding the above, in good faith we have reviewed the information contained in your
letters and the attachments you have provided in support of Mr. Radican's claim. We have
determined that some additional investigation is needed regarding Mr. Radican's eligibility for
benefits under the terms of Tarmac, Inc.'s LTD plan. We have requested additional information
from Tarmac, Inc. which is needed before a determination can be made regarding Mr. Radican's
eligibility. Once that information is received we should be in a better position to make a final
liability determination on your client's claim.

Please be advised that we will attempt to complete our review as expeditiously as possible. If you
have any additional information which you wish for us to consider please send it to my attention
at your earliest convenience. Should you have any questions please feel free to contact me at
1(800)351-7500 ext. 4165.

**RSL00142**

Sincerely,

Richard D. Walsh
Assistant Manager, Quality Review Unit

RSL00143

| | |
|---|---|
| **To:** | Hope Fischer - Tarmac, Inc. |
| **Fax #:** | (757)853-5462 |
| **Re:** | James E. Radican |
| **Date:** | March 26, 1999 |
| **Pages:** | 4, including this cover sheet. |

# FACSIMILE

# COPY TO FOLLOW VIA U.S. MAIL

From the desk of...

**Richard D. Walsh**
Assistant Manager, Quality Review Unit
Reliance Standard Life Insurance Company
2501 Parkway
Philadelphia, PA 19130-2499

1(800)351-7500 ext. 4165
Fax: (215)787-3876

**RSL00144**

 **Reliance Standard Life Insurance Company®**

March 26, 1999

Hope B. Fischer
Tarmac America, Inc.
1151 Azalea Garden Rd.
Norfolk, VA 23502

Re:       James E. Radican
Claim #:   1997-346-010
Policy #:  LSC 98842
S.S. #:    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

SENT VIA U.S. MAIL & FACSIMILE # (757)853-5462

Dear Ms. Fischer:

We are writing to you regarding the Long Term Disability ("LTD") claim for your former employee, James E. Radican. As you may be aware, Reliance Standard Life Insurance Company ("RSL") denied Mr. Radican's claim for LTD benefits after it was determined that he was not contractually eligible for coverage on the date of his claimed disability, January 1, 1997. Mr. Radican appealed our decision to deny his claim and we affirmed our prior determination. We have again been presented with a second appeal of our prior decisions and we are investigating Mr. Radican's eligibility for benefits. We have determined, however, that we are in need of some additional information from Tarmac, Inc. Could you please provide us with the following information at your earliest convenience so that we may address Mr. Radican's claim appropriately.

1. The name, address, phone number and contact name for the carrier who handled Mr. Radican's Short Term Disability ("STD") claim. In the alternative, if the claim was handled internally by Tarmac, Inc., could we please have a copy of any and all documents relating to any STD claims filed by Mr. Radican since his surgery in 1995?

2. A copy of Mr. Radican's complete personnel file from July of 1995 through the present.

3. The amount of any pension benefits which Mr. Radican is currently receiving. The date the benefits began. The type of plan (i.e. defined contribution; 401(k); etc.). Whether the drawing of the pension was mandatory or voluntary.

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

RSL00145

Enclosed is an authorization signed by Mr. Radican which allows you to release this information to RSL. Please be advised that this information will be kept in the strictest confidence and will be used for the sole purpose of evaluating Mr. Radican's eligibility for benefits under Policy #LSC-98842.

Should you have any questions regarding our requests, please feel free to contact me at 1(800)351-7500 ext. 4165.

Sincerely,

Richard D. Walsh
Assistant Manager, Quality Review Unit

RSL00146

T    'SMISSION VERIFICATION REPORT

TIME : 03/26/1999 09:53

| | |
|---|---|
| DATE,TIME | 03/26 09:53 |
| FAX NO./NAME | 917578535462 |
| DURATION | 00:00:00 |
| PAGE(S) | 00 |
| RESULT | BUSY |
| MODE | STANDARD |

BUSY: BUSY/NO RESPONSE

RSL00147

The Law Office Of

# Lawrence D. Bache

Fountains Executive Centre
9000 West Sheridan Street, Suite 174
Pembroke Pines, FL 33024
(954) 436-7376, Fax: (954) 436-2926

Lawrence D. Bache
Of Counsel:
Roy L. Taylor

March 9, 1999

Reliance Standard Life Insurance Co.
Attention: Richard D. Walsh
Assistant Manager, Quality Review Unit
2501 Parkway
Philadelphia, PA 19130-2499

Re:    James E. Radican
       Claim No.: 1997-346-010
       Policy No.: LSC 98842

Dear Mr. Walsh:

I have not received a response to my letter dated January 26, 1999, copy attached.

Please consider my January 26, 1999 letter and the documents submitted therewith as part of the administrative file. If I do not receive a response to my letter on or before April 1, 1999, I will assume you have denied my client's appeal on the basis that he is not eligible for benefits because he had not "satisfied the policy definition of a full-time employee" as stated in your prior written denials.

Sincerely,

Lawrence D. Bache

cc:    James E. Radican

Radican\Walsh 02

RSL00148

The Law Office Of
# Lawrence D. Bache

| | |
|---|---|
| Fountains Executive Centre | Lawrence D Bache |
| 9000 West Sheridan Street, Suite 174 | Cf Counsel |
| Pembroke Pines, FL 33024 | Roy L. Taylor |
| (954) 436-7376; Fax: (954) 436-2926 | |

January 26, 1999

Reliance Standard Life Insurance Co.
Attention: Richard D. Walsh                    Via Certified Mail
Assistant Manager, Quality Review Unit        Article # Z 127 195 669
2501 Parkway
Philadelphia, PA 19130-2499

Re:    James E. Radican
       Claim No.: 1997-346-010
       Policy No.: LSC 98842

Dear Mr. Walsh:

The undersigned represents Tarmac America, Inc. employee, James E. Radican.

By letter dated August 3, 1998 to Marika McVey Ostendorf, Esq., my client's claim for long-term disability benefits was denied.  More specifically, you found that Mr. Radican was never eligible to participate in the Reliance Plan because there was a "lack of conclusive evidence of full-time work (in 1996)."

The initial denial of the claim, by letter dated April 6, 1998, was made upon a finding that Mr. Radican was not eligible for benefits under the plan because he had "not satisfied the policy definition of a full-time employee . . ." and that "'Full Time' means working for you for a minimum of 40 hours during a person's regular work week."[1]

In response to an initial denial of the claim, Marika McVey Ostendorf, acting on behalf of Mr. Radican, submitted information with letter dated June 5, 1998 in an attempt to establish that Mr. Radican was a full-time employee (as defined in the plan) during the concerned time period, and accurately and truthfully stated:

> Except for the interruptions for the injections and the physical therapy (in 1995 and 1996) Mr. Radican was working on a full-time basis for Tarmac America, Inc.

---

[1]  The applicable plan document defines "Full time" on page 2.0 as "working for the policy holder for a minimum of 37.5 hours during your regular work week" rather than 40 hours as stated.

RSL00149

Page 2
January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

The evidence submitted was apparently deficient per your August 3, 1998 second denial letter in which you stated you "do not have any conclusive evidence to support that" Mr. Radican "worked on a full time basis after January 1, 1996."

There has been a misunderstanding as to what information was required to establish that Mr Radican was eligible for benefits under the Plan, i.e., that he worked "Full-Time" in 1996 (37.5 hours per week). This is understandable due to the fact that salaried employees do not punch a time clock and there is no form or other document kept in the routine course of business which could have been submitted. Accordingly, on behalf of Mr. Radican, and pursuant to the law and spirit of ERISA, information is submitted herewith to establish the truth, i.e., that Mr. Radican was a full-time employee during the concerned time period. Specifically, enclosed please find the sworn original affidavits of Mr. Radican's former co-workers, Thomas Mendez and Craig Leonard, in which each states under oath that Mr. Radican was actively at work on a full-time basis (more than 37.5 hours per week) for not less than 40 weeks during 1996. Also enclosed please find the original affidavit of James E. Radican in which he states, in concurrence with the affidavits of Mr. Mendez and Mr. Leonard, that he was actively at work on a full-time basis for not less than 40 weeks during 1996. In his affidavit Mr. Radican further clarifies what appears to have been a miscommunication in phone conversations he had with your company. More specifically, the second denial letter dated August 3, 1998 provides:

> [E]very indication we have points to the fact that your client never returned to full-time work after his surgery in 1995. In fact, on at least two separate occasions your client (Mr. Radican) informed us via the telephone that he worked part time **throughout** 1996. He (Mr. Radican) informed us that he worked part time for about one year but was told that he should apply for disability because the company could not longer accommodate him on a part-time schedule. (emphasis added)

As stated in his affidavit, in his phone conversations Mr. Radican did not state that he worked only part time in 1996. Mr. Radican was simply attempting to explain that he worked part-time during those weeks (less than 12) when he received physical therapy and/or pain treatment. The confusion was most probably caused by the use of the word "throughout" in the context in the conversation. Assuming Mr. Radican used the word "throughout," it was a reference to his having received treatments "throughout" 1996.

As a further point of clarification, Marika McVey Ostendorf, in her June 5, 1998 letter, explained that the February 4, 1998 letter from Michael Unger, General Manager of Pennsuco Cement and Aggregates, in contained inaccurate statements. In this regard, enclosed please find the sworn affidavit of Michael Unger in which, under oath, he clarifies

Page 3
January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

that he did not state or imply that Mr. Radican worked only part time in 1996. He was attempting to convey that he worked part-time during the weeks when he received physical therapy and/or pain treatments. Further, in accordance with Ms. Ostendorf's statement, Mr. Unger attests to his inadvertent error when he referred to January 1, 1996 instead of January 1, 1997.

Notwithstanding your statement in the second denial letter of August 3, 1998 that your "claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of his policy," request is hereby respectfully made for a reconsideration of the claim in light of the understandable confusion respecting the information required to establish Mr. Radican's eligibility for benefits. Bear in mind that 29 C.F.R. § 2560.503-1(F), mandating that claims procedure for ERISA plans be reasonable provides:

> A plan administrator . . . shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
>
> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> **(3) A description of any additional material or information necessary for the claimant to perfect the claim and explanation of why such material or information is necessary; and**
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.[2]

---

[2] Also bear in mind that the Employee Retirement Income Security Act of 1974 ("ERISA") at 29 U.S.C. § 1133 provides:

> [e]very employee benefit plan shall . . . (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

RSL00151

Page 4
January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

No description of the nature of the additional material or information required for Mr. Radican to perfect his claim was contained in the initial denial letter. It is respectfully submitted that this was the cause of the confusion.

Mr. Radican trusts that the information submitted herewith will be sufficient to establish the truth, i.e., that he was a full-time employee actively at work in 1996 as defined in the plan. His sincere apology for the delay in forwarding this information but the delay has been caused by Mr. Radican's condition (disability) which has affected his ability to determine the nature of the evidence required, and to obtain same. I look forward to hearing from you directly.

Sincerely,


Lawrence D. Bache

cc:     James A. Wilson, Jr. w/o enclosures
        Hope E. Fischer, w/enclosures
        James E. Radican, w/enclosures

enc.

Radican\Walsh 01

The Law Office Of

# Lawrence D. Bache

Fountains Executive Centre
9000 West Sheridan Street, Suite 174
Pembroke Pines, FL 33024
(954) 436-7376; Fax: (954) 436-2926

Lawrence D. Bache
Of Counsel:
Roy L. Taylor

January 26, 1999

Reliance Standard Life Insurance Co.
Attention: Richard D. Walsh
Assistant Manager, Quality Review Unit
2501 Parkway
Philadelphia, PA 19130-2499

Via Certified Mail
Article # Z 127 195 669

Re:    James E. Radican
       Claim No.: 1997-346-010
       Policy No.: LSC 98842

Dear Mr. Walsh:

The undersigned represents Tarmac America, Inc. employee, James E. Radican.

By letter dated August 3, 1998 to Marika McVey Ostendorf, Esq., my client's claim for long-term disability benefits was denied. More specifically, you found that Mr. Radican was never eligible to participate in the Reliance Plan because there was a "lack of conclusive evidence of full-time work (in 1996)."

The initial denial of the claim, by letter dated April 6, 1998, was made upon a finding that Mr. Radican was not eligible for benefits under the plan because he had "not satisfied the policy definition of a full-time employee . . ." and that "'Full Time' means working for you for a minimum of 40 hours during a person's regular work week."[1]

In response to an initial denial of the claim, Marika McVey Ostendorf, acting on behalf of Mr. Radican, submitted information with letter dated June 5, 1998 in an attempt to establish that Mr. Radican was a full-time employee (as defined in the plan) during the concerned time period, and accurately and truthfully stated:

> Except for the interruptions for the injections and the physical therapy (in 1995 and 1996) Mr. Radican was working on a full-time basis for Tarmac America, Inc.

---

[1] The applicable plan document defines "Full time" on page 2.0 as "working for the policy holder for a minimum of 37.5 hours during your regular work week" rather than 40 hours as stated.

RSL00153

Page 2
January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

The evidence submitted was apparently deficient per your August 3, 1998 second denial letter in which you stated you "do not have any conclusive evidence to support that" Mr. Radican "worked on a full time basis after January 1, 1996."

There has been a misunderstanding as to what information was required to establish that Mr. Radican was eligible for benefits under the Plan, i.e., that he worked "Full-Time" in 1996 (37.5 hours per week). This is understandable due to the fact that salaried employees do not punch a time clock and there is no form or other document kept in the routine course of business which could have been submitted. Accordingly, on behalf of Mr. Radican, and pursuant to the law and spirit of ERISA, information is submitted herewith to establish the truth, i.e., that Mr. Radican was a full-time employee during the concerned time period. Specifically, enclosed please find the sworn original affidavits of Mr. Radican's former co-workers, Thomas Mendez and Craig Leonard, in which each states under oath that Mr. Radican was actively at work on a full-time basis (more than 37.5 hours per week) for not less than 40 weeks during 1996. Also enclosed please find the original affidavit of James E. Radican in which he states, in concurrence with the affidavits of Mr. Mendez and Mr. Leonard, that he was actively at work on a full-time basis for not less than 40 weeks during 1996. In his affidavit Mr. Radican further clarifies what appears to have been a miscommunication in phone conversations he had with your company. More specifically, the second denial letter dated August 3, 1998 provides:

> [E]very indication we have points to the fact that your client
> never returned to full-time work after his surgery in 1995. In
> fact, on at least two separate occasions your client (Mr. Radi-
> can) informed us via the telephone that he worked part time
> **throughout** 1996. He (Mr. Radican) informed us that he worked
> part time for about one year but was told that he should apply
> for disability because the company could not longer accommo-
> date him on a part-time schedule. (emphasis added)

As stated in his affidavit, in his phone conversations Mr. Radican did not state that he worked only part time in 1996. Mr. Radican was simply attempting to explain that he worked part-time during those weeks (less than 12) when he received physical therapy and/or pain treatment. The confusion was most probably caused by the use of the word "through-out" in the context in the conversation. Assuming Mr. Radican used the word "throughout," it was a reference to his having received treatments "throughout" 1996.

As a further point of clarification, Marika McVey Ostendorf, in her June 5, 1998 letter, explained that the February 4, 1998 letter from Michael Unger, General Manager of Pennsuco Cement and Aggregates, in contained inaccurate statements. In this regard, enclosed please find the sworn affidavit of Michael Unger in which, under oath, he clarifies

RSL00154

Page 3
January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

that he did not state or imply that Mr. Radican worked only part time in 1996. He was attempting to convey that he worked part-time during the weeks when he received physical therapy and/or pain treatments. Further, in accordance with Ms. Ostendorf's statement, Mr. Unger attests to his inadvertent error when he referred to January 1, 1996 instead of January 1, 1997.

Notwithstanding your statement in the second denial letter of August 3, 1998 that your "claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of his policy," request is hereby respectfully made for a reconsideration of the claim in light of the understandable confusion respecting the information required to establish Mr. Radican's eligibility for benefits. Bear in mind that 29 C.F.R. § 2560.503-1(F), mandating that claims procedure for ERISA plans be reasonable provides:

> A plan administrator . . . shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
>
> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> **(3) A description of any additional material or information necessary for the claimant to perfect the claim and explanation of why such material or information is necessary; and**
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.[2]

---

[2] Also bear in mind that the Employee Retirement Income Security Act of 1974 ("ERISA") at 29 U.S.C. § 1133 provides:

> [e]very employee benefit plan shall . . . (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

Page 4
January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

No description of the nature of the additional material or information required for Mr. Radican to perfect his claim was contained in the initial denial letter. It is respectfully submitted that this was the cause of the confusion.

Mr. Radican trusts that the information submitted herewith will be sufficient to establish the truth, i.e., that he was a full-time employee actively at work in 1996 as defined in the plan. His sincere apology for the delay in forwarding this information but the delay has been caused by Mr. Radican's condition (disability) which has affected his ability to determine the nature of the evidence required, and to obtain same. I look forward to hearing from you directly.

Sincerely,

Lawrence D. Bache

cc:    James A. Wilson, Jr. w/o enclosures
       Hope E. Fischer, w/enclosures
       James E. Radican, w/enclosures

enc.

Radican-Walsh 01

The Law Office Of

# Lawrence D. Bache

| | |
|---|---|
| Fountains Executive Centre | Lawrence D. Bache |
| 9000 West Sheridan Street, Suite 174 | Of Counsel |
| Pembroke Pines, FL 33024 | Roy I. Tayier |
| (954) 436-7376; Fax. (954) 436-2926 | |

January 26, 1999

Reliance Standard Life Insurance Co.
Attention: Richard D. Walsh                     Via Certified Mail
Assistant Manager, Quality Review Unit          Article # Z 127 195 669
2501 Parkway
Philadelphia, PA 19130-2499

Re:    James E. Radican
       Claim No.: 1997-346-010
       Policy No.: LSC 98842

Dear Mr. Walsh:

The undersigned represents Tarmac America, Inc. employee, James E. Radican.

By letter dated August 3, 1998 to Marika McVey Ostendorf, Esq., my client's claim for long-term disability benefits was denied. More specifically, you found that Mr. Radican was never eligible to participate in the Reliance Plan because there was a "lack of conclusive evidence of full-time work (in 1996)."

The initial denial of the claim, by letter dated April 6, 1998, was made upon a finding that Mr. Radican was not eligible for benefits under the plan because he had "not satisfied the policy definition of a full-time employee . . ." and that "'Full Time' means working for you for a minimum of 40 hours during a person's regular work week."[1]

In response to an initial denial of the claim, Marika McVey Ostendorf, acting on behalf of Mr. Radican, submitted information with letter dated June 5, 1998 in an attempt to establish that Mr. Radican was a full-time employee (as defined in the plan) during the concerned time period, and accurately and truthfully stated:

> Except for the interruptions for the injections and the physical therapy (in 1995 and 1996) Mr. Radican was working on a full-time basis for Tarmac America, Inc.

---

[1] The applicable plan document defines "Full time" on page 2.0 as "working for the policy holder for a minimum of 37.5 hours during your regular work week" rather than 40 hours as stated.

RSL00157

Page 2
January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

The evidence submitted was apparently deficient per your August 3, 1998 second denial letter in which you stated you "do not have any conclusive evidence to support that" Mr. Radican "worked on a full time basis after January 1, 1996."

There has been a misunderstanding as to what information was required to establish that Mr. Radican was eligible for benefits under the Plan, i.e., that he worked "Full-Time" in 1996 (37.5 hours per week). This is understandable due to the fact that salaried employees do not punch a time clock and there is no form or other document kept in the routine course of business which could have been submitted. Accordingly, on behalf of Mr. Radican, and pursuant to the law and spirit of ERISA, information is submitted herewith to establish the truth, i.e., that Mr. Radican was a full-time employee during the concerned time period. Specifically, enclosed please find the sworn original affidavits of Mr. Radican's former co-workers, Thomas Mendez and Craig Leonard, in which each states under oath that Mr. Radican was actively at work on a full-time basis (more than 37.5 hours per week) for not less than 40 weeks during 1996. Also enclosed please find the original affidavit of James E. Radican in which he states, in concurrence with the affidavits of Mr. Mendez and Mr. Leonard, that he was actively at work on a full-time basis for not less than 40 weeks during 1996. In his affidavit Mr. Radican further clarifies what appears to have been a miscommunication in phone conversations he had with your company. More specifically, the second denial letter dated August 3, 1998 provides:

> [E]very indication we have points to the fact that your client never returned to full-time work after his surgery in 1995. In fact, on at least two separate occasions your client (Mr. Radican) informed us via the telephone that he worked part time **throughout** 1996. He (Mr. Radican) informed us that he worked part time for about one year but was told that he should apply for disability because the company could not longer accommodate him on a part-time schedule. (emphasis added)

As stated in his affidavit, in his phone conversations Mr. Radican did not state that he worked <u>only</u> part time in 1996. Mr. Radican was simply attempting to explain that he worked part-time during those weeks (less than 12) when he received physical therapy and/or pain treatment. The confusion was most probably caused by the use of the word "throughout" in the context in the conversation. Assuming Mr. Radican used the word "throughout," it was a reference to his having received treatments "throughout" 1996.

As a further point of clarification, Marika McVey Ostendorf, in her June 5, 1998 letter, explained that the February 4, 1998 letter from Michael Unger, General Manager of Pennsuco Cement and Aggregates, in contained inaccurate statements. In this regard, enclosed please find the sworn affidavit of Michael Unger in which, under oath, he clarifies

RSL00158

Page 3
January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

that he did not state or imply that Mr. Radican worked <u>only</u> part time in 1996. He was attempting to convey that he worked part-time during the weeks when he received physical therapy and/or pain treatments. Further, in accordance with Ms. Ostendorf's statement, Mr. Unger attests to his inadvertent error when he referred to January 1, 1996 instead of January 1, 1997.

Notwithstanding your statement in the second denial letter of August 3, 1998 that your "claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of his policy," request is hereby respectfully made for a reconsideration of the claim in light of the understandable confusion respecting the information required to establish Mr. Radican's eligibility for benefits. Bear in mind that 29 C.F.R. § 2560.503-1(F), mandating that claims procedure for ERISA plans be reasonable provides:

> A plan administrator . . . shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
>
> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> **(3) A description of any additional material or information necessary for the claimant to perfect the claim and explanation of why such material or information is necessary; and**
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review."

---

[2] Also bear in mind that the Employee Retirement Income Security Act of 1974 ("ERISA") at 29 U.S.C. § 1133 provides:

> [e]very employee benefit plan shall . . . (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

RSL00159

Page 4
January 26, 1999
Letter to Richard D. Walsh
Re: James E. Radican

No description of the nature of the additional material or information required for Mr. Radican to perfect his claim was contained in the initial denial letter. It is respectfully submitted that this was the cause of the confusion.

Mr. Radican trusts that the information submitted herewith will be sufficient to establish the truth, i.e.. that he was a full-time employee actively at work in 1996 as defined in the plan His sincere apology for the delay in forwarding this information but the delay has been caused by Mr. Radican's condition (disability) which has affected his ability to determine the nature of the evidence required, and to obtain same. I look forward to hearing from you directly.

Sincerely,

Lawrence D. Bache

cc:     James A. Wilson, Jr. w/o enclosures
        Hope E. Fischer. w/enclosures
        James E. Radican, w/enclosures

enc.

Radican Walsh 4

RSL00160

## AFFIDAVIT of THOMAS MENDEZ

STATE OF FLORIDA                    }
                                    }
COUNTY OF _____           }

    Before me, the undersigned authority, personally appeared, THOMAS MENDEZ, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.    I have personal knowledge that in 1996 JAMES E. RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 37.5 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**


_____
THOMAS MENDEZ

Sworn to and subscribed before me on December ___, 1998 by _____


Stamp or
Seal:

_____
Notary Public

My commission expires:

___ Personally Known

___ Produced identification

_____
Type of identification produced

\New Files Radican\ AFF 01 Mendez

RSL00161

## AFFIDAVIT of CRAIG LEONARD

STATE OF FLORIDA                    }
                                    }
COUNTY OF _Palm Beach_              }

     Before me, the undersigned authority, personally appeared, CRAIG LEONARD, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.     I worked with JAMES E. RADICAN for Tarmac America, Inc. throughout 1996.

2.     I have personal knowledge that in 1996 JAMES RADICAN performed for Tarmac America, Inc., the material duties pertaining to his job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 37.5 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 JAMES E. RADICAN was actively at work full-time as defined above totals not less than 40 weeks.

**Further Affiant Sayeth Not**

 

                              _____
                                  CRAIG LEONARD

     Sworn to and subscribed before me on ~~December~~ _January_ 11, 1998 by .

Stamp or
Seal:
                              _____
                                  Notary Public

My commission expires:

_X_ Personally Known

_____ Produced identification

                              _____
                             Type of identification produced

\New Files\Radican\Aff 01 Leonard

**RSL00162**

## AFFIDAVIT of JAMES E. RADICAN

STATE OF FLORIDA            }
                            }
COUNTY OF ⁚ᵇ⁚⁚ ⁚ᵏⁿ⁚        }

    Before me, the undersigned authority, personally appeared, JAMES E. RADICAN, who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.    Throughout 1996, I, JAMES E. RADICAN performed for Tarmac America, Inc., the material duties pertaining to my job in the place and manner in which his job was normally performed on a full-time basis, i.e., a minimum of 37.5 hours during his regular work week, with the exception of those weeks in which he received physical therapy and/or pain treatment. The number of weeks in 1996 I was actively at work full-time as defined above totals not less than 40 weeks.

2.    The only weeks I did not work a minimum of 37.5 hours per week in 1996 were those weeks in which I received physical therapy and/or pain treatment and which total not more than 12 weeks.

3.    In the letter from Richard D. Walsh dated August 3, 1998 the following is stated:

> In fact, on at least two separate occasions your client (Mr. Radican) informed us via the telephone that he worked part time throughout 1996.

The reference to "throughout" can be misleading and perhaps there has been some confusion. What I attempted to convey is the truth, i.e., that I worked part time in 1996 but only for those weeks (less than 12) when I received physical therapy and/or pain treatment.

4.    In the letter from Richard D. Walsh dated August 3, 1998 the following is stated:

> He (Mr. Radican) informed us that he worked part time for about one year but was told that he should apply for disability because the company could not longer accommodate him on a part-time schedule.

RSL00163

This is an inaccurate statement. Perhaps I was misunderstood. What I attempted to convey was the truth, i.e., the only time in 1996 in which I did not work full-time was during those weeks when I was receiving medical treatment as referred to above.

**Further Affiant Sayeth Not**

_____
JAMES E. RADICAN

Sworn to and subscribed before me on December ___, 1998.

> Michael D. Reynolds
> My Commission CC461036
> Expires May 8, 1999

_____
Notary Public

My commission expires:

_____ Personally Known

_____ Produced identification

_____
Type of identification produced

\New Files Radican Aff 01

RSL00164

## AFFIDAVIT of MICHAEL UNGER

STATE OF FLORIDA           }
                                     }
COUNTY OF _____ }

      Before me, the undersigned authority, personally appeared, MICHAEL UNGER who, after being duly cautioned and sworn, states upon personal knowledge the following:

1.     I Michael Unger am the General Manager of Pennsuco Cement and Aggregates, a Tarmac America, Inc. company.

2.     Attached hereto is my letter to Mr. James Wilson, Reliance Standard Life Insurance Co., dated February 4, 1998.

3.     My letter dated February 4, 1998 contains the statement:

> Mr Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.

The above statement does not state, nor did I mean to infer that JAMES RADICAN worked <u>only</u> part-time in 1996. I was attempting to convey that JAMES F RADICAN worked part-time during the weeks when he received physical therapy and/or pain treatment.

4.     My letter dated February 4, 1998 contains the statement:

> Jim was incapable of performing his duties on this (a full-time) basis and was required to file for short term disability on January 1, 1996.

The reference to January 1, 1996 was an inadvertent error. The date should have been January 1, 1997.

**Further Affiant Sayeth Not**



                                       MICHAEL UNGER

**RSL00165**

Sworn to and subscribed before me on December ___, 1998

Stamp or
Seal:

MARIA YEPES
My Comm Exp 8/30/2002
No. CC 750747
[ ] Personally Known [ ] Other I.D.

_____
Notary Public

My commission expires:

____ Personally Known

____ Produced identification

_____
Type of identification produced

New Files Radican\All 02\Unger

**RSL00166**



**Tarmac America, Inc.**
11000 N.W. 121st Way
Medley, FL 33178
(305) 364-2230
Fax (305) 364-2288

February 4, 1998

Mr. James Wilson
Reliance Standard Life Insurance Co.                    FAX: 215/787-4254
LTD Claim Department
2501 Parkway
Philadelphia, PA  19130-2499

Dear Mr. Wilson:

It is my understanding that, after recovering from back surgery, James Radican returned to work on or about November 1, 1995.

At that time, Jim reported to Mr. Fred Goudie, Vice President of Production and Sales for Tarmac's Pennsuco Cement Mill in Medley, Florida. Mr. Goudie allowed Jim to work on a part-time basis, and continued to work on a part-time basis for over one year while receiving physical therapy and pain treatments.

Tarmac's policy requires employees to work only on a full-time basis. Jim was incapable of performing his duties on this basis and was required to file for short-term disability on January 1, 1996.

Sincerely,

Michael Unger, General Manager
Pennsuco Cement and Aggregates

**RSL00167**

A Tarmac Group company



Law Office of
**Lawrence D. Bache**
9000 West Sheridan Street, Suite 174
Pembroke Pines, Florida 33024

Return Receipt Requested

CERTIFIED

Z 127 195 669

MAIL

Reliance Standard Life Insurance Co.
Attention: Richard D. Walsh
Assistant Manager, Quality Review Unit
2501 Parkway
Philadelphia, PA 19130-2499

RSL00168

 **RSL** Reliance Standard Life
Insurance Company®

September 10, 1998

Marika McVey Ostendorf, Esq.
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re:        James E. Radican
Claim # :  1997-346-010
Policy # : LSC 98842

Dear Ms. McVey Ostendorf:

We are in receipt of your letter dated September 9, 1998 regarding the above referenced claim for disability benefits.

Your letter correctly states that you have exhausted all of Mr. Radican's administrative remedies. You have suggested that this claim now be brought to arbitration as per the terms of the policy. The policy language states as follows:

> *Any claim or dispute arising from or relating to our determination regarding the Insured's Total Disability may be settled by arbitration <u>when agreed to by the Insured and us</u> in accordance with the rules for Health and Accident Claims of the American Arbitration Association or by any other method agreeable to the Insured and us (Emphasis added)*

Reliance Standard is not interested in pursuing arbitration at this time. Therefore, we respectfully decline your request for arbitration of this claim.

Should you have any questions regarding this matter please feel free to contact me at 1(800)351-7500 ext. 4165.

Sincerely,

Richard D. Walsh
Assistant Manager, Quality Review Unit

**RSL00169**

O B E R | K A L E R
A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699

**Marika M. Ostendorf**
mmostend@ober.com
410-347-7390

**Offices In**
Maryland
Washington, D.C.
Virginia

September 9, 1998

**BY FACSIMILE TRANSMISSION AND U.S. MAIL, POSTAGE PREPAID**
Mr. Richard D. Walsh
Assistant Manager, Quality Review Unit
Reliance Standard Life Insurance Company
2501 Parkway
Philadelphia, Pennsylvania 19130-2499

> **Re:**  **James E. Radican**
> **Claim No.: 1997-346-010**
> **Policy No.: LSC 98842**

Dear Mr. Walsh:

This letter responds to your August 3, 1998 letter regarding the denial of benefits to my client, James E. Radican.

I understand that my client has exhausted his administrative remedies under the terms of the policy. We now wish to invoke the contract language in the "Claims Provisions" section of the contract and proceed with the matter using arbitration. We propose that the parties proceed to arbitration using one arbitrator, under the applicable rules of the American Arbitration Association. In order to confirm your acceptance to arbitrate the matter, please sign below on the designated line and return the signed document to me by September 21, 1998.

Yours truly,

*Marika M. Ostendorf*

Marika McVey Ostendorf

MMO:kmk
cc:    Ms. Hope Fischer
       Mr. James E. Radican

---

Reliance Standard Life Insurance Company agrees to the terms outlined above concerning arbitration of this matter.

_____            _____
Date                                Richard D. Walsh
                                    Assistant Manager, Quality Review Unit
                                    Reliance Standard Life Insurance Company

MMO:210874 1 99998 8:37 AM

**RSL00170**

# OBER | KALER
**A Professional Corporation**
Attorneys at Law

# FACSIMILE

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120
fax 410-547-0699
www.ober.com

1401 H Street, NW
Washington, DC 20005-3324
202-408-8400
fax 202-408-0640

254 N. Washington Street
Falls Church, VA 22046

**TO:** Mr. Richard D. Walsh

**DATE:** September 9, 1998

**FACSIMILE NO:** (215) 787-4254

**TIME:** 3:41pm

**FROM:** Marika McVey Ostendorf, Esquire

**FILE NO:** 019381.059530

**RE:** James E. Radican
Claim No.: 1997-346-010
Policy No.: LSC 98842

**TOTAL PAGES:** 2

* * * IMPORTANT NOTICE * * *

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU. <NOCOVER>

RSL00171

O B E R | K A L E R
A Professional Corporation

**Ober, Kaler, Grimes & Shriver**
Attorneys at Law

120 East Baltimore Street
Baltimore, MD 21202-1643
410-685-1120 / Fax 410-547-0699

**Marika M. Ostendorf**
mmostand@ober.com
410-347-7390

**Offices In**
Maryland
Washington, D.C.
Virginia

September 9, 1998

<u>BY FACSIMILE TRANSMISSION AND U.S. MAIL, POSTAGE PREPAID</u>
Mr. Richard D. Walsh
Assistant Manager, Quality Review Unit
Reliance Standard Life Insurance Company
2501 Parkway
Philadelphia, Pennsylvania 19130-2499

    **Re:**   *James E. Radican*
          *Claim No.: 1997-346-010*
          <u>*Policy No.: LSC 98842*</u>

Dear Mr. Walsh:

    This letter responds to your August 3, 1998 letter regarding the denial of benefits to my client, James E. Radican.

    I understand that my client has exhausted his administrative remedies under the terms of the policy. We now wish to invoke the contract language in the "Claims Provisions" section of the contract and proceed with the matter using arbitration. We propose that the parties proceed to arbitration using one arbitrator, under the applicable rules of the American Arbitration Association. In order to confirm your acceptance to arbitrate the matter, please sign below on the designated line and return the signed document to me by September 21, 1998.

                Yours truly,

                *Marika M. Ostendorf*

                Marika McVey Ostendorf

MMO:kmk
cc:    Ms. Hope Fischer
      Mr. James E. Radican

---

    Reliance Standard Life Insurance Company agrees to the terms outlined above concerning arbitration of this matter.

_____
Date

_____
Richard D. Walsh
Assistant Manager, Quality Review Unit
Reliance Standard Life Insurance Company

MMO:210874 1,9/9/98 8:37 AM

**RSL00172**

 **Reliance Standard Life Insurance Company**®

August 3, 1998


Marika McVey Ostendorf, Esq.
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, MD 21202-1643

Re :        James E. Radican
Claim # :   1997-346-010
Policy # :  LSC 98842

Dear Ms. McVey Ostendorf:

We are writing to you regarding the appeal of our decision to deny benefits to your client, James Radican. Please be advised that Reliance Standard Life Insurance Company ("RSL") strives to treat all clients fairly and evaluate claims submitted to us in an objective and equitable manner.

Under the Employee Retirement Income Security Act ("ERISA") of 1974 you are entitled to an independent review of the claim facts and the determination made regarding your client's eligibility for benefits. Your client's file was referred to our Quality Review Unit to conduct such a review. This review has been conducted separately from the individual(s) who made the original determination to deny your benefits.

We have completed our initial review of the claim file and have found that our original determination to deny liability was appropriate.

We do not have any conclusive evidence to support your client's contention that he *worked* on a full-time basis for Tarmac America, Inc. after January 1, 1996. The letter from B. Edward Pittman, Vice President of Human Resources for Tarmac does not report that your client was working on a full-time basis during 1996 as you report. Rather, the letter states that your client was always considered a full-time salaried exempt employee and was never placed on part-time status. Not only does the letter avoid the issue of hours worked by your client, it appears to admit that he was not working full-time hours when it states:

> The fact that he worked partial days in 1996 following his return to work from surgery should in no way be construed as "part-time" status. Had Mr. Radican been classified a part-time employee, he would have been ineligible for participation in our long term disability benefit at all.

2501 Parkway, Philadelphia, Pennsylvania 19130-2499
(215) 787-4000
(800) 351-7500

RSL00173


**Reliance Standard Life Insurance Company**

-2-

The quotation above is representative of much of the letter. Nowhere in the letter does Mr. Pittman explain the number of hours your client actually worked but instead talks about what status was assigned to him during calendar year 1996. Unfortunately, we are not interested in the employment classification of your client, but rather in the number of hours per week he actually worked.

Every indication we have points to the fact that your client never returned to full-time work after his surgery in 1995. In fact, on at least two separate occasions your client informed us via the telephone that he worked part-time throughout 1996. He informed us that he worked part-time for about one year but was then told that he should apply for disability because the company could no longer accommodate him on a part-time schedule.

The travel expense reports which you provided do not conclusively demonstrate that your client was working on a full-time basis during any time in 1996. The reports show that your client traveled for business during the months of December 1995, and January/August of 1996, but they do not show that he worked on a full-time basis.

Furthermore, we do not understand how you wished us to interpret these expense reports in order to come to the conclusion that they proved your client was a full-time employee. The following example indicates why the expense reports are not a good indicator of hours worked by your client. Your letter relates that your client underwent physical therapy 2x per week for 3 hours per session during December of 1995. Despite a loss of approximately 6 hours per week (not including travel time to and from physical therapy) your client traveled 1,380 miles for work during that month. When compared to August of 1996, when your client was not undergoing physical therapy, we find that your client traveled significantly less miles than he did in December of 1995. In August of 1996 your client traveled 1,050 miles for business despite an extra six hours per week which were not devoted to physical therapy. If we were to determine hours worked using expense reports we would have to come to the conclusion that Mr. Radican worked more hours in December of 1995 than in August of 1996 because of the significantly greater number of miles which he traveled during December of 1995.   It is my understanding that such a conclusion would be inaccurate as your client actually worked less hours in December of 1995 due to physical therapy. Accordingly, it is impossible for us to determine actual hours worked through the use of Mr. Radican's expense reports.

Therefore, based upon the information above and the lack of conclusive evidence of full-time work by your client, we have concluded that our previous decision to deny benefits to your client was appropriate. Accordingly, no benefits are payable and your client's file will remain closed at this time.

We regret that our decision could not have been more favorable to your client, however, we are limited by the provisions of the policy. Please be advised that our claim decision is now final as you have exhausted any administrative remedies available to your client under the terms of his policy.


**RSL** Reliance Standard Life
Insurance Company

-3-

Nothing in this letter should be construed as a waiver of any of RSL's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not specifically mentioned herein.

Sincerely,

Richard D. Walsh
Assistant Manager, Quality Review Unit

**RSL00175**

# APPEAL / ERISA APPEAL REFERRAL

Deck

| | |
|---|---|
| Claimant Name: _____ | Claim Number: _____ |
| Policyholder: _____ | Policy Number: _____ |
| Examiner: _____ | Date of Initial Denial: _____ |
| Phone Extension: _____ | Date Appeal Received: _____ |

Coverage: ☐ Life  ☐ AD&D  ☒ LTD  ☐ STD  ☐ Other: _____

CAS Closed Status Code: _____          ☒ ERISA Appeal          ☐ Non ERISA Appeal

Reason Denied: _____

_____

_____

_____

Additional Comments:

**RSL00176**

LS

Date: _____

(aear 8/96)